IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, AND THE STATES OF CALIFORNIA, FLORIDA, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEW JERSEY, NEW MEXICO, NEW YORK, AND TENNESSEE, AND THE DISTRICT OF COLUMBIA, each ex rel. LYNNTOYA WASHINGTON and MICHAEL T. MAHONEY, | ) ) ) ) ) ) ) ) ) | Civil Action No. 07-CV-461 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| EDUCATION MANAGEMENT CORPORATION et al., | ) ) ) | |
| Defendants. | ) | |

THE UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AND IN THE ALTERNATIVE, TO STRIKE,
JOINED BY THE STATES OF CALIFORNIA, FLORIDA, ILLINOIS, INDIANA,
MINNESOTA, AND THE RELATORS

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     PROCEDURAL BACKGROUND...................................................................2

III.    STATUTORY BACKGROUND REGARDING TITLE IV OF THE HIGHER
        EDUCATION ACT OF 1965 ...........................................................................3

IV.     APPLICABLE PLEADING STANDARDS .......................................................6

V.      ARGUMENT ....................................................................................................9

        A.      THE COMPLAINT SUFFICIENTLY ALLEGES THAT EDMC'S
                COMPENSATION PLAN, AS IMPLEMENTED, VIOLATES THE FCA...........9

                1.      The Complaint Satisfies the Elements of an FCA Claim ...........9

                2.      The Complaint Alleges that EDMC's Quality Factor Ratings Are a
                        Sham and that EDMC Bases Admissions Personnel Compensation
                        Solely on Success in Obtaining Enrollments.............................11

                3.      EDMC Has Implemented its Compensation Plan on a Company-
                        Wide Basis ................................................................................20

                4.      The Complaint Plainly Satisfies the Legal Standard for Pleading
                        Scienter with Respect to EDMC's Compensation Plan as
                        Implemented ...............................................................................24

        B.      EDMC SUBMITTED ACTIONABLE FALSE CLAIMS AND
                STATEMENTS...................................................................................34

                1.      EDMC's Claims and Statements Are Factually False................35

                2.      EDMC is Liable for Submitting False Claims and Statements
                        Under a Fraud in the Inducement Theory ..................................37

                3.      EDMC's Claims and Statements Are False Under a Legally False
                        Certification Theory of Liability................................................39

        C.      EDMC'S NO LOSS ARGUMENT LACKS MERIT .............................44

        D.      EDMC'S COMPENSATION PLAN, AS DESIGNED, DOES NOT
                SATISFY THE SAFE HARBOR ..........................................................46

                1.      The Elements and Purpose of the Safe Harbor ........................47

                2.      EDMC Does Not Pay "Fixed Compensation" Within the Meaning
                        of the Safe Harbor....................................................................49

                3.      As Designed, the Matrix Provides For Salary Adjustments Based
                        Solely on Success in Recruiting Students..................................53

i

E. THE UNITED STATES' COMMON LAW CLAIMS ARE PROPERLY PLEADED AND NOT SUBJECT TO DISMISSAL ............................................54

F. EDMC'S MOTION TO STRIKE SHOULD BE DENIED ...................................60

VI. CONCLUSION.............................................................................................................64

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### CASES

*Ab-Tech Construction, Inc. v. United States,*
    31 Fed Cl. 429 (Fed. Cl. 1994) ............................................................................. 37, 38

*Allison Engine Co., Inc. v. United States ex rel. Sanders,*
    553 U.S. 662 (2008) ............................................................................................ 10

*American Elec. Power Co., Inc. v. Connecticut,*
    ___ U.S. ___, 131 S. Ct. 2527 (2011) ................................................................. 56

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) .................................................................................. 6, 7, 21

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .............................................................................................. 6

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001) ............................................................................................ 56

*Catahama, LLC v. Kerry, Inc.,*
    No. 2:10-cv-1140, 2011 WL 5075225 (W.D. Pa. Oct. 26, 2011) ...................... 6

*Crews v. Cent. States, Se. & Sw. Areas Pension Fund,*
    788 F.2d 332 (6th Cir. 1986) ............................................................................. 59

*Del. Health Care, Inc. v. MCD Holding Co.,*
    893 F. Supp. 1279 (D. Del. 1995) ................................................................ 61, 63

*Delaware River Stevedores v. DiFidelto,*
    440 F. 3d 615 (3d Cir. 2006) .............................................................................. 48

*DOCA Company v. Westinghouse Electric Co., LLC,*
    2011 U.S. Dist. LEXIS 88097 (W.D. Pa. Aug. 9, 2011) ................................... 60

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009) ................................................................................ 6

*Gaer v. Educ. Mgmt.,* (W.D. Pa. No. 10-1061) ...................................................... 23

*Gargiulo v. Isolagen, Inc.,*
    527 F. Supp. 2d 384 (E.D. Pa. 2007) ................................................................ 22

*Gibbons v. Kvaerner Phila. Shipyard, Inc.,*
    No. 05-685, 2006 WL 328362 (E.D. Pa. Feb. 10, 2006) ................................ 7, 8

*Gority v. Norfolk S. Ry. Co.,*
    No. 3:10-cv-87, 2011 WL 4542676, (W.D. Pa. Sept. 28, 2011) ...................................... 60

*Harrison v. Westinghouse Savannah River Co.,*
    176 F.3d 776 (4th Cir. 1999) ...................................................................................... 37

*Hopper v. Solvay Pharm., Inc.,*
    588 F.3d 1318 (11th Cir. 2009) .................................................................................. 10

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) .................................................................................................... 26

*In re Advanta Corp. Sec. Litig.,*
    180 F.3d 525 (3d Cir. 1999) ...................................................................................... 22

*In re Balko,*
    348 B.R. 684 (Bankr. W.D. Pa. 2006) ...................................................................... 23

*In re Cardiac Devices Qui Tam Litig.,*
    221 F.R.D. 318 (D. Conn. 2004) ................................................................................. 8

*Lamb Eng'g & Constr. Co. v. United States,*
    58 Fed. Cl. 106 (Ct. Fed. Cl. 2003) ..................................................................... 33, 34

*Mikes v. Straus,*
    274 F.3d 687 (2d Cir. 2001) ...................................................................................... 35

*Oran v. Stafford,*
    226 F.3d 275 (3rd. Cir. 2000) .................................................................................... 14

*Parker v. NutriSystem, Inc.,*
    620 F.3d 274 (3d Cir. 2010) ...................................................................................... 51

*Picher v. UNITE,*
    646 F. Supp. 2d 759 (E.D. Pa. 2009) ........................................................................ 29

*Pooler v. United States,*
    127 F. 519 (1st Cir. 1904) .......................................................................................... 55

*River Road Dev. Corp. v. Carlson Corp.,*
    No. 89-7037, 1990 U.S. Dist. LEXIS 6201 (E.D. Pa. May 23, 1990) ............................ 61

*Scott v. District of Columbia,*
    101 F.3d 748 (D.C. Cir. 1996) .................................................................................. 56

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,*
    742 F.2d 786 (3d Cir. 1984) .................................................................................. 7, 8

*Staub v. Proctor Hosp.*,
  No. 09-400, slip op. 6-8 (S. Ct. Mar. 1, 2011) ................................................. 31

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) ......................................................................... 23

*United States ex rel. Arnold v. CMC Eng'g*,
  2010 U.S. Dist. LEXIS 102163 (W.D.Pa. Sept. 28, 2010) ............................... 10

*United States ex rel. Cantekin v. Univ. of Pittsburgh*,
  192 F.3d 402 (3d Cir. 1999) ..................................................................... 25, 26

*United States ex rel. Compton v. Midwest Specialties, Inc.*,
  142 F.3d 296 (6th Cir. 1998) ......................................................................... 36

*United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*,
  543 F.3d 1211 (10th Cir. 2008) ......................................................... 35, 39, 42

*United States ex rel. Durcholz v. FKW Inc.*,
  189 F.3d 542 (7th Cir. 1999) ......................................................................... 33

*United States ex rel. Duxbury v. Ortho Biotech Prods.*,
  579 F.3d 13 (1st Cir. 2009) ............................................................................ 8

*United States ex rel. Graves v. ITT Educ. Servs., Inc.*,
  284 F. Supp. 2d 487 (S.D.Tex. 2003) ....................................................... 42, 43

*United States ex rel. Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) .......................................................................... 8

*United States ex rel. Hagood v. Sonoma County Water Agency*,
  929 F.2d 1416 (9th Cir. 1991) ....................................................................... 37

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
  352 F. 3d 908 (4th Cir. 2003) ......................................................... 25, 31, 32, 37

*United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*,
  495 F.3d 103 (3d Cir. 2007) ..................................................................... 10, 26

*United States ex rel. Hendow v. University of Phoenix*,
  461 F.3d 1166 (9th Cir. 2006) ............................ 25, 34, 37, 38, 40, 41, 42, 44

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*,
  647 F.3d 377 (1st Cir. 2011) ..................................................................... 39, 41

*United States ex rel. Kirk v. Schindler Elevator Corp.*,
  601 F.3d 94 (2d Cir. 2010) ............................................................................ 10

*United States ex rel. LaCorte v. SmithKline Beecham Clinical Lab.,*
   149 F.3d 227 (3d Cir. 1998)......................................................................... 7

*United States ex rel. Landsberg v. Levinson,*
   No. 03-1429 (W.D. Pa. Feb. 13, 2006) ...................................................... 7, 8

*United States ex rel. Lee v. Corinthian Colleges,*
   655 F.3d 984 (9th Cir. 2011) ....................................... 7, 19, 20, 24, 25, 33, 47

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.,*
   614 F.3d 1163 (10th Cir. 2010) ..................................................................... 8

*United States ex rel. Lisitza v. Johnson & Johnson,*
   765 F. Supp. 2d 112 (D. Mass. 2011) ........................................................... 40

*United States ex rel. Main v. Oakland City Univ.,*
   426 F.3d 914 (7th Cir. 2005) ....................................... 34, 38, 40, 41, 42, 43, 45

*United States ex rel. Marcus v. Hess,*
   317 U.S. 537 (1943)..................................................................................... 37

*United States ex rel. Mayman v. Martin Marietta Corp.,*
   894 F. Supp. 218  (D. Md. 1995) .................................................................. 57

*United States ex rel. Pilecki-Simko v. Chubb Inst.,*
   No. 10-3907, 2011 WL 3890975 (3d Cir. Sept. 6, 2011) .................... 27, 28, 30

*United States ex rel. Powell v. Am. InterContinental Univ., Inc.,*
   756 F. Supp. 2d 1374 (N.D. Ga. 2010) .................................................. 22, 41

*United States ex rel. Purcell v. MWI Corp.,*
   254 F. Supp. 2d 69 (D.D.C. 2003)......................................................... 56, 58

*United States ex rel. Quinn v. Omnicare, Inc.,*
   382 F.3d 432 (3d Cir. 2004)................................................................... 40, 42

*United States ex rel. Roberts v. Aging Care Home Health, Inc.,*
   474 F. Supp. 2d 810 (W.D. La. 2007).......................................................... 57

*United States ex rel. Roberts v. Aging Care Home Health, Inc.,*
   No. 02-2199, 2008 WL 2945946 (W.D. La. July 25, 2008)............................ 57

*United States ex rel. Rost v. Pfizer,*
   507 F.3d 720 (2007).................................................................................... 8

*United States ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Texas,*
   545 F.3d 256 (3d Cir. 2008)......................................................................... 44

*United States ex rel. Schmidt v. Zimmer, Inc.*,
   386 F.3d 235 (3d Cir. 2004)........................................................................ 10

*United States ex rel. Schumann v. AstraZeneca PLC*,
   No. 03-5423, 2010 WL 4025904 (E.D. Pa. Oct. 13, 2010) ............................ 22

*United States ex rel. Singh v. Bradford Reg'l Med. Ctr.*,
   No. 04-186, 2006 WL 2642518 (W.D. Pa. Sept. 13, 2006)........................ 7, 8, 9

*United States ex rel. Steury v. Cardinal Health, Inc.*,
   625 F.3d 262, (5th Cir. 2010 ...................................................................... 10

*United States ex rel. Thomas v. Siemens AG*,
   2010 U.S. Dist. LEXIS 40442, 2010 WL 1688582 (E.D. Pa. April 23, 2010)................ 10

*United States ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*,
   No. 5:00-CV-39-M, 2004 WL 2403114 (W.D. Ky. Sep. 30, 2004) ............................ 59

*United States ex rel. Tyson v. Amerigroup Illinois, Inc.*,
   488 F. Supp. 2d 719 (N.D. Ill. 2007) ........................................................ 33

*United States ex rel. Underwood v. Genentech, Inc.*,
   720 F. Supp. 2d 671 (E.D. Pa. 2010) ........................................................ 7, 8

*United States ex rel. Wilkins v. United Health Grp., Inc.*,
   659 F.3d 295 (3d Cir. 2011)................................................................ 35, 39, 42

*United States v. Acme Process Equip. Co.*,
   385 U.S. 138 (1966).................................................................................. 41

*United States v. Albinson*,
   2010 U.S. Dist. LEXIS 83644, 2010 WL 3258266 (D.N.J. August 16, 2010)................ 10

*United States v. Applied Pharmacy Consultants, Inc.*,
   182 F.3d 603 (8th Cir. 1999) .................................................................... 57

*United States v. Borin*,
   209 F.2d 145 (5th Cir. 1954) ................................................................ 56, 57

*United States v. Bouchey*,
   860 F. Supp 890 (D.D.C. 1994) ............................................................ 56, 57

*United States v. Chubb Institute*,
   2010 U.S. Dist. LEXIS 27187, 2010 WL 1076228 (D.N.J. March 22, 2010)................ 10

*United States v. First Nat'l Bank of Cicero*,
   957 F.2d 1362 (7th Cir. 1992) .................................................................. 37

*United States v. Lahey Clinic Hosp., Inc.,*
    399 F.3d 1 (1st Cir. 2005) ................................................................ 55, 56

*United States v. Mead,*
    426 F.2d 118 (9th Cir. 1970) ................................................................ 57

*United States v. Moffitt, Zwerling & Kemler, P.C.,*
    83 F.3d 660 (4th Cir. 1996) ............................................................ 55, 56

*United States v. Neifert-White Co.,*
    390 U.S. 228 (1968) ............................................................................ 38

*United States v. Rogan,*
    459 F. Supp. 2d 692 (N.D. Ill. 2006) ................................................ 58

*United States v. Rogan,*
    517 F.3d 449 (7th Cir. 2008) ........................................................ 45, 46

*United States v. Science Applications Int'l Corp.,*
    626 F.3d 1257 (D.C. Cir. 2010) ......................................................... 31

*United States v. Silliman,*
    167 F.2d 607 (3d Cir. 1948) ............................................................... 55

*United States v. Stevens,*
    605 F. Supp. 2d 863 (W.D. Ky. 2008) .......................................... 57, 58

*United States v. Texas,*
    507 U.S. 529 (1993) ...................................................................... 55, 56

*United States v. Univ. Hosp. at Stony Brook,*
    No. 97-cv-3463, 2001 WL 1548797 (E.D.N.Y. Oct 26, 2001) ........................ 57

*Vicom, Inc. v. Harbridge Merchant Servs.Inc.,*
    20 F.3d 771 (7th Cir. 1994) ................................................................ 23

*Wayne Moving & Storage of N.J., Inc. v. School Dist. of Phila.,*
    625 F.3d 148 (3d Cir. 2010) ............................................................... 59

*Yi v. Sterling Collision Centers, Inc.,*
    480 F.3d 505 (7th Cir. 2007) ........................................................ 50, 51

## STATUTES

15 U.S.C. § 78u-4(b)(2) ......................................................................... 22

20 U.S.C. § 1094(a) ............................................................................... 3

20 U.S.C. § 1094(a)(20) ................................................................... 4, 40, 47

20 U.S.C. § 1094(c)(1)(A) ........................................................................................ 5

20 U.S.C. § 1094(c)(1)(F) ...................................................................................... 40

20 U.S.C. § 1094(c)(1)(G) ..................................................................................... 40

20 U.S.C. § 1094(c)(3)(B) ...................................................................................... 40

31 U.S.C. § 3729(a)(1) ............................................................................................. 9

31 U.S.C. § 3729(a)(1)(B) .............................................................................. 10, 34

31 U.S.C. § 3729(a)(2) ........................................................................................... 10

34 C.F.R. § 668.14 ................................................................................................... 3

34 C.F.R. § 668.14(b)(22) .................................................................................... 4, 5

34 C.F.R. § 668.14(b)(22)(ii)(A) ............................................................................ 5

34 C.F.R. § 668.83 ................................................................................................. 40

34 C.F.R. §§ 668.23 (a)(2) ...................................................................................... 5

34 C.F.R. §§ 668.23 (a)(4) ...................................................................................... 5

67 Fed. Reg. 51723, 67056 (8/8/02) ..................................................................... 47

FERA, Pub. L. No. 11121, 123 Stat. 1617 (2009) ................................................ 10

## OTHER AUTHORITIES

5C Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure .......................... 60

Federal Rule of Civil Procedure 12(f) ............................................................. 60, 61

Federal Rule of Civil Procedure 9(b) ..................................................................... 25

H.R. Rep. No. 447 .................................................................................................. 36

H.R. Rep. No. 447, 102d Cong., 2d Sess. ............................................................... 4

S. Rep. No. 58, 102d Cong., 1st Sess. (1991) ........................................... 4, 35, 36

S. Rep. No. 99-345 ................................................................................................. 38

## I.  <u>INTRODUCTION</u>

The United States' Complaint in Intervention sets forth abundant allegations of actionable and systemic false claims by EDMC that have enabled the for-profit education company to receive more than $11 billion in federal taxpayer funds since 2003, including $2.6 billion in fiscal 2011 alone.   The Complaint includes dozens of detailed allegations, pleaded with particularity, setting out EDMC's scheme to design and implement an illegal compensation plan for its admissions personnel in order to continue to receive the taxpayer funds that account for up to 90% of its net revenue.

Notwithstanding the breadth and depth of the Complaint's averments regarding EDMC's wrongdoing, EDMC has filed a Motion to Dismiss, asserting that this case is about "at most a disputed technical violation of a regulation."  EDMC's mischaracterization of the importance of this case and its efforts to trivialize the magnitude of its own fraudulent conduct are staggering. The statutory provision at the heart of this case, the Higher Education Act's Incentive Compensation Ban, is the cornerstone of the federal government's regulation of for-profit colleges.   The Ban is critical to the integrity of federal student aid programs, assuring that recruiters are properly incentivized to evaluate students based on how much the students can gain from the education, rather than how much bonus money the students' enrollment can generate for the recruiters.  Congress passed the Incentive Compensation Ban in 1992 based on evidence of serious abuses in federal student loan programs, and the Complaint illustrates that EDMC's conduct over the last eight years has revisited on taxpayers and prospective students alike the very sorts of serious abuses that Congress acted to outlaw.  EDMC's unlawful compensation scheme emanates from the highest levels of the corporation, operates company-wide, and represents a conscious effort to do exactly what the Incentive Compensation Ban prohibits – provide incentive payments to recruiters based on the number of students they enroll.

In its Motion to Dismiss, EDMC misstates the applicable law; conflates independent requirements of the relevant statutory framework; ignores the majority of the allegations in the Complaint; and attempts to recast or dispute the remaining allegations in a manner that is improper at the pleading stage. The Complaint's False Claims Act and common law claims, however, are well-pleaded and legally sufficient, and the Court should deny EDMC's Motion to Dismiss in its entirety.

## II.   PROCEDURAL BACKGROUND

Plaintiff, the United States of America, alleges in this lawsuit that Defendants' (collectively "EDMC") compensation plan for admissions personnel,[1] as implemented by EDMC from July 1, 2003 to the present, violates the federal False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"). (Compl. Counts I-III.) The United States further alleges that EDMC's compensation plan, as designed and as implemented from July 1, 2003 to the present, violates the common law, resulting in unjust enrichment and payment by mistake to EDMC. (Compl. Counts IV-V.)

The States of California, Florida, Illinois, Indiana, and Minnesota (collectively "the States") have also intervened as plaintiffs in this action, bringing claims under their respective state false claims statutes and the common law. California, Florida, Illinois, Indiana and the United States filed a Joint Complaint in Intervention ("Complaint") on August 8, 2011. Minnesota subsequently filed its own Complaint in Intervention, which realleged and incorporated paragraphs 36 through 168 of the Complaint.[2] The States, along with Relators Lynntoya Washington and Michael Mahoney ("Relators"), join the United States' Memorandum

---

[1] The United States' use of the term "admissions personnel" in the Joint Complaint in Intervention and this Memorandum encompasses any EDMC employee engaged in any student recruiting or admissions activities or in making decisions regarding the award of student financial assistance.

[2] In light of the fact that paragraph 20 of Minnesota's Complaint in Intervention realleged and incorporated paragraphs 36 through 168 of the Complaint, subsequent references to the Complaint in this Memorandum encompass Minnesota's allegations in this case.

of Law in Opposition to Defendants' Motion to Dismiss and, in the Alternative, to Strike ("Memorandum").[3] For ease of reference, this Memorandum hereinafter refers to the United States, the States, and Relators collectively as "the United States," unless specifically noted otherwise.

Because the Complaint satisfies the requirements of Rules 8, 9, and 12 of the Federal Rules of Civil Procedure, the United States respectfully requests that this Court deny EDMC's Motion to Dismiss and to Strike the Complaint.

## III.   STATUTORY BACKGROUND REGARDING TITLE IV OF THE HIGHER EDUCATION ACT OF 1965

Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070 *et seq.*, Congress established various student loan and grant programs (collectively "Title IV programs") in order to financially assist eligible students in obtaining a post-secondary education. (Compl. ¶ 36.)   Although the mechanism by which Title IV program funding ("Title IV funding") is disbursed to eligible students varies, each Title IV program requires compliance with specific conditions as a prerequisite to obtaining federal funds.  (Compl. ¶ 37.)

In order to become eligible to receive Title IV funding or to have its students receive Title IV funding, a post-secondary educational institution such as EDMC must first enter into a program participation agreement ("PPA") with the United States Department of Education ("ED").   20 U.S.C. § 1094(a); 34 C.F.R. § 668.14.   (Compl. ¶ 38.)   Each PPA expressly conditions a school's initial and continuing eligibility to receive Title IV funding on compliance with specific statutory requirements, including 20 U.S.C. § 1094 and 34 C.F.R. § 668.14. (Compl. ¶ 39.)

---

[3] In addition to joining the United States' Memorandum, the States and Relators are filing a separate Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("States' Memorandum") to address issues pertinent to the States and Relators.

Title IV of the HEA explicitly requires that schools: "[w]ill not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. . . ." 20 U.S.C. § 1094(a)(20) ("Incentive Compensation Ban").   Title IV of the HEA expressly conditions the initial and continuing eligibility of schools to obtain Title IV funding on the requirement that the schools comply with the Incentive Compensation Ban.  (Compl. ¶ 40.) Congress enacted the prohibition against paying commissions, bonuses, or other incentive payments based on success in recruiting students in 1992 because it determined that such payments were associated with serious program abuses and high loan default rates, which in turn resulted in a significant drain on program funds where the government acts as a loan guarantor. *See* S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").

The HEA's Incentive Compensation Ban is also reiterated in the federal regulations which specify the requirements to which schools must expressly agree in PPAs. 34 C.F.R. § 668.14(b)(22) ("Incentive Compensation Regulations").  (Compl. ¶ 41.)  In 2002, the Incentive Compensation Regulations accompanying the Incentive Compensation Ban were amended to clarify, among other things, that schools may pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of

students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) ("Safe Harbor").  (Compl. ¶ 42.)

In each PPA, an educational institution certifies that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."  (Compl. ¶ 43 and Exs. 1-3 to Compl.)  The PPA then states, *inter alia*, that

> [b]y entering into this Program Participation Agreement, the Institution agrees that . . . (22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance. . . .

(Compl. ¶ 43 and Exs. 1-3 to Compl.)

In order to maintain its eligibility to receive Title IV funding, each year an educational institution that participates in any Title IV program also must provide ED with an annual compliance audit of its administration of Title IV programs, and an audit of the institution's general purpose financial statements, prepared by independent auditors.  20 U.S.C. § 1094(c)(1)(A); 34 C.F.R. §§ 668.23 (a)(2)  & (a)(4) .  (Compl. ¶ 44.)  ED uses the results of the compliance and financial audits to determine whether schools are adhering to applicable requirements for Title IV funding, including the Incentive Compensation Ban.  As part of the annual audits, EDMC is required to certify that it complies with the requirements for eligibility to participate in Title IV programs, including the Incentive Compensation Ban.  (Compl. ¶ 44 and Ex. 4 to Compl.)  Specifically, EDMC must certify that it has "[n]ot paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments, financial aid to students, or student retention [34 C.F.R. § 668.14(b)(22)]."  (Compl. ¶ 44 and Ex. 4 to Compl.)

IV.   **APPLICABLE PLEADING STANDARDS**

A motion to dismiss pursuant to Rule 12(b)(6) challenges the legal sufficiency of the complaint.   In assessing the complaint's sufficiency, the court must accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).   While a "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265 286 (1986)), this Court has noted that

> nothing in *Twombly* or *Iqbal* has changed the other pleading standards for a motion to dismiss pursuant to Rule 12(b)(6). That is, the Supreme Court did not impose a new, heightened pleading requirement, but reaffirmed that Federal Rule of Civil Procedure 8 requires only a short, plain statement of the claim showing that the pleader is entitled to relief, not "detailed factual allegations." *See Phillips v. Co. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citing *Twombly*, 550 U.S. at 552–53). Additionally, the Supreme Court did not abolish the Rule 12(b)(6) requirement that "the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Id.* (citing *Twombly*, 550 U.S. at 553).

*Catahama, LLC v. Kerry, Inc.*, No. 2:10-cv-1140, 2011 WL 5075225, at *3 (W.D. Pa. Oct. 26, 2011).

After accepting as true all well-pleaded facts and drawing all reasonable inferences therefrom in the plaintiff's favor, the court reviewing a motion to dismiss must determine whether the plaintiff has complied with Federal Rule of Civil Procedure 8 by "stat[ing] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A complaint is facially plausible when the pleadings "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949.

In addition to meeting the requirements of Federal Rule of Civil Procedure 8, actions under the FCA must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See United States ex rel. LaCorte v. SmithKline Beecham Clinical Lab.*, 149 F.3d 227, 234 (3d Cir. 1998); *see also United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011). Rule 9(b) does not require a plaintiff alleging fraud to particularize *all* of its allegations. Rather, "Rule 9(b) requires only that the *circumstances of fraud* be stated with particularity; other facts may be plead generally, or in accordance with Rule 8." *Lee*, 655 F.3d at 992 (citing *Iqbal*, 129 S. Ct. at 1954) (emphasis in original).

Courts in the Third Circuit apply Rule 9(b) with flexibility and have "cautioned against overemphasizing [Rule 9(b)'s] specificity requirement." *United States ex rel. Underwood v. Genentech, Inc.*, 720 F. Supp. 2d 671, 676 (E.D. Pa. 2010); *see also United States ex rel. Singh v. Bradford Reg'l Med. Ctr.*, No. 04-186, 2006 WL 2642518, at *4 (W.D. Pa. Sept. 13, 2006) (describing the Third Circuit's flexible approach to Rule 9(b)); *United States ex rel. Landsberg v. Levinson*, No. 03-1429 (W.D. Pa. Feb. 13, 2006) (same); *Gibbons v. Kvaerner Phila. Shipyard, Inc.*, No. 05-685, 2006 WL 328362, at *5 (E.D. Pa. Feb. 10, 2006) (same). Indeed, the Third Circuit has warned that "focusing exclusively on [Rule 9(b)'s] 'particularity' language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984) (internal citation and quotation marks omitted). Rather, "Rule 9(b) must be read with Federal Rule of Civil Procedure 8, which requires the plaintiff to allege a 'short and plain statement of the claim' and directs that averments in pleadings shall be 'simple, concise, and

direct.'" *Gibbons*, 2006 WL 328362 at *5 (quoting Fed. R. Civ. P. 8(a)(2)).  Plaintiffs in the

Third Circuit may satisfy Rule 9(b) with allegations of the "date, place, or time" of the allegedly

fraudulent conduct, though they "are free to use alternative means of injecting precision and

some measure of substantiation into their allegations of fraud." *Seville*, 742 F.2d at 791.

Additionally, courts have relaxed the pleading standard under Rule 9(b) where, as here,

the alleged scheme is complex, long-lasting, and involves a large and unwieldy number of false

claims.  *See, e.g.*, *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D. Conn. 2004)

(explaining that "[f]requently [] in cases involving complex or extensive schemes of fraud, the

courts have relaxed the pleading requirements of Rule 9(b)" and listing cases).  Courts also apply

Rule 9(b) more flexibly "when the specific factual information is peculiarly within the

defendant's knowledge or control."  *Id.* at 334; *see also United States ex rel. Grubbs v.

Kanneganti*, 565 F.3d 180, 190-91 (5th Cir. 2009).[4]

---

[4] In discussing the pertinent pleading standards, EDMC contends in passing that the United States must identify specific false claims to satisfy Federal Rule of Civil Procedure Rule 9(b).  This assertion is incorrect. Setting aside the fact that the United States has identified specific false claims, *see* Compl. ¶¶ 166-68, the cases EDMC cites are outdated, inapplicable, and entirely out of step with the law.  For example, EDMC relies on an unpublished decision from a Utah district court that rejected the relators' second amended complaint for failing to identify any specific false claims.  *See United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, No. 02-904, 2008 U.S. Dist. LEXIS 29619 (D. Utah Apr. 9, 2008).  EDMC neglects to mention that the Tenth Circuit later reversed the district court's order dismissing the relators' third amended complaint, and in doing so, rejected the district court's rigid interpretation of Rule 9(b).  *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167 (10th Cir. 2010)  The Tenth Circuit specifically held that "claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Id.* at 1172.  Similarly, EDMC relies on the First Circuit's outdated, rigid articulation of Rule 9(b) in *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220 (1st Cir. 2004), without acknowledging the First Circuit's recent softening of this standard.  *See United States ex rel. Rost v. Pfizer*, 507 F.3d 720, 732 (2007)("*Karvelas* recognized that Rule 9(b) may be satisfied where, although some questions remain unanswered, the complaint as a whole is sufficiently particular to pass muster under the FCA."); *United States ex rel. Duxbury v. Ortho Biotech Prods.*, 579 F.3d 13 (1st Cir. 2009) (applying Rule 9(b) "flexibly").  Finally, EDMC cites the District Court for the Eastern District of Pennsylvania's unpublished decision in *United States ex rel. Schmidt v. Zimmer*, No. 00-1044, 2005 WL 1806502, at *3 (E.D. Pa. July 29, 2005), which dismissed the relators' complaint where, unlike here, the relator "failed to identify with particularity a specific false claim."  *Zimmer* is out of step with the majority of more recent Third Circuit district court cases that apply Rule 9(b) flexibly and do not require plaintiffs to identify specific false claims. *See, e.g.*, *Underwood*, 720 F. Supp. 2d at 676; *Singh*, 2006 WL 2642518, at *4; *Landsberg v. Levinson*, No. 03-1429 (W.D. Pa. Feb. 13, 2006); *Gibbons*, 2006 WL 328362, at *5.  Moreover, *Zimmer* relied on outdated and inapplicable authority, including *Karvelas*, and *United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432 (3d Cir. 2004), a Third Circuit case requiring the identification of actual false claims *at the summary judgment*

## V.   ARGUMENT

### A.   THE COMPLAINT SUFFICIENTLY ALLEGES THAT EDMC'S COMPENSATION PLAN, AS IMPLEMENTED, VIOLATES THE FCA

The United States alleges with sufficient plausibility and particularity that from July 1, 2003 to the present, EDMC has implemented its company-wide compensation plan for admissions personnel in a manner that violates the FCA.   Specifically, although EDMC's compensation plan, as designed, purports to evaluate admissions personnel based on both quality factors and on the number of students they recruit, in practice, the sole factor that determines changes to the compensation of EDMC admissions personnel is the number of students they recruit.  Stated differently, the Complaint sufficiently alleges that EDMC's quality factor ratings are a sham, that EDMC's statements that it is not paying incentive compensation are false, and that it knows, or recklessly disregards, the fact that it is implementing its compensation plan in a way that violates Title IV of the HEA's Incentive Compensation Ban.   Accordingly, the United States has stated a claim upon which relief can be granted under the FCA pursuant to Federal Rule of Civil Procedure 12(b)(6), and has satisfied the pleading requirements of Rules 8 and 9(b) of the Federal Rules of Civil Procedure.

### 1.    The Complaint Satisfies the Elements of an FCA Claim

Under the false claims provision of the FCA, a person is liable to the United States government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . [a] false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(1986).  The false statements provision of the FCA imposes liability on anyone who "knowingly makes, uses, or causes to be made or

---

*stage. See also Singh*, 2006 WL 2642518, at *5 (distinguishing *Omnicare* because it involved a motion for summary judgment rather than a motion to dismiss).

used, a false record or statement material to a false or fraudulent claim; . . . ." 31 U.S.C. § 3729(a)(1)(B). [5]

A claim is "knowingly" false within the meaning of the FCA if the defendant has "actual knowledge," "deliberate ignorance," or "reckless disregard" of the truth or falsity of the information in the claim to the Government. *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir. 2007) (citing 31 U.S.C. § 3729(b)). To establish a prima facie claim under the FCA, a plaintiff bringing an action under 31 U.S.C. § 3729(a)(1) "must show that: '(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.' In order to prove a claim under § 3729(a)(2), a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004).

---

[5] The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 11121, 123 Stat. 1617 (2009), modified and renumbered former subsections 31 U.S.C. §3729(a)(1) and (a)(2) of the FCA. While the changes to former section 3729(a)(1) are not retroactive, FERA provides that the changes to former section 3729(a)(2) – now 3729(a)(1)(B) – "apply to all claims under the False Claims Act (31 U.S.C. 3729 *et seq.*) that are pending on or after [June 7, 2008]." FERA, § 4(f)(1). The majority of appellate courts to consider this language have concluded that it was intended to make the changes to former section 3729(a)(2) retroactive to all pending cases. *See United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94 (2d Cir. 2010), *rev'd on other grounds*, 131 S.Ct. 1885 (2011); *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1. The Third Circuit has not addressed the retroactivity of section 3729(a)(1)(B), but it must be noted that some courts, including several district courts within the Third Circuit, have found that "claims" in this context refers to claims for payment, rather than claims pending in litigation. *See Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1323 n.2, 1327 n.3 (11th Cir. 2009); *United States ex rel. Arnold v. CMC Eng'g*, 2010 U.S. Dist. LEXIS 102163 (W.D.Pa. Sept. 28, 2010); *United States ex rel. Thomas v. Siemens AG*, 2010 U.S. Dist. LEXIS 40442, 2010 WL 1688582, at *4 n.6 (E.D. Pa. April 23, 2010); *United States v. Chubb Institute*, 2010 U.S. Dist. LEXIS 27187, 2010 WL 1076228, at *4 n.10 (D.N.J. March 22, 2010); *United States v. Albinson*, 2010 U.S. Dist. LEXIS 83644, 2010 WL 3258266, at *8-9 (D.N.J. August 16, 2010). None of these cases represent controlling authority and this Court should follow the weight of well-reasoned appellate authority and apply amended section 3729(a)(1)(B) in this case. Accordingly, the Complaint, and this Memorandum hereinafter, cite to old section 3729(a)(1) and new section 3729(a)(1)(B). However, the analysis in this case is not affected by which version – 3729(a)(2) or 3729(a)(1)(B) – applies, because the only difference between the two provisions is that the former required proof that the defendant intended its false claims to affect the government's payment decision, *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 553 U.S. 662 (2008), and here the Complaint clearly alleges, and it cannot be disputed, that EDMC's representations in its PPAs were made for the very purpose of qualifying for federal student loans and grants. (Compl. ¶ 276.)

The Complaint's allegations regarding EDMC's implementation of its compensation plan follow precisely the three elements of FCA liability described above. First, depending on the type of Title IV funding at issue, EDMC either submits claims for funding directly to ED, or causes its students to make such claims so that ED will pay the students' tuition directly to EDMC. Second, those claims for payment are false within the meaning of the FCA because they are based on EDMC's false statements to the federal government in EDMC's PPAs and other documents that EDMC is in compliance with the Incentive Compensation Ban. Third, EDMC knows it is in violation of the Incentive Compensation Ban and therefore, that the claims for financial aid used to pay EDMC's tuition are false.

EDMC does not challenge that that the first element is met in this case, i.e. that funding claims were submitted directly or indirectly to ED. Rather, EDMC attacks the Complaint's allegations as they relate to the second element (falsity) and third element (scienter). For the reasons set forth in more detail below, the United States has satisfied these two contested elements of a prima facie claim under the FCA.

> **2.      The Complaint Alleges that EDMC's Quality Factor Ratings Are a Sham and that EDMC Bases Admissions Personnel Compensation Solely on Success in Obtaining Enrollments**

The United States alleges that, under EDMC's compensation plan as implemented, the quality factor ratings EDMC assigns to admissions personnel are a sham, and EDMC bases the compensation of admissions personnel solely on their success in obtaining student enrollments, in direct violation of Title IV of the HEA's Incentive Compensation Ban. Accordingly, each time EDMC states in its PPAs and annual audits, among other documents, that it is not paying incentive compensation, i.e. that it is compliant with the Incentive Compensation Ban, such statements are false.

The centerpiece of EDMC's compensation plan for admissions personnel is a table, with rows and columns, that EDMC refers to as "the Matrix." (Compl. ¶ 96.) The Matrix is featured in each iteration of EDMC's compensation plan for admissions personnel, and EDMC distributes it to those personnel. (Compl. ¶¶ 92, 95, 96.) The Matrix sets forth the number of "New Student Points" that an ADA[6] must attain in order to achieve a particular compensation level. (Compl. ¶ 97.) EDMC calculates New Student Points based on the number of students the ADA recruits. (Compl. ¶ 97.) Pursuant to the Matrix as designed, EDMC managers assign "quality factor" ratings, such as "needs improvement," "meets expectations," "highly effective," and "outstanding," that purport to adjust the employee's compensation within the level set by the number of students recruited. (Compl. ¶¶ 93, 97.) In practice, however, the quality factor ratings EDMC assigns to admissions personnel are a sham, and EDMC bases the compensation of admissions personnel solely on their success in obtaining student enrollments.

The Complaint includes both general allegations that provide clear notice to EDMC regarding the precise nature of its wrongdoing, and detailed, specific allegations that describe the "who, what, when, where, and why" of EDMC's fraudulent conduct. Taken together, these allegations easily overcome EDMC's motion to dismiss the United States' claim that EDMC's compensation plan, as implemented, violates the FCA.

The more general allegations, which provide clear notice to EDMC of the United States' basis for recovery, include the following:

> 154.   . . . . In practice, EDMC's so-called "quality factors" are nothing more than window-dressing, used to camouflage a compensation system that, in

---

[6] EDMC acknowledges on page 4 of its Brief that it "employ[s] people to recruit students," and notes that such admissions personnel (as defined by the United States in footnote 1 herein) are called "Associate Directors of Admission or Assistant Directors of Admission (collectively, "ADAs")." (Defs.' Br. 4.) The United States' use of the terms "ADA" and "ADAs" in the Complaint and in this Memorandum is not inconsistent with EDMC's definition.

reality, is driven entirely by student enrollment numbers and adjusts compensation based solely on the number of students recruited. In implementing its compensation system, EDMC creates an environment in which admissions employees understand that their compensation is determined solely by the number of students they enroll. . . .

As a matter of course, the quality ratings were assigned to admissions employees by supervisors who were not trained on how to rate the "quality" attributes of an ADA, who paid no attention to the "quality" attributes of an ADA, and instead were trained to focus on, and did focus, solely on the ADA's success in obtaining student enrollments.

(Compl. ¶ 154.) These allegations go beyond simply stating that EDMC has violated the

Incentive Compensation Ban and fails to qualify for the Safe Harbor. They explain how, in

practice, EDMC renders meaningless the quality factors listed in its written compensation plan

and assigns sham quality factor ratings to its admissions personnel.

The Complaint is also replete with detailed examples demonstrating how, in

implementing its compensation plan, EDMC completely ignores the quality factors, focuses

exclusively on the number of students its admissions personnel recruit, instructs ADAs that the

quality factor ratings they receive under EDMC's compensation plan are meaningless, and

ultimately bases admissions personnel compensation solely on the number of students recruited.

(Compl. ¶¶ 100, 120-126, 134-150, 389-404[7].) For example, one of the very executives

responsible for creating EDMC's company-wide compensation plan advised an ADA that EDMC

invented the quality factors merely to circumvent the Incentive Compensation Ban:

389.   In 2007, Jan Anton, a Vice President at Ai Chicago and a member of the committee that designed the compensation plan, advised an ADA at her evaluation that quality factors were insignificant relative to ADA payments and were created for the purpose of getting around the Incentive Compensation Ban.

---

[7] The United States hereby incorporates paragraphs 389 through 404 of the Complaint filed August 8, 2011, in accordance with Rule 10(c) of the Federal Rules of Civil Procedure.

(Compl. ¶ 389.)  This allegation, by itself, states the *who* (Jan Anton); the *what* (EDMC created a system of insignificant quality ratings); the *when* (she said it in 2007 about a compensation plan created in 2003); the *where* (in her role on the EDMC Compensation Task Force); and the *why* (to get around the Incentive Compensation Ban).  Ms. Anton is not the only high-ranking EDMC executive to express this view.  Stephen Weiss, the President of the EDMC division responsible for enrolling 25% of EDMC's students,[8] expressed a similar view to Relator Lynntoya Washington:

> 138.    On August 24, 2005, while meeting with EDMC's then-President of Online Higher Education Stephen Weiss, Ms. Washington expressed concerns about a recent dip in her "quality factor" rating.  Mr. Weiss responded by explaining to Ms. Washington that because she had met her student enrollment numbers, her "quality factor" rating would have no effect whatsoever on her compensation.

(Compl. ¶ 138.)  Again, this allegation includes the *who* (Stephen Weiss), *what* (quality factor rating has no effect on ADA compensation), *when* (August 24, 2005), *where* (at EDMC's Online Higher Education Division), and *why* (because student enrollment numbers are the only factor that affects ADA compensation).  These allegations identify specific EDMC managers, on particular dates, at multiple EDMC locations, both of whom confirm that quality ratings are not assigned for any purpose other than to disguise EDMC's sole focus on ADAs' success in obtaining student enrollments.  At the motion to dismiss stage, the Court must accept these allegations as true and draw all reasonable inferences therefrom in favor of the United States.  Thus, the Court may reasonably infer from these allegations that, in practice, quality ratings did not matter to ADA compensation.

---

[8] *See* EDMC's Annual Report on Form 10-K, filed with the United States Securities and Exchange Commission ("SEC") on August 30, 2011 ("EDMC's 2011 Annual Report"), at p. 10:  "The average enrollment for fully online students represented 27.5% of our total average student enrollment in fiscal 2011 compared to 24.5% in fiscal 2010."  The Court may take judicial notice of information contained in filings made to the SEC.  *See, e.g., Oran v. Stafford,* 226 F.3d 275, 289 (3rd. Cir. 2000); Defs.' Br. 2, n.4.  Further, EDMC attached certain pages of its 2011 Annual Report as Exhibit 2 to its Motion.

Although Ms. Anton's and Mr. Weiss' statements, standing alone, render the Complaint sufficient under Rule 9(b), nevertheless, many additional allegations further show how EDMC, in actuality, bases ADA compensation exclusively on student enrollment, and further particularize the circumstances of EDMC's fraud.

First, the Complaint explains how, in practice, every tool EDMC uses to set goals for, track, report, and evaluate ADAs' performance focuses exclusively on student enrollments, to the complete exclusion of quality factors. (Compl. ¶¶ 121-126, 137, 139, 398-403.) For example:

> 121. EDMC continually measures each ADA against his or her "Student Start Plan."
>
> \* \* \*
>
> 125. Quality factors are not discussed or included in an ADA's Student Start Plan, Plan to Make Plan, or documents EDMC uses to track ADAs' performance against their Student Start Plans. To the contrary, the Student Start Plan, Plan to Make Plan, and associated tracking documents focus entirely on the number of students the ADA enrolls and only measure quantitative factors.
>
> 126. EDMC managers who supervise ADAs use Student Start Plan documents, and other similar documents, as part of each ADA's review every six months, and to provide regular informal feedback to ADAs. Typically, ADAs are told at the end of their reviews exactly how many student enrollments they need to procure during the next six-month review period in order to be on track to reach their identified financial goals. ADAs are not given any similar prodding or incentivizing with respect to any "quality factors." EDMC presents an ADA's ability to reach her financial goals as solely a matter of procuring an identified number of student enrollments.
>
> 139. EDMC meticulously tracks each ADA's student enrollment activities on a daily, weekly, monthly, quarterly, and annual basis. Each ADA's enrollment activity is then included in the following reports, which are widely disseminated within EDMC: . . . [listing and attaching ten separate reports]
>
> The reports contain only quantitative information, and focus on the student applications and enrollments that ADAs procure. These reports, which EDMC uses to manage, evaluate, and compensate its ADAs, do not contain any information regarding qualitative factors.

Thus, the Complaint identifies and describes numerous specific tools and methods that EDMC uses to track, evaluate, and incentivize an ADA's performance. (Compl. ¶¶ 121-126, 137, 139, 398-403.) None of these tools discusses quality factors. To the contrary, all of them focus exclusively on the number of students the ADA recruits. (Compl. ¶¶ 125, 139.) These allegations demonstrate EDMC's relentless and exclusive focus on number of student enrollments, and its failure to take quality factors into account when motivating, evaluating, and compensating its admissions personnel. Indeed, the Court may reasonably infer from these allegations that, in practice, EDMC did not take quality factors into account in making adjustments to admissions personnel compensation.

Second, the Complaint describes instances in which quality factor ratings are merely proxies for success in obtaining student enrollments. (Compl. ¶¶ 135, 137, 138, 154, 390, 393-397.) For example, on two separate occasions, Ms. Washington's reviewer made the same comment in her Quality Assessment under "Business Practice and Ethics": "For business practices I would like to see Lynn increase her weekly and daily activity. If she increases her overall activity her overall production will increase considerably." (Compl. ¶ 135.) In addition, high level EDMC managers convey to the ADAs they supervise that the number of students ADAs recruit is the only thing that matters for their performance review and compensation:

> 137. ... [o]n October 11, 2006, Gregg Schneider, an Art Institute Online Director of Admissions, sent an email to all of the ADAs he supervised, including Ms. Washington, warning the ADAs that failure to hit their student enrollment numbers could result in their termination. (Ex. 23, Oct. 11, 2006 Schneider email.) In his email, Director of Admissions Schneider reprimanded ADAs for failing to meet their goals for the October 2006 student start date, and he reminded each ADA that "Each of you knows your plan for November. This number is not a casual level that I want you to be at but rather a number that you must hit to have a good review, get promoted or keep your position here. This number is set by the VP of Admissions and the Director of Admissions." (Ex. 23.)

(Compl. ¶ 137.)  Mr. Schneider's email confirms EDMC's message that ADAs will not receive a high quality rating (in Schneider's words "a good review") if they do not succeed in recruiting a certain number of students.

Third, EDMC also tells ADAs "exactly how many student enrollments they need to procure during the next review period in order to be on track to reach their identified financial goals . . . [and] presents an ADA's ability to reach financial goals as solely a matter of procuring an identified number of student enrollments." (Compl. ¶ 126; *see also* Compl. ¶¶ 123, 391.)

Fourth, in sharp contrast to the frequent and extensive instruction, monitoring, and feedback that EDMC admissions personnel receive regarding the number of students they must recruit, they do not receive training on the quality factors or feedback on how they can improve the qualitative aspects of their performance.  Indeed, Relator Mike Mahoney, whom EDMC hired to train the employees who train ADAs, never trained those employees on the quality factors, was unaware of anyone else providing such training to ADAs, and did not hear anyone at EDMC even mention the quality factors.  (Compl. ¶ 131.)  If the EDMC employee responsible for training does not explain the quality factors that are supposedly important for ADAs to display, but rather provides training only on selling enrollments, there is no way for the ADAs to focus their performance around quality factors, as opposed to focusing exclusively on the monetary rewards of recruiting more students.  The lack of training regarding quality factors is yet another way in which EDMC conveys to admissions personnel that their performance and compensation depend only on the number of students they recruit, and that quality factors and associated quality factor ratings do not matter.

The statements by high-level EDMC employees, together with the United States' other factual allegations regarding EDMC's relentless and exclusive focus on student enrollments and

contrasting failure to train, track, or incentivize admissions personnel regarding qualitative factors demonstrate that, under EDMC's compensation plan as implemented, EDMC's quality factors and the associated quality factor ratings are a sham.

However, in its Motion to Dismiss, EDMC ignores the Complaint's detailed allegations regarding EDMC's implementation of its compensation plan. Instead, EDMC argues that because its compensation plan, as written, describes the quality factors, and because Ms. Washington actually received a quality factor rating, therefore EDMC's compensation plan, as implemented from 2003 to the present, is compliant with the Safe Harbor. EDMC's argument is misguided. The undisputed fact that Ms. Washington and other EDMC employees receive quality factor ratings under EDMC's compensation plan does not show that EDMC implements its plan in a lawful manner. To the contrary, the United States alleges that EDMC implements the plan in contravention of the Safe Harbor requirements – by assigning quality ratings that are a sham, and, in reality, compensating admissions personnel solely based on their success in securing enrollments. If the quality ratings do not motivate or even track specific behavior other than recruiting success, then they cannot serve as an independent basis for adjusting compensation. Indeed, no one from EDMC ever discussed with Ms. Washington her quality ratings or quality reviews. (Compl. ¶ 135.) Yet mysteriously, in the one 6-month review period in which her New Student Points increased from 106 to 159, her quality rating jumped from 16 to 22 – the only significant change during her tenure. (Compl. Ex. 22.) Ms. Washington never received any feedback that comports with the documented reasons for her quality rating increase, other than the comment from EDMC executive Stephen Weiss, who told her that if she hit her enrollment targets, she need not worry about any previous dip in quality factors. (Compl. ¶ 138.)

Consistent with the above discussion, the only court of appeals to address a theory about bogus performance ratings held that the mere assignment of quality ratings does not automatically qualify an institution for Safe Harbor protection from the Incentive Compensation Ban:

> The mere inclusion of this performance rating in Corinthian's Compensation Program, however, does not allow us to conclusively determine whether its method of awarding salary increases falls within the Safe Harbor Provision. At this stage, we have no information as to the basis on which a "Good" versus "Excellent" performance rating is assigned to a Corinthian recruiter. Without an understanding what an employee must do to achieve a rating of "Good," we cannot determine whether the rating is based upon substantive requirements that are separate and distinct from recruitment numbers.

*Lee*, 655 F.3d at 993-94 (9th Cir. 2011).  In *Lee*, the Ninth Circuit reversed the district court's grant of a motion to dismiss based on the defendant's argument that it qualified for Safe Harbor protection merely by assigning quality ratings to its student recruiters:

> If the performance rating of at least "Good" requires an employee merely to fulfill basic performance requirements that are expected of any employee (such as showing up on time), then construing the Safe Harbor Provision so that these ratings serve as an independent basis for compensation increases would lead to an "absurd result."  Under such a system, educational institutions could entirely circumvent the HEA incentive compensation ban by simply formalizing, through a performance rating system, the basic requirements expected of *any* employee, that is, the requirements of employment itself.  *Allowing the Safe Harbor Provision to shield such a program from HEA's recruiter compensation requirements would render meaningless the "purpose or objective" of the statute.*

*Id.* at 994 (emphasis added).

In this case, although EDMC assigns quality ratings to its admissions personnel, in practice, as long as ADAs meet their quantitative recruiting goals, the qualitative aspects of their performance do not affect their compensation.  Indeed, EDMC does not instruct ADAs how to conform their performance to the quality factors, and the only performance metric that EDMC tracks is success in recruiting students.  Because, in practice, EDMC's compensation system rewards only student recruitment, "[a]llowing the Safe Harbor Provision to shield such a

program from HEA's recruiter compensation requirements would render meaningless the 'purpose or objective' of the statute." *Id.* (citations omitted). Accordingly, each time EDMC states in its PPAs and annual audits, among other documents, that it is not paying incentive compensation, i.e. that it is compliant with the Incentive Compensation Ban, such statements are false.

### 3. EDMC Has Implemented its Compensation Plan on a Company-Wide Basis

EDMC attempts to attack the scope and credibility of the Complaint's allegations, citing the limited geographic coverage of the relators within the EDMC family of schools, and, in particular, their alleged lack of knowledge about the practices of other EDMC institutions. (Defs.' Br. Section II.A.) Once again, EDMC ignores the allegations in the Complaint, as well as matters of public record, explaining that EDMC's implementation of its compensation plan in a manner that violates the Incentive Compensation Ban occurred on a company-wide basis.

First, through December 2006, the certifications by each and every EDMC school that the school was in compliance with the HEA were made by the same person – John McKernan, Jr., the CEO and Chairman of the entire company. (Compl. ¶ 65.) It is reasonable to infer that McKernan was able to certify compliance with the HEA's Incentive Compensation Ban for every single EDMC institution because EDMC implements its compensation policies and practices from the top down. Similarly, between approximately January of 2009 and January of 2011, high level EDMC executives, including the President for each of Brown Mackie College, Argosy University, and South University, as well as the President for each regional cluster of Art Institutes, signed the current PPAs. (Compl. ¶ 66 & Ex. 10.) EDMC's public securities filings, of which EDMC acknowledges this Court may take notice (Defs.' Br. 2 n.4), also support the

conclusion that EDMC's compensation policies for admissions personnel are implemented company-wide.[9]

Second, Jan Anton, a member of the EDMC corporate task force that came up with the company-wide compensation plan, informed an ADA at her evaluation that the task force intended the quality factors to be insignificant and created them only to get around the Incentive Compensation Ban.   (Compl. ¶ 389.)   As a member of that task force, she speaks for company-wide practices.   These allegations, alone, "allow[] the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Moreover, Relator Lynntoya Washington's and Mike Mahoney's allegations specifically cover EDMC's online division, which is responsible for enrolling more than 25% of EDMC students. The Complaint also features specific examples of how ground schools in Illinois issue meaningless quality ratings to their ADAs.[10]  Taken together, these allegations sufficiently allege that EDMC's compensation plan, as implemented company-wide, violates the FCA because its quality ratings for admissions personnel are a sham, intended to disguise EDMC's practice of compensating admissions personnel based solely on the number of students they recruit.

To the extent that EDMC challenges Relators' personal knowledge of EDMC's company-wide fraud, such an attack is improper at the motion to dismiss stage of litigation.   Neither

---

[9] *See* EDMC's 2011 Annual Report, at p. 26:  "We implemented a new compensation plan for our admissions representatives beginning in the third quarter of fiscal 2011 in response to the revised compensation rules for employees who are engaged in recruiting of students or the awarding of financial aid and revised other practices. Our prior compensation plan was designed to comply with one of the safe harbors under the prior regulation which permitted two salary adjustments per year provided that the adjustments were not solely based on the number of students recruited, admitted, enrolled or awarded financial aid."

[10] For example, the Complaint alleges that (1) "Despite their creation of five quality ratings, The Illinois Institutes of Art never used certain quality ratings, such as 'Unsatisfactory,' and other quality ratings, such as 'Outstanding,' measured ADAs' success in securing enrollments." (Compl. ¶ 390); and (2) "The 'Meets Expectations' quality rating was not based on quality, but was the default rating that ADAs received." (Compl. ¶ 391).   The Complaint also includes several specific examples demonstrating that the quality ratings were merely a proxy for student enrollments. (Compl. ¶¶ 392-397.)

Relators' credibility nor the veracity of their allegations is at issue at the pleading stage. Indeed, the United States District Court for the Eastern District of Pennsylvania rejected a similar challenge to the relator's personal knowledge under Rule 9(b), explaining that "the relator is not required to plead 'direct and independent' knowledge to satisfy Rule 9(b). He must only plead the circumstances of the fraud itself so that [the defendant] can understand the nature of the claims against it and is protected against spurious charges." *United States ex rel. Schumann v. AstraZeneca PLC*, No. 03-5423, 2010 WL 4025904, at *10 (E.D. Pa. Oct. 13, 2010); *see also United States ex rel. Powell v. Am. InterContinental Univ., Inc.*, 756 F. Supp. 2d 1374, 1377 (N.D. Ga. 2010) (rejecting defendants' argument that a relator is required to plead details as to how relators obtained firsthand knowledge of defendants' fraudulent activities).

EDMC's reliance on *Gaer v. Educ. Mgmt.*, a case arising under the federal securities laws, is even further afield. *See* Aug. 30, 2011 Report & Recommendation (Docket No. 93), *Gaer v. Educ. Mgmt.*, (W.D. Pa. No. 10-1061), *adopted at* Sept. 29, 2011 Order (Docket No. 97). In 1995, Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which imposed a unique pleading requirement in securities fraud cases. 15 U.S.C. § 78u-4(b)(2). The PSLRA provides that, in a securities fraud case, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* As courts in this Circuit have repeatedly recognized, "the PSLRA's particularity requirement for scienter deviates from Rule 9(b)'s approval of general pleading," and thus "the PSLRA 'supercedes Rule 9(b) as it relates to Rule 10b-5 actions.'" *Gargiulo v. Isolagen, Inc.*, 527 F. Supp. 384, 390 (E.D. Pa. 2007) (*quoting In re Astea Inter. Sec. Litig.*, No. 06-1467, 2007 WL 2306586, at *9 n.11 (E.D. Pa. Aug. 9, 2007); *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 n.5 (3d Cir. 1999).

Because the PLSRA's unique pleading requirements do not apply in this FCA case, EDMC's invocation of the *Gaer* decision does nothing to advance its case for dismissal.  The *Gaer* decision is further distinguishable because the court imposed the Third Circuit's higher standard for pleading the credibility of confidential witnesses.  *Gaer*, at 44 (citing *California Public Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004)).  No such standard applies to the allegations derived from Relators' testimony in this case, and in any event, unlike the lone, confidential witness in *Gaer,* here the Complaint is replete with specific allegations, based upon the statements of multiple high-level EDMC executives, regarding the precise nature of EDMC's wrongdoing.

In a final, weak attempt to challenge the scope of the allegations in the Complaint, EDMC asserts that the United States has "improperly conflated all of the individual schools" by asserting legal claims against all of the named EDMC defendants, collectively. (Defs.' Br. Section II.A.2.)  Although EDMC cites a number of cases in support of its argument against the United States' supposed "lumping together" of defendants, all of the cases EDMC points to are inapposite.  The "lumped together" defendants in the cases cited by EDMC are unrelated entities or individuals that ostensibly each played a distinct role in the fraudulent schemes alleged.  *See In re Balko*, 348 B.R. 684, 694-95 (Bankr. W.D. Pa. 2006) (rejecting generalized fraud allegations that lumped together defendant mortgage brokerage company, mortgage broker, appraisers, mortgage lender, and trustee, and failed to attribute specific fraudulent conduct to mortgage lender and trustee); *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) (rejecting general fraud claim that attributed specific misconduct to defendant accounting firm and law firm, but not defendant bank and investment firm); *Vicom, Inc. v. Harbridge Merchant Servs. Inc.*, 20 F.3d 771, 777-78 (7th Cir. 1994) (criticizing pleading for failing to inform each

unrelated defendant of its particular role in the fraudulent scheme alleged); *Lee*, 655 F.3d at 997-98 (complaint failed to specific involvement in fraudulent scheme by individual board member defendants).   In contrast to these cases, the defendants here are all schools owned by EDMC and operated through EDMC's wholly owned subsidiaries, and they have all violated the FCA in the same way.   Furthermore, the United States' allegations against the collective defendants are appropriate because EDMC dictates its compensation policies and procedures from corporate headquarters down to each school.

In summary, EDMC's challenge to the scope of the Complaint's allegations, Relators' credibility, and the specificity with which the Complaint refers to particular EDMC institutions must fail, because the Complaint contains numerous well-pleaded allegations regarding the corporate-wide scope of EDMC's fraudulent implementation of its compensation plan.

### 4.   The Complaint Plainly Satisfies the Legal Standard for Pleading Scienter with Respect to EDMC's Compensation Plan as Implemented

EDMC's arguments regarding scienter must fail.   As a threshold matter, EDMC's assertions about scienter conflate scienter regarding its compensation plan as designed, with scienter regarding EDMC's plan as implemented.   Here, the United States[11] is not alleging an FCA violation with respect to EDMC's compensation plan as designed, and therefore need not plead scienter with respect to the plan as designed.   Rather, the United States is alleging that EDMC's compensation plan, as implemented, violates the FCA.   In Section V.A.2. of this

---

[11]   The reference to the United States in this sentence of the text and the subsequent sentence of the text is to the United States of America, and does not include Relators and the States.   The United States of America's allegations of an FCA violation are confined to EDMC's implementation of its compensation plan, and do not extend to the plan as designed.   Accordingly, the United States' Memorandum in Opposition highlights the sufficiency of the allegations of EDMC's scienter with respect to its plan as implemented.   However, nothing in the Complaint suggests that the United States of America acquiesced to, or approved of, the manner in which EDMC designed its compensation plan, and the States' and Relators' separately-filed Memorandum in Opposition to EDMC's Motion to Dismiss addresses the sufficiency of the Complaint's allegations regarding EDMC's scienter with respect to its compensation plan as designed.

Memorandum, the United States highlights allegations which show that under EDMC's compensation plan as implemented, the quality factor ratings EDMC assigns to admissions personnel are a sham, and EDMC, in practice, bases the compensation of admissions personnel solely on their success in obtaining student enrollment, in direct violation of Title IV of the HEA's Incentive Compensation Ban.  The allegations demonstrating that EDMC's quality ratings are a sham also establish that EDMC knowingly failed to implement its plan as designed, and thus easily satisfy the United States' pleading obligation with respect to scienter.  Indeed, the Complaint contains extensive non-conclusory allegations concerning scienter, far more than is required at the pleading stage, and indeed, more than in *Hendow*, which both EDMC and the Third Circuit take as the model for sufficient allegations of scienter.  *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006).

### (a)       Legal Principles Governing Scienter in FCA Cases

It is well-established that scienter may be pleaded generally.  Fed. R. Civ. P. 9(b).  Even under the heightened pleading standards of Federal Rule of Civil Procedure 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F. 3d 908, 921 (4th Cir. 2003) ("*Westinghouse*").  As the Ninth Circuit has recently made clear, this principle applies in particular to allegations of scienter with respect to a for-profit college's violation of the Incentive Compensation Ban.  *See Lee,* 655 F.3d at 996 (citing Fed. R. Civ. P. 9(b)).  *See id.* at 997 (relators' general allegations that the defendant "knew it was not eligible to receive such funds" and that "[d]efendants acted 'knowingly' or 'in deliberate ignorance or reckless disregard'" *were* sufficient to allege that the defendants acted with scienter).  Relatedly, scienter, as a paradigmatic fact-intensive inquiry, "typically should not be decided" at the motion to dismiss or even the summary judgment stage.  *United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192

F.3d 402, 411 (3d Cir. 1999) (FCA case; "[W]e must heed the basic rule that a defendant's state of mind typically should not be decided on summary judgment."); *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) ("[I]t was error . . . for the District Court to resolve the disputed fact of motivation at the summary judgment stage.").

The scienter requirement of the FCA is that a defendant have "'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard' of the truth or falsity of information in the defendant's claim to the government." *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir. 2007) (quoting 31 U.S.C. § 3729(b)). The statute adds that "no proof of specific intent to defraud is required." *Cantekin*, 192 F.3d at 411 (quoting 31 U.S.C. § 3729(b)). EDMC has made numerous false statements, including repeated representations in PPAs and annual audits that the company does "not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments." (Compl. ¶ 43), (quoting Ex. 1 at p. LW 1117). Thus, with respect to scienter, the key question for the fact finder at trial will be whether, in implementing its compensation plan, EDMC actually knew that, was deliberately ignorant that, or recklessly disregarded the fact that it provided any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments.

> **(b)**   **The Complaint, No Less Than in *Hendow* and in Stark Contrast to *Chubb II*, Contains Extensive Specific Allegations Respecting Scienter**

The Complaint provides three separate *categories* of concrete, non-conclusory allegations, each of which is sufficient to meet the requirement of pleading scienter. EDMC's brief does not acknowledge or address the allegations in two of these categories at all, and misconstrues the relevance of the allegations in the final category, those concerning ED's well-

publicized finding that the University of Phoenix's similar compensation plan did not qualify for Safe Harbor protection.

### (i) EDMC's Senior Management Knows EDMC's Compensation Plan as Implemented Is a Sham

First, as detailed in Section V.A.2. of the Memorandum, the Complaint alleges specific statements by high-ranking EDMC executives, attesting to their awareness that, under the company's compensation plan, as implemented, quality factors ratings are a sham designed to camouflage EDMC's payment of illegal incentive compensation to its admissions personnel. (Compl. ¶¶ 138, 389, 100, 137, 146-47.)   These express statements by high-level EDMC managers are sufficient to establish scienter for purposes of the motion to dismiss. *Cf. United States ex rel. Pilecki-Simko v. Chubb Inst.*, No. 10-3907, 2011 WL 3890975, at *5 (3d Cir. Sept. 6, 2011) ("*Chubb II*") (noting absence of any non-conclusory allegations of facts that support a reasonable inference that Chubb knew or acted in reckless disregard that its submissions were false).

In addition, the Complaint contains numerous other allegations which show that under EDMC's compensation plan as implemented, the quality factor ratings EDMC assigns to admissions personnel are a sham, and EDMC, in practice, bases the compensation of admissions personnel solely on their success in obtaining student enrollments, in violation of Title IV of the HEA's Incentive Compensation Ban.   (*See, e.g.*, Compl. ¶¶ 100, 120-126, 134-150.)   These allegations demonstrate that EDMC management was aware of the falsity of its representations that it does not make incentive payments.   Stated differently, the allegations showing that EDMC's quality ratings are a sham also satisfy the United States' pleading obligation with respect to scienter.

(ii)    **Allegations Establishing EDMC's Senior Management's Efforts to Conceal EDMC's Implementation of the Plan**

Second, the Complaint alleges that EDMC management takes steps to conceal that it implements its compensation plan in a way that bases admissions personnel compensation solely on the number of student enrollments obtained. Specifically:

> [t]he walls and cubicle partitions of EDMC's offices display posters and charts graphing each ADA's progress toward his or her sales goals and noting whatever prize the ADA is then competing for. However, when an audit of EDMC or an accreditation is scheduled to take place, EDMC's management ensures that these materials are taken down and removed from view. Once the auditors or accreditors depart, the posters and charts are put back up.

(Compl. ¶ 147.)

These allegations demonstrate that EDMC's management was aware that its activities violate the Incentive Compensation Ban. The Third Circuit in *Chubb II*, invoking the Ninth Circuit's decision in *Hendow*, was explicit that allegations of attempted concealment or of specific instances in which superiors were aware of violations are precisely the sorts of allegations that can support scienter. *Chubb II*, 2011 WL 3890975, at *5 n.18 (citing *Hendow*, 461 F.3d at 1175 and *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010)).

(iii)    **Allegations Establishing that EDMC's Senior Management Had Specific Notice that the Compensation Plan, as Implemented, Is Illegal**

Third, the Complaint alleges that EDMC's top executive and several other executive-level managers previously worked for the University of Phoenix when its similar compensation plan was found by ED to involve a form of incentive compensation that violated the Incentive Compensation Ban. (Compl. ¶¶ 159-164, Ex. 17.) In August 2003, ED conducted a program review of the University of Phoenix, which used a compensation system similar to EDMC's. (Compl. ¶ 159.) ED's February 5, 2004 Program Review Report found that the compensation

system was an illegal attempt to circumvent the Incentive Compensation Ban, and did not qualify for Safe Harbor protection. *Id.* EDMC's President and Chief Executive Officer Todd S. Nelson was the Chairman and Chief Executive Officer of the University of Phoenix's parent corporation at the time of the ED program review. (Compl. ¶¶ 162-163.) Seven other EDMC executive-level employees worked for the University of Phoenix at the relevant time and then moved to EDMC. In addition, EDMC's current Executive Vice President and Chief Information Officer, its Senior Vice President – Marketing and Admissions, and its President of Online Higher Education, among others, are former employees of the University of Phoenix. (Compl. ¶ 163.)

EDMC's compensation plan is not materially different from the University of Phoenix's, and in fact, "the link between student enrollments and compensation is more clearly detailed in EDMC's compensation system as compared to the compensation system" found by ED to violate the Incentive Compensation Ban in the University of Phoenix case. (Compl. ¶ 161.) Moreover, ED's Program Review of the University of Phoenix's compensation policies "was made public and circulated throughout the for-profit higher education industry." (Compl. ¶ 160.)

EDMC suggests that the enforcement action against the University of Phoenix does not support scienter, merely because the University of Phoenix settled the allegations against it without admitting wrongdoing. (Defs.' Br. 32.) The argument is a patent non-sequitur. The Complaint does not rely on the settlement agreement itself to infer, much less establish, scienter. Instead, EDMC's awareness of ED's well-publicized findings supports the inference that EDMC knew that its similar compensation program, as implemented, results in the payment of prohibited incentive compensation to admissions personnel.[12] (Compl. ¶¶ 159-161.)

---

[12] In contrast to the case that EDMC relies on, *Picher v. UNITE*, in which there was "[n]o evidence. . . that could show that UNITE was or should have been on notice that [its conduct] was illegal," ED's determination (and not the settlement agreement itself) plainly sufficed to put EDMC on notice that its compensation plan was, at best, highly suspect. *Cf. Picher v. UNITE*, 646 F. Supp. 2d 759, 766 (E.D. Pa. 2009) (to infer scienter from the mere fact of a

In sum, in addition to EDMC senior management's knowledge that the compensation plan, as implemented, assigns sham quality factor ratings, and senior management's attempts to conceal how EDMC unlawfully implements its compensation plan, specific high level EDMC executives were officially notified by ED that a compensation policy very similar to EDMC's involved prohibited incentive compensation and therefore did not qualify for the Safe Harbor. Together, these allegations strongly support a reasonable inference that EDMC's senior management knew that its compensation system, as implemented, is unlawful. Indeed, the allegations in the Complaint are considerably more extensive than in *Hendow*, which the Third Circuit (and EDMC) hold up as a model of scienter in an Incentive Compensation Ban case. *See Chubb II,* No. 10-3907, 2011 WL 3890975, at *5 n.18.

### (c)     EDMC's Sundry Arguments About Scienter Are Unavailing

EDMC attempts to overcome the United States' well-pleaded allegations regarding scienter with a grab bag of novel assertions, each of which is unsound.

First, EDMC contends that it cannot have the requisite scienter for fraud unless the individual corporate officer making the statement (i.e. signing EDMC's PPAs) – in this case, EDMC Chairman John McKernan – himself has the requisite level of scienter. (Defs.' Br. 28-29.) This position is unprecedented and would undo decades of FCA case law involving corporate defendants.[13] Indeed, EDMC's position is a more radical version of the argument on

---

settlement agreement "would deter defendants from settling because regardless of the terms of the settlement, the mere fact of settlement could be used against them to infer the requisite scienter for punitive damages in a later proceeding."). EDMC's continued resistance to ED's finding is of no moment. Indeed, that EDMC management chose either to ignore or to reject ED's finding only reinforces that the episode tends to establish the company's scienter.

[13] To the extent that EDMC relies on cases in the securities law area in this section of its brief (Defs.' Br. 29), citing *Zavolta v. Lord, Abbett & Co.,* No. 08-4546, 2010 U.S. Dist. LEXIS 16491 (D.N.J. Feb. 24, 2010), for example, such cases are inapposite. As previously discussed in Section V.A.2., securities law cases provide a different and more stringent scienter requirement than the FCA.

collective knowledge that was *rejected* by the most widely cited case on the subject, *Westinghouse*, 352 F.3d at 919 (4th Cir. 2003). The defendant in that case objected to a jury instruction that "in order to find that WSRC took any action knowingly, you must find that at least one individual employee had all of the relevant factual information to satisfy that standard as to the fact or action at issue." *Id.* at 918. The court rejected the challenge and upheld the verdict, noting:

> We decline to adopt Westinghouse's "single actor" requirement in this false certification case. In particular, we decline to adopt Westinghouse's view that a single employee must know both the wrongful conduct and the certification requirement. If we established such a rule, corporations would establish segregated "certifying" offices that did nothing more than execute government contract certifications, thereby immunizing themselves against FCA liability.

*Id.* at 919.

The D.C. Circuit's decision in *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1274-1275 (D.C. Cir. 2010) does not support a different conclusion. In that case, the D.C. Circuit held that it was error for the district court to instruct the jury that it could aggregate the knowledge of all corporate employees. Such an instruction, the D.C. Circuit observed, would allow an FCA plaintiff "to prove scienter by piecing together scraps of 'innocent' knowledge held by various corporate officials, even if those officials never had contact with each other or knew what others were doing in connection with a claim seeking government funds." *Id.* at 1275. Nothing in the D.C. Circuit's decision, however, suggests much less holds that a single corporate official must know all the information necessary for liability. Rather, the D.C. Circuit's decision is entirely consistent with the Fourth Circuit's holding in *Westinghouse*, 352 F.3d 908, which it repeatedly cites for support, that a factfinder may look to the knowledge of those corporate employees engaged in the misconduct giving rise to the fraud. *See also Staub v. Proctor Hosp.*, No. 09-400, slip op. 6-8 (S. Ct. Mar. 1, 2011) (recognizing, in employment discrimination action,

that employer's "authority to reward, punish, or dismiss is often allocated among ultimate agents," and rejecting argument that employer is not liable unless final decisionmaker is motivated by discriminatory animus).   Aggregating the conduct of such employees is not "piecing together scraps of 'innocent' knowledge" held by corporate officials who "never had contact with each other," *Westinghouse*, 352 F.3d at 918-919 & n.9, and it would make no sense to permit a corporation engaged in fraud against the government to escape liability so long as the necessary tasks to carry out the fraud were performed by several corporate employees, instead of just one.  EDMC's attempt to impose such an onerous and nonsensical standard finds no support in the case law and should be rejected.

Second, EDMC asserts that scienter is precluded because the United States purportedly "had knowledge of EDMC's Plan," yet did not immediately suspend EDMC from eligibility for Title IV programs upon the filing of the original complaint in this case, but instead maintained EDMC's eligibility pending its investigation. (Defs.' Br. 33, 34.)  As a threshold matter, EDMC's contentions regarding the United States' purported knowledge rest on facts outside of the pleadings.  In addition, EDMC's unsupported assumptions are wholly inaccurate.  Contrary to EDMC's vague assertions about the "government's knowledge," the United States did *not* have knowledge of, let alone acquiesce to or approve of, the manner in which EDMC has *implemented* its compensation plan from 2003 to the present.  Indeed, once the United States conducted its investigation and substantiated the allegations that EDMC's compensation plan, as implemented, violates the FCA, the United States took action to remedy EDMC's fraud by intervening in this lawsuit.   Nothing in the law or sound public policy requires the federal government to immediately suspend business with a company on receipt of allegations of fraud, much less estops the United States from seeking to remedy the fraud, as it has here by intervening in the

instant action, once its investigation determines that fraud has occurred.   Moreover, the "government's knowledge" precludes FCA liability only when the United States knows *and approves of* the conduct on which the FCA action is based.   *See United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999).   Furthermore, although there is no evidence of acquiescence here, in any event, "[m]ere acquiescence (rather than approval) by government employees is not sufficient to avoid liability."   *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 730 (N.D. Ill. 2007).

Finally, EDMC's reliance on *Lee v. Corinthian* does nothing to further its argument regarding scienter.   EDMC quotes from *Lee* the language that "'innocent mistakes, mere negligent misrepresentations and differences in interpretations' will not suffice to create liability" under the FCA.   *Lee*, 655 F.3d at 996 (quoting *Hendow,* 461 F.3d at 1174).   In the immediately following language, however, the court in *Lee* makes clear that it is simply drawing the standard distinction between innocent or negligent conduct on the one hand and knowing or reckless conduct on the other: "[i]nstead, Relators must allege that [defendant] knew that its statements were false, or that it was deliberately indifferent to or acted with reckless disregard of the truth of the statements."   *Id.*   As detailed in the preceding paragraphs, the United States has done precisely what this standard requires – allege that, with respect to its compensation plan as implemented, EDMC "knew that it statements were false, or that it was deliberately indifferent to or acted with reckless disregard of the truth of the statements." *Id.*[14]

---

[14] Again, the other cases that EDMC cites are not to the contrary.   For example, *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 70 n.20 (2007), is inapposite because it addresses the Fair Credit Reporting Act, a statute which contains a scienter requirement that is significantly different from that of the FCA.   That case found that FCRA's scienter standard required a showing at least of recklessness.   *See id.* at 57 (equating Fair Credit Reporting Act "willfully fails to comply" standard with recklessness).   By contrast, the FCA imposes liability not only for "reckless disregard," but also for "deliberate ignorance."   As many courts have recognized, the FCA knowledge standard was expressly "'designed to address the problem of the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know.'"   *Lamb Eng'g & Constr. Co. v. United States*, 58 Fed. Cl.

### B.   EDMC   SUBMITTED   ACTIONABLE   FALSE   CLAIMS   AND   STATEMENTS

As a result of EDMC's failure to comply with the restrictions imposed by the Incentive Compensation Ban, EDMC submitted false claims, in violation of 31 U.S.C. § 3729(a)(1), and false statements material to false claims, in violation of 31 U.S.C. § 3729(a)(1)(B).  The United States' allegations that EDMC submitted actionable false claims and statements are supported by three separate and independent bases.

First, EDMC's claims and statements are factually false, because EDMC has failed to provide the service that the government is paying for – students recruited by eligible recruiters. Second, EDMC's claims and statements are false under the well-established theory of fraud in the inducement.  Finally, EDMC's claims and statements are also false under a false certification theory of liability.

EDMC erroneously contends that the United States has failed to satisfy the element of falsity because compliance with the Incentive Compensation Ban is a condition of participation rather than payment.  That distinction, however, simply has no applicability to either of the first two bases for finding that EDMC submitted false statements and claims – factual falsity and fraud in the inducement.  Moreover, even as to the false certification theory of falsity, EDMC's argument fails, because the Incentive Compensation Ban is one of those core programmatic provisions that is both a condition of payment and a condition of participation.  For this reason, both the Seventh and Ninth Circuits have soundly rejected the very argument EDMC raises here. *Hendow*, 461 F.3d 1166; *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005).

---

106, 110 (Ct. Fed. Cl. 2003) (quoting *UMC Elec. Co. v. United States*, 43 Fed. Cl. 776, 794 (1999), *aff'd,* 249 F.3d 1337 (Fed. Cir. 2001)).

### 1.   EDMC's Claims and Statements Are Factually False

The first independent basis for finding that EDMC's claims and statements in this case are false can be found in the distinction some courts draw between "factually false" and "legally false" claims. *See, e.g., United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295 (3d Cir. 2011)[15]; *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1218-19 (10th Cir. 2008).   A claim is *factually* false if the defendant fails to provide the specific good or service for which the government bargained. *Wilkins,* 659 F.3d at 305; *Mikes v. Straus,* 274 F.3d 687, 697 (2d Cir. 2001).   In such a circumstance, there is no requirement of an additional false certification with a condition of payment to render the claim false.   By contrast, a *legally* false claim arises where the defendant provides the good or service requested by the government, but falsely certifies that it has complied with a statute or regulation, the compliance with which is a condition for government payment. *Wilkins,* 659. F.3d at 305.

Claims that fail to comply with the HEA's Incentive Compensation Ban fall comfortably within the definition of a "factually false" claim.   The prohibition against paying incentive compensation is not just a technical requirement, but instead is a core prerequisite for payment that is at the heart of the bargain between the United States and any institution that receives student loans and grants.   Congress enacted the prohibition against paying commissions, bonuses, or other incentive payments based on success in recruiting students because such payments were associated with high loan default rates, which in turn resulted in a significant drain on program funds where the government acts as a loan guarantor.   When Congress amended the HEA in 1992 to prohibit schools from paying these incentives, it did so based on evidence of serious program abuses, including incentive compensation. *See* S. Rep. No. 58,

---

[15] For ease of reference, please note that Westlaw in some places refers to this case as *United States ex rel. Willis v. United Health Group, Inc.* (Mr. Willis being the other relator in that case).

102d Cong., 1st Sess., at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period") [App. B, at 43]; H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").

Thus, violations of the Incentive Compensation Ban eviscerate the value of the very service the government has bargained for:  an educational program designed to attract qualified students who will benefit from a taxpayer-supported education.   When students are instead recruited based solely on a recruiter's own financial interest, without regard to the students' needs and qualifications, the United States fails to realize the purpose for which it provides federal funds.

The premise underlying the payment of student loans and grants is to enable eligible and deserving students to obtain an education.  Recruiting practices tainted by improper incentive schemes fundamentally undermine that premise.   By creating financial incentives that compromise the integrity of the student recruiting process, violations of the Incentive Compensation Ban are no less false than a claim for payment on brake shoes for jeeps where the required quality-assurance tests were not performed on the brake shoes actually delivered. *See United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 & n.4 (6th Cir. 1998) (explaining that the mere delivery of a product "as good as the one contracted for does not relieve the defendants of [FCA] liability").  In both circumstances, the defendant's conduct has undermined the trustworthiness of the very good or service purchased by the government, and renders the resulting claims for payment "factually false," regardless of any legally false certification of compliance with a condition of payment.

### 2. EDMC is Liable for Submitting False Claims and Statements Under a Fraud in the Inducement Theory

Where a contract or eligibility to participate in a program was "obtained originally through false statements or fraudulent conduct," courts have recognized a theory of "fraud-in-the-inducement" or promissory fraud under the FCA. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787-88 (4th Cir. 1999) ("*Harrison*"). This theory reflects the proposition "[t]hat a contract based on false information is a species of false claim." *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1420 (9th Cir. 1991).

Like factually false claims, promissory fraud claims do not require a legally false certification with a condition of payment. *Hendow*, 461 F.3d at 1173. Instead, an actionable promissory fraud claim requires only that "the contract or extension of government benefits was obtained originally through false statements or fraudulent conduct." *Harrison*, 176 F.3d at 787. As courts have recognized, this is simply a straightforward application of the FCA's prohibition on using "a false record or statement material to a false claim." 31 U.S.C. 3729(a)(1)(B); *see Hendow*, 461 F.3d at 1173 ("liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct."); *Hagood*, 929 F.2d at 1420.

Not surprisingly, therefore, fraud in the inducement or promissory fraud is a well-established basis for FCA liability. *See, e.g., United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) (contractor that violated prohibition on bid-rigging subsequently submitted false claims); *Westinghouse*, 352 F.3d 908 (affirming liability of defendant who falsely certified absence of conflict of interest); *United States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992) (finding FCA liability where government would not have not guaranteed loans but for applicant's false certification as to eligibility); *Ab-Tech Construction, Inc. v. United States*, 31

Fed Cl. 429, 433-34 (Fed. Cl. 1994) (defendant submitted false claims where it misrepresented its status as a small business); S. Rep. No. 99-345 at 9, reprinted in 1986 U.S.C.C.A.N. 5266, 5274 ("claims may be false even though the services are provided as claimed if, for example, *the claimant is ineligible to participate in the program*") (emphasis added); *see also United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) (any action which has the "effect of inducing the Government immediately to part with money" would be a claim under the Act).

Of particular relevance to this case, both the Seventh and Ninth Circuits have recognized fraud in the inducement as a valid basis for bringing an FCA violation against an institution that has violated the Incentive Compensation Ban:

> Failure to honor one's promise is (just) breach of contract, but making a promise that one intends not to keep is fraud.... [I]f the University knew about the rule and told the Department that it would comply, while planning to do otherwise, it is exposed to penalties under the False Claims Act.

*Main*, 426 F.3d at 917; *see also Hendow*, 461 F.3d at 1174 (following the Seventh Circuit's holding in *Main* and "find[ing] the Seventh Circuit's reasoning in adopting the promissory fraud theory persuasive").

In this case, the Complaint alleges that ED was induced to enter into PPAs with EDMC in part on the basis of EDMC's express representations that it would comply with the HEA's Incentive Compensation Ban. (Compl. ¶ 267.) Accordingly, the United States has undeniably pleaded a sufficient claim for fraud in the inducement. As the Seventh and Ninth Circuits have previously held, if an institution makes misrepresentations that induce ED to confer program eligibility on the institution, then all subsequent requests for payments are false, and any debate over whether the Incentive Compensation Ban is a condition of payment or participation is irrelevant. *See Hendow*, 461 F.3d at 1174-77; *Main*, 426 F.3d at 917. *See also* S. Rep. No 99-345, at 9 (1986) ("[E]very claim submitted under a contract, loan, guarantee, or other agreement

which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim.").

### 3.    EDMC's Claims and Statements Are False Under a Legally False Certification Theory of Liability

A third, independent, basis for liability in this case exists under what has become known as a legally false certification theory of liability. As noted in Section V.B.1., under this theory, a defendant is liable if it falsely certifies compliance (either expressly or impliedly) with a condition of payment. *Wilkins*, 659 F.3d at 305. Here, the United States alleges that EDMC expressly and falsely certified compliance with the Incentive Compensation Ban in its PPAs and, therefore, has stated an actionable legally false certification claim.

A number of courts have held that a legally false certification claim does not exist if the defendant certified compliance only with a condition of *participation. But see United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 385-86 (1st Cir. 2011) (refusing to employ the various distinctions that courts have employed in connection with legally false claims, because they "may do more to obscure than clarify the issues before us"). Relying on these cases, EDMC argues that the Incentive Compensation Ban is a condition of participation and, therefore, cannot give rise to a legally false certification claim. But whether or not the Incentive Compensation Ban is properly characterized as a condition of participation, it unquestionably also qualifies as a condition of *payment* – as statutory text, case law, and common sense make clear.

The fundamental flaw in EDMC's argument is its implicit assumption that a statute or regulation can be *only* a condition of participation or a condition of payment – but not both. The courts have universally recognized, however, that some conditions of participation, because of their core relationship to the program, are also conditions of payment. *Conner,* 543 F.3d at 1222

("some regulations or statutes may be so integral to the government's payment decision as to make any divide between conditions of participation and conditions of payment a 'distinction without a difference'") (quoting *Hendow*, 461 F.3d at 1177); *United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432, 443 (3d Cir. 2004) ("If a provider does not comply with the Medicaid regulations, ... not only will the provider be ineligible to participate in the Medicaid programs, but Medicaid may seek to recover the money it paid to the provider for services covered by the claims."); *see also United States ex rel. Lisitza v. Johnson & Johnson*, 765 F. Supp. 2d 112, 128 (D. Mass. 2011). As the Seventh and Ninth Circuits have recognized, the Incentive Compensation Ban is such a core provision. *Hendow*, 461 F.3d 1166 (9th Cir. 2006); *Main*, 426 F.3d 914 (7th Cir. 2005).

That conclusion is readily confirmed by the text of the HEA. The HEA expressly empowers ED to withhold payments to schools that violate the Incentive Compensation Ban. In 20 U.S.C. § 1094(a), Congress mandated that an institution receiving funds under the HEA must certify its compliance with certain requirements, including the Incentive Compensation Ban. 20 U.S.C. § 1094(a)(20). In cases where those requirements are not met, ED is expressly authorized, *inter alia*, to take temporary "emergency action" *to withhold funds* from the non-compliant school. 20 U.S.C. § 1094(c)(1)(G); 34 C.F.R. § 668.83. Likewise, ED may impose prospective sanctions for violations of statutory requirements, including "the limitation, suspension, or termination of the participation" of the school in HEA programs, 20 U.S.C. § 1094(c)(1)(F); or civil penalties. 20 U.S.C. § 1094(c)(3)(B).

Congress' rationale for authorizing ED to deny payment in the event of an incentive compensation violation – the *sine qua non* of a condition of payment – is clear: the United States has no assurance that the recruitment of these students, to whom ED is supplying federal student

aid, is in the best interests of the United States and the students, rather than just the financial interest of the school and its recruiters. Incentive compensation based on recruitment can be analogized to kickbacks, and it has been long established in other contexts that not only is the United States entitled to cancel a contract tainted by kickbacks, *see United States v. Acme Process Equip. Co.*, 385 U.S. 138 (1966), the United States is also not required to pay for any goods or services tainted by this improper financial incentive. *See Hutcheson*, 647 F.3d at 394 ("If kickbacks affected the transaction underlying a claim ... the claim failed to meet a condition of payment"). Moreover, as noted, in amending the HEA in 1992 to add the Incentive Compensation Ban, Congress expressly highlighted recruiting abuses as a core programmatic concern. Accordingly, it defies common sense to conclude that despite its concerns about such abuses and their resulting impact on the expenditure of taxpayer funds, Congress nevertheless intended ED to pay a school found to be in violation of this critical requirement.

For this reason, in the only published appellate rulings on this question, the Seventh and Ninth Circuits easily concluded that a violation of the Incentive Compensation Ban is a condition of payment that can give rise to FCA liability.[16]   *Hendow*, 461 F.3d 1166; *Main*, 426 F.3d at 914. As the Ninth Circuit explained, the argument that the Incentive Compensation Ban is a condition of participation rather than a condition of payment "is a distinction without a difference. In the context of Title IV and the Higher Education Act, if we held that conditions of participation were not conditions of payment, there would be no conditions of payment at all –

---

[16] Also, at least one district court in the Eleventh Circuit has adopted the view of *Main* and *Hendow*. *United States ex rel. Powell v. American InterContinental Univ., Inc.*, 756 F.Supp.2d 1374 (N.D.Ga. 2010). That court also cited to district courts in the First and Second Circuits that have "endorsed or adopted this construction of the FCA as it pertains to conditions of eligibility for payment." *Id.* at 1379 (citing *United States ex rel. Westmoreland v. Amgen, Inc.*, 707 F.Supp.2d 123, 135 (D. Mass. 2010) and *United States ex rel. Anti–Discrimination Ctr. of Metro N.Y., Inc. v. Westchester County*, 668 F.Supp.2d 548, 566–67 (S.D.N.Y.2009)).

and thus, an educational institution could flout the law at will." *Hendow*, 461 F.3d at 1176. EDMC has not, and cannot, offer any convincing argument for concluding otherwise.

Although EDMC cites to the Third Circuit's decision in *Wilkins*, 659 F.3d 295, that case supports the proposition that compliance with the Incentive Compensation Ban is a condition of payment. The only conclusion reached by the *Wilkins* court is that some conditions of Medicare eligibility are conditions of participation but not conditions of payment. That is undoubtedly true, but it does nothing to undermine the conclusion that the Incentive Compensation Ban qualifies as a condition of payment, and as noted, the Third Circuit (among other courts) has expressly acknowledged that a core programmatic provision can be both a condition of payment and a condition of participation. *See Quinn*, 382 F.3d at 443. Moreover, the Third Circuit in *Wilkins* relied extensively on the Tenth Circuit's opinion in *Conner*, 543 F.3d 1211, and the *Conner* Court in turn cites the Incentive Compensation Ban as a paradigmatic condition of payment and discusses with approval the Ninth Circuit's analysis in *Hendow*. *Wilkins*, 543 F.3d at 305-313 (relying on *Conner*, 543 F.3d 1211); *Conner*, 543 F.3d at 1222 (citing *Hendow*, 461 F.3d at 1168-69, 1176-77).

In addition, the Fifth Circuit *Graves* case cited by EDMC is *unpublished*, has no precedential value under that Circuit's governing rules, and predates the decisions in *Hendow* and *Main*. *United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487 (S.D.Tex. 2003), *aff'd mem.*, 111 Fed.Appx. 296 (5th Cir. 2004). More importantly, it merely alludes to the district court's ruling as the basis for its decision. But in concluding that the Incentive Compensation Ban could not support an FCA cause of action, the district court erroneously overlooked ED's statutory authority to withhold funds based upon non-compliance with PPA provisions and incorrectly found that "the regulation does not expressly condition the delivery of

disbursement of funds to ITT students on ITT's certification of compliance with this requirement." *Graves*, 284 F. Supp. 2d at 501. The *Graves* case therefore fails to provide any compelling basis to find that compliance with the Incentive Compensation Ban is not a condition of payment, or to reject the more recent and more thoroughly reasoned rulings of the Seventh and Ninth Circuits on this issue.

Finally, EDMC's slippery slope argument – that if this Court follows *Main* and *Hendow* and finds that knowingly false statements regarding a school's compliance with the Incentive Compensation Ban will lead to FCA liability "for even the most insignificant and unwitting regulatory transgression" – suffers on many different levels. (Defs.' Br. 42.) For this reason, the *Main* and *Hendow* courts swiftly dismissed a similar doomsday scenario. As those Courts recognized, the FCA does not punish mere regulatory transgressions. *Main*, 426 F.3d at 917 ("Tripping up on a regulatory complexity does not entail a knowingly false representation."). Accordingly, the illusion of FCA liability being imposed on unwitting institutions for minor regulatory transgressions is just that.

In any event, as previously discussed, the Incentive Compensation Ban is not a minor regulatory requirement, but rather a core programmatic feature of the HEA's taxpayer-supported student funding mechanism. Accordingly, a finding that a knowing violation of the Incentive Compensation Ban can support FCA liability in no way entails a landslide of lawsuits for violations that lack such a core nexus to the payment of federal funds. Given the obvious importance and centrality of the Incentive Compensation Ban as a condition on the receipt of government benefits, the United States clearly satisfies the element of falsity under the FCA in this case.

## C.    EDMC'S NO LOSS ARGUMENT LACKS MERIT

EDMC's contention that the United States' FCA claim is subject to dismissal because the United States has not alleged that EDMC's violations of the Incentive Compensation Ban caused any loss to the government lacks merit. As an initial matter, the United States does not have to allege a specific injury flowing from a false claim in order to recover under the FCA. *See United States ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Texas*, 545 F.3d 256, 259 (3d Cir. 2008) ("[a] party can be subject to FCA liability (i.e., civil penalties) even where the government suffers no monetary damages."). Thus, there is no need for the United States to trace and allege certain financial losses from the illegal compensation paid to specific ADAs, either at the pleading stage, or at any other point in this case.

Moreover, the financial loss to the United States in this case stems from the fact that it funded payments to EDMC that EDMC was not eligible to receive. As explained in the Section V.B. of this Memorandum, EDMC's compliance with the Incentive Compensation Ban is a prerequisite to its receipt of government funding. *See Hendow*, 461 F.3d at 1177. In *Hendow*, the Ninth Circuit flatly rejected the same argument that EDMC makes here and held that compliance with the Incentive Compensation Ban is material to the Government's decision to disburse student aid because "the eligibility of the University under Title IV and the Higher Education Act of 1965 – and thus, the funding that is associated with such eligibility – is *explicitly* conditioned . . . on compliance with the incentive compensation ban." *Id.* at 1175. Furthermore, promises to comply with the PPA are "'prerequisites,' and 'the *sine qua non*' of federal funding, for one basic reason: if the University had not agreed to comply with them, it would not have gotten paid." *Id.* at 1176.

EDMC makes much of the fact that the federal government continued to fund EDMC institutions after "knowing" about their alleged regulatory violations through Relator Lynntoya

Washington's initial complaint in this case.   The fact that ED permitted EDMC to receive government funding while this case is pending says nothing about the United States' approval of EDMC's conduct or the United States' right to recover.   "The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers; the False Claims Act does this by insisting that persons who send bills to the Treasury tell the truth.   As Justice Holmes put it, '[m]en must turn square corners when they deal with the Government.'"   *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008).

Finally, EDMC argues that the Complaint fails to allege any injury to the United States because, even if EDMC *has* violated the Incentive Compensation Ban, the students recruited by improperly compensated ADAs might have received financial aid from the United States anyway.   This argument is grounded in part on an eight-year-old internal ED memorandum circulated by the Deputy Secretary of Education to his subordinates.   In *Main*, the Seventh Circuit made quick work of EDMC's argument, *and the precise memorandum on which EDMC relies*:

> Such a memorandum has no legal effect; it was not published for notice and comment and does not authoritatively construe any regulation. . . . [The Department of Justice's] view, and not one implied by a back-office memo, represents the position of the United States. Not that the memo offers the University much assistance even on its own terms. It states that a violation of the rule against incentive compensation usually does not lead to financial loss to the United States-for any given student may well have enrolled, and been eligible, anyway. The University argues from this that a fraudulent certification does not violate the False Claims Act. That's a non-sequitur. The statute provides for penalties even if (indeed, *especially* if) actual loss is hard to quantify, and at the margin contingent payments will lead to *some* unwarranted enrollments (and thus some unjustified federal disbursements). That is, after all, why contingent payments are forbidden.

*Main*, 426 F.3d at 917.   EDMC's liability under the FCA does not turn on whether the students who were recruited by illegally compensated ADAs happened to be qualified for, or receive, government aid anyway.   *See Rogan*, 517 F.3d at 453 (rejecting argument that the United States'

damage award for illegal physician referrals be reduced because some illegally referred patients may have (1) received government-funded care elsewhere, or (2) paid for care themselves and holding that "neither possibility allows [the defendant] to keep money obtained from the Treasury by false pretenses, or avoid the penalty for deceit.").   In short, the United States' payments to EDMC are conditioned on EDMC's compliance with the Incentive Compensation Ban, and "[w]hen the conditions [of payment] are not satisfied, nothing is due." *Id.*

### D. EDMC'S COMPENSATION PLAN, AS DESIGNED, DOES NOT SATISFY THE SAFE HARBOR

EDMC's compensation plan, as designed, violates Title IV of the HEA because it involves "incentive payments," which the statute explicitly prohibits, and does not involve "fixed compensation," which, by the plain words of the Safe Harbor regulation, is necessary to come within the Safe Harbor.  In addition, the compensation plan violates the adjustments clause of the Safe Harbor because, even in its design, it provides for payments based solely on the number of students recruited.

In support of its position that its compensation plan satisfies Title IV of the HEA's regulatory Safe Harbor because it purportedly pays fixed compensation, EDMC simply provides a dictionary definition of "fixed" and recites, in a single sentence, that its compensation plan "meets this standard:  ADAs received a salary that was not adjusted or changed more than twice a year." (Defs.' Br. 11-12.)  Given the centrality of this issue to EDMC's defense, EDMC's argument is stunningly brief and conclusory.   It is also manifestly wrong:   EDMC has misinterpreted the meaning of fixed compensation and conflated two separate and independent requirements of the Safe Harbor.  Accordingly, EDMC's argument that its compensation plan, as designed, complies with the Safe Harbor lacks merit.

### 1.    The Elements and Purpose of the Safe Harbor

The Safe Harbor regulation provides non-exhaustive examples of compensation practices that do not violate the Incentive Compensation Ban.  EDMC's entire argument for dismissal is based on its flawed interpretation of one of these examples, which provides that an institution may engage in:

> The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.

34 C.F.R. § 668.14(b)(22)(ii)(A).

Throughout its brief, EDMC treats the Safe Harbor as a freestanding legal standard – as if it, rather than the statute that it interprets, controls.  Indeed, after a brief recitation of the Incentive Compensation Ban (Defs.' Br. 4), EDMC never mentions it again.  Importantly, however, the Safe Harbor regulation is an agency interpretation of a statutory command, which remains the controlling law, and requires that schools "not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities." 20 U.S.C. § 1094(a)(20).  ED itself, in proposing the regulation, emphasized that the regulation is formulated so as not to "circumvent[] the statutory prohibition against incentive payments." 67 Fed. Reg. 51723, 67056 (8/8/02).  Thus, any reading of the Safe Harbor regulation that would have the effect of circumventing the Incentive Compensation Ban is untenable.  *See Lee*, 655 F.3d at 994 (refusing to interpret the Safe Harbor in a way that "would render meaningless the 'purpose or objective' of the statute.").  Otherwise put, under a well-established principle of administrative law, the regulation should be interpreted to harmonize with the statute's plain

meaning, origins, and purpose. *See Delaware River Stevedores v. DiFidelto*, 440 F. 3d 615, 619 (3d Cir. 2006).

By its clear terms, the Safe Harbor regulation has two separate requirements (the second of which has two parts): a school must 1) pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage," and 2a) adjust that compensation no more than twice during any 12-month period, and 2b) not base any adjustment solely on a recruiter's enrollment numbers. It follows that unless a school is paying "fixed compensation" to its recruiters, it is not eligible for Safe Harbor protection. Moreover, with respect to the clause concerning adjustments, a compensation scheme does not qualify for the Safe Harbor if the compensation scheme permits any adjustments to the total compensation that are based entirely on enrollment numbers.

Construing the Safe Harbor as a means to implement the statutory command, the reach and purpose of the Safe Harbor are easy to discern. Even for companies that pay fixed compensation, such as an annual salary or hourly wage, it is common to take account of a number of factors when determining periodic raises or adjustments to a fixed salary. Given the breadth of the statutory Incentive Compensation Ban, a company that pays by the hour, or that pays a set annual salary might legitimately worry about whether taking recruitment success into account in determining customary periodic merit raises would run afoul of the Incentive Compensation Ban. The Safe Harbor provides important assurance that as long as a company is paying a fixed hourly or weekly rate, it may make adjustments to that rate based on past performance if it satisfies certain restrictions to prevent those adjustments from being used to evade the statutory ban. It does not purport to interpret or modify the meaning of "incentive compensation" or to be co-extensive with the statutory command; it simply provides one example of a common practice that does not violate the statute. It most certainly does not

purport to allow a company to redefine hourly wages or annual salary into a payment scheme that is linked directly to sales success.  On this understanding, the Safe Harbor is entirely consistent with the statute's Incentive Compensation Ban.

In stark contrast, EDMC proffers a reading of the Safe Harbor that would completely circumvent the Incentive Compensation Ban, transforming a general prohibition on all incentive compensation into a license for plans driven nearly entirely by incentive compensation.  EDMC's interpretation of the Safe Harbor's fixed compensation requirement has no footing in law or common understanding, and undermines the purposes of the Incentive Compensation Ban.

### 2. EDMC Does Not Pay "Fixed Compensation" Within the Meaning of the Safe Harbor

As the Complaint alleges, an ADA's compensation package includes payments specified by the Matrix, as well as various valuable prizes and bonuses. The Matrix, as its name suggests, is a table with rows and columns.  Running down the left side of the Matrix are numbered rows.  Which row an employee is in depends on how many students he recruits.  In particular, for each student recruited, the ADA receives a particular number of New Student Points, and the number of New Student Points determines the row.[17]  Running across the top of the Matrix, each column is headed by a qualitative term, from "unsatisfactory" to "outstanding."  Given a particular number of students recruited and an assignment of quality points, the Matrix specifies a dollar amount.

Once an ADA is "on the Matrix," she becomes eligible for per-student payment for each student she recruits.  The exact amount of the future payment for each particular number of students enrolled is specified in advance. For example, under the July 1, 2003 Matrix, an ADA

---

[17] For example, under the July 1, 2003 and December 2004 Matrices, ADAs would typically receive 3 new student points per student recruited.  (Compl. Ex. 13, at LW 1215; Compl. Ex. 16, at p. 11.)

who obtained 120 New Student Points would receive a minimum payment of $28,500, with additions thereafter depending on her quality factor ratings. (Compl. Ex. 16, at p. 13.)

Because the Matrix makes an employee's compensation depend in a way specified in advance on the number of students that an employee recruits, payments made in accordance with the Matrix are straightforwardly incentive payments. However, rather than issuing the incentive payments as students are recruited or at the end of the pay period, the payments earned during the twelve-month period immediately preceding each performance evaluation are paid out over the following six months in bi-weekly installments and labeled "salary." Consequently, at any given point in time, an ADA is receiving the payments specified by the Matrix for the students she has recruited during the twelve-month period immediately preceding her last performance evaluation, and she is earning payments that will be issued to her in the future, for students that she is currently recruiting.

But as the Complaint alleges, the fact that the payments "are accumulated and then paid to the employee in bi-weekly installments during the subsequent six-month period does not convert the improper compensation into permissible fixed compensation." (Compl. ¶ 153.) In fact, the terms "incentive compensation" and "fixed compensation" have set, well-known, and common sense meanings that EDMC cannot simply eviscerate. As is clear from any number of cases, as well as the dictionary, the core distinction is between, on the one hand, pay that is based (in a way specified in advance) on performance, for example, sales, and therefore varies with sales, and, on the other, pay based on time worked.

Judge Posner makes the distinction clear: "The essence of a commission is that it bases compensation on sales." *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 508 (7th Cir. 2007). Thus, an employee paid by salary earns the same amount per unit of time worked, regardless of

the number of sales he makes.   Conversely, for a worker who is paid by commission, compensation will vary according to the number of sales made.  *See also id.* at 510 ("sales depend on buyers' decisions, which are unpredictable.").   As Posner puts it, "[t]hat is how commissions work; they are decoupled from actual time worked." *Id.* at 509.

The Third Circuit recently discussed Judge Posner's analysis of commissions in *Yi* with approval in *Parker v. NutriSystem, Inc.*, 620 F.3d 274 (3d Cir. 2010).   There the Court considered whether a compensation plan constituted commissions within the meaning of the Fair Labor Standards Act, in which case the company did not have to pay its employees overtime. The Third Circuit noted approvingly Judge Posner's explanation that "[t]he essence of a commission is that it bases compensation on sales, for example a percentage of the sales price, as when a real estate broker receives as his compensation a percentage of the price at which the property he brokers is sold." *Id.* at 281.  In its analysis of why NutriSystem's plan provided for commissions, the Court explained that "it is persuasive that NutriSystem's plan 'bases compensation on sales,' just as Judge Posner described in *Yi*, [and that] sales associates' compensation is also 'decoupled from actual time worked,' a characteristic that both the Seventh Circuit and the Department [of Labor] identified as a hallmark of 'how commissions work.'" *Id.* at 284 (internal citations omitted).

Payment based on performance rather than time – a "decoupling" of compensation from actual time worked – is thus the hallmark of an incentive compensation system.   Conversely, payment based on and consistent over time, such as an hourly wage or weekly salary, is the hallmark of fixed compensation.  A person whose compensation is specified per sale earns incentive payments.  A person whose compensation is specified per hour or per year earns fixed compensation.   Under the well-established and common sense understanding of incentive

compensation, EDMC's compensation plan is plainly incentive compensation.  The very point of the Matrix is to specify in advance how much an ADA earns for each number of students recruited.

EDMC's argument is that ADAs receive a fixed salary merely because the amount of their paycheck does not change for six months.  In fact, however, those paychecks are the aggregated commissions from the previous twelve-month period.   And the ADA's total compensation at any given time includes not only the paychecks that she is currently receiving, but the future payments specified by the Matrix for the students that she is now enrolling. Whether an employee receives incentive compensation or fixed compensation depends on whether the employee's *total compensation* varies with the number of students he recruits, not whether her *current paycheck* does.

Throughout its brief, EDMC continually asserts that the Safe Harbor "permitted recruiter *salaries* that were not based 'solely' on enrollment..." (Defs.' Br. 40) (emphasis added); *see also id.* at 1, 16, 19, 38.  That is, it attempts to rewrite the regulation's "solely" clause so that it applies to overall compensation. But it is *adjustments* to compensation that the Safe Harbor's second clause allows to depend in part on past recruitment success.  Thus, EDMC's argument cannot gain even initial traction unless the Matrix specifies adjustments to compensation.  It does not. Like "fixed compensation," "adjustment" to compensation has a common, well-understood meaning; in plain, general terms, an adjustment to salary takes the pre-existing salary as a point of departure and then increases or decreases it, typically within a fairly small range.  EDMC's Matrix did no such thing: it did not specify an increase or decrease in a pre-existing salary, but rather a bottom-line amount of compensation based on the same fixed formula, computed anew each 6 months depending on the ADA's performance.  ADAs' paychecks under the Matrix

changed not by virtue of a raise or a pay cut but because they had varying recruitment success over time, just like a salesman with fewer sales.  On its face, this is a specification of the ADA's compensation, not a change to that compensation.

If EDMC's interpretation were sound, it would completely gut the controlling statute, in violation of elementary principles of administrative law, a point EDMC does not attempt to dispute.  It would permit any incentive compensation to be repackaged and legitimized as fixed compensation, making a mockery of the statutory mandate.  The unavoidable implication of EDMC's argument is that the Safe Harbor allows a company to take a system that has all the defining characteristics of incentive compensation, and transform it to "fixed compensation" just by paying it out in even increments during the next pay period.  That interpretation does violence not only to the statutory and regulatory scheme, but also to the common understanding of fixed and incentive compensation.

### 3.   As Designed, the Matrix Provides For Salary Adjustments Based Solely on Success in Recruiting Students

Even if the Matrix were treated, as EDMC would have it, as a specification of *adjustments* to compensation, it would fail the relevant requirement of the Safe Harbor regulation because it would provide for many "adjustments" based solely on the number of students recruited.[18]  That is because there are many instances in which, according to the explicit design of the Matrix, *even if an ADA had received a lower or higher quality rating*, it would have made no difference to the size of his or her increase or decrease in compensation.  That increase or

---

[18] In fact, as the Complaint alleges, EDMC's plan provided that an ADA must recruit a specified number of students in order to "go on to the Matrix" in the first place, at least at the 12-month mark.  (Compl. ¶ 98.)  According to the Complaint, an admission employee's initial eligibility to "go on the Matrix" is strictly based on the number of students the admissions employee can recruit.  (Compl. ¶ 154.)  This initial graduation from the employee's starting salary to "Matrix compensation" is itself plainly an adjustment to compensation.  It is therefore an adjustment to compensation based solely on enrollment numbers.  For this reason alone, EDMC's compensation plan as written does not qualify for the Safe Harbor.

decrease – the adjustment – is determined entirely by the number of students the ADA recruited in the previous period.

To take one of many examples, suppose that an ADA with a quality rating of "Needs Improvement" is at Level 2.[19]  If she increases her recruitment numbers to Level 3, she will receive an additional $3000.  But – and this is the crucial point – if she had had a quality rating of "Meets Expectations," and she had made the same move from Level 2 to Level 3, her increase in compensation would still have been $3000.  Indeed, if her quality rating had been "Highly Effective," or even "Outstanding," she would still have received a $3000 increase in compensation.  In such instances, which abound on the face of the Matrix, the quality rating makes no difference to the bottom line.

### E.  THE UNITED STATES' COMMON LAW CLAIMS ARE PROPERLY PLEADED AND NOT SUBJECT TO DISMISSAL

EDMC asserts that this Court should dismiss the United States'[20] common-law claims for unjust enrichment and payment by mistake of fact on the grounds that the claims: 1) have been preempted by Congress; 2) arise from a breach of contract and therefore are "strictly prohibited"; and 3) since EDMC used the federal funds in part to educate students, the United States has received the "benefit of the bargain" and recovery under common law claims would constitute an impermissible "double recovery."  (Defs.' Br. 47.)  EDMC's arguments regarding the United States' common law claims are factually and legally incorrect.

First, there is extensive and longstanding authority that, absent clear indication to the contrary by Congress, the enactment of statutory remedies (such as the FCA) or of administrative

---

[19] The illustration in this paragraph is based on the July 1, 2003 edition of the Matrix.  (Compl. Ex. 16, p. 13.)

[20] References to the "United States" in Section V.E. of this Memorandum refer only to the United States of America, and do not include the States or Relators.

procedures (such as the regulation EDMC cites for retroactive re-payment) does not eliminate the United States' pre-existing right to seek recovery under the common law or equitable theories. *See United States v. Texas*, 507 U.S. 529, 534 (1993) ("[C]ourts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except 'when a statutory purpose to the contrary is evident.'") (quoting *Astoria Fed. Sav. & Loan Ass'n. v. Solimino*, 501 U.S. 104, 108 (1991)); *United States v. Silliman*, 167 F.2d 607, 610-11 (3d Cir. 1948) ("The defendant offers us no reason, and we see none, for concluding that because [the FCA statute] enlarged the liability of the defendant, it abrogated the right which the sovereign otherwise has to pursue common law remedies against tort-feasors in its own courts."); *United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 667 (4th Cir. 1996) ("We start from the premise that federal statutes do not, by implication, abrogate the government's right to bring common law suits."); *Pooler v. United States*, 127 F. 519, 520 (1st Cir. 1904) ("The right in this case . . . was not created by Congress, but existed at common law; and it is plain that whatever remedies are afforded to the United States by the provisions of the Revised Statutes which the plaintiff in error cites are cumulative, so that it is at the option of the United States which to elect."); *see also United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 8 (1st Cir. 2005) (administrative procedures created under Medicare Act did not "displace[] the underlying common law causes of action relied on by the government in this case to recover payments wrongfully made out of the public fisc.").

There is no possible basis for contending, and EDMC does not offer any, that Congress intended in the FCA to displace common law remedies. In addition, a holding that the United States may not plead common law claims as an alternative to an FCA theory would go against longstanding pleading practice. The cases that EDMC cites are inapposite because they involve

statutory schemes expressly stating Congress's intention to displace common law remedies. *See, e.g., Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) (involving the preclusion of state tort law claims by a detailed federal regulatory scheme); *American Elec. Power Co., Inc. v. Connecticut*, ___ U.S. ___, 131 S. Ct. 2527, 2538 (2011) (holding that Congress explicitly displaced common law nuisance claims for emissions, because the Clean Air Act "permits emissions *until* EPA acts") (emphasis in original). *Cf., United States v. Borin*, 209 F.2d 145, 148 (5th Cir. 1954) (recognizing that the FCA does not constitute an exclusive remedy and that the "the remedy for common law fraud is always available"). As documented above, it is well-established that common law actions are available to the government to supplement those remedies found in federal statutes, as long as the statute does not expressly abrogate those rights. *Texas*, 507 U.S. at 534. Courts have reaffirmed this principle many times. *Moffitt*, 83 F.3d at 667-68 (collecting cases); *Lahey*, 399 F.3d at 15 (presumption of retention of common law remedies "may be even stronger when a longstanding power of the United States is involved. In the context of recovery of overpayments, the government has broad power to recover monies wrongly paid from the Treasury, even absent any express statutory authorization to sue.").

Equally well-established is the principle that under Rule 8(d)(2)[21] of the Federal Rules of Civil Procedure, a plaintiff may plead alternative theories of liability, regardless of whether such theories are consistent with one another. *United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 78-79 (D.D.C. 2003) (holding that FRCP 8(e)(2) allows the plaintiff to maintain both FCA and common-law unjust enrichment claims); *Scott v. District of Columbia*, 101 F.3d 748, 753 (D.C. Cir. 1996). The United States therefore may proceed with claims alleging FCA violations as well as claims for unjust enrichment or payment by mistake. *E.g., United States v.*

---

[21] Fed. R. Civ. P. (8)(d)(2) was formerly Fed. R. Civ. P. (8)(e)(2).  Much of the case law cites the former provision, Rule (8)(e)(2).

*Bouchey,* 860 F. Supp 890, 892-94 (D.D.C. 1994); *United States ex rel. Mayman v. Martin Marietta Corp.,* 894 F. Supp. 218, 221, 225 (D. Md. 1995); *United States v. Univ. Hosp. at Stony Brook,* No. 97-cv-3463, 2001 WL 1548797, at *1 & n.1 (E.D.N.Y. Oct 26, 2001). While the United States is limited to one recovery, where it has not prevailed upon its statutory claim, it may recover under applicable common law theories. *See, e.g., United States v. Applied Pharmacy Consultants, Inc.,* 182 F.3d 603, 609 (8th Cir. 1999) (where jury found no liability under FCA, district court appropriately awarded relief to government on its unjust enrichment claim); *United States v. Mead,* 426 F.2d 118, 124 (9th Cir. 1970) (where court found insufficient evidence to support liability under FCA, government was permitted to recover under its alternate theory of payment by mistake); *Borin,* 209 F.2d at 148 (where statute of limitations for FCA claim had expired, government was permitted to pursue restitution of payments made for invalid claims under terms of Emergency Price Control Act and under theory of common law fraud).

Thus, at the motion to dismiss stage, courts generally will not preclude the United States from pursuing alternative theories of recovery. Rather, the overwhelming judicial practice is to permit the United States to pursue common law theories alongside a claim under the FCA all the way to judgment. *E.g., United States ex rel. Roberts v. Aging Care Home Health, Inc.,* 474 F. Supp. 2d 810, 820-21 (W.D. La. 2007) (in FCA case, awarding government summary judgment on its payment by mistake and unjust enrichment theories based on Stark Law violations, and holding that FCA claim, which required scienter showing not required by alternative common law claims, was not an adequate remedy); *United States ex rel. Roberts v. Aging Care Home Health, Inc.,* No. 02-2199, 2008 WL 2945946, at *11 (W.D. La. July 25, 2008) (granting summary judgment to government under FCA, payment by mistake and unjust enrichment claims, but limiting damages to those awarded under FCA to avoid double recovery); *United*

*States v. Stevens*, 605 F. Supp. 2d 863, 870 (W.D. Ky. 2008) (rejecting "adequate remedy at law" argument and holding that because "the FCA claim against [defendant] has not been fully litigated, it would be premature to dismiss the alternative unjust enrichment claim"); *United States v. Rogan*, 459 F. Supp. 2d 692, 727-28 (N.D. Ill. 2006) (after bench trial, finding defendant liable under FCA, payment by mistake and unjust enrichment, but setting aside relief under common law claims to avoid double redress for same wrong); *Purcell*, 254 F. Supp. 2d at 78-79 (in FCA case, refusing to dismiss unjust enrichment and payment by mistake claims, notwithstanding "adequate remedy at law" argument, because parties are permitted to plead alternate theories of recovery).

In a related vein, EDMC contends that "because the Government's common-law equity claims arise from an alleged breach of contract (violation of the PPAs), they are strictly prohibited." (Defs.' Br. 47.)  EDMC is wrong on several fronts.  First, regardless of whether or not the PPA itself constitutes a contract, separate and apart from the requirements in the PPA, EDMC is limited by federal statute and regulations as to what conduct it may lawfully engage in. Here, the United States' claims are based not on EDMC's violation of a PPA, but on EDMC's violation of Title IV of the HEA, and its accompanying federal regulations, which prohibit EDMC from paying incentive compensation.  The relevance of the PPA to this litigation is not its potential status or character as a contract, but rather the fact that each PPA signed by EDMC contains an express (false) statement that EDMC is complying with Title IV of the HEA's Incentive Compensation Ban.  Therefore, it is proper for the United States to assert common law claims for payment by mistake and unjust enrichment based on EDMC's violation of the HEA and its implementing regulations, whether or not it would also have a breach of contract claim based on violation of the PPA itself.  Moreover, even if the United States were asserting a breach

of contract claim, as noted, it would not be precluded at this pleading stage from asserting alternative common law theories of recovery. Indeed, the three cases EDMC cites – a diversity case interpreting Pennsylvania contract doctrine, *see Wayne Moving & Storage of N.J., Inc. v. School Dist. of Phila.*, 625 F.3d 148, 150 (3d Cir. 2010), and two cases arising under ERISA, whose comprehensive regulatory scheme does preclude certain remedies, *see Van Orman v. Am. Ins. Co.*, 680 F.2d 301 (3d Cir. 1982), and *Crews v. Cent. States, Se. & Sw. Areas Pension Fund*, 788 F.2d 332, 333 (6th Cir. 1986) – are wholly inapposite. Rather, "it is axiomatic" that equitable claims may be pleaded in the alternative to contract claims. *United States ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*, No. 5:00-CV-39-M, 2004 WL 2403114, at *26 (W.D. Ky. Sep. 30, 2004) (rejecting defendants' argument that United States' unjust enrichment count "must be dismissed because the Government alleges that numerous contracts governed Defendants' activities"; "a party is permitted pursuant to Fed. R. Civ. P. 8(e)(2) to 'state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime ground'") (citing multiple cases).

Finally, EDMC's blithe assertion that the United States' claims are foreclosed because the United States "has received the benefit of its bargain – the education of students," (Defs.' Br. 47), is legally groundless. Here, EDMC has not complied with its end of the bargain, and the United States certainly has not received the benefit of its bargain with EDMC. In exchange for the privilege of participating in Title IV, HEA programs, EDMC must comply with the dictates of federal law and regulations, specifically the Incentive Compensation Ban. The United States alleges in this lawsuit that, despite expressly representing to the United States in PPAs and other documents that it was complying with the Incentive Compensation Ban, in fact, EDMC violated that provision, and therefore was not eligible to receive Title IV funds. The benefit of the

bargain to which the United States is entitled is not merely the education of students, but the education of students by a company that complies with federal law and regulations and is therefore eligible to receive the Title IV federal funds it seeks from the United States.

### F.    EDMC'S MOTION TO STRIKE SHOULD BE DENIED

This Court should deny EDMC's request to strike certain paragraphs[22] of the Complaint because the cited paragraphs and the allegations therein are not "redundant, immaterial, impertinent, or scandalous." *See* F.R.C.P. 12(f).  To the contrary, the allegations evidence EDMC's violations of the Incentive Compensation Ban by compensating its admissions personnel solely based on their success in securing student enrollments.  Accordingly, they are material and should not be stricken.

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Motions to strike, however, are "not favored and usually will be denied unless the allegations show no possible relation to the controversy and may cause prejudice to one of the parties." *See DOCA Company v. Westinghouse Electric Co., LLC,* 2011 U.S. Dist. LEXIS 88097, at **11-12  (W.D. Pa. Aug. 9, 2011); *see also* 5C Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1382 ("there appears to be general judicial agreement, as reflected in the extensive case law on the subject, that [Rule 12(f) motions] should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action."); *Gority v. Norfolk S. Ry. Co.,* No. 3:10-cv-87, 2011 WL 4542676, at *2 (W.D. Pa. Sept. 28, 2011) (striking portions of a plaintiff's complaint is a "drastic remedy")

---

[22] It appears from general discussion in EDMC's brief that it seeks to strike Paragraphs 105, 120, 137, and 140-49.

(citations omitted).  As the court noted in *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F.

Supp. 1279, 1292 (D. Del. 1995), a case cited and relied upon by EDMC in support of its Motion

to Strike, "[w]hen faced with allegation that could possibly serve to achieve a better

understanding of plaintiff's claims or perform any useful purpose in promoting the just

disposition of the litigation, courts generally deny such motions to strike." *Del. Health Care*,

893 F. Supp. at 1292 (citing 5A Wright & Miller at § 1382, at 695-96).  In another case cited by

EDMC,[23] the court refused to strike several specified paragraphs in Count III of plaintiff's

complaint because, as the Court concluded, "[a] motion to dismiss[24] for immateriality or

impertinence should not be granted if part of the challenged material is so connected with the

subject matter of the suit that it might be deemed to present a question of law or fact that the

court ought to hear." *River Road Dev. Corp. v. Carlson Corp.*, No. 89-7037, 1990 U.S. Dist.

LEXIS 6201, at **21-22 (E.D. Pa. May 23, 1990).[25]

Here, the challenged allegations, along with other allegations set forth in the Complaint,

are germane to the United States' claims that EDMC's compensation plan, as implemented,

violates the FCA, and that EDMC's compensation plan, as designed and as implemented, violates

---

[23] EDMC cites *River Road* for the proposition that a court may strike confusing allegations in a complaint under Rule 12(f).  In that case, however, the court struck only two words from the complaint – conversion and convert – because there were no conversion allegations in the complaint and therefore the terms (as terms of art) confused the issues in the case.  *See River Road*, 1990 U.S. Dist. LEXIS 6201, at *7.  As noted above, the Court refused to strike Section III of the Complaint.

[24] Although the court uses the term "dismiss," the court's analysis is under (or at a minimum consistent with) F.R.C.P. 12(f).

[25] EDMC also cites *NN&R, Inc. v. One Beacon Ins. Grp.*, 362 F.Supp.2d 514, 525 (D.N.J. 2005) to support its motion to strike.  *NN&R*, like EDMC's other citations, is inapposite.  First, the plaintiff did not oppose defendant's motion to strike based on immateriality.  Second, the allegations struck by the court in the amended complaint related to: "designation of trial counsel; certification that no other actions are pending; certification regarding demand for service of pleadings and interrogatories; demand for certification of insurance information; request for reproduction of documents addressed to defendant; and demand for answer to interrogatories."  There is simply no comparison between the patently immaterial portions of NN&R's amended complaint and the United States' allegations in this case.

the common law.  Specifically, the allegations EDMC seeks to strike tend to show that EDMC has violated the Incentive Compensation Ban by compensating admissions personnel based solely on their success in obtaining student enrollments.

Some challenged allegations, such as those regarding EDMC's "President's Club," (Compl. ¶¶ 140-143) directly establish violations of the Incentive Compensation Ban.  The Complaint states directly that the President's Club trips "are not designed for the purpose of educating and improving the skills of the institutions' admissions personnel in a way that complies with the incentive compensation ban." (Compl. ¶ 143.)  This allegation directly belies EDMC's reliance on ED's Feb. 6, 1995 letter.  (Ex. 11 to Defs.' Mot. to Dismiss).  EDMC conveniently omits ED's caution that its equivocal blessing was squarely premised on the assumption that "these business meetings are designed for the purpose of educating and improving the skills of the institutions' admissions personnel, or are otherwise intended for the benefit of the institution . . . ." (*See id.*)  The Complaint alleges that EDMC's President's Club has no such educational purpose and is merely a method by which EDMC can pay incentive compensation to its best recruiters.[26]  Taken as true, these allegations establish a violation of the Incentive Compensation Ban.  EDMC's challenge is to their truth, but such a challenge raises an issue for trial or summary judgment, not grounds for an order striking the allegations.

The President's Club is only one method by which EDMC improperly incentivizes admissions personnel.  EDMC also provides financial incentives for ADAs to enroll more students on a short term basis (daily and weekly), including Godiva Chocolate gift baskets, movie tickets, Pittsburgh Pirate baseball tickets, amusement park tickets, various restaurant and Starbuck gift cards and free lunches with EDMC management.  (Compl. ¶ 145.)  In each case,

---

[26] The Complaint also alleges that, in contravention of the 1995 letter's guidance, EDMC pays for a family member or significant other to attend the President's Club festivities. (*See* Compl. ¶ 141.)

EDMC directly and expressly rewards ADAs' enrollment performance with bonuses and increased compensation. (Compl. ¶ 146.) Even if this behavior does not in and of itself violate the Incentive Compensation Ban as alleged by the United States (it does), it nevertheless is probative of EDMC's "relentless and exclusive focus on the number of students as ADA is able to recruit," (Compl. ¶ 88) allegations that are at the heart of the Complaint and, therefore, should not be stricken.

Similarly, the Complaint's allegations regarding EDMC's close monitoring of "underachievers," and its termination of admissions personnel who fail to meet targeted enrollment numbers (Compl. ¶¶ 137, 148) tend to demonstrate that EDMC's real standard for admissions personnel performance is the number of students they recruit, and nothing more. The same holds true for the Complaint's allegations regarding "selling" and "tracking enrollments." (Compl. ¶¶ 105, 120.) These allegations, together with others set forth in the Complaint, demonstrate, for example, that EDMC's compensation plan, as implemented, renders the quality ratings a sham and compensates admissions personnel based solely on the number of students they recruit.

Because the allegations EDMC seeks to strike are relevant, material, pertinent, and are not scandalous, they should remain. Indeed, they certainly "serve to achieve a better understanding of plaintiff's claims [and] perform a[] useful purpose in promoting the just disposition of the litigation." *Del. Health Care*, 893 F. Supp. at 1292 (citing 5A Wright & Miller at § 1382, at 695-96). The challenged allegations directly and logically relate to the subject matter at issue here, and accordingly, these portions of the Complaint should not be stricken.

## VI.   **CONCLUSION**

For all of the foregoing reasons, the United States respectfully requests that this Court deny EDMC's Motion to Dismiss and, in the Alternative, to Strike.

Respectfully submitted,

TONY WEST
Assistant Attorney General
Civil Division


DAVID J. HICKTON
United States Attorney


/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney
Western District of PA
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7452
Email: christy.wiegand@usdoj.gov
Counsel for Plaintiff United States of America


JOYCE R. BRANDA
MICHAEL D. GRANSTON
JAY D. MAJORS
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, DC 20044
(202) 307-0264
Counsel for Plaintiff United States of America

/s/ Kenny V. Nguyen
Kenny V. Nguyen
California Attorney General's Office
1300 I Street
Sacramento, CA 95814
(916) 323-6311
Fax: 916-323-6882
Email: kenny.nguyen@doj.ca.gov
Counsel for Plaintiff State of California


/s/ Rene D. Harrod
Rene D. Harrod
Office of the Attorney General, State of Florida
110 SE 6th Street, 10th Floor
Ft. Lauderdale, FL 33301
(954) 712-4600
Fax: 954-527-3708
Email: rene.harrod@myfloridalegal.com
Counsel for Plaintiff State of Florida


/s/ Jennifer M. Zlotow
Jennifer M. Zlotow
Office of the Illinois Attorney General
100 W. Randolph Street, 11th Floor
Chicago, IL 60601
(312) 814-5354
Fax: 312-814-4452
Email: jzlotow@atg.state.il.us
Counsel for Plaintiff State of Illinois


/s/ Patricia O. Erdmann
Patricia O. Erdmann
Corinne W. Gilchrist
State of Indiana Office of the Attorney General
302 West Washington Street
IGCS, Fifth Floor
Indianapolis, IN 46204
(317) 232-6318
Fax: 232-7979(fax)
Email: Patricia.erdmann@atg.in.gov
Counsel for Plaintiff State of Indiana

/s/ Jason Pleggenkuhle
Jason Pleggenkuhle
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1100
St. Paul, MN 55101
(651) 757-1147
Jason.pleggenkuhle@ag.state.mn.us
Counsel for Plaintiff State of Minnesota

s/ Thomas J. Farrell
Thomas J. Farrell, Esquire
PA ID No. 48976
Farrell & Reisinger, LLC
200 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219-1827
(412) 893-1380
tfarrell@farrellreisinger.com
Counsel for Relators

/s/ Harry P. Litman
Harry P. Litman, Esquire
PA ID No. 51634
Litman Law Firm
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
(412) 456-2000
harry.litman@verizon.net
Counsel for Relators

/s/ H. Yale Gutnick
H. Yale Gutnick, Esquire
PA ID No. 1226
Strassburger McKenna Gutnick & Gefsky
Four Gateway Center, Suite 2200
Pittsburgh, PA 15222
(412) 281-5423
ygutnick@smgglaw.com
Counsel for Relators

66

/s/ David J. Chizewer
David J. Chizewer, Esquire
William C. Meyers, Esquire
Courtney R. Baron, Esquire
Goldberg Kohn Ltd.
55 East Monroe Street
Suite 3300
Chicago, IL 60603
(312) 201-3938
djc@goldbergkohn.com
wcm@goldbergkohn.com
courtney.baron@goldbergkohn.com
Counsel for Relators

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of December, 2011, I have served a copy of the within **UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN THE ALTERNATIVE, TO STRIKE, JOINED BY THE STATES OF CALIFORNIA, FLORIDA, ILLINOIS, INDIANA, MINNESOTA, AND THE RELATORS**, either electronically or by first-class United States mail, upon the following:

Laura E. Ellsworth, Esquire
Charles H. Moellenberg, Jr., Esquire
Scott W. Brady, Esquire
Amy K. Pohl, Esquire
Thomas S. Jones, Esquire
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA  15219
**Counsel for Defendants**

Timothy H. Hatch, Esquire
GIBSON DUNN
333 South Grand Avenue
Los Angeles, CA  90071-3197
**Counsel for Defendants**

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney