**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA, AND THE STATES OF CALIFORNIA, FLORIDA, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEW JERSEY, NEW MEXICO, NEW YORK, AND TENNESSEE, AND THE DISTRICT OF COLUMBIA, each ex rel. LYNNTOYA WASHINGTON and MICHAEL T. MAHONEY,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil Action No. 07-CV-461** |
| ) | |
|         **Plaintiffs,** )<br>    **v.** ) | **Honorable Terrence F. McVerry** |
| ) | |
| **EDUCATION MANAGEMENT CORPORATION; et al.,** )<br>) | |
| ) | |
|         **Defendants.** ) | |

**MEMORANDUM OF LAW OF THE STATES OF CALIFORNIA, FLORIDA
ILLINOIS, INDIANA, AND MINNESOTA, AND RELATORS IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.  EDMC IS LIABLE UNDER THE FCA BECAUSE ITS COMPENSATION PLAN AS DESIGNED DID NOT SATISFY THE SAFE HARBOR. ..............................2

  A.  The Matrix Does Not Provide for Fixed Compensation. ..........................................4

    1.  The Matrix Provides for Incentive Compensation, Not Fixed Compensation. ...........................................................................................4

    2.  The Matrix Does Not Adjust Fixed Compensation, But Simply Specifies Incentive Payments, Which Are Calculated Twice a Year Without Any Adjustment to a Fixed Salary.................................................6

  B.  The Matrix Violates the "Solely" Clause of the Safe Harbor. .................................7

  C.  The JCII Contains Extensive Allegations Concerning Scienter That Plainly Satisfy The Legal Standard At The Pleading Stage.................................................9

    1.  EDMC's Concealment Of Its Policies........................................................11

    2.  EDMC's Executive Management Was Aware of ED's View of the ICB. .........................................................................................................13

    3.  EDMC's Management Expressed the Matrix's Purpose to Get Around the ICB......................................................................................14

    4.  Recruitment of Students Was Effectively The Sole Factor In Compensation. ..........................................................................................15

  D.  EDMC May Not Shield Itself From Liability, Much Less Support a Motion to Dismiss, By Arguing that It Relied On Advice of Counsel or on a Wrong but Reasonable Interpretation of the Safe Harbor...................................17

II.  THE STATES' ALLEGATIONS IN SUPPORT OF THEIR FCA AND EQUITABLE CLAIMS SATISFY RULE 8 AND RULE 9(B)........................................19

III.  THE CLAIMS THAT EDMC SUBMITTED OR CAUSED TO BE SUBMITTED TO THE STATES WERE FALSE. ..................................................................................22

  A.  State Funding of EDMC Institutions is Conditioned on Compliance with the Incentive Compensation Ban. ..........................................................................22

  B.  Falsity Under the FCAs Is Plainly Established Under Any of the Multiple Approaches Courts Employ. ...................................................................................24

IV.  EDMC HAS MISCHARACTERIZED THE STATES' STATUTORY REGIMES. ........29

A.      Defendants Were Required To Participate In The Federal Pell Grant Program To Qualify As "Eligible Institutions" Under Minnesota Law.................29

B.      California Did Not and Does Not Permit Schools To Pay Their Recruiters Incentive Compensation In EDMC's Manner. .......................................32

C.      Florida's FCA Claim is Based Upon EDMC'S False Certification of Compliance With The Federal Incentive Compensation Ban................................35

D.      Indiana and Minnesota Are Not Seeking Retroactive Application Of Their False Claims Acts. ......................................................................................35

E.      California May Recover Treble Damages Under Its False Claims Act.................36

V.      THE STATES' EQUITABLE CLAIMS ARE PROPERLY PLED AND NOT SUBJECT TO DISMISSAL. ...........................................................................37

A.      The States are Entitled to Equitable Relief if There is No Adequate Remedy at Law. .......................................................................................37

B.      The States' Claims Involve an Area of Exclusive State Interest, and Thus, Are Not Precluded..................................................................................38

C.      Allowing the States to Advance Equitable Claims Will Not Result in Double Recovery. ...................................................................................40

D.      Illinois and California Law Recognizes Independent Claims for Unjust Enrichment...........................................................................................41

VI.     THE CONTINUED INCLUSION OF MICHAEL T. MAHONEY AS A RELATOR IN THIS ACTION IS APPROPRIATE. ..........................................42

VII.    THE RELATORS PROPERLY CONVEY THE ALLEGATIONS IN THE COMPLAINTS..............................................................................................46

CONCLUSION .....................................................................................................49

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Avco Cmty. Developers, Inc. v. S. Coast Reg'l Comm'n*, 553 P.2d 546 (Cal. 1976)..................... 36

*Bryan v. United States*, 524 U.S. 184, 192 (1998)....................................................... 18

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001) .......................................... 38

*Chamber of Commerce of the United States v. Whiting*,
    131 S. Ct. 1968 (2011).................................................................. 39

*Cleary v. Philip Morris Inc.*,
    656 F.3d 511 (7th Cir. 2011) ............................................................ 41

*Cnty. Mobilehome Positive Action Comm., Inc. v. Cnty. of San Diego*,
    62 Cal. App. 4th 727 (1998) ............................................................ 36

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009)............................................................. 12

*Green v. Fund Asset Mgmt., L.P.*,
    245 F.3d 214 (3d Cir. 2001)............................................................. 39

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
    MDL No. 1827, 2011 WL 4345435 (N.D. Cal. Sept. 15, 2011) .................................... 42

*Lewsader v. Wal-Mart Stores, Inc.*,
    694 N.E.2d 191 (Ill. App. Ct. 1998) ...................................................... 37

*Meridian Fin. Advisors, Ltd. v. Pence*,
    763 F. Supp. 2d 1046 (S.D. Ind. 2011) .................................................... 37

*Mikes v. Straus*,
    274 F.3d 687 (2d Cir. 2001).............................................................. 25

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993)............................................................. 33

*Phillips v. Cnty of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)................................... 12

*Picher v. UNITE*,
    646 F. Supp. 2d 759 (E.D. Pa. 2009) ...................................................... 14

*Porous Media Corp. v. Pall Corp.*,
   186 F.3d 1077 (8th Cir. 1999) .................................................................. 31

*Raintree Homes, Inc. v. Vill. of Long Grove*,
   807 N.E.2d 439 (Ill. 2004) ....................................................................... 41

*Ramona Manor Convalescent Hosp. v. Care Enters.*,
   177 Cal. App. 3d 1120 (1986) .................................................................. 38

*Southtown Plumbing, Inc. v. Har-Ned Lumber Co.*,
   493 N.W.2d 137 (Minn. Ct. App. 1992) .................................................. 37

*State v. Caldwell*,
   803 N.W.2d 373, 382 (Minn. 2011) ......................................................... 31

*Twp. of S. Fayette v. Allegheny Cnty. Hous. Auth.*,
   27 F. Supp. 2d 582 (W.D. Pa. 1998) ....................................................... 31

*United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006)................................. 48

*United States  ex rel. Howard v. Lockheed Martin Corp.*,
   No. 1:99-CV-285, 2011 WL 4348104 (S.D. Ohio Sept. 16, 2011) ........................... 44, 46

*United States ex rel Pilecki-Simko v. Chubb Institute*, No. 06-3562, 2010 WL 3463307 at
   * 6 (D.N.J. Aug, 27, 2010) ....................................................................... 47

*United States ex rel. Becker v. Tools & Metals, Inc.*,
   Nos. 3:05-CV-0627-L, 3:05-CV-2301-L, 2009 WL 855651 (N.D. Tex. March 31,
   2009) ......................................................................................................... 2

*United States ex rel. Cantekin v. Univ. of Pittsburgh*,
   192 F.3d 402 (3d Cir. 1999)........................................................... 10, 11, 18

*United States ex rel. Conner v. Salina Reg'l Health Center*, *Inc.*,
   543 F.3d 1211 (10th Cir. 2008) ............................................................... 28

*United States ex rel. Feingold v. Palmetto Gov't Benefits Admin.*, 477 F. Supp. 2d 1187
   (S.D. Fla 2007)................................................................................... 47, 48

*United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*,
   495 F.3d 103 (3d Cir. 2007)..................................................................... 10

*United States ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) .......................................................... passim

*United States ex rel. Hutcheson v. Blackstone Med., Inc.*,
   647 F.3d 377 (1st Cir. 2011)..................................................................... 26

*United States ex rel. Johnson v. Shell Oil Co.*,
   No. 9:96 CV 66 Dckt. No. 426 (E.D. Tex. Dec. 8, 1998)................................. 45

*United States ex rel. Main v. Oakland City University*,
   426 F.3d 914 (7th Cir. 2005) .............................................. 24, 25, 27

*United States ex rel. Marcus v. Hess*,
   317 U.S. 537 (1943)......................................................... 40

*United States ex rel. O'Keefe v. McDonnell Douglas Corp.*,
   918 F. Supp. 1338 (E.D. Mo. 1996)........................................... 2

*United States ex rel. Pilecki-Simko v. Chubb Inst.*,
   No. 06-3562, 2010 WL 1076228 (D.N.J. Mar. 22, 2010) ...................... 7

*United States ex rel. Pilecko-Simko v. Chubb Institute*,
   No. 10-3907, 2011 WL 3890975 (3d Cir., Sept 6, 2011) .................. 12, 15

*United States ex rel. Powell v. Am. Intercontinental Univ., Inc.*, 756 F. Supp. 2d 1374
   (N.D.Ga. 2010) ....................................................... 28, 47

*United States ex rel. Roberts v. Aging Care Home Health, Inc.*,
   474 F. Supp. 2d 810 (W.D. La. 2007)....................................... 38

*United States ex rel. Roby v. Boeing Co.*,
   302 F.3d 637 (6th Cir. 2002) ............................................. 36

*United States ex rel. Sanders v. E. Ala. Healthcare Auth.*,
   953 F. Supp. 1404 (M.D. Ala. 1996) ....................................... 45

*United States ex rel. Schmidt v. Zimmer, Inc.*,
   386 F.3d 235 (3d Cir. 2004)............................................... 25

*United States ex rel. Schumann v. AstraZeneca PLC*, No. 03-5423, 2010 WL 4025904, at
   *10 (E.D. Pa. Oct. 13, 2010)............................................. 47

*United States ex rel. Westfall v. Axiom Worldwide, Inc.*, No. 8:06-cv-571-T-33TBM,
   2009 WL 1424213, at *5 (M.D. Fla. May 20, 2009)......................... 48

United States ex rel. Wilkins v. United Health Group*,
   659 F.3d 295 (3d Cir. 2011)* .......................................... 24, 25, 28

*United States v. Martorano*,
    767 F.2d at 66, *cert. denied*, 474 U.S. 949, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985).. 18, 19

*United States v. Ragsdale*,
   426 F. 3d 765 (5th Cir. 2005) ............................................ 19

*United States v. Smith*,
    No. 99-10447, 2001 WL 371927 (9th Cir. 2001) (unpublished) ...................................... 19

*United States v. Traitz*, 871 F.2d 368, 382 (3d Cir. 1989) ............................................. 18

*United States v. Urfer*,
    287 F.3d 663 (7th Cir. 2002) ........................................................................... 19

*United States v. Wood*,
    446 F.2d 505 (9th Cir. 1971) ........................................................................... 19

**Statutes**

31 U.S.C. § 3729(b) ....................................................................................... 11, 18

31 U.S.C. § 3730(b)(5) ............................................................................... 42, 43, 45

740 ILCS 175/3(b) ............................................................................................. 20

740 ILCS 175/3(b)(1) ......................................................................................... 20

Cal. Gov't Code § 12650(b)(2) (2010) ....................................................................... 20

California False Claims Act, Cal. Gov't Code § 12651(a)(1) ................................................. 20

Florida False Claims Act, § 6.082.2(a) ..................................................................... 20

Illinois False Claims Act, 740 ILCS 175/3(a)(1) ............................................................ 20

Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/3(a) ....................................... 20

Ind. Code. § 5-11-5.5-1(4) .................................................................................. 20

Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-2 ............................. 20

Minn. Stat. § 136A.103(b)(3)(i) (2010) ............................................................... 29, 31, 32

Minn. Stat. § 136A.103(b)(3)(ii) (2010) ................................................................. 29, 30

Minn. Stat. § 136A.103(d) (2010) ........................................................................... 30

Minn. Stat. § 136A.103(e) (2010) ........................................................................... 31

Minn. Stat. § 15C.01, subd. 3 .............................................................................. 20

Minn. Stat. § 645.16 (1947) ................................................................................ 31

Minn. Stat. §§ 136A.101, subd. 4, .103(b)(3) ............................................................... 24

Minnesota False Claims Act, Minn. Stat. § 15C.02 .................................................... 20

**Other Authorities**

585 IND. ADMIN. CODE § 1-9-1(7) ............................................................................. 23

Audio Recording of 03/09/10 Meeting of Minn. Senate Higher Ed. Comm. beginning at
      59:40, available at
      *http://www.senate.leg.state.mn.us/schedule/unofficial_action.php?ls=86&bill_typ
      e=SF&bill_number=0184&ss_number=0&ss_year=2009* ............................................ 30

Cal. Educ. Code § 94832(e) (2001) (repealed 2007) .................................................. 33

Cal. Gov. Code § 12650 (2010) .................................................................................... 32

California IPA, Art. IV(C)(3)(x) ("Reconciliation of Cal Grant Funds")) *available at
      http://www.csac.ca.gov/pubs/forms/grnt_frm/NewNon_Public
      InstitutionalParticipationAgreement.pdf* ........................................................ 36

Fed. R. Civ. P. 14 ........................................................................................................... 43

Fed. R. Civ. P. 15 ..................................................................................................... passim

Fed. R. Civ. P. 15(a). .................................................................................................... 43

Fed. R. Civ. P. 20 ............................................................................................... 30, 33, 43

Fed. R. Civ. P. 24 ........................................................................................................... 43

Fla. Stat. §§ 1009.50-1009.892 .................................................................................... 35

Ill. Admin. Code tit. 23, § 2700.30(a)(1) ..................................................................... 23

Ill. Admin. Code tit. 23, § 2700.30(a)(3) ..................................................................... 23

*Martis v. Grinnell Mut. Reinsurance Co.*, which would have rejected an unjust
      enrichment claim "[b]ecause there was no valid underlying fraud claim."  905
      N.E.2d 920, 928 (Ill. App. Ct. 2009) ............................................................... 41

*OHE Report: Financial Aid Awarded, Fiscal Year 2003 at pp. 55-56 (April 2004),
      available at http://www.ohe.state.mn.us/pdf/FAA-03.pdf* ................................ 31

OHE Report: *Financial Aid Awarded, Fiscal Year 2007 at pp. 55-56 (Aug. 2008),
      available at http://www.ohe.state.mn.us/pdf/FAA-07.pdf; OHE Report: Financial
      Aid Awarded, Fiscal Year 2005 at pp. 56-57 (Aug. 2006)* ............................... 31

OHE Report: Financial Aid Awarded, Fiscal Year 2009 at pp. 65-66 (July 2010),
      available at *http://www.ohe.state.mn.us/pdf/FAA-09.pdf* ................................. 31

# INTRODUCTION

The United States' Memorandum of Law in Opposition to Defendants' Motion to Dismiss or in the Alternative, to Strike (the "United States' Mem.") provides a compelling, indeed an overwhelming, case for denial in full of EDMC's motion to dismiss.  It is clear from that memorandum that all of the claims in the Joint Complaint filed by the United States of America and the States of California, Florida, Illinois, and Indiana ("JCII") and in Minnesota's Complaint in Intervention ("MN Comp.")[1] are properly pled and not subject to dismissal.  The United States' Mem. soundly rebuts EDMC's principal claim that its compensation plan fell within the protection of the Safe Harbor.  The States of California, Florida, Illinois, Indiana, and Minnesota (the "States"), along with Relators, join the United States' Mem. in full and also file this memorandum of law to address more specifically the legal sufficiency of certain claims that they have brought and certain arguments that EDMC has directed at them in particular.[2]   Our arguments fall into three categories.

**First**, the parties to this memorandum address the legal sufficiency of their allegations that EDMC's compensation plan violated the Incentive Compensation Ban not only in its implementation, but also as designed.  These allegations provide a separate, independent reason

---

[1]   In light of the fact that paragraph 20 of Minnesota's Complaint in Intervention realleged and incorporated paragraphs 36 through 168 of the JCII, subsequent references to the JCII in this Memorandum encompass Minnesota's allegations in this case.

[2]   Capitalized terms not defined herein are defined in the United States' Mem., filed contemporaneously, herewith.

why EDMC's representations of compliance with the Incentive Compensation Ban were false and therefore why EDMC violated the FCA.[3]

**Second**, we address a number of arguments in Section V of Defendants' Brief in Support of Their Motion to Dismiss and Alternative Motion to Strike ("Defendants' Brief"), directed at claims brought by Relators and the States pursuant to state FCAs and the common law.

**Third**, this memorandum addresses EDMC's argument that the Court should dismiss the claims of relator Michael T. Mahoney.

## ARGUMENT

I. **EDMC IS LIABLE UNDER THE FCA BECAUSE ITS COMPENSATION PLAN AS DESIGNED DID NOT SATISFY THE SAFE HARBOR.**

The States and Relators allege that EDMC is liable under the federal and the state FCAs based on the design of EDMC's compensation plan, as well as its implementation.  This theory is an independent basis in the JCII, the MN Comp. and SAC (collectively, the "Complaints") for denying the motion to dismiss.  It is, in other words, an entirely separate basis for finding that the identical FCA counts in the Complaints have been validly pled and are not subject to dismissal.

The claim that EDMC's compensation plan as designed constitutes an FCA violation consists of two parts:  1) the plan as designed provided for illegal incentive compensation and was not eligible for the Safe Harbor; and 2) EDMC "knew" within the meaning of the FCA that

---

[3]     In their Second Amended Complaint ("SAC"), Relators allege on behalf of the United States and several states that EDMC's compensation plan as designed violated the federal and State FCAs.  (*See* SAC ¶¶ 80-81, 98-106)  The States of California, Florida, Illinois, Indiana, and Minnesota bring claims in the JCII that EDMC's compensation plan as designed violated their respective State FCAs.  The United States has not intervened as to Relators' claim that EDMC's compensation plan as designed violated the FCA.  Thus, Relators, through the allegations in the SAC, have an independent statutory entitlement to pursue this claim on behalf of the United States, and to pursue all claims under the SAC on behalf of those states that have not yet intervened in this action, pursuant to those states' FCAs.  *See United States ex rel. Becker v. Tools & Metals, Inc.,* Nos. 3:05-CV-0627-L, 3:05-CV-2301-L, 2009 WL 855651, at *9 (N.D. Tex. March 31, 2009) (under § 3730(b)(4)(B), when the Government partially intervenes, the relator is entitled to pursue those claims with respect to which the Government declines to intervene); *see also United States ex rel. O'Keefe v. McDonnell Douglas Corp.,* 918 F. Supp. 1338, 1346-47 (E.D. Mo. 1996) (relators were entitled to pursue claims where, as here, the Government partially intervened and did not object to relators' pursuit of remaining claims).

its representations of compliance were false (i.e., it knew, or acted in deliberate ignorance or reckless disregard of, the falsity of these representations). All of the Plaintiffs allege the first of these two parts, that EDMC's plan as designed provided for illegal incentive compensation and did not comply with the Safe Harbor. The United States Memorandum, which all the parties to this memorandum join, demonstrates conclusively why those allegations are legally sufficient to withstand EDMC's motion to dismiss. (*See* JCII ¶¶ 151-156; United States' Mem. 51-59.) We do not recapitulate those arguments here, but add only a few amplifying points. We then highlight the allegations and evidence of EDMC's scienter in the Complaints that are especially relevant to the plan as designed.[4] In brief, the Complaints advance multiple categories of allegations – concrete, detailed, and extensive – that EDMC knew its statements that it did not pay incentive compensation were false based on the plan as designed, as well as based on the plan as implemented.

Indeed, the Complaints plead numerous facts that EDMC's compensation plan as designed provides for illegal incentive compensation and does not qualify for the Safe Harbor. (*See*, *e.g.*, JCII ¶¶ 91-115, ¶¶ 153-156, ¶¶ 369-389, ¶¶ 406-419; SAC ¶¶ 80-81, 98-106 ). In response, EDMC nowhere references ¶¶ 369-389 and ¶¶ 406-419, which are to be taken as true on a motion to dismiss and which are supported by EDMC's compensation plan attached to the Complaints. (Ex.'s 13, 15 and 16 to JCII; Ex.'s 4 and 6 to SAC). Instead of responding to the well-pled allegations of the Complaints, EDMC offers a strained argument that, in fact, its compensation plan satisfies the "fixed compensation" and other requirements of the Regulatory

---

[4]    In this regard, the United States, the States, and the Relators incorporate ¶¶ 389-404 of the JCII in accordance with Fed. R. Civ. P. 10 (c).  *See also* United States' Mem. 15, n. 7.  Moreover, the States and Relators also incorporate ¶¶ 369–388 of the JCII.

Safe Harbor.  (*See* Defs.' Br. 11-19).   For the reasons shown by the United States, and the additional reasons set out below, EDMC's regulatory argument is untenable on the merits.   None of EDMC's arguments meet the standard for a 12(b)(6) dismissal or negate the allegations of the Complaints.

### A.   The Matrix Does Not Provide for Fixed Compensation.

As alleged in the JCII and the SAC, and as the United States conclusively demonstrates in its memorandum, EDMC's compensation plan as designed did not come within the Safe Harbor first and foremost because it did not provide for "fixed compensation" as the regulation requires.   (JCII ¶¶ 92-102, ¶¶ 109, ¶¶ 151-153, ¶¶ 373-379; SAC ¶ 99; United Statement Mem. 54-58.)   Rather, the Matrix pays recruiters illegal incentive compensation that is not based on time worked, but rather is based on, and fluctuates with, enrollment numbers.   (JCII ¶¶ 92-102, ¶¶ 373-379, MN Comp. 20, SAC ¶¶ 80-81, 98-106.)

### 1.   The Matrix Provides for Incentive Compensation, Not Fixed Compensation.

The whole point and design of the Matrix was to specify in advance a set sum of money per student recruited, a classic instance of "incentive compensation" under both the law and common understanding.   (JCII ¶¶ 92-102, ¶¶ 374-379; SAC ¶¶ 80-81, 98-106).   EDMC's effort to camouflage the incentive compensation by paying it out in equal two-week increments at a later time does nothing to alter the basic character of the compensation.   The unalterable fact – in fact the essence of the plan – is that ADAs were paid by the body, not by the hour.   (*See* United States' Mem. 54-58.)

The Safe Harbor's threshold requirement that a company pay fixed compensation is necessary to ensure that the Safe Harbor does not undermine the statute's ban on incentive compensation.   Without this requirement, a company could simply pay only commissions, but be

sure that any changes to the commission rate satisfy the adjustments clause of the Safe Harbor regulation.  For example, a company could simply pay a commission of $1,000 per student enrolled and not change that commission at all.  Such a compensation plan would involve incentive payments which would be impermissible under the Incentive Compensation Ban. Thus, it is clear that the "fixed compensation" requirement is essential to the Safe Harbor's proper interpretation.  What the Safe Harbor permits is that *adjustments* to fixed compensation – *changes* in how much an employee earns per week, per year, or otherwise – may be based in part on past performance.   Put simply, the hourly employee earns "fixed compensation" – compensation that is fixed per rate of time.   The commissioned employee, however, earns "incentive compensation" not tied to time worked.

EDMC's regulatory analysis is threadbare, and wholly unpersuasive.  EDMC simply provides a dictionary definition of "fixed" and recites, in a single sentence, that its compensation plan "meets this this standard:  ADAs received a salary that was not adjusted or changed more than twice a year."  (Defs.' Br. 11-12.)  In other words, EDMC takes the position that merely because ADAs received a bi-weekly payment that did not change for six months, their compensation was "a fixed salary" and therefore satisfied the Safe Harbor.  EDMC makes no attempt to square this unsupported assertion with the fact that an ADA's compensation package is calculated under the Matrix to vary directly in accordance with recruitment success, which, based on the common understanding of incentive compensation set out above, makes it incentive compensation.  EDMC ignores this glaring, indeed defining, feature of its compensation system.

EDMC's position reduces to the untenable proposition that it can somehow convert illegal incentive compensation into lawful "fixed salary" simply by aggregating incentive payments and parceling them out later in equal bi-weekly payments.  Thus, according to EDMC, payments that

are specified in advance to depend on the number of students recruited, and are thereby designed to incentivize its recruiters in precisely the manner Congress sought to outlaw – and that everyone at EDMC thinks of as incentive compensation – can be transformed into lawful "fixed compensation" salary with a couple of accountant's tricks of timing and nomenclature.  Indeed, under EDMC's interpretation of the Safe Harbor, the company could do away with the camouflage altogether and simply pay ADAs $1,000 per student recruited for ADAs with a "satisfactory" rating and $1,100 per student recruited for ADAs with an "outstanding" rating, as long as the commissions were paid out in equal bi-weekly installments.

> **2.    The Matrix Does Not Adjust Fixed Compensation, But Simply Specifies Incentive Payments, Which Are Calculated Twice a Year Without Any Adjustment to a Fixed Salary.**

EDMC's position also writes out of the Safe Harbor the critical distinction between specifying compensation and specifying adjustments to compensation.  Throughout its brief, EDMC asserts that the Safe Harbor "permitted recruiter salaries that were not based 'solely' on enrollment . . ." (Defs.' Br. 40 (emphasis added); *see also id.* at 1, 16, 19, 38, 12-18.)  This mangled reading would effectively eliminate the fixed compensation clause and stand the Incentive Compensation Ban, which the Safe Harbor is meant to effectuate, on its head.  It is adjustments to *fixed* compensation that the Safe Harbor allows to depend in part on past recruitment success.  Therefore, for EDMC's argument to have even superficial plausibility, the Matrix must specify adjustments to *fixed compensation*.  But that is not what the Matrix does. The Matrix specifies how much an employee will receive for any combination of enrollment numbers and quality ratings.  On the face of it, this is a specification of the ADA's compensation, not a change in that compensation.  Every six months, the Matrix is used to calculate the accumulated incentive payments; no adjustment is made to a pre-existing fixed salary, or indeed to the rate of compensation.  ADAs' paychecks changed not by virtue of a raise or a pay cut but

because they had varying recruitment success over time.   (Similarly, the paychecks of an employee with a fixed hourly rate can change without an "adjustment" to that rate if the employee's hours vary.)   Because the Matrix does not adjust an ADA's fixed compensation or fixed salary, it does not qualify for the Safe Harbor under the adjustments clause.   Notably, in *United States ex rel. Pilecki-Simko v. Chubb Inst.*, No. 06-3562, 2010 WL 1076228, at *7 (D.N.J. Mar. 22, 2010) ("*Chubb I*"), a case to which Defendants repeatedly attempt to analogize (s*ee, e.g.*, Defs.' Br. 12, 15), the court never addresses the "fixed compensation" issue at all.

### B.    The Matrix Violates the "Solely" Clause of the Safe Harbor.

An entirely separate and alternative reason why the Matrix as designed is not eligible for the protection of the Safe Harbor is that *if* it provides "adjustments" to fixed compensation, then those adjustments are based solely on the numbers of students recruited in violation of the Safe Harbor.[5]   Both initial eligibility for the Matrix and changes in compensation within the Matrix were, by design, driven by numbers alone.

The "solely" clause on which EDMC stakes its defense applies only to "adjustments" to fixed compensation, and as the previous section explains, the Matrix does not provide for fixed compensation or specify "adjustments" to fixed compensation.   But even if the Matrix were treated, as EDMC would have it, as providing fixed compensation, it would fail the relevant requirement of the Safe Harbor because it would provide for many "adjustments" based solely on the number of students recruited.   That is because, in many instances under the Matrix, the changes in overall compensation from one period to the next are necessarily driven by enrollment numbers alone.

---

[5]    That is, even if the Matrix were read as specifying adjustments rather than bottom-line compensation – which it plainly did not – it would still have provided for adjustments based on enrollment numbers alone.  *See* United States' Mem. 59.

First, as the Complaints JCII allege, EDMC's plan provided that an ADA must recruit a specified number of students in order to "go on to the Matrix" in the first place, at least at the twelve-month mark.  (JCII ¶ 98; SAC ¶¶ 62-69.)  According to the Complaints, "an admission employee's initial eligibility to 'go on the matrix' is strictly based on the number of students the admissions employee can recruit."  (JCII ¶ 154; SAC ¶ 62-69.)  This initial graduation from the employee's starting salary to "Matrix compensation" is itself plainly an adjustment to compensation – indeed, one that ADAs are exhorted to attain from their first days with the company.  (JCII ¶ 102; SAC ¶ 69.)  It is therefore an adjustment to compensation based solely on enrollment numbers.  For this reason alone, the Matrix-based compensation system does not qualify for the Safe Harbor.

Second, under the Matrix, many adjustments to compensation are driven by recruitment numbers alone.  The United States' Mem. demonstrates that there are many instances in which, according to the explicit design of the Matrix, even if an ADA had received a lower or higher quality rating, it would have made no difference to the size of his or her increase or decrease in compensation.  (United States' Mem. 59.)  In addition, EDMC's compensation plan allowed EDMC to base adjustments solely on quality ratings by simply leaving an ADA's quality ratings unchanged over multiple reviews.  (JCII ¶¶ 154, 382.)  The JCII alleges that some quality ratings were used as defaults, ¶ 391, and provides three detailed examples of ADA compensation where the quality rating of "Meets Expectations remained the same over multiple reviews, with the consequence that the adjustments to ADA compensation were solely based on the numbers of students recruited.  (JCII ¶¶ 383-385.)

Moreover, EDMC's suggestion that New Student Points are not exclusively based on enrollment numbers is disingenuous.  (Def. Ex. 3, page 13 at "G").  For example, the plan

explains that ADAs are assigned to certain categories of student, and one type of ADA is "Long Distance or Zone B" who "specialize[s] in working with prospects who live more than 100 miles from the school at the point of inquiry."  (Def. Ex. 3, page 6.)  The fact that students' geography can earn an ADA more student points only heightens – not lessens – the emphasis on recruiting.

### C.   The JCII Contains Extensive Allegations Concerning Scienter That Plainly Satisfy The Legal Standard At The Pleading Stage.

The United States has alleged that EDMC violated the FCA only with respect to its implementation of its compensation plan.  Therefore, its discussion of scienter focuses on EDMC's knowledge with respect to the plan as implemented.  While we adopt these arguments, here we highlight the evidence of EDMC's scienter with respect to the plan as designed.

With respect to scienter, the discussions of the plan as implemented and the plan as designed necessarily overlap significantly, both analytically and in fact.  Analytically, both the as designed and the as implemented theories concern knowledge of precisely the same false statements – namely, EDMC's representations that it did not pay incentive compensation.  Under either theory, the scienter that is required to establish a violation of the FCA is knowledge, or reckless disregard, or deliberate ignorance of the falsity of EDMC's statement that it did not pay incentive compensation.  Factually, many of the allegations on which the federal government relies in its discussion of scienter for the "as implemented" FCA violation also support, at least as strongly, EDMC's awareness that its compensation plan, as designed, involved incentive payments, as the following discussion will highlight.

EDMC's chief argument with respect to scienter is that, in contrast with cases, notably *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), in which scienter was found at the pleading stage, the "Government alleges no facts similar to those that the Third Circuit found to be critical in *Hendow*…"  (Defs.' Br. 30.)  EDMC also argues: 1) the

enforcement action against the University of Phoenix, then headed by the current CEO of EDMC, in which the United States Department of Education ("ED") determined that the school was in violation of the Incentive Compensation Ban, does not support an inference of scienter because, in the resulting settlement agreement, the University of Phoenix did not admit wrongdoing or agree to change its compensation plan (Defs.' Br. 32); and 2) so long as EDMC had a reasonable, albeit mistaken, view of the Safe Harbor, scienter cannot be established as a matter of law.  (Defs.' Br. 34.)[6]

EDMC's main contention is simply mistaken.   The JCII contains extensive non-conclusory allegations concerning scienter, far more than is required at the pleading stage, and indeed, more than in *Hendow*, which both EDMC and the Third Circuit take as the model for sufficient allegations of scienter.  EDMC's other two arguments are also meritless.

The memorandum of law filed by the United States sets out the legal principles governing scienter in FCA cases, including the well-established principle that scienter may be pled generally and the Third Circuit's instruction that scienter may not be determined on the pleadings or even at summary judgment.  (*See* United States' Mem. 28.)  *United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 411 (3d Cir. 1999).  ("[W]e must heed the basic rule that a defendant's state of mind typically should not be decided on summary judgment.")

The FCA and case law interpreting it also emphasize that the scienter requirement of the statute is that the defendant know (or be deliberately ignorant or in reckless disregard of) the falsity of the information the defendant gave the government.  *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 109 (3d Cir. 2007) (quoting 31 U.S.C. § 3729(b)).

---

[6]  In addition, EDMC adds in passing the somewhat outlandish suggestion – utterly at odds with FCA case law – that the governments have to establish that the individual corporate officer who actually signed the false representation himself had the requisite level of scienter.  (*See* Defs.' Br. 31.)  The United States' Mem. soundly rebuts this claim.  (*See* United States' Mem. 32.)

Otherwise put, "no proof of specific intent to defraud is required." *Cantekin*, 192 F.3d at 411 (quoting 31 U.S.C. § 3729(b)).  Thus, as the United States also points out, the central question with respect to scienter at trial will be whether EDMC actually knew that, was deliberately ignorant that, or recklessly disregarded that it provided any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments.  *See* United States' Mem. at 25-26.  A defining feature of general-intent offenses such as the FCA (*see* 31 U.S.C. § 3729(b)), is that it is no defense to believe that the conduct is lawful; what matters is that the conduct itself was knowing.  That is important to underscore in light of EDMC's argument that the relevant knowledge or recklessness is knowledge or recklessness that the plan violated the law.  (Defs.' Br. 28.)  As detailed in the following section, the Complaints provide extensive allegations of facts that support the inference that Defendants knew or were reckless with respect to the fact that they were paying incentive compensation.

EDMC's argument concerning scienter is grounded in the remarkable claim that the Complaints' only factual allegations concerning scienter relate to the settlement of the administrative claim against the University of Phoenix.  (Defs.' Br. 32.)  The allegations concerning the University of Phoenix do amply support scienter, for the reasons explained by the United States in its memorandum of law.  (*See* United States' Mem. 28-30.)  Those allegations, however, are only a fraction of the multiple and detailed allegations that EDMC simply ignores in its four-paragraph discussion of the factual basis for scienter in the Complaints.  There are, in fact, four separate categories of concrete, non-conclusory allegations that support scienter and preclude dismissal of the Complaints on scienter grounds.

### 1.    EDMC's Concealment Of Its Policies

The first category comprises specific allegations that EDMC management took steps to conceal its compensation policies from ED, (JCII ¶ 147), of exactly the sort that *Hendow* found

established scienter, and the Third Circuit cited approvingly in *Chubb II*. *See United States ex rel. Pilecko-Simko v. Chubb Institute*, No. 10-3907, 2011 WL 3890975 (3d Cir. Sept 6, 2011) at *5 n.18 ("*Chubb II*").  As an initial matter, the Complaints allege that payments to ADAs that are in fact commissions are packaged as "salary" by accumulating them and then paying them "to the ADAs in bi-weekly installments in the subsequent six-month period."  (JCII at ¶ 153, SAC ¶ 99.) It is reasonable to infer from the well-pled allegations in the Complaints that the very goal of the design is to camouflage the nature of the compensation, and as such, EDMC management knew they were paying incentive-based compensation.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009), citing *Phillips v. Cnty of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (in assessing the complaint's sufficiency, court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff).

Moreover, there are concrete, direct, and detailed allegations in the Complaints that EDMC knowingly designed the compensation plan in order to "get[] around" the Incentive Compensation Ban.  (JCII ¶ 389; SAC ¶¶ 99, 101-106.)  The Complaints provide specific details of how, when, why, and by whom this attempt at concealment was accomplished.  Thus, they allege that "[a]fter passage of the Regulatory Safe Harbor in November 2002, EDMC redesigned its compensation plan to pay ADAs prohibited incentive payments.  To achieve that goal, EDMC formed a task force of its management and executives, which included Jan Anton, an executive at Ai Chicago.  The task force worked to design a compensation plan that would boost EDMC's enrollment numbers and, in turn, its revenue and profits to shareholders."[7]  (JCII ¶¶ 369-371.)

---

[7]  These allegations are in a section that focuses on the Illinois Institutes of Art, but the allegations concern EDMC's national management – in particular, the plan to redesign EDMC's compensation to evade the statute that the JCII describes was a companywide plan.  With respect to the Illinois institutions, the JCII is even more pointed, alleging that those institutions "intentionally and knowingly *designed* and implemented the quality factors and ratings to attempt to conceal their violations of the Incentive Compensation Ban and Regulatory Safe Harbor."  (JCII ¶ 387.)  (emphasis added).

2.      **EDMC's Executive Management Was Aware of ED's View of the ICB.**

The second category comprises allegations that EDMC's top executive and several other managers previously worked for the University of Phoenix when its similar compensation policy was found by ED to involve a form of incentive compensation that violated the Incentive Compensation Ban.  (JCII ¶¶ 159-164, Ex. 43; SAC ¶¶ 80-81, 98-106.)  The United States' Mem. sets out the details of these allegations and argues that they support scienter as implemented, but they also support, at least as strongly, scienter as designed.

ED's report concerned both aspects of the University of Phoenix's compensation system. And the most striking similarities between the EDMC compensation system and the University of Phoenix compensation system are similarities in design.  The detailed allegations include that: (1) "EDMC's compensation system is not materially different from the University of Phoenix's with respect to the violation of Title IV . . .," (JCII ¶ 161; SAC ¶¶ 101-106); (2) the link between enrollments and compensation is even more extreme in the EDMC system; (3) ED's report was publicized throughout the industry; and (4) Todd Nelson, the CEO who signed the settlement agreement with ED, as well as several senior executives at the University of Phoenix, thereafter assumed management positions at EDMC) (JCII ¶ 163; SAC ¶¶ 101-106); ED's determination that the University of Phoenix's compensation system, "was an illegal attempt to circumvent Title IV of the HEA's prohibition on incentive compensation, and did not qualify for safe harbor protection," (JCII ¶ 159; SAC ¶¶ 101-106) (citing Ex. 43, Program Review Report for University of Phoenix, at p. 29).  These allegations more than support a reasonable inference that "EDMC knew that its Matrix-based compensation system and the sales culture it was implementing did not satisfy the Incentive Compensation Ban and Regulatory Safe Harbor." (JCII ¶ 161; SAC ¶¶ 101-106.)

The reasonable, if not the only, inference from these allegations, taken as true, is that EDMC was at best deliberately ignorant or reckless about whether its plan, as written, constituted incentive-based compensation.[8]  The fact that the University of Phoenix disputed ED's conclusions and did not admit wrongdoing (though it paid $9.8 million to ED as part of the settlement), (JCII ¶ 162), obviously does not affect the inference that EDMC was aware of the serious risk that its compensation system involved incentive payments and was, therefore, in violation of the Incentive Compensation Ban.  As noted above, the actual ED findings concerning the University of Phoenix's compensation system explicitly support EDMC's knowledge of the nature of its compensation system as incentive payments.

Thus, in contrast to the case that EDMC relies on, *Picher v. UNITE*, 646 F. Supp. 2d 759, 756-66 (E.D. Pa. 2009) , in which there was "no evidence. . . that could show that UNITE was or should have been on notice that [its conduct] was illegal," the determination by ED (not the settlement agreement) plainly sufficed to put EDMC on notice that its compensation plan was, at best, highly suspect.  *Id.*  Certainly for purposes of the motion to dismiss, EDMC's continued resistance to ED's finding is of no moment.

### 3.    EDMC's Management Expressed the Matrix's Purpose to Get Around the ICB.

The third category of allegations concern specific statements by high-ranking EDMC executives that attest to their awareness that the company's compensation scheme was a sham designed to camouflage an illegal incentive compensation scheme.  (JCII ¶¶ 100, 137-38, 146-47; 389; SAC ¶¶ 80-81.)   The United States Memorandum discusses these statements and

---

[8]    Thus, even if EDMC were right in its suggestion that the required scienter is knowledge, deliberate ignorance, or reckless disregard of whether the plan complied with the law—and it is not—the allegations concerning the University of Phoenix episode would themselves establish scienter for purposes of the motion to dismiss. Likewise, EDMC's brazen assertion that its understanding of the Safe Harbor "conformed with the federal government's views, and had never been questioned previously," (Defs.' Br. 34) is soundly rebutted by the allegations concerning the ED's report on the University of Phoenix's compensation plan.

explains that standing alone, they suffice to establish scienter for purposes of the motion to dismiss.  We highlight only that paragraph 389 directly supports the allegation in the JCII that "[a]fter passage of the Regulatory Safe Harbor in November 2002, EDMC redesigned its compensation plan to pay ADAs prohibited incentive payments".  The JCII alleges:

> In 2007, Jan Anton, a Vice President at the Ai Chicago and a member of the committee that designed the compensation plan, advised an ADA at her evaluation that quality factors were insignificant relative to ADA payments and were created for the purpose of getting around the Incentive Compensation Ban.

(JCII ¶ 389.)   This allegation again concerns the design of the plan.   Since Anton's alleged statement was that the plan was created to evade the law, it goes to Anton's knowledge of the compensation plan as designed.  On its own, this detailed allegation of an express admission by a high-level employee necessarily defeats EDMC's arguments concerning scienter for purposes of the motion to dismiss.

The express statements by high-level employees are no less inflammatory and damning as the allegations in *Hendow*.   Either of them, on its own, would be sufficient to establish scienter for purposes of the motion to dismiss.  *Cf.  Chubb II*, No. 10-3907, 2011 WL 3890975, at *5 (noting absence of any non-conclusory allegations of facts that support a reasonable inference that Chubb knew or acted in reckless disregard that its submissions were false).[9]

### 4.   Recruitment of Students Was Effectively The Sole Factor In Compensation.

Fourth, the Complaints contain numerous and detailed allegations of specific statements by EDMC management in official documents, e-mails, and conversations that recognize that

---

[9]   Notably, these allegations recite direct statements manifesting knowledge by senior EDMC management, not suppositions by relator or anyone else; and the bulk of the other allegations detailed below similarly consists of direct documentary or eyewitness evidence.  It thus is confounding, and certainly wrong, for EDMC to insist in its motion – and repeat in press releases – that the JCII "relies almost exclusively on the representations of two former EDMC employees."  (Defs.' Br. 2.)

EDMC's compensation of recruiters is based on the numbers of students that they recruit.  (*See* JCII ¶ 120-126, 134-150 ¶¶ 120-126; SAC ¶¶ 62-90.)  These allegations are direct evidence that EDMC management was aware of the falsity of its representations that it does not make incentive payments.  For example, EDMC's "Guide to the Admissions Performance Plan" states that ADA compensation "is based [on]… the number and types of new students you recruited over the past 12 months."  (JCII at ¶ 93, quoting Ex. 13 at p. 5).  Similarly, the JCII alleges that EDMC Vice President of Admissions Ken Boutelle told plaintiff Washington during her interview in May 2004 that "her compensation would depend on the number of students she enrolled . . . ."  (JCII at ¶ 100.)  These allegations concern EDMC's compensation, not its adjustments to compensation.  They therefore are relevant to the theory of FCA liability according to which EDMC's compensation did not qualify for the Safe Harbor because it was incentive compensation, not fixed compensation (i.e., the "as designed" theory).

The Complaints allege, with supporting documentary evidence, that ADAs are told by supervisory Directors of Admission that reaching specific financial goals is solely dependent on achieving an identified number of student enrollments.  (*See, e.g.*, JCII at ¶¶ 126, 135, 378.)  Relator Mahoney served as EDMC's Director of Training of EDMC's online division – the employee in charge of training the EDMC employees who trained the ADAs.  Yet, according to the Complaints, in addition to never providing training regarding the quality factors himself, Mr. Mahoney was unaware of anyone else providing such training to ADAs, or of anyone at EDMC ever even mentioning the quality factors – factors upon which EDMC's compensation plan, as designed, purports to evaluate admissions personnel:

> Mr. Mahoney was employed as EDMC's Director of Training for the online division.  His core function was to train the EDMC employees who would then train EDMC's ADAs.  During his employment at EDMC, Mr. Mahoney never gave any training whatsoever regarding the "quality factors."  Indeed,

during the eight months that Mr. Mahoney was employed at EDMC, he never heard anyone focus on, or even discuss, the "quality factors" reflected on the Matrix, in any context.

(JCII at ¶ 136; SAC at ¶ 79.)

The Complaints also allege that EDMC management and recruiters openly discussed students in terms of their cash value. For example, a cartoon equating new student applications with cash was often e-mailed to recruiters. (JCII at ¶ 146; SAC at ¶ 90.) That management and recruiters regularly equated new students with cash strongly suggests that they were aware that new students directly resulted in additional compensation – the paradigm of incentive compensation. From this allegation, it can therefore reasonably be inferred that EDMC management and recruiters were aware that, or were at least reckless with respect to the fact that, EDMC was providing commissions, bonuses, or other incentive payments. As argued above, such awareness is precisely what is required for scienter.

> **D. EDMC May Not Shield Itself From Liability, Much Less Support a Motion to Dismiss, By Arguing that It Relied On Advice of Counsel or on a Wrong but Reasonable Interpretation of the Safe Harbor.**

As a last gasp position, EDMC makes a 2-sentence argument that the Governments cannot show scienter because "EDMC's interpretation and application of the compensation regulations were reasonably based on the plan English of the Safe Harbor regulation. . ." (Defs.' Br. 34.) This position has multiple fatal defects. [10]

First, even if a reasonable (but mistaken) belief that it was complying with the Safe Harbor could save EMC – and for reasons summarized below, it could not – it would have to be an actual belief that the defendants held, in fact and in good faith. Scienter is first and foremost a

---

[10]    EDMC actually offers its "reasonable interpretation" argument not in isolation but in tandem with the ostensible facts that the interpretation "conformed with the federal government's own views, and had never been questioned previously. Defs.' Br. 34.) Those contentions are fanciful, for the reasons explained by the United States. United States' Mem. 32-33.

question of the defendant's state of mind, which is why the courts "heed the basic rule that a defendant's state of mind typically should not be decided on summary judgment." *Cantekin*, 192 F.3d at 411.  Here the allegations in the complaint, taken as true, provide not the slightest support for an argument that EDMC actually believed that the Safe Harbor gave them license to tell the government that they were not paying incentive compensation.  Any such support will need to await discovery.

Second, it is undisputed that the FCA incorporates a general intent scienter of "knowingly," not one of specific intent, *see* 31 U.S.C. § 3729(b), and so the object of the scienter inquiry in an FCA case is the defendant's knowledge of the falsity of its statements to the government, not its understanding of the law.  *See Bryan v. United States*, 524 U.S. 184, 192 (1998) ("As Justice Jackson correctly observed, 'the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law.'").

In the same desperate vein, EDMC later in its brief drops a footnote that appears to be an oblique attempt to assert an advice of counsel defense, which, EDMC asserts, is a "complete defense" to an FCA claim.  Apart from EDMC's failure to invoke this defense in anything approaching the manner required, an advice of counsel defense cannot be legally germane at the motion to dismiss state, since it entails a series of fact-intensive inquiries about the defendant's interactions with counsel that by definition are outside the parameters of the complaint.  *See United States v. Traitz*, 871 F.2d 368, 382 (3d Cir. 1989), (citing *United States v. Martorano*, 767 F.2d at 66, *cert. denied*, 474 U.S. 949, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985).

The case that EDMC cites in support of the defense holds instead a defendant in a non-FCA case could *not* use the advice of counsel defense because "a defense based on good faith reliance on an attorney's advice requires full disclosure to counsel of all material facts and

retention of counsel for advice and not to ensure the success of a fraudulent scheme." *Martorano*, 767 F.2d at 66. The courts have consistently rejected an advice of counsel defense for general intent offenses such as the FCA. [11]  It is therefore not surprising that there appears to be not a single reported case upholding the application of an advice of counsel defense to an FCA charge.

Finally, since EDMC has charged that it was "disingenuous" not to present that defense in the JCII (Defs.' Br. 46, n.38), it is only fair for the governments to dispel those improper suggestions to the Court.  In fact, the materials that EDMC proffered in no way establish a legally valid advice of counsel defense and, to the contrary, include evidence that would strongly undermine such a defense, as would be quickly apparent in the event that EDMC decides to advance it.

## II.    THE STATES' ALLEGATIONS IN SUPPORT OF THEIR FCA AND EQUITABLE CLAIMS SATISFY RULE 8 AND RULE 9(B).

The counts brought under the federal FCA and the State FCAs are all grounded in the same conduct:  EDMC's knowingly false statements that it did not pay incentive compensation, which the company made in order to receive federal and state student aid funds.  In a single sentence, EDMC argues that all of the States' FCA claims fail because they do not meet the pleading requirements of Fed. R. Civ. P 8 and 9(b).  (Defs.' Br. 52.)  EDMC's cursory argument

---

[11]    *See, e.g.*, *United States v. Ragsdale*, 426 F. 3d 765, 778 (5th Cir. 2005) (advice of counsel defense did not apply because § 1461 obscenity statute did not require intent to violate the law); *United States v. Urfer*, 287 F.3d 663, 665-666 (7th Cir. 2002) (no Advice of Counsel instruction should have been given; defendants "knew it was a  crime to destroy government property.  Their argument is that they were advised by counsel that the statute could not be applied to them."); *United States v. Smith*, No. 99-10447, 2001 WL 371927, at *2 (9th Cir. 2001) (unpublished) (no advice of counsel defense for manufacturing and possessing a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 844); *United States v. Wood*, 446 F.2d 505, 507 (9th Cir. 1971) (advice of counsel was not a defense because specific intent was not an element of the offense of refusing induction into the armed forces).

is untenable.   Like the United States, the States have plausibly alleged, with sufficient particularity, that EDMC has violated each State's False Claims Act. [12]

The States' FCA statutes closely track the federal FCA and, like the federal FCA, require each State to allege the following elements to establish a prima facie claim that EDMC has violated the State's FCA:

> (1)     EDMC presented or caused students to present to the State government claims for payment;
>
> (2)     The claims for payment were false or fraudulent; and
>
> (3)     EDMC knew that the claims were false or fraudulent.

*See* United States' Mem. Section V.A.1. ("Elements of an FCA Claim"); California False Claims Act, Cal. Gov't Code § 12651(a)(1); Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-2; Florida False Claims Act, § 6.082.2(a), Fla. Stat.; Illinois False Claims Act, 740 ILCS 175/3(a)(1) (effective July 27, 2010) and its predecessor, the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/3(a) (1992); Minnesota False Claims Act, Minn. Stat. § 15C.02.

Mapping the federal FCA, each State FCA provides that a claim is "knowingly false" if the defendant has "actual knowledge," "deliberate ignorance," or "reckless disregard" of the truth or falsity of the information in the claim to the government.   Cal. Gov't Code § 12650(b)(2) (2010); Ind. Code. § 5-11-5.5-1(4); § 6.082.1(c), Fla. Stat.; 740 ILCS 175/3(b)(1) (2010); 740 ILCS 175/3(b) (1992); Minn. Stat. § 15C.01, subd. 3.   Like the United States, the States have satisfied each of these elements.

---

[12]     *See* the United States' articulation of the Fed. R. Civ. P. 8 and 9(b) pleading standards, which apply equally to the States' FCA claims.  (*See* United States' Mem. Section IV.)

First, each State alleges that EDMC received State funding by either submitting claims or causing students to submit claims for financial aid to each State government.  See **California**: *See* JCII ¶ 179 (alleging that from 1999 to 2010, EDMC obtained $93 million under the Cal Grants program); **Indiana**:  *id.* at ¶¶ 184, 196, 224-261 (alleging that since January 1, 2003, EDMC has obtained over $12.3 million in Indiana State funding under programs such as the Frank O'Bannon Higher Education Grants and the Twenty-First Century Scholar Awards); **Florida**:  *id.* at ¶¶ 302, 308 (alleging that from the 2006-07 through the 2009-10 academic years, EDMC received approximately $5,205,337.52 in Florida State funding); **Illinois**:  *id.* at ¶¶ 314, 351-362 (alleging that between the 2004-2005 academic year and the 2010-2011 academic year, EDMC obtained approximately $27,552,111 in Illinois State funding under its Monetary Award Program); **Minnesota**:  MN Comp. ¶¶ 2, 3 (alleging that since at least July 1, 2010, EDMC has wrongly received and/or caused the disbursement of at least $1.28 million in Minnesota state aid).

Second, EDMC's claims for payment to each State are "false" because they are all predicated upon EDMC's false representations that it complies with the federal Incentive Compensation Ban.  As described in the United States Memorandum, the Complaints contain a plethora of particularized allegations demonstrating that EDMC has designed and implemented its compensation plan in a manner that violates the Incentive Compensation Ban.  (*See* United States' Mem. Section V.A.) (explaining that EDMC's compensation plan, as implemented, violates the Incentive Compensation Ban) and (United States' Mem. at V.D.) (explaining that EDMC's compensation plan, as designed, violates the Incentive Compensation Ban), *infra*, Section V.A.-B.

Third, EDMC's claims are "knowingly" false.  The Complaints provide extensive, specific allegations that EDMC knew – or, at a minimum, recklessly disregarded – the fact that it designed and implemented its compensation plan in a manner that violates the Incentive Compensation Ban.  (*See* United States' Mem. at Section V.A.4.) (explaining that EDMC had the requisite scienter with respect to its implementation of its compensation plan); *Infra*, at Section I.C. (explaining that EDMC had the requisite scienter with respect to its design of its compensation plan).

Accordingly, the States have all stated claims upon which relief can be granted under their respective FCA statutes pursuant to Federal Rule of Civil Procedure 12(b)(6), and have satisfied the pleading requirements of Rules 8 and 9(b) of the Federal Rules of Civil Procedure.

## III.   THE CLAIMS THAT EDMC SUBMITTED OR CAUSED TO BE SUBMITTED TO THE STATES WERE FALSE.

The source of the falsity in this case is EDMC's promises to comply with Title IV of the HEA, including the Incentive Compensation Ban.  EDMC made these promises to the federal and State governments, and just as EDMC's promises were "false" when made to the federal government, they were "false" when made to the State governments.

### A.   State Funding of EDMC Institutions is Conditioned on Compliance with the Incentive Compensation Ban.

The Incentive Compensation Ban is at the heart of the States' bargain with any institution that seeks state-funded loans and grants.  As such, each of the States has specifically alleged that its provision of funding to EDMC was conditioned on EDMC's promise to comply with Title IV of the HEA, including the Incentive Compensation Ban:

> **California** alleges that EDMC caused California to disburse grants under the Cal Grants program by falsely certifying compliance with federal regulations including the Incentive Compensation Ban in its Institutional Participation Agreement with California.  That certification of compliance must be made in

order to participate and receive funds from the Cal Grants Program. (*See* JCII ¶¶ 173-74, 176-78.)

**Florida** alleges that EDMC caused Florida to provide student grants and scholarships as a result of EDMC's false representation of compliance with Title IV of the HEA, including the Incentive Compensation Ban.  (*See* JCII ¶¶ 302-303.)

**Illinois** alleges that EDMC caused Illinois to provide MAP funding as a result of EDMC's false and express certification of compliance specifically with the HEA of 1965, which includes the Incentive Compensation Ban.  (JCII ¶¶ 314-362, ¶¶ 409-419, Gov. Ex. 51 at 1, ¶ 2.)  Illinois alleges that an institution must have both a valid federal PPA with ED and a valid ISAC PPA, and comply with the requirements therein, in order to receive MAP funds under Illinois law.  (JCII ¶¶ 318, 327, 330; Ill. Admin. Code tit. 23, § 2700.30(a)(1), (j)).  As Illinois law requires, EDMC's PPAs in Illinois contain provisions requiring it to comply with federal and state law and rules, and specifically the HEA and its regulations. (JCII ¶ 330; Gov. Ex. 51 at 1, ¶ 2; Ill. Admin. Code tit. 23, § 2700.30(a)(3)) Illinois would not have paid MAP funds to EDMC if it had known about EDMC's fraud.  (JCII ¶¶ 323-324, ¶¶ 416-417.)

When the Illinois Institutes of Art executed the 2004 and 2006 PPAs, EDMC had already knowingly designed and implemented its compensation plan to provide incentive-based compensation and, as such, knew that it would not comply with the Incentive Compensation Ban.  (JCII ¶¶ 369-373, 410; *infra* at Section I) Illinois has alleged that the State of Illinois would not have paid MAP funds to The Illinois Institutes of Art if it had known about the fraud.  (JCII ¶¶ 323-324, ¶¶ 416-417.)

**Indiana** alleges that, in order to participate in Indiana financial aid programs, institutions must sign an Indiana Agreement with the State Student Assistance Commission of Indiana ("SSACI"), and this agreement requires the schools to provide SSACI with documentation of their federal PPAs with ED.  (JCII ¶¶ 197-98.)  The Indiana Agreement expressly conditions a school's eligibility to receive State funds on compliance with specific Indiana and federal statutes and regulations.  (JCII ¶¶ 198-99.)  In particular, institutions must have "active Title IV participation agreements with [ED]" to receive State funding.  (JCII ¶¶ 200-01; 585 Ind. Admin. Code § 1-9-1(7), (21).)

All of EDMC's institutions in Indiana have an Indiana Agreement in place and have submitted their federal PPAs to Indiana.  (JCII ¶ 210.)  EDMC intentionally or knowingly made false or fraudulent statements, records, certifications, and claims regarding compliance with the Incentive Compensation Ban in order to become and remain eligible for Title IV funding, and in turn, in order to become and remain eligible for Indiana financial aid.  (JCII ¶ 209.)  EDMC's statements were false when made, and caused the State of Indiana to pay various claims under the Indiana financial aid programs.  (JCII ¶ 209; *see* JCII ¶¶ 210-12.)

      __Minnesota__ alleges that a private for-profit institution that wishes to receive Minnesota student aid funds must qualify as an "eligible institution" pursuant to Minnesota Statutes section 136A.103, which means that the private for-profit institution must "by July 1, 2010, participate in the federal Pell Grant program under Title IV of the [HEA]." (Minn. Stat. §§ 136A.101, subd. 4, .103(b)(3), .15, subd. 6, .155; MN Comp. ¶ 23.) To receive Minnesota student funds, EDMC's institutions in Minnesota were required to and did enter into institutional participation agreements with the Minnesota Office of Higher Education ("OHE"). (MN Comp. ¶ 27) In these agreements, EDMC's institutions represented that they would remain "eligible institutions" for purposes of Minnesota's student financial aid programs. (MN Comp. ¶ 28.) EDMC's eligibility to receive state student aid funds pursuant to Minnesota's student financial aid programs is conditioned upon its ongoing compliance with the requirements of Title IV of the HEA, including the Incentive Compensation Ban, as a prerequisite to EDMC's eligibility to receive state student aid funds. (MN Comp. ¶ 25; *see also* MN Comp. ¶¶ 26, 30-37.)

      It is clear from the detailed allegations described above, that each State conditions its financial aid on compliance with the Incentive Compensation Ban, which is an integral part of the HEA on which federal funding is conditioned. *See Hendow*, 461 F.3d 1166; *Main*, 426 F.3d at 914; United States' Mem. 45-46. As stated in *United States ex rel. Wilkins v. United Health Group*, 659 F.3d 295, 303 (3d Cir. 2011), requests for payment can be implicitly false or fraudulent under the FCA when submitted by a contractor that has violated requirements material to the government's decision to pay, regardless of whether the contractor expressly certifies compliance with the requirement. Accordingly, EDMC's knowing violation of that condition renders the claims for funding factually false, legally false, and fraudulently induced.

    **B.**    **Falsity Under the FCAs Is Plainly Established Under Any of the Multiple Approaches Courts Employ.**

      As the United States Memorandum spells out, there are a number of theories that courts have employed to analyze falsity in FCA cases, typically in settings in which the falsity is far more nuanced than the circumstances alleged in the Complaints here. We need not reiterate the various theories. The important point is that, as outlined at length by the United States, each of the theories is an independent basis for finding falsity. EDMC is liable under a theory of

fraudulent inducement (for which this case is a paradigm, as made clear by the leading decision in *Hendow*); it is, alternatively and independently, liable under a theory of factual falsity because EDMC failed to provide the specific good or service for which the government bargained. *Wilkins*, 659 F.3d at 305; *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001). EDMC is liable under a theory of express false certification since it made express false certifications that it did not pay incentive compensation, and it is liable under a theory of implied false certification, since compliance with the Incentive Compensation Ban was a condition of payment. (*See* United States' Mem. 43-48.) Most straightforwardly, it is liable because its repeated false statements of compliance with the Incentive Compensation Ban were part of a causal chain that led the federal government and the States to pay out money. *See United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004) (applying "ordinary causation principles from negligence law in determining responsibility under the FCA" to impose liability on defendant that did not directly submit a false claim but caused a third party to do so); *United States ex rel. Main v. Oakland City University*, 426 F.3d 914, 916 (7th Cir. 2005) (the FCA "requires a causal rather than a temporal connection between fraud and payment.").

Each of the States has adequately alleged this causal connection between fraud and payment. For example, California has alleged that, "as a result of [EDMC's] concealment" of its ineligibility for federal financial aid, as a result of their violation of the Incentive Compensation Ban, "Defendants were able to continue receiving funds from the Cal Grants Program," and "[o]nce eligibility for the Cal Grants Program funds is established, the CSAC disburses the Cal Grants Program fund to Defendants as an advance…" (JCII at ¶¶ 176-178.) To receive Illinois MAP funds, EDMC executed an ISAC Program Participation Agreement containing a provision certifying compliance the HEA's Incentive Compensation Ban even while the "Illinois Institutes

of Art knowingly and intentionally created a compensation system that not only pays incentive compensation, but aggressively promotes the recruitment of students."  (JCII at ¶¶ 327-332, 339, 346, 363-64.)  EDMC submitted specific false representations of compliance to Indiana "as a prerequisite to receiving [Indiana] funds."  (JCII at ¶¶ 197-198, 206-210.)  EDMC falsely represented that its institutions complied with Title IV of the HEA in order to become eligible for Florida scholarship and grant programs.  (JCII ¶¶ 303, 309.)  To receive Minnesota student financial aid funds, EDMC represented that it was participating in the Pell Grant program in accordance with the requirements of Title IV of the HEA, including ongoing compliance with the Incentive Compensation Ban, and thus qualified as an "eligible institution" to receive such funds, while knowingly in violation of the Incentive Compensation Ban.  (MN Comp. at ¶¶ 3, 23-26, 31-37.)

The Court need not, and should not, be distracted by the overlapping and less than pristine categories of falsity that have led some courts recently to veer away altogether from the distinctions in favor of a straightforward application of the statutory requirements.  *See United States ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 385 (1st Cir. 2011):

> Courts have created these categories in an effort to clarify how different behaviors can give rise to a false or fraudulent claim.  Judicially-created categories sometimes can help carry out a statute's requirements, but they can also create artificial barriers that obscure and distort those requirements.  The text of the FCA does not refer to "factually false" or "legally false" claims, nor does it refer to "express certification" or "implied certification."  Indeed, it does not refer to 'certification' at all. *See United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006) (refusing to give the term "certification" a "paramount and talismanic significance" in part because it does not appear in the text of the FCA).  In light of this, and our view that these categories may do more to obscure than clarify the issues before us, we do not employ them here.

In this context, where falsity is established under any and all of the various approaches (and where satisfaction of any single one of the approaches is satisfactory), the words of the Ninth Circuit in *Hendow* (analyzing the precise legal issue here) are apposite:  "So long as the

statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach."  461 F.3d at 1172.

Consequently, EDMC's strained efforts to persuade the Court that compliance with the Incentive Compensation Ban is a "condition of participation," rather than a "condition of payment," *see* Defs.' Br. 41-45, are beside the point.  Most notably, because EDMC fraudulently induced the federal and state governments to permit the company to participate in student grant and loan programs, liability attaches to each of the claims for payment in any event.  (*See* United States' Mem. Section V.B.2.)  Thus, the Court need not accept EDMC's invitation to dive into the weeds of certification theory, or analyze whether compliance with the incentive compensation ban is a condition of payment or a condition of participation.

In an attempt to bolster its argument that violation of the Incentive Compensation Ban is a minor "technical violation," on a par with failing to establish "an ongoing drug-free awareness program" or a "campus security policy," (Defs.' Br. 41, 43, n.36), EDMC advises the Court that "[t]he question of whether or not the incentive compensation ban is a condition of payment has previously split the judiciary." (Defs.' Br. 45, n.37.)  For its assertion that the judiciary is "split" on the question, EDMC cites two district court opinions, one unpublished, as against the courts of appeals opinions in *Hendow* and *Main*.  (*See* Defs.' Br. 41, 43 (citing *United States ex rel. Graves v. ITT Educ. Servs. Inc.*, 284 F. Supp 2d 487 (S.D. Tex. 2003) and *United States ex rel. Gay v. Lincoln Tech. Institute*, No. 01-505, 2003 WL 22474586 (N.D. Tex. Sept. 3, 2003).)

The cursory analysis in *Graves* (and the even more cursory discussion in *Gay*) have been thoroughly discredited by the extensive, and influential, analysis in the leading cases in the area, in particular the Ninth Circuit's analysis in *Hendow*.  Contrary to EDMC's assertion, the judiciary is not split on the question of whether or not the Incentive Compensation Ban is a condition of

payment.  *See United States ex rel. Powell v. Am. Intercontinental Univ., Inc.,* 756 F. Supp. 2d 1374 (N.D. Ga. 2010).  In *Powell*, the court rejected the defendant school's request to certify its adverse decision on precisely the same ground as urged by EDMC here:  that there is a "split in authority" on the condition of payment issue 8.  The court firmly rejected the request and the characterization, explaining in a careful analysis that:

> No other courts have cited *Graves* or *Gay* on the present issue. As such, the persuasive value of these decisions is negligible in comparison to *Hendow* and *Main.*"

*Powell*, 756 F. Supp. 2d at 1380.

Nor is *Hendow* an isolated holding.  Indeed, while EDMC would like to suggest that the Third Circuit's decision in *Wilkins* re-configured the landscape on the issue, in fact the decision incorporates by reference the holding and analysis in *Hendow*.  In recognizing the implied false certification doctrine, the Third Circuit in *Wilkins* relied extensively on the Tenth Circuit's opinion in *United States ex rel. Conner v. Salina Reg'l Health Center, Inc.,* 543 F.3d 1211 (10th Cir. 2008),  a case that EDMC quotes in relating the *Wilkins* decision.  *Wilkins*, 659 F.3d at 305-06.  EDMC neglects to mention, however, that *Conner* cites the Incentive Compensation Ban as a paradigm of a condition of payment, approvingly citing at length the analysis in *Hendow*.  *See id.* at 1176.

EDMC is of course entitled to try to persuade this Court to endorse a position that is against the great weight of authority, but its suggestion that the issue presents a choice between two equally well-represented and established views is badly off-base.  In fact, EDMC's position that compliance with the Incentive Compensation Ban is not a condition of payment lacks support in either logic or precedent, and should the Court reach the issue of implied certification, it should dispose of the argument as quickly as did the Ninth Circuit in *Hendow* and Seventh Circuit in *Main*.

## IV.    EDMC HAS MISCHARACTERIZED THE STATES' STATUTORY REGIMES.

EDMC has made several ad hoc arguments regarding certain of the States' financial aid regimes and FCAs.  These arguments misconstrue the relevant statutes and regulations.

### A.    Defendants Were Required To Participate In The Federal Pell Grant Program To Qualify As "Eligible Institutions" Under Minnesota Law.

As explained in Minnesota's complaint, Minnesota Statutes section 136A.103(b)(3)(i) (2010) makes Defendants'[13] compliance with the Incentive Compensation Ban a specific and strict prerequisite and *sine qua non* of receiving Minnesota student aid funds.  If Defendants had not fraudulently represented that they were participating in the federal Pell Grant program in accordance with the requirements of Title IV of the HEA, which includes ongoing compliance with the Incentive Compensation Ban, Minnesota would not have paid Defendants at least $1.28 million in student aid funding.  MN Comp., ¶¶ 32-37.  Defendants erroneously contend that Minnesota Statutes section 136A.103(b)(3)(ii) (2010) demonstrates that their participation in the Pell Grant program was not strictly required to qualify as "eligible institutions."  However, section 136A.103(b)(3)(ii) does not apply to Defendants, and Defendants have not even claimed that they qualify as "eligible institutions" for Minnesota student aid funds pursuant to that section.   Section 136A.103(b)(3)(ii) allows those institutions that were participating in Minnesota's student aid programs as of June 30, 2010, but were not participating in the federal Pell Grant program by that date, to qualify as "eligible institutions" so long as they "require every student who enrolls to sign a disclosure form, provided by [OHE], stating that the institution is not participating in the federal Pell Grant program."   *See* Minn. Stat. § 136A.103(b)(3)(ii) (2010).

---

[13]    For purposes of this subsection, "Defendants" include EDMC and its subsidiary corporations located in Minnesota, the Art Institutes International Minnesota and Argosy University - Twin Cities.

The legislative history surrounding the enactment of section 136A.103(b)(3)(ii) shows that this section was a compromise between OHE and a small number of approximately 20 private for-profit institutions that were already participating in Minnesota's student aid programs, but did not participate in the Pell Grant program.[14]   *See* Audio Recording of 03/09/10 Meeting of Minn. Senate Higher Ed. Comm. beginning at 59:40, available at *http://www.senate.leg.state.mn.us/schedule/unofficial_action.php?ls=86&bill_type=SF&bill_number=0184&ss_number=0&ss_year=2009*.   Section 136A.103(b)(3)(ii) was intended to allow these few institutions to avoid immediately incurring the considerable cost of becoming accredited for participation in the Pell Grant program by "grandfathering" them in as "eligible institutions" for continued participation in Minnesota's student aid programs, so long as they abided by certain requirements.  *Id.*  However, the legislature's goal was eventually to require all private for-profit institutions to participate in the Pell Grant program in order to qualify as "eligible institutions" for the receipt of state student aid.  *Id.*  This goal is evidenced by the statutory scheme, which provides that when an institution changes ownership it must begin participating in the Pell Grant program "within four calendar years."  *See* Minn. Stat. § 136A.103(d) (2010).

Thus, as of July 1, 2010, the only institutions for which participation in the federal Pell Grant program was not a strict requirement in order to qualify as an "eligible institution" were the approximately twenty (20) institutions that had already been participating in Minnesota's financial aid programs as of June 30, 2010, but were not participating in the Pell Grant program as of that date. Minn. Stat. § 136A.103(b)(3)(ii) (2010).  For all other institutions, including Defendants, section 136A.103(b)(3)(ii) has no application and participation in the Pell Grant

---

[14]    All the other private for-profit institutions receiving Minnesota student aid funds, including Defendants, were already participating in the Pell Grant program.

program by July 1, 2010 is strictly required in order to qualify as an "eligible institution" for the receipt of Minnesota student aid funds.  *Id.* Minn. Stat. § 136A.103(b)(3)(i) (2010); *see also* Minn. Stat. § 645.16 (1947) (stating courts must apply the plain meaning of a statute, when the words of the law "in their application to an existing situation are clear and free from all ambiguity"); *State v. Caldwell*, 803 N.W.2d 373, 382 (Minn. 2011) (same).  This fact is also supported by the statute's declaration that "[a]n institution that loses its eligibility for the federal Pell Grant program is not an eligible institution."  Minn. Stat. § 136A.103(e) (2010).

Long before July 1, 2010, Defendants have consistently executed PPAs with ED in order to participate in the Pell Grant program.  Indeed, public records indicate that for the 2008-2009 school year, 918 students enrolled at Art Institutes International Minnesota received $2,435,162 in Pell Grants, and 642 students enrolled at Argosy University - Twin Cities received $1,325,716 in Pell Grants.  *See* OHE Report: Financial Aid Awarded, Fiscal Year 2009 at pp. 65-66 (July 2010), available at *http://www.ohe.state.mn.us/pdf/FAA-09.pdf*.[15]  Therefore, Defendants have not, and cannot, claim that they qualified as "eligible institutions" pursuant to section 136A.103(b)(3)(ii), or that they met the requirements of section 136A.103(b)(3)(ii) by requiring each of their students to sign a disclosure form stating they are not participating in the federal Pell Grant program. Because Defendants were already participating in the Pell Grant program as of June 30, 2010, their continued participation in the Pell Grant program—which encompasses ongoing compliance with the Incentive Compensation Ban—was strictly required in order for

---

[15]  Likewise, public records show that EDMC participated in the federal Pell Grant program and received millions of dollars in Pell Grants during the 2003 to 2007 school years. *See* OHE Report: *Financial Aid Awarded, Fiscal Year 2007* at pp. 55-56 (Aug. 2008), *available at http://www.ohe.state.mn.us/pdf/FAA-07.pdf; OHE Report: Financial Aid Awarded, Fiscal Year 2005 at pp. 56-57 (Aug. 2006), available at http://www.ohe.state.mn.us/pdf/FAA-05.pdf; OHE Report: Financial Aid Awarded, Fiscal Year 2003 at pp. 55-56 (April 2004), available at http://www.ohe.state.mn.us/pdf/FAA-03.pdf.*  The Court may take judicial notice of these publicly available statistics pursuant to Fed. R. Evid. 201(b)(2). *See, e.g., Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *Twp. of S. Fayette v. Allegheny Cnty. Hous. Auth.*, 27 F. Supp. 2d 582, 593-94 (W.D. Pa. 1998).

them to continue to qualify as "eligible institutions" and to receive Minnesota student aid funds. Minn. Stat.§ 136A.103(b)(3)(i) (2010).

   **B.    California Did Not and Does Not Permit Schools To Pay Their Recruiters Incentive Compensation In EDMC's Manner.**

In a misguided attack on California's False Claims Act ("CFCA")[16] claim, EDMC argues that California's Education Code once permitted schools to pay recruiters incentive compensation. (*See* Defs.' Br. 51.)  EDMC's argument is merely a distraction, and it is wrong in any event.  California alleges that, in order to become eligible for state funding, EDMC must certify compliance with federal law, including the federal Incentive Compensation Ban. (*See* JCII ¶¶ 173-74.)  California's CFCA claim is accordingly based on EDMC's false certification of compliance with the federal Incentive Compensation Ban, not related state law provisions. (*See* JCII ¶¶ 176-77.)

Thus, compliance with the federal Incentive Compensation Ban is a condition of payment of funds from the Cal Grant Program.  As expressly stated in California's Institutional Participation Agreement ("IPA"), EDMC "agreed to be subject to and comply with 'all current and applicable federal . . . regulations in its implementation of'" the terms of the IPA. (*See* JCII ¶¶ 173-174.)  Furthermore, the IPA refers to section 69432.7 (l)(1) of the California Education Code, which requires that a California private post-secondary institution, such as EDMC, must be approved by ED to participate in the federal Pell Grant program and at least two of the three federal campus-based student aid programs before becoming eligible to participate in the Cal Grant Program. (*See* California IPA, Art. II(A)(1), *available at* http://www.csac.ca.gov/pubs/forms/grnt_frm/NewNon_PublicInstitutionalParticipationAgreeme

---

[16]      *See* Cal. Gov. Code § 12650 (2010) *et seq.*

*nt.pdf*, which is cited by EDMC in Defs.' Br. at n. 43, and expressly referenced in the JCII.) [17]

As explained in the JCII, in order to become eligible to receive Title IV funding under programs

such as the federal Pell Grant, EDMC had to enter into a PPA with ED to certify that it was in

compliance with specific statutory requirements, including 20 U.S.C § 1094(a)(20) and 34

C.F.R. § 668.14 (b)(22) and (b)(22)(ii)(A), which set forth the federal Incentive Compensation

Ban and the "Safe Harbor."  (*See* JCII ¶¶ 36-44.)

EDMC's suggestion that a pre-2007 California law permitted Defendants to pay incentive

compensation is plainly incorrect.  Echoing the spirit of the federal Incentive Compensation Ban,

Section 94832(e) of the California Education Code, which was repealed effective June 30, 2007,

provided:

> (e) No institution shall compensate a representative involved in recruitment, enrollment, admissions, student attendance, or sales of equipment to students on the basis of a commission, commission draw, bonus, quota, or other similar method except as follows:
>
> . . .
>
> (2) If the program of instruction is scheduled to be completed in more than 90 days, the institution shall pay compensation related to a particular student as follows:
>
> (A) No compensation shall be paid for at least 90 days after that student has begun the program.
>
> (B) Up to one-half of the compensation may be paid before the student completes the program only if the student has made satisfactory academic progress, documented by the institution in the student's file, for more than 90 days.
>
> (C) The remainder of the compensation shall be paid only after the student's completion of the program. This subdivision shall not prevent the payment at any time of an hourly, weekly, monthly, or annual wage or salary.

Cal. Educ. Code § 94832(e) (2001) (repealed 2007).

---

[17]   See *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document").

Contrary to EDMC's assertion that this provision allowed schools to pay incentive compensation, in fact, it prohibited schools from paying incentive compensation, unless they tied recruiters' incentive compensation to students' completion of their programs in the specific ways prescribed by the statute.   EDMC conveniently cites only a truncated portion of this statute and fails to explain how its own compensation practices fell within the exception to the statute's prohibition against the payment of incentive compensation.   Nor can it, because, as alleged in the JCII, EDMC's recruiters earned "New Student Points" as soon as a student enrolled in classes, rather than after the student substantially completed the course or program, as required under the "safe harbor" exceptions of former section 94832(e) of the Education Code.   (*See* JCII ¶ 114.) Thus, nothing in the JCII suggests that EDMC was entitled to pay incentive compensation even under the pre-2007 Education Code.

Moreover, in its latest revision of the California Education Code §§ 94800-95010, the California Legislature has reiterated that educational institutions need to comply with federal laws and regulations governing federal student financial aid programs.   *See* Cal. Educ. Code § 94897 (2010).   Specifically, section 94897(n)(2) of the Education Code prohibits incentive compensation for institutions participating in the federal student financial aid programs, unless the compensation payments "are in conformity with federal regulations governing an institution's participation in the federal student financial aid programs."   *Id*.   This is further evidence that California's incentive compensation ban provision reflects the Legislature's intent to track the federal Incentive Compensation Ban, and that no California law permits EDMC to practice the incentive compensation plan it currently has in place.

**C.      Florida's FCA Claim is Based Upon EDMC'S False Certification of Compliance With The Federal Incentive Compensation Ban.**

EDMC attempts to attack Florida's FCA claim by arguing that Florida repealed its state law incentive compensation ban.  Like EDMC's related argument with respect to California's FCA claim, this argument is meritless.  Like California, Florida state funding is conditioned on compliance with Title IV of the HEA, including the federal Incentive Compensation Ban.  *See* JCII ¶ 303; Fla. Stat. §§ 1009.50-1009.892.  For example, EDMC received Florida state funding under the Florida Postsecondary Student Assistance Grant Program, which requires institutions to be eligible for participation in the Pell Grant program under Title IV.  *See* Fla. Stat. § 1009.52.  EDMC was not, in fact, eligible for participation in the Pell Grant program because it was not in compliance with the federal Incentive Compensation Ban.  Nevertheless, EDMC obtained Florida state funding by falsely representing that they were eligible for participation in the Pell Grant program and that they had complied with the federal Incentive Compensation Ban.  As such, the false statement on which Florida bases its FCA claim is Defendants' false certification of compliance with the federal Incentive Compensation Ban, not any related Florida state law provisions.  (*See* JCII ¶ 303.)  Defendants' effort to shift the focus to the Florida state education code is misleading and provides no basis for dismissing Florida's FCA claim.

**D.      Indiana and Minnesota Are Not Seeking Retroactive Application Of Their False Claims Acts.**

Indiana limits its allegations under the Indiana FCA to Defendants' false or fraudulent claims or statements knowingly or intentionally presented or made, or caused to be presented or made by EDMC to Indiana, for payment or approval, since at least July 1, 2005.

Minnesota limits its allegations under the Minnesota FCA to Defendants' false or fraudulent claims knowingly presented, or caused to be presented, to Minnesota, for payment or approval since at least July 1, 2010.  (*See* MN Comp. ¶¶ 3, 31, 33, 37, 39.)

**E.      California May Recover Treble Damages Under Its False Claims Act.**

EDMC argues that a provision of California's Institutional Participation Agreement ("IPA")[18] limits the State's recovery to the actual amount of Cal Grant funds the institution is not entitled to retain, and thus precludes California from bringing a claim for treble damages under the CFCA.  (*See* Defs.' Br. 51 n.43.)  This argument also fails for several reasons.

First, EDMC seeks to import more into the plain language of Article IV(c)(3)(x), the relevant provision of the IPA.  Nothing about Article IV(c)(3)(x) limits an educational institution's liability for statutory violations under the CFCA.  *See, e.g., United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 644 (6th Cir. 2002) (a contract term limiting liability is not a defense to FCA violations when there is nothing in the agreement that suggests that limitations of contractor liability covered statutory violations).  Rather, Article IV's purpose is to allow the CSAC to recover any excess or undisbursed Cal Grant funds received by the institution upon the yearly reconciliation of Cal Grant program expenditures.  Article IV has no bearing on the State's right to recover for statutory violations.  (*See* California IPA, Art. IV(C)(3)(x) ("Reconciliation of Cal Grant Funds")) *available at http://www.csac.ca.gov/pubs/forms/grnt_frm/NewNon_Public InstitutionalParticipationAgreement.pdf*.)

Second, under well-established California law, a state agency such as the CSAC cannot contract away the State's police power, which includes its power to bring actions under the CFCA.  *See Avco Cmty. Developers, Inc. v. S. Coast Reg'l Comm'n*, 553 P.2d 546, 556 (Cal. 1976) ("[I]t is settled that the government may not contract away its right to exercise the police power in the future"); *Cnty. Mobilehome Positive Action Comm., Inc. v. Cnty. of San Diego*, 62 Cal. App. 4th 727, 736 (1998) ("[T]he government may not contract away its right to exercise the

---

[18]      As noted above, in order to receive state funding through the Cal Grants Program, an educational institution must sign and submit an IPA to the California Student Aid Commission (CSAC).  (JCII ¶ 172-73.)

police power in the future.  A contract that does so is invalid and unenforceable as contrary to

public policy.")  (citations and quotation marks omitted).  Accordingly, the IPAs executed by the

CSAC neither bar California from bringing the current action nor limit the damages California

seeks pursuant to the CFCA.

## V.     THE STATES' EQUITABLE CLAIMS ARE PROPERLY PLED AND NOT SUBJECT TO DISMISSAL.

The States have properly pled valid equitable claims.  In addressing these claims, EDMC

advances the same flawed arguments it raised with respect to the United States' common law

claims: (1) that the States may not recover in equity because there is an adequate remedy at law;

(2) that the States' equitable claims are somehow preempted or precluded by federal law; and (3)

that allowing the States to recover in equity would constitute impermissible "double recovery."

These arguments fail here, just as they fail when addressed to the United States' equitable claims.

### A.     The States are Entitled to Equitable Relief if There is No Adequate Remedy at Law.

California, Minnesota, Indiana, and Illinois assert claims for equitable relief in the

alternative to their State FCA claims.[19]  They are perfectly entitled to do so, as it is well-

established that parties may seek equitable relief where there is no adequate remedy at law.  *See*

*Lewsader v. Wal-Mart Stores, Inc.*, 694 N.E.2d 191, 195 (Ill. App. Ct. 1998) ("a trial court has

broad equitable power to grant relief when there is no adequate remedy at law."); *Southtown*

*Plumbing, Inc. v. Har-Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992) (where no

adequate remedy at law exists, a plaintiff may seek a remedy in equity); *Meridian Fin. Advisors,*

*Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1065 (S.D. Ind. 2011) (same); *Ramona Manor*

---

[19]     In addition, because Indiana's claim under the Indiana False Claims and Whistleblowers Protection Act only covers funds paid by the State of Indiana from 2005 to the present, Indiana's unjust enrichment claim provides an avenue for the State of Indiana to receive relief for those funds paid by the State of Indiana from 2003 to 2005.

*Convalescent Hosp. v. Care Enters.*, 177 Cal. App. 3d 1120, 1138 (1986) (same).[20]  Equally well-established is the principle that under Rule 8(d)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead alternative theories of liability, regardless of whether such theories are consistent with one another.  (*See* United States' Mem. 56-57.)  As such, it is entirely proper for the States to pursue alternative theories of recovery at the motion to dismiss stage.  Indeed, courts routinely permit plaintiffs to pursue alternative common law and FCA claims all the way to judgment.  *See e.g.*, *United States ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 820-21 (W.D. La. 2007); (*See* United States' Mem. 56-57).

> **B.      The States' Claims Involve an Area of Exclusive State Interest, and Thus, Are Not Precluded.**

EDMC's argument that the States' equitable claims are "precluded by codified federal law" also fails.  (Defs.' Br. 46.)  In support of this argument, EDMC relies on *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001), which is distinguishable for at least each of the following reasons:

First, the States are entitled to recover losses from false claims submitted to the State governments, which are separate and independent from any false claims submitted to the federal government.  Whereas the plaintiff's claim in *Buckman* was for fraud committed solely against one federal agency, here, the States' equitable claims allege fraud committed against the State governments in violation of each State's law.  *See Green v. Fund Asset Mgmt., L.P.*, 245 F.3d

---

[20]   To the extent EDMC argues that the States have an adequate remedy at law because their claims arise from a breach of contract, EDMC misunderstands the States' claims.  The States' claims are not based on EDMC's "breach" of the States' PPAs.  Rather, the States' claims are based upon EDMC's false statement of compliance with Title IV of the HEA, which EDMC makes in order to obtain funding from the State governments.  Thus, the relevance of the PPAs to this litigation is not in their character as contracts, but rather in the fact that each PPA signed by EDMC contains express, false statements that EDMC is complying with Title IV.  (*See* United States' Mem. 58-59.)

214, 222 n.7 (3d Cir. 2001) (distinguishing *Buckman* from case in which plaintiffs alleged violation of state law in addition to fraud committed against a federal agency).

Second, the States' student aid programs pay for student education using state funds, not federal funds, and therefore concern exclusive areas of state interest.  (*See, e.g.*, JCII ¶ 172 **California** provides students with financial aid in the form of Cal Grants); ¶ 196 **Indiana** provides Frank O'Bannon Higher Education Grants and Twenty-First Century Scholar Awards, which are state grant awards "designed to financially assist eligible students in obtaining a post-secondary education."); ¶¶ 314-15, 325-326 **Illinois** provides student assistance funds through Monetary Award Program); MN Comp. ¶ 21 **Minnesota** provides state "student grant, aid, scholarship and loan programs to supplement federal and other sources of financial aid").)  In contrast, as the Supreme Court found, the *Buckman* case "involve[d] uniquely federal areas of interest."  *See Chamber of Commerce of the United States v. Whiting*, 131 S. Ct. 1968, 1971 (2011) (distinguishing *Buckman*, which involved claims submitted to the FDA, from state licensing laws which are not considered an "area of dominant federal concern").  The States' causes of action involve areas of exclusive State interest – the eligibility to participate in State-funded student aid programs and to receive State funds – and not an "area of dominant federal concern."  *See Chamber*, 131 S. Ct. at 1983.

Third, the States' requirements that EDMC comply with federal financial aid program regulations in order to receive State funds obviously support, rather than conflict with federal law.  Whereas the Supreme Court denied equitable claims in *Buckman* because the state cause of action "directly interfered with the operation of a federal program," no such danger exists here. *Chamber*, 131 S. Ct. at 1983 (citing *Buckman Co.*, 531 U.S. at 351).  Given that the States'

student aid programs do not interfere or conflict with federal law or the operation of the federal student aid program, the States' equitable claims are not precluded.

      **C.**      **Allowing the States to Advance Equitable Claims Will Not Result in Double Recovery.**

Finally, EDMC's argument that the States' equitable claims seek "impermissible double recovery" is also meritless.  (Defs.' Br. 47.)  EDMC bases this argument on the flawed premise that the States have "received the benefit of [their] bargain – the education of students."  (Defs.' Br. 47.)  In fact, the States have not received the benefit of their bargain, which includes not just the education of students, but the education of students by a company that complies with Title IV of the HEA and is therefore eligible for State funding.  (*See*, *e.g.*, JCII ¶¶ 330-331 (**Illinois**: Institution may receive MAP grant funds only after certifying compliance with HEA and corresponding ED regulations); ¶¶ 200-201 (**Indiana**: in order to receive funding, institutions must have active Title IV participation agreements with ED); ¶¶ 173-74, 176 (**California**: in order to participate and receive disbursed funds from Cal Grants Program, institutions must sign IPA certification agreeing to comply with applicable federal regulations, such as incentive compensation ban); MN. Comp. ¶¶ 23-26, 32 (**Minnesota**: in order to qualify as an "eligible institution" for the receipt of Minnesota student financial aid funds, private for-profit institutions must, by July 1, 2010, participate in the Pell Grant program in accordance with the requirements of Title IV of the HEA, which includes ongoing compliance with the Incentive Compensation Ban).)  Moreover, EDMC's argument conflicts with the well-established principle of FCA law that, where the government is fraudulently induced into entering a contract, claims under that contract are false, even if services have been provided.  *See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542-543 (1943).  (*See* United States' Mem. 58.)  Moreover, it is disputed that the service of educating students has been provided.

**D.    Illinois and California Law Recognizes Independent Claims for Unjust Enrichment.**

Illinois has stated a valid claim for unjust enrichment under Illinois law, which recognizes a separate cause of action for unjust enrichment. *Raintree Homes, Inc. v. Vill. of Long Grove*, 807 N.E.2d 439, 445 (Ill. 2004); *see Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516-18 (7th Cir. 2011).  EDMC's argument to the contrary relies solely on the Illinois Appellate Court's decision in *Martis v. Grinnell Mut. Reinsurance Co.*, which would have rejected an unjust enrichment claim "[b]ecause there was no valid underlying fraud claim."  905 N.E.2d 920, 928 (Ill. App. Ct. 2009).  However, the Seventh Circuit recently read the *Martis* court's articulation of unjust enrichment law as "language limited to its particular facts" and "not a true variance" from the Illinois Supreme Court's recognition of an independent cause of action for unjust enrichment.  *Cleary*, 656 F.3d at 518.  Reconciling Illinois Supreme Court law and the Illinois Appellate Court's language in *Martis*, the Seventh Circuit explained:

> Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust. What makes the retention of the benefit unjust is often due to some improper conduct by the defendant.  And usually this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute. So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim— and, of course, unjust enrichment will stand or fall with the related claim.

*Id.,* 656 F.3d at 517 (footnote and citation omitted).

As *Cleary* and *Raintree Homes* make clear, Illinois is permitted to bring an independent claim for unjust enrichment in this case, and Illinois has stated a viable claim for relief by alleging that EDMC fraudulently procured Illinois State funds, and that EDMC's retention of these funds is unjust.

Similarly, EDMC argues that California may not recover in equity because California does not recognize an independent claim for unjust enrichment.  (Defs.' Br. 52 n.44.)  However,

California's unjust enrichment claim is not an independent claim; it is pled as an alternative theory of recovery for the same fraudulent conduct alleged under the California False Claims Act cause of action.  (*See* JCII at ¶¶ 296-299.)  Moreover, EDMC's assertion that California does not recognize an independent claim for unjust enrichment invokes a semantic debate in California courts over whether unjust enrichment is a separate cause of action or only a legal remedy.  *See*, *e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827, 2011 WL 4345435, at *3-4 (N.D. Cal. Sept. 15, 2011) (listing cases).  However, "regardless of the precise label assigned to the cause of action," California has stated a viable claim for recovery based on its allegations that EDMC improperly benefited from its fraudulent conduct at California's expense.  *Id*. at *4.

## VI.    THE CONTINUED INCLUSION OF MICHAEL T. MAHONEY AS A RELATOR IN THIS ACTION IS APPROPRIATE.

On April 1, 2011, this Court granted relator Lynntoya Washington's motion to amend her complaint in order to add Michael T. Mahoney as a co-relator based on his knowledge and experience as former Director of Training for EDMC's Online Education Division.  Because Mr. Mahoney has neither "intervene[d]" nor filed a related "action," the plain language of 31 U.S.C. § 3730(b)(5) does not bar his involvement as a relator in this lawsuit.  Thus, EDMC's request that this Court dismiss Mr. Mahoney's "claims" as "second-filed" under 31 U.S.C. § 3730(b)(5) is plainly improper.  Setting aside the fact that Mr. Mahoney has not filed any separate "claims" in this case, EDMC's argument ignores the straightforward language of section 3730(b)(5), the policies underlying this section, and the numerous cases that have rejected the precise argument EDMC makes here.  Accordingly, EDMC's motion to dismiss Mr. Mahoney's "claims" should be denied.

The Court need not look beyond the plain language of section 3730(b)(5) to reject EDMC's attempt to remove Mr. Mahoney from this case.  Commonly known as the "first-to-file

bar," section 3730(b)(5) provides that, "[w]hen a person brings an action [under the FCA], no person other than the Government may **intervene** or bring a **related action** based on the facts underlying the pending action."   31 U.S.C. § 3730(b)(5) (emphasis added).   EDMC has not demonstrated (or even alleged) that Mr. Mahoney "intervene[d]" in this case or filed a separate "action."   *See* Fed. R. Civ. P. 24 (governing intervention).   Instead, EDMC admits, as it must, that Ms. Washington **amended** her complaint.   Defs.' Br. 65; *see* Fed. R. Civ. P. 15(a). Therefore, it has failed to demonstrate that section 3730(b)(5) applies in this case.

In contrast to a Rule 24 motion to intervene, Mr. Mahoney became a part of this lawsuit when Ms. Washington learned of his existence and moved for leave to amend her complaint and add him as a co-relator.   This Court granted Ms. Washington's motion, and she and Mr. Mahoney subsequently filed the Second Amended Complaint together.   Because Mr. Mahoney is a co-relator who Ms. Washington invited into this lawsuit, the first-to-file bar does not preclude his involvement as a relator in this action.

EDMC argues that a relator cannot amend her complaint to add a co-relator because the first-to-file bar is "exception free."   Because EDMC cannot establish that Mr. Mahoney intervened under the plain meaning of the term, EDMC attempts to read a prohibition against "amendment" into the statute, even though such a prohibition is not supported by the statute's plain language.   In promulgating section 3730(b)(5), Congress was well aware that *qui tam* litigants would be using the Federal Rules of Civil Procedure.   In this context, Congress used the word "intervene" and not "amend" or "join."   *See* Fed. R. Civ. P. 14, 15, 20, respectively. Simply put, the Court need not consider whether any "exceptions" to the bar apply because Ms. Washington's amendment does not constitute "intervention" within the scope of section 3730(b)(5).

The Tenth Circuit relied on the plain language of section 3730(b)(5) to reject EDMC's exact argument in a decision that EDMC fails to acknowledge. *See U.S. ex. rel. Precision Co. v. Koch Indus.*, 31 F.3d 1015 (10th Cir. 1995). In *Koch*, the Tenth Circuit permitted the original relator to file an amended complaint adding two co-relators despite the defendant's challenge under section 3730(b)(5). After examining the language of section 3730(b)(5), and the meaning of the word, "intervene," in particular, the Court concluded that "the statute implies intervention of the types set forth in Rule 24(b)(2), and *the addition of parties does not constitute intervention*." *Id.* at 1017 (emphasis added). The court reasoned that "intervene" means "permissive intervention" under Rule 24 because that interpretation "gives substance to the legislative intent to prohibit 'multiple separate suits based on identical facts and circumstances.'" *Koch, Id.* at 1018 (quoting legislative history of the first-to-file bar, S. Rep. No. 99-345, 99th Cong., 2d Sess. 25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5290). Like the relators in *Koch*, Mr. Mahoney was invited by Ms. Washington to "join" as a relator; he is not a "stranger" to the action who would need to "intervene" pursuant to Rule 24. *Koch*, 31 F.3d at 1017-18.

On consideration of *Koch*, the United States District Court for the Southern District of Ohio recently held that adding a relator by amending a complaint (as Ms. Washington did) does not constitute "intervention" because:

> [T]he addition of the [co-relators'] claims does not require the duplicative expenditures of time and resources that a separate action [] would have entailed. The first-to-file rule also purports to avoid parasitic claims. . . . The Relators here have reached a private agreement as to the distribution of any recovery. [Defendant] is not at risk for multiple or inconsistent judgments by the addition of [the co-relators].

*United States  ex rel. Howard v. Lockheed Martin Corp.*, No. 1:99-CV-285, 2011 WL 4348104, at *4 (S.D. Ohio Sept. 16, 2011); *see also United States ex rel. Sanders v. E. Ala. Healthcare*

*Auth.*, 953 F. Supp. 1404, 1408 (M.D. Ala. 1996) ("While § 3730(b)(5) prohibits persons other than the government from intervening or bringing a related action based on the facts underlying the pending action, it does not automatically bar the addition of new parties.") (citations and internal quotations omitted); *United States ex rel. Johnson v. Shell Oil Co.*, No. 9:96 CV 66 Dckt. No. 426 at 3, 9-10 (E.D. Tex. Dec. 8, 1998)[21] (permitting addition of relator to originally filed complaint because additional relator was not an "intervenor" and did not file a separate action but prohibiting addition of other relators who had previously filed their own separate actions).[22]

As in *Koch*, and the district court decisions that followed suit, Mr. Mahoney's inclusion in this lawsuit comports with both the plain language of section 3730(b)(5) and the policy behind this provision. Mr. Mahoney has not filed a "parasitic" claim, as Ms. Washington invited him into this case. Nor does Mr. Mahoney's involvement subject EDMC to duplicative lawsuits or risk multiple recoveries for the government. *See id.*; *see also* (James B. Helmer, Jr., False Claims Act: Whistleblower Litigation) § 6-1, p. 351 (3d ed. 2002) ("A single lawsuit with more than one relator does not conflict with Congress' goals of avoiding duplicative actions and

---

[21] The court in *Johnson* held that a relator who was added pursuant to Rule 15(a) was not an intervenor and had not filed a "related action" because Rule 15(a) "governs the addition of parties by amendment of a complaint as well as the addition of allegations against existing defendants." *Id.* at 9.

[22] EDMC fails to acknowledge any of the on-point cases that directly contradict its argument. Additionally, EDMC mischaracterizes the only published case it cites, *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 551 F. Supp. 2d 100 (D. Mass. 2008), *aff'd*, 579 F.3d 13, 28-29 (1st Cir. 2009). Although EDMC relies on *Duxbury* to support its argument for the dismissal of Mr. Mahoney under the first-to-file bar, the district court in *Duxbury* actually dismissed the relator under the public disclosure bar, adding briefly, in dicta, that the relator would also be barred by the first-to-file bar. *See id.* at 110. In affirming the district court's decision, the First Circuit relied only on the public disclosure bar and declined to even reach the first-to-file question. *Duxbury*, 579 F.3d at 28-29. To the extent EDMC relies on cases that are contrary to *Koch* and its progeny, including the unpublished decisions in *United States ex rel. Wilson v. Bristol Myers Squibb, Inc.*, No. 06-CV-12195, 2011 WL 2462469 (D. Mass. June 16, 2011), *United States ex rel. Manion v. St. Lukes Reg'l Med. Ctr., Ltd.*, No. 06-498, 2008 WL 906022 (D. Ida. Mar. 31, 2008), and *United States ex rel. Fry v. Guidant Corp.*, No. 3:03-842, 2006 WL 1102397 (M.D. Tenn. Apr. 25, 2006), the reasoning adopted in these cases should be rejected by this Court as inconsistent with the plain language and policies pursued by section 3730(b)(5).

double recoveries for the Government.  No matter how many *qui tam* plaintiffs join together in a single suit, only one recovery can result.").

As in *Koch*, *Howard*, and the other on-point cases that EDMC ignores, Mr. Mahoney's inclusion in this lawsuit is consistent with both the plain language and policies of the first-to-file bar.  Accordingly, EDMC's motion to dismiss Mr. Mahoney from this lawsuit should be denied.

## VII.   THE RELATORS PROPERLY CONVEY THE ALLEGATIONS IN THE COMPLAINTS.

While EDMC concedes that the relators *do* allege facts (as opposed to conclusions), EDMC nevertheless argue that these facts do not matter due to the relators' purported "limited knowledge." (Defs.' Br 22-26.)  It is unclear what the Defendants are arguing.  First EDMC seems to be saying that the because Relators did not themselves make compensation decisions or manage those who did (*see, e.g.*, Defs.' Br. at 23), their factual statements are somehow immaterial.  EDMC ignores the fact that Ms. Washington had conversations about quality points with higher-level employees *who did have such authority*.  If EDMC's argument is that the relators themselves cannot speak to *company-wide* practices such as would support a claim against all the defendant entities, the Complaints allege various others facts to suggest that compensation practices were set on a company-wide basis and that the corporate culture throughout was one of manic, exclusive focus on student enrollment numbers.

Relatedly, Defendants also argue that the Relators' allegations have insufficient indicia of reliability even to establish that false claims were submitted in the geographic region in which they worked, apparently due to a purported lack of personal knowledge about EDMC's compensation practices.  (*See* Defs.' Br. at 24-25.)   There is simply no basis for this position.

The relators' key allegations are direct and specific.  As discussed in the United States Memorandum, the crux of Mr. Mahoney's allegations is that as the head of training for the

Online Higher Education division, he *never* gave *any* training on the quality factors reflected in the compensation plan's matrix and never heard anyone discuss those factors. (JCII, ¶ 131).  Ms. Washington reports being told by the President of her division that a dip in her quality factor rating would have "no effect whatsoever on her compensation" because she had hit her student enrollment numbers (JCII, ¶ 138), with her direct supervisor similarly advising that "a good review" was predicated on her hitting her enrollment numbers (JCII, ¶ 137).  These allegations (in addition to strongly supporting the conclusion that quality factors did not affect compensation at EDMC, for the reasons set forth above) are undeniably *facts* (not speculative "inferences" or mere legal conclusions), and, what's more, *are* based on personal knowledge: they are first-hand accounts of what the relators heard and did not hear about quality factors when employed at EDMC.  Indeed, they presumably would be admissible *at the trial* of this case, and, in any event, are certainly much more specific and direct than are required to be well-pled in a Complaint. *See, e.g., United States ex rel. Schumann v. AstraZeneca PLC*, No. 03-5423, 2010 WL 4025904, at *10 (E.D. Pa. Oct. 13, 2010) ("[T]he relator is not required to plead 'direct and independent' knowledge to satisfy Rule 9(b)); *Powell,* 756 F. Supp. 2d at 1377 (rejecting defendants' argument that a relator is required to plead details as to how relators obtained firsthand knowledge of defendants' fraudulent activities).   In this way, the Relators' allegation in this case are completely unlike those discredited in the cases cited by EDMC, where the allegations in question depended on the relator's "belief" that a fraud was occurring, (*United States ex rel. Feingold v. Palmetto Gov't Benefits Admin.*, 477 F. Supp. 2d 1187, 1195-96 (S.D. Fla 2007)) or on a series of tenuous "inferences"  (*United States ex rel Pilecki-Simko v. Chubb Institute*, No. 06-3562, 2010 WL 3463307 at * 6 (D.N.J. Aug, 27, 2010).

Given this direct evidence of how compensation worked in practice at EDMC obtained *by EDMC employees from EDMC employees during the course of their employment*, this case is easily distinguishable from a line of false Medicare/Medicaid billing cases on which EDMC relies in which relators' allegations were dismissed because they did not work in the medical offices in question and hence had *no* specific evidence as to a necessary element of the offense: whether false claims were actually submitted to the government.  *See, e.g. United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006) (relator lacked "firsthand knowledge" as to whether false claims were actually submitted by defendants because he was not employed by the billing facility but rather just rotated through and based his claims in part on "rumors from staff"); *Feingold*, 477 F. Supp. at 1195 (relator was unable to provide sufficiently reliable allegations that false claims were submitted where he brought FCA case against various companies for whom he had never worked based on belief that fraudulent practices occurred industry-wide and could "demonstrate only generalities" as to whether false claims were in fact submitted by the defendant); *United States ex rel. Westfall v. Axiom Worldwide, Inc.*, No. 8:06-cv-571-T-33TBM, 2009 WL 1424213, at *5 (M.D. Fla. May 20, 2009) (relators failed to provide sufficiently reliable allegations that false claims were submitted because they never worked in the medical practices of the doctors alleged to have submitted false claims and hence, among deficiencies, "do not have firsthand knowledge to support the allegation that any claims in question were actually submitted to Medicare or any other federal healthcare program").[23]

---

[23] All unpublished decisions cited herein have been attached to this memorandum in alphabetical order as an exhibit.

## CONCLUSION

For the foregoing reasons, EDMC's motion to dismiss should be denied in its entirety.

Respectfully submitted,

/s/ David J. Chizewer
David J. Chizewer, Esquire
William C. Meyers, Esquire
Courtney R. Baron, Esquire
Goldberg Kohn Ltd.
55 East Monroe Street
Suite 3300
Chicago, IL 60603
(312) 201-3938
djc@goldbergkohn.com
wcm@goldbergkohn.com
courtney.baron@goldbergkohn.com
Counsel for Relators

/s/ Harry P. Litman
Harry P. Litman, Esquire
PA ID No. 51634
Litman Law Firm
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
(412) 456-2000
harry.litman@verizon.net
Counsel for Relators

/s/ Thomas J. Farrell
Thomas J. Farrell, Esquire
PA ID No. 48976
Farrell & Reisinger, LLC
200 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219-1827
(412) 893-1380
tfarrell@farrellreisinger.com
Counsel for Relators

/s/ H. Yale Gutnick_____
H. Yale Gutnick, Esquire
PA ID No. 1226
Strassburger McKenna Gutnick & Gefsky
Four Gateway Center, Suite 2200
Pittsburgh, PA 15222
(412) 281-5423
ygutnick@smgglaw.com
Counsel for Relators


/s/ Kenny V. Nguyen
Kenny V. Nguyen
California Attorney General's Office
1300 I Street
Sacramento, CA 95814
(916) 323-6311
Fax: 916-323-6882
Email: kenny.nguyen@doj.ca.gov
Counsel for Plaintiff State of California


/s/ Rene D. Harrod
Rene D. Harrod
Office of the Attorney General, State of Florida
110 SE 6th Street, 10th Floor
Ft. Lauderdale, FL 33301
(954) 712-4600
Fax: 954-527-3708
Email: rene.harrod@myfloridalegal.com
Counsel for Plaintiff State of Florida


/s/ Jennifer M. Zlotow
Jennifer M. Zlotow
Office of the Illinois Attorney General
100 W. Randolph Street, 11th Floor
Chicago, IL 60601
(312) 814-5354
Fax: 312-814-4452
Email: jzlotow@atg.state.il.us
Counsel for Plaintiff State of Illinois

<u>/s/ Patricia O. Erdmann</u>
Patricia O. Erdmann
Corinne W. Gilchrist
State of Indiana Office of the Attorney General
302 West Washington Street
IGCS, Fifth Floor
Indianapolis, IN 46204
(317) 232-6318
Fax: 232-7979(fax)
Email: Patricia.erdmann@atg.in.gov
Counsel for Plaintiff State of Indiana


<u>/s/ Jason Pleggenkuhle</u>
Jason Pleggenkuhle
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1100
St. Paul, MN 55101
(651) 757-1147
Jason.pleggenkuhle@ag.state.mn.us
Counsel for Plaintiff State of Minnesota

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of December, 2011, I have served a copy of the foregoing **MEMORANDUM OF LAW THE STATES OF ILLINOIS, CALIFORNIA, INDIANA, MINNESOTA, AND FLORIDA AND RELATORS IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**, via the Court's ECF system upon the following:

Laura E. Ellsworth, Esquire
Charles H. Moellenberg, Jr., Esquire
Scott W. Brady, Esquire
Amy K. Pohl, Esquire
Thomas S. Jones, Esquire
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA  15219
leellsworth@jonesday.com
chmoellenberg@jonesday.com
sbrady@jonesday.com
akpohl@jonesday.com
tsjones@jonesday.com

Timothy H. Hatch, Esquire
GIBSON DUNN
333 South Grand Avenue
Los Angeles, CA  90071-3197
thatch@gibsondunn.com

/s/ David J. Chizewer
DAVID J. CHIZEWER
Counsel for Relators