**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, AND THE** | ) | |
| **STATES OF CALIFORNIA, FLORIDA,** | ) | |
| **ILLINOIS, INDIANA, MASSACHUSETTS,** | ) | |
| **MINNESOTA, MONTANA, NEW JERSEY,** | ) | |
| **NEW MEXICO, NEW YORK, AND** | ) | |
| **TENNESSEE, AND THE DISTRICT OF** | ) | |
| **COLUMBIA, each ex rel. LYNNTOYA** | ) | **Civil Action** |
| **WASHINGTON and MICHAEL T.** | ) | **No. 07-CV-461** |
| **MAHONEY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Honorable Terrence F. McVerry** |
| **v.** | ) | |
| | ) | |
| **EDUCATION MANAGEMENT** | ) | |
| **CORPORATION; et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**EXHIBIT TO MEMORANDUM OF LAW OF THE STATES OF CALIFORNIA,
FLORIDA, ILLINOIS, INDIANA, AND MINNESOTA, AND RELATORS IN
<u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

Slip Copy, 2011 WL 4345435 (N.D.Cal.), 2011-2 Trade Cases P 77,613
**(Cite as: 2011 WL 4345435 (N.D.Cal.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
In re TFT–LCD (FLAT PANEL) ANTITRUST
LITIGATION.
This Order Relates To:
Alfred H. Siegel, as Trustee of the Circuit City
Stores, Inc. Liquidating Trust, Plaintiff,
v.
AU Optronics Corporation, et al., Defendants.

Nos. M 07–1827 SI., C 10–5625 SI.
MDL No. 1827.
Sept. 15, 2011.

**ORDER DENYING DEFENDANTS' JOINT
MOTION TO DISMISS THE SECOND
AMENDED COMPLAINT**

SUSAN ILLSTON, District Judge.

**\*1** Now before the Court is defendants' joint motion to dismiss plaintiff's second amended complaint. Pursuant to Civil Local Rule 7–1(b), the Court finds this matter suitable for disposition without oral argument and therefore VACATES the hearing currently scheduled for September 16, 2011. Having considered the papers of the parties, and for good cause appearing, the Court hereby DENIES defendants' motion.

**BACKGROUND**

Plaintiff Alfred H. Siegel, Trustee of the Circuit City Stores Liquidating Trust ("Circuit City"), filed this action on December 10, 2010, seeking to recover for a "long-running and largely-admitted conspiracy among suppliers of liquid crystal display panels ('LCD Panels') and related products ('LCD Products')." Compl., ¶ 1. On July 7, 2011, plaintiff filed a second amended complaint ("SAC"), which included antitrust claims under the Sherman Act, California's Cartwright Act, and the Illinois Antitrust Act, as well as a claim under California's consumer protection and unfair competition laws, and a claim for restitution and unjust enrichment under California law. SAC at ¶¶ 254–89. The SAC names as defendants entities from ten corporate families: AU Optronics FN1; Chi Mei FN2; Chunghwa Pictures Tubes FN3; Epson FN4; Hannstar FN5; LG FN6; Samsung FN7; Sharp FN8; Toshiba FN9; and Hitachi FN10. SAC at ¶¶ 15–58.

FN1. AU Optronics Corporation and AU Optronics Corporation America.

FN2. Chi Mei Corporation, Chimei Innolux Corporation, Chi Mei Optoelectronics USA, Inc., CMO Japan Co. Ltd., Nexgen Mediatech, Inc ., and Nexgen Mediatech USA, Inc.

FN3. Chunghwa Pictures Tubes Ltd. and Tatung Company of America, Inc.

FN4. Epson Imaging Devices Corporation and Epson Electronics America, Inc.

FN5. Hannstar Display Corporation.

FN6. LG Display Co. Ltd. and LG Display America, Inc.

FN7. Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., and Samsung Electronics America, Inc.

FN8. Sharp Corporation and Sharp Electronics Corporation.

FN9. Toshiba Corporation, Toshiba America Electronics Components, Inc., Toshiba Mobile Display Co., Ltd, and Toshiba America Information Systems, Inc.

FN10. Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi Electronic Devices (USA), Inc.

On August 8, 2011, defendants filed a joint motion to dismiss Circuit City's SAC. Defendants

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4345435 (N.D.Cal.), 2011-2 Trade Cases P 77,613
**(Cite as: 2011 WL 4345435 (N.D.Cal.))**

claim that the SAC fails to adequately plead the involvement of each defendant in the price-fixing conspiracy. Defendants also argue that plaintiff's claim for unjust enrichment must be dismissed because a stand-alone claim for unjust enrichment does not exist under California law.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint that fails to state a claim upon which relief may be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 544, 555.

In deciding whether the plaintiff has stated a claim upon which relief may be granted, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir.2008).

### DISCUSSION

**\*2** As mentioned above, defendants' motion challenges only two aspects of Circuit City's complaint: (1) Circuit City's use of "group pleading"; and (2) Circuit City's cause of action for restitution and unjust enrichment under California law.[FN11]

> FN11. Defendants also move to dismiss

Circuit City's complaint to the extent it includes any indirect-purchaser claims for damages under federal law. Circuit City's complaint, however, indicates that it brings only direct-purchaser claims under federal law, and Circuit City's opposition brief reiterates that it does not bring indirect-purchaser claims under the Sherman Act. SAC at ¶ 260.

### I. Adequacy of Pleading

Defendants first assert that Circuit City's SAC fails to assert "a plausible set of factual allegations to show that the plaintiff is entitled to relief against each named defendant," as required by *Iqbal* and *Twombly.* Motion at 3–4. Defendants argue that the SAC "invokes only sweeping allegations and group pleadings to support its claims against *twenty-seven* separate and independent entities, often lumping them together as one undifferentiated mass and making it impossible to determine which named defendant allegedly participated in what alleged conduct." Motion at 4.

As defendants' recognize in their reply brief, *see* Reply at 1, this Court's recent orders in other "direct-action" cases in this MDL have addressed the argument defendants raise. *See* Order Granting in Part Defendants' Joint Motion to Dismiss Kodak's First Amended Complaint, Master Docket No. 3346 (August 23, 2011) (Eastman Kodak direct-action case); Order Granting in Part Defendants' Motion to Dismiss, Master Docket No. 3359 (August 24, 2011) (Best Buy); Order Granting in Part Defendants' Joint Motion to Dismiss Target's First Amended Complaint, Master Docket No. 3362 (August 24, 2011) (Target); Order Granting in Part Defendants' Joint Motion to Dismiss Complaint, Master Docket No. 3396 (August 29, 2011) (Costco). The Court has found that the direct-action plaintiffs' complaints—all of which are highly similar—contain adequate factual allegations to state a claim against defendants, despite their use of "group pleading."

Defendants emphasize that the SAC does not

Slip Copy, 2011 WL 4345435 (N.D.Cal.), 2011-2 Trade Cases P 77,613
(Cite as: 2011 WL 4345435 (N.D.Cal.))

"specifically plead how each individual defendant joined the alleged price-fixing conspiracy." Reply at 2 (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 2010 U.S. Dist LEXIS 64930, at *23–24, 2010 WL 2629728 (N.D. Cal., June 29, 2010)). The Court, however, finds that the SAC includes ample detail about defendants' involvement in the conspiracy. The SAC contains a detailed description of the meetings that were held in furtherance of the price-fixing conspiracy, as well as a description of actions taken in furtherance of the conspiracy by defendants' American subsidiaries. *See* SAC at ¶¶ 74–93, 228–37. Further, it alleges that the conspiracy was implemented at the highest level of the corporation and that "individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families." SAC at ¶ 197; *In re TFT LCD (Flat Panel) Antitrust Litig.,* 599 F.Supp.2d at 1184–85. These allegations are more than sufficient to inform defendants of their link to plaintiff's case. More detailed "defendant by defendant" pleading is not required.

**\*3** The Court finds that Circuit City's SAC includes a plausible set of factual allegations that are sufficient to give each defendant notice of the charges against it. Accordingly, it DENIES defendants' motion to dismiss based on Circuit City's use of group pleading.

**II. Unjust Enrichment**

Defendants also claim that Circuit City may not bring a stand-alone claim for unjust enrichment under California law. Both parties agree that California courts are split on the question whether unjust enrichment is a viable cause of action under California law. *See, e.g., Fammilop v. Wells Fargo Bank, N.A.,* 2011 WL 61614, at *4 (C.D.Cal., Jan.4, 2011)* ("California courts appear to be split on whether unjust enrichment can be an independent claim or merely an equitable remedy." (internal quotation marks omitted)).

Although perhaps not technically an action for "unjust enrichment," the Court finds that plaintiffs' allegations are sufficient to state a claim under California law. Many of the courts that have rejected "unjust enrichment" claims have nonetheless indicated that the claims could proceed under a different title. *See, e.g., Munoz v. MacMillan,* 195 Cal.App.4th 648, 675–76, 124 Cal.Rptr.3d 664 (2011) (stating that "[t]here is no freestanding cause of action for 'restitution' in California," but indicating that "a typical cause of action involving such remedy is 'quasi-contract' "); *see also Nordberg v. Trilegiant Corp.,* 445 F.Supp.2d 1082, 1100 (N.D.Cal.2006) (allowing cause of action to proceed because "[a]lthough their Eighth cause of action is entitled 'unjust enrichment' it is clear that plaintiffs are seeking restitution"); *Reyes v. Wells Fargo Bank, N.A.,* 2011 WL 30759, at *17 n. 7 (N.D.Cal., Jan.3, 2011) ("The Court notes that even if there is disagreement as to whether there is a claim for 'restitution,' the disagreement turns in large part on the label that is attached to the claim on which restitution is sought; while some courts refer to claims for 'restitution,' others label these claims according to the underlying theory attached to the claim."); *Keilholtz v. Superior Fireplace Co.,* 2009 WL 839076, at *5 (N.D.Cal., March 30, 2009) ("Whether Plaintiffs' unjust enrichment cause of action is construed as a claim for restitution as in the *McBride* case or is considered to be an independent cause of action as in the *Lectrodryer* and *First Nationwide* cases, the allegations are sufficient to state a claim under California law."); *see also McBride v. Boughton,* 123 Cal.App.4th 379, 387–90, 20 Cal.Rptr.3d 115 (2004) (recognizing that "[a]n individual is required to make restitution if he or she is unjustly enriched at the expense of another" but affirming dismissal of unjust enrichment claim based upon public policy implications); *Lauriedale Assocs., Ltd. v. Wilson,* 7 Cal.App.4th 1439, 1448, 9 Cal.Rptr.2d 774 (1992) (equating unjust enrichment with restitution, but concluding that cause of action for restitution was barred because the plaintiff had breached its fiduciary duties).

**\*4** In contrast to the above, many of the cases defendants rely on involved plaintiffs that had

Slip Copy, 2011 WL 4345435 (N.D.Cal.), 2011-2 Trade Cases P 77,613
**(Cite as: 2011 WL 4345435 (N.D.Cal.))**

failed to plead any cognizable claim for relief whatsoever. *See Hill v. Roll Internat. Corp.,* 195 Cal.App.4th 1295, 1307, 128 Cal.Rptr.3d 109 ("There being no actionable wrong, there is no basis for the relief [of an unjust enrichment or restitution claim]."); *Robinson v. HSBC Bank USA,* 732 F.Supp.2d 976, 987 (N.D.Cal.2010) (dismissing unjust enrichment claim and dismissing complaint with prejudice); *see also Levine v. Blue Shield of Cal.,* 189 Cal.App.4th 1117, 1138, 117 Cal.Rptr.3d 262 (2010) (affirming dismissal of unjust enrichment claim after dismissal of other causes of action because the plaintiffs "have not demonstrated any basis on which they would be entitled to restitution pursuant to a theory of unjust enrichment").

In this case, plaintiffs have invoked a valid theory of recovery. In such circumstances, courts have generally allowed claims for "unjust enrichment" to proceed, regardless of the precise label assigned to the cause of action. Accordingly, the Court DENIES defendants' motion to dismiss Circuit City's unjust enrichment claim.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court DENIES defendants' motion to dismiss Circuit City's second amended complaint. Docket No. 3238 in 07–1827; Docket No. 48 in 10–5625.

**IT IS SO ORDERED.**

N.D.Cal.,2011.
In re TFT-LCD (Flat Panel) Antitrust Litigation
Slip Copy, 2011 WL 4345435 (N.D.Cal.), 2011-2 Trade Cases P 77,613

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Dallas Division.
UNITED STATES of America, ex rel., John Becker, Plaintiffs,
v.
TOOLS & METALS, INC., Todd Loftis, Lockheed Martin Corporation, and Byron Young, et al., Defendants.

Civil Action Nos. 3:05-CV-0627-L,
3:05-CV-2301-L.
March 31, 2009.

West KeySummary**United States 393 ⚖122**

393 United States
   393VIII Claims Against United States
      393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
      393k122 k. Penalties and Actions Therefor. Most Cited Cases

Relators' claims were not barred by the public disclosure bar of the False Claims Act (FCA) because claims in an earlier suit were never publicly disclosed. The prior litigation did not include all the defendants in this case. Some of the allegations were based on events that did not occur until after the other litigation began. 31 U.S.C.A. § 3730(e)(4).

Thomas W. Mills, Jr., Mills & Williams, Samuel L. Boyd, Catherine Carlyle Jobe, Boyd & Associates, Dallas, TX, Phillip E. Benson, Warren-Benson Law Group, Newport Beach, CA, J. Scott Hogan, Matthew Zandi, US Attorney's Office, Fort Worth, TX, Dennis I. Phillips, Michael G. Granston, Michael F. Hertz, Russell B. Kinner, US Department of Justice, Joyce R. Branda, US Attorney's Office, Washington, DC, for Plaintiffs.

Andrew L. Morrison, K&L Gates LLP, H. Barry Vasios, Holland & Knight LLP, New York, NY, Jeffrey C. King, K&L Gates LLP, Fort Worth, TX, David N. Kitner, Strasburger & Price, Dallas, TX, Steven D. Gordon, Holland & Knight LLP, William R. Stoughton, Jenner & Block LLP, Washington, DC, Glenn V. Whitaker, Adam L. Wright, Michael J. Bronson, Noel J. Bouche, Victor A. Walton, Jr., Vorys Sater Seymour & Pease LLP, Cincinnati, OH, for Defendants.

***MEMORANDUM OPINION AND ORDER***
SAM A. LINDSAY, District Judge.
  ***1** Before the court are: (1) Motion of Defendants Lockheed Martin Corporation, Byron Young, and Harriet Stroh to Dismiss the *Qui Tam* Plaintiffs' Second Joint Amended Complaint (doc. 119), filed April 30, 2008; (2) Defendant Lockheed Martin Corporation's Motion to Dismiss Relators from the Government's Action (doc. 121), filed April 30, 2008; (3) Defendant Linda Loehr's Motion to Dismiss Relators' Second Amended Joint Complaint (doc. 134), filed May 30, 2008; (4) Motion of Defendant William C. Johnson to Dismiss the *Qui Tam* Plaintiffs' Second Joint Amended Complaint (doc. 135), filed May 30, 2008; (5) Motion of Defendants Lockheed Martin Corporation, Byron Young, and Harriet Stroh to Dismiss All Claims of Relator John Becker or Relator Robert Spencer Pursuant to the False Claim Act's First-to-File Rule (doc. 172), filed September 2, 2008; (6) Motion and Brief in Support of Defendant Linda Loehr's Motion to Dismiss Relators' Second Amended Joint Complaint Pursuant to the False Claims Act's Public Disclosure Rule (doc. 181), filed September 23, 2008; (7) Defendant William C. Johnson's Additional Motion to Dismiss *Qui Tam* Plaintiffs' Second Joint Amended Complaint with Prejudice (doc. 196), filed October 16, 2008; and (8) *Qui Tam* Plaintiff Robert B. Spencer's Motion to Strike and Alternatively, Response in Opposition to Defendant Linda Loehr's (Second, Mischaracterized) Motion to Dismiss Pursuant to the Public Disclosure Rule (doc. 206), filed November 14, 2006).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

After carefully considering the motions, briefs, record, and applicable law, the court **grants in part** and **denies in part** Motion of Defendants Lockheed Martin Corporation, Byron Young, and Harriet Stroh to Dismiss the *Qui Tam* Plaintiffs' Second Joint Amended Complaint (doc. 119); **denies** Defendant Lockheed Martin Corporation's Motion to Dismiss Relators from the Government's Action (doc. 121); **grants** Defendant Linda Loehr's Motion to Dismiss Relators' Second Amended Joint Complaint (doc. 134); **grants** Motion of Defendant William C. Johnson to Dismiss the *Qui Tam* Plaintiffs' Second Joint Amended Complaint (doc. 135); **grants** Motion of Defendants Lockheed Martin Corporation, Byron Young, and Harriet Stroh to Dismiss All Claims of Relator John Becker or Relator Robert Spencer Pursuant to the False Claim Act's First-to-File Rule (doc. 172) to the extent these Defendants seek to dismiss Becker's claims against them; **denies as moot** Motion and Brief in Support of Defendant Linda Loehr's Motion to Dismiss Relators' Second Amended Joint Complaint Pursuant to the False Claims Act's Public Disclosure Rule (doc. 181); **denies as moot** Defendant William C. Johnson's Additional Motion to Dismiss *Qui Tam* Plaintiffs' Second Joint Amended Complaint with Prejudice (doc. 196); and **denies as moot** *Qui Tam* Plaintiff Robert B. Spencer's Motion to Strike and Alternatively, Response in Opposition to Defendant Linda Loehr's (Second, Mischaracterized) Motion to Dismiss Pursuant to the Public Disclosure Rule (doc. 206).

### I. Factual and Procedural Background

**\*2** This *qui tam* action was originally filed by relator John Becker ("Becker") on March 30, 2005. Becker alleged violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729(a)(1) and (2), by Defendant Tools and Metals, Inc. a/k/a TMI Integrated Services ("TMI") based upon TMI's conduct as a government subcontractor with respect to its tool sales to Lockheed-Martin Company ("Lockheed") in Fort Worth, Texas, and Marietta, Georgia. On September 26, 2005, relator Robert B. Spencer ("Spencer") filed a separate *qui tam* complaint

against Lockheed, Byron Young ("Young"), TMI, and Todd Loftis ("Loftis"). Civil Action No. 3:05-CV-2301-L. Spencer also alleged violation of the FCA. On December 9, 2005, the court consolidated the actions brought by Becker and Spencer.

The government sought, and was granted, several extensions of its deadline to intervene in the *qui tam* actions. During this time, Becker and Spencer (collectively, "Relators") filed their *Qui Tam* Plaintiffs' Joint Amended Complaint on May 24, 2007, adding additional claims and Defendants. On October 30, 2007, the government elected to intervene. The government filed its Complaint of the United States of America ("Government Complaint"), alleging claims against TMI, Loftis, Lockheed, and Linda Loehr ("Linda Loehr"). The government asserted claims of violations of the FCA, breach of contract, unauthorized payment to Lockheed, violations of the Truth-in-Negotiations Act, 10 U.S.C. § 2306(f), unjust enrichment, and negligence. The government declined to intervene on Spencer's bid collusion allegations, Becker's conspiracy allegations under section 3729(a)(3), and Becker's claims predating the Master Agreement. The government also declined to intervene on any claims against William C. Johnson ("Johnson"), TMI Integrated Holdings Corporation ("TMI Integrated"), Greentree Capital LP ("Greentree"), Robert Chartener ("Chartener"), Harriet Stroh ("Stroh"), or Young.

On March 28, 2008, Relators filed their live pleading, *Qui Tam* Plaintiffs' Second Joint Amended Complaint ("Relators' Complaint"). In this complaint, Becker and Spencer allege claims against TMI, TMI Integrated, Loftis, Johnson, Linda Loehr, Lockheed, Young, Stroh, Greentree, and Chartener. All of their claims are for various violations of the FCA.

Defendants filed several motions to dismiss the Relators' Complaint. On August 19, 2008, the court ordered the unsealing of much of this action and the original Spencer action.[FN1] Subsequently, additional motions to dismiss were filed, and the court

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

now turns to the pending motions to dismiss.[FN2]

> FN1. Also pending, but not addressed in this memorandum opinion and order, is the government's motion for redactions on certain documents still under seal. The court will address the government's motion and the remaining redaction issues by separate order.

> FN2. Although certain Defendants raise challenges regarding subject matter jurisdiction, such as the motions to dismiss based upon the FCA's first-to-file rule, for ease of consideration and understanding, the court addresses the motions in the order in which they were filed. This approach does not alter the outcome had the court first considered the challenges to subject matter jurisdiction.

## II. Legal Standards

### A. Rule 12(b)(1)-Subject Matter Jurisdiction

A federal court has subject matter jurisdiction over cases "arising under" the Constitution, laws, or treaties of the United States, or in cases where the matter in controversy exceeds $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties. 28 U.S.C. §§ 1331, 1332. Federal courts are courts of limited jurisdiction and must have statutory or constitutional power to adjudicate a claim. *See Home Builders Ass'n, Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir.1998). Absent jurisdiction conferred by statute or the Constitution, they lack the power to adjudicate claims and must dismiss an action if subject matter jurisdiction is lacking. *Id.; Stockman v. Federal Election Comm'n,* 138 F.3d 144, 151 (5th Cir.1998) (citing *Veldhoen v. United States Coast Guard,* 35 F.3d 222, 225 (5th Cir.1994)). A federal court has an independent duty, at any level of the proceedings, to determine whether it properly has subject matter jurisdiction over a case. *See Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level."); *McDonal v. Abbott Labs.,* 408 F.3d 177, 182 n. 5 (5th Cir.2005) ("federal court may raise subject matter jurisdiction *sua sponte*").

**\*3** In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 424 (5th Cir.), *cert. denied,* 534 U.S. 1127, 122 S.Ct. 1059, 151 L.Ed.2d 967 (2002); *see also Ynclan v. Dep't of Air Force,* 943 F.2d 1388, 1390 (5th Cir.1991). Thus, unlike a Rule 12(b)(6) motion to dismiss for failure to state a claim, the district court is entitled to consider disputed facts as well as undisputed facts in the record. *See Clark v. Tarrant County,* 798 F.2d 736, 741 (5th Cir.1986). All factual allegations of the complaint, however, must be accepted as true. *Den Norske Stats Oljeselskap As,* 241 F.3d at 424.

### B. Rule 12(b)(6)-Failure to State a Claim

To defeat a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) (6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007); *Reliable Consultants, Inc. v. Earle,* 517 F.3d 738, 742 (5th Cir.2008); *Guidry v. American Pub. Life Ins. Co.,* 512 F.3d 177, 180 (5th Cir.2007). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1965 (citation omitted). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

citations, and footnote omitted).

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir.2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir.2004); *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.; Spivey v. Robertson,* 197 F.3d 772, 774 (5th Cir.1999), *cert. denied,* 530 U.S. 1229, 120 S.Ct. 2659, 147 L.Ed.2d 274 (2000). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498-99 (5th Cir.2000). Likewise, " '[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.' " *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993)).

The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter,* 313 F.3d 305, 312 (5th Cir.2002). A court, however, is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir.2005) (citations omitted). The court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 (5th Cir.2004).

## III. Analysis

### A. Lockheed, Young, and Stroh's Motion to Dismiss the Relators' Complaint

**\*4** Defendants Lockheed, Young, and Stroh

have moved collectively to dismiss the Relators' Complaint pursuant to the FCA public disclosure bar, 31 U.S.C. § 3730(e)(4), and Rule 12(b)(1) of the Federal Rules of Civil Procedure. In the alternative, they move to dismiss these claims pursuant to Rules 9(b) and 12(b)(6) for failure to plead fraud with particularity and failure to state a claim upon which relief can be granted.

### 1. Public Disclosure Bar

The FCA provides, in part:

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of information.

31 U.S.C. § 3730(e)(4)(A). The statute defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). Lockheed, Young, and Stroh argue that Relators' claims are barred because they are based upon an earlier lawsuit and that neither Relator is an original source.

Defendants contend that eight years before Relators brought their lawsuits, Andrew Loehr alleged in a lawsuit that TMI and Loftis had fraudulently inflated costs in a scheme to defraud the government. Andrew Loehr is the son of Gerald Loehr, the founder of TMI, and was president and chief executive officer of TMI. Andrew Loehr allegedly reported the scheme to his father, who then fired him and replaced him with Loftis. Andrew Loehr brought an employment action against TMI and others in California. In this lawsuit, Andrew Loehr alleged that Loftis and other TMI employees were

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)

**(Cite as: 2009 WL 855651 (N.D.Tex.))**

engaged in a scheme to defraud the government by presenting false documentation to Lockheed. One of the allegations was that TMI relied upon a cost-plus-percentage-of-cost ("CPPC") provision in its fraud.

Relator Becker, who was a sales manager for TMI, alleges that he sent an e-mail to Stroh and others in May 2000, warning them that Lockheed was a victim of TMI's scheme. Relator Spencer, who was co-owner and president of Spenro Industrial Supply, a competitor of TMI, alleges that he learned in December 1996 that Lockheed would enter into a prohibited CPPC contract with TMI. Defendants argue that neither Becker nor Spencer explains how they learned of the overcharging. Defendants also contend that Relators' *qui tam* claims raise the same issues as those raised by Andrew Loehr in the California lawsuit.

Relators FN3 respond that Andrew Loehr's state court lawsuit is not a public disclosure under the FCA. They contend that the government was not aware of any claims against Lockheed, Young, and Stroh until the Relators came forward, that the transactions that are the basis for the claims against these Defendants did not occur until after Andrew Loehr was fired, and that they are original sources of the information on which their claims are based.

> FN3. Relators Becker and Spencer filed separate responses, but the arguments they make are largely identical.

**\*5** To determine if a claim is prohibited by the public disclosure bar, the court must determine: "1) whether there has been a public disclosure of allegations or transactions, 2) whether the qui tam action is based upon such publicly disclosed allegations, and 3) if so, whether the relator is the original source of the information." *Federal Recovery Servs., Inc. v. United States,* 72 F.3d 447, 450 (5th Cir.1995) (internal quotations and citation omitted). "An FCA qui tam action even partly based upon public allegations or transactions is nonetheless 'based upon' such allegations or transactions."

*United States ex rel. Reagan v. East Texas Med. Ctr. Reg'l Healthcare Sys.,* 384 F.3d 168, 176 (5th Cir.2004) (citation and brackets omitted). The public disclosure bar is meant to "prevent[ ] parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud." *Id.* at 174 (citation and quotations omitted).

The court has reviewed the Andrew Loehr complaint, the parties' arguments, and cited cases, and it determines that the Relators' claims against Lockheed, Young, and Stroh are not barred by the public disclosure bar because these claims were never publicly disclosed. Although the Andrew Loehr litigation made public some of the claims Relators brought against TMI and Loftis, Andrew Loehr never made any claim against Lockheed, Young, or Stroh, and some of Relators' allegations against these Defendants are based on events that did not occur until after the Andrew Loehr litigation began. Although there is some overlap with Andrew Loehr's claims against TMI and Loftis, he never made any allegation of wrongdoing by Lockheed, Young, or Stroh. Accordingly, these claims were never publicly disclosed, and the public disclosure bar does not apply.

**2. Relators' Third Claim-Certain FCA Claims Against Lockheed**

Defendants also move to dismiss the Relators' third claim, which alleges violation of the FCA, 31 U.S.C. §§ 3729(a)(1) and (2)(3), against Lockheed. Defendants contend that this claim is impermissibly duplicative of the government's claim and that it fails to comply with Rule 9(b) of the Federal Rules of Civil Procedure. In this claim, Relators allege that between January 1998 and February 2006, Lockheed passed on unlawfully inflated prices to the government by submitting certified Forward Pricing Rate Agreement proposals, certified claims for payment, and Final Indirect Cost Certifications for overhead and indirect costs. Relators' Compl. ¶ 32.

Defendants first contend that the government's intervention on this claim precludes Relators from

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)

**(Cite as: 2009 WL 855651 (N.D.Tex.))**

pursuing this claim. They contend that the statute provides that the government may proceed with an action and then conduct it, or decline to take over the action and allow the person bringing the action to conduct it. 31 U.S.C. § 3730(b)(4) ("[T]he Government shall-(A) proceed with the action, in which the action shall be conducted by the Government; or (B) notify the court that it declines to take over an action, in which case the person bringing the action shall have the right to conduct the action."). Defendants argue that Relators' third claim is substantively identical to the government's first and second claims.

**\*6** Relators respond that the government has primary responsibility to prosecute the action, but that they remain as parties and may participate in this claim. They argue that exceptions to participation, such as harassment or adding an undue burden expense, do not apply. They contend that there is no case law supporting Defendants' position that their claim should be dismissed.

The court has reviewed the parties' arguments, cited case law, and the statute, and it determines that Relators' third claim should be dismissed, but that Relators may participate in the government's claim. It is without cavil, and Relators do not appear to dispute, that upon intervention, the government takes "primary responsibility for prosecuting" this claim. 31 U.S.C. § 3730(c). Relators also do not dispute that under certain circumstances, the court can restrict their participation in the prosecution of the claim. 31 U.S.C. § 3730(c)(2)(C)-(D). Further, Relators admit that it is the government's complaint on this claim that is the operative pleading, and therefore Defendants' request to dismiss this claim is moot. Becker Resp. (doc. 142) 23.

The court determines that, as Relators acknowledge, the government's claims are the operative claims now before it, as "once the government has intervened, the relator has no separate free-standing FCA cause of action." *In re Pharma. Indus. Average Wholesale Price Litig.,* 2007 WL 4287572, *4 (D.Mass. Dec.6, 2007) (citing *United States ex rel.*

*Barajas v. Northrop Corp.,* 147 F.3d 905, 910 (9th Cir.1998)). Accordingly, Relators' third claim should be dismissed. This holding, however, does not preclude Relators from participating in the litigation of the claim. Relators remain parties to the claim and are entitled to participate in the claim pursuant to the statute. *See United States ex rel. Wilkins v. North American Const. Corp.,* 173 F.Supp.2d 601, 644-45 (S.D.Tex.2001). Accordingly, the court **dismisses with prejudice** Relators' third claim as duplicative of the government's first and second claims, and therefore it does not address the parties' remaining arguments regarding the sufficiency of the claim.

### 3. Spencer's Claim for FCA Violation Against Young and Lockheed

The fourth claim in Relators' Complaint is a claim brought by Spencer against TMI, Loftis, Young, and Lockheed for violation of the FCA. Spencer alleges that these Defendants engaged in bid collusion to defraud the government. Relators Compl. ¶¶ 35-47. Defendants Young and Lockheed move to dismiss this claim against them pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

Defendants argue that this claim fails to state a claim upon which relief can be granted because Spencer has failed allege any connection between a fraudulent scheme and false claims or statements to the government. They contend that he has failed to identify any statute or regulation that was violated by the bidding process, and that any alleged false statements were made to prospective bidders, not to the government. They also argue that this claim is not pleaded with the specificity required by Rule 9(b).

**\*7** Spencer responds that the government was deprived of fair pricing because TMI submitted inflated prices to Lockheed, which were then submitted to the government. He also contends that federal procurement laws, including 10 U.S.C. § 2304, require sealed, competitive bidding or best cost certifications. Spencer argues that his complaint com-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

plies with Rule 9(b), and if it does not, he requests leave to amend his complaint.

"FCA liability has in certain cases been imposed when the contract under which payment is made was procured by fraud." *United States ex rel. Willard v. Humana Health Plan of Texas Inc., 336 F.3d 375, 384 (5th Cir.2003).* The legislative history of the FCA supports claims based upon a fraud-in-the-inducement theory:

> When Congress amended the FCA in 1986, its legislative history recognized fraud-in-the-inducement liability under the Act. Specifically, Congress noted that, under FCA case law, "each and every claim submitted under a contract, loan guarantee, or other agreement that was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim."

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc., 393 F.3d 1321, 1326 (D.C.Cir.2005)* (citation omitted). Spencer relies upon *United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), superseded in part by statute as stated in United States ex rel. McKenzie v. Bellsouth Telecoms., 123 F.3d 935 (6th Cir.1997) cert. denied, 522 U.S. 1077, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998),* a case in which the Supreme Court held that a collusive bidding scheme defrauded the government.

The court has reviewed the cases cited by the parties and the parties' arguments, and it determines that this claim states a claim upon which relief can be granted. The court determines that in light of the legislative history of the FCA and the fraud-in-the-inducement cases going back to *Hess,* Spencer has sufficiently alleged a claim pursuant to the FCA based upon the alleged collusion between TMI, Loftis, Young, and Lockheed.

Defendants also argue that Spencer's claim is not pleaded specifically pursuant to Rule 9(b). Rule 9(b) applies to actions under the FCA. *United States ex rel. Williams v. Bell Helicopter Textron Inc., 417 F.3d 450, 453 (5th Cir.2005).* "At a minimum, this requires that a plaintiff set forth the who, what, when, where, and how of the alleged fraud." *Id.* (internal brackets, quotations, and citation omitted). Defendants contend that Spencer has failed to plead how the bidding violated any regulations, what false statements or claims were made to the government, and how the fraud affected the government's decision to pay a claim. Spencer responds that his claim incorporates paragraphs 1-33 and explains how the government was deprived of fair pricing.

After considering the parties' arguments and the claim as pleaded by Spencer, the court determines that the fourth claim meets the specificity requirements of Rule 9(b). Spencer sets forth in detail the alleged actions of the scheme to defraud the government, including the bid requirements set forth by Lockheed, the allegation that Defendants used information from a competitor to set their bid, and specific actions that support Spencer's allegation of a bid collusion scheme. Accordingly, the court determines that Spencer's fourth claim is pled with the specificity required by Rule 9(b).

### 4. Conspiracy Claim

**\*8** Defendants move to dismiss Relators' first claim, which alleges a conspiracy based on the underlying allegations of their third and fourth claims. They move to dismiss this derivative conspiracy claim based on their arguments that the third and fourth claims should be dismissed. Relators respond that the first claim alone pleads a conspiracy in violation of the FCA. The court has already determined that Relators may proceed on their third claim, as participants in the government's first and second claims, and Spencer's fourth claim states a claim upon which relief can be granted. Accordingly, the court will not dismiss Relators' conspiracy claim.

### 5. Statute of Limitations

Finally, Defendants argue that any conduct alleged by Relators more than six years prior to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

filing of their complaints must be dismissed. At the time Defendants filed their motion, the Relators' cases had not been unsealed. Relators respond that they agree with Defendants with respect to the statute of limitations and that any claim based on the submission of false claims before March 30, 1999, has expired. Accordingly, any claims based upon conduct before March 30, 1999, are barred by the statute of limitations. 31 U.S.C. § 3731(b).

For the reasons set forth herein, the court **grants in part** and **denies in part** Motion of Defendants Lockheed Martin Corporation, Byron Young, and Harriet Stroh to Dismiss the *Qui Tam* Plaintiffs' Second Joint Amended Complaint (doc. 119).

**B. Lockheed's Motion to Dismiss Relators from the Government's Action**

Lockheed also moves to dismiss Relators Becker and Spencer from the Government's Complaint for lack of subject matter jurisdiction and lack of standing. It argues that Relators should be barred by the FCA's public disclosure rule and, in the alternative, that they lack standing with respect to the government's claims that are not brought pursuant to the FCA. It therefore argues that Relators should not be allowed to participate in or litigate the government's fourth, fifth, sixth, seventh, eighth, and ninth claims. Relators oppose Lockheed's motion with respect to the public disclosure bar and argue that Lockheed's motion to dismiss them from the non-FCA claims is not ripe for adjudication because they have not asserted any claims.

The court has already concluded that Relators' claims are not barred by the public disclosure rule and that they are entitled to participate in the government's first and second claims. As Relators acknowledge, they are not asserting any non-FCA claims, and they are prohibited from doing so as a matter of law. 31 U.S.C. § 3730(b)(1); *In re Pharma. Indus. AWP Litig.,* 2007 WL 4287572, *5. For these reasons, the court **denies** Defendant Lockheed Martin Corporation's Motion to Dismiss Relators from the Government Action (doc. 121).

**C. Linda Loehr's Motion to Dismiss Relators' Complaint**

Relators assert a single claim against Linda Loehr for violation of 31 U.S.C. § 3729(a)(3), their first claim. Linda Loehr argues that the Relators' Complaint is a "legal nullity" because the government chose not to intervene in Relators' claim against her. She contends that allowing Relators to bring a claim against her would prevent the government from controlling its action. In the alternative, Linda Loehr argues that Relators' claim against her fails to comply with Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Finally, Linda Loehr argues that the Relators' action is barred by the public disclosure rule of the FCA, and she incorporates the motion brought by Lockheed, Young, and Stroh.

**\*9** Relators argue that their claims are not barred by the public disclosure rule. They contend that they are entitled to continue participating in this litigation as parties, absent a showing that they are causing harassment or an undue burden or expense; accordingly, Becker and Spencer contend that they are entitled to bring their FCA conspiracy claim, which includes Linda Loehr. They also argue that they have pleaded their conspiracy claim against Linda Loehr with the specificity required by Rule 9(b).

**1. Legal Effect of Relators' Complaint**

Linda Loehr argues that the Relators' Complaint is a nullity because the government's intervention supersedes their claims. She contends that upon intervention, the government alone conducts and controls the litigation, and Relators should not be entitled to pursue claims against her after the government declined to intervene on Relators' claims against her and instead asserted its own common law claims against her.

Relators respond that while the government has "primary responsibility" for the claims upon which it intervenes, they are still entitled to unrestricted participation absent a showing that they are causing harassment or undue burden or expense. They argue

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

that the legislative history of amendments to the FCA makes clear that they may continue to act as parties and may pursue those claims in which the government did not elect to intervene.

The court has reviewed the parties' arguments and cited case law, and it determines that Relators may proceed on their FCA conspiracy claim against Linda Loehr. Although Linda Loehr contends that Relators' entire complaint is barred by the government's intervention, the court only considers her arguments with respect to the claim asserted against her.

The government specifically declined to intervene in "relator Becker's conspiracy allegations under section 3729(a)(3)." Gov't Notice (doc. 59) 1. The court reads the government's notice as declining to intervene in what is now Relators' first claim, violation of 31 U.S.C. § 3729(a)(3) against all Defendants. This claim falls squarely within the provision of the FCA that provides that the government shall "notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." 31 U.S.C. § 3730(b) (4)(B). Accordingly, this court joins other courts that have held that relators are entitled to proceed on their claims when the government only partially intervenes. *Federal Recovery Servs.*, 72 F.3d at 449, n. 1; *United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 918 F.Supp. 1338, 1346-47 (E.D.Mo.1996); *Juliano v. Federal Asset Disposition Ass'n*, 736 F.Supp. 348 (D.D.C.1990), *aff'd*, 959 F.2d 1101 (D.C.Cir.1992).

The court therefore determines that Relators' first claim, which is asserted against Linda Loehr, is not legally void and that Relators are entitled to bring this claim against her. Accordingly, the court considers Linda Loehr's additional arguments for dismissal.

## 2. Rules 9(b) and 12(b)(6)

**\*10** Linda Loehr argues that Relators' FCA conspiracy claim fails because it is not pleaded with the specificity required by Rule 9(b), and because

they have failed to plead that she had a specific intent to defraud the government. She contends that Relators must allege "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the government] and (2) at least one act performed in furtherance of that agreement." *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir.) (citation omitted), *cert. denied*, --- U.S. ----, 129 S.Ct. 570, 172 L.Ed.2d 430 (2008). Further, she argues that a conspiracy claim under section 3729(a)(3) requires a showing that "defendants shared a specific intent to defraud the government" and that "negligence alone cannot satisfy [section] 3729(a)(3)." *Id.* (internal quotations, brackets, and citation omitted). She also argues that inaction alone is insufficient to support a claim for violation of the FCA. *United States ex rel. Grynberg v. Ernst & Young LLP*, 323 F.Supp.2d 1152, 1155 (D.Wyo.2004).

Relators respond that their conspiracy claim is pleaded with particularity, though it is unclear if Rule 9(b) applies to FCA conspiracy claims. They contend that their pleaded allegations contain information sufficient to allow Linda Loehr to prepare her response. Further, they contend that they have sufficiently alleged the elements of an FCA conspiracy claim. They argue that they have described in detail the agreement among Defendants and overt acts of certain Defendants. With respect to Linda Loehr, Relators allege that Becker notified her of the scheme no later than May 2000, and that she discussed the allegations of the scheme with Loftis and Johnson. Relators also contend that their claim, read in conjunction with the Government's Complaint, also includes allegations that Linda Loehr agreed with Loftis and Johnson, that she would not question the responsible TMI employees about allegations, and that she voted to promote Loftis after she learned of the false claims and agreed to join the conspiracy. Accordingly, they contend that they have pleaded enough to support an inference that Linda Loehr shared a specific intent to defraud the government with her coconspir-

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

ators.

Without reaching the issue of whether an FCA conspiracy claim must meet the particularity requirements of Rule 9(b), the court determines that Relators have failed to state a claim against Linda Loehr for violation of section 3729(a)(3) because they have not alleged that she was part of any unlawful agreement to defraud the government. The court has reviewed the arguments, case law, and Relators' Complaint. Relators make the following allegations against Linda Loehr: (1) Linda Loehr was substituted as a defendant in Andrew Loehr's lawsuit after her husband died; (2) Andrew Loehr alleged that Loftis and other TMI employees were engaged in a scheme to defraud the government; (3) Linda Loehr failed to stop Loftis after attending the Andrew Loehr deposition, receiving e-mails from Becker in May 2000, and being advised by an outside director that Loftis's behavior was "close to the line of criminality"; (4) she was paid sums from TMI that were the spoils of Loftis's fraud; and (5) she had influence over TMI's affairs and approved a March 2004 merger agreement that stated that TMI was in compliance with federal procurement standards. Relators' Compl. ¶¶ 17, 23. The court finds that these allegations at most allege that Linda Loehr failed to take action to stop Loftis; there is simply nothing in the Relators' Complaint that states a basis for a claim against her for being part of an unlawful agreement to defraud the government.

**\*11** Because the court determines that Relators have failed to state a claim against Linda Loehr pursuant to Rule 12(b)(6), it **grants** Defendant Linda Loehr's Motion to Dismiss Relators' Second Amended Joint Complaint (doc. 134). Each Relator amended his complaint at least once, and Relators together have amended their joint pleading; the court therefore determines that Relators have had more than ample opportunity to plead their best claim against Linda Loehr and that further amendment will unnecessarily delay disposition of this action, which has been pending for almost four years.

Accordingly, it **denies** Relators leave to replead this claim. The court **dismisses with prejudice** Relators' first claim as to Defendant Linda Loehr, which is the only claim they assert against her. Accordingly, the court **denies as moot** Motion and Brief in Support of Defendant Linda Loehr's Motion to Dismiss Relators' Second Amended Joint Complaint Pursuant to the False Claims Act's Public Disclosure Rule (doc. 181), and *Qui Tam* Plaintiff Robert B. Spencer's Motion to Strike and Alternatively, Response in Opposition to Defendant Linda Loehr's (Second, Mischaracterized) Motion to Dismiss Pursuant to the Public Disclosure Rule (doc. 206).

**D. Johnson's Motion to Dismiss the Relators' Complaint**

Relators have asserted only a single claim against Defendant Johnson, their claim for conspiracy pursuant to 31 U.S.C. § 3729(a) (3). Johnson moves to dismiss this claim for failure to plead with particularity pursuant to Rule 9(b) and for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). Johnson also apparently adopts and incorporates the arguments made by Lockheed regarding Relators' claims being barred by the public disclosure rule.

Relators oppose Johnson's motion and argue that it should be treated as a motion for summary judgment because he has included a 120-page appendix. They argue that they are entitled to an opportunity to present material in response to Johnson's motion. They contend that they have pleaded their conspiracy claim against Johnson with the particularity required by Rule 9(b), and they incorporate their response to Linda Loehr's motion to dismiss on the same ground. Further, Relators contend that they have pleaded facts sufficient to state a claim for FCA conspiracy against Johnson. Finally, Relators seek leave to amend if the court determines that they have failed to state a claim against Johnson.

The court first addresses Relators' argument that this motion should be converted to a summary judgment motion. The documents attached by John-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

son are documents that were referred to in the Relators' Complaint, and the court may therefore consider them. *Collins,* 224 F.3d at 498-99. Even without reference to any of these documents, the court's decision would be the same. Accordingly, the court denies Relators' request to convert this motion to a summary judgment motion.

The court set forth the elements of an FCA conspiracy claim above, in considering Linda Loehr's motion on the same ground, and will not repeat them here. The court has considered the parties' arguments, cited cases, and the allegations in the Relators' Complaint. Relators allege that Johnson was a TMI director beginning in 1997, and that he was chairman of the board from 1998 until March 30, 2004. Relators' Compl. ¶ 7. They also allege that he is cotrustee of the Gerald G. Loehr Separate Property Trust. *Id.* Against Johnson, Relators allege: (1) he was substituted as a defendant in Andrew Loehr's lawsuit after Gerald Loehr died; (2) Andrew Loehr alleged that Loftis and other TMI employees were engaged in a scheme to defraud the government; (3) he failed to stop Loftis after being informed by Andrew Loehr of Loftis's misconduct, attending the Andrew Loehr deposition, and receiving information from Becker in May 2000; (4) he voted to keep basing Loftis's compenation on gross revenue rather than company growth; (5) he benefited from dividend payments and the increase in the value of TMI shares caused by Loftis's fraudulent conduct; and (5) he signed the March 2004 agreement that stated that TMI was in compliance with federal procurement standards. Relators' Compl. ¶¶ 17, 22. The court finds that these allegations at most allege that Johnson failed to take action to stop Loftis; there is simply nothing in the Relators' Complaint that states a basis for a claim against him for being part of an unlawful agreement to defraud the government.

**\*12** Because the court determines that Relators have failed to state a claim against Johnson pursuant to Rule 12(b)(6), it **grants** Motion of Defendant William C. Johnson to Dismiss the *Qui Tam*

Plaintiffs' Second Joint Amended Complaint (doc. 135). Each Relator amended his complaint at least once, and Relators together have amended their joint pleading; the court therefore determines that Relators have had more than ample opportunity to plead their best claim against Johnson, and that further amendment will unnecessarily delay disposition of this action, which has been pending for almost four years. Accordingly, it **denies** Relators leave to replead this claim. The court **dismisses with prejudice** Relators' first claim as to Defendant Johnson, which is the only claim they assert against him. Accordingly, the court **denies as moot** Defendant William C. Johnson's Additional Motion to Dismiss *Qui Tam* Plaintiffs' Second Joint Amended Complaint with Prejudice (doc. 196).

### E. Lockheed, Young, and Stroh's Motion to Dismiss Pursuant to the First-to-File Rule

Finally, Defendants Lockheed, Young, and Stroh (the "Lockheed Defendants") move to dismiss the claims of Relator Becker or Relator Spencer pursuant to the FCA's first-to-file rule, 31 U.S.C. § 3730(b)(5). They argue that although Becker filed the first *qui tam* action, he did not assert any claims against the Lockheed Defendants until months after Spencer filed his *qui tam* action alleging claims against them. In the alternative, Defendants argue that if Becker's initial complaint was sufficient to provide the government with notice of their fraud, then his claims against them must be dismissed.

In response, Becker argues that the court should not decide this motion until after it decides the motions relating to the public disclosure bar, that it must consider the complaints on a claim-byclaim basis, and that he was the first to file all claims with respect to TMI's fraudulent pricing scheme. He also contends that Spencer's later-filed claims do not give rise to a separate and distinct recovery by the government. Spencer argues that the court should rule first on the public disclosure motions and then on these first-to-file motions. He further argues that the court should consider Defend-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

ants' arguments on a claim-by-claim basis. He contends that although Becker was first to file claims based upon the fraudulent pricing scheme, he first filed the conspiracy and bid-rigging scheme, and they jointly filed the CPPC and cost claims together.

The court determines that Relators' arguments on this ground are moot because it has determined that their claims against the Lockheed Defendants are not barred by the public disclosure rule. Thus, to the extent that they argue that an earlier-filed complaint may be barred on that ground, this argument is without merit, and the court now considers the remaining arguments.

### 1. Legal Standard

The FCA provides: "When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). This circuit has recently considered this statutory section and held that "as long as the later-filed complaint alleges the same material or essential elements of fraud described in a pending *qui tam* action, § 3730(b)(5)'s jurisdictional bar applies." *United States ex rel. Branch Consultants v. Allstate Ins. Co.,* 560 F.3d 371, 2009 WL 388947, *5 (5th Cir. Feb.18, 2009). The court noted that the amendment of the FCA to introduce this rule "attempted to achieve the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *Id.* (internal quotations and citation omitted).

**\*13** In *Allstate,* the court considered a situation similar to that before this court. Two relators had brought similar *qui tam* actions; the second relator filed while the first relator's action was under seal. *Id.* at *3. The second relator pleaded with more specificity on some claims and also added several insurers that the first relator did not sue. *Id.* The court affirmed the dismissal of the claims that were

pleaded with greater specificity; "simply adding factual details or geographic locations to the essential or material elements of a fraud claim against the same defendant described in a prior complaint" is insufficient to avoid the first-to-file rule. *Id.* at *6. For the claims against the defendants named only by the second relator, however, the court held that the district court erred in dismissing defendants named by the second relator. *Id.* at * 8. The court noted that "nothing in the [first] complaint provided the government with facts from which it could discern a widespread fraud involving all [defendants]. Thus, the claims in the present case against previously unnamed alleged fraud-feasors are not barred by the first-to-file rule." *Id.* Under this standard, the court now considers the facts as alleged by each of the Relators.

### 2. Relators' Complaints

Becker filed his original complaint on March 30, 2005. He named only TMI as a Defendant and brought a single claim pursuant to the FCA. In this complaint, Becker alleged that TMI "routinely falsified and misrepresented its actual costs" to Lockheed and "routinely deceived" Lockheed. Compl. (doc. 1) ¶¶ 7-9.

Spencer filed his original complaint on September 26, 2005. Civil Action No. 3:05-CV2301-L (doc. 1). Spencer brought claims against Lockheed, Young, TMI, and Loftis. He also asserted a single claim under the FCA, but he alleged collusion between TMI and Lockheed with respect to the bid process for the contract at issue. *Id.* ¶¶ 11-13. He also alleged that Lockheed rewarded TMI with a minimum profit margin on the contract and that transactions under the contract generated higher profits for TMI. *Id.* ¶ 21. His complaint alleges that "TMI and Lockheed joined forces to fraudulently inflate the price of the cost plus award fee contract for products for which the United States Government has paid for products and services obtained through TMI." *Id.* ¶ 22.

Spencer amended his complaint on October 6, 2005, and again on November 16, 2005, while his

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

case remained under seal and before it was consolidated with this case. He added allegations that Loftis and Young "orchestrated a fraudulent and sham[ ] invoice auditing procedure," and that all Defendants were aware of the fraud. Amend. Compl. (doc. 6) ¶ 23. Spencer then filed a Second Amended Complaint, without leave of court, and added additional allegations that implicate Lockheed in TMI's alleged fraud.

The government filed a notice of related cases in both cases on November 21, 2005. The government stated that the complaints both identified TMI as a defendant, and that they relate to the "same facts and circumstances." Notice (doc. 24) 3. The government noted that Spencer's allegations "go[ ] a step further and allege[ ] that the reason for [TMI's] improperly inflated pricing was illicit collaboration between [TMI's] employee, Todd Loftis, and [Lockheed's] employee, Byron Young, a fact not alleged in [Becker's] case." *Id.* The government also stated that the facts "substantially involve the same issues of law." *Id.* Spencer's case was transferred to this court, and on December 9, 2005, the court consolidated the actions.

**\*14** Becker amended his complaint on July 5, 2006. He added claims against Loftis, Johnson, Linda Loehr, Lockheed, Young, Stroh, Greentree Capital, and Chartener. In this complaint, he alleged a claim pursuant to section 3729(a)(3) against all Defendants except for TMI; a claim against TMI, Greentree, and Chartener for violation of section 3729(a)(1) and (a)(2); and a claim against Lockheed for violation of section 3729(a)(1) and (a)(2).

On May 24, 2007, the Relators filed their first joint complaint, which alleged the same claims as in Becker's first amended complaint and against the same Defendants. After the government intervened, Relators filed an amended complaint, the Relators' Complaint. This complaint added a fourth claim, brought by Spencer only, against TMI, Loftis, Young, and Lockheed in violation of section 3729(a) (1-3), alleging bid collusion.

**3. Analysis**

The court has reviewed the parties' arguments, the Relators' complaints, and the relevant case law, and it determines that there is a material difference between Becker's original allegations, which cast Lockheed as a victim, and Spencer's allegations, which included Lockheed and certain of its employees as actors in the fraud. In reviewing the complaints, it is clear that Spencer first alleged that the Lockheed Defendants were liable for the fraud upon the government. As in *Allstate,* the court determines that although Becker's complaint included allegations against TMI, there was nothing is his complaint, which cast Lockheed as a victim, that would alert the government that the Lockheed Defendants were, in fact, active participants in the fraud. Accordingly, the court determines that Becker's claims against the Lockheed Defendants should be dismissed because there are material differences in the Relators' allegations with respect to these Defendants.

The court also rejects the Relators' attempt to cast this inquiry required of the court as one that involves examining the complaints claim by claim. Becker and Spencer's claims against TMI are largely identical; the difference lies in Spencer's additional allegations that the Lockheed Defendants were in active concert with TMI in defrauding the government. This result, which applies section 3730(b)(5) and not the doctrines of judicial or collateral estoppel, is not inconsistent with the court's ruling with respect to the government's claims. Here, Becker did not allege any claims against Lockheed until months after he was made aware of Spencer's claims. Barring Becker's claims against the Lockheed Defendants is consistent with both the underlying policy behind the FCA's first-to-file rule and the result in *Allstate.*

Accordingly, the court finds that there are material differences between Relators' claims and that Becker's claims against the Lockheed Defendants are barred by Spencer's first-filed claims against them. To the extent the rule might bar other claims

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

against other Defendants, the court need not reach these issues as no other Defendants have moved on this ground. The court therefore **grants** Motion of Defendants Lockheed Martin Corporation, Byron Young, and Harriet Stroh to Dismiss All Claims of Relator John Becker or Relator Robert Spencer Pursuant to the False Claim Act's First-to-File Rule (doc. 172) to the extent these Defendants seek to dismiss Becker's claims against them. The Relators' first and third claims are brought jointly. The court **dismisses with prejudice** the first claim against the Lockheed Defendants with respect to Becker's right to participate or recover on this claim. The court has dismissed Relators' third claim as duplicative of the government's first and second claims, and Becker is hereby prohibited from participating or recovering on these claims against Lockheed.

## IV. Other Defendants

*15 Relators have also asserted claims against TMI Integrated, Loftis, JHW Greentree Capital, and Chartener. On September 12, 2008, Relators voluntarily dismissed Defendants JHW Greentree Capital and Chartener. Relators requested the court to issue an entry of default as to Defendant Loftis, which the clerk issued on December 3, 2008; however, they have not moved for default judgment against Loftis. Relators allege that TMI Integrated merged with TMI on March 30, 2004. Relators Compl. ¶ 5. They state that TMI filed for bankruptcy on or about September 9, 2005, in the Northern District of Texas. *Id.*

Relators bring their first and fourth claims against TMI and acknowledge that "TMI may currently be excepted from [the first] claim because of the automatic bankruptcy stay arising from the filing by TMI of a Chapter 7 bankruptcy petition in the Northern District of Texas in case number 05-49445-RFN-7." *Id.* ¶ 15. Relators also state that "the United States has obtained an order from the bankruptcy court in the bankruptcy action permitting it to proceed in certain respects against TMI in this action." *Id.* To the extent that TMI has filed bankruptcy and Relators have not obtained permis-

sion to proceed against TMI from the bankruptcy court, the court **stays** Relators' claims against TMI.

With respect to Defendant Loftis, the court orders Relators to move for default judgment no later than **April 30, 2009.** Failure to comply with this order will lead the court to dismiss Relators' claims against Loftis without prejudice pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.

## V. Conclusion

For the reasons set forth herein, the court **grants in part** and **denies in part** Motion of Defendants Lockheed Martin Corporation, Byron Young, and Harriet Stroh to Dismiss the *Qui Tam* Plaintiffs' Second Joint Amended Complaint (doc. 119); **denies** Defendant Lockheed Martin Corporation's Motion to Dismiss Relators from the Government's Action (doc. 121); **grants** Defendant Linda Loehr's Motion to Dismiss Relators' Second Amended Joint Complaint (doc. 134); **grants** Motion of Defendant William C. Johnson to Dismiss the *Qui Tam* Plaintiffs' Second Joint Amended Complaint (doc. 135); **grants** Motion of Defendants Lockheed Martin Corporation, Byron Young, and Harriet Stroh to Dismiss All Claims of Relator John Becker or Relator Robert Spencer Pursuant to the False Claim Act's First-to-File Rule (doc. 172) to the extent these Defendants seek to dismiss Becker's claims against them; **denies as moot** Motion and Brief in Support of Defendant Linda Loehr's Motion to Dismiss Relators' Second Amended Joint Complaint Pursuant to the False Claims Act's Public Disclosure Rule (doc. 181); **denies as moot** Defendant William C. Johnson's Additional Motion to Dismiss *Qui Tam* Plaintiffs' Second Joint Amended Complaint with Prejudice (doc. 196); and **denies as moot** *Qui Tam* Plaintiff Robert B. Spencer's Motion to Strike and Alternatively, Response in Opposition to Defendant Linda Loehr's (Second, Mischaracterized) Motion to Dismiss Pursuant to the Public Disclosure Rule (doc. 206).

*16 The court **dismisses with prejudice** Relators' third claim; **dismisses with prejudice** Relators'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)
**(Cite as: 2009 WL 855651 (N.D.Tex.))**

first claim against Defendants Linda Loehr and Johnson; **dismisses with prejudice** the first claim against the Lockheed Defendants with respect to Becker's right to participate or recover on this claim; and **prohibits** Becker from participating or recovering on the government's first and second claims against Lockheed. With respect to Relators' Complaint, the following claims remain: Becker's first claim for violation of 31 U.S.C. § 3729(a)(3) against TMI and Loftis; Spencer's first claim for violation of 31 U.S.C. § 3729(a)(3) against Lockheed, Young, and Stroh; Becker and Spencer's second claim for violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2) against Loftis and TMI; and Spencer's fourth claim for violation of 31 U.S.C. § 3729(a)(1)-(3) against TMI, Loftis, Young, and Lockheed.

*The court has already expressed its frustration with the piecemeal litigation of this action. While the court recognizes that Defendants discovered potential additional grounds to dismiss after the court unsealed parts of the Relators' suits, its order prohibiting the filing of additional motions to dismiss without leave of court remains in effect. Further, although this case is complicated, the court is unlikely to be as generous in the future with respect to the parties' requests for extensions of their briefing deadlines and to enlarge their page limitations. The time has come for this case to move forward, and, by separate order, the parties will be instructed to confer so that a scheduling order may be issued.*

**It is so ordered.**

N.D.Tex.,2009.
U.S., ex rel. Becker v. Tools & Metals, Inc.
Not Reported in F.Supp.2d, 2009 WL 855651 (N.D.Tex.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4348104 (S.D.Ohio)
**(Cite as: 2011 WL 4348104 (S.D.Ohio))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Ohio,
Western Division.
UNITED STATES ex rel. Donald E. HOWARD, et al., Relators,
v.
LOCKHEED MARTIN CORP., et al., Defendants.

No. 1:99–CV–285.
Sept. 16, 2011.

Donetta Donaldson Wiethe, Jennifer Marie Verkamp, Kevin Mitchell Detroy, Morgan Verkamp LLC, Cincinnati, OH, Michael F. Hertz, Russell B. Kinner, Department of Justice, Washington, DC, Kevin Weimer, Stephen Thomas Labriola, Fellows Labriola LLP, Atlanta, GA, Mike Bothwell, Julie Keeton Bracker, Bothwell Bracker & Vann P.C., Roswell, GA, for Relators.

Christopher C. Burris, Edward T. Logan, Jessica J.M. Hagen, King & Spalding, Atlanta, GA, Glenn Virgil Whitaker, Jacob D. Mahle, Victor A. Walton, Jr., Cincinnati, OH, for Defendants.

ORDER DENYING MOTION TO DISMISS ALL CLAIMS OF RELATORS HARRISON AND MOSS

SUSAN J. DLOTT, Chief Judge.

**\*1** This matter comes before the Court on Defendant Lockheed Martin Corporation's Motion to Dismiss All Claims of Relators Charles Harrison and Morris Moss (doc. 204).

Relators Harrison and Moss were added to this suit pursuant to the filing of the Second Amended Complaint on May 13, 2005. Lockheed now moves to dismiss the claims by Relators Harrison and Moss on the basis of the "first-to-file" rule stated in the False Claims Act ("FCA"), 31 U.S.C. § 3730(b)(5). For the reasons that follow, the Court

will **DENY** the Motion to Dismiss.

**I. BACKGROUND**

**A. Procedural History**

Relators Donald Howard and Larry Wilson filed the initial Complaint (doc. 3) in this action alleging FCA violations against Lockheed and five subcontractors on April 21, 1999. The Complaint was filed under seal. The Government then began an investigation into Relators' allegations for the purpose of determining whether to intervene. On June 11, 2003, Relators Howard and Wilson filed an Amended Complaint. (Doc. 25.) The Court partially lifted the seal on the pleadings in this case on August 6, 2003 so Relators could serve a copy of the Complaint and the Amended Complaint on Lockheed. (Doc. 27.)

While this case was in its initial proceedings, Charles Harrison and Morris Moss filed a separate suit alleging FCA violations against Lockheed on January 15, 2002 in the Northern District of Georgia. *Harrison v. Lockheed Martin Corp.,* No. 1:02–cv–118, Dkt. 1 (N.D.Ga. Jan. 15, 2002). The Government became aware of both suits, and upon leave of this Court and of the Northern District of Georgia, informed each set of Relators about the existence of the other. Harrison and Moss then moved to dismiss the second-filed suit. The Northern District of Georgia granted the dismissal motion on February 23, 2005. *Harrison,* No. 1:02–cv–118, Dkt. 36 (N.D.Ga. Feb. 23, 2005).

On May 13, 2005, Relators Howard and Wilson moved for leave to file a Second Amended Complaint in this first-filed suit to add Harrison and Moss as relators. (Doc. 38.) The Government did not oppose the addition of Harrison and Moss to this suit. (*Id.*) The Court granted leave to amend and Relators filed the Second Amended Complaint against Lockheed and eight subcontractors on that same day. (Docs.39, 40.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

On October 5, 2006, the Government filed a Notice to Decline Intervention in this case. (Doc. 61.) On October 12, 2006, the Court ordered that the Second Amended Complaint be unsealed and served on Defendants, along with the Order and the Notice to Decline Intervention. (Doc. 62.)

On March 13, 2007, Lockheed moved to dismiss the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6). (Doc. 65.) Relevant to the pending motion, Lockheed did not assert in the first dismissal motion that Relators violated the first-to-file rule. The Court granted Lockheed's motion in part in an Order dated June 28, 2007. (Doc. 88.)

The parties, including Relators Harrison and Moss, have engaged in extensive, and sometimes contentious, discovery from 2007 through the present. On July 1, 2011, one month before a scheduled settlement conference, Lockheed filed the pending dismissal motion premised upon the first-to-file rule. The pending motion now is fully briefed and ripe for consideration.

## II. ANALYSIS

**\*2** The FCA first-to-file rule provides that "[w]hen a person brings an [FCA action], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5). The rule is jurisdictional. *U.S. ex rel. Poteet v. Medtronic, Inc.,* 552 F.3d 503, 516 (6th Cir.2009). "The basis for jurisdiction must be apparent from the facts existing at the time the complaint is brought." *Id.* at 511. In the typical case, the rule "unambiguously establishes a first-to-file bar, preventing successive plaintiffs from bringing related actions based on the same underlying facts." *Walburn v. Lockheed Martin Corp.,* 431 F.3d 966, 971 (6th Cir.2005) (quoting *U.S. ex rel. Lujan v. Hughes Aircraft Co.,* 243 F.3d 1181, 1187 (9th Cir.2001)). A district court must compare the allegations in the first complaint to the allegations in the second-filed complaint to determine if the first-to-file rule is implicated. *Walburn,* 431 F.3d at 971. If both complaints

allege "all the essential facts of the underlying fraud[,]" then the second action is barred. *Id.* (internal quotation and citation omitted).

The rule "furthers the policies animating the FCA by ensuring that the government has notice of the essential facts of an allegedly fraudulent scheme while, at the same time, preventing 'opportunistic plaintiffs from bringing parasitic lawsuits.' " *Poteet,* 552 F.3d at 516 (quoting *Walburn,* 431 F.3d at 970). The Sixth Circuit further explained that "the purpose of the FCA's first-to-file provision is to prevent the filing of *more* qui tam suits once the government already has been made aware of the potential fraud perpetrated against it." *Id.* at 517 (emphasis added); *see also U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.,* 149 F.3d 227, 234 (3d Cir.1998) ( "[D]uplicative claims do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds."). A purported FCA relator must be a "true 'whistleblower.' " *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.,* 41 F.3d 1032, 1035 (6th Cir.1994). Therefore, a purported relator lacks standing to file a second, duplicative suit and "collect[ ] a bounty .. if someone else has filed the claim first." *Id.; see also Poteet,* 552 F.3d at 515–16 (same).

Lockheed and Relators agree on these basic principles. They further agree that Relators Howard and Wilson were the first to file for purposes of § 3730(b)(5). Moreover, Relators do not dispute that the claims filed by Relators Harrison and Moss in the Northern District of Georgia case shared the same or related facts regarding the alleged fraud as the original claims by Relators Howard and Wilson here. In fact, in seeking to file the Second Amended Complaint, Relators Howard and Wilson referred to the claims by Harrison and Moss as "similar" to their own and stated that they "concern[ed] subject-matter closely related to that of this action." (Doc. 38 at 2.) Nonetheless, Relat-

Slip Copy, 2011 WL 4348104 (S.D.Ohio)
**(Cite as: 2011 WL 4348104 (S.D.Ohio))**

ors dispute, and this Court must resolve, whether § 3730(b)(5) bars Relators Harrison's and Moss's claims.

**\*3** Lockheed contends that the Harrison and Moss claims should be dismissed because the claims were barred at their inception by § 3730(b)(5). The claims would have been subject to involuntary dismissal for lack of jurisdiction in the Northern District of Georgia. Lockheed insists that the claims likewise should be barred here. Lockheed asserts that this case is analogous to *U.S. ex rel. Nowak v. Medtronic, Inc.,* Nos. 1:08–cv–10368, 1:09–cv–11625, 2011 WL 3208007 (D.Mass. July 27, 2011), and should be treated the same. In *Nowak,* Relator Nowak filed her complaint under seal in Massachusetts in March 2008, while Relator Dodd filed his complaint in a different federal district more than one year later in April 2009. *Id.* at *11. In September 2009, the *Dodd* action was "removed" to the District of Massachusetts and consolidated with the first-filed *Nowak* action. *Id.* Thereafter, the relators reached a relator-share agreement and filed a consolidated complaint in the *Nowak* action. *Id.* Defendant Medtronic then moved for dismissal on multiple grounds, including that Dodd's claims were barred by the first-to-file rule in § 3730(b)(5). *Id.* at *11–12. The district court agreed. *Id.* at *18–19.

The *Nowak* court began its analysis by instructing that the first-to-file rule is "exception-free." *Id.* at *18 (quoting *U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P.,* 579 F.3d 13, 32 (1st Cir.2009) ). The court then compared the allegations made by Nowak to those made by Dodd. *Id.* at *18–19. The court concluded that the claims shared the same essential facts and stated the same elements of fraud. *Id.* Finally, and most relevant to the issue in this case, the *Nowak* court found that the act of consolidating the two suits did not save Dodd's claim from dismissal pursuant to § 3730(b)(5):

The relators argue that because they have a relator-or-share agreement and because they submitted a consolidated complaint, Dodd cannot be dis-

missed from the instant action. This assertion is patently incorrect. Where this court lacks jurisdiction over the claims of a later-added relator due to the first-to-file rule, those claims attributable to that relator—and that relator—must be dismissed. Whether the relator-share agreement survives the dismissal of one relator is a matter of contract between the relators.

*Id.* at *19 n. 14 (internal citation omitted). Lockheed argues that just as Dodd's claims were dismissed after the consolidation of the two cases in Nowak, Harrison's and Moss's claims here should be dismissed.

In rebuttal, Relators make two primary arguments why the first-to-file rule does not bar the claims of Relators Harrison and Moss. Both arguments are based on a plain-language interpretation of § 3730(b)(5), which prohibits a purported relator or group of relators from either intervening into an existing suit or filing a successive, related suit. Relators cite a Tenth Circuit opinion for the proposition that intervention for purposes of § 3730(b)(5) is limited to "intervention of the types set forth in [ Fed.R.Civ.P.] 24(b)(2), and the addition of parties does not constitute intervention." *U.S. ex rel. Precision Co. v. Koch Industries, Inc.,* 31 F.3d 1015, 1017 (10th Cir.1994); *but see U.S. ex rel. Manion v. St. Luke's Reg'l Med. Center, Ltd.,* No. CV 06–498, 2008 WL 906022 at *7 (D.Idaho Mar. 31, 2008) (declining to follow *Precision Company* and holding that the term "intervene" should be given its plain meaning, not the strict Rule 24(b) meaning). The court in *Precision Company* allowed an original relator, a corporation, to join two corporate stockholders as relators pursuant to Rule 15 amendment of the pleadings because their joinder did not constitute impermissible intervention in violation of § 3730(b)(5). 31 F.3d at 1018; *see also U.S. ex rel. Sanders v. East Ala. Healthcare Auth.,* 953 F.Supp. 1404, 1408 (M.D.Ala.1996) (permitting a relator to be added to a first-filed suit if the new relator is "either being related to the original plaintiff or shar[es] a common question of law or fact with the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 4348104 (S.D.Ohio)
**(Cite as: 2011 WL 4348104 (S.D.Ohio))**

original plaintiff"); *but see Fry v. Guidant Corp.,* No. 3:03–cv–842, 2006 WL 1102397, at *5–6 (M.D.Tenn. Apr.25, 2006) (disagreeing with *Precision Company* and holding that new relator could not be added by amendment). Consistent with *Precision Company,* Relators contend that the addition of Relators Harrison and Moss pursuant to Rule 15 did not run afoul of the first-to-file rule because there was no Rule 24 intervention.

**\*4** Relators' second argument is that § 3730(b)(5) cannot be used as a basis to dismiss claims from a first-filed suit. Section § 3730(b)(5) prohibits a purported relator from bringing a successive, related *qui tam* action. It serves as a bar on duplicative litigation. *See Poteet,* 552 F.3d at 516. Relators purport that the bar on successive litigation is not applicable here where only the first-filed lawsuit is pending.

Upon consideration of the parties' arguments, the Court agrees with Relators' interpretation of § 3730(b)(5). Neither party was able to identify binding authority on all fours with the present case. *Nowak,* the recent decision relied upon by Lockheed in a district court dismissed the second-filed set of FCA claims in a consolidated action, is not binding on this Court. Though the procedural circumstances are not fully set forth in the decision, two separate pending cases were consolidated in that case. *Nowak,* 2011 WL 3208007 at *11. Here, Harrison and Moss voluntarily dismissed their separate lawsuit more than six years ago. Harrison and Moss did not have a separate lawsuit pending when they were added to this action pursuant to the Second Amended Complaint. Moreover, the *Nowak* court provided no analysis to explain whether the *Dodd* claims were barred as being brought by intervenors or as a related action, and how it reached that conclusion. *Id.* at *18–19. This Court cannot adopt the *Nowak* court conclusion on the basis of such limited analysis.

Additionally, policy considerations favor Relators. Relators in this action have acted in a manner consistent with the first-to-file rule. One pur-

pose of the rule is to inform the Government of the alleged fraud. The Government became aware of the two sets of claims before the Relators. The Government did not oppose the motion to add the Harrison and Moss claims to this action by Rule 15 amendment after Harrison and Moss dismissed their separate Georgia action. (Doc. 38 at 1.) Relatedly, the addition of the Harrison and Moss claims does not require the duplicative expenditure of time and resources that a separate action in Georgia would have entailed. The first-to-file rule also purports to avoid parasitic claims. *See Poteet,* 552 F.3d at 516. The Relators here have reached a private agreement as to the distribution of any recovery. Lockheed is not at risk for multiple or inconsistent judgments by the addition of Relators Harrison and Moss to this action.

**IV. CONCLUSION**

For the foregoing reasons, Defendant Lockheed Martin Corporation's Motion to Dismiss All Claims of Relators Charles Harrison and Morrison Moss (doc. 204) is **DENIED.**

IT IS SO ORDERED.

S.D.Ohio,2011.
U.S. ex rel. Howard v. Lockheed Martin Corp.
Slip Copy, 2011 WL 4348104 (S.D.Ohio)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

EOD 12-8-98

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

DEC 0 8 1998

DAVID J. MALAND, CLERK
BY
DEPUTY_____

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| ex rel. J. BENJAMIN JOHNSON, | | |
| JR., et al. | § | |
| | | |
| V. | § | CIVIL ACTION NO. 9:96 CV 66 |
| | | |
| SHELL OIL COMPANY, et al. | § | |

MEMORANDUM AND ORDER

Before the Court is the Defendants'[1] Motion and Memorandum to Dismiss
Relators' Claims for Lack of Subject Matter Jurisdiction Under 31 U.S.C. §
3730(b)(5) (Doc. #345). Defendants move, pursuant to Rule 12(b)(1), to dismiss the
claims of Relators Martineck, Wright, Brock, Brain, and the Project on Government
Oversight ("POGO") asserting that the Court lacks subject matter jurisdiction. After
reviewing the motions, briefs and materials submitted by the parties, hearing the
arguments of counsel, and reviewing the applicable law, the Court is ready to make
its ruling.

---

[1]Defendants are all the named defendants.

1

426

## BACKGROUND

This action under the False Claim Act, 31 U.S.C. 3729 *et seq.,* was commenced on February 16, 1996 by the filing, under seal, of an Original Complaint by Relator J. Benjamin Johnson, Jr. The suit named as defendants Exxon Corporation, Chevron Corporation, Shell Oil Company, Mobil Oil Corporation, Conoco. Inc., Texaco, Inc., Marathon Oil Company, Unocal Corporation, Pennzoil Company, B. P. America, Kerr-McGee Corporation, Amoco Corporation, and a number of others companies that have since been dropped by the relators in their consolidated complaints. Johnson sued to recover penalties and damages arising from the defendants' false statements regarding the royalties owned and/or paid to the United States by the defendants for crude oil produced from Government owned lands. He alleged the defendants had historically underpaid oil royalties to the Government by calculating the royalties using prices substantially lower then the consideration the defendants actually have received for the oil. The complaint states that the value of production of oil from Government owned lands, for royalty purposes, is determined according to the valuation standards set forth in 30 C.F.R. §206.102 (1995). The complaint further alleged that the foundation on which these valuation standards are based is the requirement that the value of oil for royalty computation purposes is the value of the oil that would have been received pursuant to an arm's-length sale, or true fair market

2

value. It is alleged that for the last decade, the "value" on which the defendants have calculated and paid the Government royalties, however, typically has been the "posted price" of the oil for the field from which the oil was produced. Johnson alleged that these "posted prices" are, in fact, artificially low prices set by the defendants and are substantially less than the true value of the oil ultimately received by the defendants. Johnson alleged that the defendants used four techniques to shortchange the Government of its proper royalty payments: 1.) misrepresenting that the first sale of oil under buy/sell agreements is the actual value received for the oil; 2.) buying and selling non-operated working interest crude oil at the wellhead at values less than what should have been received in an arm's-length transaction with the implicit understanding that as long as approximately equal volumes are brought and sold, the net financial impact is neutral; 3.) using sales to affiliated companies to mask the true value of the oil, and 4.) using an artificially low price for valuing the oil when it is refined by the defendants and never finally sold.

On July 12, 1996, Johnson filed the First Amended Original Complaint wherein he was joined by Relator John Martineck. Johnson and Martineck added some subsidiaries of the previously named defendants and added some new defendants. The substance of the fraudulent conduct alleged against the defendants in the First Amended Original Complaint is substantially the same as was alleged in

the first complaint.

On August 2, 1996, Relator Harrold E. ("Gene")Wright filed a False Claims Act action, under seal, in the Texarkana Division.[2] Wright sued most, if not all of the companies named by Johnson and Martineck, and added several others, totaling 143 defendants. Wright alleged that the defendants, over the past ten years, had engaged in a nationwide scheme of systematic underpayments of oil royalties owed to the United States from all Federal onshore, Indian and Outer Continental Shelf leases in which the defendants owned interests. The oil royalties have been paid on so called "posted prices" which were conspiratorially set by certain of the defendants below the sale price actually accruing to the defendants.[3] Wright alleged that the MSS-2014 forms filed by the defendants to report the value of the oil taken from federal and Indian Land leases were knowingly false.

On June 9, 1997, Realtors Leonard Brock, Danielle Brain, and POGO filed two additional False Claims Act actions, under seal.[4] One suit covered California on and offshore leases and the second covered all federal leases exclusive of those in

---

[2] Cause No. 5:96 CV 243.

[3] Wright also alleged that the defendant have under paid royalties on gas and natural gas liquids. This part was severed off from the allegations regarding oil and made into a separate case.

[4] Cause Nos. 9:97 CV 208 and 9:97 CV 209.

4

California. These relators named approximately 285 defendants. Brock, Brian, and POGO alleged underpayment of royalties on federal and Indian lands, on and off shore of California, due to defendants engaging in five "devious illegal schemes." They are: 1.) creating an artificially low "posted price;" 2.) receiving a "premium" on which they didn't pay royalties; 3.) receiving price breaks on transportation, the value of which was not reported; 4.) oil exchanges on which royalties were not paid on the fair market value of the oil; and 5.) generally paying royalties on less than fair market value.

On July 24, 1997, on the *ex parte* motion of the United States, this Court consolidated all four cases during the pendency of the *qui tam* investigation. On February 18, 1998, the United States elected to intervene in the suit as to Shell Oil Company, Amoco Oil Company, Conoco Inc., and Burlington Resources, Inc. and their various subsidiaries and affiliates.[5] Also on February 18, 1998, the relators jointly moved the Court to consolidate the cases, stating that "[b]ecause the actions are so similar from a legal and factual perspective, there is virtually no risk of prejudice or possible confusion to any of the parties if the cases were to be consolidated." The Court granted the consolidation "for all purposes, including

---

[5]Later the government also intervened against Texaco, Inc.

discovery and trial." On that date the case was unsealed and was ordered to be served on the defendants.

The relators have twice amended their consolidated complaint since the case was consolidated. The current pleading is the Relators' Consolidated and Second Amended Complaint, filed September 29, 1998. In this pleading the relators have dropped many of the companies named previously by various relators. The current complaint names eighteen major oil companies plus numerous subsidiaries or affiliates. Relators now allege fraudulent conduct on the part of the defendants resulting in underpayment of oil royalties for the last twelve years. The allegations of Brock, Brian and POGO regarding conduct previous to that time have been dropped.

In brief, defendants argue that §3730(b)(5) establishes a "first to file" rule that precludes the claims of relators Martineck, Wright, Brock, Brian and POGO. Defendants argue that these relators were improperly allowed to intervene in the pending suit first filed by Johnson and/or that they filed a lawsuit in a related matter in violation of the statutory bar established by § 3730(b)(5). Defendants interpret § 3730(b)(5) as jurisdictional. Accordingly, they argue that the Court has no jurisdiction over any claims raised by relators Martineck, Wright, Brock, Brian and POGO.

6

The relators argue that the voluntary consolidation of Relators' Complaints into this unified action created a single case, just as though one compliant originally had been filed. In essence, they argue that since the Court has previously consolidated the case for all purposes, the cases filed by the various relators lost their separate identities, became a single action, and that the consolidation nullified the status of the relators as they originally stood when they filed their individual cases. Further, they argue that § 3730(b)(5) is not jurisdictional. They say the language of that section only bars intervention into an existing lawsuit and the filing of related actions. They assert that no intervention or filing of a related action occurred in this case.

DISCUSSION

31 U.S.C. § 3730(b)(5) provides: "When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."

The purpose of this barrier is to prevent parasitic lawsuits. *United States of America, ex rel. LaCorte v. Smithkline Beecham Clinical Laboratories, Inc.,* 149 F.3d 227, 233 (3d Cir. 1998) ("Section 3730(b)(5) attempts to reconcile two conflicting goals, specifically, preventing opportunistic suits, on the one hand, while encouraging citizens to act as whistleblowers, on the other."); *Erickson ex rel. United States v. American Institute of Biological Sciences*, 716 F. Supp. 908, 918 (E.D. Va. 1989) ("A

7

subsequently filed qui tam suit may continue only to the extent that it is (a) based on facts different from those alleged in the prior suit and (b) gives rise to separate and distinct recovery by the Government.")

The defendants argue that § 3730(b)(5) is jurisdictional in nature. The relators disagree. There is little case law on this point. However, what little there is seems to favor defendants' interpretation. *See United States of America, ex rel. Merena v. Smithkline Beecham Corp.,* 1997 U.S. Dist. LEXIS 19896 (D. C. Penn, July 21, 1997) wherein, at footnote 21, the court stated, "[n]otably, I find that § 3730(b)(5) is 'jurisdictional' in nature, as its application presents a threshold issue regarding the court's ability to hear a later-filed qui tam action." In *Hyatt v. Northrop Corp.,* 1989 U.S. Dist. LEXIS 18941 (C.D. Cal., Dec. 27, 1989) the court dismissed with prejudice claims it found barred by § 3730(b)(5). In *United States of America, ex rel. LaCorte v. Smithkline Beecham Clinical Laboratories, Inc.,* 149 F.3d 227, 237 (3d Cir. 1998), in *dicta,* the Third Circuit applied §3730(b)(5) to a situation of two groups of relators. The second group of relators, (Clausen, Miller and LaCorte) challenged the status of the first group of consolidated relators, (Merena, and the Grossenbacher and Spear parties) arguing that only the original relator (Merena) was entitled to recover and that the claims of Grossenbacher and Spear were barred. The Third Circuit held that the second group of relators did not have standing to challenge the consolidated

8

relators' status, but noted, "Clausen is correct that Merena filed his complaint before any of the other consolidated relators, and that §3730(b)(5) therefore would bar any claims in the Grossenbacher and Spear complaints that repeat Merena's allegations."[6]

The Court finds the above reasoning persuasive and holds that §3730(b)(5) is jurisdictional in nature because it poses a threshold issue of the Court's ability to hear the later-filed qui tam actions. Thus, we must examine whether the Court had jurisdiction over the later filed actions before the consolidation of the cases took place.

Relator Martineck:

Rule 15(a) Fed. R. Civ. P. provides that, "a party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served...." It is undisputed that the defendants had not been served at the time Relator Johnson first amended his pleading to include Relator Martineck. The case was under seal at that time. This rule governs the addition of parties by amendment of a complaint as well as the addition of allegations against existing defendants. *Hines v.*

---

[6]*Cf. United State of America ex rel. Dorsey v. Dr. Warren E. Smith Community M.H./M.R. Centers,* 1997 U.S. Dist. LEXIS 9424 (C.D. Penn., June 25, 1997) ( wherein in *dicta,* the court states "... I doubt that § 3730(b)(5) is also jurisdictional in nature....")

9

*Delta Air Lines, Inc.,* 461 F.2d 576, 580 (5th Cir. 1972); *See also, Brever v. Rockwell Int'l Corp.,* 40 F.3d 1119 (10th Cir. 1994); *Washington v. New York City Board of Estimate,* 709 F.2d 792, 795 (2nd Cir. 1983). Therefore, the Court finds that Relator Martineck is not an intervenor, nor has he filed a "related" action. Thus, he is a proper party in the case and his participation is not barred by §3730(b)(5).

Relators Wright, Brock, Brain and POGO:

The status of Relators Wright, Brock, Brain, and POGO differs from that of Relator Martineck. These relators filed separate actions with the court after Relator Johnson filed his initial complaint. Although the Court does not agree with defendants position that these filings and the subsequent consolidation constituted an intervention by these relators, it does agree that these actions were "related" within the meaning of §3730(b)(5) and thus the Court is jurisdictionally barred from hearing their claims. The essence of each of these lawsuits is that the defendant oil companies underpaid the royalties owed on oil taken from Federal and Indian land through undervaluing the oil.

Both the government and the relators have previously acknowledged the "related" nature of these cases in filings made with the Court. The government, in its motion for a partial lifting of the seal and for leave to advise Relators Johnson, Martineck and Wright of each others' actions stated that both actions made

10

"essentially the same allegations" regarding "a consistent pattern of underpaying crude oil royalties due on Federal leases."[7]  In its motion to consolidate the Johnson, Martineck and Wright actions, the government stated, "The theories of liability and damages as to royalties alleged in both cases are substantially identical."[8]  In relation to the action brought by Relators Brock, Brian, and POGO, the government made the same motion to advise the other relators of the existence of each others' actions. In that motion, the government noted that all of the actions include "essentially the same allegations" regarding the payment by defendants of their royalty obligations to the government.[9]  On July 16, 1997, the government moved to consolidate all four actions.  The motion to consolidate informed the Court that all four cases "address the same or similar issues of law and facts; to wit, whether or not oil companies violated the terms of the False Claims Act by underpaying royalties owed to the United States."[10]

The relators, in their joint motion to consolidate their lawsuits, stated "[b]ecause the actions are so similar from a legal and factual perspective, there is

[7]Document No. 11.

[8]Document No. 13.

[9]Document No. 32.

[10]Document No. 38.

11

virtually no risk of prejudice or possible confusion to any of the parties if the cases

were to be consolidated."[11] The defendants point out that in this motion, the relators

went on to assert:

> Specifically, each pending action alleges that the oil
> company defendants have continually and systematically
> underpaid royalties owed the federal government for crude
> oil taken from federal onshore and offshore leases. Each
> action further asserts that such underpayments were the
> result of crude oil royalties being calculated based on
> 'posted prices' for such royalty oil, as opposed to the
> market value of such oil an/or the actual amounts received
> by defendants from the sale of such oil in an arms length
> third-party transaction. The actions assert substantially
> identical legal theories of liability against the various
> defendants.[12]

In granting their motion to consolidate, the Court made express findings

adopting the above language. The relators are bound by this previous admission.

Accordingly, the Court finds that the actions filed by Relators Wright, Brock, Brian

and POGO are "related" to the action first filed by Relators Johnson and Martineck

and thus are barred by § 3730(b)(5).

IT IS THEREFORE ORDERED that the Defendants' Motion to Dismiss

---

[11]Document No. 53.

[12]*Id.*

12

Relators' Claims for Lack of Subject Matter Jurisdiction Under 31 U.S.C. § 3730(b)(5) is GRANTED as to Relators Wright,[13] Brock, Brian and POGO.

IT IS ORDERED that the Defendants' Motion to Dismiss Relators' Claims for Lack of Subject Matter Jurisdiction Under 31 U.S.C. § 3730(b)(5) as to Relator Martineck is DENIED.

SIGNED this _____8th_____ day of ___December___, 1998.

John Hannah, Jr.

JOHN HANNAH, JR.
UNITED STATES DISTRICT JUDGE

---

[13]This order, as to Relator Wright, only applies to the claims regarding oil royalties in his initial action.

13

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

**H**

Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
UNITED STATES of America, ex rel. Mary Beth
Pilecki-Simko and Tom Giunta, Relators,
v.
The CHUBB INSTITUTE, the Chubb Corporation,
Chubb America Service Corporation, and High-
Tech Institute, Inc., Defendants.

Civil Action No. 06-3562.
March 22, 2010.

Michael S. Green, Esq., Green & Pagano, LLP,
East Brunswick, NJ, Gary S. Graifman, Esq., Kan-
trowitz, Goldhamer & Graifman, Montvale, NJ, for
Plaintiffs/Relators.

Eric A. Savage, Esq., Littler Mendelson, PC, Ne-
wark, NJ, for Defendants The Chubb Institute &
High-Tech Institute, Inc.

Michael R. McDonald, Esq., Gibbons, PC, Newark,
NJ, for Defendant The Chubb Corporation.

### *MEMORANDUM OPINION*

BROWN, Chief Judge.

**\*1** This matter is a *qui tam* action FN1 brought
pursuant to the False Claims Act, 31 U.S.C. § 3729
et seq., by Relators Mary Beth Pilecki-Simko and
Tom Giunta against their former employer, The
Chubb Institute (TCI). Relators allege that TCI
knowingly caused false claims to be filed by mak-
ing a number of misrepresentations to the Depart-
ment of Education, its accrediting agencies, and
students that wrongfully enabled them to secure
student financial aid in the form of loans and grants
from the federal government. Relators also seek to
impose liability for this conduct on TCI's former
corporate parents, High-Tech Institute (HTI) and

The Chubb Corporation, on the basis of their al-
leged control of TCI's actions.

> FN1. "*Qui tam* actions have a long history
> and were used in England before the
> foundation of this country." *United States
> ex rel. Atkinson v. Pa. Shipbuilding Co.,*
> 473 F.3d 506, 509 (3d Cir.2007). The term
> "*qui tam*" derives from "the Latin phrase
> *qui tam pro domino rege quam pro se ipso
> in hac parte sequitur,* which means 'who
> pursues this action on our Lord the King's
> behalf as well as his own.' " *Vt. Agency of
> Natural Res. v. United States ex rel.
> Stevens,* 529 U.S. 765, 769 n. 1, 120 S.Ct.
> 1858, 146 L.Ed.2d 836 (2000) (citation
> omitted). "Under modern practice, *qui tam*
> actions are brought by private plaintiffs on
> behalf of the Government in exchange for
> some portion of any resulting damages
> award." *United States ex rel. Rodriguez v.
> Our Lady of Lourdes Med. Ctr.,* 552 F.3d
> 297, 299 n. 1 (3d Cir.2009) (citing *Vt.
> Agency of Natural Res.,* 529 U.S. at
> 773-74).

Presently before the Court are two motions
(Doc. Nos.38, 39) to dismiss Relators' Second
Amended Complaint filed by Defendants The
Chubb Corporation, TCI, and HTI.FN2 Both mo-
tions seek dismissal pursuant to Federal Rules of
Civil Procedure 9(b) and 12(b)(6) on the grounds
that Relators have failed to plead fraud with the re-
quisite particularity and failed to state a claim upon
which relief can be granted. HTI and The Chubb
Corporation also challenge the sufficiency of the al-
legations supporting Relators' veil-piercing and
successor liability claims against them. For the fol-
lowing reasons, the Court will grant The Chubb
Corporation's motion, and the Court will grant the
motion filed by TCI and HTI.

> FN2. This matter was reassigned to the un-
> dersigned by Order of August 10, 2009.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

## I. PROCEDURAL HISTORY

The present motions challenge the sufficiency of Relators' Second Amended Complaint (SAC). Defendants had previously filed motions challenging the sufficiency of Relators' First Amended Complaint,[FN3] but this Court denied those motions without prejudice on August 24, 2009, because Relators sought leave to amend their pleadings a second time. Defendants and the Court consented to Relators' request,[FN4] and Relators filed a six-count SAC on September 21, 2009.

> FN3. The Court notes that the docket in this case reflects that Relators' did not properly file the First Amended Complaint on the Court's CM/ECF system. In lieu of this filing, The Chubb Corporation has provided a copy of the First Amended Complaint (McDonald Decl., Ex. B), which Relators do not dispute.

> FN4. Defendants' stipulation of consent is reflected by Magistrate Judge Esther Salas' Consent Order of September 22, 2009.

Defendants renewed their motions to dismiss on October 16, 2009, and the Government reinstated the Statement of Interest it filed with regard to Defendants' earlier motions to dismiss. (Doc. No. 43 .)[FN5] These motions are now ripe for the Court's consideration.

> FN5. The Government had previously declined to intervene in this case on August 19, 2008. (Doc. No. 5.)

## II. THE SECOND AMENDED COMPLAINT

For purposes of these motions, this Court must accept as true the factual allegations contained in the SAC and draw all reasonable inferences in favor of Relators. *See, e.g., Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). According to the SAC, as of the time of the Complaint, TCI[FN6] was a technical career training institute that had been a part of the HTI family of technical career training schools since HTI pur-

chased the Institute in 2004. Prior to that time, TCI had been a subsidiary of insurance company The Chubb Corporation. Relators worked as career services and admissions counselors, respectively, for the North Brunswick Campus of TCI for different periods between 1995 and 2005. (SAC ¶¶ 5-7.)

> FN6. The Court notes that the SAC purports to use "Chubb Institute" and/or "Chubb" to refer to TCI, The Chubb Corporation, and Chubb America Service Corporation (SAC ¶ 6); yet, the SAC consistently differentiates between TCI and its alleged parent corporations bearing the "Chubb" name. Furthermore, in their opposition papers, Relators do not contend that The Chubb Corporation or Chubb America Service Corporation directly violated the False Claims Act. Thus, rather than reading every allegation about "Chubb" as a group allegation against all three Chubb Defendants, which would be inconsistent with Relators' representations to the Court, the Court construes the SAC's "Chubb" and "Chubb Institute" allegations to refer to TCI unless the SAC specifies that allegation concerns The Chubb Corporation or Chubb America Service Corporation.

According to Relators, TCI participates in the federal student financial aid program authorized by Title IV of the Higher Education Act, which provides financial assistance in the form of direct loans and federally insured private loans to eligible students that attend qualifying higher education institutions. In order to qualify for federal subsidies, the institution must enter into a Program Participation Agreement (PPA) with the Department of Education, which requires continuing adherence to a number of statutory and regulatory conditions. (*See id.* ¶¶ 9-23.) This process has been referred to by courts as the "phase I application." Students at qualifying higher education institutions then submit individual applications for financial aid, which

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

courts have referred to as "phase II applications."

   **\*2** The Court understands Relators to contend that TCI violated the False Claims Act by knowingly violating Title IV requirements it had agreed to in the phase I application (the PPA) and knowingly providing false statements to maintain Title IV eligibility, but nevertheless continuing to submit students' phase II applications for financial aid as if it had complied with the regulations. (*See id.* ¶¶ 24, 51-86.) Courts have referred to this theory of False Claims Act liability-wherein a party "submit[s] claims for payment to the federal Government while at the same time violating, without disclosing, applicable rules" governing eligibility for the government program-as the implied false certification [FN7] theory of liability. *See, e.g., United States ex rel. Rodriguez v. Our Lady of Lourdes Med. Ctr.,* 552 F.3d 297, 303 (3d Cir.2009). In other words, by submitting or causing to be submitted the claim for funds, the entity implicitly falsely certifies that it has complied with governing regulations.

   [FN7.] Implied false certification, which refers to a submission for payment without disclosing the knowing failure to comply with applicable regulations, thus differs from an express false certification, which occurs when a participating institution falsely certifies, usually on the claim for payment itself, that it is currently in compliance with the applicable regulations.

   With regard to specific violations of Title IV regulations, Relators allege that TCI knowingly made the following misrepresentations to the Department of Education, its accreditation agencies, and students between 2001 and 2006 in order to satisfy various phase I obligations: (1) false reports of the employment placement rates of TCI graduates (SAC ¶¶ 24(i)(a)-(g) and (ii), 52-59); (2) false assurances that TCI students were making satisfactory academic progress in their program of study (*id.* ¶¶ 24(iii), 68-72); (3) permitting English-deficient applicants and applicants who failed admissions tests to enroll despite their failure to meet TCI ad-

missions standards (*id.* ¶¶ 24(iv), 60-67); (4) allowing students ineligible for financial assistance under Title IV to apply for Title IV funds (SAC ¶¶ 24(v), 80-85); and (5) false assurances of compliance with Title IV's ban (hereinafter "incentive compensation ban") on the payment of bonuses to recruiters on the basis of the number of students they admit (*id.* ¶¶ 24(vi), 73-79). Further, Relators allege that TCI employees used "pixie dust" to increase applicants' admission test scores and thereby increase enrollment, that TCI rated admissions personnel with scorecards to award bonuses based on enrollment numbers, and that TCI administrators made "professional judgment[s]" that admissions personnel should submit to the Government the financial aid forms for ineligible students. (*Id.* at ¶¶ 61, 74-75, 82.)

   In support of these allegations, Relators submit numerous exhibits that they contend demonstrate the willfully false statements TCI submitted to its accreditation agencies concerning the job-placement rates of its students. (SAC Exs. A-E.) Relator Pilecki-Simko also submitted a sworn affidavit identifying 13 students from TCI's North Brunswick campus that she claims "are examples of the allegations made in the complaint and disclosure statement." (SAC Ex. F, Pt. 23 ¶ 3.) These purported "examples" included one graduate discovered to be an illegal alien, two graduates who were not proficient in the English language, two students who gave poor interviews and could not be placed, two students that received assurances from admissions representatives regarding employment and salary opportunities, and six students whose employment TCI ostensibly misrepresented. (*See id.*) [FN8]

   [FN8.] Relator Giunta also submitted a two-paragraph affidavit, consisting solely of vague assertions that he was "fully familiar with this proceeding," and that "[t]he allegations in the complaint and disclosure statement ... as to the Admission Process and misrepresentations as regards admis-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

sions and financial aid are to my knowledge accurate." (SAC Ex. F, Pt. 24.) Relator Pilecki-Simko's affidavit contained similar generic assertions. (*See* SAC Ex. F, Pt. 23 ¶¶ 1-2.)

**\*3** With regard to TCI's parent corporations, Relators assert that HTI directly participated in TCI's misrepresentations to its accrediting agency about the employment placement rates of TCI graduates. (*See* ¶ 24(i)(a), (b).) Relators further allege that HTI and The Chubb Corporation both (i) knew of TCI's misconduct, and (ii) controlled TCI to the point that TCI was their alter ego. (*See id.* ¶¶ 99-119.)

As presently constituted, the SAC presents three counts of False Claims Act violations arising under the following subsections [FN9] of 31 U.S.C. § 3729:(a)(1) (knowingly causing a false claim for payment to be presented to an employee of the United States Government), (a)(2) (knowingly using a false statement to get a false claim paid by the Government), and (a)(3) (conspiracy to defraud the Government by getting a false claim paid). With regard to TCI's former parent corporations, the SAC alleges one count of piercing the corporate veil against both HTI and The Chubb Corporation, as well as one count of successor liability against HTI.

> FN9. Unless otherwise noted, the Court refers to portions of 31 U.S.C. § 3729 when it refers to "subsections."

### III. DISCUSSION

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted). A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).

The plausibility standard requires that "the plaintiff plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556). Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555); *see also Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008). In evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon those documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993).

Here, Relators allege that TCI violated the False Claims Act by knowingly violating Title IV requirements it had agreed to in its phase I application (the PPA) and knowingly providing false statements to maintain Title IV eligibility, but nevertheless continuing to submit students' phase II applications for financial aid as if it had complied with the applicable regulations. Alternatively, Relators allege that TCI conspired with its corporate parents to defraud the Government by performing these alleged acts. Relators further allege that TCI's parent corporations controlled TCI's operations to the point that liability should attach to them for TCI's transgressions. Presently, Defendants challenge both the legal basis and the sufficiency of the fraud allegations for Relators' False Claims Act claims, as well as the pleadings for Relators' veil-piercing and successor liability claims. Although the weight of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

authority appears to support Relators' implied false certification theory of a False Claims Act violation in the context of a university's phase I application for Title IV funds, the Court finds that the allegations contained in the SAC fall well short of Rule 9(b)'s heightened pleading requirement for allegations of fraud. The Court further finds Relators' conclusory allegations about TCI's parent corporations insufficient to support veil-piercing and successor liability claims.

*A. False Claims Act*

**\*4** At the time that Relators commenced this lawsuit, the False Claims Act provisions relied on by Relators made it unlawful for any entity to do the following acts:

(1) knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspir[ing] to defraud the Government by getting a false or fraudulent claim allowed or paid....

31 U.S.C.A. § 3729(a)(1)-(3) (West 2003 & Supp.2008).FN10 For purposes of these subsections, the Act defined the scienter requirement "knowingly" to refer to a person who "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," but notes that "no proof of specific intent to defraud is required." 31 U.S.C.A. § 3729(b)(1)-(3) (West 2003 & Supp.2008).

FN10. Last year, Congress substantively revised and reorganized the above portion of § 3729(a) into a new § 3729(a)(1),

which prohibited the following acts:

(A) knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspir[ing] to commit a violation of subparagraph (A), (B), ...

Fraud Enforcement Recovery Act (FERA), Pub.L. No. 111-21, § 4(a)(1), 123 Stat. 1617, 1621 (2009) (codified at 31 U.S.C. § 3729(a)(1)). Congress provided that, with the exception of new § 3729(a)(1)(B), these revisions to § 3729(a)(1) would only "apply to conduct on or after the date of enactment [May 20, 2009]." FERA § 4(f)(1). Thus, it is clear that FERA's revisions to the False Claims Act would not supplant the preexisting subsections (a)(1) and (a)(3) of § 3729 in this case. Yet Congress made new § 3729(a) (1)(B) retroactive to "all claims under the False Claims Act ... that are pending on or after [June 7, 2008]." FERA § 4(f) (1).

Defendants submit that the statutory provision applicable at the time of the filing of the lawsuit should apply, and Relators do not suggest otherwise. This Court is persuaded by Judge Rose's statutory interpretation in *United States ex rel. Sanders v. Allison Engine Co.*, 667 F.Supp.2d 747, 2009 WL 3626773 at *3-4 (S.D.Ohio 2009) (citing § 3729's definition of "claim," 31 U.S.C. § 3729(b) (2)(A), another FERA retroactivity provision premised on "cases pending on the date of enactment," FERA § 4(f)(2), and the legislative his-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

tory of FERA), that the "claims pending" trigger to FERA's retroactivity clause refers to *claims* for payment and not *cases* presenting False Claims Act claims. *See also United States v. Aguillon,* 628 F.Supp.2d 542, 550-51 (D.Del.2009) (declining to give FERA's revisions retroactive effect). Relators have not alleged that Defendants directly or indirectly made false claims for payment that were pending on or after June 7, 2008. Thus, the Court will not apply FERA's § 3729 provisions retroactively to the legal claims involved in this case.

Subsections (a)(1) and (a)(2) share many common elements. As the Third Circuit explained in *United States ex rel. Schmidt v. Zimmer, Inc.,* a prima facie case of a violation under subsection (a)(1) requires a showing that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent," but "[i]n order to prove a claim under [subsection] (a)(2), a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." 386 F.3d 235, 242 (3d Cir.2004) (citations omitted). The Supreme Court clarified in *Allison Engine Co. v. United States ex rel. Sanders* that while a subsection (a)(2) violation does not require subsection (a)(1)'s presentment requirement, an (a)(2) violation requires a showing "that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.' " 553 U.S. 662, 128 S.Ct. 2123, 2139, 170 L.Ed.2d 1030 (2008). Meanwhile, a conspiracy in violation of subsection (a)(3) does not require a showing "that the conspirators intended the false record or statement to be presented directly to the Government, but it must be established that they agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent

claim." *Id.* at 2130.

Before the Court addresses Relators' pleadings, the Court will examine the viability of Relators' false certification theory of False Claims Act liability and the applicability of Federal Rule of Civil Procedure 9(b).

*1. Implied False Certification Theory of Liability*

**\*5** With regard to Relators' false certification theory of False Claims Act liability, it bears mentioning that the Third Circuit has twice declined to adopt this doctrine, but in each instance, it left the door open for this theory of liability in future cases. *See Rodriguez,* 552 F.3d at 303-04 & n. 6 (explaining, on review of a 12(b)(6) dismissal, that the Circuit has not adopted the false certification theory and declining to address the issue, but nevertheless holding that the relators "failed to assert the elements necessary to succeed under that theory"), *abrogated on other grounds by United States ex rel. Eisenstein v. City of N.Y.,* --- U.S. ----, 129 S.Ct. 2230, 173 L.Ed.2d 1255 (2009); *United States ex rel. Quinn v. Omnicare Inc.,* 382 F.3d 432, 441-43 (3d Cir.2004) (finding, on appeal of an order of summary judgment, that relators' evidence failed to establish a false certification claim under the standards articulated by other courts).

The "archetypal *qui tam* False Claims action" involves "a private company overcharg[ing] under a government contract, [where] the claim for payment is itself literally false or fraudulent." *United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1170 (9th Cir.2006). Yet the Supreme Court has recognized that Congress "intended [the False Claims Act] to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) (citation omitted). Congress reinforced this broad mandate when it passed the 1986 amendments to the False Claims Act, instructing courts that "each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim." S.Rep. No. 99-345, at 9, *reprinted in* 1986 U.S.C.C.A.N. at 5274. Consequently, the overwhelming majority of courts have extended False Claims Act liability to a party's knowingly false certification of compliance with applicable regulations when such regulations are a condition of payment. *See, e.g., United States ex rel. Mikes v. Straus,* 274 F.3d 687, 697 (2d Cir.2001); *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1376 (D.C.Cir.2000); *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 786-87, 793 (4th Cir.1999); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 902 (5th Cir.1997); *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266-67 (9th Cir.1996).

While the extent of the broader implied false certification theory (i.e., where the claim for payment does not include an express certification of compliance) is less clear, both the Seventh and Ninth Circuits have endorsed False Claims Act liability under false certification and/or promissory fraud theory in the context of educational institutions' phase I applications for Title IV eligibility and subsequent receipt of financial aid. *Hendow,* 461 F.3d at 1171-77; *United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 916-17 (7th Cir.2005).FN11 Although these decisions are not binding on this Court, the Court finds their analyses helpful in gauging the extent of false certification liability under the False Claims Act. The purported false certification in both cases, which also appears in the matter *sub judice,* consisted of the educational institution's false certification on its PPA that it would comply with Title IV's incentive compensation ban. *Hendow,* 461 F.3d at 1175; *Main,* 426 F.3d at 916. Placing the purported fraud in terms of the statutory language, the *Main* court explained:

> FN11. Although the *Main* court's decision relies on principles of promissory fraud, this Court agrees with the *Hendow* court's

observation that promissory fraud and false certification are two sides of the same coin. *See Hendow,* 461 F.3d at 1174 (explaining that promissory fraud "in substance, is not so different from the false certification theory, and even requires the same elements"). The difference between the two, so far as the Court can discern, is when the institution manifested the scienter to defraud the Government: when it signed the PPA (promissory fraud), or when it purposely caused claims to be filed, knowing that it was violating the PPA (false certification). *Compare Main,* 426 F.3d at 917 *with Hendow,* 461 F.3d at 1171-72.

**\*6** [t]he University "uses" its phase-one application (and the resulting certification of eligibility) when it makes (or "causes" a student to make) a phase-two application for payment.... The phase-two application is itself false because it represents that the student is enrolled in an eligible institution, which isn't true.... If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork. *Main,* 426 F.3d at 916.

Defendants ask this Court to employ the Second Circuit's narrow application of the doctrine, which requires that the applicable regulations be an express condition of payment. *See Mikes,* 274 F.3d at 699-700. Ostensibly, Defendants worry that broad application of the false certification theory would turn the False Claims Act "into 'a blunt instrument to enforce compliance with all ... regulations.'" *See Rodriguez,* 552 F.3d at 304 (quoting *Mikes,* 274 F.3d at 699). With regard to the Second Circuit's express-condition requirement, the Court notes that the Third Circuit, while stopping short of adopting the false certification theory, has suggested a lower threshold would apply, one requiring only "that the alleged violations would be relevant to 'the [G]overnment's disbursement decisions.' "

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

*Id.* (addressing *dicta* in the Circuit's prior opinion in *Quinn* that the false certification theory should not be limited to regulations that are express conditions of payment). However, even if the express-condition-of-payment rule applied, the Court does not see how the narrower rule would benefit TCI in this case; federal statutory and regulatory law, as well as the PPA itself, expressly condition Title IV participation, and necessarily the receipt of federal funds, on compliance with a number of regulations, including the incentive compensation ban. *E.g.,* 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(a)(1), (b)(22)(i); *Hendow,* 461 F.3d at 1176 (rejecting the university's argument that PPA-incorporated regulations were "merely ... condition[s] of *participation,* [but] not [ ] condition[s] of *payment"* ). The PPA requirements are " 'prerequisites,' and 'the *sine qua non'* of federal funding, for one basic reason: if the [institution] had not agreed to comply with them, it would not have gotten paid." *Hendow,* 461 F.3d at 1176. As for Defendants' larger concern about a broad application of the false certification theory, this Court finds solace in the Seventh Circuit's differentiation between breach of contract and promissory fraud in *Main* :

The University protests that this approach would treat any violation of federal regulations in a funding program as actionable fraud, but that's wrong. A university that accepts federal funds that are contingent on following a regulation, which it then violates, has broken a contract. But fraud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do. Tripping up on a regulatory complexity does not entail a knowingly false representation.

*7 426 F.3d at 917 (citation omitted).

2. *Federal Rule of Civil Procedure 9(b)*

At the motion to dismiss stage, Relators need not satisfy the above burdens with specific proofs. Yet, because the False Claims Act is a fraud statute, Relators' pleadings must satisfy the heightened

pleading requirements of Federal Rule 9(b). *See United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.,* 149 F.3d 227, 234 (3d Cir.1998) (noting that Rule 9(b) "provides sufficient deterrence against overly broad allegations" under the False Claims Act); *see also United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1309-10 (11th Cir.2002) (concluding that it was "well settled" and "self-evident" that the False Claims Act was "a fraud statute" triggering application of Rule 9(b)'s heightened pleading requirements). Accordingly, Relators must plead "with particularity the circumstances constituting fraud," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b).

The Third Circuit has held that "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of ... fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'-that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 217 (3d Cir.2002) (citations omitted). "Fed.R.Civ.P. 9(b) requires plaintiffs to plead the circumstances of the alleged fraud with particularity to ensure that defendants are placed on notice of the 'precise misconduct with which they are charged, and to safeguard defendants against spurious charges' of fraud." *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984).

Although Rule 9(b) permits a plaintiff to generally allege a defendant's mental state, the Third Circuit has read the Rule to still require plaintiffs to "allege facts that show the court their basis for inferring that the defendants acted with 'scienter.' " *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997). Although *Burlington Coat Factory* dealt with securities fraud, the Court sees no reason to limit its ruling to that context, especially in light of the Circuit's concern that the

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

False Claims Act not become a "blunt instrument" of regulatory enforcement. *See Rodriguez,* 552 F.3d at 304; *cf. Quinn,* 382 F.3d at 440 (explaining that False Claims Act relators "cannot ... describe a private scheme in detail but then ... allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.") (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1311 (11th Cir.2002)).[FN12]

> FN12. The Court notes that the Seventh Circuit has endorsed a similar pleading requirement-that the plaintiff "must be able to point to specific, objective manifestations of fraudulent intent"-in the analogous context of promissory fraud claims. *Bower v. Jones,* 978 F.2d 1004, 1012 (7th Cir.1992) (quoting *Hollymatic Corp. v. Holly Sys., Inc.,* 620 F.Supp. 1366, 1369 (N.D.Ill.1985)).

*3. Application*

**\*8** While the Court agrees that the weight of authority supports Relators' implied false certification theory of liability in the Title IV context under the False Claims Act, the Court finds that Relators' allegations lack sufficient particularity to satisfy Rule 9(b).

Although Relators present five species of misrepresentation that they contend demonstrate TCI's knowing false certification of compliance with PPA requirements, Relators do not allege any facts identifying either a particular false claim submitted to a Government agent, per § 3729(a)(1), or a false statement used to get a false claim paid in violation of § 3729(a)(2). To recap, Relators allege that TCI made the following misrepresentations to its accreditation agency, the Department of Education, and/or its students, in violation of PPA regulations: (a) false reports of TCI graduates' employment placement rates; (b) false assurances that TCI students were making satisfactory academic progress in their program of study; (c) permitting English-

deficient applicants and applicants who failed admissions tests to enroll despite their failure to meet TCI admissions standards; (d) allowing students ineligible for financial assistance under Title IV to apply for Title IV funds; and (e) false assurances of compliance with Title IV's incentive compensation ban. Relators also allege (f) that TCI and its parent corporations conspired to commit the above violations. The Court considers each subset of allegations in turn.

*a. Misrepresentations Regarding Employment Placement*

With regard to the alleged false reports of employment placement rates, Relators attached numerous documents to the SAC that they contend TCI submitted to its accreditation agency between 2003 and 2005. (*See* SAC ¶ 24(i) Exs. A ("Completion and Placement Charts"), B ("Letter of Assurance" and "[TCI] Jersey City Campus Interim Report, July 2004"), C ("2003 ACCSCT Annual Report for [TCI] North Brunswick Campus"), D ("2005 Annual Institutional Report for the Year [2004-2005]"), and E ("Probation Officer Response").) Relators claim that these documents contained willfully false statements "with the purpose of falsely obtaining accreditation" and Title IV eligibility. *See generally* SAC ¶ 24(i). Yet Relators' pleadings do not provide a plausible basis for making this conclusion, and the purported false statements are not apparent on the face of the documents. Among the voluminous statistics presented by these documents, Relators' pleadings do not identify which statements regarding the placement rates were false (or conversely what the actual placement rates were), to what degree they were inflated or diminished, and upon whose instructions they were falsified. In other words, Relators only provide the *what,* but omit the *who, when,* and *how.*[FN13]

> FN13. The "examples" contained in Relator Pilecki-Simko's Affidavit do not fill in these gaps. Although Relator indicates that as many as six graduates' employment placements were incorrectly entered into

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

TCI's student-placement database, it is unclear who made these entries (i.e., did the Relators make these entries?), why these entries were made, and how they were used. The SAC does not allege that this data was in any way improperly used by TCI to procure federal funds, and the SAC fails to allege circumstantial facts permitting the inference that these entries were knowingly entered into the database with the purpose of obtaining federal funds not otherwise due.

Also missing from Relators' conclusory allegations is the *why;* Relators do not allege circumstantial facts indicating that TCI knowingly committed acts in violation of § 3729. *See* 31 U.S .C. § 3729(b) (defining "knowing" to require, at a minimum, "reckless disregard of the truth or falsity of the information"); *Allison Engine,* 128 S.Ct. at 2128 (explaining that "a person must have the purpose of getting a false or fraudulent claim 'paid or approved by the Government' in order to be liable under § 3729(a) (2)"). Conspicuously absent from the SAC is any indication, other than Relators' *ipse dixit,* that TCI had notice that its submissions contained erroneous data, let alone that they intended to use erroneous data for the purpose of defrauding the Government. *Cf. Hendow,* 461 F.3d at 1175 (noting that relators had alleged specific instances of improper bonuses, in addition to allegations that the university adopted policies of violating the incentive compensation ban, that it repeatedly changed these policies to avoid detection, and that its staff "openly bragged about perpetrating fraud"). The SAC does not provide a plausible basis for inferring that TCI acted with scienter with regard to providing false employment placement reports. *See Burlington Coat Factory,* 114 F.3d at 1418.

### b. False Certifications of Satisfactory Progress

**\*9** Turning next to Relators' allegations that TCI gave false assurances of students' satisfactory progress in their program of study, the SAC again provides the *what,* but omits the *who, where, when,*

*why,* and *how.* Relators aver that failing students received passing grades so that they would be eligible for Title IV financial aid, that teachers gave open-book exams with the answers included in the exam, and that "teachers were pressured by management to change the grade curving of classes such that more students would pass ... [and consequently Chubb] would be allowed under federal and state guidelines to receive more of the tuition monies paid by students." (SAC ¶¶ 69-71.) [FN14] Relators provide no examples of this alleged misconduct (i.e., specific student grades changed, specific teacher pressured to change grading practices), and again they fail to aver circumstantial facts enabling the inference that TCI acted with scienter with regard to providing false progress reports. *See Burlington Coat Factory,* 114 F.3d at 1418.

> FN14. It is unclear from the SAC whether this alleged misconduct violated Title IV requirements, accreditation requirements, or TCI's own guidelines.

### c. Admitting Sub-Standard Students Contrary to TCI Guidelines

Relators' allegations that TCI knowingly admitted unqualified students who failed TCI's Entrance Assessment Test or lacked English proficiency also lack particularity. Relators provide no examples of admissions counselors being instructed to apply "pixie dust" to the admissions exams, nor do they provide examples of students benefitting from this practice. (*See generally* SAC ¶¶ 60-63 .) Although Relator's Affidavit identifies two students whom she claims were not proficient in the English language, the SAC does not explain how their admission violated TCI's PPA requirements. Further, the SAC again fails to aver circumstantial facts enabling the inference that TCI acted with scienter with regard to admitting allegedly unqualified students. *See Burlington Coat Factory,* 114 F.3d at 1418.

### d. Permitting Ineligible Students to Apply for Title IV Financial Aid

With regard to Relators' allegations that TCI

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

permitted inelegble students (including illegal ali-
ens) to apply for Title IV financial aid, Relators
plead no specific facts to support this allegation.
Although Relator's Affidavit identifies one TCI
graduate who was discovered to be an illegal alien
by her employer, neither the SAC nor the Affidavit
allege that TCI knew of this fact at the time it ad-
mitted this student, or that the mere admission of
this student violated TCI's PPA requirements.
Moreover, the SAC fails to allege circumstantial
facts enabling the inference that TCI acted with sci-
enter in assisting ineligible students apply for Title
IV financial aid. *See Burlington Coat Factory,* 114
F.3d at 1418.

*e. False Certification of Compliance with Incentive
Compensation Plan*

With regard to Relators' claim that TCI adopted
compensation policies that rewarded higher enroll-
ments in violation of Title IV's incentive compensa-
tion ban, Relators attached examples of TCI's com-
pensation plan to the SAC. Defendants argue that
the compensation plans are protected by regulatory
safeharbor because the compensation plan was not
based solely on enrollment practices covered by the
ban. As a matter of law, the Court agrees with De-
fendants.

**\*10** While the incentive compensation ban pro-
hibits Title IV-participating institutions from
"provid[ing] any commission, bonus, or other in-
centive payment based directly or indirectly upon
success in securing enrollments or financial aid to
any person or entity engaged in any student recruit-
ing or admission activities," 20 U.S.C. §
1094(a)(20), 31 C.F.R. § 668.14(b)(22)(i), federal
regulation permits:

The payment of fixed compensation, such as a
fixed annual salary or a fixed hourly wage, as
long as that compensation is not adjusted up or
down more than twice during any twelve month
period, and any adjustment is not based solely on
the number of students recruited, admitted, en-
rolled, or awarded financial aid.

31 C.F.R. § 668.14(b)(22)(ii)(A). Although the
language of the safeharbor provision appears at
odds with the incentive compensation ban, it stands
to reason that an institution adhering to a federal
regulation defining the contours of permissible
compensation under the incentive compensation
ban cannot have the requisite scienter to violate the
ban. *See, e.g., United States ex rel. Bott v. Silicon
Valley Colleges,* 262 F. App'x 810, 812 (9th
Cir.2008); *United States ex rel. Lee v. Corinthian
Colleges,* No. 07-1984, 2009 WL 4730890, at \*4
(C.D.Cal. Dec.4, 2009). Relators do not allege that
TCI based its compensation practices solely on
means prohibited by the Title IV ban, and the ex-
amples provided with the SAC demonstrate that
TCI's compensation scale complied with the regu-
latory safeharbor. (*See* SAC, Ex. F, Pts. 25 (basing
performance evaluation not only on enrollment
starts, but student retention, success at recruiting
activities, and administrative tasks), 26-27 (basing
compensation not only on enrollment starts, but stu-
dent retention, success at recruiting activities, ad-
ministrative records-keeping, and professional-
ism).)

The SAC does not allege with particularity ex-
amples of other prohibited compensation practices
not covered by the safeharbor, and the SAC further
fails to allege circumstantial facts enabling the in-
ference that TCI acted with scienter by falsely certi-
fying compliance with Title IV's incentive com-
pensation ban. *See Burlington Coat Factory,* 114
F.3d at 1418.

*f. Conspiracy to Commit the Above Violations*

Lastly, the Court considers Relators' claim that
TCI conspired with its corporate parents to commit
the above violations. Defendants argue, and the
Court agrees, that the law deems a parent corpora-
tion and its subsidiaries "legally incapable of form-
ing a conspiracy with one another." *Fogie v.
THORN Ams., Inc.,* 190 F.3d 889 (8th Cir.1999)
(applying parent-subsidiary conspiracy rule, pro-
nounced by the Supreme Court in the context of the
Sherman Act, *see Copperweld Corp. v. Independ-*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

*ence Tube Corp.,* 467 U.S. 752, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), to claims arising under RICO). However, even if the law permitted a conspiracy claim to lie solely between a parent corporation and its subsidiary, Relators have not plead a plausible conspiracy claim against TCI and its parent corporations. Other than conclusory assertions that HTI provided false statements for TCI's placement records and participated in the submission of false placement records to TCI's accreditation agency, the SAC does not provide particularized allegations that TCI had an agreement with any of its corporate parents that it would use a false record or statement that "would have a material effect on the Government's decision to pay the false or fraudulent claim." *See Allison Engine,* 128 S.Ct. at 2130. Further, as explained *supra,* Relators have not identified with particularity any intentional falsehoods in the attached placement statements.

\* \* \*

**\*11** To summarize, Relators' primary allegations of fraudulent misconduct against TCI lack sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b). Perhaps in recognition of these deficiencies, Relators ask this Court to ease Rule 9(b)'s pleading requirements, arguing that Defendants retain control over key information supporting their claims. Relators correctly note that courts will "relax" the particularity requirements of Rule 9(b) "when factual information is peculiarly within the defendant's knowledge or control," *Craftmatic Sec. Litig.,* 890 F.2d at 645 (collecting cases), but "even under a non-restrictive application of the rule, claimants must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based," *id.* (collecting cases). However, Relators' argument is undermined by the fact that they have had access for the past two years to voluminous records concerning TCI's employment placement statistics (including the records submitted as Exhibits to the SAC) courtesy of the Government's 2007 subpoena. Relators do not explain how the additional discov-

ery they seek will enable them to cure the above pleading deficiencies. Because Defendants have not stated plausible False Claims Act claim against TCI, the Court will dismiss all such claims (SAC, Counts I-III) pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

*B. Piercing the Corporate Veil & Successor Liability*

Because Relators have not sufficiently alleged that TCI violated the False Claims Act, and because Relators do not aver that The Chubb Corporation, Chubb America Service Corporation, and/or HTI themselves violated the False Claims Act, no claims remain for the imposition of liability upon TCI's corporate parents. [FN15] However, *assuming arguendo* that Relators sufficiently alleged False Claims Act violations committed by TCI, the allegations contained in Relators' SAC fail to state veil-piercing and successor liability claims against The Chubb Corpration and HTI.

> [FN15]. Although Defendant Chubb America Service Corporation does not join the current motions, the SAC only seeks to impose liability against this Defendant on the basis of its veil-piercing claim, a derivative claim. (*See* SAC Count IV, ¶ 100-04.) In the absence of a properly pled claim against TCI, Relators may not impose liability on a purported corporate parent such as Chubb America Service Corporation. Accordingly, this Count will be dismissed as against both The Chubb Corporation and Chubb America Service Corporation.

*1. Veil-Piercing*

Because veil-piercing is a state-law claim, the Court must apply the alter ego framework of the state(s) in which The Chubb Corporation and HTI are incorporated. *See, e.g., In re Cambridge Biotech Corp.,* 186 F.3d 1356, 1376 n. 11 (Fed.Cir.1999); *Stromberg Metal Works, Inc. v. Press Mech., Inc.,* 77 F.3d 928, 933 (7th Cir.1996). The SAC alleges that The Chubb Corporation was incorporated in New Jersey, and the parties appear to agree that

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

New Jersey law governs Relators' veil-piercing claim against it. With regard to HTI, however, the SAC only avers that HTI has a principal place of business in Arizona, leading this Court to believe that Arizona law may govern this veil-piercing claim. However, the Court need not definitively decide which jurisdiction controls this claim, because the Court agrees with Defendants that Arizona law does not materially differ from New Jersey law as it applies to Relators' pleadings.

**\*12** As in other jurisdictions, it is well-established in New Jersey "that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *State, Dep't of Envtl. Prot. v. Ventron Corp.,* 94 N.J. 473, 500, 468 A.2d 150 (1983) (citations omitted). This limited-liability principle-known as the corporate veil-applies to corporate shareholders as well. *Id.* In the parent-subsidiary context, New Jersey law permits courts to "pierce the corporate veil" where the subsidiary is shown to be the alter ego, or "mere instrumentality," of the parent corporation. *Id.* at 500-01, 468 A.2d 150. Alter ego liability attaches where "the parent [corporation] so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." *Id.* at 501, 468 A.2d 150 (citation omitted); *accord Gatecliff v. Great Republic Life Ins. Co.,* 170 Ariz. 34, 821 P.2d 725, 729 (Ariz.1991) (applying Arizona law). Yet, "[e]ven in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Ventron,* 94 N.J. at 501, 468 A.2d 150 (citations omitted); *see also Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 150 (3d Cir.1988) ("It is patently clear since *Ventron* that in New Jersey even the exercise of significant control by the parent over the subsidiary will not suffice to pierce the corporate veil.").

"In order to state a claim for piercing the cor-

porate veil under New Jersey law, a plaintiff must show that: (1) one corporation is organized and operated as to make it a mere instrumentality of another corporation, and (2) the dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 171 (3d Cir.2002) (citation omitted); *cf. Gatecliff,* 821 P.2d at 728 (recognizing that veil-piercing in Arizona requires a showing of "(1) unity of control and (2) that observance of the corporate form would sanction a fraud or promote injustice.") (citations omitted). Relevant considerations to the veil-piercing analysis include

gross undercapitalization ... failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Foodtown,* 296 F.3d at 172 (citations and internal quotation marks omitted) (applying New Jersey law); *cf. Deutsche Credit Corp. v. Case Power & Equip. Co.,* 179 Ariz. 155, 876 P.2d 1190, 1195-96 (Ariz.Ct.App.1994) (identifying similar relevant factors under Arizona law). Without more, neither stock ownership (majority or complete) nor overlapping boards of directors suffice to establish an alter ego relationship. *E.g., Ramirez v. STi Prepaid LLC,* 644 F.Supp.2d 496, 507 (D.N.J.2009) (applying New Jersey law); *Horizon Res. Bethany Ltd. v. Cutco Indus.,* 180 Ariz. 72, 881 P.2d 1177, 1180 (Ariz.Ct.App.1994) (applying Arizona law); *see also United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998); *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484-85 (3d Cir.2001).

### a. The Chubb Corporation
**\*13** With regard to The Chubb Corporation,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

Relators allege that The Chubb Corporation founded TCI in 1970 to train employees for its computer center, FN16 and that TCI was a subsidiary of The Chubb Corporation until The Chubb Corporation sold TCI to co-Defendant HTI in 2004. (SAC ¶¶ 6-7, 26.) Under its veil-piercing claim in Count IV, Relators further aver that The Chubb Corporation and Chubb Services Corporation both (i) "exclusively controlled" and "managed" TCI; (ii) that they received reports from TCI; (iii) that they "directly benefitted" from the federal funds obtained by TCI; (iv) that they used TCI as an alter ego; (v) that they "were aware of and had complete control of the fraud committed by [TCI];" and (vi) that they "created this corporate structure to avoid [their] duties to consumers and to shelter [their] wrongdoings from judicial or administrative oversight." (*id.* ¶¶ 100-105.) These boilerplate allegations, which presume the legal conclusion that TCI was The Chubb Corporation's alter ego, do not speak to the factors identified by the Third Circuit for determining whether a subsidiary is the mere instrumentality of the parent. Relators do not allege that TCI was grossly undercapitalized, failed to observe corporate formalities, had non-functioning directors, or that it commingled funds with either of its parent corporations. Instead, Relators contend that The Chubb Corporation should be liable because it was the "sole owner and beneficiary" of TCI's alleged false claims. (Relators' J. Opp'n Br. at 23.) Yet courts in New Jersey have consistently rejected imposing alter ego liability solely on this basis. *E.g., Ramirez,* 644 F.Supp.2d at 508 (finding allegations that a parent corporation owned a controlling interest in its subsidiary and shared upper management with its subsidiary insufficient to state a valid veil-piercing claim); *Premier Pork L .L. C. v. Westin, Inc.,* No. 07-1661, 2008 WL 724352, at *7 (D.N.J. Mar.17, 2008) (same).

> FN16. Relators base this allegation on a statement that purportedly appeared on TCI's website on or about the time this case was filed. (*See* SAC ¶ 26 (averring that TCI's website contained the following

statement: "In 1970, one of the largest insurance organizations in the world needed qualified people to run its multimillion dollar computer center. Not able to find skilled employees, it created its own training center. This proved so successful that [other companies] soon asked [TCI] to provide them with computer professionals. And so [TCI] was born").)

Relators attempt to minimize these deficiencies in their opposition brief and in the declaration of counsel, which present the following new allegations not contained in the SAC: (i) that another corporation, Chubb Computer Services, Inc., owned all of TCI's stock in 2004; (ii) that *this* entity sold the shares to HTI in the 2004 sale of TCI; and (iii) that this entity had a common treasurer and secretary with The Chubb Corporation. (Relators' J. Opp'n Br. at 7 (citing Green Decl., Exs. E, F).) Relators' attempt to bolster their pleadings midstream is improper. *See Burlington Coat Factory.,* 114 F.3d at 1426 ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."). However, accepting these allegations for the sake of argument, the Court does not understand how they advance Relators' position. Not only do these allegations add nothing to the claim that The Chubb Corporation dominated TCI, but they contradict the SAC's claim that The Chubb Corporation sold TCI to HTI in 2004. If anything, the new allegations suggest that The Chubb Corporation had a close working relationship with Chubb Computer Services, Inc., but the SAC does not allege that The Chubb Corporation had an alter ego relationship with this company. FN17

> FN17. In fact, it does not appear that the SAC even identifies this entity, lest this Court is to presume that Chubb Computer Services, Inc., is the same corporation as co-Defendant Chubb America Service Corporation.

**\*14** The SAC also falls short under the second

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

prong of the Third Circuit's veil-piercing analysis, because Relators fail to plead The Chubb Corporation's role in TCI's alleged fraud with sufficient particularity. "When a cause of action seeks to pierce the corporate veil on the basis of fraud, it is subject to Fed.R.Civ.P. 9(b)." *Foodtown,* 296 F.3d at 172 n. 10 (citing *Coyer v. Hemmer,* 901 F.Supp. 872, 883-84 (D.N.J.1995)). As noted above, the SAC fails to allege with sufficient particularity that TCI used false statements to fraudulently procure federal monies. The SAC provides no additional perspective on The Chubb Corporation's purported role in this scheme. Construing the SAC in the light most favorable to Relators and accepting the additional facts asserted in Relators' brief, the SAC is bereft of allegations permitting an inference that The Chubb Corporation used TCI as a mere instrumentality to perpetrate fraud.

### b. HTI

Turning to HTI, Relators advance *verbatim* the same veil-piercing allegations that they made about The Chubb Corporation that the Court considered above. (SAC ¶¶ 107-12.) Relators also allege that Defendants submitted documents, letters, and reports to its accreditation agency at various dates between 2003 and 2005 that "contain[ed] willfully false statements made by [TCI] and The High Tech Institute" (*id.* ¶ 24(i)(a)), and that TCI and HTI "submitted these documents with the purpose of falsely obtaining accreditation and falsely entitling them to Title IV/HEA funding from the Department of Education" (*id.* ¶ 24(i)(b)). Although the SAC does not appear to speak to the matter, Relators contend in their brief that HTI's chief executive officer also acted as an officer of TCI and submitted documents on their behalf to unspecified recipients. (Relators' J. Opp'n Br. at 30; *see also id* . at 7 (suggesting additional overlapping officers.)) Finally, Relators allege that statements appeared on TCI's and/or HTI's website [FN18] proclaiming that HTI "added The Chubb Institute's eight locations to its list of 17 HTI campuses throughout the United States," and referring to TCI and/or TCI affiliates as "branch [ ] schools" and "part of the HTI family

of schools." (SAC ¶ 27; Relators' J. Opp'n Br. at 24.)

> FN18. The Court notes that not all of these statements appear in the SAC, and the SAC indicates that one of the statements appeared on The Chubb Institute's website rather than HTI's website. (*See* SAC ¶ 27.) Further, although Relators attached printouts of portions of Defendants' respective websites, the Court has been unable to locate where each of these statements were made, and the websites referenced in the SAC appear to have changed since the time this lawsuit was filed. For purposes of addressing Relators' argument, the Court will accept the alleged website statements as described in Relators' brief.

By themselves, the duplicated boilerplate allegations and the shared-corporate-officers allegations fail to state a claim with respect to HTI for the same reason that these allegations failed to state a claim against The Chubb Corporation. *See Horizon,* 881 P.2d at 1180 (recognizing that, under Arizona law, "[A] mere showing that one corporation is owned by another or that the two share interlocking officers or directors is insufficient to support a finding of alter ego."); *accord Ramirez,* 644 F.Supp.2d at 507 (applying New Jersey law). The question remains whether Relators' additional allegations that HTI welcomed TCI into its "family of schools" and participated in the submission of false statements to TCI's accreditation agency sufficiently plead the unity of control and/or mere instrumentality status to state a claim for veil-piercing. The Court finds that they do not.

**\*15** With regard to the alleged website statements that TCI joined the HTI family of schools, these statements do not permit the inference that TCI ceased operating as a distinct corporate entity. The alleged statements do not suggest that TCI was grossly undercapitalized, failed to observe corporate formalities, had non-functioning directors, or that it commingled funds with either of its parent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

corporations. Meanwhile, Relators' contention that HTI participated in the submission of false documents fails to state a plausible veil-piercing claim against HTI because the documents provided with the SAC do not support this contention.

As noted above, Relators included Exhibits A (2003 Placement Charts) and B (2004 Letter of Assurance and Interim Report) with the SAC to demonstrate Defendants' submission of false statements to their accreditation agencies. The SAC avers that HTI either provided false statements and/or participated in the submission of these documents to the accreditation agency, but these documents do not bear any indicia of HTI approval or participation, and Relators do not explain which, if any, of the statements contained therein were attributable to HTI. Moreover, because these allegations purport to speak for HTI's role in the fraudulent activity, they must comport with the heightened pleading requirements of *Rule 9(b). See, e.g., Foodtown,* 296 F.3d at 172 n. 10. As the Court explained with regard to Relators' claims against TCI, *see supra* Part III.A, Relators do not identify a single knowingly false statement among the voluminous statistics contained in these exhibits. Thus, presuming that HTI submitted some of these documents to accreditation agencies and/or that HTI made some of the statements contained therein, Relators have not plead with particularity that HTI participated in the commission of fraud.

*2. Successor Liability*

Relators rely on the same veil-piercing allegations above (including the boilerplate allegations made against The Chubb Corporation and HTI) to present a claim for successor liability against HTI. ( *See* SAC ¶¶ 114-19.) However, the same allegations fair no better under New Jersey's law for successor liability.

The general rule in New Jersey is that "where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor." *Ramirez v. Amsted Indus., Inc.,* 86 N.J. 332, 340, 431 A.2d

811 (1981) (citations omitted). Nevertheless, New Jersey law recognizes the following exceptions warranting the imposition of successor liability: "where (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities." *Id.* at 340-41, 431 A.2d 811 (collecting cases); *see also Colman v. Fisher-Price, Inc.,* 954 F.Supp. 835, 838 (D.N.J.1996). Relators contend that their allegations state a plausible claim under the merger and mere continuation theories.

**\*16** The following considerations guide a court's determination of whether the sale of a corporation constitutes a *de facto* merger or mere continuation: "(a) continuity of management, personnel, physical location, assets, and general business operations; (b) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (c) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (d) continuity of ownership/shareholders." *Portfolio Fin. Servicing Co. ex rel. Jacom Computer Servs., Inc.,* 334 F.Supp.2d 620, 625-26 (D.N.J.2004); *see also Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.,* 13 F.3d 69, 73 (3d Cir.1993). All of the factors need not be present to demonstrate a *de facto* merger or mere continuation, and "[t]he crucial inquiry is whether there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.' " *Luxliner,* 13 F.3d at 73 (quoting *McKee v. Harris-Seybold Co.,* 109 N.J.Super. 555, 567, 264 A.2d 98 (App.Div.1970)).

Here, Relators contend that HTI absorbed TCI by incorporating TCI's campuses into the "HTI family of schools." (Relators' J. Opp'n Br. at 27.) Relators further argue that HTI's assumption of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

TCI's liabilities "is clear on its face-the obligations for accreditation and revenue requirements, obligations to vendors, teachers and administrators have all undeniably passed to the new entity going forward." (*id.*) [FN19] Unfortunately, these conclusory assertions are not supported by the pleadings.

> FN19. The Court understands Relators to argue that the purchase of stock necessarily entails an assumption of the corporation's debts and obligations. This argument flies in the face of the corporate veil doctrine, which presumes, with limited exceptions, "that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *Ventron,* 94 N.J. at 500, 468 A.2d 150.

The SAC avers that HTI is the successor corporation to TCI (SAC ¶ 119), but Relators concede that HTI purchased TCI from Chubb Computer Services, Inc. (Relators' J. Opp'n Br. at 27). [FN20] Relators also appear to concede that HTI did not purchase TCI's assets. (Relators' J. Opp'n Br. at 27 (explaining that the 2004 sale of TCI "was a stock purchase, not an asset purchase").) With regard to the purportedly merged entity, the SAC does not allege that TCI has ever ceased operations as a distinct corporate entity, and Relators concede that TCI continued to operate as the "same campus locations" under the same "Chubb brand" after the stock sale, "albeit within the HTI 'family' of schools." (Relators' J. Opp'n Br. at 26, 27.) Furthermore, the SAC neither alleges that HTI's purchase of TCI maintained continuity in shareholders (i.e., that HTI exchanged shares for TCI's assets), nor that HTI expressly or implicitly agreed to assume TCI's debts and obligations. In the absence of such allegations, Relators cannot plausibly claim that HTI and Chubb Computer Services, Inc. intended to merge TCI into HTI when the latter sold its shares of TCI stock.

> FN20. As previously noted, the SAC does

not identify Chubb Computer Services, Inc., and Relators do not suggest that this entity merged with HTI.

## III. LEAVE TO AMEND

The Court notes that Relators have already amended the original Complaint twice. It also appears that, courtesy of a Government subpoena served in 2007, they have had access to a considerable amount of records providing TCI's employment placement statistics for the years 2003-2005, which included student and employer contact information, as well as all TCI submissions to accreditation agencies. (*See* SAC Exs. A-E; TCI & HTI Reply Br. at 1.) Despite having had access to this information for more than two years, Relators still have not pled plausible causes of action for a False Claims Act violation, piercing the corporate veil, or successor liability. Further, Relators do not seek leave to amend the SAC to cure their pleading deficiencies.

**\*17** Federal Rule of Civil Procedure 15(a) provides that "leave [to amend] shall be freely given when justice so requires," and the Third Circuit has recommended granting leave to amend unless amendment would be futile, prejudicial to a party, or dilatory, *see In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). It may well be that further amendment would be futile; however, the Court will give Relators an opportunity to explain otherwise. For the time being, the Court will dismiss the claims presented in the Second Amended Complaint without prejudice, and the Court will give Relators 30 days from the receipt of the accompanying Order to show cause as to why they should be granted leave to amend the Complaint for a third time. Pursuant to the Government's continuing authority under 31 U.S.C. § 3730, the Court will require Relators to provide the Government a copy of any such reasons within the time allotted to show cause.

## IV. CONCLUSION

For the aforementioned reasons, the Court will grant The Chubb Corporation's motion (Doc. No.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1076228 (D.N.J.)
**(Cite as: 2010 WL 1076228 (D.N.J.))**

38) to dismiss, as well as the motion (Doc. No. 39) to dismiss filed by TCI and HTI. Relators' Second Amended Complaint will be dismissed in its entirety without prejudice. An appropriate form of order accompanies this Memorandum Opinion. Relators will have thirty (30) days from the filing of the accompanying Order to show cause for why they should be granted leave to amend the Second Amended Complaint.

D.N.J.,2010.
U.S. v. Chubb Institute
Slip Copy, 2010 WL 1076228 (D.N.J.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))**

**H**

Only the Westlaw citation is currently avail-
able.This case was not selected for publication in
the Federal Reporter.

Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Third Circuit LAR,
App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)

United States Court of Appeals,
Third Circuit.
UNITED STATES of America, ex rel. Mary Beth
PILECKI–SIMKO and Tom Giunta, Appellants
v.
The CHUBB INSTITUTE; The Chubb Corporation;
Chubb America Service Corporation and
High–Tech Institute, Inc.

No. 10–3907.
Argued June 21, 2011.
Filed Sept. 6, 2011.

**Background:** Former employees of private educa-
tional institution brought qui tam action against in-
stitution and its parent companies, alleging that in-
stitution knowingly caused false claims to be filed,
in violation of False Claims Act (FCA), by making
misrepresentations to the Department of Education
(DOE), its accrediting agencies, and students that
wrongfully enabled institution to secure student fin-
ancial aid pursuant to Title IV of the Higher Educa-
tion Act (HEA). Defendants moved to dismiss for
failure to state a claim. The United States District
Court for the District of New Jersey, Garrett E.
Brown, Jr., J., 2010 WL 1994794,granted motion,
and, 2010 WL 3463307, denied employees' sub-
sequent motion for reconsideration. Employees ap-
pealed.

**Holdings:** The Court of Appeals, Greenaway, Jr.,
Circuit Judge, held that:
(1) conclusory allegations were insufficient to state

a claim under FCA; and
(2) parent company was entitled to attorney fees
and costs.

Affirmed.

West Headnotes

**[1] United States 393 ⬚122**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions There-
for. Most Cited Cases
    Conclusory allegations that private educational
institution, as recipient of student financial aid un-
der Title IV of the Higher Education Act (HEA),
knew that its claim of compliance with HEA's in-
centive compensation ban was false, based on insti-
tute's violations of the incentive compensation ban,
did not state a plausible claim to relief that institute
knew that its claims were false or fraudulent, as re-
quired to state a claim under False Claims Act
(FCA). 31 U.S.C.A. § 3729.

**[2] United States 393 ⬚122**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions There-
for. Most Cited Cases
    Parent company of private educational institu-
tion alleged to have violated False Claims Act
(FCA) was entitled to requested attorney fees and
costs as a matter of justice, where appeal of dis-
missal of FCA claim was frivolous. F.R.A.P.Rule
38, 28 U.S.C.A.

Appeal from the United States District Court for the
District of New Jersey (D.C. Civ. Action No.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))**

2–06–CV–03562), District Judge: Honorable Garrett E. Brown, Jr.Timothy J. Matusheski, Esq., (Argued), Gary S. Graifman, Esq., Kantrowitz, Goldhamer & Graifman, P.C., Chestnut Ridge, NY, Michael S. Green, Esq., Green & Associates, LLC, East Brunswick, NJ, for Appellants.

Thomas Hylden, Esq., (Argued), Larry S. Gondelman, Esq., Powers, Pyles, Sutter & Verville, P.C., Washington, DC, Eric A. Savage, Esq., Littler Mendelson, Esq., Floor Newark, NJ, for Appellees The Chubb Institute and High–Tech Institute.

Michael R. McDonald, Esq., (Argued), Christine A. Amalfe, Esq., Megan Frese Porio, Esq., Gibbons P.C., Newark, NJ, for Appellee The Chubb Corporation.

Before: CHAGARES, JORDAN, and GREEN-AWAY, JR., Circuit Judges.

OPINION

GREENAWAY, JR., Circuit Judge.

**\*1** Plaintiffs Mary Beth Pilecki–Simko and Tom Guinta ("Appellants") filed a *qui tam* action against The Chubb Institute ("TCI"), The Chubb Corporation ("TCC") [FN1] and Chubb America Service Corp., [FN1] and High–Tech Institute, Inc. ("HTI"), [FN2] pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. [FN3] Appellants alleged that TCI knowingly caused false claims to be presented to the Government and made or used false statements to get false claims paid by the Government. These claims are rooted in Appellants' allegation that TCI made misrepresentations to the Department of Education ("DOE") that wrongfully enabled it to secure student financial aid in the form of loans and grants from the federal government. They also sought liability for this conduct against TCI's relevant corporate parents, HTI and TCC, on the basis of their alleged control of TCI's actions.

Appellants appeal the District Court's denial of their Motion for Reconsideration of the Court's denial of leave to amend their complaint and the or-

der dismissing, with prejudice, their second amended complaint ("SAC"). For the reasons discussed below, we will affirm the orders of the District Court. Additionally, we will grant Appellee TCC's Motion for Damages and Costs, pursuant to Federal Rule of Appellate Procedure 38.

**I. BACKGROUND**

We write primarily for the parties and recount only the essential facts.

This matter is a qui tam action brought by Appellants against their former employer, TCI. The FCA prohibits, in relevant part: [FN4]

(1) knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval;

(2) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

31 U.S.C. § 3729(a)(1) –(2). (West 2003 & Supp.2008). In their claim, Appellants allege that Appellees, with knowledge of their falsity, presented or caused to be presented to the United States Government claims, and caused payments for the claims to be made by the Government, pursuant to § 3729(a)(1); and knowingly made, used or caused to be made or used false records or statements to get a false or fraudulent claim paid by the Government, pursuant to § 3729(a)(2). [FN5] Appellants allege that TCI knowingly caused false claims to be filed by making misrepresentations to the DOE, its accrediting agencies, and students that wrongfully enabled TCI to secure student financial aid pursuant to Title IV of the Higher Education Act ("HEA").

"When an educational institution wishes to receive federal subsidies under Title IV and the [HEA], it must enter into a Program Participation Agreement with the [DOE], in which it agrees to abide by a panoply of statutory, regulatory, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))**

contractual requirements." *U.S. ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1168 (9th Cir.2006). Appellants claim that TCI knowingly violated Title IV requirements by falsely certifying compliance with the Program Participation Agreement (PPA) [FN6] and knowingly continuing to submit students' applications for financial aid, which included certifications that the students were eligible for Title IV financial aid, although TCI was allegedly in violation of the incentive compensation ban contained within the PPA. [FN7]

**\*2** Appellees moved to dismiss Appellants' SAC for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6) and failure to satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b). The District Court granted the motions. The District Court analyzed Appellants' claims under the implied false certification theory, which is premised "on the notion that the act of submitting a claim for reimbursement itself implies compliance with federal rules that are a precondition to payment." *U.S. ex rel. Willis v. United Health Grp., Inc.,* No. 10–2747, 659 F.3d 295, 305 (3d Cir.2011) (citation and internal quotation marks omitted). [FN8] The District Court found that Appellants' allegations of Appellees' misconduct failed to plead a FCA claim with particularity under Rule 9(b), which governs pleading for special matters, including fraud. Alternatively, the District Court also found that TCI's salary compensation policy fell within the FCA's safe harbor; thus, saving TCI from liability.

Additionally, the Court found insufficient support in Appellants' pleading for their corporate liability and veil-piercing claims against TCC and HTI. The District Court dismissed the SAC, without prejudice, and permitted Appellants to explain why they should be given a third opportunity to amend, ordering Appellants to show cause why the SAC should not be dismissed with prejudice.

Appellants responded to the Order to Show Cause with two allegations—that TCI (1) falsely certified compliance with the incentive compensa-

tion ban imposed by Title IV's incentive compensation ban and (2) misrepresented employment placement statistics. The District Court found that Appellants' submissions did not cure their previous pleading deficiencies and determined that further amendment would be futile. The Court dismissed the SAC with prejudice. [FN9]

Appellants then moved for reconsideration of the District Court's dismissal with prejudice to the extent that it dismissed Appellants' claim that TCI falsely certified compliance with Title IV's incentive compensation ban. For the first time, Appellants argued that (1) the safeharbor is an affirmative defense not appropriately raised in a motion to dismiss; (2) the safeharbor regulation had only been in effect since 2003 and therefore did not apply to allegations about TCI's conduct prior to that time; and (3) the safe harbor did not cover appropriations such as gifts and offers of trips to its top admissions officers.

The District Court denied Appellants' Motion for Reconsideration, finding that it was procedurally improper and Appellants had not demonstrated a clear error of law resulting in manifest injustice. Appellants timely appealed and now challenge the District Court's dismissal of their claims and its denial of the request for leave to amend. [FN10] Also before us is TCC's Motion for Costs and Fees, filed pursuant to Federal Rule of Appellate Procedure 38 . [FN11]

## II. *ANALYSIS*

A. *Motion to Dismiss*

**\*3** Appellants initially claim that the District Court erred because it applied the heightened pleadings standard of Rule 9(b), reserved for claims of fraud, to their complaint, which they assert does not make allegations of fraud or mistake. Even if their complaint did not make such allegations, which is itself an implausible argument, Appellants failed to raise this argument before the District Court and offer no explanation for that failure. Therefore, it is waived and we will not address it. *See In re DVI, Inc. Sec. Litig.,* 639 F.3d 623, 643 n. 30 (3d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))

Cir.2011) (citing *Srein v. Frankfort Trust Co.,* 323 F.3d 214, 224 n. 8 (3d Cir.2003) ("we will not consider issues that are raised for the first time on appeal absent compelling reasons") (internal quotation marks omitted).[FN12]

Appellants next argue that even if Rule 9(b) applies to their FCA claim, the District Court misapplied the rule because it required Appellants to plead knowledge at a level reserved for private securities fraud cases, requiring Appellants to allege more facts about Appellees' scienter than it should have.[FN13]

We exercise plenary review of the District Court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. *See Santiago v. Warminster Twp.,* 629 F.3d 121, 128 (3d Cir.2010).[FN14]

We have held that a prima facie claim under the FCA requires a plaintiff to show that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *Willis,* 659 F.3d at 305 (quoting *U.S. ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 242 (3d Cir.2004)).

The FCA states that the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

31 U.S.C. § 3729(b)(1).

Our Court has not yet analyzed the knowledge pleading requirement under Rule 9(b) for an FCA claim of this nature; however, we need not resolve the question of whether Appellants sufficiently pled an FCA claim under Rule 9(b) because Appellants fail to state a plausible claim for relief under the more lenient standards of Rule 8. *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (quotation and citation omitted)). "Rule 9 does not give [a plaintiff] license to evade the less rigid-though still operative-strictures of Rule 8 ... [a]nd Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." *Id.* at 1954; *see also Cafasso ex rel. v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047, 1055 (9th Cir.2011) (explicitly recognizing that *Iqbal*'s plausibility requirement applies to FCA claims subject to Rule 9(b) because they must comply with Rule 8(a), which requires the pleading of a plausible claim under *Iqbal* ).

**\*4** When reviewing a motion to dismiss, we construe the complaint "in the light most favorable to the plaintiff." *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 314 (3d Cir.2010) (internal quotation marks omitted) (quoting *Gelman v. State Farm Mut. Auto. Ins. Co.,* 583 F.3d 187, 190 (3d Cir.2009)). A motion to dismiss, pursuant to the plausibility standard, should be granted if the plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).[FN15] A complaint satisfies the plausibility standard when the factual pleadings "allow [ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))

This standard requires that plaintiff allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955.) "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (citation omitted) (alteration in *Twombly* ).

To determine the sufficiency of a complaint under *Twombly* and *Iqbal,* we must "tak[e] note of the elements a plaintiff must plead to state a claim," identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth," and finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago,* 629 F.3d at 130 (citing *Iqbal,* 129 S.Ct. at 1947, 1950) (internal quotation marks omitted); *see also Great Western Mining & Min. Co. v. Fox Rothschild LLP,* 615 F.3d 159, 177 (3d Cir.2010).[FN16]

In this case, Appellants claim that they sufficiently pled knowledge for FCA liability because they alleged that TCI (1) violated the incentive compensation ban; and (2) signed the PPA stating compliance with the ban.[FN17] Appellants claimed at oral argument that paragraphs 73–79 of their SAC contained their allegations of facts supporting Appellees' knowledge. These paragraphs include a description of "Chubb's" alleged violation of the incentive compensation ban through its "Admission Compensation Plan" and ranking of counselors based on their enrollment numbers (¶ 73); that Admission Representatives are graded with "scorecards" earning points for their percentage of enrollments (¶ 74); that the top ranking counselors are among the highest paid, receiving the highest salary as well as trips, awards, and gifts based on their enrollment numbers (¶ 75); a description of the PPA conditions (¶ 76); and a description of the student applications submitted by Chubb containing

certification of eligibility under Title IV. (¶ 78.)

**\*5** [1] However, the facts alleged therein, or anywhere else in the SAC, do not state a plausible claim to relief that TCI knew that its claims were false or fraudulent, an element of Appellants' FCA claims.[FN18] Instead, they contain conclusory allegations that "Chubb knows that this claim ... is false because Chubb knows its students are not eligible under the Title IV program due to Chubb's violations of the HEA incentive compensation ban" and is "ineligible for those funds because of its intentional violations of the HEA funding statute." It adds that "Chubb also knowingly uses the false records or statements provided to the [DOE]" in their PPA that certifies compliance. (App. at 108, ¶¶ 78–79.)

These are not sufficient facts to state a plausible claim to relief as they do not allow us to "draw the reasonable inference" that TCI was liable for the misconduct alleged, which required knowledge that the claims were false. *See Iqbal,* 129 S.Ct. at 1949. Further, Appellants' submissions in their response to the Court's Order to Show Cause, which failed to include a proposed third amended complaint (an omission that we have held "is fatal to a request for leave to amend," *Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 252 (3d Cir.2007)), did not remedy this obvious pleading deficiency. The submissions relevant to Appellants' arguments on appeal include declarations from Appellants explaining the nature of TCI's incentive compensation plan, rather than asserting facts which allow an inference that their knowledge pleading is plausible.

Appellants' SAC does not state facts supporting a reasonable inference that TCI knew, acted in reckless disregard, or deliberately ignored that its submissions were false due to their alleged violation of the incentive compensation ban, and therefore did not survive Appellees' motion to dismiss under Rule 12(b)(6). *Cf. U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.,* 614 F.3d 1163, 1169 (10th Cir.2010) (finding that relators' complaint con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))**

tained sufficient factual allegations to support their implied false certification claims where they documented, among other things, the alleged violations and how defendant government contractor was aware of the violations, "listing specific instances in which Plaintiffs documented and/or informed their superiors of the violations.")

Here, Appellants do not allege similar facts, such as how Appellees documented, or were aware or informed of the violations, that would support a plausible claim that they knowingly submitted false claims. Because we resolve the dismissal on this ground, we need not make a determination with respect to the District Court's allegedly heightened knowledge standard.[FN19]

B. *Denial of Leave to Amend and Motion to Reconsider*

"We review a denial of a motion for reconsideration for abuse of discretion, but we review the District Court's underlying legal determinations de novo and factual determinations for clear error." *Howard Hess Dental Labs. Inc. v. Dentsply Intern., Inc.,* 602 F.3d 237, 245 (3d Cir.2010) (citing *Max's Seafood Cafe v. Quinteros,* 176 F.3d 669, 673 (3d Cir.1999)) (internal quotation marks omitted).[FN20]

**\*6** The purpose of such a motion is to correct a clear error of law or to prevent a manifest injustice in the District Court's original ruling. *Id.* at 677. Such motions "are granted for compelling reasons, such as a change in the law which reveals that an earlier ruling was erroneous, not for addressing arguments that a party should have raised earlier." *United States v. Dupree,* 617 F.3d 724, 732 (3d Cir.2010) (citation and internal quotation marks omitted).

Appellants moved the District Court to reconsider its denial of leave to amend their SAC. However, the only specific arguments Appellants raise in their appeal, which does not discuss the standard of review for denial of leave to amend or denial of reconsideration, are unavailing, either because they were waived or otherwise have no im-

pact on our alternate ground for dismissal.[FN21]

Appellants have not shown that the District Court abused its discretion in denying their Motion to Reconsider. The District Court, in its discretion, rejected Appellants' arguments about the safeharbor provision because they were untimely and Appellants offered no explanation for this delay.

C. *TCC's* Rule 38 *Motion for Attorney's Fees and Costs*

In its dismissal of Appellants' SAC, the District Court determined that Appellants failed to sufficiently plead veil-piercing or successor liability, as alleged against TCC and HTI. In their appeal, Appellants do not raise the issue of the District Court's dismissal of their claims for imposition of liability on TCC and HTI, nor did they raise this issue before the District Court in either their attempt to amend their SAC or their Motion for Reconsideration. However, both of these parties were included in this appeal. Based on its belief that its inclusion in the appeal was frivolous, TCC moved for attorney's fees and costs. Appellants responded to this motion on April 11, 2011.

"This court employs an objective standard to determine whether or not an appeal is frivolous" which "focuses on the merits of the appeal regardless of good or bad faith." *Kerchner v. Obama,* 612 F.3d 204, 209 (3d Cir.2010) (citation and internal quotation marks omitted). In this case, the appeal—specifically against TCC—is frivolous. Even if we reversed the District Court's decision on any of the arguments that Appellants have made on appeal regarding the application of Rule 9(b), the sufficiency of Appellants' pleading under Rule 9(b), or the application of the safeharbor provision of Title IV, there is no possibility of reversal on the corporate liability claims. Appellants make no argument on appeal as to why their corporate liability claims were improperly dismissed. Further, no argument is advanced about the District Court's dismissal of these claims in their subsequent motions and pleadings before the District Court, including in their Motion for Reconsideration. Additionally, Appel-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))**

lants' proposed Third Amended Complaint, attached to their Motion for Reconsideration, did not name TCC as a defendant. (App. at 547–67.)

**\*7** [2] Thus, the appeal against TCC is frivolous and, as TCC argues, "th [e] appeal never had any possibility of resulting in a reversal of the dismissal of The Chubb Corporation," (Appellee TCC's Br. at 2). *See, e.g., Nagle v. Alspach,* 8 F.3d 141, 145 (3d Cir.1993) (finding appeal frivolous where appeal "never had any possibility of resulting in a reversal" because appellants challenged only two of the four conclusions asserted by the district court to support its summary judgment for defendants and so, even if the court held for appellants on both asserted allegations of error, two unchallenged bases would remain and the district court's judgment would still be affirmed).

Appellants' response to the motion is unavailing. Without addressing the District Court's corporate liability findings, Appellants assert, without any support, that the standard for a motion for reconsideration "does not necessitate that every claim previously claimed be appealed in order to obtain a favorable outcome." (Appellant's Resp. Br. at 7.) In this case, their only claims against TCC were not raised on appeal, and are therefore waived. *See Graden v. Conexant Sys., Inc.,* 496 F.3d 291, 296 n. 7 (3d Cir.2007) ("Absent compelling circumstances not present here, failing to raise an argument in one's opening brief waives it.") They have not presented any explanation, let alone a compelling explanation, for why their claim against TCC is not waived.

Appellants' assertion at oral argument that their reference to "Chubb" includes "all the Chubbs," and they therefore raised these issues in the appeal, is not persuasive, as they do not actually make any argument about their successor liability or corporate veil piercing claims that the District Court dismissed in its very first dismissal without prejudice. FN22

Appellants also argue that TCC's motion is pre-

mature since frivolousness of the appeal had not been decided. Rule 38 provides that " '[i]f a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee.' " *Kerchner,* 612 F.3d at 209 (quoting FED.R.CIV.P. 38). We have determined that the appeal against TCC was frivolous, TCC filed a separate motion, and Appellants were given the opportunity to—and did—respond to TCC's Motion, as is required. Appellants present no authority supporting their argument that TCC's Motion was too early.

"The purpose of an award of attorneys' fees under Rule 38 is to compensate appellees who are forced to defend judgments awarded them in the trial court from appeals that are wholly without merit, and to preserve the appellate court calendar for cases worthy of consideration." *Huck v. Dawson,* 106 F.3d 45, 52 (3d Cir.1997) (citation and internal quotation marks omitted). "Damages [under Rule 38] are awarded by the court in its discretion ... as a matter of justice to the appellee." *Beam v. Bauer,* 383 F.3d 106, 108 (3d Cir.2004) (citation and internal quotation marks omitted). An "important purpose [of a damages award] is to discourage litigants from unnecessarily wasting their opponents' time and resources." *Nagle,* 8 F.3d at 145. Because the appeal against TCC is frivolous and Appellants have not shown cause why just damages and costs should not be imposed, pursuant to Fed. R.App. P. 38, we will award to TCC, as a matter of justice, its requested damages and costs.

## III. *CONCLUSION*

**\*8** For the foregoing reasons, we will affirm the District Court's order denying reconsideration of its denial of leave to amend Appellants' SAC, as well as its dismissal of Appellants' SAC. Additionally, we will grant Appellee TCC's Rule 38 Motion for Damages and Costs. TCC is directed to provide an itemized list of damages, including attorneys' fees associated with responding to this appeal, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))**

a bill of costs, pursuant to Federal Rules of Appellate Procedure 38 and 39, within 14 days after the entry of the accompanying judgment in this case.

FN1. Chubb America Service Corporation was listed as a defendant in the case below. It does not appear that the entity was ever served below or that counsel entered an appearance for that entity. No appearance was entered on behalf of that entity on this appeal.

FN2. "The FCA allows a private citizen, called a relator, to bring an action in the name of the United States, and the government may intervene if it so chooses.... The FCA permits the relator to bring the action in the absence of the government's intervention." *U.S. ex rel. Quinn v. Omnicare Inc.,* 382 F.3d 432, 436 n. 7 (3d Cir.2004). As in *Quinn,* the government declined to intervene in this case.

FN3. The FCA reaches "all fraudulent attempts to cause the Government to pay out sums of money." *Quinn,* 382 F.3d at 438 (internal quotation marks omitted) (quoting *Harrison v. Westinghouse Savannah River,* 176 F.3d 776, 788 (4th Cir.1999)).

FN4. The Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub.L. No. 111–21, § 4, 123 Stat. 1616 (2009) modified the FCA; it now imposes liability on

[A]ny person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]

31 U.S.C. § 3729(a)(1). Neither party

suggests that the revisions apply to this case, nor would it appear to materially affect our analysis. For those reasons, we have cited the pre-amendment subsections, § 3729(a)(1)–(2).

FN5. Appellants also alleged a) that Appellees were liable for conspiring to defraud the government under § 3729(a)(3); b) that TCC, Chubb America Services Corporation, and HTI were liable under a corporate veil-piercing theory; and c) that HTI was liable under a successor liability theory. Because Appellants do not raise these issues on appeal, the issues are waived.

FN6. Specifically, in their SAC, Appellants claims that one of the "terms and conditions" of the PPA that Chubb submits to the DOE in order to be eligible to receive Title IV funds is the incentive compensation ban. In the PPA, the educational institution certifies that "it will not provide ... any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments ..." (App. at 107, SAC ¶ 76.)

FN7. Appellants alleged other violations on TCI's part including permitting ineligible students to apply for Title IV financial aid, false certification of satisfactory progress of students, and misrepresentations regarding employment placement. These violations were not raised on appeal; we need not address them now.

FN8. Since the District Court's ruling, our Court has recognized the application of the implied false certification theory of an FCA claim in the Medicare context. *See Willis,* 659 F.3d at 305–06. In that case, we also clarified that under the express false certification theory, "an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))**

prerequisites to Government payment in connection with the claim for payment of federal funds," and under an implied false certification theory, liability attaches "when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." *Id.*

FN9. The District Court's May 17 Order conditioned dismissal of the SAC upon the Government's consent, pursuant to 31 U.S.C. § 3730. The Government filed a supplemental statement of interest on June 14, 2010 stating that its consent is not required for that type of involuntary dismissal. This is not an issue on appeal.

FN10. Appellants' Notice of Appeal states that they appeal the District Court's Order denying their Motion for Reconsideration. Federal Rule of Appellate Procedure 3(c) provides that a notice of appeal must "designate the judgment, order or part thereof being appealed." FED. R.APP. P. 3(c)(1)(B). We liberally construe Rule 3(c)'s requirements. *See Pacitti v. Macy's,* 193 F.3d 766, 776 (3d Cir.1999); *Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 858 (3d Cir.1990). We have reviewed orders not specified in the notice of appeal where: "(1) there is a connection between the specified and unspecified order, (2) the intention to appeal the unspecified order is apparent, and (3) the opposing party is not prejudiced and has a full opportunity to brief the issues." *Pacitti,* 193 F.3d at 777 (citing *Polonski v. Trump Taj Mahal Assocs.,* 137 F.3d 139, 144 (3d Cir.1998)). Therefore, we will consider the District Court's dismissal with prejudice of Appellants' SAC.

FN11. The District Court had subject matter jurisdiction, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331. We have

jurisdiction, pursuant to 28 U.S.C. § 1291.

FN12. We also noted in *Willis* that we have previously held that plaintiffs must plead FCA claims with particularity in accordance with Rule 9(b). 659 F.3d at 301 n. 9 (citing *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs.,* 149 F.3d 227, 234 (3d Cir.1998)).

FN13. In their Motion for Reconsideration, and on appeal, Appellants only raise the claim of TCI's alleged violation of the incentive compensation plan. Thus, arguments relating to other grounds for liability in their SAC are waived.

FN14. This is the same standard of review pertaining to a dismissal under Rule 9(b) for failure to satisfy the pleading with particularity requirement. *Frederico v. Home Depot,* 507 F.3d 188 (3d Cir.2007).

FN15. In their January 27, 2011 appellate brief, Appellants cite to the rule articulated prior to *Iqbal* and *Twombly:* that "the [c]ourt should not dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claims which would entitle him to relief." (Appellant's Br. at 16 (quoting *Schmidt,* 386 F.3d at 240).) The Supreme Court rejected this standard. *See Twombly,* 550 U.S. at 561–63, 127 S.Ct. 1955.

FN16. *Iqbal* describes the process as a "two-pronged approach" but the Supreme Court took note of the elements a plaintiff must plead to state a claim before proceeding to its two-step approach. In *Santiago,* this Circuit deemed the process a three-step approach. 629 F.3d at 130.

FN17. Appellants contend that under Rule 9(b), they were permitted to plead know-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))**

ledge "generally." Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.... Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED.R.CIV.P. 9(b). " '[G]enerally'," as stated in Rule 9(b), "is a relative term." Iqbal, 129 S.Ct. 1937, 1954 (2009). In that context, "[generally] is to be compared to the particularity requirement applicable to fraud or mistake." Subsequently, " Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid-though still operative-strictures of Rule 8." Id.

FN18. The Ninth Circuit's decision in Hendow, which reviewed an allegation of a false certification claim under the FCA through violation of the Title IV incentive compensation ban, also suggests that Appellants' knowledge pleading is deficient. There, although that court reversed the district court's 12(b)(6) dismissal of the relators' complaint and articulated the essential elements of a FCA claim under a false certification theory slightly differently than we have—(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due—it found that relators properly alleged scienter.

The relators there "allege[d] that University staff openly bragged about perpetrating a fraud, that the University had an established infrastructure to deceive the government, and that the University repeatedly changed its policies to hide its fraud." Hendow, 461 F.3d at 1175. They further "allege[d] that the Uni-

versity provided statements to the government that were intentional, palpable lie[s], made with knowledge of the falsity and with intent to deceive." Id. (internal citations and quotation marks omitted). In allaying relators' concerns about broadening liability for regulatory violations, the court noted that "innocent or unintentional violations do not lead to False Claims Act liability." Id.

FN19. Appellants also claim that the District Court erred in ruling that only the implied certification theory applied to Appellants' claims against "Chubb" under the FCA, and that, in fact, under § 3729(a)(2), "Chubb caused [false statements] to be made by the Chubb institutions to the government and accrediting agencies that Chubb did not employ a compensation scheme wherein it compensated employees based directly or indirectly upon those employees' success in securing enrollments at a Chubb institution." (Appellant's Br. at 21.)

Presumably, Appellants reference to "Chubb" causing claims to be filed is to TCC or HTI. They claim that the District Court committed "reversible error" by ruling that only the implied certification theory applied to Appellants' claims against Chubb under the FCA, or just under § 3729(a) subsection one of the FCA, instead of recognizing that § 3729(a) subsection two also applied under the express certification theory. (Id.) Although they cite no Third Circuit or other authority for this argument, we need not consider this argument as (1) it appears to have been raised for the first time on appeal; and (2) Appellants still would not state a claim under either § 3729(a)(1) or (2), as both require knowledge on the part of the party accused of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2011 WL 3890975 (C.A.3 (N.J.)))**

fraud.

FN20. We also review a denial of leave to amend for abuse of discretion. *See Travelers Indem. Co. v. Dammann & Co.,* 594 F.3d 238, 243 n. 3 (3d Cir.2010).

FN21. Appellants' motion focused on the District Court's alternate ground for dismissal—that Appellees' incentive compensation plan was saved by the safe harbor within Title IV, and therefore, they could not have the requisite intent to violate the ban. Specifically, Appellants argued that: (1) the safeharbor is an affirmative defense not appropriately raised in a motion to dismiss; (2) the safeharbor regulation has only been in effect since 2003 and therefore did not encompass TCI's conduct before that date; and (3) appropriations such as gifts and "President's Club" trips to its top admissions representatives were not subject to the safeharbor.

The District Court rejected Appellants' arguments, finding first that the motion was procedurally improper for seeking to reargue matters previously argued before the Court and raising new arguments not presented in response to either the original motion to dismiss or Order to Show Cause. "These defects, alone, warrant denial of Relators' motion." (App. at 53.) Furthermore, none of Appellants' arguments about the safe harbor, repeated on appeal, cure their pleading deficiency to survive a Rule 12(b)(6) motion to dismiss. Lastly, they do not offer any explanation for their delay in raising their arguments about the safe harbor.

FN22. Also telling is the District Court's statement in its opinion denying reconsideration that the Court "dismissed Relators' veil-piercing and successor liability claims without prejudice on March 22, 2010, and

Relators did not seek leave to amend th[ose] claims in response to the Court's accompanying Order to Show Cause. Accordingly, the Court dismissed th[ose] claims with prejudice on May 17, 2010." *U.S. ex rel. Pilecki–Simko v. Chubb Inst.,* No. 06–3562, 2010 WL 3463307, *1 n. 1 (D.N.J. Aug. 27, 2010)* Appellants offer no meaningful response to this statement or the Court's conclusions therein.

C.A.3 (N.J.),2011.
U.S., ex rel. Pilecki-Simko v. Chubb Institute
Slip Copy, 2011 WL 3890975 (C.A.3 (N.J.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 3463307 (D.N.J.)
**(Cite as: 2010 WL 3463307 (D.N.J.))**

Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
UNITED STATES of America, ex rel. Mary Beth
PILECKI–SIMKO and Tom Giunta, Relators,
v.
The CHUBB INSTITUTE, Defendant.

Civil Action No. 06–3562.
Aug. 27, 2010.

John Gustave Silbermann, Jr., Office of The U.S.
Attorney, Newark, NJ, Gary S. Graifman, Kantrow-
itz, Goldhamer & Graifman, Esqs., Montvale, NJ,
Michael Scott Green, Milltown, NJ, for Relators.

Eric A. Savage, Littler Mendelson, PC, Newark,
NJ, for Defendant.

### *MEMORANDUM OPINION*
BROWN, Chief Judge.

**\*1** This matter comes before the Court upon
Relators' motion (Doc. No. 60) for reconsideration
of the Court's May 17, 2010 Opinion and Order
(Doc. Nos. 58, 59 ("May 17 Opinion")) dismissing
Relators' Second Amended Complaint (SAC) with
prejudice. For the following reasons, the Court will
deny Relators' motion.

### *Background*
This matter is a *qui tam* action brought pursu-
ant to the False Claims Act, 31 U.S.C. § 3729 *et
seq.,* by Relators Mary Beth Pilecki–Simko and
Tom Giunta against their former employer, The
Chubb Institute (TCI). Relators allege that TCI
knowingly caused false claims to be filed by mak-
ing misrepresentations to the Department of Educa-
tion, its accrediting agencies, and students that
wrongfully enabled TCI to secure student financial
aid pursuant to Title IV of the Higher Education

Act.[FN1] Among other misrepresentations, Relators
allege that TCI violated Title IV requirements with
which it had agreed to comply in the Program Parti-
cipation Agreement (PPA) that governs an institu-
tion's eligibility for the financial aid program, but
knowingly continued to submit students' applica-
tions for financial aid, which included certifications
that the students were eligible for Title IV financial
aid, without disclosing that TCI was not in compli-
ance with the program's governing regulations. (*See*
SAC ¶¶ 24, 51–86.) This theory of False Claims
Act liability has been referred to as the implied
false certification theory of liability. *See, e .g.,
United States ex rel. Rodriguez v. Our Lady of
Lourdes Med. Ctr., 552 F.3d 297, 303 (3d Cir.2009)* .

> FN1. Relators initially sought to impose li-
> ability for this conduct on TCI's former
> corporate parents, High–Tech Institute,
> The Chubb Corporation, and Chubb Amer-
> ica Service Corporation, on the basis of
> their alleged control of TCI's actions. This
> Court dismissed Relators' veil-piercing and
> successor liability claims without prejudice
> on March 22, 2010, and Relators did not
> seek leave to amend these claims in re-
> sponse to the Court's accompanying Order
> to Show Cause. Accordingly, the Court
> dismissed these claims with prejudice on
> May 17, 2010. May 17 Opinion at 4 & n. 1.

Defendants TCI, the Chubb Corporation, and
High–Tech Institute (HTI) moved to dismiss Relat-
ors' SAC for failure to state a claim pursuant to
Federal Rule of Civil Procedure 12(b)(6) and fail-
ure to satisfy the pleading requirements of Federal
Rule of Civil Procedure 9(b). This Court granted
the motions on March 22, 2010. (Doc. Nos. 52, 53
("March 22 Opinion").) In granting Defendants'
motions, the Court held that Relators' allegations of
Defendants' misconduct failed to plead a False
Claims Act claim with particularity. March 22

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3463307 (D.N.J.)
**(Cite as: 2010 WL 3463307 (D.N.J.))**

Opinion at 17–23. Although Relators had not specifically sought leave to amend to cure any pleading deficiencies, the Federal Rules' liberal standard for granting leave to amend deficient pleadings prompted this Court, out of an abundance of caution, to give Relators an opportunity to explain why they should be permitted a third chance to amend their pleadings. Accordingly, the Court dismissed the SAC without prejudice and ordered Relators to show cause ("Order to Show Cause") why the SAC should not be dismissed with prejudice.

Relators timely responded to the Order to Show Cause with a memorandum seeking leave to amend the SAC only with regard to allegations that TCI (1) falsely certified compliance with the incentive compensation ban imposed by Title IV of the Higher Education Act, 20 U.S.C. § 1094(a)(20),FN2 and (2) misrepresented employment placement statistics. The Court found that Relators' submissions did not cure the pleading deficiencies identified by the Court's March 22 Opinion, determined that further amendment would be futile, and, therefore, dismissed the SAC with prejudice. May 17 Opinion at 4–10.FN3

> FN2. Title IV's incentive compensation ban prohibits participating institutions from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities ...." 20 U.S.C. § 1094(a)(20); *accord* 31 C.F.R. § 668.14(b)(22)(i).

> FN3. The Court's May 17 Order conditioned dismissal of the SAC upon the Government's consent, pursuant to 31 U.S.C. § 3730. The Government filed a supplemental statement of interest on June 14, 2010, that contends that the Government's consent is not required for this type of involuntary dismissal. (Doc. No. 62 at 2–3.)

**\*2** Relators now move for reconsideration of the May 17 Opinion to the extent that it dismissed Relators' claim that TCI falsely certified compliance with Title IV's incentive compensation ban.

### *Analysis*

It is well settled in this Circuit that "[t]he purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985). Courts will only grant reconsideration in the following circumstances: (1) when intervening changes in controlling law occur; (2) when previously unavailable evidence comes to light; or (3) when "necessary to correct a clear error of law or prevent manifest injustice." *Database Am., Inc. v. Bellsouth Adver. & Publ'g Corp.,* 825 F.Supp. 1216, 1220 (D.N.J.1993) (citation omitted); *see also* N. *River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir.1995). Reconsideration is "an extraordinary remedy" that is to be granted "very sparingly." *In re Lord Abbett Mut. Funds Fee Litig.,* 417 F.Supp.2d 624, 627 (D.N.J.2005) (quoting *Yurecko v. Port Auth. Trans–Hudson Corp.,* 279 F.Supp.2d 606, 608 (D.N.J.2003)). "[A] motion for reconsideration is not an appeal," *Feit v. Great–West Life & Annuity Ins. Co.,* 460 F.Supp.2d 632, 643 (D.N.J.2006), and a party may not "ask the court to rethink what it ha[s] already thought through—rightly or wrongly," *Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co.,* 744 F.Supp. 1311, 1314 (D.N.J.1990) (quoting *Above the Belt v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983)).

Relators argue that this Court committed a clear error of law when it dismissed their claim that TCI falsely certified compliance with Title IV's incentive compensation ban. Relators present three basic arguments on reconsideration: (1) that the Court improperly made a legal determination at the motion to dismiss stage that the regulatory safeharbor provision, 31 C.F.R. § 668.14(b)(22)(i), barred Relators' claim; (2) that the safeharbor provision

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3463307 (D.N.J.)
**(Cite as: 2010 WL 3463307 (D.N.J.))**

does not apply to Relators' allegations concerning TCI's conduct prior to the provision's effective date in 2003; and (3) that the safeharbor provision does not bar a claim based upon Relators' allegations that TCI provided "President's Club" trips to its top admissions representatives. [FN4] As the Court explains below, Relators' motion is procedurally improper, and Relators have not demonstrated a clear error of law that would result in manifest injustice. Therefore, the "extraordinary remedy" of reconsideration is not warranted.

> FN4. Relators also present a 2004 Department of Education report finding that other educational institutions utilized incentive compensation policies that were prohibited by Title IV. Relators rely on this report to argue that a facially compliant incentive policy can violate Title IV's incentive compensation ban. (Relators' Recons. Br. at 10–11.) However, the Department of Education's factual findings and legal determinations regarding other institutions' compliance with Title IV has no bearing on this Court's consideration of whether Relators have properly *pled* a False Claims Act claim that TCI knowingly made or used a false statement to get a false claim paid.

*A. Procedural Defects*

Relators' motion for reconsideration is procedurally improper because it both seeks to reargue matters previously argued before the Court and raises new arguments not presented in response to either the original motion to dismiss or the Order to Show Cause. These defects, alone, warrant denial of Relators' motion. *E.g., Feit,* 460 F.Supp.2d at 643 ("Local Rule 7.1(i) does not contemplate a recapitulation of arguments considered by the court before rendering its decision."); *Bowers v. NCAA,* 130 F.Supp.2d 610, 613 (D.N.J.2001) (explaining that motions for reconsideration "are *not* an opportunity to argue what could have been, but was not, argued in the original set of moving and responsive

papers."); *see also Dunkley v. Mellon Investor Servs.,* No. 09–3609, 2010 WL 1767238, at *2 (3d Cir. May 4, 2010)* ("A motion for reconsideration cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.") (citations and internal quotation marks omitted).

**\*3** With regard to arguments already presented to the Court, Relators rely on the same examples of TCI's compensation plans from 2003 and 2004 and the supplemental declaration of Tom Giunta that they relied on in responding to the Court's Order to Show Cause. (*See* Relators' Recons. Br. at 7.) As before, Relators argue that the compensation plans and the supplemental declaration demonstrate that TCI "intentionally deceptively designed their incentive compensation program and knew they were violating the Title IV incentive compensation ban." (Relators' Recons. Br. at 7.) However, this is essentially the same argument that Relators' raised in opposition to the original motion to dismiss: that the compensation plans demonstrate noncompliance with the Title IV ban, and thus evince that TCI made a knowingly false statement of compliance when they certified students' eligibility for financial aid. Indeed, the similarity in Relators' arguments in response to the motion to dismiss and the Order to Show Cause prompted the Court to characterize this portion of Relators' response to the Order to Show Cause as a *motion for reconsideration.* May 17 Opinion at 5. The only information added by the supplemental declaration in response to the Court's Order to Show Cause was Relator Giunta's conclusory assertions that TCI "cleverly disguised" the plans to appear compliant with federal regulations, that TCI's plans did not adhere to federal regulations in practice, and that the mathematical formula applied in the compensation plans is weighted so as to award salary bonuses only on the basis of enrollment numbers, a consideration prohibited by Title IV's incentive compensation ban. (Giunta Supp. Decl. ¶¶ 2–18.) He did not allege specific facts that would permit the inference that TCI had made or used a knowingly false statement to get a false

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3463307 (D.N.J.)
**(Cite as: 2010 WL 3463307 (D.N.J.))**

claim paid, *i.e.* conversations among TCI policy-makers regarding the purpose of the compensation plans, instances where TCI policymakers instructed employees to disregard applicable regulations or certain portions of TCI's own compensation plans, or instances where TCI policymakers disregarded notifications of non-compliance with applicable regulations. Thus, the conclusory statements in the supplemental declaration did not cure Relators' pleading deficiency.

Rather than presenting the more particularized factual allegations requested by the Court's Order to Show Cause, Relators primarily relied (and still rely) on the same exhibits and arguments that they presented in opposition to the original motion to dismiss. The Court has twice rejected Relators' argument that the TCI compensation plans attached to the SAC, by themselves, demonstrate that TCI knowingly falsely certified compliance with Title IV's incentive compensation ban. Relators may not attempt a third bite at the apple.[FN5]

> FN5. Indeed, the present motion, though styled as a motion seeking reconsideration of the May 17 Opinion, is really an un-timely and improper second request for re-consideration of the March 22 Opinion. The limitations period for filing a motion for reconsideration is "14 days after the entry of the order or judgment on the ori-ginal motion by the Judge." L. Civ. R. 7.1(i). The March 22 Opinion held that Re-lators failed to plead with particularity "that TCI acted with scienter by falsely certifying compliance with Title IV's in-centive compensation ban." March 22 Opinion at 21. The May 17 Opinion, which rejected Relators' arguments in support of this claim and deemed further amendment futile, *see* May 17 Opinion at 5–7, did not substantively change the March 22 Opin-ion. Where a subsequent order does not substantively change the initial order, the Local Rule's limitations period runs from

the initial order. *See, e.g., Omar v. Mueller,* No. 07–813, 2007 WL 2868102, at \*1 (D.N.J. Sept.27, 2007) (finding that an amended order that did not change the substantive rulings of the prior order did not reset the clock for the filing of a mo-tion for reconsideration); Allyn Z. Lite, New Jersey Federal Practice Rules, cmt. to Rule 7.1 at 68 (2010 ed.). Relators filed the present motion on June 1, 2010, more than two months after the March 22 Opinion and well after the 14–day period provided by Local Rule 7.1(i).

Relators' motion is also improper because it raises two arguments not previously raised in re-sponse to Defendants' original motions to dismiss or in response to the Court's Order to Show Cause, namely that the regulatory safeharbor did not apply to (i) their allegations concerning TCI's pre–2003 incentive plans, or (ii) their allegations concerning TCI's President's Club.[FN6] Relators have provided no explanation for why they did not advance these arguments in response to the motion to dismiss or Order to Show Cause. To allow reconsideration on the basis of Relators' new arguments would greatly expand the scope of the reconsideration doctrine and undermine the finality of judicial decisions. *See, e.g., United States v. Jones,* 158 F.R.D. 309, 314 (D.N.J.1994) ("The purpose of the rule, which limits the motion to facts and law 'overlooked' in the original motion is 'to encourage parties to present their positions as completely as possible, and to prevent parties from filing a second motion, with the hindsight provided by the court's analysis, covering issues that should have been raised in the first set of motions.' ") (quoting *United States v. Torres,* Crim. No. 89–240, slip op. (D.N.J. Mar. 30, 1990); *Bowers,* 130 F.Supp.2d at 613 (explaining that "the initial motion is the 'main event,' not a 'tryout on the road' to a motion for reargument").

> FN6. The Court notes that Relators im-properly presented the President's Club ar-gument for the first time in a reply brief

Not Reported in F.Supp.2d, 2010 WL 3463307 (D.N.J.)
**(Cite as: 2010 WL 3463307 (D.N.J.))**

Page 5

without prior leave of the Court. *See* L. Civ. R. 7.1(d)(3) ("No reply papers shall be filed on a motion for reconsideration pursuant to L. Civ. R. 7.1(i) or on a cross-motion, unless the Court otherwise orders."). By Letter Order of July 12, 2010, the Court exercised its discretion to allow Relators' Reply Brief and permitted TCI to file a sur-reply responding to the new argument.

**\*4** In sum, Relators' motion does not present proper grounds for reconsideration. Thus, Relators' motion for reconsideration must be denied.

*B. Relators' Arguments*

Even if Relators' motion was procedurally sound, Relators' arguments do not demonstrate a clear error of law warranting reconsideration. Each of Relators' arguments contends to some degree that the Court erred in its application of the regulatory safeharbor that, notwithstanding the Title IV ban, permits certain salary adjustments "not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 31 C.F.R. § 668.14(b)(22)(ii)(A).[FN7] However, Relators' focus on this portion of the Court's ruling, which addresses Relators' contention that TCI violated the Title IV ban, disregards the more germane issue decided by the Court: whether TCI "knowingly ma[de], us[ed], or caus[ed] to be made or used, ... a false statement to get a false or fraudulent claim paid...." 31 U.S.C.A. § 3729(a)(2) (West 2003 & Supp.2008).[FN8] As a claim arising under the False Claims Act, the primary issue is not whether the institution complied with regulations governing the distribution of federal funds, but whether the institution knowingly made, used, or caused to be made or used a false statement to get a false claim paid.

> FN7. The regulatory safeharbor provision permits:
>
> The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensa-

tion is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.

31 C.F.R. § 668.14(b)(22)(ii)(A). Relators take issue with this Court's conclusion, in both the March 22 and May 17 Opinions, that TCI's compensation plans complied with the regulatory safeharbor provided by 31 C.F.R. § 668.14(b)(22)(ii)(a). *See* March 22 Opinion at 20–21; May 17 Opinion at 5–6. Specifically, Relators argue that this Court improperly determined facts at the motion to dismiss stage in determining the application of the regulatory safeharbor to Relators' allegations.

Relators overlook the fact that, at both the motion to dismiss stage and in response to the Court's Order to Show Cause, they presented examples of TCI's alleged compensation policy with their pleadings and argued that these documents demonstrated that TCI had knowingly falsely certified compliance with Title IV's incentive compensation ban. (Relators' MTD Br. (Doc. No. 45) at 13; Relators' OTSC Br. at 3–4; *see generally* Giunta Supp. Decl.) Importantly, Relators did not allege that TCI's compensation policies were based *solely* on considerations prohibited by the Title IV ban, so as to plead around the safeharbor, nor did they provide particularized allegations that TCI policymakers implemented the TCI compensation policies in a manner that violated Title IV, or instructed others to do the same. Instead, Relators presented legal conclusions about these plans' non-compliance with Title IV's incentive compensation ban

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3463307 (D.N.J.)
**(Cite as: 2010 WL 3463307 (D.N.J.))**

and conclusory assertions about the intent behind the plans. (*See generally* Giunta Supp. Decl.)

In the absence of particularized factual allegations permitting the inference that TCI policymakers knowingly made or used false statements to get false claims paid, the Court addressed Relators' legal arguments about the alleged TCI incentive plans, finding them flawed. March 22 Opinion at 21 ("Relators do not allege that TCI based its compensation practices solely on means prohibited by the Title IV ban, and the examples [of TCI's incentive plans] provided with the SAC demonstrate that TCI's compensation scale complied with the regulatory safeharbor." (citations to TCI incentive plans omitted)); May 17 Opinion at 6 ("While Relators' factual deduction that TCI employees could not receive a bonus under the compensation plan without meeting certain enrollment objectives is sound, its legal conclusion that this compensation plan did not comply with the regulatory safeharbor is not."). The Court's ruling regarding the regulatory safeharbor, thus, is best understood as a response to the specific arguments advanced by Relators. Contrary to Relators' representations, the TCI compensation plans provided with the SAC do not, by themselves, establish that TCI's compensation program violated the Title IV incentive compensation ban.

FN8. This Court continues to apply § 3729 as it appeared prior to amendments made by the Fraud Enforcement Recovery Act in 2009 for the reasons stated in the March 22 Opinion. March 22 Opinion at 9 n .10. Neither party has suggested that the 2009 revisions apply to this case, or that they would materially affect this Court's analysis.

In addition to the Court's observations regarding the regulatory safeharbor, the Court found that Relators had failed to allege circumstantial facts permitting the inference that TCI acted with scienter by falsely certifying compliance with the Title IV ban. March 22 Opinion at 21. Although the Court did not elaborate on Relators' pre–2003 and President's Club allegations, primarily because Relators did not advance them in opposing the motion to dismiss, these allegations suffered from the same Rule 9(b) pleading deficiency that plagued Relators' other theories of a False Claims Act claim: the complete absence of factual allegations that would reasonably permit the inference that TCI policymakers acted with scienter by knowingly making, using, or causing to be made or used a false statement to get a false claim paid. *Compare* March 22 Opinion at 21 *with id.* at 17–20. Presuming Relators' allegations to be true, the mere fact that TCI policies violated federal regulations and TCI failed to disclose this information on students' applications for financial aid does not establish False Claims Act liability under 31 U.S.C.A. § 3729(a)(2) (West 2003 & Supp.2008), for knowingly making, using, or causing to be made or used a false statement to get a false claim paid. *See, e.g., United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 917 (7th Cir.2005) ("[F]raud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something it plans not to do. Tripping up on a regulatory complexity does not entail a knowingly false representation."). Relators failed to provide more particularized allegations in response to the Court's Order to Show Cause, and they do not attempt to cure this pleading deficiency with the present motion.

**\*5** Relators further contend that this Court's application of Rule 9(b)'s heightened pleading standard is too strict. This argument speaks to an issue also addressed by the Government's supplemental statement of interest, which takes issue with the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3463307 (D.N.J.)
**(Cite as: 2010 WL 3463307 (D.N.J.))**

Court's characterization of the Supreme Court's decision in *Allison Engine Co. v. United States ex rel. Sanders,* 553 U.S. 662, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008). (*See* Gov't Supp. Statement of Interest at 7.) The Court sees fit to clarify what the Court has referred to as the "scienter requirement" in both the March 22 and May 17 Opinions, and why Relators' pleadings have been deficient.

To present a subsection (a)(2) False Claims Act claim, Relators needed to allege with particularity direct or circumstantial facts that would permit a reasonable inference that TCI knowingly made, used, or caused to be made or used a false statement to get a false claim paid. 31 U.S.C.A. § 3729(a)(2) (West 2003 & Supp.2008). The Supreme Court in *Allison Engine* differentiated between the two scienter requirements imposed by subsection (a)(2). The first scienter element required the *knowing* making or using of a false statement, or causing the same to be made or used, and the second scienter element involved using the false statement *to get* a false claim paid. *Allison Engine,* 128 S.Ct. at 2130 & n. 2. While the *Allison Engine* Court held that the latter scienter element relating to submission of the false claim required that "the defendant made a false record or statement *for the purpose* of getting 'a false or fraudulent claim paid or approved by the Government,' " *id.* at 2130 (emphasis added), the Court noted that the scienter requirement "with regard to the truth or falsity of the 'information' " contained in the false statement derived from § 3729(b), *id.* at 2130 n. 2. Section 3729(b) defines "knowingly" to refer to "a person, with respect to information [who] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information," but expressly states that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1). Thus, this Court acknowledged in the March 22 Opinion that the False Claims Act required, at a minimum, an incorrect statement made, used, or caused to be made or used with "reckless disregard of the truth or falsity of the information."

*See* March 22 Opinion at 18.

The Government's Statement of Interest contends that this Court erroneously applied a specific intent requirement for the first scienter requirement related to the falsity of the statement made, used, or caused to be made or used. (*See* Gov't Supp. Statement of Interest at 7.) While portions of this Court's May 17 Opinion invoked the *Allison Engine* "purpose to get false claims paid" scienter requirement for the submission of false claims, it was not this Court's intention to suggest that *Allison Engine* or § 3729(b) required a specific intent to defraud with regard to the making or using of a false statement. It bears mentioning, though, that *Allison Engine* did not address an implied false certification theory of False Claims Act liability, which courts have applied with greater caution than traditional false claims analysis. As a number of courts have recognized, the implied false certification theory—which imposes liability on the basis of a party's failure to disclose its non-compliance with regulations governing the issuance of federal funding—has the potential to expand the False Claims Act beyond fraudulent acts. *See, e.g., Rodriguez,* 552 F.3d at 304 (expressing concern that the False Claims Act would become a "blunt instrument to enforce compliance with all ... regulations") (quoting *United States ex rel. Mikes v. Straus,* 274 F.3d 687, 699 (2d Cir.2001)).[FN9] Because of its potential to exceed the anti-fraud purpose of the False Claims Act, courts have stressed the importance of the actor's scienter in making the false statement. *See, e.g., United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1172 (9th Cir.2006) ("[E]mphasiz[ing] the central importance of the scienter element to liability under" the false certification theory, noting that "a palpably false statement, known to be a lie when it is made, is required for a party to be found liable under the False Claims Act") (citations omitted); *Main,* 426 F.3d at 917 (explaining that False Claims Act liability attaches under the related promissory fraud theory[FN10] where "the University not only knew, when it signed the phase one application, that contingent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3463307 (D.N.J.)
**(Cite as: 2010 WL 3463307 (D.N.J.))**

fees to recruiters are forbidden, but also planned to continue paying those fees while keeping the Department of Education in the dark"); *cf. Mikes,* 274 F.3d at 700 ("Liability under the Act may properly be found therefore when a defendant submits a claim for reimbursement while knowing—as that term is defined by the Act, *see* 31 U.S.C. § 3729(b) —that payment expressly is precluded because of some noncompliance by the defendant."). In particular, *Hendow* and *Main* are instructive, because these cases dealt with similar allegations that an educational institution continued to submit student applications for financial aid without disclosing its failure to comply with Title IV's incentive compensation ban.

> FN9. As this Court noted in the March 22 Opinion, the Third Circuit has twice declined to adopt the implied false certification theory of False Claims Act liability, but it has not ruled out the possibility that it will adopt the doctrine in the future. *See Rodriguez,* 552 F.3d at 303–04 & n. 6; *United States ex rel. Quinn v. Omnicare Inc.,* 382 F.3d 432, 441–43 (3d Cir.2004).

> FN10. This Court described the promissory fraud theory examined in *Hendow* and *Main* as the opposite side of the implied false certification coin. March 22 Opinion at 13 n. 11 (explaining that courts have looked to the same elements for both theories of False Claims Act liability). "The difference between the two, so far as the Court can discern, is when the institution manifested the scienter to defraud the Government: when it signed the PPA (promissory fraud), or when it purposely caused claims to be filed, knowing that it was violating the PPA (false certification)." *Id.* (citations omitted).

**\*6** Measured against the minimum scienter element provided by § 3729(b) —reckless disregard of the truth or falsity of the information—Relators have not alleged particularized facts permitting the

inference that TCI acted with scienter by making or using a false statement, either in the PPA (promissory fraud) or in conjunction with students' applications for financial aid (implied false certification). In both the SAC and proposed Third Amended Complaint, Relators' theory of scienter appears to be that the mere existence of these compensation policies rendered TCI ineligible for participation in the Title IV program, and that its continued submission of student applications for funds demonstrated a knowingly false certification of eligibility. (See SAC ¶ 78 ("Chubb by violating the incentive compensation ban falsely asserts compliance with HEA, Title IV[sic] Chubb's request for [student financial aid] arranged, managed and prepared by Chubb, includes a student application that contains an express certification by Chubb that the student is an eligible student under the Title IV program. Chubb knows that this claim for funds is false because Chubb knows its students are not eligible under the Title IV program due to Chubb's violations of the HEA incentive compensation ban."); TAC ¶ 45 (same).). However, besides their conclusory assertions that TCI *knew* its compensation policies violated Title IV but nevertheless continued to submit student applications certifying continued eligibility, Relators allege no facts permitting the inference that TCI policymakers had notice, or reasonably should have had notice, that its policies were in violation of the Title IV ban. The conclusory allegations in this case, thus, stand in stark contrast to the particularized allegations that the Ninth Circuit found sufficient to state a false certification claim in *Hendow:* specific instances of improper bonuses, policymakers "openly brag[ing] about perpetrating fraud, that the University had established infrastructure to deceive the government, and that the University repeatedly changed its policies to hide its fraud." *Hendow,* 461 F.3d at 1175. The compensation plans themselves cannot cure this pleading deficiency. Presuming that TCI's compensation policies violated Title IV's incentive compensation ban, Relators have presented no allegations—i.e., notices, conversations, "red flags"—that would permit the reasonable inference

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3463307 (D.N.J.)
**(Cite as: 2010 WL 3463307 (D.N.J.))**

that TCI policymakers made, used, or caused to be made or used, a false statement, with reckless disregard for the truth or falsity of the information, to get a false claim paid. *See, e. g., Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1210 (11th Cir.2001) (finding in a case involving securities fraud claims that "the series of inferences is too tenuous" to satisfy Rule 9(b)'s heightened pleading requirements where plaintiffs failed to allege "tips, letters, or conversations raising inferences that [the defendant] knew of any fraud" or "was severely reckless in not knowing about any fraud").[FN11] Having failed to meet the minimum scienter standard for the falsity of the statement, Relators' allegations necessarily fail to meet the standards articulated by the *Hendow* and *Main* courts.

> FN11. The absence of "red flags" also distinguish the present matter from *Abner v. Jewish Hospital Health Care Services,* No. 4:05–106, 2009 WL 595558, 2009 U.S. Dist. LEXIS 61985 (S.D.Ind. Mar. 5, 2009), which Relators argue supports a more lenient application of Rule 9(b). The relators in *Abner* alleged that the laboratory supervisor "instructed laboratory employees to engage in" a fraudulent billing practice. *Id.* at *17–21. Moreover, the alleged fraudulent billing practice in *Abner* involved submitting Medicare and Medicaid invoices for services that had not been performed, and thus did not constitute "honest billing errors." *Id.* at *17–18. The hypothetical equivalent for the present case would be an educational institution submitting financial aid applications for students that did not exist.

**\*7** Courts have recognized that a party's failure to heed court instructions regarding remedying such pleading deficiencies justifies dismissal. *E.g., United States ex rel. Claussen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1310 (11th Cir.2002) (citing *Friedlander v. Nims,* 755 F.2d 810, 813 (11th Cir.1985)). This Court identified Relators' pleading deficiency

in the March 22 Opinion and gave Relators an opportunity to show cause why they should be permitted to amend the SAC. March 22 Opinion at 17–23, 33–34. Relators did not provide more particularized allegations in response to the Court's Order to Show Cause, and they do not now attempt to present more particularized factual allegations that would permit the inference that TCI knowingly made, used, or caused to be made or used, a false statement. Thus, Relators have not demonstrated clear error with this Court's Rule 9(b) conclusion in the March 22 Opinion. Nor have Relators demonstrated clear error with regard to the Court's May 17 finding that further amendment would be futile. As the Court noted in the March 22 Opinion, Relators have already amended the original Complaint twice, and Relators have had access to numerous TCI records by virtue of a Government subpoena served in 2007.

The Court has also accorded Relators considerable latitude in the presentation of their claims. May 17 Opinion at 3–4 (noting Relators' failure to provide a proposed Third Amended Complaint); Letter Order of July 12, 2010 (permitting Relators' improper reply brief). Relators' repeated failure to cure this pleading deficiency warranted-and still warrants-dismissal of this action. Accordingly, the Court will deny Relators' motion for reconsideration.

### Conclusion

For the aforementioned reasons, the Court will deny Relators' motion (Doc. No. 60) for reconsideration. An appropriate form of order accompanies this Memorandum Opinion.

D.N.J.,2010.
U.S. ex rel. Pilecki-Simko v. Chubb Institute
Not Reported in F.Supp.2d, 2010 WL 3463307 (D.N.J.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
**(Cite as: 2010 WL 4025904 (E.D.Pa.))**

United States District Court,
E.D. Pennsylvania.
U.S. ex rel. SCHUMANN, et al.
v.
ASTRAZENECA PLC, et al.

Civil Action No. 03-5423.
Oct. 13, 2010.

West KeySummary **United States 393 ⊃ 122**

393 United States
    393VIII Claims Against United States
        393k120 Making or Presentation of False
Claims and Other Offenses Relating to Claims
            393k122 k. Penalties and Actions There-
for. Most Cited Cases
    An alleged whistleblower's qui tam action
against a pharmaceutical company was subject to
the False Claims Act's public disclosure bar. Vari-
ous civil actions demonstrated that the whis-
tleblower's allegations of fraud and illegal kick-
backs had already been disclosed publicly when the
whistleblower informed the government of them
prior to filing his original complaint. The whis-
tleblower alleged that the company and drug manu-
facturers engaged in a kickback scheme to submit
false reimbursement claims to government insurers
in violation of the federal False Claims Act. 31
U.S.C.A. § 3730(e)(4)(A).

Nicholas Carl Harbist, Blank Rome, LLP, Prin-
ceton, NJ, Thomas J. Poulin, W. Scott Simmer,
Blank Rome, LLP, Washington, DC, Arthur M. Ka-
plan, Fine, Kaplan & Black, Philadelphia, PA, for
Plaintiffs.

Alexander Kerr, McCarter and English, LLP, Phil-
adelphia, PA, John W. Treece, Paul E. Kalb, Sidley
Austin, LLP, Chicago, IL, Thomas M. Gallagher,
Allan A. Thoen, Pepper Hamilton LLP, Phil-
adelphia, PA, Mitchell J. Lazris, Nicholas G.
Stavlas, Eliza L. Andonova, Hogan Lovells US

LLP, Washington, D.C., for Defendants.

### *MEMORANDUM AND ORDER*

DITTER, District Judge.
    **\*1** This case involves a whistleblower's claims
that two pharmaceutical companies violated federal
and state false claims statutes by entering into
fraudulent agreements to sell their brand-name
drugs. It comes before me on motions to dismiss
the fourth amended complaint by defendants E.I. du
Pont de Nemours and Company, DuPont Pharma-
ceuticals Company, and Bristol-Meyers Squibb
Company (collectively "BMS") (Doc. 172) and de-
fendants AstraZeneca Pharmaceuticals LP and As-
traZeneca LP (collectively "AZ") (Doc. 174).

    The relator, Karl Schumann, alleges in this *qui
tam* action that the defendants paid disguised, un-
disclosed rebates to a purchaser of their products so
that the actual price of those products was misrep-
resented to the government and the government
overpaid for them. This memorandum is filed to ex-
plain the reasons for my order of September 30,
2010, granting BMS' motion to dismiss the relator's
claims with prejudice and denying AZ's motion to
dismiss the relator's claims.

### I. FACTUAL BACKGROUND
    The relator makes the following allegations in
his fourth amended complaint that are relevant to
this opinion:

    The relator is a registered pharmacist and was
the vice-president of pharmaceutical contracting for
Medco from December 1999 to January 2003, dur-
ing which time he alleges he obtained knowledge of
the defendants' false claims and kickbacks. Medco
has been one of the largest pharmacy benefit man-
agers and mail-order pharmacies in the country.
Medco negotiates with drug manufacturers and re-
tail pharmacies to obtain discounts on prescription
drugs for its health plans and has considerable
leverage with drug manufacturers in deciding which

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
**(Cite as: 2010 WL 4025904 (E.D.Pa.))**

of their drug products are dispensed in their retail pharmacy networks and mail-order pharmacies. Medco has provided prescription drug services to various federal and state government plans. The defendants, BMS and AZ, manufactured, marketed, and sold drug products in Pennsylvania and throughout the United States. Coumadin is a brand-name drug manufactured by BMS. Prilosec and Nexium are brand-name drugs manufactured by AZ. Under certain federal laws, drug manufacturers who participate in government programs must price their products so that the government will not pay more for a drug than the best price for which the manufacturer sells that drug to other purchasers.

The relator alleges that BMS and AZ violated federal and state false claims statutes in two ways. First, BMS and AZ entered into sham contracts with Medco to induce it to purchase and dispense to government plan patients the defendants' brand-name drugs, rather than the equivalent generic drugs, in violation of anti-kickback laws, causing false claims [FN1] for reimbursement of those drugs to be submitted to government plans. Second, BMS and AZ submitted false best price reports for the defendants' brand-name drugs, causing false claims [FN2] for rebates of Medicaid and 340B expenditures to be submitted to the government. The alleged sham contracts between BMS and Medco included rebates and data fees from 1997 through 2003 related to the drug Coumadin, and the alleged sham contracts between AZ and Medco included rebates, service fees, disease-management fees, and unrestricted educational grants from 1996 through 2003 related to the drugs Prilosec and Nexium.

> FN1. Overstated, but false in the sense that they were based on the alleged kickback fraud between AZ and Medco.

> FN2. Understated, but false in the sense that they were based on the alleged false best price reports submitted by AZ.

**\*2** With respect to the relator's claims against BMS, he alleges that "he regularly discussed with his Medco colleagues the highly confidential dealings with the BMS defendants that had occurred prior to his employment with Medco wherein he learned of the [fraud] ." (Fourth Am. Compl. ¶ 54.) He also alleges that he was involved in contract negotiations with BMS on April 24, 2001, and January 25, 2002, to discuss Coumadin rebate agreements. (Id. ¶¶ 55, 86-87.)

With respect to the relator's claims against AZ, the relator alleges that "[b]ut for the [AZ] Defendants' Fraudulent Kickbacks ... to Medco ... to induce the referral of the [AZ] Defendants' Prilosec and Nexium, the Government would not have paid millions of dollars for Prilosec and Nexium prescriptions" through government-health plans and programs. (Id. ¶ 115; see also id. ¶¶ 109, 113, 114, 120, 134, 239-243.) The relator also alleges that AZ "submitted false quarterly statements to [the government] of its Best Prices on [Prilosec and/or Nexium] ... to reduce improperly [its] rebate obligations to the States under the Best Price Program." ( Id. ¶ 141; see also id. ¶¶ 151, 163, 171, 184, 187, 193, 204, 214, 221, 229, 237.) He alleges that AZ's "false quarterly statements of the Best Prices on [Prilosec and Nexium] caused the States to submit false and inflated submissions to the Federal Government for reimbursement of Medicaid expenditures." (Id. ¶ 141.)

The relator filed this *qui tam* action under federal and state statutes that allow private persons with knowledge of past or present fraud against the government to bring claims on its behalf. 31 U.S.C. § 3730. In his fourth amended complaint, [the relator brought four counts each against BMS and AZ for making or causing false claims or false statements and conspiracy to commit acts in violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729. [FN3] The relator also brought thirteen similar counts against BMS and AZ under various state false claim statutes.[FN4] Both BMS and AZ filed motions to dismiss and oral argument on the motion was held before me.

> FN3. On May 20, 2009, the FCA was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
**(Cite as: 2010 WL 4025904 (E.D.Pa.))**

amended, but with one exception not applicable here, the amendments are prospective only. Fraud Enforcement and Recovery Act of 2009, Pub.L. No. 111-21, 31 U.S.C. § 3729 (2009). Therefore, I refer to the substantive provisions of the FCA prior to enactment throughout this opinion, just as the parties did in their submissions. Both the kickback claims and best price report claims form the basis for all of the relator's counts under FCA provisions. 31 U.S.C. § 3729(a)(1)-(3), (7).

FN4. The state false claims statutes on which the relator relies are modeled on the federal FCA and are consistently interpreted with that statute. *See, e.g. United States ex rel. Bogart v. King Pharm.,* 414 F.Supp.2d 540, 543 (E.D.Pa.2006); *United States v. Johnson Controls, Inc.,* 457 F.3d 1009, 1021 (9th Cir.2006); *Int'l Game Tech, Inc. v. Second Judicial Dist. Ct.,* 122 Nev. 132, 127 P.3d 1088, 1101 (Nev.2006) .

## II. PARTIES' CONTENTIONS

BMS contends that the fourth amended complaint must be dismissed because the relator's allegations are based on prior publicly disclosed allegations or information and that the relator is not an "original source" as defined by the FCA. In the alternative, BMS contends that the complaint must be dismissed pursuant to Rule 12(b) (6) for the relator's failure to satisfy the pleading requirements of Rule 9(b) and Rule 8(a). AZ likewise contends that the complaint must be dismissed under Rule 12(b)(6) for relator's failure to satisfy the pleading requirements of Rule 9(b) and Rule 8(a). AZ argues that the relator has failed to plead the details of any individually submitted false claim, and/or false claims submitted by the states, or any facts demonstrating that any state's submissions or AZ's best price reports were false. BMS and AZ also contend that some claims are barred by the statute of limitations and that dismissal should be with prejudice

because any amendments to the complaint would be futile.[FN5]

FN5. I shall defer a decision on AZ's statute of limitations argument because I find the issue is dependent on factual determinations that can not be made at this stage of the proceedings. For the reasons that follow, I do not address BMS' statute of limitations argument because I dismiss the complaint on other grounds.

## III. DISCUSSION

### A. Relator's Claims Against BMS

**\*3** BMS asks for dismissal of the relator's claims against it for lack of subject matter jurisdiction under Rule 12(b)(1) because they are barred by the FCA's existing information limitation, 31 U.S .C. § 3730(e)(4)(A). BMS argues that the claims are based upon allegations or transactions that were publicly disclosed before the relator asserted them in this action and that the relator is not an original source because he fails to allege the necessary "direct and independent" knowledge. I agree. The relator's claims against BMS are substantially similar to numerous prior public disclosures, and based on his limited allegations in the fourth amended complaint, the relator cannot be deemed an original source.

### 1. Standard of Review for Jurisdictional Challenges

Before addressing the merits of a case, a court must resolve any jurisdictional challenge. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Here, BMS asserts a factual challenge to subject matter jurisdiction under Rule 12(b)(1).[FN6] (BMS Mot. 6-30; Oral Argument 46.) In a factual attack, a court may consider matters outside of the pleadings. *United States ex rel. Atkinson v. Pa. Shipbuilding Co.,* 473 F.3d 506, 514 (3d Cir.2007). When a defendant does not challenge the facts alleged in the pleadings relating to jurisdiction, the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
**(Cite as: 2010 WL 4025904 (E.D.Pa.))**

court may accept those allegations as true. *Gould Elecs., Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). "A relator bears the burden of alleging facts essential to show jurisdiction under the False Claims Act as well as supporting those allegations with competent proof." *United States ex rel. Pritsker v. Sodexho, Inc.,* No. 03-6003, 2009 U.S. Dist. LEXIS 51469, *18, 2009 WL 579380 (E.D.Pa. Mar. 6, 2009)* (internal quotations omitted).

> FN6. This factual challenge is related to subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) (allowing false claims jurisdiction for any action under § 3730). If this court had jurisdiction over the federal claims pursuant to § 3732(a), it would also have jurisdiction over the state law claims pursuant to § 3732(b).

**2. Relator's Claims Against BMS Are Substantially Similar to Prior Public Disclosures**

The FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4)(A), is intended "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits" based on information already known to the government. *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson,* --- U.S. ----, ----, 130 S.Ct. 1396, 1407, 176 L.Ed.2d 225 (2010). Under the public disclosure bar, a court lacks jurisdiction over a *qui tam* action when:

> (1) there was a 'public disclosure'; (2) 'in a criminal, civil, or administrative hearing, in a congressional, administrative or [GAO] report, hearing, audit, or investigation, or from the news media'; (3) of 'allegations or transactions' of the fraud; (4) that the relator's action was 'based upon'; and (5) the relator was not an 'original source' of the information.

> *United States ex rel. Paranich v. Sorgnard,* 396 F.3d 326, 332 (3d Cir.2005) (quoting 31 U.S.C. § 3730(e)(4)(A)).

By its plain terms, § 3730(e)(4)(A) covers al-

legations or transactions disclosed in civil hearings, which "encompass the full range of proceedings in a civil lawsuit," including the complaint. *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1156-57 (3rd Cir.1991); *see also Paranich,* 396 F.3d at 334. An "allegation" of fraud means a "conclusory statement implying the existence of provable supporting facts." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 653-54 (D.C.Cir.1994). A relator's allegations are "based upon" the publicly revealed allegations or transactions if they are "supported by or substantially similar to the disclosed allegations and transactions." *Atkinson,* 473 F.3d at 519 (internal quotations omitted). The Third Circuit uses a formula to determine the amount of information necessary to trigger the public disclosure bar:

*\*4* If X+Y=Z, Z represents the allegation of fraud and X and Y represent its essential elements.... [I]f either X (fraud) or both X (misrepresented facts) and Y (true facts) are disclosed by way of a listed source, then a relator is barred from bringing suit under § 3730(e)(4)(A) unless he is an original source.

*Id.* at 519.[FN7]

> FN7. The relator cites to *United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 740 (3d Cir.1997), noting a distinction between publicly disclosed "allegations or transactions" and the disclosure of ordinary "information." The relator relies heavily on this distinction in arguing that BMS conflates the two in its motion to dismiss. However, *Dunleavy* simply applies the same X+Y=Z formula for determining what quantum of information must be disclosed to trigger the public disclosure bar. *Id.* At 741.

Here, both sets of the relator's claims against BMS-the kickback claims and the best price claims-are substantially similar to allegations and transac-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
**(Cite as: 2010 WL 4025904 (E.D.Pa.))**

tions that were already publicly disclosed when the relator filed his complaint.

**a. Kickback Claims Against BMS**

The relator's first set of claims against BMS involve allegations that in violation of anti-kickback laws BMS entered into sham rebate and data purchase agreements with Medco to induce it to purchase and dispense to government-plan patients the drug Coumadin, rather than the equivalent generic drugs. BMS has presented examples from various civil actions demonstrating that the allegations of fraud and the essential elements of relator's kickback claims had already been disclosed publicly when the relator informed the government of them prior to filing his original complaint in September 2003. These examples of public disclosures include the following: [FN8]

> FN8. BMS presented more than six civil actions with allegations and transactions similar to the relator's allegations here, along with numerous newspaper articles. I discuss three of those civil actions. The relator argues that all the essential elements of the fraud must be stated in a single public disclosure. However, the Third Circuit has not interpreted § 3730(e)(4)(A) in that way. *See, e .g. Atkinson,* 473 F.3d at 525-26 (essential element X disclosed in letter from Senate Chief Investigator; Y disclosed in newspaper article, government report, and FOIA response). The only case cited by the relator on this point, *United States ex rel. Foundation Aiding the Elderly v. Horizon West, Inc.,* No. 99-17539, 2001 U.S.App. LEXIS 27343, 2001 WL 1045592 (9th Cir. Sept. 13, 2001), did not require a single public disclosure, but discussed "several documents purportedly disclos[ing] allegations of fraud" (*id.* at *8) and the Ninth Circuit applies the rule that "elements of fraud need not have been made public in a single document." *United States ex rel. Haight v. Catholic Health-*

> *care West,* 445 F.3d 1147, 11521 n. 1 (9th Cir.2006).

• In a civil action filed in March 1998 by a manufacturer of the generic equivalent for Coumadin against DuPont Merck Pharmaceutical Co. ("DMPC") [FN9], it was alleged that "DuPont Merck has offered and paid rebates and/or 'administrative fees' to ... [pharmacy benefit managers] ... to ensure that Coumadin, rather than [the equivalent generic drug], is dispensed to patients. No extra services were being rendered in exchange for the payment of these rebates and administrative fees by DuPont Merck." Complaint at ¶ 53, *Barr Labs, Inc. v. DuPont Merck Pharm. Co.,* No. 98-1795 (S.D.N.Y. Mar. 9, 1998).

> FN9. The relator's fourth amended complaint alleges that DuPont formed DMPC as a joint venture between DuPont and Merck & Co. and that DMPC eventually became BMS. (Fourth Am. Comp. ¶¶ 16, 83).

• A proposed class action suit filed in July 2003 alleged that BMS and other drug manufacturers conspired with Medco and other pharmacy benefit managers to "collect inflated prescription drug payments" by providing "rebates, hidden price discounts and/or other unlawful financial inducements" to encourage the use of their products, including the drug Coumadin. Amended Master Consol. Class Action Complaint at ¶¶ 2, 4, 327, 650, *In re Pharm. Indus. Average Wholesale Price Litig.,* MDL No. 1456, No. 01-12257 (D.Mass. July 28, 2003).

• In a Medco ERISA Litigation suit filed in July 2002, the plaintiffs alleged that Medco entered into sham contracts with drug manufacturers that required the manufacturers to "pay kickbacks in the form of rebates, discounts and other soft dollars .... in exchange for Medco's discretionary decisions to provide access to, or to favor specific drugs on [ ] Medco's standardized formulary" and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
**(Cite as: 2010 WL 4025904 (E.D.Pa.))**

that those incentives were not disclosed. (First Amended Complaint at ¶¶ 4-5, *Jones v. Merck-Medco Managed Care, LLC,* No. 02-0707 (D.Nev. July 2, 2002). The plaintiffs also alleged that "Medco often decides to favor higher-cost drugs over lower-cost therapeutic equivalents." *Id.*

**\*5** As these three examples show, the essential elements of the fraud-that BMS concealed the true nature of sham rebates with Medco (misrepresented facts) and that those rebates were meant to induce Medco to favor Coumadin over the equivalent generic drugs (true facts)-had already been alleged in numerous other civil actions.

It matters not that the publicly disclosed allegations and transactions do not identify the exact theory of fraud alleged by the relator (violations under the False Claims Act) or the specific defendants, as long as there is sufficient information in the public sphere to put the government on notice of the potential presence of fraud. *In re Natural Gas Royalties Qui Tam Litig.,* 566 F.3d 956, 961 (10th Cir.2009) ("[A] disclosure need not identify a defendant by name to trigger the public disclosure bar, so long as the disclosures are 'sufficient to set the government on the trail of fraud as to [the] Defendants.' "); *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 654 (D.C.Cir.1994) (finding that the FCA's jurisdictional bar is best understood as applying when publicly disclosed information has already, or can reasonably be expected to be, set the government "on the trail" of fraud); *see also United States ex rd. Findley v. FPC-Boron Employees' Club,* 105 F.3d 675, 688 (D.C.Cir.1997) ("A relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed."); *Sodexho, Inc.,* 2009 U.S. Dist. LEXIS 51469, at \*27, 2009 WL 579380 ("[T]he FCA's jurisdictional bar would be rendered meaningless if a relator could bypass public disclosures through the semantic legerdemain of re-

casting disclosed ... violations in false claims language."). Here, the many prior public disclosures were more than adequate to set the government "on the trail" of the fraud alleged by the relator.

The relator argues that the examples of public disclosures provided by BMS are merely allegations of widespread fraud among pharmaceutical benefit managers and major drug manufacturers that lack the specificity needed to implicate the FCA's public disclosure bar. However, the level of specificity necessary to trigger the bar is determined by the X+Y=Z formula, which requires only public disclosure of the allegations of fraud or its essential elements. *Atkinson,* 473 F.3d at 519. While some of the sources presented by BMS include allegations of industry-wide fraud, other public disclosures, such as the examples above, repeatedly mention the BMS entities, Medco, and Coumadin, and allege that BMS entered into sham contracts with Medco to induce it to favor Coumadin over the equivalent generic drugs.

**b. Best Price Claims Against BMS**

The relator's second set of claims against BMS involve allegations that BMS submitted false best price reports for the drug Coumadin, causing overstated claims for reimbursement of Medicaid and 340B expenditures to be submitted to the government. Again, BMS has presented examples from various civil actions demonstrating that the allegations of fraud and the essential elements of relator's best price claims had already been disclosed publicly when the relator first filed a complaint with these claims in June 2009.[FN10] These public disclosures include the following:[FN11]

FN10. The relator's first mention of improper best price reports by BMS appear in the first amended complaint filed in November 2005. (First Am. Compl. ¶¶ 27-29.) The relator does not assert an actual claim against BMS under 31 U.S.C. § 3729(a)(7) based on alleged violations of BMS' best price reporting obligations until the third amended complaint filed in June

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
**(Cite as: 2010 WL 4025904 (E.D.Pa.))**

2009. (Third Am. Compl. ¶¶ 74, 232.)

FN11. BMS again presented more than six civil actions with allegations and transactions similar to the relator's allegations, and I discuss three of those here.

**\*6** • The Medco ERISA Litigation filed in July 2002 included allegations that Medco "contracts with drug manufacturers to be paid moneys that the manufacturers will not be required to include in their best price submissions to the federal government" and that those incentives "include soft dollars, such as ... data sales fees, or other indirect forms of compensation that the manufacturers might provide to third parties, but which the manufacturers might not need to include when calculating their best price for the government." First Amended Complaint at ¶¶ 7 and 39, *Jones v. Merck-Medco Managed Care, LLC,* No. 02-0707 (D.Nev. July 2, 2002).

• In a civil action brought by the City of New York in August 2004 against defendants for their failure to comply with the Medicaid rebate statute, it was alleged that pharmacy benefit managers, including Medco, contracted with the defendants, including BMS, for product placement on formularies, which was "based on the profits they can make" including "rebates, and hidden discounts and financial incentives" that drug manufacturers "exclude[ ] from [their] calculations of Best Price." Complaint at ¶¶ 108, 114-15, 117, *City of New York v. Abbott Labs, Inc.,* No. 04-6054 (S.D.N.Y. Aug. 4, 2004). The City alleged that BMS filed "intentionally false and misleading" average wholesale prices for specific drugs, including Coumadin. *Id.* at ¶ 262, Ex. A.

• A suit brought by the State of Montana in August 2003, related to *In re Pharm. Indus. Average Wholesale Price Litig.,* MDL No. 1456, No. 01-12257 (D.Mass. July 28, 2003), alleged that defendants, including BMS, "did not report the actual Best Price," but instead "excluded discounts and other inducements ... such as ... re-

bates ... that lower the providers' actual cost of the drugs, that resulted in lower prices reported to the Medicaid Program (and, consequently, the payment of lower rebates)." Second Amended Complaint at ¶ 612, *Montana v. Abbott Labs., Inc.,* No. 02-09-H-DWM (D.Mont. Aug. 1, 2003).

These examples demonstrate that the relator's best price claims were also the subject of repeated prior public disclosures. The essential elements of the best price fraud-that BMS concealed the true nature of sham rebate and data purchase agreements with Medco (misrepresented facts) so that BMS could avoid accounting for those sham contracts in its best price reports to the government (true facts)-had already been alleged in numerous other civil actions and were sufficient to set the government on the trail of fraud before the relator filed a complaint with these claims. The relator may have blown a whistle here, but he was certainly not the first to toot.

### 3. Relator Is Not An "Original Source"

When a relator's claims are based upon publicly disclosed allegations or transactions of fraud, his claims are barred by the FCA's public disclosure bar unless the relator qualifies as an "original source." 31 U.S.C. § 3730(e)(4)(B); *Paranich,* 396 F.3d at 332.

**\*7** " 'Original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action ... which is based on the information." 31 U.S.C. § 3730(e)(4)(B); *Paranich,* 396 F.3d at 335. "Direct knowledge is knowledge obtained without any intervening agency, instrumentality or influence: immediate", while "[i]ndependent knowledge is knowledge that does not depend on public disclosures." *Atkinson,* 473 F.3d at 520 (internal quotations omitted). A relator ... cannot establish that he is an original source solely by relying on "unsupported, conclusory allegation[s]." *Kennard [v. Comstock Resources, Inc.],*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
(Cite as: 2010 WL 4025904 (E.D.Pa.))

363 F.3d [1039,] 1044 [ (10th Cir.2004) ]. In assessing [the relator's] original source status, the Court must examine the allegations contained in the Amended Complaint. *See Rockwell Int'l Corp. v. United States,* 549 U.S. 457, 473, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007).

*Sodexho, Inc.,* 2009 U.S. Dist. LEXIS 51469, at *40-41, 2009 WL 579380.

Here, the relator has failed to allege that he had the necessary direct and independent knowledge of fraud by BMS to qualify as an "original source." The only facts alleged in the complaint relating to his direct and independent knowledge of the information on which his claims are based are recounting contract negotiations in which he participated but with no mention of how he obtained direct knowledge of the ultimate fraudulent conduct. (Fourth Am. Compl. ¶¶ 55, 86-87.) For example, the relator alleges that "he and other Medco personnel met on April 24, 2001 with DuPont personnel to negotiate an increase of the discount to 63% below the reported [wholesale acquisition cost]," and then baldly asserts that "it was DuPont's intent to disguise the ... discount ... to evade reporting these prices under the Best Price statute and provide kickbacks to Medco so that Coumadin would remain [Medco's] exclusive anticoagulant." (Fourth Am. Compl. ¶ 86.) However, it is not alleged how, when, where, or from whom he obtained the knowledge that the discounts given to Medco were somehow linked to the evasion of BMS' best price reporting obligations. The relator does not allege direct and independent knowledge of facts to establish FCA violations; rather, he merely alleges facts suggesting he had direct knowledge that BMS was selling Coumadin to Medco at a discount. I am left to guess how he obtained knowledge of fraud. The relator's reliance on inferences belies his claims that he has the direct and independent knowledge necessary to be deemed an original source.[FN12]

FN12. The relator plainly alleges additional details about the circumstances of the fraud, but fails to allege how he himself

obtained "direct and independent" knowledge.

\* \* \*

The relator's kickback claims and best price claims against BMS fail to overcome the FCA's public disclosure bar. The relator's claims against BMS are substantially similar to allegations and transactions that were already publicly disclosed before the relator asserted them, and the relator is not an "original source" because he fails to allege the necessary "direct and independent" knowledge. The relator has failed to meet his burden of alleging facts essential to demonstrate jurisdiction under the FCA and supporting those facts with competent proof. Accordingly, I must dismiss the relator's claims against BMS pursuant to Rule 12(b)(1) for lack of jurisdiction. Having dismissed all the federal claims against BMS, I decline to exercise supplemental jurisdiction over the state law claims.

**\*8** The relator has had sufficient opportunities to cure jurisdictional deficiencies in his pleadings, specifically with regard to his "direct and independent" knowledge of the fraud. Therefore, I will dismiss the relator's claims against BMS with prejudice because I find that any amendments would be futile.

**B. Relator's Claims Against AZ**

AZ argues that the complaint must be dismissed under Rule 12(b) (6) for the relator's failure to satisfy the pleading requirements of Rule 9(b) and Rule 8(a). AZ argues that the relator has failed to plead the details of any actual false claim submitted by the states or any facts demonstrating that the states' submissions or AZ's best price reports were false. The allegations that form the basis for all counts against AZ are that (1) AZ provided illegal kickbacks in the form of rebates, service fees, disease-management fees, and unrestricted educational grants to Medco to induce it to purchase and dispense Prilosec and Nexium to government-plan patients, rather than the equivalent generic drugs,, which resulted in patients submitting claims with overstated amounts to government plans for reim-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
**(Cite as: 2010 WL 4025904 (E.D.Pa.))**

bursement; and (2) AZ failed to account for the sham agreements in its best price reports for Prilosec and Nexium, which resulted in AZ submitting false best price reports to the government, states submitting false claims for rebates under the Medicaid and 340B programs, and AZ underpaying its rebates. I find that the relator has pled the circumstances of the fraud with sufficient particularity to satisfy the pleadings requirements.

**1. Standard of Review Under Rules 8(a) and 9(b)**

Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief can be granted. I must accept as true the factual allegations contained in the complaint and all reasonable inferences drawn therefrom and view the facts in the light most favorable to the plaintiff. Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although Rule 8(a) does not demand " 'detailed factual allegations,' .... 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 556).

Claims under the FCA sound in fraud and therefore must satisfy Rule 9(b)'s heightened pleading standard. *United States ex rel. Schmidt v. Zimmer, Inc.,* 386 F.3d 235, 242 n. 9 (3d Cir.2004). Under Rule 9(b), the complaint "must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* Rule 9(b) requires this heightened

pleading "in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir.1984).

**2. FCA Claims Against AZ Are Stated With Sufficient Particularity**

**\*9** The "false claims" provision of the FCA imposes liability on a defendant who "knowingly ... causes to be presented to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a) (1). The "reverse false claims" provision imposes liability on a defendant who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the government." 31 U.S.C. § 3729(a)(7). The falsity or fraud ascribed to these "false claims" and "reverse false claims" must be pled with particularity pursuant to Rule 9(b), so that the defendants are put on notice of the fraud being alleged by the relator. [FN13]

> [FN13]. The "false claims" and "reverse false claims" provisions are the predicates for all the relator's counts against AZ.

Here, the relator alleges that AZ and Medco set up an elaborate, well-planned scheme to defraud the government through a series of sham contracts. Specifically, the relator alleges the details of eleven different agreements between AZ and Medco that he says were intended to carry out their plan to defraud the government. These details include contract titles, payment amounts, the products involved, and the years during which these fraudulent agreements were in force. The relator alleges meeting dates and the names of participants; in short, the how, when, and why the fraudulent agreements were created.

The relator then alleges that as a consequence, government-plan patients and states were caused to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
**(Cite as: 2010 WL 4025904 (E.D.Pa.))**

submit inflated and therefore "false claims" for payments and that AZ submitted "reverse false claims" to avoid its refund obligations. The alleged "false claims" submitted by government-plan patients were "false" only in the sense that the claims were based on the alleged kickback fraud between AZ and Medco; similarly, the alleged "false claims" submitted by the states were false only in the sense that they were based on the alleged false best price reports submitted by AZ. The falsity of the "reverse false claim" lies in AZ's alleged failure to account for its sham agreements with Medco in its best price reports. The relator has therefore alleged with sufficient particularity, as required by Rule 9(b), the circumstances of the falsities and fraud in its FCA claims against AZ.

AZ argues that the relator's claims must fail because he has not identified and pled the details of any actual false claim. However, "claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *U.S. ex rel. Lemmon v. Enviro-cafre, Inc.,* No. 09-4079, 2010 U.S.App. LEXIS 16117 *21, 2010 WL 3025021 (10 Cir.2010).* Requiring the relator to plead the details of an actual claim would not place AZ in a better position to answer and defend the charges of fraud against it. Here, the "false claims" are only false because they are based on the kickback fraud between AZ and Medco or the "false" best price reports submitted by AZ. If the relator had described the details of an actual claim submitted by a government-plan patient or state Medicaid office and included specifics, such as the contents of the claim, who submitted it, the date, the amount claimed, and the amount actually due, AZ would not be in a better position to defend itself because neither the patients nor the states are being charged with fraudulent conduct. [FN14] A case should not turn on whether a pointless allegation has been pled or not.

FN14. In its motion to dismiss, AZ does not specifically address the deficiencies in

the alleged "false claims" submitted by government-plan patients, but instead focuses on the "reverse false claims" submitted by AZ in connection with its best price reporting obligations and the "false claims" submitted by the states as a result of the false best price reports.

**\*10** Furthermore, "allegations of 'date, place, or time' ' may fulfill the requirement of particularity, "but nothing in Rule 9(b) requires them." *Seville,* 742 F.2d at 791. Here, AZ "use[d] alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.*

**a. Kickback Claims Against AZ**
The fourth amended complaint is littered with details about the alleged kickbacks which form the basis of the false claims, such as the specific rebates, service fees, disease-management fees, and unrestricted educational grants. (Fourth Am. Compl. ¶¶ 123-230.) The relator alleges the parties involved, (AZ and Medco), the drugs at issue, (Prilosec and Nexium), the dates the kickbacks were paid (from 1996 through at least 2003), the dates of certain meetings where the sham agreements were discussed (e.g., Fourth Am. Compl. ¶ 124), and the names of persons at those meetings (e.g., Mark Mallon, Carrie Maglich and Mark Bardi). *Id.* The relator then alleges that these kickbacks resulted in patients submitting inflated, and thereby false, claims to government plans for reimbursement: "These kickbacks were intended to result in the dispensing of these drugs and reimbursement by Medco's customers, including Government Programs, when using Medco's mail service pharmacies, including under the FEHBP contract with Medco." (*Id.* ¶ 239.) This is enough to put AZ on notice of the circumstances of the fraud.

**b. Best Price Claims Against AZ**
Similarly, AZ argues that the relator's best price report claims must fail because the relator has no personal knowledge of the content of any actual best price reports. However, AZ appears to conflate Rule 9(b)'s particularity requirement with the FCA's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584
**(Cite as: 2010 WL 4025904 (E.D.Pa.))**

requirement that the relator have "direct and inde-pendent" knowledge of the fraud if there are prior public disclosures. *See* 31 U.S.C. § 3730(e)(4)(B). The relator is not required to plead "direct and in-dependent" knowledge to satisfy Rule 9(b). He must only plead the circumstances of the fraud it-self so that AZ can understand the nature of the claims against it and is protected against spurious charges. *See Seville,* 742 F.2d at 791.

As described above, the relator has sufficiently alleged the details of fraud involving the sham agreements between AZ and Medco. The relator then alleges that AZ "submitted false quarterly statements to [the government] of its Best Prices on [Prilosec and/or Nexium] to reduce improperly its rebate obligations to the States under the Best Price Program" by not accounting for those agreements. ( *Id.* ¶ 141; *see also, id.* ¶¶ 151, 163, 171, 184, 187, 193, 204, 214, 221, 229, 237.) The relator also al-leges that AZ's "false quarterly statements of the Best Prices on [Prilosec and Nexium] caused the States to submit false and inflated submissions to the Federal Government for reimbursement of Medicaid expenditures." (*Id.*) Again, the relator al-leges the parties involved in the underlying fraud, the drugs at issue, and the periods the false best prices were reported. With these allegations, AZ is placed on sufficient notice of the charges against it.

\* \* \*

**\*11** The relator's kickback claims and best price claims against AZ satisfy the pleading re-quirements of Rules 8(a) and 9(b). Requiring the re-lator to plead an actual claim in these circumstances would not place AZ in a better position to answer and defend the charges of fraud against it. The re-lator's FCA claims against AZ are pled with suffi-cient particularity to place AZ on notice of the charges and protect it from spurious charges. Ac-cordingly, I must deny AZ's motion to dismiss the relator's claims.

**IV. CONCLUSION**
For the foregoing reasons, I have granted BMS' motion to dismiss under Rule 12(b)(1) for lack of

jurisdiction, and I have denied AZ's motion to dis-miss under Rule 12(b)(6) for failure to state a claim. I dismissed all of the relator's claims against BMS with prejudice because I find that the any amendments would be futile.

E.D.Pa.,2010.
U.S. ex rel. Schumann v. AstraZeneca PLC
Slip Copy, 2010 WL 4025904 (E.D.Pa.), Med & Med GD (CCH) P 303,584

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 1424213 (M.D.Fla.), Med & Med GD (CCH) P 302,887
**(Cite as: 2009 WL 1424213 (M.D.Fla.))**

H

United States District Court, M.D. Florida,
Tampa Division.
UNITED STATES of America ex rel., Greg West-
fall and Suzanne WESTFALL, Plaintiffs,
v.
AXIOM WORLDWIDE, INC., Axiom Worldwide,
LLC, James J. Gibson, Jr., Nicholas Exarhos,
Timothy Exarhos, Peer Review Network, Inc., De-
fendants.

No. 8:06-cv-571-T-33TBM.
May 20, 2009.

Alan E. Kleinburt, U.S. Dept. of Justice, Washing-
ton, DC, Jennifer Chorpening, Washington, DC,
Kenneth Joel Haber, Kenneth Joel Haber, Law Of-
fice of Kenneth Joel Haber, PC, Rockville, MD,
Lacy R. Harwell, Jr., US Attorney's Office - FLM,
Tampa, FL, Daniel F. Pilka, Pilka & Associates,
PA*, Brandon, FL, for Plaintiffs.

Louis Joseph Shaheen, Jr., Mitchell C. Robiner,
Akerman Senterfitt, Marcos E. Hasbun, Morris
Weinberg, Jr., Zuckerman Spaeder, LLP, Timothy
Allen Andreu, Glenn, Rasmussen, Fogarty & Hook-
er, PA, Mitchell C. Robiner, Akerman Senterfitt,
Tampa, FL, Kathryn H. Ruemmler, Roger S. Gold-
man, Latham & Watkins, PA, Washington, DC, D.
David Keller, Bunnell, Woulfe, Kirschbaum, Keller
& Gregoire, P.A., Ft Lauderdale , FL, for Defend-
ants.

***ORDER***
VIRGINIA M. HERNANDEZ COVINGTON, Dis-
trict Judge.
**\*1** This cause is before the Court pursuant to
Defendants Axiom Worldwide, Inc., Axiom World-
wide, LLC, James J. Gibson, Jr., and Nicholas Ex-
arhos' Motion to Dismiss Relators' Second
Amended Complaint with Prejudice (Doc. # 81),
which was filed on April 22, 2009. On May 6,
2009, Relators Greg and Suzanne Westfall filed

their Response in Opposition to the Motion to Dis-
miss. (Doc. # 82). For the reasons that follow, this
Court will grant Defendants' motion to dismiss.

**I. *Factual Background*FN1**

FN1. The factual allegations are taken
from the second amended complaint (Doc.
# 77) and are accepted as true for the pur-
pose of deciding Defendants' motion to
dismiss.

Defendants Axiom Worldwide, Inc. and Axiom
Worldwide, LLC (collectively "Axiom World-
wide") are business entities developed by Defend-
ants James Gibson, Nicholas Exarhos, and Timothy
Exarhos to market, promote, and sell DRX spinal
decompression devices to healthcare professionals.
The DRX devices are high-tech tables used by
physicians to ease neck and back pain. (Doc. # 77
at ¶ 12).

Relators allege that the DRX devices were
"mechanical traction devices" and that "Defendants
devised a sales scheme to promote the sale of their
DRX-9000 (and related devices) by knowingly,
falsely, and fraudulently causing physicians to sub-
mit claims for payment to Medicare and other fed-
eral healthcare programs for services rendered with
the DRX devices (and related devices) by use of
their billing scheme." (*Id.*)

Relators describe the alleged "billing scheme:"

Traction devices are similar to the DRX device
and are billed under Medicare for approximately
fifteen dollars ($15) per session [under mechanic-
al traction CPT Code 97012 or an unlisted code].
Axiom [Worldwide] falsely and fraudulently
markets and promotes its device as one to be
billed in a manner devised by Defendants Gibson,
Nicholas and Timothy Exarhos and PRN for ap-
proximately one hundred and fifty-six dollars
($156) per session for multiple procedures as
physical therapy type services; such as, Manual

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1424213 (M.D.Fla.), Med & Med GD (CCH) P 302,887
**(Cite as: 2009 WL 1424213 (M.D.Fla.))**

Therapy/Joint Mobilization (CPT Code 97140) and/or Therapeutic/Kinetic Activities (CPT Code 97530), instead of mechanical traction or an unlisted procedure which in truth and fact is what it should be billed as.

   (*Id.*)

   Relator Greg Westfall was a sales representative and sales manager for Axiom Worldwide and Relator Suzanne Westfall served as Greg Westfall's assistant. (*Id.* at ¶ 3).

   While employed at Axiom Worldwide, Relators concluded that the DRX tables were being sold to physicians under the scheme described above. Particularly, Relators claim that Defendants "devised a sales scheme and program using false and fraudulent and misleading representations to physicians which they knew would cause physicians to submit false and fraudulent claims to the Medicare and other Federal Program Officials in order for the physicians to obtain the higher reimbursements of approximately $156 per patient session." (*Id.* at ¶ 14).

## II. *Relators' Complaint and Procedural History*

   On April 5, 2006, Relators filed a sealed complaint against Defendants under the False Claims Act, 31 U.S.C. § 3729 (the "FCA"). (Doc. # 1). On August 3, 2007, the United States declined to intervene in this suit. (Doc. # 2). On February 19, 2008, Defendant Axiom Worldwide, Inc. filed a motion to dismiss the complaint with prejudice pursuant to Rules 9(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure (Doc. # 15), arguing, among other things, that Axiom Worldwide, Inc. never submitted any claims to Medicare, or any other Government agency, for reimbursement.

   *2 On February 20, 2008, Relators filed a motion to amend the complaint, which was granted. (Doc.16, 22). On March 31, 2008, Relators filed the first amended complaint, mooting the initial motion to dismiss the complaint. (Doc. # 27). On June 10, 2008, Defendants again sought dismissal of the

case, asserting that the amended complaint was "an unfocused, meandering, and virtually incomprehensible pleading that consists of errant and disjointed allegations." (Doc.33, 63 at 3). On March 20, 2009, this Court dismissed the first amended complaint without prejudice, noting: "Reading the first amended complaint carefully, this Court was not able to connect with any certainty the numerous allegations with the individual Defendants." (Doc. # 70 at 9). In the Order, the Court directed the Relators to:

   [F]ile a second amended complaint, limited to fifteen pages, within ten days of the date of this Order. The second amended complaint shall be organized into specific counts and shall, as to each count: (1) identify specific false claims for payment or specific false statements made in order to get a false claim paid by the Government; (2) if a false statement is alleged, connect that statement to a specific claim for payment and state who made the statement to whom and when; and (3) state why those claims or statements were false. As for the conspiracy allegations, Relators should specifically identify the alleged co-conspirators and describe the alleged agreement to defraud the Government.

   If Relators fail to comply with this Court's Order and with the basic requirements of Rule 9(b) of the Federal Rules of Civil Procedure, this Court will be inclined to dismiss this case with prejudice.

   (Doc. # 70 at 25-26).

   On April 6, 2009, Relators filed a second amended complaint containing nineteen counts. (Doc. # 77). Counts one through four are asserted against each Defendant and allege that the Defendants collectively submitted false claims for payment to Medicare and other Government programs through Defendant Timothy Exarhos' medical practice. (*Id.* at ¶¶ 23-24). Counts five through eight are also asserted against each Defendant and allege that Defendants collectively created and used false re-

Slip Copy, 2009 WL 1424213 (M.D.Fla.), Med & Med GD (CCH) P 302,887
**(Cite as: 2009 WL 1424213 (M.D.Fla.))**

cords to get claims paid by the Government through Defendant Timothy Exarhos' medical practice. (*Id.* at ¶¶ 25-26). Akin to counts one through eight, counts nine through eighteen are asserted against each Defendant and allege that Defendants collectively caused false claims to be presented to the Government for payment through James Staheli's medical practice. (*Id.* at ¶¶ 27-30). In count nineteen, Relators allege that Defendants conspired "to defraud the Government of the United States, in particular the Medicare and other government healthcare programs, by getting false and fraudulent claims allowed and paid in the amount of multi-millions of dollars so that the Defendants could sell their DRX devices." (*Id.* at ¶¶ 31-34).

**\*3** By their present motion to dismiss, Defendants argue that Relators failed to comply with Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure as well as with the directives set forth in this Court's Order of dismissal.

### III. *Legal Standard*

On a motion to dismiss, this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. *Jackson v. Bellsouth Telecomms.,* 372 F.3d 1250, 1262 (11th Cir.2004). Further, this Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. *Stephens v. Dep't of Health & Human Servs.,* 901 F.2d 1571, 1573 (11th Cir.1990) ("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true.")

However, the Supreme Court explains that:

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted). Further, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

### IV. *Motion to Dismiss with Prejudice*

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." However, Rule 9(b) of the Federal Rules of Civil Procedure places more stringent pleading requirements on cases alleging fraud, such as the present one. *Clausen v. Lab. Corp. of Am., Inc.,* 290 F.3d 1301, 1305 (11th Cir.2002). Rule 9(b) is satisfied only if the complaint sets forth: "(1) precisely what statements were made in what documents or oral representations or what omissions were made, (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) [the] same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir.2001).

Furthermore, the Eleventh Circuit recently held in a similar FCA case:

Rule 9(b) requires 'some indicia of reliability in the complaint to support allegations of an *actual false claim* for payment being made to the Government.' Plaintiffs need not prove their allegations in the complaint but must provide particular facts so the Court is not left wondering whether a plaintiff has offered mere conjecture or a specifically pleaded allegation on an essential element of the lawsuit.

*Mitchell v. Beverly Enters., Inc.,* 248 F. App'x 73, 74-75 (11th Cir.2007) (citing *Clausen,* 290 F.3d at 1311) (emphasis in original).

**\*4** The FCA permits private persons to file *qui*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1424213 (M.D.Fla.), Med & Med GD (CCH) P 302,887
**(Cite as: 2009 WL 1424213 (M.D.Fla.))**

*tam* actions on behalf of the United States against any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. § 3729(a).

Under the FCA, a person acts "knowingly" when he "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). Furthermore, a "claim" under the FCA is "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested." 31 U.S.C. § 3729(c).

Thus, to succeed on an FCA claim, a relator must prove: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant[s] to the United States for payment or approval; (3) with knowledge that the claim was false." *Walker v. R & F Props. of Lake City, Inc.,* 433 F.3d 1349, 1355 (11th Cir.2005).

The statute provides for a "civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person ...." 31 U.S.C. § 3729(a). This bounty provision encourages litigation. As stated by the Supreme Court, *qui tam* suits "are motivated primarily by prospects of monetary reward, rather than public good" and "raise a high risk of abusive litigation." *Hughes Aircraft Co. v. Schumer,* 520 U.S. 939, 949, 117

S.Ct. 1871, 138 L.Ed.2d 135 (1997); *Twombly,* 550 U.S. 544, 569 n. 14, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

The *sine qua non* of any FCA case is the submission of a false claim for payment to the Government. Relators, insiders of Axiom Worldwide, generally contend that two specific physicians (Defendant Dr. Timothy Exarhos and non-party Dr. James Staheli) submitted fraudulent claims for payment in connection with billing Medicare and other federal programs for use of the DRX devices. In an abundance of caution and fairness, this Court allowed Relators to amend their complaint to comply with Rule 9(b) as to these bare allegations. Though given ample opportunity, Relators failed to comply with Rule 9(b) and this Court's Order.

Specifically, this Court finds that counts one through eighteen (alleging the submission of false claims to the Government and creation of false records to get a false claim paid under 31 U.S.C. § 3729(a)) lack the necessary indicia of reliability to survive Defendants' motion to dismiss. Relators identified four claims reflecting CPT code 97530 allegedly billed to Medicare by Dr. Timothy Exarhos and eight claims reflecting CPT codes 97530 or 97140 allegedly billed to Medicare by Dr. Staheli. These allegations cannot support an FCA action and are not reliable because Relators do not allege what services were actually rendered by Dr. Timothy Exarhos and Dr. Staheli. As argued by Defendants, "Because Relators neither worked ... in either Timothy Exarhos' or Dr. Staheli's medical practices, they do not have firsthand knowledge about the services rendered to the patients, who, likewise, are not known to Relators." (Doc. # 81 at 10).

**\*5** Even if this Court were to take judicial notice, as requested by Relators, of the CPT codes and their meanings, this Court could not allow counts one through four and counts nine through eighteen to stand. This is because Relators have provided no reliable basis to support the allegations that claims submitted by these physicians were false.[FN2] The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1424213 (M.D.Fla.), Med & Med GD (CCH) P 302,887
**(Cite as: 2009 WL 1424213 (M.D.Fla.))**

two physicians identified (Dr. Timothy Exarhos and Dr. Staheli) may have owned a DRX table, but this Court cannot conclude that these physicians were submitting false claims to Medicare simply because they owned a certain device and billed Medicare under various CPT codes. Furthermore, Relators do not have firsthand knowledge to support the allegation that any claims in question were actually submitted to Medicare or any other federal healthcare program.

> FN2. This Court also agrees with Defendants that "the [complaint] heading pertaining to counts 1 through 4 conveys the impression that the counts are against Timothy Exarhos only." (Doc. # 81 at 6). Relators fail to explain how the other Defendants were involved in the alleged submission of false claims to Medicare.

The same analysis applies with equal force to counts five through eight, which concern false records. The breadth of the allegations concerning false records is of particular concern to this Court. Relators contend, "[o]n information and belief" that:

> [N]umerous thousands of other false and fraudulent records and statements were made and used and caused to be made and used to get false and fraudulent claims paid and approved by the government health care programs including but not limited to the Medicare program through Defendant Dr. Timothy Exarhos' medical practice by each of the Defendants herein and these will be determined upon discovery.

(Doc. # 77 at 11). This vague allegation cannot carry the day in an FCA case concerning false records.[FN3]

> FN3. *See, e.g., Rafizadeh v. Cont'l Common, Inc.,* 553 F.3d 869, 874 (5th Cir.2008) ("Despite the fact that § 3729(a)(2) does not require presentment, a relator alleging a § 3729(a)(2) violation

must still show the who, what, when, and how of the alleged fraud under Rule 9(b). Rafidazeh has failed to meet several of the Rule 9(b) requirements: what statements were in the budget, who prepared it, and how it was used to get government funds.")

In conducting its analysis, this Court finds instructive *Atkins v. McInteer,* 470 F.3d 1350 (11th Cir.2006). In *Atkins,* the relator alleged that defendants created an elaborate scheme for defrauding the Government through the submission of false claims to Medicare. Even though the complaint listed particular patients, dates, and corresponding medical codes, the Eleventh Circuit held that the relator failed to provide the nexus "showing that the defendants actually submitted reimbursement claims for the services." *Id.* at 1359.

The Eleventh Circuit further held that the FCA does not allow a plaintiff "merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id.* at 1357 (citing *Clausen,* 290 F.3d at 1311). Finally, the Eleventh Circuit determined that the relator summarily concluded, without specifically alleging, that the defendants submitted false claims to the Government for reimbursement, and accordingly, the Eleventh Circuit affirmed the dismissal of the case with prejudice. *Id.* at 1355.

The holding in *Atkins* is in sharp contrast to that in *Hill v. Morehouse Med. Assoc., Inc.,* 82 Fed App' x 213, 2003 WL 22019936 (11th Cir. Aug.15, 2003) (unpublished). In *Hill,* the Eleventh Circuit reversed the dismissal of a FCA complaint, finding that a former medical billing and coding employee satisfied Rule 9(b)'s particularity requirement when she claimed in her complaint that she had firsthand knowledge that her employer submitted false claims. *Id.* at *5. In *Hill,* the relator worked for seven months in the department responsible for claims

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1424213 (M.D.Fla.), Med & Med GD (CCH) P 302,887
**(Cite as: 2009 WL 1424213 (M.D.Fla.))**

submission. *Id.* at *4.

**\*6** Here, Relators are akin to those from *Atkins.* Though they were employees of Axiom Worldwide, they allege that Dr. Timothy Exarhos and Dr. Staheli submitted false claims to the Government. Relators never worked in the offices of these physicians, nor did they witness these physicians submitting false claims. Relators' second amended complaint fails to allege false claims and false records with the level of specificity required by Rule 9(b). Accordingly, this Court dismisses counts one through eighteen.

This Court similarly dismisses count nineteen, containing Relator's conspiracy allegations. Relators' bare boned conspiracy count alleges that Defendants:

> Did combine, conspire, and agree together and with each other to defraud the Government of the United States, in particular the Medicare and other government healthcare programs, by getting false and fraudulent claims allowed and paid in the amount of multi-millions of dollars so that the Defendants could sell their DRX devices. Said Defendants combined, conspired and agreed together and with each other and others unknown and uncharged herein, to commit the acts and omissions cited in this complaint.

> (Doc. # 77 at ¶ 31).

As overt acts, in addition to those listed in the complaint, Relators allege that Defendant Nicholas Exarhos sold Dr. Fisher a DRX device and that he "instructed by fax, Dr. Staheli ... to use the fraudulent billing scheme codes, all of which he knew to be false and fraudulent." (*Id.* at ¶¶ 32-34).

The second amended complaint fails to comply with this Court's Order (Doc. # 70 at 25) because it "does not describe the alleged agreement to defraud the Government." (Doc. # 81 at 15). Further, it does not refer to any particular communication between or among the alleged co-conspirators that demon-

strates any agreement to defraud the Government. There is no allegation concerning where or when the agreement was reached. The allegations concerning a conspiracy (lacking specific allegations regarding the entry of an agreement or overt acts) are merely legal conclusions masquerading as factual allegations, which do not survive the motion to dismiss. *See Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1014 (11th Cir.2005).

This Court presumes, as with the other counts, that Relators intend to uncover the basis for their conspiracy claim through discovery, which is impermissible.

**V. *Conclusion***

The stringent standards imposed by Rule 9(b) safeguard a defendant's reputation from the injury which can result from fraud allegations. *See Durham v. Business Mgmt. Assoc.,* 847 F.2d 1505, 1511 (11th Cir.1988). Rule 9(b)'s requirements also rebuff "fraud actions in which all of the facts are learned through discovery after the complaint is filed." *Friedlander v. Nims,* 755 F.2d 810, 813 (11th Cir.1985); *Clausen,* 290 F.3d 1313 n. 24 ("When a plaintiff does not specifically plead the minimum elements of their allegations, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements.")

**\*7** As the Eleventh Circuit held in *Atkins:*

The particularly requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim.... If given such a ticket, the next stage of the litigation is clear. The Plaintiff will request production of every claim submitted by the Defendant during the time period corresponding to Plaintiff's claims. At that point, the Defendant may decide to settle the case to avoid the enormous cost of such discovery and the possible disruption of its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1424213 (M.D.Fla.), Med & Med GD (CCH) P 302,887
**(Cite as: 2009 WL 1424213 (M.D.Fla.))**

ongoing business. On the other hand, the Defendant may choose to resist the discovery. In that case, the Court will be presented with the dilemma of allowing an unlimited fishing expedition or no discovery at all because of the difficulty in fashioning logical and principled limits on what has to be produced. The particularity requirement of Rule 9(b), if enforced, will not only protect defendants against strike suits, but will result in claims with discernable boundaries and manageable discovery limits.

*Id.* at 1359-1360 (citations omitted).

This Court roundly refuses to open the door to discovery and litigation when, after three attempts, Relators failed to file a complaint in compliance with Rule 9(b) of the Federal Rules of Civil Procedure. Thus, upon due consideration, this Court dismisses this case with prejudice.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendants Axiom Worldwide, Inc., Axiom Worldwide, LLC, James J. Gibson, Jr., and Nicholas Exarhos' Motion to Dismiss (Doc. # 81) is **GRANTED.**

(2) This case is **DISMISSED WITH PREJUDICE.** The Clerk is directed to terminate all pending motions and **CLOSE** this case.

**DONE** and **ORDERED.**

M.D.Fla.,2009.
U.S. ex rel. Westfall v. Axiom Worldwide, Inc.
Slip Copy, 2009 WL 1424213 (M.D.Fla.), Med & Med GD (CCH) P 302,887

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.)))**

**C**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Ninth Circuit Rule 36-3. (Find CTA9 Rule 36-3)

United States Court of Appeals,
Ninth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
B.E. SMITH, Defendant-Appellant.

No. 99-10447.
D.C. No. CR-97-558-GEB.
Argued and Submitted March 12, 2001.
Decided April 12, 2001.

Defendant was convicted in the United States District Court for the Eastern District of California, Garland E. Burrell, J., for manufacture and possession of marijuana, and he appealed. The Court of Appeals held that: (1) defendant failed to establish the defense of necessity; (2) defendant was not entitled to discovery of prosecution documents in support of his claim of selective prosecution; (3) advice of counsel defense was not available; (4) defense of entrapment by estoppel was not available; (5) the district court did not abuse its discretion in imposing a two-level enhancement of sentence for obstruction of justice; but (6) defendant was entitled to a two-level reduction for acceptance of responsibility.

Affirmed in part, reversed in part, and remanded for resentencing.

Reinhardt, Circuit Judge, dissented in part and would reverse the imposition of a two-level enhancement for obstruction of justice.

Rymer, Circuit Judge. dissented in part and

would affirm denial of an adjustment for acceptance of responsibility.

West Headnotes

**[1] Controlled Substances 96H ☞51**

96H Controlled Substances
    96HII Offenses
        96Hk48 Defenses
            96Hk51 k. Medical Necessity. Most Cited Cases
    (Formerly 138k78 Drugs and Narcotics)

Even assuming that a necessity defense is permitted in prosecutions under the Controlled Substances Act, defendant's evidence in prosecution for manufacture and possession of marijuana, in support of his claim that medical necessity compelled the use of marijuana to treat his post-traumatic stress disorder, failed to satisfy the requirement that there were no other legal alternatives to violating the law, where his medical evidence consisted of a letter from a chiropractor and an affidavit from a psychiatrist, and the affidavit contained no individualized assessment of defendant's symptoms, and was in fact based on a psychological assessment that indicated that defendant had never sought psychiatric treatment for his condition.

**[2] Criminal Law 110 ☞38**

110 Criminal Law
    110II Defenses in General
        110k38 k. Compulsion or Necessity; Justification in General. Most Cited Cases

A defendant must establish the existence of four elements to be entitled to a necessity defense: (1) that he was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm; (3) that he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law.

**[3] Criminal Law 110 ☞37.10(1)**

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.)))**

110 Criminal Law
   110II Defenses in General
     110k36.5 Official Action, Inaction, Representation, Misconduct, or Bad Faith
       110k37.10 Discriminatory or Selective Prosecution
         110k37.10(1) k. In General. Most Cited Cases

    To prove selective prosecution, a defendant must show that a prosecutorial policy or decision had a discriminatory effect and that it was motivated by a discriminatory purpose.

**[4] Criminal Law 110  37.10(1)**

110 Criminal Law
   110II Defenses in General
     110k36.5 Official Action, Inaction, Representation, Misconduct, or Bad Faith
       110k37.10 Discriminatory or Selective Prosecution
         110k37.10(1) k. In General. Most Cited Cases

    A proffer in support of a discovery motion in support of claim of selective prosecution must include a credible showing of different treatment of similarly situated persons.

**[5] Criminal Law 110  37.10(1)**

110 Criminal Law
   110II Defenses in General
     110k36.5 Official Action, Inaction, Representation, Misconduct, or Bad Faith
       110k37.10 Discriminatory or Selective Prosecution
         110k37.10(1) k. In General. Most Cited Cases

**Criminal Law 110  627.6(2)**

110 Criminal Law
   110XX Trial
     110XX(A) Preliminary Proceedings
       110k627.5 Discovery Prior to and Incident to Trial

       110k627.6 Information or Things, Disclosure of
         110k627.6(2) k. Documents or Tangible Objects. Most Cited Cases

    Defendant was not entitled to discovery of prosecution documents in support of his claim of selective prosecution, where his proffer failed to identify similarly situated persons who received different treatment.

**[6] Criminal Law 110  37.20**

110 Criminal Law
   110II Defenses in General
     110k37.20 k. Good Faith; Advice of Counsel. Most Cited Cases

    Advice of counsel is a partial defense offered to disprove a mens rea element of a crime, and a defendant who reasonably relies on the advice of counsel may not be convicted of a crime which involves wilful and unlawful intent.

**[7] Criminal Law 110  37.20**

110 Criminal Law
   110II Defenses in General
     110k37.20 k. Good Faith; Advice of Counsel.
Most Cited Cases

    In order to assert an advice of counsel defense, a defendant must have made a full disclosure to his attorney, received advice as to the specific course of conduct that he followed, and relied on this advice in good faith.

**[8] Controlled Substances 96H  22**

96H Controlled Substances
   96HII Offenses
     96Hk22 k. Manufacture. Most Cited Cases
(Formerly 138k73.1 Drugs and Narcotics)
    Offenses of manufacture and possession of marijuana required a "knowing" scienter, not a "willful" one, and government was required to show only that defendant must have known that he was in fact performing an act, whether or not he knew that the act had been criminalized by statute.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.)))**

Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 404, 21 U.S.C.A. §§ 841(a)(1), 844.

**[9] Criminal Law 110 ⚛37.20**

110 Criminal Law
    110II Defenses in General
      110k37.20 k. Good Faith; Advice of Counsel.
Most Cited Cases

    Advice of counsel defense was not available as a defense to the general-intent crimes of manufacture and possession of marijuana. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 401(a)(1), 404, 21 U.S.C.A. §§ 841(a)(1), 844.

**[10] Criminal Law 110 ⚛37(2.1)**

110 Criminal Law
    110II Defenses in General
      110k36.5 Official Action, Inaction, Representation, Misconduct, or Bad Faith
        110k37 Entrapment
          110k37(2) What Constitutes Entrapment
            110k37(2.1) k. In General. Most Cited Cases

    The defense of entrapment by estoppel is based on the proposition that it is improper to permit the government to prosecute individuals who reasonably rely upon that government's interpretation of the law.

**[11] Criminal Law 110 ⚛37(2.1)**

110 Criminal Law
    110II Defenses in General
      110k36.5 Official Action, Inaction, Representation, Misconduct, or Bad Faith
        110k37 Entrapment
          110k37(2) What Constitutes Entrapment
            110k37(2.1) k. In General. Most Cited Cases

    Defense of entrapment by estoppel applies when an authorized government official tells the defendant that certain conduct is legal, and the defendant believes the official, and the defendant must also establish that he relied on the official's advice, and that his reliance was reasonable.

**[12] Criminal Law 110 ⚛37(8)**

110 Criminal Law
    110II Defenses in General
      110k36.5 Official Action, Inaction, Representation, Misconduct, or Bad Faith
        110k37 Entrapment
          110k37(6) Particular Cases and Offenses
            110k37(8) k. Narcotics and Drugs.
Most Cited Cases

    Reliance on the actions, or lack thereof, of county officials could not form the basis of an entrapment by estoppel defense against a federal criminal charge of manufacture and possession of marijuana, because state officials lack the authority to bind the federal government to a particular course of action.

**[13] Criminal Law 110 ⚛37(8)**

110 Criminal Law
    110II Defenses in General
      110k36.5 Official Action, Inaction, Representation, Misconduct, or Bad Faith
        110k37 Entrapment
          110k37(6) Particular Cases and Offenses
            110k37(8) k. Narcotics and Drugs.
Most Cited Cases

    While a Veterans Hospital physician, who wrote a prescription on behalf of an individual for whom defendant was growing marijuana, was arguably "authorized" for purposes of an entrapment by estoppel defense, the prescription did not provide such a defense to charge of manufacture and possession of marijuana, as the physician did not instruct defendant that his conduct was legal, and in fact had no contact whatsoever with defendant.

**[14] Sentencing and Punishment 350H ⚛761**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.)))**

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
     350HIV(C) Adjustments
       350HIV(C)2 Factors Increasing Offense
Level
         350Hk761 k. Obstruction of Justice.
Most Cited Cases

   In prosecution for manufacture and possession of marijuana, the district court did not abuse its discretion in determining that defendant's untrue testimony with respect to the amount of marijuana he had grown in the past and his belief that cannabis "indica" was not a controlled substance under federal law was "material," warranting two-level enhancement of sentence for obstruction of justice, because it contained outright lies designed to substantially alter the outcome of the case by encouraging jury nullification. U.S.S.G. § 3C1.1, 18 U.S.C.A.

**[15] Sentencing and Punishment 350H ⟷761**

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
     350HIV(C) Adjustments
       350HIV(C)2 Factors Increasing Offense
Level
         350Hk761 k. Obstruction of Justice.
Most Cited Cases

   Untrue testimony is "material," supporting an enhancement for obstruction of justice where, if believed, it would tend to influence or affect the issue under determination. U.S.S.G. §§ 3C1.1, 3C1.1, comment. (n. 6), 18 U.S.C.A.

**[16] Sentencing and Punishment 350H ⟷765**

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
     350HIV(C) Adjustments
       350HIV(C)3 Factors Decreasing Offense
Level
         350Hk765 k. Acceptance of Responsibility. Most Cited Cases

   Defendant was entitled to a two-level reduction for acceptance of responsibility, in sentencing for

manufacture and possession of marijuana, where he did not contest his factual guilt, but instead argued that his behavior was lawful because it was compelled by medical necessity; defendant was not required to also express moral contrition. U.S.S.G. §§ 3E1.1(a), 3E1.1, comment. (n. 2), 18 U.S.C.A.

Appeal from the United States District Court for the Eastern District of California, Garland E. Burrell, District Judge, Presiding.

Before REINHARDT, RYMER, and FISHER, Circuit Judges.

MEMORANDUM FN*
  ***1** B.E. Smith appeals his conviction and sentence for manufacture and possession of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 844. We affirm in part, reverse in part, and remand for resentencing.

  [1][2] A. Smith contends that the district court erred in denying his request to present a defense of medical necessity to the jury. Even assuming that such a defense is permitted in prosecutions under the Controlled Substances Act-a question we do not decide here-Smith's evidentiary proffer fell short of the requirements for establishing legal necessity. *See United States v. Aguilar,* 883 F.2d 662, 693 (9th Cir.1989). Under *Aguilar,* "a defendant must establish the existence of four elements to be entitled to a necessity defense: (1) that he was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm; (3) that he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law." *Id.* (citing *United States v. Dorrell,* 758 F.2d 427, 430-31 (9th Cir.1985)). If a defendant's "offer of proof is deficient with regard to any of the four elements, the district judge must grant the [government's in limine] motion to preclude evidence of necessity." *Id.*

  The district court was correct in concluding

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.)))**

that Smith's evidence in support of his claim that medical necessity compelled the use of marijuana to treat his post-traumatic stress disorder failed to satisfy *Aguilar*'s fourth requirement. As the court noted, Smith's medical evidence "consist[ed] of a letter from a chiropractor and an affidavit from a psychiatrist." The affidavit contained no individualized assessment of Smith's symptoms, and was in fact based on a psychological assessment that indicated that Smith had never sought psychiatric treatment for his condition. In these circumstances, it cannot be said that Smith demonstrated the absence of any "legal alternatives to violating the law." *Aguilar,* 883 F.2d at 693. Accordingly, the district court did not err in barring the necessity defense.

[3][4][5] B. Smith argues that the district court erred in denying his motion for discovery of prosecution documents in support of his claim of selective prosecution. To prove selective prosecution, a defendant must show that a prosecutorial policy or decision "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). A proffer in support of a discovery motion for selective prosecution must "include a credible showing of different treatment of similarly situated persons." *United States v. Armstrong,* 517 U.S. 456, 470, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). Smith's proffer failed to identify such persons. Accordingly, Smith did not show the requisite discriminatory effect, and the district court did not err in denying his discovery motion.

[6][7] C. Smith next contends that the district court erred in denying him the opportunity to present a defense that he relied on the advice of counsel. Advice of counsel is a partial defense offered to disprove a *mens rea* element of a crime. *Bisno v. United States,* 299 F.2d 711, 719 (9th Cir.1961). A defendant who reasonably relies on the advice of counsel may "not be convicted of a crime which involves wilful and unlawful intent." *Williamson v. United States,* 207 U.S. 425, 453, 28 S.Ct. 163, 52 L.Ed. 278 (1908). In order to assert an

advice of counsel defense, a defendant must have made a full disclosure to his attorney, received advice as to the specific course of conduct that he followed, and relied on this advice in good faith. *United States v. Ibarra-Alcarez,* 830 F.2d 968, 973 (9th Cir.1987).

**\*2** [8][9] Smith was charged with violating 21 U.S.C. §§ 841(a)(1) and 844, both of which require a "knowing" scienter, not a "willful" one. The government is required to show only that Smith "must know that he is in fact performing an act, whether or not he knows that the act has been criminalized by statute." *United States v. Lynch,* 233 F.3d 1139, 1141 (9th Cir.2000). Even if Smith could have met all of the other elements required for an advice of counsel defense, it was not available as a defense to the general-intent crimes with which he was charged. Accordingly, the district court did not err in barring Smith from presenting an advice of counsel defense.

[10][11] D. Smith argues that the district court erred in refusing to admit evidence relating to the defense of entrapment by estoppel. The defense of entrapment by estoppel is based on the proposition that it is improper to "permit[] the government to prosecute individuals who reasonably rely upon that government's interpretation of the law." *United States v. Etheridge,* 932 F.2d 318, 321 (4th Cir.1991). The defense applies "when an authorized government official tells the defendant that certain conduct is legal, and the defendant believes the official." *United States v. Brebner,* 951 F.2d 1017, 1024 (9th Cir.1991). A defendant must also establish that he relied on the official's advice, and that his reliance was reasonable. *Id.*

[12][13] Smith's reliance on the actions (or lack thereof) of Trinity County officials cannot form the basis of an entrapment by estoppel defense against a federal criminal charge, because state officials lack the authority to bind the federal government to a particular course of action. *Id.* at 1026. With respect to his reliance on the medical prescription prepared by a Veterans Hospital physician on be-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.)))**

half of an individual for whom Smith was growing marijuana, although such an official is arguably "authorized" under circuit law, *see United States v. Tallmadge,* 829 F.2d 767 (9th Cir.1987) (defendant entitled to assert entrapment defense on basis of information provided by federally licensed gun dealer), the physician did not instruct Smith that his conduct was legal. In fact, the physician in this case had no contact whatsoever with Smith. The district court did not err in concluding that Smith was not permitted to assert an entrapment defense at trial.

[14][15] E. Smith contends that the district court erred in enhancing his sentence two levels for obstruction of justice under United States Sentencing Guidelines (U.S.S.G.) § 3C1.1. This circuit has explained that an adjustment for obstruction of justice under section 3C1.1 may be imposed "if the district judge determines that the defendant committed perjury, i.e., gave 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.' " *United States v. Monzon-Valenzuela,* 186 F.3d 1181, 1183 (9th Cir.1999) (quoting *United States v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)). Untrue testimony is "material" where, "if believed, [it] would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, Application Note 6; *United States v. Magana-Guerrero,* 80 F.3d 398, 400 (9th Cir.1996).

*3 The district court concluded that Smith had provided untrue testimony with respect to two issues: the amount of marijuana he had grown in the past, and his belief that cannabis "indica" was not a controlled substance under federal law. The court found that the false testimony was "material" because it contained "outright lies designed to substantially alter the outcome of the case by encouraging jury nullification." Giving "due deference to the district court's application of the Sentencing Guidelines to the facts," *United States v. Edmonds,* 103 F.3d 822, 826 (9th Cir.1996), we cannot say that the district court abused its discretion by applying section 3C1.1 in these circumstances.

[16] F. Finally, Smith argues that the district court erred in denying him a two-level sentence reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. Smith is correct.

Section 3E1.1(a) provides: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." Application Note 2 to section 3E1.1 explains that the downward adjustment for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." However, in "rare situations a defendant may clearly demonstrate acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a *challenge to the applicability of a statute to his conduct*)" (emphasis added).

Smith did not contest his factual guilt, but instead argued that his behavior was lawful because it was compelled by medical necessity. Accordingly, Application Note 2's reference to a defendant who raises a "challenge to the applicability of a statute to his conduct" applies precisely to the facts of this case. The district court explained its denial of the two-level reduction by noting that Smith "never admitted moral wrongdoing for violating federal marijuana laws" and thus "failed to carry his burden of affirmatively demonstrating sincere contrition and remorse for his offenses." However, nothing in the Guidelines or in our case law supports the district court's requirement that a defendant who challenges the applicability of a statute to his conduct must *also* express moral contrition. Smith was entitled to challenge the applicability of the Controlled Substances Act to his conduct without foregoing his eligibility for a reduction under section

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.)))**

3E1.1. *See, e.g., United States v. McKittrick,* 142 F.3d 1170, 1178 (9th Cir.1998).

Accordingly, we reverse Smith's sentence and remand to the district court with instructions that he be resentenced according to an Offense Level of 14.

**\*4** AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTEN-CING.

Judge Reinhardt dissents from the holding in Part E and would reverse the district court's imposition of a two-level enhancement for obstruction of justice on the ground that Smith's testimony, even if false, was not material to the issue under determination.

Judge Rymer dissents from the holding in Part F and would affirm the district court's denial of an adjustment for acceptance of responsibility because Smith did not just challenge the applicability of the federal drug statutes to his conduct, but their morality and legitimacy.

FN* This disposition is inappropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by 9th Cir. R. 36-3.

C.A.9 (Cal.),2001.
U.S. v. Smith
7 Fed.Appx. 772, 2001 WL 371927 (C.A.9 (Cal.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.