# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, AND THE )
STATES OF CALIFORNIA, FLORIDA, )
ILLINOIS, INDIANA, MASSACHUSETTS, )
MINNESOTA, MONTANA, NEW JERSEY, )
NEW MEXICO, NEW YORK, AND )
TENNESSEE, AND THE DISTRICT OF )
COLUMBIA, each ex rel. LYNNTOYA ) Civil Action
WASHINGTON and MICHAEL T. ) No. 07-CV-461
MAHONEY, )
        Plaintiffs, )
      v. )
     )
EDUCATION MANAGEMENT )
CORPORATION; EDUCATION )
MANAGEMENT HOLDINGS LLC; )
EDUCATION MANAGEMENT LLC; THE ) MEMORANDUM OPINION AND
ART INSTITUTE OF CALIFORNIA – ) ORDER OF COURT
HOLLYWOOD; THE ART INSTITUTE OF )
CALIFORNIA – INLAND EMPIRE; THE ART )
INSTITUTE OF CALIFORNIA – LOS )
ANGELES; THE ART INSTITUTE OF )
CALIFORNIA – ORANGE COUNTY; THE )
ART INSTITUTE OF CALIFORNIA – )
SACRAMENTO; THE ART INSTITUTE OF )
CALIFORNIA – SAN DIEGO; THE ART )
INSTITUTE OF CALIFORNIA – SAN )
FRANCISCO; THE ART INSTITUTE OF )
CALIFORNIA – SUNNYVALE; ARGOSY )
UNIVERSITY, INLAND EMPIRE; ARGOSY )
UNIVERSITY, ORANGE COUNTY; ARGOSY )
UNIVERSITY, SAN DIEGO; ARGOSY )
UNIVERSITY, SAN FRANCISCO; ARGOSY )
UNIVERSITY, SANTA MONICA; WESTERN )
STATE UNIVERSITY COLLEGE OF LAW; )
THE ART INSTITUTE OF FORT )
LAUDERDALE; THE ART INSTITUTE OF )
JACKSONVILLE; THE ART INSTITUTE OF )
TAMPA; MIAMI INTERNATIONAL )
UNIVERSITY OF ART & DESIGN; ARGOSY )
UNIVERSITY, SARASOTA; ARGOSY )
UNIVERSITY, TAMPA; SOUTH )
UNIVERSITY/WEST PALM BEACH; SOUTH )
UNIVERSITY/TAMPA; BROWN MACKIE )

COLLEGE – MIAMI; THE ILLINOIS                    )
INSTITUTE OF ART – CHICAGO; THE                  )
ILLINOIS INSTITUTE OF ART –                      )
SCHAUMBERG; ARGOSY UNIVERSITY,                   )
CHICAGO; ARGOSY UNIVERSITY,                      )
SCHAUMBURG; BROWN MACKIE                         )
COLLEGE – MOLINE; THE ART                        )
INSTITUTE OF INDIANAPOLIS; BROWN                 )
MACKIE COLLEGE – MERRILLVILLE;                   )
BROWN MACKIE COLLEGE – MICHIGAN                  )
CITY; BROWN MACKIE COLLEGE – FORT                )
WAYNE; BROWN MACKIE COLLEGE –                    )
SOUTH BEND; BROWN MACKIE COLLEGE                 )
– INDIANAPOLIS; THE ART INSTITUTES               )
INTERNATIONAL MINNESOTA; ARGOSY                  )
UNIVERSITY, TWIN CITIES; BROWN                   )
MACKIE COLLEGE – ALBUQUERQUE;                    )
THE ART INSTITUTE OF NEW YORK CITY;              )
THE ART INSTITUTE OF TENNESSEE –                 )
NASHVILLE; ARGOSY UNIVERSITY,                    )
NASHVILLE; THE ART INSTITUTE OF                  )
ATLANTA; THE ART INSTITUTE OF                    )
ATLANTA – DECATUR; THE ART                       )
INSTITUTE OF AUSTIN; THE ART                     )
INSTITUTE OF CHARLESTON; THE ART                 )
INSTITUTE OF CHARLOTTE; THE ART                  )
INSTITUTE OF COLORADO; THE ART                   )
INSTITUTE OF DALLAS; THE ART                     )
INSTITUTE OF FORT WORTH; THE ART                 )
INSTITUTE OF HOUSTON; THE ART                    )
INSTITUTE OF HOUSTON – NORTH; THE                )
ART INSTITUTE OF LAS VEGAS; THE ART              )
INSTITUTE OF MICHIGAN; THE ART                   )
INSTITUTE OF OHIO – CINCINNATI; THE              )
ART INSTITUTE OF PHILADELPHIA; THE               )
ART INSTITUTE OF PHOENIX; THE ART                )
INSTITUTE OF PITTSBURGH; THE ART                 )
INSTITUTE OF PORTLAND; THE ART                   )
INSTITUTE OF RALEIGH – DURHAM; THE               )
ART INSTITUTE OF SAN ANTONIO; THE                )
ART INSTITUTE OF SALT LAKE CITY;                 )
THE ART INSTITUTE OF SEATTLE; THE                )
ART INSTITUTE OF TUCSON; THE ART                 )
INSTITUTE OF VANCOUVER; THE ART                  )
INSTITUTE OF VIRGINIA BEACH; THE                 )
ART INSTITUTE OF WASHINGTON; THE                 )

**ART INSTITUTE OF WASHINGTON –**
**NORTHERN VIRGINIA; THE ART**
**INSTITUTE OF WISCONSIN; THE ART**
**INSTITUTE OF YORK – PENNSYLVANIA;**
**THE ART INSTITUTES INTERNATIONAL –**
**KANSAS CITY; THE NEW ENGLAND**
**INSTITUTE OF ART; ARGOSY**
**UNIVERSITY, ATLANTA; ARGOSY**
**UNIVERSITY, DALLAS; ARGOSY**
**UNIVERSITY, DENVER; ARGOSY**
**UNIVERSITY, HONOLULU; ARGOSY**
**UNIVERSITY, PHOENIX; ARGOSY**
**UNIVERSITY, SALT LAKE CITY; ARGOSY**
**UNIVERSITY, WASHINGTON D.C.; SOUTH**
**UNIVERSITY/SAVANNAH; SOUTH**
**UNIVERSITY/MONTGOMERY; SOUTH**
**UNIVERSITY/COLUMBIA; SOUTH**
**UNIVERSITY/RICHMOND; SOUTH**
**UNIVERSITY/NOVI; SOUTH**
**UNIVERSITY/VIRGINIA BEACH; BROWN**
**MACKIE COLLEGE – AKRON; BROWN**
**MACKIE COLLEGE – CINCINNATI;**
**BROWN MACKIE COLLEGE – FINDLAY;**
**BROWN MACKIE COLLEGE – NORTHERN**
**KENTUCKY; BROWN MACKIE COLLEGE –**
**NORTH CANTON; BROWN MACKIE**
**COLLEGE – ATLANTA; BROWN MACKIE**
**COLLEGE – KANSAS CITY; BROWN**
**MACKIE COLLEGE – SALINA; BROWN**
**MACKIE COLLEGE – LOUISVILLE;**
**BROWN MACKIE COLLEGE –**
**HOPKINSVILLE; BROWN MACKIE**
**COLLEGE – TUCSON; BROWN MACKIE**
**COLLEGE – BOISE; BROWN MACKIE**
**COLLEGE – TULSA; BROWN MACKIE**
**COLLEGE – PHOENIX; BROWN MACKIE**
**COLLEGE – GREENVILLE; BROWN**
**MACKIE COLLEGE – ST. LOUIS; BROWN**
**MACKIE COLLEGE – SAN ANTONIO,**
     **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

<u>**MEMORANDUM OPINION**</u>

Pending before the Court are DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6), AND, IN THE ALTERNATIVE, MOTION TO STRIKE UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(f) (Document No. 145) and DEFENDANTS' MOTION TO DISMISS COMPLAINT IN INTERVENTION BY THE DISTRICT OF COLUMBIA (Document No. 165). Defendants (collectively "EDMC") filed briefs in support of each motion. The United States, Intervenor States and Relators, and the District of Columbia filed briefs in opposition; EDMC filed a consolidated reply brief; Plaintiffs filed a joint sur-reply brief; and EDMC filed a sur-sur-reply brief. Plaintiffs also filed a notice of supplemental authority, to which EDMC responded. Needless to say, the motions are now ripe for disposition. The Court commends counsel for the high quality of their written advocacy.

<u>Factual Background</u>

EDMC is one of the largest providers of post-high school education in America and operates over one hundred schools. Plaintiffs allege that EDMC paid incentive compensation to the employees who recruit new students to attend their numerous affiliated schools, referred to as Associate or Assistant Directors of Admissions ("ADAs"), in violation of Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 et seq., and EDMC's Program Participation Agreements ("PPA"). As a result of EDMC's alleged violation of the "Incentive Compensation Ban," Plaintiffs contend that EDMC falsely represented its eligibility to receive federal student aid funds. Plaintiffs aver that since July 1, 2003, EDMC and/or students enrolled in EDMC schools have wrongfully obtained over eleven billion dollars ($11,000,000,000) in federal

student aid funds and millions more in state funds. Plaintiffs seek treble damages under the federal and state False Claims Acts and have also asserted a number of common law claims.

Governmental financial support of students, beginning with the GI Bill,[1] has been widely viewed as an enlightened social policy and investment in the nation's future. As explained in *In re Brunner*, 46 B.R. 752, 756 (S.D.N.Y. 1985): "[T]hose whose past work or credit record might foreclose them from the commercial loan market are able to obtain credit at subsidized rates to advance their education. Those who might obtain loans only at exorbitant rates are similarly able to obtain low cost, deferred loans. . . . it is undeniable that guaranteed student loans have extended higher education to thousands who would otherwise have been forced to forego college or vocational training." The government "offers loans at a fixed rate of interest, and it does so almost without regard for creditworthiness. Indeed, because it bases its loan decisions in part on student need, it arguably offers loans selectively to the worst credit risks." *Id.* EDMC represents that its students come from traditionally underserved groups, and about half are minorities.

In *Association of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859 (D.C. Cir. 1992), the Court provided a succinct summary of how the student loan program is structured:

> Under Title IV of the Higher Education Act of 1965, students may obtain "Guaranteed Student Loans" ("GSLs") to pay their post-secondary tuition and expenses. Schools wishing to participate in the GSL program must apply to the Department of Education ("Department") for certification as "eligible institutions" under the HEA. As one might expect, such certification depends on the schools' satisfaction of several statutory and regulatory requirements. If a school's application is approved, the school must sign a contract with the Department called a "Program Participation Agreement." In signing the Agreement, the school agrees, inter alia, "to comply with all the relevant program statutes and regulations governing the operation of each Title IV, HEA Program in which it participates." Program Participation Agreement, at 2. The school also agrees that the Agreement "automatically terminates ... [o]n the date the

---

[1] There are numerous federal financial assistance programs under the HEA at issue in this case, including Pell Grants, the Family Education Loan Program, Stafford Loans, Direct Student Loans, Perkins Loans, the Work Study Program and the Supplemental Education Opportunity Grant Program.

institution no longer qualifies as an eligible institution." *Id*. at 6. Once both parties
have signed the Program Participation Agreement, participating lenders are
authorized to make GSLs to the school's students. State or non-profit agencies
guarantee the repayment of the GSLs. The Department, in turn, "reinsures" the
guarantee agencies, meaning that it will pay off a defaulted loan with federal
funds after specified collection efforts have proven futile.

*Id*. at 860 (citations omitted). The risk of defaults on student loans is borne not by the

educational institution but by the students and taxpayers, who absorb the cost of any defaults. *Id*.

Because the schools receive payment in full, there is little economic incentive for them to

limit student enrollments. This has led to perceived abuses of government funding by some

schools. *See generally* "Abuses in Federal Student Aid Programs," Sen. Rep. No. 102-58 (May

17, 1991) ("Senate Report") (unscrupulous elements have exploited "both the ready availability

of billions of dollars of guaranteed student loans and the weak and inattentive system responsible

for them, leaving hundreds of thousands of students with little or no training, no jobs, and

significant debts that they cannot possibly repay. While those responsible have reaped huge

profits, the American taxpayer has been left to pick up the tab for the billions of dollars in

attendant losses."); *See also* Adam J. Williams, Note, "*Fixing the "Undue Hardship" Hardship:*

*Solutions for the Problem of Discharging Educational Loans Through Bankruptcy*," 70 U. Pitt.

L. Rev. 217, 231-32 (2006) ("Currently, over 3,000 schools are considered 'qualified lenders'

under federal loan programs with little consideration given to the qualifications for eligibility to

the programs. This has created the somewhat undesirable situation in which schools can loan

money to students and be guaranteed repayment by the government, allowing them to increase

tuition at a more rapid pace. They receive the benefit of full payment while the rest of the

population pays the costs of default. For schools, therefore, there is no real risk of default.").

*Accord United States v. ITT Educational Services, Inc*., 2012 WL 266943 at *2 (S.D. Ind.

January 30, 2012) (For-profit schools "possess unique characteristics that arguably divorce their

productivity from their incentives, potentially encouraging behavior that runs afoul of the HEA.").

The Incentive Compensation Ban was originally enacted by Congress in 1992, shortly after the Senate Report, and remains in place.  Specifically, 20 U.S.C. § 1094(a)(20) states: "**The institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. . . .**"  The Incentive Compensation Ban was intended to curb the risk that recruiters will "sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans." *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005).  In *United States ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp.2d 633, 635 (E.D. Va. 2010), the Court commented:

> The underlying concern here is that institutions, motivated by profit rather than a legitimate educational purpose, will recruit unqualified students who will then find themselves unable to repay these loans, causing a significant loss to the U.S. government which: 1) pays the funds directly to the schools on behalf of the students; or 2) guarantees other loans and thus is liable in the event of default. Thus, the ban on incentive payments and commissions is meant to curb eligible schools from recruiting unqualified students simply to fill quotas and turn a profit, which ultimately works to the detriment of the U.S. government.

Plaintiffs contend that EDMC has pursued such an enrollment-maximization strategy, and had a goal to dramatically increase student enrollment (from 4,500 in 2006 to 50,000 in 2011, Intervenor Complaint ¶ 128(a)).  Plaintiffs aver that EDMC accepted all potential students who completed an application, regardless of their high school grades or the quality of their written essay.  Intervenor Complaint ¶ 106.  As pled, the annual federal student aid funds

received by EDMC increased rapidly, from $656 million in 2003-2004 to $2.578 billion in 2010-2011.  Intervenor Complaint ¶ 73, 80.

Although Congress enacted the Incentive Compensation Ban to combat perceived abuses of federal student aid funding, it did not completely outlaw the recruiting of students.  Indeed, schools have a legitimate need to employ persons to recruit students.  As the *Strayer Educ*. Court noted:  "clearly not all compensation violates the Incentive Compensation Ban."  698 F. Supp.2d at 635. Moreover, it should be non-controversial to recognize that an employer is entitled to compensate a productive employee more favorably than a lesser performer.  A school may consider a recruiter's success at recruiting students and adjust his/her salary based in part on that success.  *See* 67 Fed. Reg. at 67,053 (HEA not intended to prevent schools from basing salary on "merit"); *Accord United States v. Corinthian Colleges*, 655 F.3d 984, 992 (9th Cir. 2011) ("Even as broadly construed, the HEA does not prohibit any and all employment-related decisions on the basis of recruitment numbers; it prohibits only a particular type of incentive compensation.")

Moreover, the Department of Education has clarified that certain compensation practices do not violate the Incentive Compensation Ban.  In 2002, in response to questions and concerns from institutions, the Department of Education promulgated a regulation to create "Safe Harbors." The Department explained that the Safe Harbors were based on a "purposive reading" of the HEA, 20 U.S.C. § 1094(a)(20), i.e., that it was enacted "with the purpose of preventing an institution from providing incentives to its staff to enroll unqualified students."  *See* 67 Fed. Reg. 67048-01, 67053-54 (November 1, 2002).  The Department further explained that various payments to ADAs "constituted legitimate business practices that did not support the enrollment of unqualified students" and, thus, did not violate the Ban.  The Department rejected the

contention that the Safe Harbors would allow unscrupulous institutions to engage in the kinds of improper recruiting activities that originally gave rise to the Incentive Compensation Ban. *Id.*

The "Safe Harbor" regulation[2], 34 C.F.R. § 668.14, provided in relevant part as follows:

> **(b) By entering into a program participation agreement, an institution agrees that—**
>
> **(1) It will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program;**
>
> &ast; &ast; &ast;
>
> **(22)(i) It will not provide any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds, except that this limitation does not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive title IV, HEA program funds.**
>
> **(ii) Activities and arrangements that an institution may carry out without violating the provisions of paragraph (b)(22)(i) of this section include, but are not limited to:**
>
> > **(A) The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid. For this purpose, an increase in fixed compensation resulting from a cost of living increase that is paid to all or substantially all full-time employees is not considered an adjustment.**

---

[2] Regulation 668.14 was amended in 2008, 2009 and 2010. The parties have not raised any material distinctions between the versions, as applied to this case. In 2011, the Department of Education again amended § 668.14 to eliminate the "Safe Harbor" effective July 1, 2011.

In response to the Incentive Compensation Ban and Safe Harbor, EDMC developed a corporate policy for ADA compensation, called the Admissions Performance Plan (the "Plan"). EDMC provided guidelines and training on the Plan to ADAs and managers (Intervenor Complaint Exh. 4-6, 8). According to its terms, the Plan calculates ADA salaries based on a number of quantitative and qualitative factors, including the manager's evaluation of defined "quality factors" such as job knowledge, business practices and ethics, professionalism, customer service and initiative; the types and quantity of new students recruited over the previous year ("new student points"); an adjustment to reflect differences in labor costs in various markets; an increase for supervising people or projects; and years of service. The "quality points" and "new student points" are placed into a chart, known as the "matrix," that sets annualized baseline salary ranges for ADAs. There are separate provisions for compensation of new ADAs before they qualify to "go on the matrix."

All Plaintiffs assert that the Plan was a sham used to cover up for improper compensation practices. They contend that, as implemented, EDMC's "quality factors are nothing more than window-dressing, used to camouflage a compensation system that, in reality, is driven entirely by student enrollment numbers." The Relators and Intervenor States also allege that the Plan, as written, violates the Incentive Compensation Ban. The United States does not join the "as written" theory of liability.

Procedural Background

This case was originally filed in 2007 by Relator Lynntoya Washington, a former ADA at the Art Institute of Pittsburgh Online Division, pursuant to the federal False Claims Act, 31 U.S.C. § 3730(b)(1), and various state-equivalent false claims acts. The case remained under

seal for over four years, while the United States evaluated whether or not to intervene. On April 29, 2011, after numerous extensions of time, the United States filed a Notice of its Election to Intervene in this case. California, Florida, Illinois and Indiana also filed notices of intervention as of right, pursuant to their respective state-equivalent false claims acts. On May 2, 2011, Ms. Washington, joined by another relator-plaintiff, Michael Mahoney, a former Director of Training for EDMC (collectively, the "Relators"), filed a redacted version of their Second Amended Complaint (Document No. 84) (the "Relator Complaint").[3] The Relator Complaint remains the operative pleading as to claims on behalf of the non-intervening states of Massachusetts, Montana, New Jersey, New Mexico, New York and Tennessee.

On August 8, 2011 the United States, California, Florida, Illinois and Indiana (the "Intervenors"), filed a 16-count Joint Complaint in Intervention (Document No. 128) (the "Intervenor Complaint").[4] In addition to claims under the federal and state false claims acts, the Intervenors assert common law claims for mistake of fact, unjust enrichment, and fraud. On September 22, 2011, the State of Minnesota intervened pursuant to its state-equivalent false claims act and filed a separate Complaint (Document No. 141) (the "Minnesota Complaint").[5] On October 27, 2011, the District of Columbia ("D.C.") intervened pursuant to its false claims

[3] The Relator Complaint asserts the following counts: (1) federal False Claims Act; (2) California False Claims Act; (3) Florida False Claims Act; (4) Illinois False Claims Act; (5) Indiana False Claims Act; (6) Massachusetts False Claims Act; (7)Minnesota False Claims Act; (8) Montana False Claims Act; (9) New Jersey False Claims Act; (10) New Mexico Fraud Against Taxpayers Act; (11) New York False Claims Act; (12) Tennessee False Claims Act; (13) District of Columbia False Claims Act; and (14) Title VII race discrimination by Washington.
[4] The Intevenor Complaint asserts the following counts: (1-3) Federal False Claims Act; (4) federal Payment by Mistake of Fact; (5) federal unjust enrichment; (6-7) California False Claims Act; (8) California unjust enrichment; (9-10) Florida False Claims Act; (11) Illinois False Claims Act; (12) Illinois Payment by Mistake of Fact; (13) Illinois unjust enrichment; (14) Indiana False Claims Act; (15) Indiana Fraud; and (16) Indiana unjust enrichment.
[5] The Minnesota Complaint asserts the following counts: (1) Minnesota False Claims Act; and (2) unjust enrichment.

act and filed a separate Complaint (Document No. 155) (the "D.C. Complaint").[6]  The Court

denied a motion for permissive intervention filed by the Commonwealth of Kentucky.  On

October 5, 2011, the parties entered a Stipulation (Document No. 143) which deferred EDMC's

response to Counts 6 and 8-14 of the Relator Complaint.  Subject to that Stipulation, Defendants

seek dismissal of all four pending complaints.


Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is a challenge

to the legal sufficiency of the complaint filed by Plaintiff.  The United States Supreme Court has

held that "[a] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*citing*

*Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alterations in original).

The Court must accept as true all well-pleaded facts and allegations, and must draw all

reasonable inferences therefrom in favor of the plaintiff.  However, as the Supreme Court made

clear in *Twombly,* the "factual allegations must be enough to raise a right to relief above the

speculative level."  *Id*.  The Supreme Court has subsequently broadened the scope of this

requirement, stating that "only a complaint that states a plausible claim for relief survives a

motion to dismiss."  *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937, 1950 (2009).

However, nothing in *Twombly* or *Iqbal* has changed the other pleading standards for a

motion to dismiss pursuant to Rule 12(b)(6).  That is, the Supreme Court did not impose a new,

heightened pleading requirement, but reaffirmed that Federal Rule of Civil Procedure 8 requires

_____

[6] D.C. Complaint asserts the following counts:  (1-2) D.C. False Claims Act; and (3) unjust
enrichment.

only a short, plain statement of the claim showing that the pleader is entitled to relief, not "detailed factual allegations." *See Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (*citing Twombly*, 550 U.S. at 552-53). Additionally, the Supreme Court did not abolish the Rule 12(b)(6) requirement that "the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Id.* (*citing Twombly*, 550 U.S. at 553). As described in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 (3d Cir. 2009), the Court must first distinguish between factual allegations and legal conclusions in the complaint and then determine whether the well-pleaded factual allegations and favorable inferences drawn therefrom show an entitlement to relief.

The more-rigorous pleading standard in Fed. R. Civ. P. 9(b) also applies to the False Claims Act claims because they allege fraud. *United States ex rel Wilkins v. United Health Group*, 659 F.3d 295, 301 n.9 (3d Cir. 2011); *see also United States ex rel Pilecki-Simko v. Chubb Institute*, 443 Fed. Appx. 754, 759 (3d Cir. 2011) (unpublished) (both Rule 8 and Rule 9 apply). Accordingly, plaintiffs "must state with particularity the circumstances constituting fraud or mistake." *Id.* The imposition of a heightened pleading requirement in fraud actions serves important objectives: "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1418 (3d Cir. 1997). *See also Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 232-33 (3d Cir. 2011) ("Rule 9(b) exists to insure adequate notice so that defendants can intelligently respond.").

A plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the "precise misconduct with which [it is] charged." *Lum v. Bank of America*, 361 F.3d 217, 223-224 (3d Cir. 2004) (abrogated on other grounds by *Twombly*). To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation. *See id.* at 224; *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (same); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (noting that plaintiffs averring securities fraud claims must specify "the who, what, when, where, and how: the first paragraph of any newspaper story.").

"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Supreme Court has explained that "generally" is a relative term: "In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8." *Iqbal*, 129 S. Ct. at 1954; *But* s*ee Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n.2 (3d Cir. 2003) ("The purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim.")

Moreover, in *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989), the Court of Appeals explained that Rule 9 must be applied flexibly to alleged corporate fraud:

> Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud." Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs. Thus, courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control. We agree that rigid enforcement in such circumstances could permit "sophisticated defrauders" to avoid liability. Nonetheless, even under a non-restrictive application of the rule, pleaders must allege that the

necessary information lies within defendants' control, and their allegations must
be accompanied by a statement of the facts upon which the allegations are based.

*Id*. at 645 (citations omitted).


Legal Analysis

Except for the claims subject to the parties' stipulation, EDMC moves for complete

dismissal of all of the Complaints filed in this case pursuant to Fed. R. Civ. P. 12(b)(6) and

moves to strike certain averments pursuant to Fed. R. Civ. P. 12(f). [7] EDMC advances the

following primary arguments: (1) the Compensation Plan, as written, complies with the Safe

Harbor; (2) Plaintiffs failed to adequately plead the details of the alleged fraud to satisfy all the

elements a prima facie case under the False Claims Act in support of the "as implemented"

theory; (3) the Incentive Compensation Ban was a condition of *participation*, rather than a

condition of *payment*, and therefore, the appropriate avenue for relief is regulatory enforcement

and not the False Claims Act; (4) federal common-law claims are displaced by the complex

regulatory regime created by Congress and the Department of Education to enforce the HEA; (5)

the governments have received the benefit of their bargain, i.e., the education of students; (6) the

state law pleadings fail for similar reasons; and (7) Mahoney's claims should be dismissed

because he is a "second filed" relator. In a separate motion and brief, EDMC contends that the

Complaint filed by D.C. is untimely. These contentions will be addressed seriatim.

---

[7] EDMC also cited Rule 12(b)(1) but has not pursued a jurisdictional challenge, except
tangentially as to the claims of Relator Mahoney based on the "first filed" bar. The Court is
satisfied that it may exercise subject-matter jurisdiction over this case pursuant to 28 U.S.C.§§
1331 and 1345, as it involves a federal statute and the United States is a party.

I.      Federal False Claims Act Theories

The False Claims Act enables the government to recover losses it has incurred as a result

of fraud.  *ITT Educational*, 2012 WL 266943 at * 1.  Its roots can be traced to the Civil War,

when it was enacted in response to contractors who sold faulty weaponry, rancid food and

unseaworthy ships to the government.  *Id*.  Because it would be difficult for the government to

discover and prosecute all potential violations, the False Claims Act "provides a *qui tam*

enforcement mechanism, which allows a private party (i.e., a relator) to bring a lawsuit on behalf

of the government and against an entity to recover money the government paid as a result of

fraudulent claims."  *Id*.  As an incentive, relators are entitled to keep a percentage of the proceeds

from any judgment or settlement in their cases.  *See* 31 U.S.C. § 3730(d)(1) and (2).  On the other

hand, the statute contains mechanisms to minimize baseless suits brought by opportunistic

relators.  *Id*.  The United States is entitled to intervene to prosecute the claim(s) on its own

behalf, as has occurred in this case.  The state law False Claims Acts are similarly structured.

Count I of the Relator Complaint asserts a claim under the federal False Claims Act.

Count I of the Intervenor Complaint is based on a violation of the False Claims Act, 31 U.S.C. §

3729(a)(1), which was in effect from July 1, 2003 to May 20, 2009.[8]  Counts II and III are based

on the False Claims Act, as amended by the Fraud Enforcement and Recovery Act of 2009

("FERA"), enacted at 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B), respectively.[9]  The parties have

---

[8]The 2003-2009 version of the False Claims Act provided, in relevant part: "(a) Liability for
certain acts.—Any person who— (1) knowingly presents, or causes to be presented, to an officer
or employee of the United States Government or a member of the Armed Forces of the United
States a false or fraudulent claim for payment or approval;"
[9]The 2009 amendment to § 3729, in relevant part:
"(a) Liability for certain acts.-- (1) In general.--Subject to paragraph (2), any person who-- (A)
knowingly presents, or causes to be presented, a false or fraudulent claim for payment or
approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or
statement material to a false or fraudulent claim;"

16

not pointed to substantive differences between the versions of the statute. [10] Under each version, the elements of a prima facie case under the federal False Claims Act are: (1) the defendant presented a false or fraudulent claim against the United States; (2) the claim was presented to an agency or contractor of the United States; and (3) the defendant knew the claim was false or fraudulent. *See Wilkins*, 659 F.3d at 305; *United States v. Thayer*, 201 F.3d 214, 222–23 (3d Cir. 1999).

Although it is not apparent from the claims asserted in the Complaints, the Relators and Intervening States pursue two distinct theories of fraud under the False Claims Act: (1) that EDMC's written ADA compensation plan violates the Incentive Compensation Ban "as designed"; and (2) that EDMC has used the written compensation plan as a "sham" or coverup for its actual implementation of a compensation system based solely on quantitative factors, thereby violating the Incentive Compensation Ban. The United States joins only in the "as implemented" theory.

A. EDMC's Compensation Plan "As Written"

The Relators and Intervenor States contend that the EDMC Compensation Plan, as written, violates the Incentive Compensation Ban for the following reasons: (1) the essence of EDMC's plan does not provide "fixed compensation" because ADA compensation varies with the number of students recruited and ADAs are not paid a "fixed compensation," "fixed annual salary" or "fixed hourly wage" as defined in the Safe Harbor; (2) the Plan violates the adjustment clause of the Safe Harbor regulation because it provides for payments which are revised every

---

[10] Notably, however, FERA contains a limited retroactivity provision, which provides that § 3729(a)(1)(B) took effect as if enacted on June 7, 2008 and is applicable to all claims pending on or after that date. *Wilkins*, 659 F.3d at 303-04. Thus, Count 3 must be limited to claims pending on or after June 7, 2008.

six months to reflect accumulated incentive payments; (3) any adjustments to ADA compensation are based "solely" on the number of students recruited; and (4) initial eligibility to go "on the matrix" is based solely on enrollment numbers. More broadly, the Relators and Intervenor States point to the HEA statutory language, which provides that institutions will not provide incentive payments based "directly or *indirectly* on success in securing enrollments." 20 U.S.C. § 1094(a)(20) (emphasis added), and reason that the Safe Harbor regulation must be interpreted consistent with this statutory command. Plaintiffs theorize that even though ADA pay is labeled as "salary," in actuality the EDMC Plan indirectly pays commissions which are doled out in equal increments over the following six months to make them appear to be salary.

EDMC contends that the Plan, on its face, falls squarely within the regulatory Safe Harbor. EDMC argues that the Plan provides for a "fixed annual salary" for ADAs; that ADA compensation is adjusted no more than twice per year; and that adjustments cannot be based "solely" on the number of students enrolled because they are determined pursuant to a matrix which also contains qualitative factors. EDMC refers to the Plan's discussion of various "quality factors," such as job knowledge, business practices and ethics, professionalism, customer service and initiative. By virtue of the matrix structure, EDMC contends that it is impossible to determine an ADAs salary without considering these quality factors. EDMC points out that an ADA's initial salary, by definition, cannot be based on enrollment figures. In addition, EDMC maintains that its compliance with the Safe Harbor negates the scienter required to make out a prima facie case under the False Claims Act.

As an initial matter, the Court is not convinced by the Relators and Intervenor States' broad theory that the Safe Harbor regulation violates the HEA by permitting "indirect" incentive payments. The Department of Education, in promulgating the regulation, specifically explained

that the Safe Harbors create "conditions under which an institution may make an incentive payment to an individual or entity that could be construed as based upon securing enrollments." 67 Fed. Reg. at 67054. Thus, the Department of Education has clearly determined that some incentive payments, i.e., those not based solely on enrollment numbers, are consistent with the statutory language of the HEA. The Safe Harbor regulation was developed pursuant to "notice and comment" rulemaking and the Department has broad authority to enforce and interpret the HEA, such that the Court is constrained to give deference to the agency's interpretation. *Compare De La Mota v. Department of Education*, 412 F.3d 71 (2d Cir. 2005).

Moreover, the actual text of the Safe Harbor regulation favors EDMC. ADA salaries were "fixed" under the Plan, as defined in 34 C.F.R. § 668.14(b)(22)(ii)(A), as each bi-weekly payment to be received by an ADA during the six-month period until the next adjustment was for the same amount. The Court cannot accept Plaintiffs' effort to interpret the term "fixed" to mean only an "hourly" wage based upon "actual time worked." To the contrary, the regulation distinguishes a "fixed annual salary" from a "fixed hourly wage" and deems both to be permissible. A salary decoupled from hours worked – even if calculated partially on past Student Start points – is "fixed" compensation. *See, e.g.,* Merriam-Webster.com (defining "salary" as "fixed compensation paid regularly for services").

Plaintiffs attempt to conflate the terms "salary" and "sales commission." The terms are not synonymous. Under a "sales commission" plan, an employee would not be paid anything unless he/she completed a sale. *See Parker v. NutriSystem, Inc.*, 620 F.3d 274, 281, 284 (3d Cir. 2010). A "sales commission," applied to the circumstances of this case, would pay ADAs only if/when they recruited students. Under the Plan as written, ADAs are paid a "fixed salary," not a "commission."

It is undisputed that "adjustments" were not made more than twice during any twelve month period.  Moreover, by its very nature, the matrix used to determine and adjust compensation cannot be based "solely" on quantity.  Instead, the compensation generated by the matrix can only be derived by combining the quantitative factor on one axis with the "quality factors" on the other axis.  In other words, the use of the matrix, by definition, could not have adjusted compensation solely on recruitment numbers.

Plaintiffs also challenge the initial eligibility to go "on the matrix" because it is triggered by recruiting numbers.  According to the written Plan, however, New Hire Starting Salaries for ADAs are based on "their relevant experience and education."  Indeed, at that point no students have yet been recruited.  The First Evaluation, after six months, is based on quality factors.  The Second Evaluation awards ADAs the higher salary as determined under the matrix or under quality factors alone.  At the Third Evaluation, all ADAs are reviewed under the matrix.  Thus, at no time does the Plan, as written, pay ADAs a commission based solely on enrollments.

Moreover, even assuming arguendo that the Plan "as written" violates the Incentive Compensation Ban, scienter has not been adequately pled to support a False Claims Act theory.  In *United States v. Chubb Institute*, 2010 WL 1076228 (D.N.J. 2010) ("Chubb I"), the Court explained:  "Although the language of the safe harbor provision appears at odds with the Incentive Compensation Ban, it stands to reason that an institution adhering to a federal regulation defining the contours of permissible compensation under the Incentive Compensation Ban cannot have the requisite scienter to violate the ban." *Id*. at *10 (citations omitted).   This reasoning is persuasive. Similarly, because the Department of Education advised schools in 1995 that paying travel and related expenses for ADAs to attend sales meetings would not violate the Incentive Compensation Ban, *see* EDMC Exh. 11, Plaintiffs have failed to establish the scienter

element as to EDMC's use of prizes and trips such as the President's Club. In addition, the Complaints fail to meet the Rule 9(b) pleading standard for the "as written" theory, as there are no particularized allegations as to who, what, where, when, why and how the Plan was designed.

In summary, Plaintiffs have failed to plead a plausible False Claims Act cause of action based on the Compensation Plan "as written." As noted above, however, because the "as written" theory is not asserted as a separate cause of action, this conclusion does not result in dismissal of any of the separate counts asserted in the Complaints.


B.  EDMC's Compensation Plan "As Implemented"

Plaintiffs' primary contention is that EDMC failed to implement its Plan in accordance with the HEA. As an initial matter, it is important to recognize the stark differences between the "as written" and "as implemented" theories. Under the "as implemented" theory, Plaintiffs do not allege an honest misinterpretation of the governing statute and regulations. Rather, Plaintiffs allege a knowing decision by EDMC executives to perpetuate a company-wide "sham" Plan to cover up for prohibited compensation practices. To put it starkly, Plaintiffs allege a coordinated, multi-billion dollar corporate-wide fraud.

More specifically, Plaintiffs allege that EDMC has violated the Incentive Compensation Ban from July 1, 2003 through the present because: (1) ADA compensation and advancement is exclusively focused on the number of new students an ADA is able to recruit; (2) EDMC has created a culture that has made recruiting and enrolling new students the sole focus of its compensation system; and (3) EDMC's practices result in payment of commissions, bonuses and other incentive payments such as "President's Club" trips and "Circle of Achievement" awards, which are based solely on the number of students being enrolled. Plaintiffs allege that the

metrics used to measure an ADA's performance, such as the Student Start Plan, "Plan to Make Plan" and other tracking documents, focus solely on the number of students enrolled. Plaintiffs also allege that ADAs are terminated from their employment or placed on "performance improvement plans" solely due to enrollment numbers. Plaintiffs recognize that EDMC's written compensation policy contains a "matrix" which combines student enrollment numbers with a variety of "quality factors." However, they argue that the "quality factors" have no real impact on the manner in which EDMC's compensation system is actually implemented.

EDMC argues that Plaintiffs' claims are precluded as a matter of law based on the exhibits attached to the Complaint and/or because the conduct in question was based on a reasonable interpretation of the Safe Harbor. *See, e.g.,* Sur-Sur-Reply at 9. This argument fundamentally contradicts Plaintiffs' "as implemented" theory of the case, which is that even if the paperwork looked correct on its face, such paperwork was only a pretext or cover-up and did not reflect EDMC's real compensation practices.

Whether EDMC actually <u>implemented</u> the Plan in accordance with the Safe Harbor cannot be resolved based on the status of the current record. As explained in *Corinthian Colleges*, 655 F.3d at 993-94 (reversing district court's decision to dismiss case on the ground that similar recruiter compensation program fell within Safe Harbor):

> The mere inclusion of this performance rating in Corinthian's Compensation Program, however, does not allow us to conclusively determine whether its method of awarding salary increases falls within the Safe Harbor Provision. At this stage, we have no information as to the basis on which a "Good" versus "Excellent" performance rating is assigned to a Corinthian recruiter. Without an understanding what an employee must do to achieve a rating of "Good," we cannot determine whether the rating is based upon substantive requirements that are separate and distinct from recruitment numbers.

Indeed, the *Corinthian* Court expressly stated that relators might be able to state a valid claim based on "Corinthian's implementation of its policy, rather than the written policy itself." *Id.* at

22

996.  The same analysis applies in this case.  Even though the Plan, on its face, appears to comply with the Safe Harbor, at this stage of the case the Court cannot determine whether or not, in actuality, the "quality factors" were used merely as a proxy for recruiting success.

Two other United States Courts of Appeals have held that similar "as implemented" claims for alleged violations of the Incentive Compensation Ban are cognizable.  In *Main*, 426 F.3d at 914 (reversing district court's grant of motion to dismiss), the Seventh Circuit explained that at the pleading stage, courts were required to accept allegations in the Complaint that the school knew of the Incentive Compensation Ban; lied to the Department of Education about its compliance to obtain eligibility; and that all subsequent disbursements depended on that eligibility.  Similarly, in *United States ex rel Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006) (reversing grant of motion to dismiss), the Ninth Circuit stated that an alleged violation of the Incentive Compensation Ban created an "axiomatic fit" with the False Claims Act statute.  In short, on three recent occasions the Courts of Appeals have reversed the granting of motions to dismiss and have recognized False Claims Act claims for very similar alleged violations of the Incentive Compensation Ban "as implemented."

EDMC acknowledges Plaintiffs' theory that the written Compensation Plan constitutes only a window-dressing or camouflage.  Nevertheless, EDMC argues that Plaintiffs have failed to plead fraud with the particularity required by Fed. R. Civ. P. 9.  Specifically, EDMC argues that Plaintiffs have not pled sufficient facts to show how it based ADA compensation solely on enrollments; how it presented false claims; how its representations were false, i.e., how the matrix was disregarded or details supporting the theory that quality factors were merely a sham.  EDMC points to Lynntoya Washington's own Performance Review (Exh.  22), which appears to show that the quality factors were taken into account.  EDMC further notes that the Relators

have limited knowledge. For example, there are no allegations regarding conduct prior to June 2004 or after June 2007. In addition, neither Washington nor Mahoney had responsibility for evaluating ADAs or making compensation decisions or had access to the factors actually used to pay ADAs. EDMC points out that the Relators did not work at each individual school named as a Defendant nor did they participate in the certifications made to the governments. EDMC also contends that Plaintiffs have failed to identify the conduct of each separately named Defendant.[11] Moreover, EDMC argues that the Complaints fail to adequately plead the scienter element in that the Complaint fails to allege facts regarding EDMC's knowledge at the time the Plan was drafted and implemented and does not link the persons who signed the PPA's and/or certifications to the alleged compensation violations. In particular, EDMC points out that Plaintiffs cannot rely on the knowledge possessed by former University of Phoenix executives who later went to work for EDMC because they did not join EDMC until 2007 (four years after the alleged fraud began). Plaintiffs recognize that the more rigorous Rule 9 standard of pleading applies to the False Claims Act claims and contend that they have nonetheless stated valid claims.

EDMC also raises several legal and analytical challenges. Inter alia, EDMC suggests that the government knew of its Plan and took no enforcement action for four years, such that it is unable to prove that EDMC's actions have caused any injury. EDMC also contends that compliance with the Incentive Compensation Ban is a condition of participation, rather than a condition of payment. In essence, EDMC analogizes the Incentive Compensation Ban to Medicare regulatory fineprint, the non-compliance with which may warrant a slap on the wrist from the Department of Education but cannot justify massive liability under the False Claims Act. The Court turns now to these contentions.

---

[11] For example, EDMC alleges that at least fifteen schools did not exist or were not part of EDMC during the 2003-2009 timeframe.

1. Falsity

Plaintiffs contend that the falsity element of the prima facie case is established under several different theories. In *Wilkins*, the Court of Appeals for the Third Circuit held that a False Claims Act cause of action may be based on actions that are: (1) "factually false"; or (2) "legally false." 659 F.3d at 305. A claim is "factually false" when the claimant misrepresents the goods or services that it provided to the Government. *Id*. A claim is "legally false" when the claimant knowingly falsely certifies that it has complied with a statute or regulation, the compliance with which is a condition of Government payment. *Id*. There are two types of "legally false" claims. Under the "express false certification" theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds. *Id*. Under the broader "implied false certification" theory adopted in *Wilkins*, liability attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it has violated regulations that affect its eligibility for payment. *Id*. As the *Wilkins* Court explained: "Thus, an implied false certification theory of liability is premised on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Id*. (citation omitted). Several courts have also recognized False Claims Act liability for violations of the Incentive Compensation Ban under a fourth theory, namely fraudulent inducement. *See Hendow*, 461 F.3d at 1173-74.

Plaintiffs contend that they have satisified each theory. As to "factual falsity," they argue that the service to be provided was education of students by an institution that complied with the Incentive Compensation Ban. As to "express false certification," Plaintiffs point to EDMC's statements in the PPA and periodic audits regarding its compliance with the Incentive

Compensation Ban. Under the "implied false certification" theory, Plaintiffs point to each and every request for payment by EDMC, made while knowing that the "quality factor" ratings were a sham. Finally, under the fraudulent inducement theory, Plaintiffs reason that EDMC's promise that it would comply with the Incentive Compensation Ban induced the government to grant EDMC eligibility to participate in the program. The Complaint adequately avers the representations, express and implied, which were involved in the obtaining of student aid funding from the governments by EDMC.

In support of the "falsity" element, Plaintiffs have alleged that "quality factors" were nothing more than "window dressing" and were not actually used to determine ADA compensation. The Complaint provides some specific factual details in support of the allegation. For example, the Complaint alleges that EDMC did not measure, encourage or incentivize ADAs with respect to quality factors. ¶ 120-126. This is in stark contrast to EDMC's detailed tracking of ADA student enrollment numbers. Relator Mahoney, whose duties included training of ADAs, averred that he never provided training on the Incentive Compensation Ban. Similarly, the Complaint avers "Mahoney never gave any training whatsoever regarding the 'quality factors'" or even heard anyone discuss them. ¶ 136. EDMC contends that Mahoney had limited knowledge of actual ADA compensation practices. Nevertheless, viewing the allegation in the light most favorable to Plaintiffs, it supports their contention that "quality factors" were ignored, in actuality. Plaintiffs also aver that Jan Anton, a Vice President of the Art Institute of Chicago and a member of the committee that designed the Plan, told an ADA that "quality factors were insignificant relative to ADA payments and were created for the purpose of getting around the Incentive Compensation Ban." ¶ 389. As another example, Plaintiffs aver that Stephen Weiss, then President of Online Higher Education, told relator Washington that "because she had met

her student enrollment numbers, her 'quality factor' rating would have no effect whatsoever on her compensation." ¶ 138. EDMC contends that the context of this statement reveals that Washington's quality rating had changed by only one point. However, the Court must read this allegation in the light most favorable to Plaintiffs. In Washington's experience, the only significant change in her "quality factor" rating corresponded to a significant increase in her student starts. Thus, the allegations regarding Washington support the inference that quality factors were not independent, but were used merely as a proxy for recruiting success. *See generally* ¶ 154 (describing how the quality factors were ignored in practice).

These allegations are more than sufficient to make it plausible that EDMC's ADA compensation, as implemented, was violative of the Incentive Compensation Ban. Plaintiffs are attempting to "prove a negative"—i.e., that the quality factors were not used. It is difficult to plead such a theory with a great degree of particularity, but Plaintiffs have provided a sufficient level of detail. In sum, the Court concludes that the "falsity" element of a False Claims Act prima facie case has been met.

### 2. Scienter

EDMC contends that Plaintiffs have failed to adequately plead scienter, for several reasons. First, EDMC contends that Plaintiffs must establish the wrongful scienter of a particular employee as opposed to the "collective knowledge" of the entire corporation. Second, EDMC contends that scienter must be pled with specificity as to every school named as a Defendant. EDMC also contends that its liability cannot be based on the 2004 Department of Education enforcement proceeding against the University of Phoenix for an alleged violation of the Incentive Compensation Ban. EDMC suggests that the government's knowledge and

acquiescence to its Plan – as evidenced by continued student aid payments – negates EDMC's scienter.

Plaintiffs have responded to each of these arguments. They point out that scienter may be alleged generally, and need not meet the particularity standard in Rule 9(b). Plaintiffs note that the "single actor" theory of corporate liability has been rejected. Plaintiffs argue that there is no need to detail the conduct of each school because Defendants are related corporate entities and implementation of the alleged fraudulent ADA compensation plan was done top-down, company-wide. As to the University of Phoenix, Plaintiffs contend not only that the former executives' knowledge is attributable to EDMC after they were hired by EDMC, but also that the Department of Education's position was known by EDMC in 2004. Plaintiffs argue that EDMC's arguments regarding the government's knowledge and acquiescense are premature because they depend on facts outside of the pleadings. Plaintiffs dispute that EDMC implemented its Plan reasonably and deny that the government was aware of the alleged fraud.

The False Claims Act requires a defendant to have acted "knowing" or "knowingly." It defines these terms to mean: (A) [ ] that a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1). The Court concludes that this element has been adequately pled.

As an initial matter, the Court is not persuaded by EDMC's arguments with respect to the standards governing corporate scienter. The Court does agree with EDMC that scienter may not be based on a "collective knowledge" theory "by piecing together scraps of 'innocent' knowledge held by various corporate officials, even if those officials never had contact with each

other or knew what others were doing in connection with a claim seeking government funds." *United States v. Science Applications Intl. Corp.*, 626 F.3d 1257, 1275 (D.C. Cir. 2010). However, the Complaints in this case do not attempt to establish scienter based on collective, innocent knowledge. Moreover, the *Science Applications* Court recognized that the definition of "knowingly" in the False Claims Act was intended "to capture the ostrich-like conduct which can occur in large corporations where corporate officers insulate themselves from knowledge of false claims submitted by lower-level subordinates." *Id*. at 1274 (citation and punctuation omitted).

EDMC's reliance on *Zavolta v. Lord, Abbett & Co. LLC*, 2010 WL 686546 (D.N.J. 2010), for the proposition that the individual corporate officer making the statement must have the requisite scienter is misplaced. *Zavolta* involved a claim brought under the Public Securities Litigation Reform Act, 15 U.S.C. § 74u-4 et seq., which "changed [the] standard in regard to inferences involving factual allegations relating to scienter in securities law cases." *Id*. at *6. Indeed, in *United States ex rel. Harrison v. Westinghouse Savannah River Co*., 352 F.3d 908, 919 (4th Cir. 2003), the Court rejected a "single actor" theory similar to that proposed by EDMC in the False Claims Act context. EDMC's reliance on *Long v. Tommy Hilfiger*, 2012 WL 180874 (3d Cir. January 24, 2012), and *United States ex rel. Hefner v. Hackensack University Medical Center*, 495 F.3d 103, 109 (3d Cir. 2007), is also misplaced. *Long* is legally distinguishable because it involved a different statute, the Fair and Accurate Credit Transactions Act ("FACTA"), which imposed a threshold scienter requirement of "willfulness" which required a plaintiff to plead "objective unreasonableness." 2012 WL 180874 at *4-5. No such requirement exists in the False Claims Act. Moreover, even though the scienter issue was resolved at the motion to dismiss stage in *Long* based on a reasonable interpretation of the statute, such resolution is not possible here as Plaintiffs allege that EDMC knowingly schemed to

evade the Safe Harbor. *Hackensack University* is factually distinguishable because it involved a billing error that had "slipped through the cracks," an employee caught the error and notified staff, and they "rectified the problem." 495 F.3d at 103. That is far different than the widespread, long-lasting corporate practice alleged in this case.

Plaintiffs allege that EDMC corporate headquarters signed and submitted the PPA's on behalf of all of its related educational institutions. In December 2006, John R. McKernan, Jr., then Chairman and CEO of EDMC, signed all PPA's for EDMC schools. Beginning in 2009, the Presidents of Brown Mackie, Argosy University, South University and the regional clusters of Art Institutes signed the PPAs. Complaint ¶¶ 65, 66. In addition, Plaintiffs aver that the compensation plan was developed by an EDMC-wide task force. ¶ 370. Because government funding represented such a significant source of EDMC's revenues, it is plausible that any conduct which would have imperiled those revenues, such as the alleged violations of the Incentive Compensation Ban, would have required approval from the highest levels of EDMC management. In sum, Plaintiffs have pled the involvement and knowledge of senior EDMC executives. Because Plaintiffs' theory is that there was one, EDMC-wide scheme controlled by top-level executives, it is not necessary to allege separate conduct by each of the affiliated schools named as Defendants.

Pursuant to Fed. R. Civ. P. 9(b), scienter may be pled "generally." In numerous paragraphs, Plaintiffs have alleged that EDMC acted "knowingly." The Complaint also contains specific examples that make the allegation plausible. For example, in ¶ 147 Plaintiffs allege that EDMC offices usually display posters and charts which graph ADA performance on quantitative factors. However, if an audit or accreditation is scheduled such materials are removed from view – to be put back up after the auditors or accreditors had departed. One plausible inference is that

EDMC knew that such materials (and the compensation practices they represented) were improper. As another example, a member of the team that developed the Plan allegedly advised an ADA "that quality factors were insignificant relative to ADA payments and were created for the purpose of getting around the Incentive Compensation Ban." ¶¶ 370, 389. This allegation supports not only the "falsity" element, but also that EDMC acted with scienter. In addition, a scienter element is implicit in the allegations that the "quality factors" were a sham or a cover up.

EDMC relies extensively on *Chubb I*, 2010 WL 1076228 (D.N.J. Mar. 22, 2010), *aff'd*, 2011 WL 3890975 (3d Cir. Sept. 6, 2011) (*"Chubb II"*), for the proposition that Plaintiffs have failed to adequately plead scienter because "[n]owhere do Plaintiffs allege how EDMC documented or openly bragged about its fraud; was informed that managers were calculating recruiters' salaries based solely on enrollments; or maintained an established infrastructure to defraud the government." Defendants' Reply Br. at 33. In *Chubb*, the plaintiffs supported their alleged violation of the Incentive Compensation Ban only by attaching Chubb's compensation plan "as written." 2010 WL 1076228 at *9. The Court commented: "Conspicuously absent from the SAC is any indication, other than Relators' ipse dixit, that TCI had notice that its submissions contained erroneous data, let alone that they intended to use erroneous data for the purpose of defrauding the Government." 2010 WL 1076228 at * 8. Because the Court found that the written plan complied with the Safe Harbor, it dismissed the claim. *Id.* at *10. Indeed, the plan at issue in Chubb contained concrete, merit-based metrics to measure qualitative factors such as student retention, records-keeping and professionalism. By contrast, Plaintiffs allege that EDMC used no such metrics for quality factors.

In dismissing the claim, the *Chubb* Court explained that Plaintiffs could have prevailed by pleading "examples of other prohibited compensation practices not covered by the safe

harbor" or "circumstantial facts enabling the inference that [defendant] acted with scienter by falsely certifying compliance with Title IV's incentive compensation ban." *Id.* In denying the plaintiffs' motion for reconsideration, the Court further elaborated on the sort of "red flags" that could have established a cognizable claim. 2010 WL 3463307 at *3-6. In an unpublished opinion, the Court of Appeals for the Third Circuit affirmed. It compared the absence of allegations regarding Chubb's scienter with the claim in *Hendow*, in which the relators "allege[d] that University staff openly bragged about perpetrating a fraud, that the University had an established infrastructure to deceive the government, and that the University repeatedly changed its policies to hide its fraud." *See Chubb II*, 2011 WL 3890975 at *5 n.18 (citing *Hendow*, 461 F.3d at 1175). In this case, Plaintiffs have alleged numerous "red flags" of the sort envisioned by the court in *Chubb*. To be sure, these allegations are not as strong as those in *Hendow*. On the other hand, the allegations in this case are more substantial than those at issue in *Chubb*.

Defendants rely on *Gaer v. Education Management Corporation,* 2011 WL 7277578 (W.D. Pa. Sept. 29, 2011) for the proposition that the "as implemented" claims must be dismissed due to the relators' limited knowledge of the relevant details of EDMC's compensation practices and their failure to sufficiently establish their credibility. *Gaer* is distinguishable because it involved claims of stock price manipulation under the securities laws.[12] Moreover, because the allegations that EDMC's Plan was a sham were made only by a confidential witness (CW1), the Court applied a heightened pleading standard, which "requires confidential witnesses to provide some indicia of their reliability." *Id.* at 25-26 (citing *California Public Employees Retirement Sys. v. Chubb*, 394 F.3d, 126 146-47 (3d Cir. 2004)). No

---

[12]Although Plaintiffs are correct that *Gaer* applied the more rigorous scienter requirement of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), it did not do so in the portion of the opinion which discussed the Incentive Compensation Ban.

heightened standard applies to the relators' statements in this case, as their identities are not confidential.

Nor do EDMC's arguments regarding the University of Phoenix warrant dismissal. The Complaint alleges that in a February 5, 2004 Program Review Report, the Department of Education found that the University of Phoenix compensation system "was an illegal attempt to circumvent Title IV of the HEA's prohibition on incentive compensation." Complaint ¶ 159. The Court recognizes that the former University of Phoenix executives did not become employees of EDMC until 2007 and their knowledge cannot be imputed to EDMC prior to their employment. However, the Complaint further alleges that the Department of Education's enforcement actions against the University of Phoenix were well-known in 2004 throughout the for-profit higher education industry.[13] Complaint ¶ 160. Construed in the light most favorable to Plaintiffs, the allegations support the inference that EDMC knew that its Plan was similar to that used by University of Phoenix, and therefore was improper. Accordingly, one may infer that EDMC's alleged continued implementation of a similar compensation system was done knowingly.

EDMC 's remaining scienter arguments require only cursory discussion. The Court has explained above why EDMC's alleged "reasonable" interpretation of the Safe Harbor does not merit dismissal of the "as implemented" theory at this juncture. To the extent that EDMC is contending that the government waived its right to enforce the HEA and/or acquiesced to EDMC's alleged violation of the Incentive Compensation Ban, such contentions would be affirmative defenses on which EDMC bears the burden of proof. *See, e.g. United States ex rel.*

---

[13] As explained in *Southern Track & Pump, Inc. v. Terex Corp.*, 722 F. Supp.2d 509, 519 (D. Del. 2010), the particularity required with respect to "time" is flexible because the purpose of Rule 9(b) is to provide notice of the claims to defendants. Plaintiffs have sufficiently provided EDMC with the dates of the alleged fraud at this stage of the case.

*Monahan v. Robert Wood Johnson University Hosp. at Hamilton*, 2009 WL 4576097 at *7 (D.N.J. 2009).  Moreover, the governments deny knowing that EDMC implemented the Plan in violation of the Incentive Compensation Ban.  At this stage, the Court must resolve the dispute in favor of Plaintiffs.

In sum, the Court concludes that the scienter allegations satisfy the applicable pleading standard.  It will be incumbent upon Plaintiffs to prove that EDMC acted with the requisite scienter, but dismissal is not warranted at this stage of the case.


### 3.   Causation of Economic Loss

EDMC argues that the Complaint fails to allege that its ADA compensation practices caused an economic injury to the government.  Citing *United States v. Hibbs*, 568 F.2d 347, 349 (3d Cir. 1977), EDMC argues that a causal connection must be shown between the loss and fraudulent conduct, i.e., that the falsity caused a loss that the government would not have otherwise incurred.  EDMC points out that Plaintiffs have continued to pay EDMC for at least four years after knowing of the alleged violation.   In addition, EDMC points to other gaps in the Complaint: no identification of ADAs who recruited unqualified students as a result of incentive compensation; no identification of students who would otherwise not have enrolled (and received financial aid) at other schools; and no identification of students who have defaulted on improperly obtained loans.  In essence, EDMC reasons that the government received the benefit of its bargain because the students received an education. EDMC cites to a Department of Education memo dated October 30, 2002 (Defendants Exhibit 8), which stated that a violation of the Incentive Compensation Ban does not result in a monetary loss to the Department or prevent the student from receiving student aid funds.

Plaintiffs contend that they need not allege a specific injury or trace a particular loss in order to recover under the False Claims Act. Rather, their theory is that the loss stems from the fact that the government funded billions of dollars in student aid payments to EDMC which it was not entitled to receive. Plaintiffs further note that in *Main*, the Court held that the 2002 Department of Education memo cited by EDMC has "no legal effect." 426 F.3d at 917.

As an initial matter, the Court does not agree that a plaintiff must demonstrate that the falsity caused an actual loss to the government. Causation is not an explicit element of a False Claims Act prima facie case, as currently formulated. *See Wilkins*, 659 F.3d at 305. EDMC's reliance on *Hibbs* is misplaced because *Hibbs* was based on the pre-1982 version of the False Claims Act, which limited the government to recovery of damages "sustained by reason of the doing or committing" false claims. The False Claims Act has since been amended.[14] In *United States v. Merck-Medco Managed Care, L.L.C.,* 336 F. Supp.2d 430, 441-42 (E.D. Pa. 2004), the Court clarified:

> The FCA is a statute designed to protect the Government's coffers from fraud and from attempted fraud. Thus, a causal link between a false claim and economic harm must be possible, plausible, and pleaded, even though the claim need not actually be paid for liability to attach under specific provisions of the FCA (i.e. 31 U.S.C. § 3729(a)(1)). Rather, to avoid dismissal a complaint must allege that, at the very least, the Government could have been harmed. Medco is, in this respect, quite incorrect in its statement that "damages and loss causation are preconditions of FCA liability." Medco Reply at 5. Medco has craftily blurred the distinction between different provisions of the FCA—specifically, between § 3729(a)(1) and (2). Although every FCA claim does not hinge upon the Government suffering monetary damages, liability attaches if a demand for money has been made on the government, the government "has been billed for nonexistent or worthless goods, [or] charged exorbitant prices, or the fraud might cause the government to suffer economic loss." *United States ex rel Watson v. Connecticut General Life Ins. Co*., 87 Fed. Appx. 257, 260 (3d Cir. 2004) (emphasis added). The law in the Third Circuit is settled that a claim brought under 31 U.S.C. § 3729(a)(1) need not actually be paid to be actionable. Because a claim need not be paid to be

---

[14] Section 3729 now provides for a civil penalty "plus 3 times the amount of damages which the Government sustains because of the act of that person."

actionable, a plaintiff does not, as a concrete rule, need to plead damages and causation to proceed in every case.

In any event, Plaintiffs have adequately pled an economic loss, in that EDMC's alleged misrepresentations enabled it to receive billions of dollars of student aid funds. In *Hendow*, the Court rejected a similar argument and observed that participation and eligibility to receive federal funds are "*explicitly* conditioned" on compliance with the Incentive Compensation Ban. 461 F.3d at 1175 (emphasis in original). This reasoning is persuasive at this stage of the case. Plaintiffs have adequately pled that the alleged violation of the Incentive Compensation Ban caused economic loss to the governments.


4.  Condition of Participation or Payment?

EDMC argues that even assuming arguendo that it paid ADAs improperly, the False Claims Act claims must be dismissed because compliance with the Incentive Compensation Ban was a "condition of *participation*" rather than a "condition of *payment*." In other words, EDMC might face a loss of eligibility to participate in student aid, but payments EDMC has already received would not be implicated. In essence, EDMC contends that ADA compensation is not a core programmatic concern such that compliance with the Incentive Compensation Ban should be enforced administratively by the Department of Education rather than through the drastic penalties available under the False Claims Act.

EDMC relies heavily upon *Wilkins*, 659 F.3d at 295, a qui tam False Claims Act case in which the relators alleged that their employer had knowingly violated several Medicare marketing regulations. *Id.* at 300. The Court of Appeals for the Third Circuit cautioned: "the implied certification theory of liability should not be applied expansively, particularly when advanced on the basis of FCA allegations arising from the Government's payment of claims

under federally funded health care programs." *Id*. at 307. The Court further explained that the False Claims Act "was not designed for use as a blunt instrument to enforce compliance with all medical regulations – but rather only those regulations that are a precondition to payment." *Id*. (citation omitted). A violation concerns a "condition of payment" if such violation "might cause [the government] to actually refuse payment." *Id*. (*citing United States ex rel Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008)). In *Wilkins*, the Court held that the alleged violations of Medicare marketing regulations were not conditions of payment and noted that the relators had failed to cite examples, in case law or otherwise, of the government seeking recovery of Medicare payments for services that a provider had actually performed due to non-compliance with marketing regulations.[15] *Id*. at 310.

This case is distinguishable from *Wilkins* because the Incentive Compensation Ban is simply not analogous to Medicare marketing regulations. In *Hendow*, 461 F.3d at 1175, the Court distinguished the Medicare context and rejected the argument that "the Incentive Compensation Ban [was] nothing more than one of hundreds of boilerplate requirements." 461 F.3d at 1175. The Court further reasoned that in the absence of False Claims Act liability, "the University would be virtually unfettered in its ability to receive funds from the government while flouting the law." *Id*. at 1176. *Accord Main*, 426 F.3d at 914 ("if the University knew about the rule and told the Department that it would comply, while planning to do otherwise, it is exposed to penalties under the False Claims Act"). In *Conner*, 543 F.3d at 1222, the Court explicitly stated that the Incentive Compensation Ban at issue in *Hendow* provided a "telling contrast" to an alleged violation of Medicare regulations. *Wilkins* cited *Conner* with approval and did not

---

[15] The Court reversed, in part, on the ground that alleged violations of the Anti-Kickback statute did constitute a "condition of payment." *Id*. at 313-14.

disavow or disagree with *Hendow* or *Main*.[16]  In sum, *Wilkins* does not mandate dismissal as a matter of law.

In summary, the Court will deny the motion to dismiss the False Claims Act challenges to the Plan "as implemented."  This theory is inherently difficult to resolve at the motion to dismiss stage.  The Complaint provides adequate notice of Plaintiff's theory, such that EDMC is able to prepare a responsive pleading.  It will be incumbent upon Plaintiffs to develop admissible evidence to support the theory, but they have adequately pled a cognizable claim.

II.     State False Claims Act Claims

The parties' arguments regarding the state law False Claims Act claims essentially mirror their positions as to the federal claims.  The parties recognize that the state False Claims Act statutes are interpreted consistent with the federal statute in all material respects.  Accordingly, the claims based on the Plan "as written" suffer from the same flaws identified above and the claims based on the Plan "as implemented" appear to be cognizable.

However, EDMC argues that compliance with the <u>federal</u> Incentive Compensation Ban is not a requirement for <u>state</u> funding.  In addition, EDMC makes several targeted arguments as to individual states:  (1) that Indiana had no False Claims Act prior to 2005 and Minnesota had no False Claims Act until 2010; (2) that Minnesota did not condition state funding on participation in the federal program, pursuant to Minn. Stat. § 136A.103(b)(3)(i); (3) that California authorized incentive compensation pay to ADAs per Cal. Ed. Code § 94832(e); (4) that Florida

---

[16] The Court is not convinced that the requests for payment submitted by EDMC were "factually false" as defined in Wilkins.  However, because the "as implemented" claims survive under the "legally false" and "fraudulent inducement" rationales, the Court need not finally resolve this issue at this stage of the proceedings.

repeated its Incentive Compensation Ban in 2003 pursuant to Fla. Stat. Ann. § 246.081(4); and (5) that California's Institutional Participation Agreement ("IPA") bars it from recovering treble damages.

Plaintiffs contend that compliance with the federal Incentive Compensation Ban was, in fact, a material requirement for state funding. Plaintiffs further contend that all the elements of their False Claims Act statutes have been satisfied. Indiana and Minnesota represent that they are not seeking retroactive application of their respective False Claims Acts. The states contend that Minn. Stat. § 136A.103(b)(3)(i) does not apply to EDMC because it had already been participating in the Pell Grant program; that California does not permit the type of incentive compensation to ADAs alleged in this case[17] and that the provision cited by EDMC was repealed in 2007; that the repeal of Florida's Incentive Compensation Ban is irrelevant because its claim is based on the false certification of compliance with the federal ban; and that California is entitled to seek treble damages, as the provision cited by EDMC does not apply to statutory violations and cannot limit the state's police power.

Plaintiffs specifically allege, numerous times, that state funding was conditioned on compliance with the federal Incentive Compensation Ban. *See, e.g.,* Intervenor Complaint ¶¶ 174, 176, 198, 303, 318, 330; Minnesota Complaint ¶ 25, 26. The states also contend that their various False Claims Acts remain applicable to EDMC's conduct. Resolution of these issues would benefit from a more fully developed evidentiary record. The Complaints aver that EDMC obtained funds from the states; that EDMC's representations of compliance with the Incentive Compensation Ban were false; and that EDMC acted knowingly. Thus, Plaintiffs have pled all

---

[17] California contends that § 94832(e)(2)(B) conditioned compensation on "satisfactory academic progress" while EDMC's Plan awarded credit immediately upon enrollment. Intervenor Complaint ¶ 114.

of the elements of a prima facie case under the state False Claims Acts for the Plan, as implemented.

###### III.    Federal and State Common Law Claims

EDMC contends that the United States' claims for unjust enrichment and mistake of fact should be dismissed as a matter of law. EDMC argues that: (1) they are preempted by the regulatory scheme created by Congress to enforce the HEA; (2) the claims are really for breach of contract (the PPA); and (3) the United States would receive a double recovery because the students who received government funding were educated. EDMC asserts similar reasons for dismissal of the state common law claims. Plaintiffs contend that their claims are not preempted; are not based on EDMC's alleged contractual breaches of the PPA, but on the false statements contained therein; and that they did not receive the benefit of their bargain.

The Court concludes that the common law claims are not subject to dismissal at this stage of the case. Federal Rule of Civil Procedure 8(d)(3) authorizes pursuit of inconsistent claims or defenses. In *United States v. Silliman*, 167 F.2d 607, 611 (3d Cir. 1948), the Court of Appeals for the Third Circuit held that the False Claims Act does not preempt federal common law remedies. This analysis also applies to the common law claims asserted by the states to recover the separate state funds each provided to EDMC and/or its students. *See Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 222 n.7, 223-24 (3d Cir. 2001) (rejecting contention that state claims were preempted). Moreover, the parties' relationship is not purely contractual, because the PPA was executed within the context of the broader federal and state student aid statutory and regulatory framework. *See Hendow*, 461 F.3d at 1168 (noting the "panoply of statutory, regulatory, and contractual requirements"). The mere fact that students received an education

does not entirely mitigate the governments' damages.  *Id.* at 1176 (rejecting idea that schools could be unfettered in their ability to receive government funds while flouting the Incentive Compensation Ban).  In sum, the Court concludes that the common law claims will not be dismissed.

IV.    Status of Relator Mahoney

EDMC argues that the Court lacks jurisdiction over Michael Mahoney's claims, pursuant to the "first filed" bar in 31 U.S.C. § 3730(b)(5).  That provision states:  "When a person brings an action under this subsection, no person other than the Government may **intervene** or bring a **related action** based on the facts underlying the pending action."  (Emphasis added).  EDMC cites *United States ex rel St. John LaCorte v. SmithKline Beecham Clinical Labs, Inc.*, 149 F.3d 227, 232-34 (3d Cir. 1998), for the proposition that § 3730 bars any new claims arising from events that are already the subject of existing actions.  Plaintiffs contend that this provision is not implicated because Mahoney did not "intervene" or "bring a related action."  Rather, Mahoney and Washington entered into a private arrangement to name Mahoney as an additional relator in an amended complaint in this same case.

Although there is some authority on each side of this issue, the Court agrees with Plaintiffs.[18]  The plain text of § 3730(b)(5) does not apply to the unique procedural status of this case because Mahoney is not "intervening" or bringing a "related action."  *See  United States ex rel. Precision Co. v. Koch Industries, Inc*., 31 F.3d 1015, 1017 (10th Cir.1994);  *Accord United States ex rel. Howard v. Lockheed Martin Corp*., 2011 WL 4348104 (S.D. Ohio 2011) (noting split authority but permitting amendment to add additional relator on statutory interpretation and

_____

[18] As a practical matter, the addition of Mahoney as a relator may be of limited impact because the United States has intervened and is vigorously pursuing this case.

policy grounds). *St. John LaCorte* is distinguishable, as that case did not involve an additional plaintiff added to the same lawsuit. Indeed, in *St. John LaCorte*, the Court noted – without disapproval – that in one of the underlying qui tam cases, a relator (Grossenbacher) was "later joined by" another relator (Robinson). 149 F.3d at 230. In sum, the Court will not dismiss Mahoney as a relator.

V.      Motion to Strike

EDMC contends that allegations regarding its "perfectly legal conduct" should be stricken from the Complaint pursuant to Fed. R. Civ. P. 12(f). For example, EDMC asks the Court to strike averments which set forth EDMC's emphasis on tracking ADA enrollment and recruiting performance data; termination of ADAs who failed to meet performance targets; and references to the President's Club and other prizes. The court may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). As this Court recently explained in *Simmons v. Nationwide Mut. Fire Ins. Co.*:

> A decision to grant or deny a motion to strike a pleading is vested in the trial court's discretion. "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." Motions to strike are decided on the pleadings alone. Because a motion to strike is not favored, a court will generally not grant such a motion unless the material to be stricken bears no possible relationship to the controversy and may cause prejudice to one of the parties.

788 F. Supp.2d 404, 407 (W.D. Pa. 2011) (citations omitted). The averments challenged by EDMC are not redundant, immaterial, impertinent, or scandalous and they are related to the matters at issue. Accordingly, the motion to strike will be **DENIED**.

VI.    District of Columbia Complaint

EDMC filed a separate motion to dismiss the complaint filed by the District of Columbia in November 2011, after briefing had already commenced.  The District asserts two claims under its False Claims Act and one claim for unjust enrichment.  D.C. incorporates by reference many of the factual allegations in the Intervenor Complaint and the parties' respective arguments also largely mirror those discussed above.

However, EDMC also argues that D.C.'s claims are barred by the applicable statutes of limitations.  EDMC points out that D.C. was first named as a party in the Relators' Second Amended Complaint, which was filed on May 2, 2011.  D.C. contends that its claims are timely and properly pled.  The Court will not address the parties' substantive arguments because it agrees with EDMC that D.C.'s claims are untimely.

D.C. pleads in Complaint ¶ 24 that it seeks to recover grant awards made "between 2003 and 2005."  D.C.'s False Claims Act has a six-year statute of limitations.  D.C. Code § 2-381.05. The unjust enrichment claim is subject to a three-year statute of limitations.  D.C. Code § 12-301(8).  D.C. does not contest that these claims would otherwise be time-barred.  However, it argues that they should "relate back" to the filing of the Relators' initial Complaint pursuant to Fed. R. Civ. P. 15(c).

In *Nelson v. County of Allegheny*, 60 F.3d 1010, 1014-15 (3d Cir. 1995), the Court of Appeals for the Third Circuit explained that where the effort to amend and "relate back" is to add new plaintiffs, the Court must inquire whether the defendants received such notice that they will not be prejudiced.  The Court explained:

> Statutes of limitations ensure that defendants are "protected against the prejudice of having to defend against stale claims, as well as the notion that, at some point, claims should be laid to rest so that security and stability can be restored to human affairs." *Cunningham*, 530 A.2d at 409 (citations omitted). In order to preserve

this protection, the relation-back rule requires plaintiffs to show that the already commenced action sufficiently embraces the amended claims so that defendants are not unfairly prejudiced by these late-coming plaintiffs and that plaintiffs have not slept on their rights.

*Id*. The Court then cited *Leachman v. Beech Aircraft Corp.*, 694 F.2d 1301, 1309 (D.C. Cir. 1982), for the proposition that a failure to limit the "relation back" doctrine:

would allow the tardy plaintiffs to benefit from the diligence of the other victims and, more importantly, could cause defendants' liability to increase geometrically and their defensive strategy to become far more complex long after the statute of limitations had run. Even if, as here, there were no showing of specific prejudice in the sense of lost or destroyed evidence, defendants would still be deprived of their interest in repose. At some point, defendants should have notice of who their adversaries are.

*Id. See also Asher v. Unarco Material Handling, Inc.,* 596 F.3d 313, 318 (6th Cir. 2010) (citations omitted) (amendment which adds new Plaintiff does not relate back and cannot be maintained when the statute of limitations has run).

The Court concludes that the requirements for the "relation back" doctrine have not been met in this case. D.C. is a tardy Plaintiff which seeks to benefit from the diligence of others. D.C.'s claims were not embraced by the Relators' earlier Complaints because D.C. is attempting to recover for alleged misrepresentations made to the <u>District</u>, not to the other Plaintiffs. EDMC did not receive notice of D.C.'s claims within the limitations period and there is no indication that the failure to name D.C. earlier was due to a mistake concerning its identity. Even though there has been no showing of specific prejudice, EDMC "would still be deprived of [its] interest in repose."

Accordingly DEFENDANTS' MOTION TO DISMISS COMPLAINT IN INTERVENTION BY THE DISTRICT OF COLUMBIA (Document No. 165) will be **GRANTED**.

Conclusion

This is a massive and complex case.  It is certainly possible that EDMC has properly compensated its ADAs in compliance with all government requirements.  Indeed, the Court has concluded that claims based on EDMC's Compensation Plan "as written" must be dismissed. However, the Court concludes that the claims based on the Plan "as implemented" will not be dismissed.  At this stage of the proceedings, the Court merely concludes that Plaintiffs' allegations of a company-wide fraud, viewed in the light most favorable to Plaintiffs and assumed to be true, are cognizable.  Plaintiffs are entitled to take discovery in an effort to prove these allegations.


An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, AND THE STATES OF CALIFORNIA, FLORIDA, ILLINOIS, INDIANA, MASSACHUSETTS, MINNESOTA, MONTANA, NEW JERSEY, NEW MEXICO, NEW YORK, AND TENNESSEE, AND THE DISTRICT OF COLUMBIA, each ex rel. LYNNTOYA WASHINGTON and MICHAEL T. MAHONEY,** | ) ) ) ) ) ) ) ) ) | **Civil Action No. 07-CV-461** |
| **Plaintiffs,** | ) | |
| **v.** | ) ) | |
| **EDUCATION MANAGEMENT CORPORATION; EDUCATION MANAGEMENT HOLDINGS LLC; EDUCATION MANAGEMENT LLC; THE ART INSTITUTE OF CALIFORNIA – HOLLYWOOD; THE ART INSTITUTE OF CALIFORNIA – INLAND EMPIRE; THE ART INSTITUTE OF CALIFORNIA – LOS ANGELES; THE ART INSTITUTE OF CALIFORNIA – ORANGE COUNTY; THE ART INSTITUTE OF CALIFORNIA – SACRAMENTO; THE ART INSTITUTE OF CALIFORNIA – SAN DIEGO; THE ART INSTITUTE OF CALIFORNIA – SAN FRANCISCO; THE ART INSTITUTE OF CALIFORNIA – SUNNYVALE; ARGOSY UNIVERSITY, INLAND EMPIRE; ARGOSY UNIVERSITY, ORANGE COUNTY; ARGOSY UNIVERSITY, SAN DIEGO; ARGOSY UNIVERSITY, SAN FRANCISCO; ARGOSY UNIVERSITY, SANTA MONICA; WESTERN STATE UNIVERSITY COLLEGE OF LAW; THE ART INSTITUTE OF FORT LAUDERDALE; THE ART INSTITUTE OF JACKSONVILLE; THE ART INSTITUTE OF TAMPA; MIAMI INTERNATIONAL UNIVERSITY OF ART & DESIGN; ARGOSY UNIVERSITY, SARASOTA; ARGOSY UNIVERSITY, TAMPA; SOUTH** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **ORDER OF COURT** |

UNIVERSITY/WEST PALM BEACH; SOUTH  )
UNIVERSITY/TAMPA; BROWN MACKIE  )
COLLEGE – MIAMI; THE ILLINOIS  )
INSTITUTE OF ART – CHICAGO; THE  )
ILLINOIS INSTITUTE OF ART –  )
SCHAUMBERG; ARGOSY UNIVERSITY,  )
CHICAGO; ARGOSY UNIVERSITY,  )
SCHAUMBURG; BROWN MACKIE  )
COLLEGE – MOLINE; THE ART  )
INSTITUTE OF INDIANAPOLIS; BROWN  )
MACKIE COLLEGE – MERRILLVILLE;  )
BROWN MACKIE COLLEGE – MICHIGAN  )
CITY; BROWN MACKIE COLLEGE – FORT  )
WAYNE; BROWN MACKIE COLLEGE –  )
SOUTH BEND; BROWN MACKIE COLLEGE  )
– INDIANAPOLIS; THE ART INSTITUTES  )
INTERNATIONAL MINNESOTA; ARGOSY  )
UNIVERSITY, TWIN CITIES; BROWN  )
MACKIE COLLEGE – ALBUQUERQUE;  )
THE ART INSTITUTE OF NEW YORK CITY;  )
THE ART INSTITUTE OF TENNESSEE –  )
NASHVILLE; ARGOSY UNIVERSITY,  )
NASHVILLE; THE ART INSTITUTE OF  )
ATLANTA; THE ART INSTITUTE OF  )
ATLANTA – DECATUR; THE ART  )
INSTITUTE OF AUSTIN; THE ART  )
INSTITUTE OF CHARLESTON; THE ART  )
INSTITUTE OF CHARLOTTE; THE ART  )
INSTITUTE OF COLORADO; THE ART  )
INSTITUTE OF DALLAS; THE ART  )
INSTITUTE OF FORT WORTH; THE ART  )
INSTITUTE OF HOUSTON; THE ART  )
INSTITUTE OF HOUSTON – NORTH; THE  )
ART INSTITUTE OF LAS VEGAS; THE ART  )
INSTITUTE OF MICHIGAN; THE ART  )
INSTITUTE OF OHIO – CINCINNATI; THE  )
ART INSTITUTE OF PHILADELPHIA; THE  )
ART INSTITUTE OF PHOENIX; THE ART  )
INSTITUTE OF PITTSBURGH; THE ART  )
INSTITUTE OF PORTLAND; THE ART  )
INSTITUTE OF RALEIGH – DURHAM; THE  )
ART INSTITUTE OF SAN ANTONIO; THE  )
ART INSTITUTE OF SALT LAKE CITY;  )
THE ART INSTITUTE OF SEATTLE; THE  )
ART INSTITUTE OF TUCSON; THE ART  )
INSTITUTE OF VANCOUVER; THE ART  )

INSTITUTE OF VIRGINIA BEACH; THE          )
ART INSTITUTE OF WASHINGTON; THE          )
ART INSTITUTE OF WASHINGTON –            )
NORTHERN VIRGINIA; THE ART               )
INSTITUTE OF WISCONSIN; THE ART          )
INSTITUTE OF YORK – PENNSYLVANIA;        )
THE ART INSTITUTES INTERNATIONAL –       )
KANSAS CITY; THE NEW ENGLAND             )
INSTITUTE OF ART; ARGOSY                 )
UNIVERSITY, ATLANTA; ARGOSY              )
UNIVERSITY, DALLAS; ARGOSY               )
UNIVERSITY, DENVER; ARGOSY               )
UNIVERSITY, HONOLULU; ARGOSY             )
UNIVERSITY, PHOENIX; ARGOSY              )
UNIVERSITY, SALT LAKE CITY; ARGOSY       )
UNIVERSITY, WASHINGTON D.C.; SOUTH       )
UNIVERSITY/SAVANNAH; SOUTH               )
UNIVERSITY/MONTGOMERY; SOUTH             )
UNIVERSITY/COLUMBIA; SOUTH               )
UNIVERSITY/RICHMOND; SOUTH               )
UNIVERSITY/NOVI; SOUTH                   )
UNIVERSITY/VIRGINIA BEACH; BROWN         )
MACKIE COLLEGE – AKRON; BROWN            )
MACKIE COLLEGE – CINCINNATI;             )
BROWN MACKIE COLLEGE – FINDLAY;          )
BROWN MACKIE COLLEGE – NORTHERN          )
KENTUCKY; BROWN MACKIE COLLEGE –         )
NORTH CANTON; BROWN MACKIE               )
COLLEGE – ATLANTA; BROWN MACKIE          )
COLLEGE – KANSAS CITY; BROWN             )
MACKIE COLLEGE – SALINA; BROWN           )
MACKIE COLLEGE – LOUISVILLE;             )
BROWN MACKIE COLLEGE –                   )
HOPKINSVILLE; BROWN MACKIE               )
COLLEGE – TUCSON; BROWN MACKIE           )
COLLEGE – BOISE; BROWN MACKIE            )
COLLEGE – TULSA; BROWN MACKIE            )
COLLEGE – PHOENIX; BROWN MACKIE          )
COLLEGE – GREENVILLE; BROWN              )
MACKIE COLLEGE – ST. LOUIS; BROWN        )
MACKIE COLLEGE – SAN ANTONIO,            )
                    **Defendants.**      )

**ORDER OF COURT**

AND NOW, this 11th day of May, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED, and DECREED that DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6), AND, IN THE ALTERNATIVE, MOTION TO STRIKE UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(f) (Document No. 145) is **GRANTED IN PART AND DENIED IN PART** as follows**:**

(1) the motion to dismiss claims based on the EDMC Compensation Plan "as written" is **GRANTED**;

(2) Count III of the Intervenor Complaint is limited to claims pending on or after June 7, 2008;

(3) the Indiana and Minnesota False Claims Act claims are limited to conduct since the enactment of those statutes in 2005 and 2010, respectively;

(4) the motion to dismiss relator Mahoney is **DENIED**;

(5) the motion to strike averments pursuant to Fed. R. Civ. P. 12(f) is **DENIED**; and

(6) in all other respects, the motion is **DENIED**.


DEFENDANTS' MOTION TO DISMISS COMPLAINT IN INTERVENTION BY THE DISTRICT OF COLUMBIA (Document No. 165) is **GRANTED.**  The District of Columbia is dismissed as a party and the caption shall be so amended.

EDMC shall file an Answer as to the remaining Complaints on or before June 11, 2012.

EDMC shall also file a response as to Counts 6 and 8-14 of the Relator Complaint on or before

June 11, 2012.

For the convenience of all concerned, the Court and parties shall utilize the following

"short form" of the caption for future filings in this case:

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, et al.** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No. 07-461** |
| **EDUCATION MANAGEMENT CORPORATION,** | ) | |
| **et al.,** | ) | |
| **Defendants.** | ) | |

BY THE COURT:

<u>s/ Terrence F. McVerry</u>
United States District Judge

cc:    All counsel of record
       (Via CM/ECF)