## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 07-461 |
| v. | ) |
| | ) Judge McVerry |
| EDUCATION MANAGEMENT CORP., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## PLAINTIFFS' BRIEF IN SUPPORT OF PLAINTIFFS' MOTION PURSUANT TO FED. R. CIV. P. 56(d) TO DENY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**PAGE**

I.      **Introduction**....................................................................................................**1**

II.     **Background** ....................................................................................................**2**

      a.      Defendants' Statistical Arguments Have Been Repeatedly Rejected
Because Plaintiffs Are Entitled to Discover Recruiters' Actual
Experiences .......................................................................................3

      b.      Defendants' Motion is an Attempt to Avoid Producing the Core Discovery
That Defendants Have Withheld to Date. ...................................................7

III.    **Argument.** ....................................................................................................**11**

      a.      Rule 56(d) Provides that Defendants' Motion Should be Denied. ............12

      b.      The Missing Discovery in Defendants' Possession Will Create a Genuine
Dispute of Material Fact. ..........................................................................13

      c.      Defendants Rely on an Untenable Reading of the ICB and Safe Harbor...17

IV.     **Conclusion.** ....................................................................................................**20**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Commonwealth v. Sebelius,*
   674 F.3d 139 (3d Cir. 2012).........................................................................12

*Contractors Ass'n v. City of Philadelphia,*
   945 F.2d 1260 (3d Cir. 1991).................................................................2, 12, 13

*Doe v. Abington Friends Sch.,*
   480 F.3d 252 (3d Cir. 2007)........................................................................13

*LaVallee Northside Civic Ass'n v. Virgin Islands Coastal Zone Management Comm'n,*
   866 F.2d 616 (3d Cir.1989)..........................................................................18

*McComb v. Wambaugh,*
   934 F.2d 474 (3d Cir.1991)..........................................................................18

*Pa. Dep't of Pub. Welfare v. U.S. Dept. of Health & Human Servs.,*
   80 F.3d 796 (3d Cir. 1996)..........................................................................18

*Polychrome Int'l Corp. v. Krigger,*
   5 F. 3d 1522 (3d Cir. 1993)..........................................................................18

*St. Surin v. V.I. Daily News,*
   21 F.3d 1309 (3d Cir. 1994)...........................................................................2

**Statutes**

20 U.S.C. § 1094(a)(20).................................................................................17

**Other Authorities**

34 C.F.R. § 668.14(b)(22)(ii)(A) ....................................................................19

Fed. R. Civ. P. 56 Advisory Committee Notes (2010) .................................12

75 Fed. Reg. 34817 (Jun. 18, 2010)..............................................................19

## I.        Introduction

Defendants' Motion for Summary Judgment [Dkt. No. 369] represents at least the fifth time Defendants have attempted to use a preliminary statistical submission to short-circuit Plaintiffs' case and deny Plaintiffs the necessary discovery the Court has ordered.   On each previous occasion, the Court and Special Master have explained that Plaintiffs' as-implemented claim cannot be resolved through a statistical analysis of the ratings of Defendants' recruiters, since the core of Plaintiffs' claim is that ratings were camouflage, obscuring a compensation system driven entirely by enrollments.   Thus, the Court has repeatedly held that Plaintiffs are entitled to look behind the quality factor ratings to discover whether non-enrollment-based factors were actually of significance.   Such discovery is ongoing.   Therefore, the Court should deny Defendants' Motion pursuant to Federal Rule of Civil Procedure 56(d).

Defendants do not suggest there are any new facts to justify the recycled arguments in their current Motion.   To the contrary, the Motion coincides with Plaintiffs identifying and moving to remedy significant deficiencies in Defendants' production and Defendants acknowledging before the Special Master that they will be unable to complete their ordered productions by the April 30, 2014 document discovery deadline established in Case Management Order No. 2 [Dkt. No. 298] ("CMO No. 2").   Specifically, Defendants have failed to produce **99%** of the communications to and among their Assistant Directors of Admissions ("ADAs"), Defendants' primary recruiters. This is discovery that the Court and Special Master have explained constitutes "some of the most probative evidence sought by Plaintiffs," and is "central" to Plaintiffs' claim.   Report & Recommendation No. 2 [Dkt. No. 258] ("R&R No. 2") 40, 43; Order Overruling Objs. to R&R Nos. 2 & 3 [Dkt. No. 291] (adopting R&R No. 2 in full).   The parties are also just beginning to discuss how Defendants' inadequate production will impact the primary deposition period, which CMO No. 2 provides should follow the completion of document discovery, and during which

1

Plaintiffs may take more than 420 hours of depositions.

In this light, the purpose of Defendants' Motion is plain.  It is a last-ditch effort to avoid complying with this Court's Orders to provide Plaintiffs the evidence that can establish the true incentives Defendants created for their recruiters.  Where, as here, a summary judgment movant possesses relevant documentary and testimonial evidence that it has not yet produced, the Third Circuit explains the summary judgment motion should be denied under Rule 56(d) "as a matter of course."  *Contractors Ass'n v. City of Philadelphia*, 945 F.2d 1260, 1267 (3d Cir. 1991). Because of Defendants' non-production of essential facts, Plaintiffs respectfully request Defendants' Motion be denied.[1]

## II.    Background

In their Rule 12(b)(6) motion to dismiss, motion for a case management order seeking phased discovery, and opposition and objections to Plaintiffs' initial discovery requests, Defendants advanced the *exact same* statistical argument that they now present.  Indeed, Defendants relied on the *same* statements by the *same* statistician and previewed for the Court the *same* conclusions.  In fact, prior to ordering the "conventional, unlimited discovery" that Defendants strenuously fought, Order Denying Case Management Order [Dkt. No. 224], the Court explained that Defendants had already made clear "what the data shows," Trans. Oct. 10, 2012 Hearing (Ex. A) 25:11-12.  Still, the Court indicated, statistics cannot undermine the evidence of Defendants' actual compensation practices on which Plaintiffs' as-implemented claim relies.

---

[1] Because of the current state of discovery, specifically Defendants' non-production of key evidence, Plaintiffs also request the Court hold in abeyance the deadline for Plaintiffs to respond to Defendants' Motion on the merits until the Court has the opportunity to consider the arguments raised herein and any opposition Defendants may file. Should the Court request a response on the merits, Plaintiffs request additional time to analyze Defendants' exhibits. *See St. Surin v. V.I. Daily News*, 21 F.3d 1309 (3d Cir. 1994) ("[W]e think the district court should have resolved St. Surin's Rule 56[(d)] motions before proceeding to the merits of the newspaper's summary judgment motion and then, if it decided to deny the request for delay, give St. Surin reasonable notice and an opportunity to respond on the merits to the motion for summary judgment.").

Order Denying Case Management Order [Dkt. No. 224]. Documents and communications that could show "EDMC's relentless and exclusive focus on the number of new students an ADA is able to recruit" could establish a violation of the Incentive Compensation Ban ("ICB"). *See* Joint Complaint in Intervention [Dkt. No. 128] ¶ 88. This is precisely the material that Plaintiffs have consistently sought and recently demonstrated has largely not yet been produced, seriously undermining Plaintiffs' ability to create a documentary record and prepare for depositions. Defendants' Summary Judgment Motion represents yet another attempt to bulldoze past the Court's Orders and prevent Plaintiffs from obtaining the discovery this Court has explained is necessary.

### a. Defendants' Statistical Arguments Have Been Repeatedly Rejected Because Plaintiffs Are Entitled to Discover Recruiters' Actual Experiences.

Dating back to Defendants' Rule 12(b)(6) motion to dismiss, Defendants have argued that the actual incentives Defendants created for and communicated to their recruiters are immaterial, because there is not a one-to-one relationship between a recruiter's enrollments and salary. In seeking to dismiss Plaintiffs' as-implemented claim, Defendants argued that recruiter compensation "did not necessarily increase when an ADA's enrollment numbers did." Defs.' Reply ISO Motion to Dismiss [Dkt. No. 176] 19. Certain "ADAs earned the exact same salary despite recruiting very different numbers of new students. . . . [Also] EDMC did not negate the importance of Quality Factors by giving each ADA the same Quality Rating. Even ADAs with the same number of enrollments had different Quality Ratings." *Id.*

In denying Defendants' motion, the Court explained that Plaintiffs' as-implemented theory was not based on the numbers entered on recruiters' salary paperwork. Instead, it turns on evidence regarding the "culture" and "practices" of Defendants' sales force.

> Plaintiffs allege that EDMC has violated the Incentive Compensation Ban from July 1, 2003 through the present because: (1) ADA compensation and

> advancement is exclusively focused on the number of new students an ADA is
> able to recruit; (2) EDMC has created a culture that has made recruiting and
> enrolling new students the sole focus of its compensation system; and (3)
> EDMC's practices result in payment of commissions, bonuses and other incentive
> payments such as "President's Club" trips and "Circle of Achievement" awards,
> which are based solely on the number of students being enrolled.

Order Denying Motion to Dismiss ("MTD Order") [Dkt. No. 183] 21.  Evidence demonstrating

the actual experiences of Defendants' recruiters, for instance Defendants' "detailed tracking of

ADA student enrollment numbers," could establish liability. *Id.* at 26.

Nonetheless, in their case management proposal, Defendants sought to deny Plaintiffs

discovery of this evidence because Defendants claimed that "[t]he crux of this case is a basic

statistical exercise."  Defs.' Br. ISO Case Management Order [Dkt. No. 217] 4.  Defendants

stated that "the question is whether salary and enrollment were perfectly correlated or, instead,

whether other, non-enrollment factors impacted the compensation that Defendants actually

awarded." *Id.* at 9.  As a result, Defendants suggested that initial discovery be limited to the

"facts and figures" collected from recruiters' salary paperwork and contained in Defendants'

"Salary Factor Database," because an analysis of this data would establish the "non-enrollment

factors . . . were not a mere proxy for enrollments." *Id.* at 5.

At the Rule 16 conference, Defendants doubled-down on these arguments.

> We are willing to present at that ENE [early neutral evaluation], whether the
> government chooses to participate or not in the assessment of the data, *a
> statistical analysis which will demonstrate, we believe, unequivocally, that
> enrollments were not the sole factor in either the quality points that were given,
> nor in the salary adjustments that were actually made*.

Trans. Oct. 10, 2012 Hearing (Ex. A) 12:1-7 (emphasis added).  Consistent with the Court's

decision on the motion to dismiss, Plaintiffs countered that "statistics are not going to be

dispositive [because] we need to discover information such as communications between

admission personnel and their supervisors and executives" which is "at the heart of our as

4

implemented claims." *Id.* 18:11-20.  Defendants requested that they be allowed to present their

statistical case so that they could avoid Plaintiffs' intended discovery:   "[W]hatever

communications, or back-and-forth, or training, or whatever went on," could not create a

material issue of fact.  *Id.* 21:23-24.  Thus, even if the Court did not order an ENE, Defendants

insisted they be allowed to present their statistical conclusions to the Court.

> We can do that in front of you with respect to the data.  We believe it's important
> for you to see it.  We could do it today, if you would like.  We're prepared to do it
> today. . . . Your Honor, I submit to you, and I know I'm promising, I submit to
> you that ***when you see the data analysis you would have an answer*** . . . .

*Id.* 23:24-24:2, 25:25-26:2 (emphasis added).

Having explained at the conference that "[Plaintiffs] now know, like me, what the data

shows, because you've told us what it shows," the Court again rejected Defendants' attempt to

foreclose proper discovery with a statistical presentation.  *Id.* at 25:11-12.  The Court explained:

> EDMC's focus on statistical and documentary evidence is difficult to reconcile
> with Plaintiffs' "as implemented" theory of the case, which is that even if the
> paperwork looked correct on its face, such paperwork was only a pretext or cover-
> up and did not reflect EDMC's actual compensation practices.

Order Denying Case Management Order [Dkt. No. 224] 2.  As a result, the Court concluded

Plaintiffs are entitled to "conventional, unlimited discovery" to pursue their claims, and could

not be limited to discovery of the salary data alone.  *Id.* at 3.

In responding to Plaintiffs' discovery requests, Defendants still refused to produce nearly all

of the evidence regarding their actual compensation practices that Plaintiffs requested, most

critically the communications among recruiters and between recruiters and their supervisors.

Accordingly, Plaintiffs were forced to move to compel.   Defendants again resisted such

discovery based on their claim that a statistical analysis of the salary data could resolve the

dispute.  Defs.' Apr. 18, 2013 Opp. MTC (Ex. B) 12-15.  Relying on a declaration from Dr.

Edward Lazear, Defendants suggested Plaintiffs' requested discovery was irrelevant because Dr.

Lazear's statistical analysis would be able to show whether "all of the variation in compensation found in the [compensation] data must be explained fully by variation in enrollment success." Ex. A to Defs.' Apr. 18, 2013 Opp. MTC (Ex. C) ¶ 15. Exactly as they do in their Motion for Summary Judgment, through Dr. Lazear, Defendants argued at the motion to compel stage that "with data on the factors actually used to calculate the actual salaries, basic statistics would permit determination of whether compensation was solely based on enrollments." *Id.* ¶ 21.

> This time the Special Master rejected Defendants' arguments.
>
> [I]nasmuch as Defendants argue that the affidavit from Dr. Lazear shows that statistics can be used to show that Plaintiffs['] requests are irrelevant, thereby obviating Plaintiffs' needs for the requested information, the Special Master notes that it would be inappropriate to reject Plaintiffs' discovery requests at this stage of the litigation based on untested expert testimony which Plaintiffs have not had sufficient opportunity to refute with their own expert. ***Moreover, the Court has twice rejected Defendants' contention that statistical evidence alone can disprove Plaintiffs' allegations and the Special Master has previously ruled similarly.***

R&R No. 2 [Dkt. No. 258] 38 (emphasis added).

Instead, the Special Master recommended that Plaintiffs be provided nearly all of the evidence they sought. In particular, the Special Master explained the daily communications to and among Defendants' recruiters, are "***central*** to [Plaintiffs'] argument.'" *Id.* at 40-41 (emphasis added). Rejecting Defendants' argument of undue burden—that these materials would come from "over 100 institutions, which have employed over 11,000 recruiters since 2003"—the Special Master stated that "this particular material represents ***some of the most probative evidence sought by Plaintiffs***." *Id.* at 42-43 (emphasis added). "[W]hen . . . the ***cumulative impact of many lawful [acts] establishes liability***, evidence regarding those individual lawful acts is relevant and discoverable[.]" *Id.* at 41-42 (emphasis added).

Defendants next objected to R&R No. 2, again citing Dr. Lazear's declaration as undercutting the relevance of Plaintiffs' requests, and reiterating the exact same reasons. Defs.

Objs. R&R No. 2 [Dkt. No. 263] 10, 17, 23.  The Court overruled Defendants' objections.

> EDMC objects to Special Master Levie's characterization of the key issue as "whether the Quality Points accurately reflected ADA performance" and continues to portray the key issue as "whether compensation was based solely on enrollments."  These are different sides of the same coin.  As noted above, ***Plaintiffs are entitled to prove their allegations that the ADA Compensation Plan was a sham through circumstantial evidence that the non-enrollment factors*** on the Grid (i.e., the Quality Points) ***were not actually of significance. Such evidence could allow a jury to conclude that ADA compensation was based solely on enrollments.***

Order Overruling Objs. R&R Nos. 2 & 3 [Dkt. No. 291] 6 (emphasis added).  The Court "adhere[d] to its earlier statements regarding the limitations of statistical evidence at this stage of the case."  *Id.* at 7.

As they do now, on at least four previous occasions, Defendants have wielded statistics in an effort to prevent Plaintiffs from gaining access to the evidence of Defendants' actual compensation practices.  Indeed, Defendants have previously submitted to both the Court and the Special Master a declaration by the statistician on whom they now rely, articulating the same claim as to what his statistical analysis can reveal and previewing for the Court the results that he now presents.  The response to each motion has been the same, that Plaintiffs' allegations do not depend on a statistical analysis of the numbers—the camouflage—but discovery into the actual incentives created for Defendants' recruiters.  Plaintiffs are entitled to the opportunity to show through circumstantial evidence that the quality factors were not "actually of significance."

### b.  Defendants' Motion is an Attempt to Avoid Producing the Core Discovery That Defendants Have Withheld to Date.

Notably, Defendants have chosen to file their redundant, yet premature Summary Judgment Motion when they are on the verge of finally being forced to produce the communications the Court has explained lie at the heart of this case.  Defendants stated at the October 2012 Rule 16 conference that, at that time, they were prepared to present the exact same statistical analysis and conclusions that are contained in their Summary Judgment Motion.  The only change that

explains Defendants' Motion is that after months of effort by Plaintiffs, Defendants can no longer avoid producing the core evidence of the recruiters' communications.

In order to deflect attention from the content of their production to date, Defendants have emphasized before the Special Master the raw volume of their production, and made meaningless comparisons between the sizes of the parties' productions.  Plaintiffs' review of the *sources* and *content* of Defendants' production, however, reveals that Defendants have thus far denied Plaintiffs the "central" communications in the case.[2]

During the initial motions to compel, relying on their statistics-based arguments, Defendants claimed that producing communications from their more than 11,000 recruiters would be unnecessary and unduly burdensome.  R&R No. 2, at 42-43; Defs. Objs. R&R No. 2, at 10, 17, 23.  The Court and Special Master rejected the arguments and ordered Defendants to produce those communications.  R&R No. 2, at 41-43.  Yet, Defendants have only produced emails from *59* ADAs, or *0.5%* of their recruiters.[3]  Relatedly, Defendants have only produced emails from 19 Directors of Admissions ("DOAs"), ADAs' immediate supervisors, and a total, including ADAs and DOAs, of 122 individuals who could be classified as "Admissions Employees."  All of these custodians collectively only worked at *14* of the more than 100 Defendant-institutions, and only a *single one* of the ADAs worked for any institution within one of the five intervened States.[4]  Indeed, Defendants acknowledge that they have gone to only *four* brick and mortar

---

[2] The key facts regarding the scope of Defendants' production to-date are attested to in the Declaration of Christy C. Wiegand attached as <u>Exhibit D</u>.

[3] Defendants have refused to state whether the communications they have produced from these few custodians constitute all of the communications by or to these custodians.  Accordingly, while Plaintiffs estimate that they have received 0.5% of the recruiter communications, because Defendants have only produced from 59 ADAs of their more than 11,000 recruiters, it may be that Plaintiffs are overestimating Defendants' current production, as there may still be more communications Defendants should produce from the 59 ADA custodians.

[4] The day before Plaintiffs submitted this brief, Defendants made an additional production containing documents from a small number of Admissions Employees, which are not accounted for in these figures, but which demonstrates that Defendants continue to possess relevant material that they have not yet produced.

institutions, none of which are in the intervened States, to collect hard copy documents. *See* Ex. A to Defs.' Dec. 31, 2013 Letter (Ex. E) 4-9. Moreover, the vast majority of the produced correspondence (indeed, of all of the produced records) post-dates the unsealing of the claims, when Defendants were put on maximum guard. In fact, 54.4% of all dated documents from the relevant time period and 52.7% of all dated emails from the relevant time period come from 2011 or 2012; only 0.5% of dated documents and emails come from 2002 or 2003—the beginning of the relevant time period in this case. Ironically, Defendants have even failed to produce the Salary Factor Database or any other compilations on which their statistical analysis relies. *See* Defs.' Br. ISO Case Management Order [Dkt. No. 217] 5. When Plaintiffs asked for the Salary Factor Database, Defendants said that Plaintiffs should seek it "through the appropriate procedural mechanisms," Defs.' Apr. 15, 2014 Letter (Ex. F), presumably expert discovery, which CMO No. 2 provides should not begin until document production and depositions are complete. CMO No. 2 ¶¶ 27-30.

Defendants indisputably possess much of the missing discovery material. Defendants have conceded that they placed the correspondence of 4,500 individuals under litigation hold. Miko Depo. Excerpts (Ex. G) 23:5-12. Moreover, they provided sworn testimony that at least once a month throughout the entire relevant period they created copies of their employees' emails and they have retained each of those backup tapes. Miko Depo. Excerpts (Ex. G) 94:25-95:2, 96:3-8.

Defendants to date have gone to great lengths to avoid producing the communications to and among their recruiters, despite Plaintiffs' consistent efforts. Near the start of document production, Plaintiffs requested that Defendants prioritize the production of key materials, including Defendants' Admissions Employees' emails. *See*, *e.g.*, Pls.' Nov. 22, 2013 Letter (Ex. H). Report and Recommendation No. 4 [Dkt. No. 314] ("R&R No. 4") adopted Plaintiffs'

request, ordering Defendants to produce all of the Admissions Employee emails "currently available to" them by December 31, 2013.  R&R No. 4, at 11.  Defendants did not do so.

Moreoever, after R&R No. 4 was entered, and despite the fact that for years Defendants had represented that they preserved all of their emails, Defs.' Sept. 13, 2012 Letter (Ex. I); Defs.' Sept. 14, 2012 Letter (Ex. J), Defendants' Rule 30(b)(6) witness stated that Defendants were not searching for email retained on their backup tapes, Miko Depo. Excerpts (Ex. G) 125:7-13; Defs.' Jan. 28, 2014 Letter (Ex. K).  Plaintiffs sent Defendants letters explaining that Defendants' position was inconsistent with their prior representations and the decisions of the Court, Pls.' Dec. 23, 2013 Letter (Ex. L); *see also* Pls.' Jan. 15, 2014 Letter (Ex. M); Pls.' Jan. 22, 2014 Letter (Ex. N).  Nonetheless, as of the end of February 2014, Defendants had produced email from only *eighteen* ADAs and documents from *thirty-two* people who worked in admissions.  *See* Pls.' Mar. 10, 2014 Reply ISO MTE R&R No. 4 (Ex. O).

Because Defendants made their intent to limit and backload their production clear, in February 2014, Plaintiffs moved to enforce this Court's earlier orders.  Plaintiffs filed motions with the Special Master seeking to enforce R&R No. 4 and to compel production from Defendants' backup tapes.  Pls.' Feb. 24, 2014 MTE R&R No. 4 (Ex. P); Pls.' Mar. 10, 2014 Reply ISO MTE R&R No. 4 (Ex. O); Pls.' Mar. 20, 2014 Letter Concerning New Evidence ISO MTE R&R No. 4 (Ex. Q); Pls.' Feb. 24, 2014 MTC Backup Tapes (Ex. R); Pls.' Mar. 27, 2014 Reply ISO MTC Backup Tapes (Ex. S).[5]  In support of Plaintiff's motion to compel production, Plaintiffs provided an expert declaration to establish that email on the backup tapes could be located and extracted for a reasonable cost.  Ex. O to Pls.' Mar. 27, 2014 Reply ISO MTC

---

[5] For completeness, Plaintiffs have enclosed Defendants' March 3, 2014 Opposition to Plaintiffs' Motion to Enforce R&R No. 4 as Exhibit T, and Defendants' March 12, 2014 Opposition to Plaintiffs' Motion to Compel Production from Defendants' Backup Tapes as Exhibit U.

Backup Tapes (Ex. V).  These motions are currently pending before the Special Master. Meanwhile, Plaintiffs have also followed up with Defendants to ensure that Defendants' existing collection efforts are complete.  Pls.' Apr. 10, 2014 Letter (Ex. W).

Anticipating that Plaintiffs will need to explore how Defendants' communications were understood by Defendants' recruiters, Plaintiffs have also reserved 420 of the 430 hours of depositions provided under CMO No. 2.  *See* CMO No. 2 ¶25(c).  Recognizing that document discovery should inform and streamline depositions, CMO No. 2 provides that the primary deposition period should follow the close of document discovery.  CMO No. 2 ¶¶ 23-24.[6]

Defendants' Summary Judgment Motion comes the moment before they will finally be forced to produce the core discovery that they have improperly withheld to date.  With document discovery coming to a close, and Plaintiffs' outstanding requests that Defendants produce from all of the custodians who possess relevant and responsive information and for whom Defendants have retained relevant communications on backup tapes, Defendants will be unable to further delay providing Plaintiffs the communications that will reveal Defendants' actual compensation practices.   Plaintiffs will then be able to use those materials to conduct the depositions of Defendants' current and former employees provided for under CMO No. 2.  Defendants' Motion for Summary Judgment is an inappropriate attempt to preempt the factual development that the Court and Special Master have confirmed is necessary, and that is finally at hand.

## III.   Argument.

Defendants' Motion for Summary Judgment is an attempt to do what their motion to dismiss, motion for phased discovery, and opposition and objections to Plaintiffs' discovery requests could not, avoid the production of the evidence that will reveal Defendants' true compensation

---

[6] Plaintiffs' efforts to obtain the discovery they are entitled to, and to utilize the other discovery mechanisms that are available are well documented.  *See* Decl. of Christy C. Wiegand (Ex. D).

practices by attempting to recast Plaintiffs' case into a pure statistical exercise.  Not only have the Court and Special Master already held that the missing discovery regarding Defendants' actual compensation practices could prove Plaintiffs' allegations, but the documents Defendants have already produced underscore how the remaining discovery can and will, at the least, create a genuine dispute of material fact.  Where, as here, a party has diligently sought relevant discovery, and where, as here, that discovery remains in the summary judgment movant's possession, the Third Circuit has explained Rule 56(d) not only provides the Court discretion to deny the Motion for Summary Judgment, but a district court should do so *as a matter of course*.

### a.  Rule 56(d) Provides that Defendants' Motion Should be Denied.

Federal Rule of Civil Procedure 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for special reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Accordingly, in determining whether to grant a Rule 56(d) motion the court should consider "'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'"  *Contractors Ass'n v. City of Philadelphia*, 945 F.2d 1260, 1266 (3d Cir. 1991) (quoting *Lunderstadt v. Colafella*, 885 F.2d 66, 71 (3d Cir. 1989)).[7]

While the Third Circuit acknowledges that the disposition of a Rule 56(d) motion is subject to the district court's discretion, it has also explained that "[t]he breadth of the district court's discretion is affected by [the summary judgment movant's] possession of records that contain the information [the non-movant] seeks.  As we said earlier, this limits the district court's discretion

---

[7] The current Rule 56(d) was previously codified at Rule 56(f).  The change "carrie[d] forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56, advisory committee notes (2010).  Thus, a party may rely on former-Rule 56(f) case law for a present-Rule 56(d) motion.  *See, e.g.*, *Commonwealth v. Sebelius*, 674 F.3d 139, 157 n.3 (3d Cir. 2012).

to deny a request for delay when a proper Rule 56[(d)] affidavit is filed. In such a case, a district court should grant a Rule 56[(d)] motion *almost as a matter of course* unless the information is otherwise available to the non-movant." *Id.* at 1267 (emphasis added); *see also Doe v. Abington Friends Sch.,* 480 F.3d 252 (3d Cir. 2007) ("[I]t is well established that a court 'is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery.'" (quoting *Dowling v. Philadelphia*, 855 F.2d 136 (3d Cir. Pa. 1988)).

The Third Circuit found a district court had abused its discretion in granting a summary judgment motion while interrogatory answers were outstanding and depositions remained to be taken. *Contractors Ass'n*, 945 F.2d at 1267. Because those discovery mechanisms could reveal relevant information, the factors justifying a Rule 56(d) motion were necessarily present. *Id.* Within the Third Circuit, where relevant and responsive discovery remains outstanding, it is appropriate to dispose of a summary judgment motion pursuant to Rule 56(d).

### b. The Missing Discovery in Defendants' Possession Will Create a Genuine Dispute of Material Fact.

As detailed above, and in the attached declaration, despite Plaintiffs' persistent efforts, Defendants have withheld the core discovery concerning how Defendants implemented their compensation scheme. *See* Decl. of Christy C. Wiegand (Ex. D). They have denied Plaintiffs access to *99%* of their recruiters' emails, and those communications they have produced come primarily from the last two years of the relevant time period. Moreover, with the exception of the correspondence of a *single* recruiter from one of Defendants' California locations, Defendants have not produced emails from any recruiters from Defendants' locations in the intervened States. Further still, it is not only document discovery that is significantly incomplete. Under CMO No. 2, the primary deposition period has not yet begun and Plaintiffs are allotted more than 400 hours of depositions to uncover the actual experience of Defendants'

13

recruiters.   CMO No. 2 also provides that expert discovery should *follow* the completion of document discovery *and* depositions.

This remaining discovery is unquestionably capable of creating a genuine dispute of material fact.   As the Special Master explained, Defendants' communications to and among their recruiters are not only "central" to Plaintiffs' claims, but their individual relevance is heightened through their "cumulative impact."   R&R No. 2, at 40-41.   As Plaintiffs have repeatedly alleged and the Court has consistently agreed, evidence establishing that Defendants ran a boiler-room operation, in which recruiters were regularly barraged with exhortations to contact, enroll and start students to the exclusion of all other considerations, will demonstrate Defendants violated the ICB.   Indeed, this Court has explained that Plaintiffs can show that the so-called quality factors were "a sham through circumstantial evidence that the non-enrollment factors . . . were not actually of significance" and this would "allow a jury to conclude that ADA compensation was based solely on enrollments."   Order Overruling Objs. R&R Nos. 2 & 3 [Dkt. No. 291] 6.

Defendants simply disregard these repeated holdings.   The assumption in their Motion is that so long as supervisors filled in the salary adjustment paperwork, regardless of whether the quality factors actually created non-enrollment based incentives, their compensation practices necessarily fell within the Safe Harbor.   Put another way, Defendants conflate the *quality factor ratings*—the numbers that Defendants' supervisors wrote down—with the *quality factors*—the actual behavior Defendants evaluated and incentivized.   In doing so, they ignore what the Court has repeatedly explained:   that looking at the numbers by themselves, it is impossible to understand "what an employee must do to achieve" a particular adjustment to compensation. Order Denying Motion to Dismiss [Dkt. No. 183] 22 (quoting *United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 993-94 (9th Cir. 2011)).

In the few instances in which Defendants even attempt to come to grips with the Court's prior decisions, they mischaracterize them in an effort to make them amenable to resolution by statistical analysis.  Thus, Defendants assume that the only way in which Plaintiffs could make out an as-implemented claim is if adjustments and enrollments "co-vary in lockstep" across the entire range of the company.  Defs.' MSJ [Dkt. No. 369] 9; *see also* Defs.' MSJ Ex. 7 [Dkt. No. 372] ¶ 36 (opining that "evidence showing varying salary adjustment for individuals with the same number of enrollments would" be dispositive).

Certainly if Defendants had promulgated and enforced a company-wide directive that quality factors vary in a pre-determined and uniform way with new student points, Defendants would not fall within the Safe Harbor.  But it is equally plain that there are many other ways in which Defendants' supervisors could have provided numerical scores on the salary paperwork, but in which non-enrollment-based quality factors were not "actually of significance."  For example, supervisors could have assigned nearly everyone a quality factor rating of 3 or 4; they could have defined the quality factors to track factors closely related to, but not identical to, enrollments, such as initiating calls to prospective students; or they could have often varied the ratings according to enrollment numbers, but in a way that was not precisely specified, leaving the exact relation between the ratings and enrollments to the discretion of the supervisor.[8]

In all of these cases, the statistics would show that enrollments and adjustments did not co-vary in lockstep, and therefore Dr. Lazear and Defendants would opine that statistics alone would show that Defendants qualified for the Safe Harbor.  But in each scenario, the non-enrollment-based factors are not actually of significance.  And, the critical point is that determining the actual state of affairs is unavoidably a matter of examining the evidence that

---

[8] Supervisors may have prized certain types of enrollments or certain periods of enrollments more than others.  *See also* Pls.' Opp. to Defs.' Case Management Order [Dkt. No. 218] 6.

Defendants are so anxious not to produce. Only the evidence of recruiters' actual experience can provide "an understanding of what an employee must do to achieve" a particular adjustment to compensation." Order Denying Motion to Dismiss [Dkt. No. 183] 22 (quoting *United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 993-94 (9th Cir. 2011)).

Indeed, the evidence adduced to date is consistent with Plaintiffs' core allegation that Defendants used the quality factor ratings as camouflage. To just cite one example, an email from a supervisor to ADAs equates purportedly non-enrollment-based quality factors with regularly securing applications.

EDMC-WASH-05858760 (Ex. X). Three applications per a week was the minimum number of applications Defendants' recruiters were expected to secure. Thus, this email suggests that the purportedly non-enrollment based consideration of "helping" students—as could be evaluated under the quality factor rubrics of "professionalism," "customer service" or "initiative"— was based on whether the recruiter consistently secured the minimum number of applications. A recruiter whose rating for "helping" was based on regularly securing the *minimum* number of *applications* might not see his quality factor ratings "co-vary" in lockstep with his new student points, but the "helping" rating would not be a non-enrollment based factor. The incentive would be for him to focus exclusively on enrolling students.[9]

This is precisely the sort of information the Court has repeatedly ruled Plaintiffs are entitled to discover and will prove material, but despite Plaintiffs' diligent efforts, the record is incomplete. Only once Plaintiffs have been able to uncover the full scope and nature of

---

[9] Enrollments are obviously the goal of recruiting efforts. But as the above example illustrates, other unlawful metrics were used to incentivize recruiters towards that goal.

Defendants' communications, across all of Defendants' schools and the relevant time period, will Plaintiffs be able to present the true incentives Defendants created for their recruiters. It is such information that should form the basis for any expert analysis. This case is about Defendants' "actual compensation practices" and despite Plaintiffs' diligence, the discovery regarding those practices is not yet complete. Order Denying Case Management Order [Dkt. No. 224] 2. Thus, the Court should deny Defendants' Motion under Rule 56(d).

### c. Defendants Rely on an Untenable Reading of the ICB and Safe Harbor.

For the reasons demonstrated above, Defendants' Motion should be denied as premature and the Court need not address Defendants' arguments. However, in making their Motion, Defendants have advanced an extreme and untenable position regarding the ICB and the 2002 Safe Harbor regulation interpreting it. Thus, Plaintiffs briefly address the most glaring problems with Defendants' account, although these concerns need not be resolved at this time.

Defendants' statistical analysis assumes a reading of the Safe Harbor regulation that if accepted and given legal effect would violate hornbook administrative law. Although Defendants scarcely mention it, the controlling legal provision here is the *statutory* ICB. At all relevant times, the statute forbade Defendants from paying their recruiters "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments . . . ." 20 U.S.C. § 1094(a)(20). Indeed, the false statements Plaintiffs allege Defendants made were their false statements in their PPAs that they did not pay their recruiters "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments." Joint Complaint in Intervention [Dkt. No. 128] ¶¶ 43-44, 64.

In interpreting a regulation purporting to interpret a statute, it is axiomatic that the statutory command controls. A regulation that conflicts with the statute under which it was promulgated is without legal effect and thus an interpretation of a regulation that results in it conflicting with

the statute cannot be considered reasonable.  *Pa. Dep't of Pub. Welfare v. U.S. Dept. of Health & Human Servs.,* 80 F.3d 796, 809 (3d Cir. 1996) ("[T]o the extent the regulation detracts from the clear import of this statute, the statute must, of course, prevail."); *McComb v. Wambaugh*, 934 F.2d 474, 481 (3d Cir. 1991) ("[I]n any conflict between a statute and a regulation purporting to implement the statutes provision, the regulation must, of course, give way.").   Indeed, in interpreting a potentially conflicting regulation, the objective is to attempt to reconcile the regulation with the controlling statute.  *LaVallee Northside Civic Ass'n v. Virgin Islands Coastal Zone Management Comm'n*, 866 F.2d 616, 623 (3d Cir.1989).  The aim is to "harmonize[]" the regulation with "the statute's language, origin, and purpose."  *Polychrome Int'l Corp. v. Krigger* 5 F. 3d 1522, 1544 (3d Cir. 1993).

Here, Defendants have built their Motion around a radically revisionary account of the regulation; namely that the Safe Harbor's protections are available to any for-profit college that includes in its overall compensation plan any role for any factor besides the recruiters' ability to sell students on attending.  Defs.' MSJ [Dkt. No. 369] 3-5.  Their contention is that the most miniscule contribution of any other consideration—seniority, geography, the so-called quality factors—immunizes a compensation plan otherwise entirely driven by sales.  *See*, *e.g.*, Defs.' MSJ [Dkt. No. 369] 5 (suggesting a plan driven 99% by numbers is lawful).  Such a "drop-in-the-ocean" interpretation simply cannot be reconciled with the language, origin, and purpose of the ICB's ban on incentive payments—to the contrary, it would make a mockery of it—and thus, if Defendants' view were accepted, the Safe Harbor itself could not stand.[10]  *See Polychrome*

_____

[10] Defendants have tried to elevate into the status of law statements made by critics of the Safe Harbor that are precisely the sorts of unprincipled arguments by "unscrupulous actors" that the Department of Education has explained are inconsistent with the ICB and the Safe Harbor itself.

*Int'l Corp.*, 5 F. 3d at 1544 (stating that where it is not possible to harmonize a regulation with the statute, the court must "disregard the regulation[]." (citing *Lavallee Northside Civ. Ass'n v. Coastal Zone Mgt.*, 866 F.2d 616, 623 (3d Cir.1989)).

Defendants' interpretation is also inconsistent with the plain language of the Safe Harbor. Despite Defendants' presentation, the plain language of the Safe Harbor does not say that the company's compensation plan is to be evaluated in the aggregate to determine whether any supervisor in any institution has used any factor other than enrollments. Rather, by its terms, the Safe Harbor requires that "***any adjustment*** is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (emphasis added). It therefore prescribes a focus on individual adjustments. Of course, as with the term "solely," the term "any" should be interpreted in accordance with the language and purpose of the controlling statute. But, at a minimum, any compensation scheme in which a significant number of individual adjustments are in fact driven by numbers would not qualify for the Safe Harbor on its plain language.

This point makes clear another fatal inadequacy with Defendants' position. Dr. Lazear assumed that the relevant field of analysis was Defendants' adjustments overall and in the aggregate. *See*, *e.g.*, Defs.' MSJ Ex. 7 [Dkt. No. 372] 22, 25, 26.[11] His opinion is that "if it can

---

The Department previously explained that it was adopting the safe harbors based on a ''purposive reading of section 487(a)(20) of the HEA.'' 67 FR 51723 (August 8, 2002). Since that time, however, the Department's experience demonstrates that unscrupulous actors routinely rely upon these safe harbors to circumvent the intent of section 487(a)(20) of the HEA. . . . For example, the first safe harbor, which prohibits the payment of incentives based solely upon success in securing enrollments, has led institutions to establish, on paper, other factors that are purportedly used to evaluate student recruiters other than the sheer numbers of students enrolled. However, in practice, consideration of these factors has been minimal at best, or otherwise indiscernible.

75 Fed. Reg. 34817 (Jun. 18, 2010).

[11] In fact, most of his analysis does not even focus on adjustments at all, the relevant regulatory term, but rather on overall compensation. *See e.g.,* Defs.' MSJ Ex. 7 [Dkt. No. 372] 14-18.

be shown that there are cases where the salary adjustment differs across recruiters when the number of enrollments does not differ, then it cannot be the case that EDMC used the number of enrollments alone to determine the salary adjustment."  Defs.' MSJ Ex. 7 [Dkt. No. 372] at 9. Dr. Lazear is asking whether Defendants' plan, taken in the aggregate, made any departure from a strict numbers approach.  He concludes the Safe Harbor would be met even if large numbers of adjustments, even all the adjustments of specific supervisors or institutions, were driven entirely by enrollment-based factors.  Yet, it is plain that in that circumstance the Safe Harbor would not be satisfied.

Indeed, Defendants' absolutist reading of the word "solely" in the Safe Harbor to immunize a plan in which any factor other than recruitments, admissions, enrollments or financial aid awards play any role, however negligible and however unrelated to recruiters' actual incentives, would directly contravene the ICB.  To harmonize the Safe Harbor's "solely" clause with the statute's language, origin, and purpose, it is necessary at a minimum that factors other than the number of recruitments, admissions, enrollments or financial aid awards in fact and in practice meaningfully affect the incentives of the recruiters.[12]

## IV.    Conclusion.

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment under Federal Rule of Civil Procedure 56(d).

---

[12] A purposive approach to "solely" has been recognized in the law in analogous contexts, for example in securities law when interpreting whether profits must come "solely" from the efforts of others.  *See*, *e.g.*, *SEC v. Turner*, 474 F. 2d 476 (9th Cir. 1973) (A "mechanical, unduly restrictive view" of the word solely would not serve the purposes of the legislation.); *SEC v. SG LTD*, 265 F.3d 42, 55 (1st Cir. 2001) ("The courts of appeals have been unanimous in declining to give literal meaning to the word 'solely' in this context, instead holding the requirement satisfied as long as the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." (quotation marks omitted)).

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General
Civil Division

DAVID J. HICKTON
United States Attorney

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
COLIN J. CALLAHAN
Assistant U.S. Attorneys
Western District of PA
U.S. Post Office & Courthouse
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
(412) 894-7452
Email: christy.wiegand@usdoj.gov
Counsel for Plaintiff United States of America

MICHAEL D. GRANSTON
RENÉE BROOKER
JAY D. MAJORS
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, DC 20044
(202) 307-0264
Counsel for Plaintiff United States of America

/s/ Richard J. Cutler
Richard J. Cutler
California Attorney General's Office
1300 I Street
Sacramento, CA 95814
(916) 324-0027
Fax: 916-323-6882
Email: richard.cutler@doj.ca.gov
Counsel for Plaintiff State of California

/s/ Mark S. Hamilton
Mark S. Hamilton
Bureau Chief, Assistant Attorney General
Office of the Attorney General

21

State of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
Fax: (850) 488-4483
Mark.Hamilton@myfloridalegal.com
Counsel for Plaintiff State of Florida

/s/ Jennifer M. Zlotow
Jennifer M. Zlotow
Kate E. Pomper
Office of the Illinois Attorney General
100 W. Randolph Street, 11th Floor
Chicago, IL 60601
(312) 814-5354
Fax: 312-814-4452
Email: jzlotow@atg.state.il.us
Counsel for Plaintiff State of Illinois

/s/ Patricia O. Erdmann
Patricia O. Erdmann
Corinne W. Gilchrist
State of Indiana Office of the Attorney General
302 West Washington Street
IGCS, Fifth Floor
Indianapolis, IN 46204
(317) 232-6318
Fax: 317-232-7979
Email: Patricia.erdmann@atg.in.gov
Counsel for Plaintiff State of Indiana

/s/ Jason Pleggenkuhle
Jason Pleggenkuhle
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1100
St. Paul, MN 55101
(651) 757-1147
Jason.pleggenkuhle@ag.state.mn.us
Counsel for Plaintiff State of Minnesota

/s/ Thomas J. Farrell
Thomas J. Farrell
PA ID No. 48976
Farrell & Reisinger, LLC
200 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219-1827
(412) 894-1380
tfarrell@farrellreisinger.com
Counsel for Relators

/s/ Harry P. Litman
Harry P. Litman
PA ID No. 51634
Litman Law Firm
One Oxford Centre
301 Grant Street
Pittsburgh, PA 15219
(412) 456-2000
harry.litman@verizon.net
Counsel for Relators

/s/ H. Yale Gutnick
H. Yale Gutnick
PA ID No. 1226
Strassburger McKenna Gutnick & Gefsky
Four Gateway Center, Suite 2200
Pittsburgh, PA 15222
(412) 281-5423
ygutnick@smgglaw.com
Counsel for Relators

/s/ Stuart Rennert
Stuart Rennert
MCKOOL SMITH
1999 K Street, NW
Suite 600
Washington, DC 20006
T: (202) 370-8300
F: (202) 370-8344
srennert@mckoolsmith.com
Counsel for Relators

23