# EXHIBIT B

# JONES DAY

500 GRANT STREET  •  SUITE 4500  •  PITTSBURGH, PENNSYLVANIA 15219.2514
TELEPHONE: +1.412.391.3939  •  FACSIMILE: +1.412.394.7959

JP008936/1265960
149637-635001

April 18, 2013

Direct Number: (412) 394-7929
leellsworth@jonesday.com

## VIA EMAIL and OVERNIGHT DELIVERY

The Honorable Richard A. Levie (Ret.)



rlevie@jamsadr.com

> Re:  **EDMC's Omnibus Opposition To Plaintiffs' Motions to Compel**; *United States ex rel. Washington v. Educ. Mgmt. Corp. et al.*, Civil Action No. 2:07-cv-00461-TFM (W.D. Pa.)

Dear Judge Levie:

Plaintiffs' motions to compel seek the very types of discovery routinely precluded both in *qui tam* cases and otherwise. As Judge McVerry recently confirmed, "the purpose of discovery is to uncover evidence of the facts pleaded in the Complaint." *Hodczak v. Latrobe Specialty Steel Co.*, No. 08-649, 2009 WL 911311, at *9 (W.D. Pa. Mar. 31, 2009) (McVerry, J.) (adopting recommendation as opinion of the court; marks and citation omitted). Thus, as a general matter, courts do not "allow parties to engage in discovery on proposed claims, issues and persons which are not currently part of a lawsuit, solely on the basis of a speculative assertion that these claims and parties may someday become part of the pending litigation." *Breslin v. Dickinson Twp.*, No. 09-1396, 2011 WL 3359638, at *2 (M.D. Pa. Aug. 03, 2011). Contrary to the expressed foundation of Plaintiffs' motions, discovery must "focus on the actual claims and defenses involved in the action.... [T]he parties ... have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." Fed. R. Civ. P. 26 adv. cmt. notes.

That is particularly true in False Claims Act ("FCA") cases. "[A] *qui tam* action is not a roving commission" free to investigate possible or hypothetical wrongdoing at will. *United States v. Cancer Treatment Ctrs. of Am.*, No. 99-8287, 2003 WL 21504998, at *2 (N.D. Ill. June 30, 2003). Any fraud case entails "a high risk of abusive litigation," and the discovery rules are meant to complement those pleading requirements that prevent any litigant from "tak[ing] up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 546, 558 (2007) (citation and marks omitted). "The particularity requirement of Rule 9(b), if enforced, will not only protect defendants against strike suits, but will result in claims with discernible boundaries and manageable discovery limits." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006).

FCA courts have therefore required that "discovery ... be limited and tailored to the specificity of the complaint." *United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*,

ALKHOBAR  •  ATLANTA  •  BEIJING  •  BOSTON  •  BRUSSELS  •  CHICAGO  •  CLEVELAND  •  COLUMBUS  •  DALLAS  •  DUBAI
DÜSSELDORF  •  FRANKFURT  •  HONG KONG  •  HOUSTON  •  IRVINE  •  JEDDAH  •  LONDON  •  LOS ANGELES  •  MADRID
MEXICO CITY  •  MILAN  •  MOSCOW  •  MUNICH  •  NEW YORK  •  PARIS  •  PITTSBURGH  •  RIYADH  •  SAN DIEGO
SAN FRANCISCO  •  SÃO PAULO  •  SHANGHAI  •  SILICON VALLEY  •  SINGAPORE  •  SYDNEY  •  TAIPEI  •  TOKYO  •  WASHINGTON

The Honorable Richard A. Levie (Ret.)                                    JONES DAY
April 18, 2013
Page 2

No. 06-40, 2008 U.S. Dist. LEXIS 65718, at *1 (M.D. Fla. Aug. 27, 2008) (denying relator's
motion to compel); *United States ex rel. Fisher v. Network Software Assoc.*, 227 F.R.D. 4, 11
(D.D.C. 2005) (refusing to permit discovery into a potentially separate fraud claim because
"relator has not stated with particularity the circumstances constituting fraud or mistake"). "A
*qui tam* action may not be used as a vehicle to allow wide-ranging discovery outside the scope of
that necessary to prove the allegations made upon personal, direct, and independent knowledge."
*United States ex rel. Lusby v. Rolls-Royce Corp.*, No. 03-680, 2010 U.S. Dist. LEXIS 69556, at
*3 (S.D. Ind. July 12, 2010).

        The proper scope of discovery in this case is framed by how the parties got to this point.
Plaintiffs survived dismissal based on the allegation that "EDMC's unlawful compensation
scheme emanates from the highest levels of the corporation, operates company-wide, and
represents a conscious effort to do exactly what the Incentive Compensation Ban prohibits...."
Dkt No. 158 at 1. The top-down theory of their claim was critical to the Court's decision to
allow a portion of this lawsuit to continue to the discovery stage. "Because Plaintiffs' theory is
that there was one, EDMC-wide scheme controlled by top-level executives," the Court held, "it
is not necessary to allege separate conduct by each of the affiliated schools named as Defendants."
Dkt. No. 183 at 30. As such, this case became an inquiry into whether there existed "a knowing
decision by EDMC executives to perpetuate a company-wide 'sham'" that, "in actuality, the
'quality factors'" central to the Admissions Performance Plan at issue in this case (the "Plan")
"were used merely as a proxy for recruiting success." *Id.* at 21, 23.

        Judge McVerry was quite specific in his explanation of Plaintiffs' burden. "Plaintiffs are
attempting to 'prove a negative'—*i.e.*, that *the quality factors were not used*," and that it was the
result of a "knowing decision by EDMC executives to perpetuate a company-wide 'sham.'" Dkt.
No. 183 at 21, 27. Given the limited standard of review under Rule 12, the court denied
dismissal because "at this stage … the Court cannot determine whether or not, in actuality, the
'quality factors' were used merely as a proxy for recruiting success." *Id.* at 23.

        Thus, Plaintiffs' case is not about whether recruiters themselves were motivated by
enrollments, or even whether any given recruiter was personally motivated solely by enrollments.
There is no personal "motivation ban." Nor does the ICB prohibit conduct based upon intent.
There is only a "compensation ban," a rule that says an employer cannot change its employee's
compensation based solely on enrollments. What motivated a particular employee's drive for
enrollments is irrelevant. Plaintiffs attempt to obscure this simple distinction by repeating the
mantra that recruiters were "motivated to recruit at all costs." But the employ**ee's** *motivation* to
recruit is irrelevant. It is the employ**er's** *calculation* of compensation that is at issue.[1] Judge

---

        [1] Plaintiffs seem to recognize that they have to focus on compensation. They acknowledge
that the pertinent question is whether Defendants' "paperwork was only a pre-text or cover-up
and did not reflect EDMC's real compensation practices." Motion 1 at 2 (quoting Dkt. 183 at
21-22). *See also* Motion II at 6 ("[T]he Court allowed [the 'as-implemented' claim] to proceed
in order to determine whether Defendants in actuality carried out their compensation scheme in a
manner that compensated Admissions Employees exclusively on the number of students they
enrolled.").

The Honorable Richard A. Levie (Ret.)                         JONES DAY
April 18, 2013
Page 3

McVerry was equally clear on the latter issue  It is permissible for an employer to consider
enrollments. *See* Dkt. No. 183 at 20 (dismissing Plaintiffs' "as-designed" claim where
compensation "could not have [been] adjusted … *solely* on recruitment numbers" (emphasis
added)).  Under the Safe Harbor, only where enrollments are the "sole" consideration in making
salary adjustments is compensation illicit.  *See* 34 C.F.R. § 668.14(b)(22)(ii)(A) (eff. July 1,
2003 to June 30, 2011) (together with the Incentive Compensation Ban, "ICB/SH").

        The discovery at issue here is not about that regulation or compensation.  Though
Plaintiffs advertised a centralized, top-down scheme focused on the executive suite, they now
want to conduct a roving expedition for regulatory violations—and any regulation will do.
While dismissing as "armchair" statistics direct evidence of how the actual enrollment numbers
were related to the actual compensation paid—the inquiry that lies at the heart of Defendants'
("EDMC") alleged violation—Plaintiffs speculate about the possibility of using student job
placement data to prove how the recruiter was paid years before.  *See* Motion IV at 10-11.  It is
unsurprising that Plaintiffs do not even attempt to meet their burden of explaining how they
would translate that into *admissible* evidence (and there is expert evidence that they could not).

        Plaintiffs' discovery suffers from other fatal flaws as well, including that it would mire
this case with development of cumulative evidence on undisputed and entirely lawful conduct.  It
is legal to use enrollments to incentivize recruiting.  It is also legal to pay recruiters based on the
number of students they enroll.  It is legal to track the number of students that recruiters enroll.
It is legal for recruiters to be personally incentivized by whatever personally matters to them.
The opinions from this Court and other FCA courts put those questions to rest.  The voluminous
and burdensome discovery that Plaintiffs seek here would serve no legitimate purpose other than
to demonstrate entirely legal conduct that is consistent with the Plan's design and is therefore
irrelevant.  It is equally clear that the discovery at issue in these motions—implicating thousands
of employees, hundreds of thousands of students, and millions of prospective students—would
impose tremendous burden on both Defendants and this Court, and would present the precise
type of improper discovery that the rules of procedure preclude.

**I.      Rule 26 Imposes A Good Cause Requirement On Overly Broad Discovery Requests
         And Balances Discovery According To The Needs Of The Case.**

        Plaintiffs misperceive the governing discovery standards.  Their motions rely on older
cases that predate more recent amendments to Rule 26.  *See, e.g.*, Motion I at 6-7 & Motion II at
14 (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).  Plaintiffs' case law
was interpreting "an earlier and more expansive version" of Rule 26(b)(1) that was substantially
narrowed in 2000.  *See, e.g.*, *Prof'l Recovery Servs. v. GE Capital Corp.*, No. 06-2829, 2009 WL
137326, at *4 n.2 (D.N.J. Jan. 15, 2009).  Under the amended rules, where a party does not seek
discovery that is directly relevant to a claim, but instead asks for discovery on the theory that it
will lead indirectly to admissible evidence, the party must make a showing of "good cause."
Fed. R. Civ. P. 26(b)(1).

        Under the amended Rule 26, "there are two types of discovery—core discovery, which is
broadly discoverable, and discovery of information reasonably calculated to lead to the discovery
of admissible evidence, which requires a showing of good cause for discovery."  *Robinson v.
Hartford Ins. Co.*, 2004 WL 1090991, at *1 n.1 (E.D. Pa. May 11, 2004).  While it has always

The Honorable Richard A. Levie (Ret.)                                    JONES DAY
April 18, 2013
Page 4

been true that parties "ought not to be permitted to use broadswords where scalpels will suffice,"
*Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 187 (1st Cir. 1989), the 2000
amendment gave courts greater authority to determine "the actual scope of discovery …
according to the reasonable needs of the action."  Fed. R. Civ. P. 26 adv. cmt. notes (2000).

## II.      Plaintiffs' Discovery Requests Amount To An Improper Fishing Expedition.

### A.      Other Compliance Obligations.

Plaintiffs dedicate a substantial amount of their discovery requests to matters that have
nothing to do with Quality Points, compensation, or even the ICB/SH more generally.  These
requests focus instead on EDMC's "other compliance obligations."  Pls.' Ex. H at 4.  Baldly
asserting an entitlement to "independently review and analyze Defendants' compliance
practices," Motion III at 7, Plaintiffs seek to compel discovery into

1) Documents that relate to PPA certifications about regulations other than
   ICB/SH (Motion III, RFP 39-45 and ROG 17);

2) Documents relating to audits, investigations, and reviews that pertain to
   regulations other than the ICB/SH (Motion III, RFP 47-52, ROG 18);

3) Documents relating to Defendants' communications with lenders, investors, and
   Plaintiffs (Motion III, RFP 54-58, 110; ROG 21);

4) Documents relating to recruitment misconduct and student performance
   (Motion IV, RFP 85, 96-103, 105-09, 115-16, 119-35); and

5) Business plans and related documents that address regulations other than
   ICB/SH (Motion V, RFP 118).

This is a pure fishing expedition in the classic mold, based upon the mistaken belief that if any
claim survives a motion to dismiss, then all possible other claims are fair game as well.

But trolling for other claims is not a proper use of discovery.  *See Sanofi-Synthelabo Inc.*,
436 F.3d 197, 204 (3d Cir. 2006) (refusing to let plaintiff "conduct a fishing expedition in order
to find a cause of action"); *Hodczak*, 2009 WL 911311; *Bergin v. Teamsters Local Union No. 77*,
No. 10-2289, 2011 WL 486230 (E.D. Pa. Feb. 04, 2011) (rejecting argument that plaintiff should
be allowed discovery that exceeded theory of complaint because "such 'fishing expeditions' . . .
are barred by the pleading clarifications in *Iqbal* and *Twombly*.").  Relevance—and irrelevance—
under Rule 26 are determined *according to the claims in the complaint*.  *See McClendon v.
Pearson*, No. 10-1339, 2011 WL 2014816, at *2 (W.D. Pa. May 23, 2011) ("The complaint and
its claims circumscribe the scope of discovery.  It is against these claims that discoverability is
determined as to each discovery request made.").  Courts restrict FCA plaintiffs from seeking
information as a "pretext for the discovery of unknown wrongs." *Fisher*, 227 F.R.D. at 9
(internal citations omitted).

Here, Plaintiffs' requests relate to regulations that govern certain discrete forms of
recruiter misconduct and student performance, all of which are unrelated to recruiter
compensation:

| MOTION | REQUEST | REGULATION |
|---|---|---|
| Motion IV | Student Academic Progress[2] (*E.g.,* RFP 126-29 ) | 34 C.F.R. §§ 668.16, 668.34 |
| Motion III; Motion IV | Accreditation[2] (*E.g.,* RFP 40, 121-25) | Misrepresentation provisions at 34 C.F.R. §§ 668.71, 668.72 |
| Motion III; Motion IV | Cost[2] (*E.g.,* RFP 40, 85, 121-25) | Misrepresentation provisions at 34 C.F.R. §§ 668.71, 668.73 |
| Motion III; Motion IV | Job Placement Statistics[2] (*E.g.,* RFP 40, 100, 103, 115, 116, 121-125) | Misrepresentation provisions at 34 C.F.R. §§ 668.71, 668.74 |
| Motion IV | Default Rates (*E.g.,* RFP 99, 103, 105) | 34 C.F.R. § 668 Subparts M-N |

Despite corpulent Complaints with nearly 700 paragraphs, there is no allegation of a false certification of compliance with any of these provisions. Discovery into each is the quintessential form of an FCA roving commission that courts find improper. *United States ex rel. Stewart*, 2003 WL 21283944, at *9 (quoting district judge's opinion) (limiting discovery to the claims pleaded in the complaint and "proscrib[ing] further proceedings bent on 'finding fraud during the discovery process'"); *United States ex rel. Grandeau*, 2003 WL 21504998, at *2 (N.D. Ill. June 30, 2003) (rejecting relator's motion to compel discovery not based on the specific claims in the pleadings).

Although unbounded discovery into unrelated claims is the epitome of an improper fishing expedition, Plaintiffs speculate that the fishing could turn out to be relevant because the rigor with which EDMC investigated other compliance issues might suggest that EDMC was "reckless" or "gross[ly] negligent" by comparison in investigating whether it was complying with the ICB/SH. *Id.* at 5. This vague and idle speculation about potential disparities or hypothetical red flags is nothing but speculation. If that were all discovery required, "good cause" under Rule 26(b)(1) would have no meaning. Plaintiffs have "not only sought to engage in a fishing expedition, but sought to drain the pond and collect the fish from the bottom. Additionally, they [are doing] so without knowing whether there [are] even any fish in the pond." *Claude P Bamberger Int'l v. Rohm & Haas Co.*, No. 96-1041 1998 WL 684263, at *4-6 (D.N.J. Apr. 1, 1998) (citation and marks omitted). *See also Thomas v. Cendant Mortgage*, No. 03-1672, 2005 WL 579903, at *3 (E.D. Pa. Mar. 11, 2005) (denying discovery that plaintiff claimed would help delineate the contours of a class because the plaintiff "base[d] his motion on the mere possibility of discovering a class of individuals").

---

[2] While not at issue in this case, these regulations are directly at issue in another false certification FCA case against EDMC, *United States ex rel. Sobek v. Educ. Mgmt. Corp.*, No. 10-131 (W.D. Pa.). It would be patently inappropriate for the government to conduct discovery in this case for use in *Sobek*. *See Massachusetts v. Mylan Labs., Inc.*, 246 F.R.D. 87, 91 (D. Mass. 2007) (refusing to permit "amorphous and wide-ranging disclosure" of documents produced in discovery to attorneys general for the purpose of assisting them in pursuing "latent claims" because "the first concern of the court is with the resolution of the case at hand").

The Honorable Richard A. Levie (Ret.)                          **JONES DAY**
April 18, 2013
Page 6

Plaintiffs' requests for other audit-related material and investor communications are just another variant of their larger foray into other compliance obligations. Defendants have already agreed to provide responsive documents to the extent they relate to either the ICB/SH or the Plan, so Plaintiffs' motion to compel the remainder is inseparable from their more general search for other regulatory violations. *See Upsher-Smith Labs. v. Mylan Labs.*, 944 F. Supp. 1411, 1445 (D. Minn. 1996) (denying motion to compel strategic business plans unrelated to the project at issue in the case, where the related plans had been produced).

Plaintiffs' requests for discovery on other regulatory violations should be seen for what they are: an attempt to use discovery in a case involving the alleged violation of a single regulation to conduct a roving inquisition into every aspect of EDMC in the hope of finding some other regulatory violations that were not pled. *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 195 (5th Cir. 2009) (remanding dismissal to allow relator access to discovery, but instructing the district court "to manage this access—discovery targeted to the claims alleged, avoiding a search for new claims"); *United States ex rel. Grandeau*, 2003 WL 21504998, at *2.

## B.      Other Compensation Plans.

The claim that Judge McVerry opened to discovery is about how "EDMC actually implemented *the Plan*"—a defined term in the Court's opinion that refers to the single compensation plan addressed in the Complaints. Dkt. No. 183 at 22 (emphasis added; other emphasis omitted). *See also id.* at 10 (defining the "Plan"). Not once do the operative Complaints make even passing reference to any compensation plan or program apart from the Plan. No other comparison plan is attached to the Complaints. Nor is there any claim that any other EDMC plan or program was unlawful, how it was allegedly unlawful, or how these Relators would have any knowledge of such unknown plans.

Plaintiffs' discovery requests are not so limited. Defendants have agreed to provide information relating to the Plan. But Plaintiffs also seek to compel:

**1)** Documents relating to all compensation plans and policies EDMC has ever used for anyone in an admissions function, including supervisors (Motion I, RFP 4, 5, 8, 9; ROG 2, 6, 14, 20); and

**2)** Documents about the creation, design, and modification of such plans (Motion I, RFP 32, 33, 34, 53).

"A party moving to compel discovery bears the initial burden of proving the relevance of the requested information." *Bracey v. Price*, No. 09-1662, 2012 WL 849865, at *2 (W.D. Pa. Mar. 13, 2012) (citation omitted). Plaintiffs have failed to make the required showing.[3]

---

[3] Plaintiffs argue that their broad discovery requests regarding compensation programs other than the Plan are somehow justified because information about other Plans will reveal why EDMC schools implemented the Admissions Performance Plan when they did. Motion I at 8. But EDMC has already agreed to produce any document that discusses why EDMC implemented

The Honorable Richard A. Levie (Ret.)                                    JONES DAY
April 18, 2013
Page 7

  Nor can they.  In *Roberts v. Fearless Farris Service Stations, Inc.*, No. 05-472, 2007 WL
625423 (D. Id. Feb. 23, 2007), plaintiff contended that his deferred compensation plan qualified
for special treatment under ERISA.  He sought discovery into a separate deferred compensation
plan that his employer provided on the basis that a comparison would be probative of the status
of his plan.  *Id*. at *2-3.  The only plan alleged in the complaint, however, was the plaintiff's own,
and his entitlement to relief depended solely on the operation of that plan.  The court thus denied
discovery.  "This case revolves around the Employee Plan that [Plaintiff] was a participant in,"
and documents pertaining to the other plan had no relevance to the case.  *Id*. at *5.  *See also
Walker v. State Farm Mut. Automobile Ins. Co.*, No. 11-529, 2012 WL 1155140 (S.D. W. Va.
Apr. 5, 2012) (holding that plaintiff lacked good cause for discovery into defendant's prior
insurance policies).

  Plaintiffs' reliance on *P.V. v. School District*, No. 11-4027, 2012 WL 676993 (E.D. Pa.
Mar. 1, 2012), is misplaced.  The objection in *P.V.* concerned the appropriate *temporal* scope of
discovery, not discovery of unrelated, unpled policies.  *Id*. at *9-13.  In any event, that case
actually supports limiting discovery to the Plan at issue here.  The issue in that case was whether
the Philadelphia School District's *de facto* practice in transferring autistic students was illegal.
The court agreed that "Plaintiffs are entitled to some background discovery on the duration of
and modifications to Defendants' policies and practices *that are at issue in this suit*."  *Id*. at *12
(emphasis added).  Unlike in this case, the plaintiffs in *P.V.* were not seeking discovery of other
policies.  *See id*. at *4-5.  Here, the issue is how EDMC applied a discrete written Plan and
whether the Quality Factors identified in the operative Complaints were applied properly or
"fraudulently."  Historic information about *other* policies or practices *not* at issue has no
relevance.

  Plaintiffs' requests for supervisor plans suffer from the same defect.  If a person—
supervisor or otherwise—were compensated under the Plan at issue, Plaintiffs will get the
information.  But there is not a single allegation in the Complaints about separate supervisor
plans, supervisor compensation, or any theory as to how or why such persons are purportedly
covered by the ICB/SH.  Such discovery has no relevance to Plaintiffs' primary contention, as

---

(continued…)

the Plan.  Plaintiffs also argue that they need discovery of other plans to discern the dates the
Plan was in place.  *Id.*  But EDMC has provided this information in its responses to Plaintiffs'
Interrogatories, *see* Pls.' Ex. D, ROG 2, and this information will also be in the Plan documents.
Finally, Plaintiffs assert that they need access to other plans to evaluate the truthfulness of
EDMC's representations in EDMC's PPAs.  *See* Motion I at 8-9.  But this highlights that
Plaintiffs' requests constitute a fishing expedition rather than legitimate discovery: Plaintiffs
admit that they are trying to ascertain whether EDMC's PPA representations were false because
of features of a plan or program other than the Plan.  This is a blatant foray outside the pleadings.
Plaintiffs have failed to show the relevance of documents relating to plans or programs other
than the Plan, and their motion should be denied.

The Honorable Richard A. Levie (Ret.)                                    JONES DAY
April 18, 2013
Page 8

framed by this Court, "that EDMC failed to implement its Plan in accordance with the [Higher Education Act]." Dkt. No. 183 at 22.

EDMC's "definitional objection" to Supervisors and Admissions Employees differentiates between those who should have been compensated under the Plan according to its lawful design and agrees to provide information for all those whose compensation was supposed to be determined pursuant to the Plan at issue. Likewise, training and other documents instructing Supervisors how to implement the Plan for those they supervised may be relevant to Plaintiffs' claim about how EDMC implemented the Plan and are therefore discoverable without objection.

But, Plaintiffs' discovery requests—which equate supervisor plans with the Plan actually at issue—illustrates that they are trying to transform a case about one specific plan covering a particular class of employees into litigation about *every* plan. *See* RFP 4 (seeking all compensation plans and policies for any "Admissions Employee," which Plaintiffs define as any person engaged in any recruiting or admission activities). Discovery into plans not pled would accomplish nothing except to allow Plaintiffs to circumvent pleading rules and effectuate a comprehensive regulatory review of EDMC notwithstanding the specificity of their narrow claim.

Plaintiffs attempt to rationalize their request for Supervisor compensation plans using a hypothetical scenario in which a Supervisor's compensation could be based on the number of enrollments secured by the subordinate team. This scenario is entirely speculative. None of the Complaints or available iterations thereof contains a claim regarding how Supervisors were compensated.

Any documents responsive to Plaintiffs' requests for compensation plans will be produced to the extent that they relate to the Plan. Otherwise, such documents are not relevant to Plaintiffs' claims, and Plaintiffs have not demonstrated the good cause required under amended Rule 26(b)(1).[4]

### C.    Student Performance Data Will Not Lead To Admissible Evidence of Fraud.

Plaintiffs denigrate "armchair statistical analysis," but then engage in precisely that, suggesting that student performance evidence is relevant because they will use it in some unspecified "analysis," Motion II at 4, for which Plaintiffs seek to compel:

1) All information about the academic performance of the students that each recruiter recruited (Motion IV, RFP 126-32, 135); and

2) Information about the prospective students that each recruiter did not enroll (Motion IV, RFP 107-09).

---

[4] Plaintiffs also seek to compel organizational information for any department anywhere in EDMC where an "Admissions Employee" worked. *See* Motion V at 7, ROG 3. Defendants have already indicated they will provide responsive information with respect to individuals involved in the performance and review of ADAs. *See* Pls.' Ex. D. Discovery beyond that point is necessarily targeting irrelevant information unrelated to the allegations.

The Honorable Richard A. Levie (Ret.)                                      JONES DAY
April 18, 2013
Page 9

        Plaintiffs argue that they can "infer" a violation of the ICB/SH in part from the presence
of poor student outcomes or by discovering that "unqualified" students attended an EDMC-
affiliated institution.  Plaintiffs argue that because the ICB/SH was intended to prevent over-
enrollment of unqualified students, the presence of these outcomes would demonstrate a
violation of the regulation.  *See* Motion IV at 12 (arguing that the presence of unqualified
students would "show that the harm the ICB was intended to avoid was in fact occurring," and
seeking all documents relating to recruitment and student performance); Pls.' Ex. H at 2 (arguing
that "representations that Defendants made to students … could lead to information proving
recruiter misconduct and the recruitment of unqualified students—*i.e.*, the very ills that the ICB
is designed to prevent").

        "[T]he court *must* limit the frequency or extent of discovery otherwise allowed by these
rules" where "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed.
R. Civ. P. 26(b)(2)(C)(iii) (emphasis added).  Thus:

                It is no longer sufficient, as a precondition for conducting
                discovery, to show that the information "appears reasonably
                calculated to lead to the discovery of admissible evidence."  After
                satisfying this threshold requirement counsel also must make a
                common sense determination, taking into account all the
                circumstances, that the information sought is of sufficient potential
                significance to justify the burden the discovery probe would
                impose, that the discovery tool selected is the most efficacious of
                the means that might be used to acquire the desired information
                (taking into account cost effectiveness and the nature of the
                information being sought), and that the timing of the probe is
                sensible, *i.e.*, that there is no other juncture in the pretrial period
                when there would be a clearly happier balance between the benefit
                derived from and the burdens imposed by the particular discovery
                effort.

Wright & Miller, Federal Practice & Procedure § 2008.1 (2012) (citation omitted).  *See also id.*
("Judges relatively frequently limit or forbid discovery when the cost and burden seem to
outweigh the likely benefit in producing evidence.").

        Thus, in *United States ex rel. Smith v. Boeing Co.*, No. 05-1073, 2009 WL 277278 (D.
Kan. Aug. 27, 2009), the court defined the scope of discovery to exclude relevant information
because it was minimally probative to the claims in the complaint.  The relators, former airplane
inspectors, alleged that Boeing was installing unapproved parts in specific models of aircraft sold
to the government.  *Id.* at *1.  They then sought discovery into parts on other models of airplanes,
justifying the request on grounds that they alleged systemic manufacturing and quality control
problems.  *Id.* at *3-4.  Since Boeing was already producing documents relative to the planes that
were the actual subject of the complaint, the discovery was of marginal importance at best and
even costs that were relatively insignificant in the overall scheme of the case could not be
justified for discovery of marginal importance.  *Id.* at *4 & n.5.  *See also United States ex rel.
McBride v. Halliburton Co.*, 272 F.R.D. 235, 240-1 (D.D.C. 2011) (denying relator's discovery

The Honorable Richard A. Levie (Ret.)                                    JONES DAY
April 18, 2013
Page 10

request as disproportionate in light of the cost of discovery weighed against the anticipated utility of the discovery sought).

In the time period covered by Plaintiffs' discovery requests, over 900,000 students have enrolled in EDMC's on-line programs or attended one of its over 100 separate on-ground campuses, each of which separately maintains student information, including in hard copy form. *See* Exhibit B, Declaration of Larry Trenga ¶ 5, 7, 10, 14 ("Trenga Decl."). There have been thousands of faculty members, all of whom have regular student contact, as well as thousands of non-faculty employees—from financial aid, to career counseling, to other support services—who also communicate with students. *Id.* ¶ 9. And, this does not count contact with prospective students. Between 2009 and 2011 alone, EDMC employees had approximately 13.7 million instances of direct contact with a prospective student. *Id.* ¶ 10. The mere process of collecting documents from potential sources of responsive data would be a significant burden, and that does not include the time necessary to review and produce the material. Plaintiffs are seeking information with no relevance to their claims and cannot demonstrate good cause for this discovery under Rule 26(b)(1). The burdens associated with these requests independently warrant denying their motion to compel.

Moreover, Plaintiffs' rationale for seeking these materials is premised on an unfounded (and certainly unproven) assumption about the ICB/SH itself—namely, that because the ICB/SH was designed to improve student outcomes, evidence of such outcomes can be causally linked to a violation of this particular regulation. By the government's own admission, however, many of the statutes and regulations adopted at the same time were designed to avoid poor student outcomes:

> H.R. 3553 [the bill that codified the ICB in 1992] includes *nearly 100 provisions to strengthen controls on schools and colleges to end waste and abuse and to minimize loan defaults.* These provisions include prohibiting the use of commissioned sales persons and recruiters, requiring pro rata tuition refunds, requiring increased financial responsibility from schools, and strengthening the ability of the Department of Education and the states to terminate the eligibility of schools which abuse the programs. H.R. 3553 ensures that an increased investment in student aid will be well spent.

H.R. Rep. 102-447, 1992 U.S.C.C.A.N. 334, 343 (1992) (emphasis added). Plaintiffs are presumably not arguing that poor student outcomes would indicate that EDMC is violating 100 separate laws. But there is also no credible way to say why that indicator would demonstrate a violation of the ICB/SH, but not the 99 other provisions in the same legislation that were intended to effectuate the same purpose. Put simply, evidence of "unqualified students" (however that might be defined)[5] would shed no light on a causal connection to a perceived

---

[5] For instance, Plaintiffs previously admitted that "EDMC's liability under the FCA does not turn on whether the students who were recruited by illegally compensated ADAs happened to be qualified for, or receive, government aid anyway." Dkt. No. 158 at 45.

The Honorable Richard A. Levie (Ret.)                                    JONES DAY
April 18, 2013
Page 11

violation of one of a hundred, or thousand, laws or regulations adopted to support the general goal of promoting student quality.

Plaintiffs' premise is also fatally flawed because they assume that the ICB/SH was *effective* even though the government itself has said that is was *ineffective*. As early as 2005, Congresswoman Maxine Waters testified that the Safe Harbor "allow[s] a thinly disguised incentive compensation or quota system which violates the spirit and intent of the prohibition" in the Ban. "Enforcement of Federal Anti-Fraud Laws in For-Profit Education," Hearing Before the Committee on Education and the Workforce, U.S. House of Representatives, Serial No. 109-2 (Mar. 1, 2005) at 19. A few years later, when DOE proposed rescinding the Safe Harbor, commentators "agreed that the current regulations, which included the language describing permitted compensation activities (i.e., 'safe harbors'), *did not achieve the goals intended by the Congress.*" 75 Fed. Reg. 66872.[6] DOE joined the consensus, finding that "rather than serving to effectuate the goals intended by Congress … the safe harbors have served to obstruct those objectives." 75 Fed. Reg. 66873. *See also* Arne Duncan, Sec'y of Educ., Letter to Chairman Tom Harkin and Senator Michael Enzi (August 13, 2010) (noting that the Safe Harbor gave "license … to pay [] recruiters based on success in securing enrollments"). Thus, lawful and compliant plans still resulted in the "ills" that Plaintiffs claim are definitive of a violation—at least in the estimate of the federal government. Plaintiffs have provided nothing to suggest that the ICB/SH succeeded in altering behavior or ensuring minimum student qualifications such that these become reasonable proxies by which to discern the payment of solely enrollment-based compensation.

Plaintiffs' argument is further misguided because it cannot be "reasonably calculated to lead to the discovery of *admissible* evidence." Fed. R. Civ. P. 26(b)(1) (emphasis added). Assuming, *arguendo*, that Plaintiffs get records on EDMC's 900,000 students, this case cannot devolve into 900,000 mini-trials on whether each individual was "qualified" for post-secondary education. Relevant evidence would have to be presented through expert statistical analysis— which Plaintiffs themselves appear to recognize. *See* Motion II at 4-5 (anticipating statistical analysis of student qualifications in relation to recruiter Quality Points).

But, "student performance data cannot speak to whether compensation was determined solely on the basis of enrollment success." Exhibit A, Declaration of Edward P. Lazear ¶ 13

---

[6] The commenters—which included admissions counselors—also noted that the Safe Harbor "enable[d] institutions to circumvent the law" and that its "elimination … would help prevent a recruiter's financial interest from overriding a student's academic interest." 75 Fed. Reg. 66872. EDMC cannot be liable for following the law, no matter how poorly conceived it may have been. For present purposes, the point is just that if Plaintiffs were to review files of the over 900,000 students who have attended EDMC schools in the last decade and find a disproportionately unqualified student body, the more reasonable inference would be that Defendants had *complied* with the ICB/SH.

The Honorable Richard A. Levie (Ret.)                                    JONES DAY
April 18, 2013
Page 12

("Lazear Decl.").[7] Methodological flaws and necessary insufficiencies in the available data
would preclude expert testimony purporting to establish that student performance rates are
predictive of when recruiter compensation is based solely on enrollments, as opposed to just
partly.

Initially, there is no basis to assume that an enrollment-based incentive payment scheme
would necessarily lead to the recruitment of unqualified students; a recruiter so compensated
might also be more diligent in finding qualified but otherwise less accessible candidates. *Id.* ¶
27. And, if student performance is not reliably indicative of whether compensation was
incentive-based, that metric is even *less* capable of determining when incentive compensation
was based solely on enrollments, as opposed to just partly on enrollments. *Id.* ¶ 28.

Putting aside those unavoidable methodological flaws in whatever analysis Plaintiffs
contemplate, essential data would necessarily be missing. Student performance and persistence
in school are driven by innumerable, individual factors, such as the characteristics of the student,
their background and the choices they make, their chosen field of study, the rigors of the course
work, and general economic conditions. *Id.* ¶ 25. These confounding factors preclude a sound
analytical model for correlating student outcome to whether or not recruiter payment was based
solely on enrollments. *Id.* ¶ 24-25.

A significant number of the discovery requests in dispute pertain to this kind of tenuous
circumstantial evidence. None of it is relevant to determining either how recruiters at EDMC
were paid, or whether enrollments were the exclusive basis for their compensation. Nor is the
data reasonably calculated to lead to admissible information. Unless and until Plaintiffs can
identify a proper means for conducting the statistical analysis they anticipate using on this data,
their discovery should be denied outright.

### D.    Discovery Into Recruiting Behavior Is Irrelevant And Improper.

Plaintiffs also propose piecing together all of the performance reviews for the 11,000
people who worked for EDMC under the Plan. Trenga Decl. ¶ 13. Purportedly so that they can
show "that quality factor ratings were a sham," Motion V at 9, Plaintiffs seek to compel:

1) All information about the particular recruiting tactics that recruiters used
   (Motion II, RFP 10-11, 13, ROG 7-10);

2) Every communication with every recruiter related to their job (Motion II, RFP
   21-22);

3) All documents about how Defendants tracked ADA performance (Motion II,
   RFP 15).

4) All complaints about recruiters (Motion IV, RFP 85, 122-25);

---

[7] Far from an "armchair" statistician, Dr. Lazear is an expert in the economics of employee
compensation and the former Chairman of the President's Council of Economic Advisors. *See*
Lazear Decl. ¶ 1-8.

The Honorable Richard A. Levie (Ret.)                                            JONES DAY
April 18, 2013
Page 13

     5)  All instances of alleged misrepresentations or other misconduct by that recruiter
          (Motion IV, RFP 122-25);

     6)  Information about ADA termination (Motion V, RFP 64-65); and

     7)  Information about what every recruiter did on a day-to-day basis (Motion V,
          RFP 71).

     The vast majority of these requests seek evidence of lawful conduct probative of neither a top-down scheme nor the allegation that Quality Points were a proxy for enrollments. There is no good cause under Rule 26 for discovery that would only prove lawful conduct. Nor can Plaintiffs justify using a claim about how managers applied Quality Points as a springboard for a general regulatory review of all recruiting behaviors and violations of "other compliance obligations."[8]

     Moreover, Plaintiffs' requests are particularly egregious under Rule 26(b)(2) and *Boeing*. EDMC operates over 100 ground schools and on-line educational centers across the country, which collectively have employed more than 11,000 recruiters since 2003, who interacted with almost a million students and millions more prospective students. *See* Trenga Decl. ¶ 5, 10, 13. Realistically, Plaintiffs' requests will require the collection, review, and production of untold millions of documents. Plaintiffs are seeking a level of information that, in practical terms, could take months and months for EDMC—on the one hand—to gather, review, and produce, and—on the other—for Plaintiffs to review and assess in the framework of their claims. Their written discovery requests implicate a level of such extreme burden as to suggest motives entirely separate from fact gathering. If permitted, those requests would make meaningful progress in resolving this case a virtual impossibility and would exert undue pressures that pervert the discovery process. *See Stephens v. City of Chicago*, 203 F.R.D. 353, 358 (N.D. Ill. 2001) ("It is clear from such overly broad discovery requests that plaintiff seeks to make discovery so onerous and burdensome in terms of manpower, costs, and the general disruption to the defendants' business so as to coerce a settlement."); *see also General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 308 (3d Cir. 2003) (equating abusive discovery with a tort).

---

     [8] Plaintiffs' requests for personnel information, such as termination, are improper for unique reasons. EDMC operates on a nationwide basis, and its employees have privacy interests that can vary state-by-state. Some of these are even subject to special statutory protections. *See, e.g.*, 820 ILCS § 40/7. But even under common-law regimes "[c]orporate employees do not forfeit their personal privacy in personnel records when their company is sued," and courts deny motions to compel personnel information where the relevance of the information is "remote." *Amfosakyi v. Lay*, No. 11-651, 2011 WL 6099567, at *5 (M.D. Pa. Dec. 7, 2011). Here, any purported relevance is non-existent. Courts have widely recognized that the ICB/SH does not regulate personnel decisions. Even with respect to the termination of recruiters for failing to meet recruiting goals, courts hold that the HEA/SH is not implicated. *See, e.g., United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 992-93 (9th Cir. 2011); *United States ex rel. Torres v. Kaplan Higher Educ. Corp.*, No. 09-21733, 2011 WL 3704707, at *12 (S.D. Fla. Aug. 23, 2011); *Boca Raton Firefighters' & Police Pension Fund v. Devry Inc.*, No. 10-7031, 2012 WL 1030474 at *11 (N.D. Ill. Mar. 27, 2012).

The Honorable Richard A. Levie (Ret.)                                      JONES DAY
April 18, 2013
Page 14

Plaintiffs' purported need for the discovery is also an ill-conceived and impracticable proposal to inject into what could be a straightforward lawsuit more than 55,000 mini-trials on each of the five Quality Ratings given at each review of EDMC's 11,000 ADAs. Plaintiffs remarkably propose to put on trial every review ever given under the Plan on an individualized basis, so that they might *infer* a potential regulatory violation after first revisiting the circumstantial evidence concerning everything that 11,000 ADAs did every day since 2003. They then propose to use that vast volume of data to question the subjective assessment of individual quality scores and hold separate proceedings on whether a particular 5 rating should have been, in hindsight, a 4, a 3 should have been a 1, etc. *See* Motion IV at 2-3. Under any circumstances, but particularly in a case about compensation and enrollments where the actual compensation and enrollment data are readily ascertainable, this is an impracticable—and likely impossible—endeavor given the numbers involved, the passage of time, and the subjectivity inherent in discretionary performance evaluations. Under any measure this does not comport with the need to appropriately assess the reasonable needs of this case under Rule 26(b)(1).

Indeed, even if the Court were to indulge such a burdensome and futile effort, these 55,000 mini-trials would also not be probative of the central issues—whether compensation was based solely on enrollment and whether there was a top-down fraudulent scheme. It is not for the Court to decide what the right Quality Point total should have been in any given case; "the court's role is not to evaluate employee performance and to determine whether an employer correctly assessed its employees' abilities. After all, the employer interacts with the employees year round and is in far better a position than a court to assess their performance." *Davis v. Solis*, No. 10-2606, 2012 WL 1566209, at *3 (N.D. Ala. Apr. 30, 2012). *See also Mengel v. Reading Eagle Co.*, No. 11-6151, 2013 WL 1285477, at *5 (E.D. Pa. Mar. 29, 2013) ("The courts generally do not second-guess the wisdom of a business' performance evaluations and ratings of its employees…."). And, to get to the jury, Plaintiffs would need evidence not just that Quality Factors were misapplied, but that they were not applied *at all* within *any* of the five categories. After all, basing four of five Quality Factors solely on enrollments still means that the resulting salary change was lawfully based only partly on enrollments.[9]

Plaintiffs' approach is contrary to the claim that Judge McVerry sustained at the pleading stage and depends exclusively on making inappropriate inferences of illegality based on conduct that is both undisputed and entirely lawful. *See Markel Int'l. Ins. Co. v. Centex Homes, LLC*, No. 05-3540, 2006 WL 278920, at *6 (D.N.J. Feb. 2, 2006) (denying additional discovery on undisputed facts that did not give rise to a claim or defense). Under Rule 26, the Court must assess "the reasonable needs of the action" when exercising its control over discovery. Fed. R. Civ. P. 26 adv. cmt. notes (2000). There are vastly more efficient and reliable ways to use the direct evidence to determine whether compensation was based solely on enrollments. *See Lazear*

---

[9] While it is not clear exactly what Plaintiffs propose to do with these millions of pages of information, to the extent they believe it to be susceptible to any statistical analysis, the principles set forth in the Lazear Declaration would apply with equal strength. There are too many confounding factors regarding ADA performance and no way to unambiguously predict the effect on them of changing compensation models, which would preclude admissibility under Fed. R. Evid. 702. *See* Ex. A ¶ 25-27.

The Honorable Richard A. Levie (Ret.)                                    JONES DAY
April 18, 2013
Page 15

Decl. ¶ 14-21.  The discovery to which the parties have already agreed to provide responses set a
proper path to that end.  The open-ended review of every regulation, every practice, every
academic standard, every admissions employee, and every student is neither tailored to the
claims nor appropriately suited to the needs of determining whether there existed a knowing, top-
down scheme to apply Quality Points solely as a proxy for enrollments.

> ### E.   Discovery into EDMC's "Culture" And Recruiters' Motivation Would Be A Prejudicial And Burdensome Distraction.

Purportedly so that they can show "that quality factor ratings were a sham," Motion V at
9, Plaintiffs seek to compel:

> 1) All documents concerning training (Motion II, RFP 10, 11, 13, 78, 79, ROG 7-
>    10);
>
> 2) All documents concerning tracking or evaluating recruiter performance and
>    compensation goals (Motion II, RFP 15-18, ROG 11-12);
>
> 3) All documents relating to implementation, design, and modification of other
>    compensation plans  (Motion II, RFP 35, 60);
>
> 4) Documents relating to audits, investigations, and reviews that pertain to
>    regulations other than the ICB/SH (Motion III, RFP 47-52, ROG 18);
>
> 5) Documents relating to execution of PPAs, to the extent they relate to regulations
>    other than the ICB/SH (Motion III, RFP 39-45, ROG 17); and
>
> 6) Documents relating to recruiter misconduct and student performance (Motion
>    IV, RFP 85, 96-103, 105-09, 115-16, 119-35).

To reveal purportedly illegal conduct, what is relevant is the alleged illegality, not all of
the lawful conduct.  Courts must "take 'special care … in assigning inferences to circumstantial
evidence,'" particularly in light of "the chilling effect on lawful conduct that would result from
the unreasonable interpretation of evidence."  *InterVest, Inc. v. Bloomberg, LP*, 340 F.3d 144,
163 (3d Cir. 2002) (citation omitted).  The vast majority of what Plaintiffs seek pertains to
perfectly legal conduct.

Plaintiffs seek much of the discovery in their motions because it will purportedly "shed
light on the systemic and constant pressure … to 'enroll at all costs.'"  Motion II at 8 (seeking all
tracking documents. *See also id.* at 10 (seeking communications about recruiter goals); *id.* at 12
(seeking training documents); Motion III at 7 (seeking PPA-related documents not related to the
ICB/SH or the Plan); *id.* at 10 (seeking audit and similar documents not related to the ICB/SH or
the Plan); Motion IV at 3 (seeking student performance documents); Motion V at 5 (seeking
discovery of business plans and admissions policies unrelated to the ICB/SH or the Plan).
Central to Plaintiffs' approach is discovery on anything that might somehow relate to whether
EDMC "incentivized [recruiters] to focus exclusively on the number of students they enrolled,"
*id.*, and the "boiler-room recruiting tactics" that allegedly predominated.  Motion II, at 5, 12.  *See
also* Motion III at 7; Motion IV at 4, 7-9; Motion V at 8.

The Honorable Richard A. Levie (Ret.)                                               **JONES DAY**
April 18, 2013
Page 16

Plaintiffs demand this exceedingly large volume of information solely because they think it reasonably calculated to lead to discovery of admissible evidence. But requests focused on the culture at EDMC, the incentives that motivated recruiters, or the methods by which ADAs performed their job represent a circular path to nowhere. Even assuming Plaintiffs demonstrate that Defendants prioritized recruiting, utilized sales techniques, and encouraged students to enroll in their programs, that is not unlawful. *See Gaer v. Educ. Mgmt. Corp.*, No. 10-1061, 2011 WL 7277447, at *30 (W.D. Pa. Aug. 30, 2011), *recommendation adopted*, 2011 WL 7277578 (Sept. 29, 2011) (dismissing securities fraud claims against EDMC based on allegations of a "boiler room sales environment where abusive practices were used to manipulate students into enrolling"); *United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 528 (6th Cir. 2012) ("Why a business ought to be punished solely for seeking to maximize profits escapes us."). Plaintiffs obscure the difference between lawful and unlawful compensation with artfully vague mantras such as, for instance, that Defendants "placed enrollment numbers above all else." Motion V at 5-6. That says nothing about whether compensation was based solely on enrollments. At best, this discovery will confirm that recruiters were incentivized to recruit and that they were frequently, or even exclusively, incentivized by money. But that is exactly how the written Plan was supposed to work, and Judge McVerry has already opined on the legality of the written plan.

In the aggregate, these requests are really designed to investigate EDMC's citizenship and exert undue pressure through the discovery process, illustrating just how far from Judge McVerry's opinion Plaintiffs have roamed.[10] Plaintiffs alleged that pursuant to a top-down scheme, managers used Quality Points as a complete proxy for enrollments. How Defendants' ADAs were *compensated* is the issue—not how they were *motivated*. That distinction is the difference between practical, probative, and efficient discovery and the free-for-all across Defendants' operations that Plaintiffs are seeking. Plaintiffs' discovery requests erase that line altogether and instead seek unfettered access to Defendants without any consideration of the legal issues at stake. There is neither good cause nor sufficient proportionality to justify permitting Plaintiffs to become exactly the kind of "roving commission" that FCA courts protect against for purposes of sifting through enormous volumes of cumulative evidence of undisputed, lawful conduct, in the hopes of finding one wrong thing. *Cancer Treatment Ctrs. of Am.*, 2003 WL 21504998, at *2 (N.D. Ill. June 30, 2003). *See also Bane*, 2008 WL 4057642, at *1; *Fisher*, 227 F.R.D. at 10-11.

---

[10] Other requests further demonstrate the frivolous and often times voluminous nature of Plaintiffs' requests. For instance, Plaintiffs allege that EDMC's fraudulent scheme began four years *before* the hiring of Todd Nelson as CEO of Education Management Corporation. *See* Dkt. No. 128 ¶ 9, 163. Yet they ask for all documents relating to the decision to hire Mr. Nelson and any other executive and employee of Mr. Nelson's former company. *See* RFP 31, 95; ROG 15. They similarly seek all documents relating to a variety of proceedings that apparently relate to the ICB/SH, without any attempt to tailor the request to the top-down theory that sustained their "as-implemented" claim. In an organization with more than a hundred separate locations and approximately 17,000 employees, *see* Trenga Decl. ¶ 9, these broad requests seek information that is neither relevant nor tailored to the claims.

The Honorable Richard A. Levie (Ret.)
April 18, 2013
Page 17

**JONES DAY**

The parties are presenting two different models of discovery. According to the Court, the pertinent question is whether Defendants' "paperwork was only a pre-text or cover-up and did not reflect EDMC's real compensation practices." Motion I at 2 (quoting Dkt. No. 183 at 21-22). *See also* Motion II at 6 ("[T]he Court allowed [Plaintiffs' 'as-implemented' claim] to proceed in order to determine whether Defendants in actuality carried out their compensation scheme in a manner that compensated Admissions Employees exclusively on the number of students they enrolled."). Denying Plaintiffs' motions will appropriately tailor discovery to the issues that Judge McVerry framed and focus the parties toward both identifying whether there truly was a top-down scheme, and evaluating the most probative, direct evidence of whether compensation *in actuality* was based solely on enrollments. In contrast, Plaintiffs seek unlimited (and likely unending) scrutiny of every facet of EDMC's recruiting, admissions, and academic operations, an analysis of each student's scholastic career with Defendants, and a performance re-evaluation of every ADA ever paid according to the Plan. Plaintiffs do not seek to try the case alleged, they seek to try EDMC in every facet and in every way. That difference between discovery tailored to the actual claims and defenses and a voluminous free-for-all that will sink this proceeding with cumulative discovery on undisputed, lawful issues, and wasteful side-tracks of little or no relevance is precisely why Rule 26 empowers courts to take a more active role in the discovery process. *See* Fed. R. Civ. P. 26(b)(1).

## III.    Motion I Seeks Irrelevant Information Unrelated To The Complaints.

### A.    Non-Cash Compensation Programs Are Irrelevant.

Plaintiffs are also improperly seeking to compel discovery regarding non-cash compensation. *See* Motion I, § III.E, RFP Nos. 24-28. Without a pending claim, this discovery falls beyond the scope of relevance defined by Rule 26(b)(1). Other courts expressly hold that discovery regarding dismissed claims is not permitted for the same reasons. *Bracey v. Price*, No. 09-1662, 2012 WL 849865, at *3 (W.D. Pa. Mar. 13, 2012) (denying Plaintiff's motion to compel because "Plaintiff's sexual harassment claim has been dismissed from this action and as such, documents related to sexual harassment claims filed by other inmates in the time period 2005–2007 are irrelevant."); *Dow Chem. Can. Inc. v. HRD Corp.*, No. 2010 U.S. Dist. LEXIS 35949, at *43-44 (D. Del. Mar. 2, 2010). "[I]t is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken." *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 352 (1978).

Such is the case with President's Club and similar non-cash compensation programs. *See* Dkt. No. 183 at 20-21. In its dismissal, the Court reasoned that Plaintiffs failed to establish the requisite scienter and failed to meet the Federal Rule of Civil Procedure 9(b) pleading standards. *See id.* As to scienter, the Court held, "[b]ecause the Department of Education advised schools in 1995 that paying travel and related expenses for ADAs to attend sales meetings would not violate the Incentive Compensation Ban ... Plaintiffs have failed to establish the scienter element as to EDMC's use of prizes and trips such as the President's Club." *Id.* Plaintiffs argue that dismissal of the "as-written" claim has no bearing on discovery regarding non-cash compensation. But the lack of properly alleged scienter precludes any claim based on these non-cash compensation programs—whether related to the as-written or as-implemented theories.

The Honorable Richard A. Levie (Ret.)                    JONES DAY
April 18, 2013
Page 18

     Even if the Court determines that dismissal of the "as-written" claim does not itself bar discovery on non-cash compensation, discovery should still not be compelled because such evidence has no relevance to the fundamental issue before the Court: whether the Plan's stated Quality Factors were not applied when ADA's salaries were adjusted. The existence of non-cash compensation plans like the President's Club has nothing to do with Quality Factors. Just because it looks like incentivization does not make non-cash compensation improper or even relevant. Indeed, as this Court noted:

> The Department of Education, in promulgating the regulation, specifically explained that the Safe Harbors create "conditions under which an institution may make an incentive payment to an individual or entity that could be construed as based upon securing enrollments." 67 Fed. Reg. at 67054. Thus, the Department of Education has clearly determined that some incentive payments, *i.e.*, those not based solely on enrollment numbers, are consistent with the statutory language of the HEA.

Dkt. No. 183 at 18-19. Because the claims regarding non-cash compensation were dismissed and have no relevance to the remaining claims before this Court, discovery would be an improper fishing expedition in contradiction to Rule 26(b)(1).

### B.    Defendants' Use of Exemplars Is Proper.

     Plaintiffs' objection to EDMC's offer to produce exemplar documents is yet another example of a demand that imposes needless burdens that far outweigh utility. EDMC anticipates that certain documents responsive to Plaintiffs' discovery requests will exist—in identical form—in hundreds or thousands of exact duplicate copies. (For example, an identical email may have been sent to a thousand recipients.) Producing the same email a thousand times over would not only be inefficient, but also unhelpful.

     EDMC has assured Plaintiffs that if there is any difference between one version of a responsive document and another version—whether it be a doodle or a minor edit—EDMC will produce each version. EDMC has also told Plaintiffs that if Plaintiffs have a legitimate need to see each identical copy of a given document, EDMC will collect and produce each copy. It is difficult to understand what Plaintiffs find objectionable about this arrangement. Parties commonly agree to limit discovery to exemplar documents in situations like this. *See, e.g., McCloskey v. UPS*, No. 95-420-FR, 1996 WL 684466, at *5 (D. Or. Nov. 21, 1996) ("The plaintiffs will be satisfied if UPS produces representative documents if there are thousands of pages of nearly identical documents…."); *United States CFTC v. Paron Capital Mgmt., LLC*, No. 11-cv-04577 CW (NC), 2012 WL 5389912, at *3 (N.D. Cal. Nov. 5, 2012); *see also Bank of the Ozarks v. Capital Mortg. Corp.*, No. 12-21, 2012 WL 2930479, at *2-3 (E.D. Ark. July 18, 2012) (advocating a "wait-and-see" approach to discovery that would delay intrusive discovery until initial, less invasive methods proved fruitless). EDMC's approach is reasonable and appropriately balances the benefits of discovery with its burdens.

The Honorable Richard A. Levie (Ret.)                                   JONES DAY
April 18, 2013
Page 19

      C.     **Plaintiffs Fail to Specifically Allege the Relevance and What is Improper About Certain "Qualified Responses" Made by Defendants.**

      Defendants properly raised their objections to Plaintiffs' discovery requests.  Then, rather than refusing to respond in the entirety to an objectionable request, Defendants provided in good faith responses where they deemed proper.  Plaintiffs' Motion to Compel cursorily claims that some of Defendants' responses to the 141 requests for production and 24 interrogatories served by Plaintiffs may be improper because Defendants answered them subject to objections. Plaintiffs claim, "*To the extent Defendants have improperly limited their response* . . . each of those requests is also at issue."  Motion to Compel at 14 (emphasis added).  Plaintiffs do not specifically allege which responses are (or even could be) improper or provide a reason why.  Instead Plaintiffs inexplicably state, "Since Defendants have provided qualified responses to a large number of discovery requests, they cannot be separately addressed here."

      After the party opposing discovery has raised an objection, as Defendants have done here, the party seeking discovery then has the burden of demonstrating the relevancy of the requested information.  *Romero v. Allstate Ins. Co.*, 271 F.R.D. 96, 101 (E.D. Pa. 2010) (citing *Corrigan v. Methodist Hosp.*, 158 F.R.D. 54, 57 (E.D. Pa. 1994)).  Here, Plaintiffs fail to specifically assert or demonstrate the particularized relevance of any of requested discovery they claim Defendants improperly excluded.

**IV.**     <u>**Plaintiffs' Motions Are Not Ripe In Several Respects.**</u>

      Throughout their motions, Plaintiffs seek to compel responses to requests to which EDMC has agreed to respond or provide a supplemental response.  *See, e.g.*, Motion II (RFP 80-84; ROG 4, 5, 24), Motion V (RFP 86, 88, 89).  Any objection to these requests is unripe. Plaintiffs are also prematurely arguing over cost-shifting of attorney-work product.  *See* Motion V at 14.  At the parties' meet-and-confer, Plaintiffs agreed to review the cost associated with building a database of ADA compensation information for use in this case.  *See* Pls.' Ex. J at 2. Any dispute would be more appropriately raised following the parties' additional discussions.

The Honorable Richard A. Levie (Ret.)                                      JONES DAY
April 18, 2013
Page 20

## V.      Conclusion.

These motions place front and center the Court's ability to streamline discovery, manage
cases toward trial, and employ the judicial system to resolve disputes in a reasonable fashion.  By
seeking nearly unlimited discovery into areas of tangential or no relevance that grossly exceed
the Complaints in this matter as limited by the Court, Plaintiffs seek to impose tremendous
burdens with no reasonable explanation for the need to engage in such extraordinary inquiry and
no legitimate expectation that the information gleaned would have any other use than placing a
crushing weight on Defendants.  While imposing in its scope because of the time and number of
entities involved, the issue to be tried is quite simple:  Did Defendants adjust recruiter
compensation solely based upon enrollment success?  That Plaintiffs now wish to turn this case
into something far different, burdensome, and ultimately untriable suggests that they already
know the answer to that simple question.

Sincerely,

_/s/ Laura E. Ellsworth_
Laura E. Ellsworth

Encl.

cc:      Christy Wiegand
         (*via email*)
         Christy.Wiegand@usdoj.gov

         Christina Calce
         (*via email and overnight delivery; w/ encl.*)
         christina.calce@gmail.com