# EXHIBIT C

*United States et al., v. Education Management Corporation, et al.*

**Declaration of Edward P. Lazear, Ph.D.**

April 18, 2013

1. I, Edward P. Lazear, do hereby attest to and declare the following of my own personal knowledge and would be willing to testify if so required.

**A.   QUALIFICATIONS**

2. I am the Jack Steele Parker Professor of Human Resources Management and Economics at Stanford University's Graduate School of Business, and the Morris A. and Nona Jean Cox Senior Fellow at the Hoover Institution.  I have also served as a professor at the University of Chicago. I received my Ph.D. in Economics from Harvard University and my A.B. and A.M. degrees from the University of California, Los Angeles.

3. I served as Chairman of the President's Council of Economic Advisers from 2006 to 2009.  In my position as the chief economic advisor to President George W. Bush, I helped formulate the government's economic policy, including briefing the President on issues relating to labor markets, wages, economic issues in education and student loans, the automobile industry and auto bailout, macroeconomic and fiscal policy, energy, health, environment, tax policy, unemployment, trade policy, telecommunications and the Internet, and antitrust and regulatory issues.

4. I have testified before Congress on a number of occasions.  I also served on the President's Advisory Panel on Federal Tax Reform in 2005.  In addition, I have been an advisor to the governments of Czechoslovakia, Romania, Russia, Ukraine, and Georgia.

5. My research applies economic principles and econometric techniques to a range of issues, including labor economics, personnel economics, worker and executive compensation, employee promotions, the effect of incentives on behavior, the economics of education, pricing and marketing policies, and the impact of government policies on a variety of social outcomes.

6. I have taught courses in many different areas of economics including labor economics, personnel economics, productivity, industrial organization, microeconomic theory, government economic policy and the macro economy, and econometrics and statistics.

7. I have over 100 published articles, many of which have been published in top economics journals, including the American Economic Review, Journal of Political Economy, Quarterly Journal of Economics, Journal of Labor Economics, and Journal of Economics Perspectives.  I have written or edited twelve books.

8. I have received four honorary doctorates.  Among other professional awards recognizing my leadership in economics, I have won the IZA Prize in Labor Economics, which is given to the person viewed to have made the most significant contributions to labor economics in the world.  This was primarily for my work in personnel economics, which includes topics such as compensation and incentives.  I received the Jacob Mincer Prize for lifetime achievement in labor economics.  I have also received two teaching awards from Stanford University.  A copy of my curriculum vitae is included as <u>Exhibit A</u>.

### B.   ASSIGNMENT

9.    I have been asked to assess whether certain student information could be used in a statistically sound manner to determine whether the number of students recruited, admitted, enrolled, or awarded financial aid was the sole factor in determining the compensation of the recruiters who initially recruited the students to the school.[1] Specifically, I have been asked to consider a) student qualifications, b) student academic performance, and c) student outcomes, including dropouts and ultimate job placements, as those topics were described in the motions to compel filed on April 11, 2013.

10.   In conducting my analysis for this declaration, I have made use of the United States Government's Joint Complaint in Intervention, the discovery requests served by the Plaintiffs dated January 14, 2013, the opinion of the Court ("Opinion") dismissing, in part, the Plaintiffs' case and ruling that Defendants' compensation plan is lawful as written but allowing Plaintiffs to proceed with their claim that the Defendants applied the manner in a fashion that amounted to the payment of salaries based solely upon enrollment success.  *See* Opinion at page 45. I have also reviewed EDMC's Admissions Performance Plan ("Plan") attached as Exhibit B.[2]  Finally, I cite below passages from Plaintiffs' letter describing the supposed relevance of the information that they seek and the April 11, 2013 motions to compel, particularly Motion to Compel No. IV – Recruiter Misconduct and Student Performance ("Motion IV").

### C.   OPINIONS

11.   As I understand this matter, the Court will be asked to determine whether EDMC made recruiter salary adjustments "solely" upon enrollment success (i.e., number of students recruited, admitted, enrolled or awarded financial aid) contrary to the written compensation plan already determined to be legal by the Court.

12.   I note the following argument made by Plaintiffs:  "As discussed in the Introduction to Plaintiffs' Motion to Compel No. II, there are a number of scenarios in which the numerical quality factor ratings awarded to Admissions Employees would not be based on any substantive factor distinct from the number of students the Admissions Employee enrolled.  *In order to properly analyze whether quality factor ratings were used as camouflage* to hide a compensation plan that, in practice, based compensation exclusively on enrollments, Plaintiffs must therefore look behind the compensation numbers and *determine whether the quality factor ratings were awarded haphazardly, arbitrarily, by default, or as a proxy for enrollment numbers*."  Motion IV at page 2 (emphasis added).

---

[1] Hereafter, I will generally refer to the number of students recruited, admitted, enrolled, or awarded financial aid as "enrollments" or "enrollment success."

[2] I understand that EDMC employed numerous versions of the Plan during the time-frame at issue but that each employed a "matrix" structure that included factors similar to those included in the exemplar Plan attached hereto and the inclusion of other factors that could influence salary adjustments including tenure, location and responsibility.

13.     As discussed below, not only are student performance related data unnecessary to determine whether enrollment success was the sole factor in determining compensation, but student performance data cannot speak to whether compensation was determined solely on the basis of enrollment success.

       a.   **DIRECT AND CONCLUSIVE EVIDENCE ON WHETHER COMPENSATION ADJUSTMENTS WERE BASED SOLELY ON ENROLLMENT SUCCESS**

14.     I understand that lawful plans may base compensation of recruiters partially or even overwhelmingly (as long as not solely) upon elements identified in the Safe Harbor.  The most direct and relevant data would therefore be those factors used to compute the actual salary changes and on the compensation itself.[3]

15.     There is a universally accepted method used by economists and statisticians to determine whether a particular factor, in this case enrollment success, is solely responsible for variation in another factor, here Admissions Employee compensation.  If compensation adjustment is based solely on enrollment success, then all of the variation in compensation found in the data must be explained fully by variation in enrollment success. If less than 100% of the variation is explained by the enrollment factors, then the only possibility is that other factors were responsible for some of the variation in compensation.

16.     It is also possible to extend the approach to multiple variables although such an extension is not necessary for assessing whether compensation was solely based on enrollment success.  For example, suppose it was alleged that compensation was based solely on the combination of enrollment success and quality points.  Then the two variables, enrollment success and quality points taken together, would be able to explain 100% of the variation in compensation.  Once again, if less than 100% of the variation is explained by the combination of enrollment factors and quality points, then the necessary conclusion is that other factors are responsible for some of the variation in compensation.

17.     It is straightforward and among the most basic and widely used statistical techniques to compute the proportion of variation in one variable that is explained by another.  As a result, standard techniques using information only on compensation and enrollment success can be used to determine whether in practice EDMC determined its compensation on the basis of enrollment factors alone or whether other factors came into play.  No additional data are necessary to make this determination.

18.     Furthermore, Plaintiffs' suggestion that quality points may be a mere smokescreen, reflecting instead enrollment success while irrelevant, can also be tested directly with the

---

[3] Under the Plan, recruiters who were eligible to be compensated on the matrix were awarded "new student points" based upon the number and type of students recruited, and "quality factor points" based upon a subjective, cumulative score given by the recruiter's supervisor with respect to job knowledge, business practices and ethics, professionalism, customer service and initiative.  Plan at pages 6, 9.  In addition, salaries were designed under the Plan to be adjusted based on other factors including supervisory activities, location and tenure.  Plan at page 19.

data on quality points and enrollment success.  As before, if quality points are just a proxy for enrollment success, one can assess using statistical tests whether variations in enrollment success explain 100% of the variation in quality points.  In addition, if, as Plaintiffs hypothesize, quality points are being assigned randomly or are uniform, this too can be assessed using standard statistical analysis.  Furthermore, information on other factors that may be behind the determination of quality points is unnecessary to assess whether quality points were a mere proxy for enrollment success.

19.     Whether quality points are a perfect proxy for enrollment success or not, it is possible, with the enrollment success data and quality points data, to assess whether quality points helped determine compensation.  Using multiple regression analysis, if the addition of quality points to a regression that already includes enrollment success improves the explanatory power of the analysis, then quality points are at least partially an independent factor in determining compensation.  Under this statistical framework, if quality points help explain variation in compensation, even after fully taking into account enrollment success, quality points could not be a mere proxy for enrollment.

20.     Although  finding that quality points help explain some of the variation in compensation implies that quality points are one determinant of compensation, this finding is by no means necessary to show that enrollment is not the sole determinant of compensation. That result comes directly from analyzing whether enrollment success alone explains 100% of the variation in the compensation of Admission Employees.  If, for example, it was found that enrollment success explained only 60% of the variation in compensation, we would know with certainty that enrollment success is not the only factor determining compensation.  It might be interesting for a variety of reasons to know which other factors were important in determining compensation, but identifying those factors would not be necessary to determine whether compensation depended solely on enrollment success factors.  That question would have already been answered in the negative because 60% is less than 100%.

21.     To reiterate, with data on the factors actually used to calculate the actual salaries, basic statistics would permit determination of whether compensation was solely based on enrollments.  Furthermore, these same data and statistical approaches could also determine whether the quality point system was a "sham," with the quality points being mere proxies for enrollment.

     **b.  STUDENT-RELATED OUTCOME DATA CANNOT DETERMINE WHETHER COMPENSATION ADJUSTMENTS WERE BASED SOLELY ON ENROLLMENT SUCCESS**

22.     Plaintiffs' suggestion that student performance related data could inform the question at issue suffers from fatal analytical and methodological flaws and could not produce a statistically reliable result.  Plaintiffs expound upon the supposed relevance of student performance related information in their Motion to Compel IV:

"Information at the level of individual schools, groups of schools, or the Online Higher Education program is also important to this case, *particularly student performance*

*information*.  Just as poor performance by the students an Admissions Employee enrolled would imply that the Admissions Employee was being incentivized to focus on enrolling students to the exclusion of everything else, *the poor performance as a whole of students enrolled at a school also indicated an 'enroll at all costs' atmosphere at the school that would inform Admissions Employees' beliefs as to how they were being compensated*.  In addition, changes in the performance of a school's student cohorts over time would suggest that Admissions Employees changed the way they treated those cohorts.  And such changes in Admissions Employee conduct would imply changes in how they were being incentivized.  For example, evidence that students who enrolled after a compensation plan went into effect did worse than students who enrolled under the prior plan would tend to show that Admissions Employees under the second plan were being improperly incentivized to enroll less qualified students."  Motion IV at page 3 (emphasis added).

23.  Plaintiffs' argument appears to be that data on student performance and outcomes, if provided in discovery, could somehow be analyzed to assess whether that performance and outcome was a product of improper compensation of the recruiters who originally recruited those students.  This argument is analytically incorrect.

24.  First and most important, the evidence that Plaintiffs' request cannot inform the court as to whether compensation was based *solely* on enrollments, which is the key point at issue.  Any analysis of a compensation scheme on student performance and outcomes would have to be carefully designed to be sound.  As a contributor to that literature, I am aware of the conditions required to establish with reasonable statistical certainty that a particular outcome is caused by the choice of one compensation scheme over another. Those conditions are not met here.

25.  To start, it is necessary to account for confounding factors that affect student outcomes.  There are many factors that may affect the likelihood that a student would perform well in school or that the knowledge gained in school was helpful later in the labor force.  Academic research shows that a student's performance depends on student's individual characteristics, including demographics, number of hours worked in a job outside class, number of hours spent studying, parents' education, class attendance, and the subject matter studied, to name a few.[4]  For example, during severe recessions, like the one recently encountered, college graduates had difficulty finding jobs.[5] It would be absurd to infer from that finding that compensation practices,  and particularly compensation solely based on enrollments, must have caused the deterioration in job market prospects. Indeed, even students from schools like Stanford where I teach are not guaranteed to be offered a

---

[4] See, e.g., Durden, Garey C. and Ellis, Larry V., "The Effects of Attendance on Student Learning in Principles of Economics," *American Economic Review*, Vol. 85, No. 2, May 1995, pp. 343–346.  See also Romer, David, "Do Students Go to Class? Should They?" *Journal of Economic Perspectives*, Vol. 7, No. 3, Summer 1993, pp. 167–174.  See also Devadoss, Stephen and Foltz, John, "Evaluation of Factors Influencing Student Class Attendance and Performance", *Journal of Agricultural Economics*, Vol. 78, August 1996, pp. 499–507.

[5] See, e.g., Shierholz, Heidi, Sabadish, Natalie, and Finio, Nicholas, "The Class of 2013: Young Graduates Still Face Dim Job Prospects," Economic Policy Institute, April 10, 2013.

high-paying job on graduation despite the fact that Stanford has highly selective admissions.  Individual effort, choice of major, macroeconomic conditions, and student ability are all factors in determining student outcomes.  A recent report demonstrates that approximately 42% of first-time, full-time students seeking a bachelor's degree fail to graduate within 6 years.[6]  None of these facts by themselves imply that students were improperly recruited, much less that they were improperly recruited because the recruiter's compensation was based solely on enrollments.

26.    Even were all the problems of confounding factors and other statistical issues overcome, the data that Plaintiffs request still could not answer the question at hand.  Plaintiffs want to use the data to do more than determine the effect of a particular compensation plan on student performance.  Plaintiffs seek to do the reverse, that is, to infer the exact nature of the compensation scheme from student performance data.  This is impractical for a variety of reasons.

27.    To further understand the difficulty of inferring compensation from student performance, let us follow Plaintiffs' approach.  Plaintiffs assume in their discussion (quoted above) that an enrollment-based compensation scheme leads to an emphasis on more enrollments coupled with, necessarily the recruitment of less qualified students.[7]  This assertion is incorrect.  A scheme that induces recruiters to increase their effort could conceivably attract poorer students, but it could also result in recruiting students who are difficult to find, but might benefit significantly from the school.  There is no unambiguous way to predict the effect of switching to an enrollment based compensation scheme on the quality of student outcomes.  As a consequence, one cannot go backwards.  The existence of poorer outcomes is not unambiguous evidence that compensation was based on enrollment, let alone based solely on enrollment.[8]

28.    Finally, even if Plaintiffs were correct in assuming that poorer performance is necessarily associated with an enrollment-based scheme, results on student outcomes could not speak to whether the scheme is *solely* based on enrollment.  Consider the before-after analysis that Plaintiffs suggest.  They state, "For example, evidence that students who enrolled

---

[6] See, e.g., "The Condition of Education 2012", National Center for Education Statistics, U.S. Department of Education, May 2012, p. 108.

[7] I will note, however, that neither the Ban nor the Safe Harbor provides a definition of what the Plaintiffs contend makes a student "unqualified."

[8] Lazear, Edward P., "Performance Pay and Productivity," *American Economic Review*, Vol. 90, No. 5, December 2000, pp. 1346-1361 (finding that a commission structure produced both higher output-per-worker and higher quality output).  One common example with which everyone is familiar involves tipping in restaurants. Consider restaurants where tipping is expected, as contrasted with those where no tipping is allowed.  Tipping might have the effect of inducing waiters to speed up because they earn more if they wait more tables.  At the same time, tipping might also improve the average quality of the service provided to diners, because waiters understand that the size of their tip depends on their attentiveness to customer wants.  This suggests that incentive-based plans do not necessarily lead to higher quantity (e.g., wait more tables) at the expense of quality (e.g., attentiveness to customer wants).  In this case, poorer quality service could easily be found in the restaurants without tipping, not in the restaurants that allowed "commissions" in the form of tips to be paid to waiters.

after a compensation plan went into effect did worse than students who enrolled under the prior plan would tend to show that Admissions Employees under the second plan were being improperly incentivized to enroll less qualified students."[9]  For this to be relevant, it is necessary that the poorer performance that hypothetically results after the plan went into effect is evidence that the plan was based *solely* on enrollment success.  But even if, as Plaintiffs want to assume, enrollment-based compensation results in poorer outcomes, this in no way implies that compensation in the second plan was based solely on enrollment success.  Consistent with their example would be a scenario where the prior plan was 20% enrollment-based and 80% straight hourly wage and the second plan was 30% enrollment-based and 70% hourly wage.  Even if, as Plaintiffs' example alleges, poorer performance results from the 30% - 70% plan, both plans would be fully compliant with the requirements set forth by the Congress.  At best Plaintiffs would only have demonstrated that there is a link between compensation and how well the students perform, which does not address the critical question of whether compensation was *solely* based on enrollments.  In this situation, where the Safe Harbor permits the consideration of enrollments in compensation, Plaintiffs' analysis would have only shown that which is already permissible under the Safe Harbor.

### D.   CONCLUSIONS

29.   In sum, data on enrollment success factors and compensation are sufficient to determine definitively whether compensation and salary adjustments were based solely on enrollment success.

30.   Additionally, the same data, coupled with information on quality points, can determine whether quality points were based solely on enrollments and were therefore a mere proxy for enrollments.

31.   On the contrary, the student performance related information that Plaintiffs seek cannot determine whether EDMC's compensation plan was based solely on enrollment success.

_____

Dr. Edward P. Lazear

---

[9] Motion IV at page 3.

Exhibit A

# EDWARD PAUL LAZEAR

## CURRICULUM VITAE
April, 2013

**Business addresses:**
Hoover Institution
Stanford University
Stanford, CA 94305-6010
Phone: 650/723-4724  Fax: 650/723-0498
and
Graduate School of Business
Stanford University
Stanford, CA  94305-5015
Phone: 650/723-9136  Fax: 650/725-7979

| | |
|---|---|
| **PRIMARY POSITIONS:** | Morris Arnold Cox and Nona Jean Cox Senior Fellow, Hoover Institution (2002- ) and Jack Steele Parker Professor of Human Resources Management and Economics, Graduate School of Business, Stanford University (1995- ) |
| **PREVIOUS POSITIONS**: | Chairman, President's Council of Economic Advisers, The White House (2006-09) Senior Fellow, Hoover Institution (1985-2002) Professor of Human Resource Management and Economics, Graduate School of Business (1992-95) Stanford University Coordinator of Domestic Studies (1987-1990), Hoover Institution Assistant Professor of Economics (1974-1978); Associate Professor of Industrial Relations (1978-1981); Professor of Industrial Relations (1981-1985); Isidore Brown and Gladys J. Brown Professor of Urban and Labor Economics, Graduate School of Business (1985-1992) University of Chicago |

**OTHER AFFILIATIONS:**   Research Fellow, IZA (2002- 6, 2009-) Research Fellow,
Center for Corporate Performance,
  Denmark (2004-6, 2009-)
Member, Global Economic Symposium Advisory Board
(2009-
Member, George W. Bush Institute Board (2009-
Research Fellow, SIEPR (2004-6, 2009-)
Member, Advisory Council, Hong Kong Institute of
  Economics and Business Strategy, University of Hong
  Kong (2000-6 )
Chairman, Academic Research Committee, Research
  Advisory Board of the American Compensation
  Association (1999-2002)
Founder of the Society of Labor Economists, 1996
Research Advisory Board, American Compensation
  Association (1996-99)
Steering Committee, SIEPR, Stanford University (1996-2006)
Research Associate, National Bureau of Economic Research
  (1974-)

**EDITORIAL AFFILIATIONS:**   Founding editor, *Journal of Labor Economics*
  (University of Chicago Press) (1982- 2001)
Associate Editor, *Journal of Economic Perspectives* (American
  Economic Association) (1986-1989)
Member, Editorial Board, *LABOUR/Review of Labour
  Economics and Industrial Relations* (1992-2006)
Member, Editorial Board, *Managerial and Decision Economics*
  (1994- )
Co-Editor, *Journal of Labor Abstracts* (1996-2006)
Associate Editor, *German Economic Review* (2000-2004)
Columnist, *The Economist's Voice* (2005-2006)
Member, Editorial Board,
  *Journal of Labor Economics,* (2009-)
Member, Board of Distinguished Advisers DIW-DC (2009-)
Member, Editorial Advisory Board, *Research in Labor
  Economics*, (2011-)
Member, Editorial Board, *International Human Resources
  Issues* (2011-)

**ACADEMIC DEGREES**:      A.B., UCLA (Economics) 1971
A.M., UCLA (Economics) 1971
Ph.D., Harvard University (Economics) 1974
Legum Doctor (Honorary), Albertson College of Idaho, 1997
Doctor Mercaturae Honoris Causa (Honorary), Aarhus School of Business 2006
Doktor, Honoris Causa (Honorary), University of Zurich, 2010
Doctor Honoris Causa (Honorary), Copenhagen Business School, 2013

**TEACHING EXPERIENCE:**    Microeconomic Theory; Labor Economics; Industrial Relations; Personnel; Econometrics; Mathematics for Economists; and Discrimination in the Labor Market

**HONORS AND FELLOWSHIPS:**
Honorary Doctorate, Copenhagen Business School, 2013
American Association for the Advancement of Sciences, Fellow, 2012-
Honorary Doctorate, University of Zurich, 2010
Spence Faculty Fellow, 2009-2010
Jacob Mincer Prize for Lifetime Achievement. Society of Labor Economists, 2006
Honorary Doctor Mercaturae Honoris Causa, Aarhus School of Business, 2006
IZA Prize in Labor Economics, 2004
Society of Labor Economists, Fellow, 2003-
National Academy of Sciences, BOTA, member, 2001-2005
Michael and Monica Spence Faculty Fellow, 2000-01
Distinguished Service Award, Ph.D. Faculty, Stanford University, 2000
American Academy of Arts and Sciences, Fellow, 2000-
Leo Melamed Biennial Prize for Outstanding Research, 1998
President, Society of Labor Economists, 1997-98
First Vice-President, Society of Labor Economists, 1996-97
Honorary Doctor of Laws degree, Albertson College of Idaho, awarded June, 1997
Stanford Graduate School of Business Research Fellowship, 1996-97
*Personnel Economics* selected as MIT Press Outstanding Book, 1996
*Personnel Economics* selected as one of ten most important books in Labor Economics Princeton, 1996
Distinguished Teaching Award, Graduate School of Business, Stanford University, May 1994
Econometric Society, Fellow, 1988-
Member, Conference on Research in Income and Wealth, 1988-
Grant by Government of Spain to study U.S./Spanish unemployment, 1987-88
Binational Fellowship, United States/Israel Binational Science Foundation, 1985
Elected Fellow, Center for Advanced Study in the Behavioral Sciences, June 1981
National Science Foundation Grant Recipient, 1979-81, 1981-83, 1984-86, 1987-90, 1991-95,

1995-96, 1996-97, 1997-2001
Graduate Fellow, National Science Foundation, 1971-74

**HONORARY LECTURES:**
Keynote Address, Celebration in Honor of Lim Chong Yah, Singapore, August, 2012.
Keynote Address, Singapore Economic Society, August 2011.
Keynote Address, European Personnel Economics Annual Meeting, February 2010.
Honorary Doctorate Lecture, University of Zurich, April, 2010.
Trevor Swan Lecture, Australian National University, September, 2009.
Keynote Address, Australian Conference of Economists, 2009.
Keynote Address, Southern Economics Association Meetings, Charleston, S.C. 2006.
Keynote Address, ITPF-Brookings Institution Conference, Washington, D.C., 2005
Keynote Address, Canadian Annual Conference on Economics, Montreal, Canada, 2005
Keynote Address, International Workshop on Human Resources Management, Seville, Spain, 2005
Keynote Address, Fifth International Symposium on Multinational Business Management, Nanjing, China, 2005
Bogen Lecture, Hebrew University of Jerusalem, 2005
Keynote Address, Personnel Economics and New Data, Bonn, Germany, November, 2004.
Adam Smith Lecture, European Association of Labor Economists, Seville, Spain, 2003
Commencement Address, UCLA, June 2002
Presidential Address, American Economic Association, for Sherwin Rosen, January 2002
Bertha Leigh Memorial Lecture, University of Washington, 2002.
Fishelson Memorial Lecture, Tel Aviv University, January 2002
Keynote Address, CAEP Conference on New Data in Personnel Economics, Aarhus, Denmark, October 2001
Keynote Address, CEP Conference on Education Policy in the UK, September 2001
Keynote Address, Ministry of Labor, Ottawa, Canada, May 2000
McMyler Annual Lecture, Case Western Reserve University, March 2000
University of Cincinnati Annual Lecture, February 1999
Astra-Erikkson Lectures in Economics, Stockholm, Sweden, September 1998
Presidential Address to Society of Labor Economists, May 1998
Frank Paish Lecture to the Royal Economic Society, April 1998
University of Dundee, Scotland, EMRU Conference Keynote Speaker, July 1995
Centre for Labour Market & Social Research, Aarhus, Denmark, Inaugural Lecture, March 1994
Wicksell Lectures, Stockholm, Sweden, March 1993
University of Warwick/European Assn. of Labour Economists Keynote Speaker, September 1992
Western Michigan University Public Lecture Series, September 1989
Harding Visiting Lecturer, University of Toronto, October 1988
Towers/Cresap Annual Lecture, University of Chicago, October 1988
Washington University, October 1987
University of Kansas, April 1985
Louisiana State University, November 1985
Goldwater Lectureship, Arizona State University, 1982

**VISITING APPOINTMENTS:**
London School of Economics, June 1999
NAKE (Netherlands Network of Economics), Tilburg, Netherlands, June 1999
University of Oregon, March 1999
Finnish Postgraduate Program in Economics, Helsinki, August 1998
Aarhus University, Denmark, September 1996
Institut d'Etudes Politiques/MBA Program, Paris, September 1995
University of Saarlandes/Center for the Study of New Institutional Economics, Saarbrucken,
    Germany, August 1992
Institut d'Etudes Politiques, Paris, May 1987
Institute for Advanced Studies, Vienna, 1983-84 (in residence January 1984)
National Productivity Board, Singapore, June 1985 & July 1982
Fellow of the Institute for Advanced Study, Hebrew University of Jerusalem, 1977-78
    (in residence June-July 1978)


**OTHER PUBLIC POLICY APPOINTMENTS AND SERVICE:**
Council of Economic Advisors, Governor Arnold Schwarzenegger, State of California, 2005-2006
Commissioner, White House Panel on Tax Reform, President George W. Bush, January, 2005-
November, 2005.
Testimony before Board of Governors of the Federal Reserve System, October 1997
Economic Advisor to President Shevardnadze of Republic of Georgia, October 1994
National Science Foundation Economics Review Panel, August 1993-95
Supreme Economic Council of Russian Republic, December 1991 - August 1993
Advisor to Prime Minister of Ukraine, Kiev, April 1993
Advisor to Supreme Economic Council, Supreme Soviet, Russian Republic, Moscow,
    March 1991, May 1991, January 1992; By Decree of Supreme Soviet, Foreign Member of
    Supreme Economic Council of Russian Republic, December 1991 - August 1993
Advisor to Prime Minister of Romania, January 1992
Advisor to Vice Prime Minister of Romania, Bucharest, February 1991
Advisor to Ministry of Privatization of Czechoslovakia, Prague, February 1991
Advisor to Government of Romania, Bucharest, October 1990
Advisor to Minimum Wage Study Comm. (an Ad Hoc Committee of the U.S. Congress), 1979-81

6

**BOOKS:**

*Allocation of Income Within the Household*, with Robert T. Michael.  Chicago: University of Chicago Press, 1988.

*Issues in Contemporary Retirement*, edited with Rita Ricardo-Campbell.  Stanford, CA: Hoover Press, 1988.

*Microeconomic Theory*, 6th edition, with John P. Gould, Jr.  Homewood, IL: Richard D. Irwin, 1989.

*Searching for Alternatives: Drug-Control Policy in the United States*, edited with Melvyn B. Krauss. Stanford, CA: Hoover Institution Press, 1991.  Paperback edition, 1992.

*Economic Transition in Eastern Europe and Russia: Realities of Reform*, ed. Edward P. Lazear. Stanford, CA: Hoover Institution Press, 1995.

*Personnel Economics* [The 1993 Wicksell Lectures].  Eleven-chapter book on which lectures were based.  Cambridge: The MIT Press, 1995.

*Personnel Economics for Managers*, Edward P. Lazear.  New York: John Wiley & Sons, 1998. (Also in Japanese, 1998; in German (with Birgitta Wolf and Uschi Backes-Gellner); in Chinese and Korean.

*Education in the 21st Century,* ed. and introduction by Edward P. Lazear, Stanford, CA: Hoover Institution Press, 2002.

*Personnel Economics, Collected Works,* ed. with Robert McNabb, Edward Elgar Publisher, 2004.

*The Structure of Wages: An International Comparison*, ed. with Kathryn L. Shaw. University of Chicago Press, National Bureau of Economic Research, 2008.

*Personnel Economics in Practice, with Michael Gibbs*, *Second Edition* . John Wiley and Sons, 2008.

*Inside the Firm: Contributions to Personnel Economics.* Oxford University Press. 2011.

**PUBLISHED PAPERS:**

"Age, Experience, and Wage Growth," *American Economic Review* 66:4 (September 1976): 548-58.

"Schooling as a Wage Depressant," *Journal of Human Resources* 12:2 (Spring 1977): 164-76.

"Education: Consumption or Production?" *Journal of Political Economy* 85:3 (June 1977): 569-97.

"The Narrowing of Black-White Wage Differentials Is Illusory," *American Economic Review* 69:4 (September 1979): 553-64.

"Why Is There Mandatory Retirement?" Orig. *Journal of Political Economy* 87:6 (December 1979): 1261-84.   Reprinted in *Labor Economics/The International Library of Critical Writings in Economics* 47, Vol. II, eds. Orley C. Ashenfelter and Kevin F. Hallock (Aldershot, England: Edward Elgar Publishing Ltd., 1995): 381-404; also reprinted in *The Economics of Aging/The International Library of Critical Writings in Economics* 51, ed. John Creedy (Aldershot, England: Edward Elgar  Publishing Ltd., 1995): 90-113. Reprinted in *Worth Series of Outstanding Contributions in Economics: Labor Economics.* Orley Ashenfelter, Series Editor and Volume Editor: Worth Publishers, Inc., University of Chicago Press, 1999.

"Male-Female Wage Differentials: Has the Government Had Any Effect?"  In *Women in the Labor Market*, edited by Cynthia B. Lloyd, Emily S. Andrews, and Curtis L. Gilroy.  New York: Columbia University Press, 1979.

"The Economics of Compensation of Government Officials," with Sherwin Rosen.  In *The Rewards of Public Service: Compensating Top Federal Officials*, ed. Robert W. Hartman and Arnold R. Weber. Washington, DC: Brookings Institution, c.1980.

"Family Background and Optimal Schooling Decisions," *Review of Economics and Statistics* 62:1 (February 1980): 42-51.

"Family Size and the Distribution of Real Per Capita Income, with Robert Michael, *American Economic Review* 70:1 (March 1980): 91-107.

"Real Income Equivalence Among One-Earner and Two-Earner Families," with Robert Michael, *American Economic Review P&P* 70:2 (May 1980): 203-8.

"Minimum Wages vs. Minimum Compensation," a report to the Minimum Wage Study Commission, with Frederick H. Miller, December 1980.

"Forced Exit," *The Wharton Magazine* 4:2 (Winter 1980): 30-33.

"Agency, Earnings Profiles, Productivity, and Hours Restrictions," *American Economic Review* 71:4

(September 1981): 606-20.   Reprinted in *The Economic Value of Education: Studies in the Economics of Education/The International Library of Critical Writings in Economics* 17, ed. Mark Blaug (Aldershot, England: Edward Elgar Publishing Limited, 1992): 226-240; also reprinted in *Labor Economics/The International Library of Critical Writings in Economics* 47, Vol. II, eds. Orley C. Ashenfelter and Kevin F. Hallock (Aldershot, England: Edward Elgar Publishing Ltd.,1995):  111-125.

"Rank-Order Tournaments as Optimum Labor Contracts," with Sherwin Rosen, *Journal of Political Economy* 89:5 (October 1981): 841-64.   Reprinted in M. Kleiner, ed., *Industrial Relations: Institutions and Organizational Performance,* Dartmouth Publishing, 1994 and in *Labor Economics/The International Library of Critical Writings in Economics* 47, Vol. II, eds. Orley Ashenfelter and Kevin F. Hallock (Aldershot, England: Edward Elgar Publishing Ltd., 1995): 422-45 and in Kevin F. Hallock and Kevin J. Murphy, *The Economics of Executive Compensation,* 1999.

"An Analysis of Federal Worker Compensation," Washington, DC: American Enterprise Institute, 1982.

"Severance Pay, Pensions, and Efficient Mobility," NBER Working Paper No. 854, February 1982.

"Intergenerational Externalities," *Canadian Journal of Economics* 16:2 (May 1983): 212-28.

"A Competitive Theory of Monopoly Unionism," *American Economic Review* 73:4 (September 1983): 631-43.

"A Microeconomic Theory of Labor Unions," *Research in Labor Economics*, Supplement 2: New Approaches to Labor Unions, ed. Joseph Reid  (Greenwich, CT: JAI Press, 1983): 53-97.

"Pensions as Severance Pay." In *Financial Aspects of the United States Pension System*, eds. Zvi Bodie and John B. Shoven. Chicago: University of Chicago Press for the NBER, 1983.

"A Comparison of Federal and Private Pension Plans," with Beth Asch, Washington, DC: American Enterprise Institute, 1984.

"The Excess Sensitivity of Layoffs and Quits to Demand," with Robert Hall, *Journal of Labor Economics* 2:2, Essays in Honor of Melvin W. Reder.  (April 1984): 233-57.  Reprinted in *Labor Economics/The International Library of Critical Writings in Economics* 47, Vol. III, eds. Orley C. Ashenfelter and Kevin F. Hallock (Aldershot, England: Edward Elgar Publishing Ltd., 1995):155-79.

"Incentives, Productivity, and Labor Contracts," with Robert L. Moore, *Quarterly Journal of Economics* 99:2 (May 1984): 275-96; also in *Efficiency Wage Models of the Labor Market*, eds. George Akerlof and Janet Yellen (Cambridge: Cambridge University Press, 1986): 135-56.

"Incentives and Wage Rigidity," *American Economic Review P&P* 74:2 (May 1984): 339-44.

"Incentive Effects of Pensions." In *Pensions, Labor, and Individual Choice*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1985): 253-82.

"Social Security and Pensions." In *Research in Labor Economics*, Vol. 7, ed. Ronald G. Ehrenberg (Greenwich, CT: JAI Press, 1985): 1-30.

"The Role of Wages in the Allocation Process," *Wirtschaftspolitische Blatter* (June 1985): 547-54.

"Retirement from the Labor Force." In *Handbook of Labor Economics*, Vol. 1, eds. Orley Ashenfelter and Richard Layard (London: Elsevier, 1986): 305-55.

"Raids and Offer Matching." In *Research in Labor Economics*, Vol. 8, Part A, ed. Ronald G. Ehrenberg (Greenwich, CT: JAI Press, 1986): 141-65.

"Retail Pricing and Clearance Sales," *American Economic Review* 76:1 (March 1986): 14-32.

"Salaries and Piece Rates," *Journal of Business* 59:3 (July 1986): 405-31.

"Estimating the Personal Distribution of Income with Adjustment for Within-Family Variation," with Robert Michael, *Journal of Labor Economics* 4:3 (July 1986): S216- S239.

"Comparable Worth and Discrimination in the Labor Market," with Daniel Fischel, *Chicago Law Review* 53 (Summer 1986): 891-918.

"Incentive Contracts," *The New Palgrave: A Dictionary of Economics*, Vol. 2 (E-J), eds. John Eatwell, Murray Milgate and Peter Newman (London: The Macmillan Press Limited, 1987): 744-48.

"Pension Inequality," with Sherwin Rosen, *Issues in Pension Economics*, eds. Zvi Bodie, John B. Shoven and David A. Wise (Chicago: University of Chicago Press for the NBER, 1987): 341-359.

"Lump-Sum Payments," *Hoover Institution Working Paper in Economics* No. E-87-8 (February 1987); A Report Prepared for the Bureau of Labor Statistics, United States Department of Labor (March 1987).

"Pensions and Turnover," with Robert Moore, *Pensions in the U.S. Economy*, eds. Zvi Bodie, John Shoven, and David Wise (Chicago:  University of Chicago Press for the NBER, 1988): 163-88.

"The Labor Market and International Competitiveness," *Thinking About America: The United States in the 1990s*, eds. Annelise Anderson and Dennis Bark (Stanford, CA: Hoover Institution Press, 1988): 367-81.

"Employment-at-Will, Job Security, and Work Incentives." In *Employment, Unemployment, and Labor Utilization*, ed. Robert A. Hart (Boston: Unwin Hyman, 1988): 39-61.

"Introduction," with Rita Ricardo-Campbell. In *Issues in Contemporary Retirement,* eds. Rita Ricardo-Campbell and Edward P. Lazear (Stanford, CA: Hoover Institution Press, 1988): xvii-xxiii; also available as separate reprint, "Introduction to *Issues in Contemporary Retirement*," Hoover Institution Press, 1988.

"Enhancing Productivity through Compensation: The 1988 Towers/Cresap Lecture," University of Chicago, Graduate School of Business, Selected Paper No. 68, 1988.

"Pay Equality and Industrial Politics," *Journal of Political Economy* 97:3 (June 1989):  561-80.

"Adjusting to an Aging Labor Force." In *Issues in the Economics of Aging*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1990): 287-312.

"Job Security and Unemployment." In *Advances in the Theory and Measurement of Unemployment*, eds. Yoram Weiss and Gideon Fishelson (London:  Macmillan, 1990): 245-67.

"Male-Female Wage Differentials in Job Ladders," with Sherwin Rosen, *Journal of Labor Economics* 8:1, Part 2: Essays in Honor of Albert Rees. (January 1990): S106-S123.

"The Introduction of New Products," with Debra J. Aron, *American Economic Review P&P* 80:2 (May 1990): 421-6.

"Pensions and Deferred Benefits as Strategic Compensation," *Industrial Relations* 28:2 (Spring 1990): 263-80; also in *The Economics of Human Resource Management*, eds. Daniel J. B. Mitchell and Mahmood A. Zaidi (Oxford, England and Cambridge, MA: Basil Blackwell, 1990): 109-26.

"Job Security Provisions and Employment," *Quarterly Journal of Economics* 105:3 (August 1990): 699-726.

"The Timing of Raises and Other Payments," *Carnegie-Rochester Conference Series on Public Policy,* Vol. 33 [Studies in Labor Economics in Honor of Walter Y. Oi], eds. Allan H. Meltzer and Charles I. Plosser. (Amsterdam: Elsevier Science Publishers, Autumn 1990): 13-48.

"The Resurgence of Regulation," Stanford University draft (November 1990).

"Labor Economics and the Psychology of Organizations," *Journal of Economic Perspectives* 5:2 (Spring 1991): 89-110; also forthcoming in Italian from Bollati Boringhieri Editore, Turin, Italy.

"Introduction," with Melvyn B. Kraus.  In *Searching for Alternatives: Drug-Control Policy in the United States,* eds. Melvyn B. Krauss and Edward P. Lazear (Stanford, CA: Hoover Institution Press, 1991): xxi-xxxvii.

"Stock, Options, and Deferred Compensation," with Matthew O. Jackson, *Research in Labor Economics,* Vol. 12, ed. Ronald G. Ehrenberg (Greenwich, CT: JAI Press, Inc., 1991):41-62.

"Discrimination in Labor Markets," *Essays on the Economics of Discrimination*, ed. Emily P. Hoffman (Kalamazoo: W. E. Upjohn Institute for Employment Research, 1991): 9-24.

"Prices and Wages in Transition Economies." In *Search of a Transition to a Free Society*, (Prague: Mont Pelerin Society Regional Meeting, November 3-6, 1991): 226-262; revision in *Hoover Institution Essays in Public Policy* series, No. 29 (June 1992).

"The Job as a Concept." In *Performance Measurement, Evaluation, and Incentives*, ed. William J. Bruns, Jr. (Boston: Harvard Business School Press, 1992): 183-215.

"Peer Pressure and Partnerships," with Eugene Kandel, *Journal of Political Economy* 100:4 (August 1992): 801-17.

"Incentive Contracts in Labour Markets," *The New Palgrave Dictionary of Money and Finance*, Vol. 2 (F-M), eds. Peter Newman, Murray Milgate and John Eatwell (New York: The Stockton Press; London: The Macmillan Press Ltd., 1992): 335-341.

"Compensation, Productivity and the New Economics of Personnel," *Research Frontiers in Industrial Relations and Human Resources*, eds. David Lewin, Olivia Mitchell and Peter Sherer (Madison: Industrial Relations Research Association, 1992): 341-380.

"The New Economics of Personnel," *LABOUR/Review of Labour Economics and Industrial Relations* 7:1 (Spring 1993): 3-23.

"The Interaction Between Political and Economic Freedom," Chapter Six, *Transition to Democracy in Poland*, ed. Richard F. Staar (New York: St. Martin's Press, 1993): 111-122.

"Some Thoughts on Savings," *Studies in the Economics of Aging*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1994): 143-169.

"Economic Reform:  Appropriate Steps and Actual Policies" [introduction]. In *Economic Transition in Eastern Europe and Russia: Realities of Reform*, ed. Edward P. Lazear (Stanford, CA: Hoover Institution Press, 1995): 3-61.

"Publicly Provided Goods and Services In a Transition Economy," with Sherwin Rosen. In *Economic Transition in Eastern Europe and Russia: Realities of Reform*, ed. Edward P.Lazear (Stanford, CA: Hoover Institution Press, 1995): 322-339.

"A Jobs-Based Analysis of Labor Markets," *American Economic Review P&P* 85:2 (May 1995): 260-265.

"Corporate Culture and the Diffusion of Values." In *Trends in Business Organization: Do Participation and Cooperation Increase Competitiveness?* [International Workshop/The Kiel Institute of World Economics], ed. Horst Siebert (Tubingen: J.C.B. Mohr/Paul Siebeck, 1995): 89-133.

"Bait and Switch," *Journal of Political Economy* 103:4 (August 1995): 813-30.

"An Economic Analysis of Works Councils," with Richard B. Freeman. In *Works Councils: Consultation, Representation, and Cooperation in Industrial Relations* [NBER conference volume], eds. Joel Rogers and Wolfgang Streeck, Chicago: University of Chicago Press for the NBER, November 1995.

"Relational Investing: The Worker's Perspective," with Richard B. Freeman, NBER Working Paper No. 5436 (January 1996); also forthcoming in *Meaningful Relationships: Institutional Investors, Relational Investing and the Future of Corporate Governance*, eds. Ronald Gilson, John C. Coffee and Louis Lowenstein (New York: Oxford University Press), expected 1998.

"Hiring Risky Workers." In *Internal Labour Markets, Incentives, and Employment*, eds. Isao Ohashi and Toshiaki Tachibanaki (New York: St. Martins Press, 1998). Also NBER Working Paper No. 5334 (November 1995).

"Culture Wars in America," *Hoover Institution Essay in Public Policy*, July 1996.

"Incentives in Basic Research," *Journal of Labor Economics* 15:1, Part 2: Essays in Honor of Yoram Ben-Porath (January 1997):S167-S197.

"Labor in a Global Economy," with Sherwin Rosen.  In *Agenda for Economic Reform in Korea: International Perspective*, eds. Kenneth Judd and Young-Ki Lee, Stanford, CA: Hoover Institution Press, 1998.

"Intellectual Property: Issues and Answers." In Hoover Conference Volume, *Capital for Our Time: The Economic, Management and Legal Challenge of Intellectual Property,* ed. N. Imparato, Stanford, CA: Hoover Institution Press, October 1998.

"Globalisation and the Market for Team-mates," Frank Paish Lecture to the Royal Economic Society, April, 1998.  *Economic Journal* 109:454 (1999):15-40.

"Personnel Economics: Past Lessons and Future Directions,"  Presidential Address to the Society of Labor Economists, San Francisco, May 1, 1998. *Journal of Labor Economics* 17:2 (April 1999): 199-236.

"The Economist as an Expert in Discrimination Cases: The Elegance of Microeconomic Theory." In *The Role of the Academic Economist in Litigation Support*, ed. Daniel J. Slottje (Amsterdam: North-Holland - Elsevier, 1999):137-45.

"Culture and Language," *Journal of Political Economy* 107:6 (December 1999):S95-S126.

"Diversity and Immigration." In NBER Conference Volume: *Issues in the Economics of Immigration,* ed. George Borjas. Chicago: University of Chicago Press, 2000.

"Economic Imperialism," Essay for Millennium Issue, *Quarterly Journal of Economics* 115:1 (February 2000): 99-146.

"The Power of Incentives," *American Economic Review P&P* 90:2 (May 2000): 410-414.

"Personnel Economics and Economic Approaches to Incentives," *HKCER Letters* 61 (Sept/ Oct 2000): 1-8.

"The Future of Personnel Economics," *Economic Journal* 110:467 (November 2000): F611-39.

"Performance Pay and Productivity," *American Economic Review* 90:5 (December 2000): 1346-1361.

"Personnel Economics". *The New Palgrave Dictionary of Economics. Second Edition*. Eds. Steven N. Durlauf and Lawrence E. Blume. Palgrave Macmillan, 2008. The New Palgrave Dictionary of Economics Online. Palgrave Macmillan.

"Educational Production," *Quarterly Journal of Economics* 116:3 (August 2001): 777-803.

"Teacher Incentives," *Swedish Economic Policy Review* 10:2 (2003): 179-214.

"The Dominance of Retail Stores," with Alexandre Ziegler, NBER Working Paper No. w9795, June 2003.

"The Peter Principle: A Theory of Decline," *Journal of Political Economy* 112:1, pt. 2 (2004): S141-S163.

"Internal and External Labor Markets," with Paul Oyer, 2003 EALE Adam Smith Lecture, *Labour Economics,* 2004.

"Balanced Skills and Entrepreneurship," *American Economic Review P&P,* May 2004.

"The Structure of Wages and Internal Mobility," with Paul Oyer, *American Economic Review P&P,* May 2004.

"Salaire à la performance: incitation ou sélection?" *Economie et Prévision*, numéro spécial *Journées de l'AFSE* « Economie des ressources humaines » 2004, pp. 17-25.

"Output-Based Pay: Incentives or Sorting?" *Research in Labor Economics*, *Volume 23, Accounting For Worker Well-Being*, (ed. by Solomon W. Polachek), 2005, pp. 1-25.

"Speeding, Terrorism, and Teaching to the Test," *Quarterly Journal of Economics,* August 2006, Vol. 121, No. 3, Pages 1029-1061: 1029-1061.

"Mexican Assimilation in the United States," in *Mexican Immigration to the United States,* edited by George Borjas, pp. 107-22, NBER-University of Chicago Press,  2007.

"Entrepreneurship," *Journal of Labor Economics,* 23:4 (October 2005): 649-80.

"Leaders and Entrepreneurs: Where They Produce the Most Value," draft, October, 2005.

"Personnel Economics: The Economist's View of Human Resources," with Kathryn Shaw.  *Journal of  Economic Perspectives*, 21 (4), (Fall 2007): 91-114.

"Tenure and Output," with Kathryn Shaw *Labour Economics*, 15 (2008): 710-724.

"Personnel Economics". *The New Palgrave Dictionary of Economics. Second Edition*. Eds. Steven N. Durlauf and Lawrence E. Blume. Palgrave Macmillan, 2008. The New Palgrave Dictionary of Economics Online. Palgrave Macmillan.

"Wage Structure, Wages, and Mobility," with Kathryn Shaw in *The Structure of Wages: An International Perspective*, Editor Edward Lazear and Kathryn Shaw, University of Chicago, National Bureau of Economic Research, 2009.

"Firm-Specific Human Capital: A Skill-Weights Approach," *Journal of Political Economy,* 2009, vol. 117, no. 5, October, pp 914-40.

"Policies Affecting Work Patterns and Labor Income for Women," with Ann-Sofie Kolm, in *Reforming the Welfare State,* ed. Richard Freeman, Birgitta Swedenborg, and Robert H. Topel, University of Chicago for NBER, Chicago and London, 2010, pp. 57-81

"Wages, Productivity and Retirement," *International Tax and Public Finance,*  18, 1, (2011), pp. 17-35.

"A Personnel Economics Approach to Productivity Enhancement," with Kathryn L. Shaw. , *Nordic Economic Policy Review,*  2 (2011).

"Sorting, Prices and Social Preferences," with Ulrike Malmendier and Roberto Weber.  *American Economic Journal, Applied Economics,* January, 2012.
"Leadership: A Personnel Economics Approach," *Labour Economics.* Volume 19, Issue 1, January 2012, Pages 92-101

"The US Fiscal Situation: Causes and Remedies," *The Economists' Voice*, March, 2012.

15

"Why Do Inventories Rise When Demand Falls in Housing and Other Markets?," *The Singapore Economic Review*, Vol. 57, No. 2 (2012) 1250007 (32 pages), DOI: 10.1142/S0217590812500075

"Hiring, Churn and the Business Cycle," with James Spletzer. *American Economic Review P&P*, May, 2012.

"Personnel Economics" with Paul Oyer, in *Handbook of Organizational Economics*, Robert Gibbons and John Roberts, ed., forthcoming, Princeton University Press.

"The US Labor Market: Status Quo or a New Normal?" with James Spletzer. Forthcoming, *Annual Proceedings of the Jackson Hole Federal Reserve Conference, August, 2012.*

"Firing and Hiring," with James Spletzer.  Draft, July, 2011.

"The Value of Bosses," with Kathryn L. Shaw and Christopher Stanton, NBER Working Paper, August, 2012.

"Making Due with Less," with Kathryn L. Shaw and Christopher Stanton, draft, July, 2012.

"Are High Unemployment Rates Here to Stay?" forthcoming, *IZA World of Labor.*

COMMENTS AND OTHER PAPERS:

"On the Shadow Price of Children," with Robert Michael, presented at the December 1971 Meeting of the Econometric Society.

"The Timing of Technical Change: An Analysis of Cyclical Variations in Technology Production," Edward P. Lazear, Ph.D. Dissertation, Harvard University, 1974.

"Human Wealth and Human Capital," NBER Working Paper No. 97, July 1975.  Stanford, CA: Center for Economic Analysis of Human Behavior and Social Institutions.

"An Economic Theory of Learning," by McKenzie and Staff, Review, *Journal of Political Economy* 84:1 (February 1976): 192-4.

"Academic Achievement and Job Performance: Note," *American Economic Review* 67:2 (March 1977): 252-254; reprinted in *The Economic Value of Education: Studies in the Economics of Education* [The International Library of Critical Writings in Economics #17], ed. Mark Blaug (Aldershot, England: Edward Elgar Publishing Limited, 1992) 223-225.

"Reply to Killingsworth" [comment on Lazear's "Male-Female Wage Differentials: Has the Government Had Any Effect?"].  In *Women in the Labor Market*, eds. Cynthia B. Lloyd, Emily S. Andrews, and Curtis L. Gilroy (New York: Columbia University Press, 1979): 376-377.

"Comment on 'New Measures of the Cost of a Worker: Implications for Demand Elasticities and Nominal Wage Growth,' by Daniel S. Hamermesh," *Studies in Income and Wealth*, Vol. 48, *The Measurement of Labor Cost* (Chicago: University of Chicago Press, 1983): 306-8.

"Some Reflections on Melvin W. Reder," *Journal of Labor Economics* 2:2, Essays in Honor of Melvin W. Reder (April 1984): 145-50.

"Illusory Wage Differentials: Reply," *American Economic Review* 74:5 (December 1984): 1128.

"An Analysis of the Marketability of a CPI Future," with Debra J. Aron, Chicago Mercantile Exchange, February 1985.

"Comment on Bernanke and Powell, 'The Cyclical Behavior of Industrial Labor Markets: A Comparison of the Pre-War and Post-War Eras,'" *The American Business Cycle: Continuity and Change,* ed. Robert J. Gordon (Chicago: University of Chicago Press for the NBER, 1986): 626-32.

"Comment on Frant and Leonard, 'Promise Them Anything: The Incentive Structures of Local Public Pension Plans,'" *Public Sector Payrolls*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1986): 237-42.

17

"Comparable Worth: A Rejoinder," with Daniel Fischel, *Chicago Law Review* 53 (Summer 1986): 950-52.

"Comment on Hausman and Paquette, 'Involuntary Early Retirement and Consumption,'"*Work, Health, and Income among the Elderly*, ed. Gary Burtless (Washington, DC: The Brookings Institution, 1987): 175-81.

"Comment on Katz, Kochan, and Keefe, 'Industrial Relations and Productivity in the U.S. Automobile Industry,'" *Brookings Papers on Economic Activity* 3 (1987): Special Issue on Microeconomics, eds. Martin Neil Baily and Clifford Winston (Washington, DC: The Brookings Institution, 1988): 716-20.

"Discussion of Laurence J. Kotlikoff's 'The Relationship of Productivity to Age,'" *Issues in Contemporary Retirement*, eds. Rita Ricardo-Campbell and Edward P. Lazear (Stanford, CA: Hoover Press, 1988):  126-9.

"Symposium on Public and Private Unionization," *Journal of Economic Perspectives* 2:2 (Spring 1988): 59-62.

"Comment on Bernheim's 'The Timing of Retirement: A Comparison of Expectations and Realizations,'" *The Economics of Aging*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1989): 356-8.

"Symposium on Women in the Labor Market," *Journal of Economic Perspectives* 3:1 (Winter 1989): 3-7.

"Comment on James H. Stock and David A. Wise, 'The Pension Inducement to Retire: An Option Value Analysis,'" *Issues in the Economics of Aging*, ed. David Wise (Chicago: University of Chicago Press for the NBER, 1990): 224-9.

"Comment on Hatta and Oguchi, 'Changing the Japanese Social Security System from Pay as You Go to Actuarially Fair,'" *Topics in the Economics of Aging*, ed. David A. Wise (Chicago: University of Chicago Press for the NBER, 1992): 245-8.

"Discussion: The Economics of Professional Etiquette," *American Economic Review* 83:2 (May 1993): 44.

"Discussion of Heckman, James J. and Peter Klenow, 'Is There Underinvestment in Human Capital?'" Hoover Conference on Capital Formation and Economic Growth, October 1997.

"Discussion of Olivier Blanchard, 'The Perverse Effects of Partial Labor Market Reform: Fixed Duration Contracts in France," Banco de Portugal Conference on Labor Market Institutions and Economic Outcomes, June 3, 2001.

"Sherwin Rosen, 1938–2001," *Annals of the National Academy of Sciences, Biographical Memoir*, Vol. 83, 2003.

"Lazear Responds to "Why the Annuity of Social Security is Valuable and Why Despite the Annuity Feature African-Americans Do Not Fare Badly," by Jack Needleman" in *The Economists' Voice*, January, 2005.

"Spence, A. Michael (born 1943)." *The New Palgrave Dictionary of Economics. Second Edition*. Eds. Steven N. Durlauf and Lawrence E. Blume. Palgrave Macmillan, 2008. The New Palgrave Dictionary of Economics Online. Palgrave Macmillan.

"Preface to 'Raids and Offer Matching', " forthcoming, *Research in Labor Economics.*

POSITION PAPERS:

"Privatization of Large Scale Enterprises in Romania" (February 1991) "Economic Reform in Eastern Europe, with Application to Czechoslovakia and Romania" (March 1991).

"Russian Economic Transition:  Privatization, Labor Issues, & Pricing Policies" (March 1991).

"Rapid Sequential Reform:  A Proposal for the Economic Transition in the Russian Republic," with Annelise Anderson, Mikhail Bernstam & Charles McLure (May 1991).

"The Renaissance:  A Set of Specific Economic Reforms for Russia" [prepared for the Supreme Economic Council of the Russian Republic] (September 1991).

"Restructuring the Coal Industry in the Kuznetzk Basin" (August 1991; revised September 1992).

"Economic Reform in Ukraine," with Michael Bernstam, John Cochrane, Charles McLure  and Sherwin Rosen (April 1993).

"Reflections on the October 1994 Trip to Tbilisi, Georgia" (October 1994).

Jonathan Marshall, "Minimum Wage Increase Finds More Support," *San Francisco Chronicle* (1/25/95).

"Cover Charge," *Hoover Digest* 2:2 (1996).

"Whose Boom Is It, Anyway?" *Hoover Digest* 2:2 (1999)

"The Plight of Mexicans in the United States" *Hoover Essays* (2004)


**WORK IN PROGRESS:**

*A Mountain Biker's Guide to Economic Policy*

"The Impatient Salesperson"

## COLUMNS, OP-EDS AND POPULAR PRESS:

"Job Security Rules Cut Employment in Much of Europe," *Wall Street Journal* (10/14/87).

"Plant Closure Notice Means Lost Jobs," *Christian Science Monitor* (10/14/87).

"U.S. Will Cripple Business If It Repeats Europe's Follies," *The American* (9/21/88).

"Which Minimum Wage Bill," *The Washington Times* (4/10/89).

"Some Thoughts on Economies in Transition, with Special Application to the Soviet Union," *Pravda* (Moscow), 1990.

"Water for the People." (Perspective on the Drought/Agriculture accounts for 85% of the usage, so inefficient farming, not householders, should bear the brunt of cuts.) *Los Angeles Times* (2/5/91).

"Politics Thwarts Reform/Central European planners trying to introduce market practices contend with leaders eager to hold power and masses eager to hold down prices," *Christian Science Monitor* (4/16/91).

"Moving to a Free Market in Eastern Europe and the Lessons for Japan and the United States," *Japan Research Review* 1:10 (October 1991): 48-53.

"Russia's Economic Reform As Seen From the Inside," *San Francisco Chronicle* (2/3/92); reprinted as "Russia:  Misunderstanding Market Economics," *Newport Daily Independent* (Arkansas) (8/7/92).

"The Shifting World of Work," *Los Angeles Times* (2/7/94).

"Fixing the Immigration Problem," *San Francisco Chronicle* (8/2/95).

"Clinton rides the prosperity wave," *Washington Times* (1/20/99).

"Smaller Class Size Isn't a Magic Bullet," *Los Angeles Times* (9/2/99).

"Education in California: Teachers for the New Century," *San Francisco Chronicle* (12/23/02).

"How are managers to be compensated? Amazing insights from the field of Personnel Economics," *Neue Zürcher Zeitung* (6/10/03).

"The Double Benefit of Tax Cuts," with Gary S. Becker and Kevin M. Murphy, *Wall Street Journal* (10/7/03).

**"**Private Accounts for Social Security," *Economist's Voice,* (2005).

"A Golden Opportunity," with James M. Poterba, *Wall Street Journal,* (11/1/05)

""Reforming Taxes to Promote Economic Growth" *Economist's Voice* (2005), reprinted in Hoover Digest, 2005.

"American at Work," with Katherine Baicker *Wall Street Journal* (May 2, 2006), p. A-18

"Coming of Wage," with Allan B. Hubbard *Wall Street Journal* (Oct 2, 2006), p. A-10.

"Lead Weight or Gold Mine: What Are the True Costs of Immigration?" with Karl Zinsmeister. *Realclearpolitics.com*, June 25, 2007.

"Let the Market Set Gas Prices," *Politico,* June 21, 2007.

"The Republicans' no-bang mortgage plan," with Gary S. Becker.  *Financial Times*, February 10, 2009.

"High Five with Edward P. Lazear," *Forbes.com*, April 15, 2009.

"Do We Need a Second Stimulus?" *Wall Street Journal,* July 9, 2009.

"Stimulus and the Jobless Recovery" *Wall Street Journal,* November 2, 2009.

"The Spending "Freeze" that Isn't" *Wall Street Journal,* January 28, 2010.

"How to Grow Out of the Deficit" *Wall Street Journal,* September 27, 2010.

"Unsustainable Budget Threatens the Nation" (with nine other CEA chairs),  *Politico,* March 24, 2011

"Why the Job Market Feels So Dismal," *Wall Street Journal,* May 16, 2010.

"How Big Government Hurts the Average Joe ", *Wall Street Journal,* August 5, 2011.

"The Euro Crisis: Doubting the 'Domino' Effect," *Wall Street Journal,* October 31, 2011.

"The Jobs Picture Is Still Far From Rosy,"  *Wall Street Journal,* January 20, 2012.

"The Worst Economic Recovery in History," *Wall Street Journal,* April 3, 2012.

"Three Views of the 'Fiscal Cliff'" *Wall Street Journal,* May 18, 2012.

"Whose Fault is Today's Bad Economy?" *Wall Street Journal,* June 13, 2012.

"Slow Recovery or Failed Agenda?" *Wall Street Journal,* July 30, 2012.

"There is No 'Structural' Unemployment Problem" *Wall Street Journal*, September 4, 2012.

"Middle class will share with the rich the burden of spending" *Orlando Sentinel*, October 23, 2012.

"Election could determine future course of the economy," *The Daily Caller,* November 5, 2012.

"Chinese 'Currency Manipulation' Is Not the Problem," *Wall Street Journal,* January 8, 2013

"A Market Solution to Immigration Reform," with Gary S. Becker.  *Wall Street Journal,* March 2, 2013

"Beware the Monthly Jobs-Report Chatter," *Wall Street Journal,* April 5, 2013.

Exhibit B





# Admissions Performance Plan

## Information for Assistant and Associate Directors of Admissions
(Effective January 2, 2008)

*CONFIDENTIAL*

DO NOT DUPLICATE. FOR ADDITIONAL COPIES, PLEASE CONTACT YOUR LOCAL HUMAN RESOURCES DIRECTOR.

*This guide is intended to assist with the administration of EDMC's Admissions Performance Plan. The Company reserves the right to change, modify or alter any of the plans outlined in this guide at any time without prior notice. Receipt of this guide does not guarantee future employment with the Company.*

## Introduction

All of us at Education Management Corporation (EDMC) take pride in doing our jobs well.  Our goal is to deliver superior education for our students, and to help us meet this goal and our business objectives, we must continue to recruit and retain qualified students.  Our success in doing so begins with our Admissions staff.

The Admissions Performance Plan is designed to reward performance that helps the Company achieve business results.  The Plan is for Associate and Assistant Directors of Admissions at The Art Institutes On Ground locations.  Through the Plan, Associates and ADAs are evaluated twice per year based on qualitative and quantitative factors, and their salary will be modified based on this evaluation.

This guide provides an overview of:

- EDMC's compensation philosophy

- The Admissions Office structure and career paths

- Roles, responsibilities, and timeframes for administering the Plan

- How the Plan works

- The performance evaluation process

# Our Compensation Philosophy

Compensation is an important element of the overall rewards available to EDMC employees.  These rewards also include a competitive employee benefits program, and career development and advancement opportunities.

EDMC's compensation philosophy is to reward individuals for their contributions to the Company's success.  Specifically, the compensation program is designed to:
- Support our overall business strategy for growth
- Align our salary ranges with market trends
- Reflect labor market differences
- Create a compensation program that is easy to understand and administer
- Support our recruiting and retention efforts, consistent with the highest ethical and applicable regulatory standards
- Attract, retain and develop a high caliber of ethical and professional Associates and ADAs

The Admissions Performance Plan is the means by which Associates and ADAs are evaluated on their performance in support of the Company's goals.  In addition, the Plan provides participants with career enrichment and long-term development opportunities with EDMC.

## *EDMC's Expectations*

The Company expects Associates and ADAs to continually recruit and retain qualified students while adhering to business and ethical standards.  Associates, ADAs, and those who manage them also must comply with Company policies and applicable standards of our schools' regulatory bodies at all times.  Associate and ADA performance will be rated with respect to both qualitative and quantitative factors, and salaries will be adjusted to reflect the overall performance evaluation.  This comprehensive performance focus will be a critical factor in EDMC continuing to be successful in the future.

# Admissions Office Structure

Because of the critical role each Admissions Office plays in EDMC's overall success, the Company has developed a structure for how these offices are to be organized. Here is an overview of this structure.

The **Senior Director of Admissions (SDOA)** serves as the primary recruiting manager for all local recruitment efforts and Admissions administrative operations.  In addition, the SDOA serves as a member of the school's Executive Committee (EC), and therefore, has input and involvement in most matters affecting the school beyond the Admissions Department's functions.  The SDOA oversees all recruiting functions and manages Directors of Admissions (DOAs), Associate and Assistant Directors of Admissions, as well as the Admissions Support Staff.   (Note that within this document the employee with the title Vice President, Senior Director of Admissions is referred to as Senior Director of Admissions).

The **Director of Admissions (DOA)** is responsible for the development and management of a team of 8 to 12 ADAs.

The **Associate Director of Admissions (Associate)** reports to the DOA or SDOA.  An Associate carries a personal production plan and is responsible for additional management responsibilities as assigned by the DOA and/or SDOA.  (See the Associate position description for further details).

The **Assistant Directors of Admissions (ADAs)** are the in-school recruiters who may fall into several categories.  Several categorizes are:
- Generic (non-dedicated) – work predominantly with all types of inquiries;
- High School – work predominantly with working with high school senior inquiries;
- General – work predominantly with inquiries who have graduated from high school;
- International – work predominantly with inquiries who need a student visa;
- Program-Specific – work predominantly with inquiries for a specific area of study, such as Culinary Arts, regardless of year of high school graduation; and
- Long Distance or Zone B – work predominantly with prospects who live more than 100 miles from the school at the point of inquiry.

## *ADA Career Path*

EDMC is committed to rewarding, retaining, and extending further opportunities to ADAs who meet or exceed the Company's expectations with regard to qualitative performance and their recruitment plans.  There are many career avenues for successful ADAs to pursue, within and outside the Admissions area.  Growth – personal, professional, and financial – is important for candidates who are attracted to the ADA position as a long-term career, due to the nature of the position.  Other employees may wish to apply their talents in other avenues and, through their accomplishments as an ADA, position themselves to branch out into other areas.  Many current EDMC managers began their careers in the ADA role, and have moved on to become Department Heads, School Executive Committee Members, and Regional and/or CS employees.

# Performance Evaluation

Performance evaluations – face-to-face discussions with employees regarding their qualitative and quantitative results – are a critically important part of the Admissions Performance Plan.  Such discussions ensure employees focus on the critical factors that contribute to their personal success, which results in EDMC's success.  Performance evaluations establish clear expectations and a connection between EDMC, its managers and its employees.

## The Review Process

Under the Plan, managers conduct formal performance evaluations twice a year, at the end of each evaluation period.  These evaluations typically will consist of at least two meetings with each individual employee:

- The first meeting is to review quality factors, career development (including career options both inside and outside Admissions, and EDMC, depending on skills, performance and interest), new student results, and performance improvement plans as warranted.  The Performance Evaluation and Planning Form must be completed in preparation for and during this meeting.

- The second meeting is the manager's opportunity to review with each employee his/her Plan Worksheet, which shows the salary calculation, based on a number of qualitative and quantitative factors, for the salary that will go into effect shortly thereafter.

In addition, managers will meet with employees on an on-going basis to review progress and discuss individual development plans.

# How the Plan Works

The fundamentals of the Admissions Performance Plan work the same way for all participants, to ensure that Associate and ADA compensation is standardized and rewards performance against specific qualitative and quantitative objectives.

In summary, salaries under the Plan are calculated based on a number of quantitative and qualitative parameters:

- the employee's qualitative performance, as expressed in the manager's evaluation of defined quality factors,
- the types and quantity of new students recruited over the previous 12 months,
- the employee's years of service with EDMC,
- as applicable, a labor market adjustment, to accommodate for variances in the cost of labor across North America, and
- incremental salary paid to Associates who for additional responsibilities.

The new students recruited over the previous 12 months are converted into points (based on the characteristics of each new student), and the point total determines a salary range for a participant.  The salary within the range is determined by the manager's evaluation of the employee's performance against quality factors. Increments for years of service and labor market differences are applied independently, as described later in this document.

Standard performance evaluations are conducted based on 12 months of new student results as of April 25 or October 25, and quality factor evaluations over the previous six months.  Salary changes are effective July 1 and January 1.  Qualitative performance evaluations must be approved by two other individuals: the School President (or Human Resources Director, at the President's discretion), and the appropriate Admissions Specialist.

After each performance evaluation, salaries may increase, stay the same, or decrease, based on the results of the evaluation, as described in detail later in this document.

More details on how the Plan works can be found on the following pages.

**Under no circumstances is any employee covered by this Plan permitted to receive more than two salary changes in any 12-month period of time.  This restriction is an absolute requirement, based on Federal regulations.**

## Calendar of Events

The following calendar of events provides a general sense of timing for performance evaluations and salary changes under the Plan.  These evaluations are in addition to the regular quarterly reviews to evaluate performance goals and development plans.

| | |
|---|---|
| **May/June** | ▪ Performance evaluation meetings with employees to review:<br> • New students for the previous 12 months<br> • Performance on quality factors for the previous six months<br> ▪ Meeting with employees to discuss salary change |
| **July 1** | ▪ Salary changes go into effect |
| **November/December** | ▪ Performance evaluation meeting with employees to review:<br> • New students for the previous 12 months<br> • Performance on quality factors for the previous six months<br> ▪ Meeting with employees to discuss salary change |
| **January 1** | ▪ Salary changes go into effect |

## New Student Points

A new student is an individual whose intention is to complete a program of study (i.e., not taking a single course or workshop), and who is considered to have started school by the Registrar's Office as of the end of the add/drop period for the start date. Quarterly data collections of new student results are not considered final, since a new student admitted on a conditional class start agreement who subsequently is rejected for lack of proof of educational credentials will be deducted at a later date.

For the purposes of the semi-annual evaluation, new students over the preceding 12-month period will be considered.  For the May/June evaluation, new students from the most recent April, back through the previous May will be considered.  For the November/December evaluation, new students from the most recent October, back through the previous November will be considered.

New students for each evaluation period are compiled and converted into points, based on five key pieces of data for each new student, as recorded in the student information system.  The data elements are:
- Program (Undergraduate/Graduate or CPD)
- Visa/Citizenship
- Year of high school graduation
- Zone at time of original inquiry
- Start date

CPD students count as one point regardless of all other criteria.  The visa/citizenship data defines whether a non-CPD new student is international, and supersedes the year of high school graduation.  Non-CPD new students who do not qualify as international are categorized as senior, if they start school no later than the month of May following their graduation from high school.  All remaining non-CPD new students who do not qualify as international or senior are categorized as general.

***All employees are required to enter and maintain accurate data in the student information system.  Employees who attempt to inflate new student point values through inaccurate data entry or updates will be subject to disciplinary action that may range from disqualifying themselves for a salary increase, up to and including termination.***

New student points will be awarded in accordance with the new student point values in the chart below.

| | Points | |
|---|---|---|
| **Type of New Student** | *Zone A* | *Zone B or C* |
| General | 2 | 3 |
| Senior | 4 | 5 |
| International | 3 | 4 |
| CPD | 1 | 1 |
| Inter-School Referrals*<br>• General<br>• Senior or International | <br>2<br>3 | <br>2<br>3 |

*Note: Inquiries referred by an Associate or ADA to another EDMC location will count for new student points for the sending Associate or ADA, provided the formal ISR process is followed, and the referred inquiry becomes a new student at the receiving school.

***All requests for new student lists for salary calculation verification purposes must be sent to CS by July 15, for the July 1 salary change date, and January 15, for the January 1 salary change date.***

## New Student Points from Inherited Applicants

Applicants who were enrolled by Associates or ADAs who subsequently leave EDMC before the applicant starts school are considered "inherited applicants."  To ensure the best level of service to these applicants, and the best possible outcome for the school, the SDOA or DOA also will re-assign the active applicants of Associates or ADAs who take a temporary leave for medical reasons or military service, or who leave the Company.  If these inherited applicants matriculate, the receiving Associate or ADA earns full new student point values, according to the chart above.

Inherited applicants must be re-assigned evenly among the remaining Associates and ADAs who have at least six months of service with EDMC, and who are not on corrective action.  In cases where DOA teams exist, inherited applications are to be re-assigned among the Associates and ADA on the same team, following the criteria above.

## Quality Factors

In addition to new student points, each Associate or ADA is evaluated based on the extent to which he or she demonstrates certain quality factors.  These factors are a critical part of EDMC's continued success.  For the Admissions Performance Plan, the five quality factors are as follows:

| Overview of Quality Factors | |
| --- | --- |
| **Job Knowledge** | Adheres to approved recruitment methods and practices.  Knows the products.  Understands fellow enrollment and education department functions and objectives.  Uses the enrollment systems and technology correctly. |
| **Business Practices and Ethics** | Demonstrates sound business ethics and business principles in serving prospective students and applicants, including achievement on the Compliance/FAQ test. |
| **Professionalism** | Assists prospective students and applicants in a cooperative manner.  Willing to assist students assigned to others.  Displays a positive attitude in the work environment. |
| **Customer Service** | Serves prospective students, applicants and fellow employees in a timely and accurate manner.  Works to resolve issues and acts in a consultative sales role in achieving positive customer satisfaction. |
| **Initiative** | Evaluates, selects and appropriately acts on various methods and strategies for effectively and appropriately solving problems and meeting objectives before being asked or required to do so. Self-starting rather than passively complying with instructions or assignments. |

Managers will rate each employee's performance during the previous six months (November through April for the May/June evaluation, or May through October for the November/December evaluation), on each of the above factors, from Outstanding to Unsatisfactory performance.  Each rating corresponds to a whole-point scale, from 5 to 1 for each factor, and the total of the five individual scores will determine the employee's total quality points, from a high of 25, to a low of 5.

DOAs will conduct quality point evaluations for the Associates and ADAS on their teams, but all quality point ratings must be reviewed and approved by the SDOA.  In cases where DOAs are not part of the Admissions Office structure, the SDOA conducts quality point evaluations.  Each participant's quality factor ratings must be approved by the President (or Human Resources Director, at the President's discretion) and the appropriate Admissions Specialist.

## ADA/Associate Annualized Salary Chart

The combination of the total number of new student points and quality factor points determines the participant's annualized baseline salary.  (Adjustments may apply to this annualized salary—as applicable—for labor market, years of service and Associate management responsibilities.)

The following chart provides annualized baseline salaries based on new student points and quality factor points:

| Level | New Student Point Range | Annualized Salary, Based on Quality Points | | | | |
|---|---|---|---|---|---|---|
| | | Unsatisfactory | Needs Improvement | Meets Expectations | Highly Effective | Outstanding |
| | | 5-8 points | 9-12 points | 13-17 points | 18-22 points | 23-25 points |
| 1 | 0 – 99 | $26,000 | $27,000 | $29,000 | $31,000 | $33,000 |
| 2 | 100 – 125 | $28,500 | $29,500 | $32,000 | $34,000 | $36,000 |
| 3 | 126 – 150 | $31,250 | $32,500 | $35,000 | $37,000 | $39,000 |
| 4 | 151- 175 | $34,750 | $36,000 | $39,000 | $41,000 | $43,500 |
| 5 | 176 - 200 | $38,500 | $40,000 | $43,000 | $45,500 | $48,000 |
| 6 | 201 - 225 | $42,500 | $44,000 | $47,000 | $49,750 | $52,000 |
| 7 | 226 - 250 | $47,000 | $49,000 | $52,000 | $55,000 | $57,500 |
| 8 | 251 - 275 | $51,500 | $53,500 | $57,000 | $60,000 | $63,000 |
| 9 | 276 - 300 | $56,000 | $58,000 | $62,000 | $65,000 | $68,000 |
| 10 | 301 - 325 | $61,000 | $63,500 | $68,000 | $71,000 | $74,000 |
| 11 | 326 - 350 | $67,000 | $70,000 | $74,000 | $77,000 | $80,500 |
| 12 | 351 - 375 | $73,000 | $76,000 | $80,000 | $84,000 | $87,500 |
| 13 | 376 - 400 | $79,000 | $82,000 | $87,000 | $91,000 | $95,000 |
| 14 | 401 - 425 | $86,000 | $89,000 | $94,000 | $99,000 | $103,000 |
| 15 | 426-450 | $93,000 | $96,000 | $101,000 | $107,000 | $111,000 |
| 16 | 451-475 | $100,000 | $103,000 | $108,000 | $115,000 | $119,000 |
| 17 | 476-500 | $107,000 | $110,000 | $115,000 | $123,000 | $127,000 |
| 18 | 501-525 | $114,000 | $117,000 | $122,000 | $131,000 | $135,000 |
| 19 | 526-550 | $121,000 | $124,000 | $129,000 | $139,000 | $143,000 |
| 20 | 551-575 | $128,000 | $131,000 | $136,000 | $147,000 | $151,000 |
| Add'l levels | 25-point increments | Add $7,000 | Add $7,000 | Add $7,000 | Add $8,000 | Add $8,000 |

This chart will be reviewed and updated as necessary to ensure it continues to support EDMC's goals, and that salaries are competitive within the marketplace.

Examples of various new student and quality point totals are located in the Appendix, but note that all of them conclude with an annualized baseline salary—the compensation level attained _before_ adjustments are made for length of service, the labor market, and duties carried out by Associate Directors of Admissions.

# *Labor Market Adjustment*

Not all labor markets are the same.  While the intent of the Admissions Performance Plan is to standardize the compensation Plan across EDMC and link pay to performance, labor market adjustments will be made as appropriate for employees who live in the same market where their school is located.  These labor market adjustments are based on the cost of labor in a geographical area, as determined by The Economic Research Institute data on wage and salary differentials.

| Labor Market Adjustments | |
|---|---|
| *Adjustment* | *Locations* |
| 0% | AiA, AiAD, AiAU, AiCH, AiCSC, AiD, AiFL, AiH, AiIND, AiJX, AiKC, AiMIU, AiOHC, AiP, AiPX, AiRD, AiSLC, AiTA, AiTN, AiTU, AiVAN, AiY |
| 5% | AiC, AiM |
| 10% | AiLV, AiPD, AiPH, ILiC, ILiS |
| 15% | AiMD, AiS, AiW, NEiA |
| 20% | AiCAIE, AiCALA, AiCAOC, AiCASAC, AiCASUN, AiCASD, AiCASF, AiCDC, AiNYC |

These adjustments will be reviewed periodically and updated as necessary.

The labor market adjustment to salary is an incremental amount calculated using the appropriate percentage above, and the participant's annualized baseline salary, determined by new student points and quality factor points.  The product of these two figures is added to the annualized baseline salary.

Note that employees who do not live in the same market where their school is located do not receive any labor market adjustment.

### *Example of Labor Market Adjustment:* (NO Years of Service Adjustment)

| | |
|---|---|
| *Total new student points* | *210* |
| *Quality points (Meets Expectations)* | *13* |
| *Annualized baseline salary* | *$47,000* |
| *Labor Market Adjustment (example: 10% market)* | *$4,700* |
| *Total Annualized Salary* | *$51,700* |

## Years of Service

Because continuity, knowledge of the school, and knowledge of the marketplace all are valued by the Company, additional salary is awarded based on years of service. These years of service do not have to be with the same school, or in the Admissions function, but are with EDMC overall. Service with companies EDMC has acquired also count for this adjustment.

Employees must have at least two years of continuous service with EDMC to be eligible for this adjustment. Years of service are calculated using complete years, *based on the last day of each quality point evaluation period, namely October 31 (toward the January 1 salary change date) or April 30 (for the July 1 salary change date).*

For employees of record as of July 1, 2003, who subsequently do not separate from the Company, the years of service calculation is based on total cumulative years from the original hire date, less any time away from the Company due to an official separation.

Following July 1, 2003, the years of service calculation will be based on the employee's adjusted hire date. This means that if an employee leaves EDMC after July 1, 2003, and comes back to the Company, his or her service for this adjustment will be counted from the date he or she rejoined the Company, and not the original date of hire.

The years of service adjustment to the salary is an incremental amount calculated using the appropriate percentage below, and the participant's annualized baseline salary, as determined by new student points and quality factor points.

| Completed Years of Service | Adjustment |
|---|---|
| Less than 2 years | 0% |
| At least 2, but less than 5 years | 3% |
| At least 5, but less than 10 years | 5% |
| At least 10, but less than 15 years | 7% |
| At least 15, but less than 20 years | 10% |
| 20 or more years | 15% |

### *Examples of Years of Service Adjustment:*

### *July 1, 2008 Salary Change*

| | |
|---|---|
| *Annualized baseline salary (from points chart)* | *$52,000* |
| *Labor market adjustment (for a 10% market)* | *$5,200* |
| *Years of service adjustment (5%)* | *$2,600* |
| *Original Hire Date=March 4, 2003* | |
| *(5 years of service as of the end of the evaluation period, April 30, 2008 = 5%)* | |
| *Total annualized salary* | |
| *($52,000 + $5,200 + $2,600)* | *$59,800* |

### *January 1, 2009 Salary Change*

| | |
|---|---|
| *Annualized baseline salary (from points chart)* | *$52,000* |
| *Labor market adjustment (for a 10% market)* | *$5,200* |
| *Years of service adjustment (5%)* | *$2,600* |
| *Original Hire Date=November 4, 2002* | |
| *(5 years of service as of the end of the evaluation period, October 31, 2008 = 5%)* | |
| *Total annualized salary* | |
| *($52,000 + $5,200 + $2,600)* | *$59,800* |

# Salary Calculations

Salaries are re-calculated every six months, and take effect based on the employee's specific situation within the Plan.

- The salary changes of new hire ADAs take effect on the six- and twelve-month anniversaries of the date they became an ADA, as a result of their first two performance evaluations.
- Otherwise, salary changes take effect each January 1 and July 1, following the standard bi-annual performance evaluations.

An employee's re-calculated salary may be higher than, the same as, or lower than the current salary, based on the employee's performance evaluation and the terms of the Plan. The Plan does not apply any limits to the degree to which a salary can increase, but to protect employees from dramatic downward changes in compensation, the Plan does include limits to the degree to which a salary can decrease.

**Under no circumstances is any employee covered by this Plan permitted to receive more than two salary changes in any 12-month period of time. This restriction is an absolute requirement, based on Federal regulations.**

<u>For the July 1, 2008, salary calculation</u>, all Ai On Ground ADAs and Associates will be ranked from highest to lowest, according to their ranking index. The ranking index is the number determined by multiplying ADAs' and Associates' current new student points by their current quality points. Based on the total Ai On Ground ADA staffing level at the end April, employees will be subject to a maximum salary decrease, if applicable, as follows:

- The top 10% of Ai On Ground ADAs and Associates will be protected against a salary decrease of no more than five percent.
- All other ADAs and Associates will be protected against a salary decrease of no more than ten percent.

However, there are two qualifying notes to the salary protection rules.

- Employees must have earned a minimum quality point rating of 13 – the lowest "Meets Expectations" value – to qualify for a maximum five percent salary decrease. Those who earn a quality point rating of 12 or lower will be subject to salary decreases up to the maximum of ten percent.
- The Associate segments of the salaries of Associate Directors of Admissions are not protected in cases where those employees are demoted.

**IMPORANT NOTE: Beginning with the January 1, 2009, salary calculation, and for all future salary calculations, the first level of salary protection described above will expire. From that point forward the maximum salary decrease under the Plan will be 10% for all Associates and ADAs.**

## Changes in Status During the Year

While changes in status (promotions and demotions) can occur at any time during the year, salaries for employees covered by this Plan can change only on specific dates. For most employees those dates are July 1 and January 1, as a result of bi-annual performance evaluations.  For new hires those dates are the employee's six-month and twelve-month anniversaries.

**Under no circumstances is any employee covered by this Plan permitted to receive more than two salary changes in any 12-month period of time.  This restriction is an absolute requirement, based on Federal regulations.**

## Overtime

Under the Fair Labor Standards Act (FLSA), Associate and Assistant Directors of Admissions are considered non-exempt positions.  This means they are eligible for overtime for all hours worked in excess of 40 hours in a work week.  Associates and ADAs will receive 1.5 times their hourly rate of pay for all hours worked in excess of 40 hours in a work week.

Special overtime rules apply for employees in California, in accordance with state laws. Contact the local Human Resources Director for more information.

All overtime worked by non-exempt employees must be approved in advance and authorized by the manager.  Scheduled overtime is deemed pre-approved overtime. Unauthorized overtime is against Company policy and employees who violate this policy are subject to discipline.

## Standards of Conduct

This Plan provides for additional rules and regulations regarding performance and compensation.  It is intended to augment—not to replace—existing workplace policies. While reductions in salary are one possible outcome of poor performance, the Company retains the right to take other disciplinary actions as appropriate and, as described in part below, in the general Standards of Conduct.

Since the proper working relationship of all employees depends upon each of us, the Company has established certain minimum standards of personal conduct.  These "common sense" guidelines are included here for those who, through lack of understanding or experience, could experience difficulties.

Examples of impermissible conduct that may lead to disciplinary action (up to and including termination) are identified below, to promote an understanding of what is considered unacceptable conduct, and to encourage consistent action.

- excessive or unexcused absenteeism and tardiness
- theft
- use or possession of illegal drugs or alcohol or other violations of our drug prevention policy
- unsafe acts
- carelessness or negligence
- harassment, including sexual harassment
- failure to comply with a lawful management directive, and
- unsatisfactory performance.

Admissions employees are subject to additional standards of conduct that are specific to their type of work, and any of the following actions may lead to the imposition of discipline, up to and including termination.

- written or spoken misrepresentation of the school, its facilities, its programs, and/or career outcomes
- non-compliance with state or federal rules, and
- non-compliance with regional or national accreditation standards.

The preceding lists are not meant to be exhaustive, but are only a representative sample of prohibited behavior.  As noted previously, all employees are employed at-will. Just as the Company can terminate any employee at any time with or without cause or notice, any employee can resign with or without cause or notice.

# The First Three Evaluations Under the Plan

The following descriptions outline the process steps for the first three evaluations under the Performance Plan for a newly-hired employee.

### First Evaluation:

Six months after hire, the Admissions Manager will evaluate the employee's performance using the quality factors included in this Plan.  The employee's salary may change based on this review, as follows:

- Up to 12 quality points – no salary increase
- 13 to 17 quality points – 3% salary increase
- 18 to 22 quality points – 4.5% salary increase
- 23 or more quality points – 6% salary increase

No other salary increment is permitted prior to the employee's six-month evaluation, and only the percent increases above are permitted.

The six-month evaluation is based on the date the employee assumed the position of ADA, which usually is the employee's hire date.  It is <u>not</u> the date the ADA "went on production."  In cases where an existing employee moved from a previous job into the ADA role, the date they became an ADA will be different from their hire date within the Company.

Note that the Labor Market and Years of Service Adjustments do <u>*not*</u> apply at the six-month evaluation, but are factored in only when the employee's salary is calculated based on the combination of new student points and quality points.

### Second Evaluation:

Twelve months after hire, the Admissions Manager will again evaluate the employee's performance using the quality factors included in this Plan.  The Admissions Manager also will request that CS collect a new student point tally for the employee, based on new students over the twelve months since the employee's start date as an ADA.  At this evaluation the employee will receive the <u>greater</u> salary of the following two calculations:

The 12-month evaluation process follows the same steps outlined above for the six-month evaluation.

- The salary determined by quality points alone, based on the following percentages:
  - Up to 12 quality points – no salary increase
  - 13 to 17 quality points – 3% salary increase
  - 18 to 22 quality points – 4.5% salary increase
  - 23 or more quality points – 6% salary increase, or

- The salary determined by the standard Plan calculation, using new student points and quality points, and any applicable labor market adjustment.

**Special Note:**  Depending upon the ADA's hire date and level of success, it may be beneficial for the ADA to forego the salary increase from the typical 12-month evaluation, and instead opt for a standard Plan salary calculation toward the next January 1 or July 1 salary change date.  This decision is entirely up to the ADA.  The decision to waive the 12-month salary increase must be finalized no later than one month following the ADA's 12-month anniversary date via the Waiver Form (see Appendix), and that decision is irrevocable.  Special Circumstances Requests cannot be submitted to reverse these waiver decisions.

### *Third Evaluation:*

The employee's third performance evaluation is based on both qualitative and quantitative performance, as explained earlier in this document.  The timing of the third evaluation is determined by the ADA's hire date, as illustrated on the chart below:

| Evaluation  Schedule | | | | | |
|---|---|---|---|---|---|
| **Hire Date** | *First Eval* | *Second Eval* | *Third Eval* | *Fourth Eval* | *Fifth Eval* |
| **New Hire** | **6 months after hire:**<br>• A percentage increase based on quality points (according to guidelines above) | **12 months after hire:**<br>The higher of:<br>• A percentage increase based on quality points (according to the guidelines above), or<br>• Based on Plan | **Next July 1 or January 1 that is at least 18 months after hire date:**<br>• Based on Plan | Based on Plan | Based on Plan |

Note that certain exceptions apply to this evaluation schedule:
(1.) ADAs and Associates employed by start-up locations will be protected from salary reductions for a period of two years from the date the Admissions Office opens.  New employees hired after the Admissions Office opens are protected until the two-year anniversary date of the office opening, not for two years from their hire date.
(2.) ADAs hired during the months of July through December will be eligible for their third evaluation toward the July 1 salary change that is at least 18 months after their hire date.  In cases where an ADA's inquiry flow, from the date of hire through the third evaluation, is made up if at least 65% seniors, the ADA's salary as of July 1 will be protected against any decrease.
(3.) ADAs and Associates who transfer to a new location are evaluated on the terms of their transfer agreement letter.  Refer to the section on Employees Who Transfer to a New Location.
(4.) If an ADA takes a leave of absence at any time during the first 18 months of employment, the ADA's 6-, 12- and third evaluations under the Plan can be delayed the length of time of the ADA's leave of absence.

# Associate Director of Admissions Responsibilities

Associate DOAs are eligible for additional compensation based on their management responsibilities within the Admissions Office.  Associates receive an increment to their annualized salary for the responsibilities they are assigned as of the beginning of the evaluation period.

ADA status changes to Associate must be made by December 1, toward the January 1 salary change, or June 1, toward the July 1 salary change.  Changes after these dates must be done via a Special Circumstances Request.

In addition, while changes in status (promotions and demotions) for Associates can occur at any time during the year, their salaries can change only on specific dates, as a result of bi-annual performance evaluations.

## Examples of Determining Associate Salary

Salary is calculated under the Plan as follows:
1.  New student points and quality factor points determine the annualized baseline salary according to the chart.
2.  A Labor Market Adjustment is calculated, if applicable.
3.  A Years of Service Adjustment is calculated, if applicable.
4.  The Labor Market and Years of Service Adjustments, and the Associate salary increment of $5,000, are added to the annualized baseline salary, to determine the ADA's total annualized salary.

The following example illustrates how an employee's annualized salary is calculated under the Plan.

### Example:

Associate with 255 new student points, 15 quality factor points (Meets Expectations) and 6 years of service…

| | |
|---|---|
| *New student/quality points annualized salary* | *$57,000* |
| *Years of service adjustment* | *$2,850* |
| *(5% x $57,000)* | |
| *Labor market adjustment (10% labor market)* | *$5,700* |
| *(10% x $57,000)* | |
| *Associate adjustment* | *$5,000* |
| **Annualized salary** | **$70,550** |

## Part-Time ADAs

Part-time ADAs are subject to the same quantitative and qualitative evaluations as full-time employees under the Plan.  New student points will be pro-rated to the full-time equivalent, based on the number of hours worked over the past 12 months.  The pro-rated new student points and quality factors are then used to determine the annualized salary.  From the annualized salary, an hourly pay rate is calculated, as shown in the example below.  This hourly pay rate will be applied to the hours worked by the part-time ADA.

Part-time ADAs are also eligible for Labor Market and Years of Service Adjustments, which are applied to the prorated salary calculation.

*Example:*

- *A part-time ADA who worked 1,560 hours during the previous 52 weeks, earned 150 new student points and was awarded 14 quality factor points.*

- *The pro-rated full-time equivalent performance is 200 points (150 new student points divided by 1,560/2,080, or 75%).*

- *200 new student points and 14 quality factor points = $43,000 full-time annualized salary.  (Appropriate Labor Market and/or Years of Service Adjustments would be applied at this point.)*

- *The ADA's new hourly rate = $20.67 ($43,000/[40 hours X 52 weeks])*

Due to the nature of the work involved with the Associate position, the Plan does not support part-time Associate Directors of Admissions.

## Compensation in Special Circumstances

No compensation Plan can anticipate and accommodate every possible set of circumstances that an employee might encounter.  While the Company expects all employees to do their best to work through typical day-to-day challenges, we also acknowledge that some circumstances may create a situation that is beyond the employee's control, and may negatively impact the employee's ability to fully carry out his/her responsibilities.

This Plan accommodates such special circumstances through an expanded evaluation process.  The objective of this process is to estimate what the new student results of an ADA or Associate would have been, had they not been in the situation caused by the special circumstances.  The evaluation is carried out through a series of steps to estimate the impact of the situation, based on results of the ADA/Associate, as compared to the trends of the Admissions Office over the same time period.  (For some metrics, it also may be appropriate to consider past results to estimate lost production, such as with application distribution among start dates, and start rate history.)  The objective is to estimate lost new students, and – based on average points per new student – lost new student points, and then estimated impact on salary.

## Glossary of Terms

**Fair Labor Standards Act (FLSA)** – This federal labor law established minimum wage and overtime compensation (1.5 times an employee's regular hourly rate of pay for hours worked over 40 in one week). Special rules apply to employees in California, in accordance with state laws.

**Labor market adjustment** – This is an adjustment made to salary for participants in some locations. It recognizes that the cost of labor in these locations may be higher than in other areas of the country.

**New student points** – The number of new students recruited over the past 12 months will be converted into points, based on the type of student. The total points—along with quality factor points—will determine a participant's salary within a range.

**Non-exempt** – A term defined by the FLSA. Associates and ADAs are classified as non-exempt positions, which means they are subject to the overtime provisions of the FLSA.

**Overtime** – The practice of paying non-exempt or hourly employees 1.5 times their regular hourly rate of pay for hours worked over 40 in one week.

**Quality factors** – Managers evaluate employees twice per year on their performance against five quality factors: job knowledge, business practices and ethics, professionalism, customer service and initiative.

**Years of service adjustment** – Under the Plan, participants receive an adjustment to their salary based on total completed years of service with EDMC (including service with eligible acquired companies).

***Examples of New Student/Quality Factor Annualized Salary:***

Example #1: Generic (non-dedicated) ADA

| | |
|---|---|
| *42 general new students in Zone A (2 points each)* | *84* |
| *16 general new students in Zone B (3 points each)* | *48* |
| *18 senior new students in Zone A (4 points each)* | *72* |
| *8 senior new students in Zone B (5 points each)* | *40* |
| *84 total students* | |
| *Total new student points* | *244* |
| *Quality points (Needs Improvement)* | *12* |
| *Annualized baseline salary* | *$49,000* |

Example #2: General ADA

| | |
|---|---|
| *90 general new students in Zone A (2 points each)* | *180* |
| *13 senior new students in Zone A (4 points each)* | *52* |
| *5 CPD new students (1 point each)* | *5* |
| *1 General Zone A Inter-School Referral* | *2* |
| *109 total students* | |
| *Total new student points* | *239* |
| *Quality points (Meets Expectations)* | *17* |
| *Annualized baseline salary* | *$52,000* |

Example #3: High School ADA

| | |
|---|---|
| *4 general new students in Zone A (2 points each)* | *8* |
| *45 senior new students in Zone A (4 points each)* | *180* |
| *12 senior new students in Zone B (5 points each)* | *60* |
| *61 total students* | |
| *Total new student points* | *248* |
| *Quality points (Highly Effective)* | *21* |
| *Annualized baseline salary* | *$55,000* |



# Quality Factors



| Job Knowledge | ❶ Unsatisfactory | ❷ Needs Improvement | ❸ Meets Expectations | ❹ Highly Effective | ❺ Outstanding Performance |
|---|---|---|---|---|---|
| **Job Knowledge** | Does not understand the job | Is learning the job and needs to improve adherence to policies and procedures | Understands the job and effectively works within policies and procedures | Uses a range of knowledge to achieve positive results | Is considered an expert within the job and actively seeks to improve the job within guidelines |
| Adheres to approved recruitment methods and practices. Knows the products. Understands fellow enrollment and education department functions and objectives. Uses the enrollment systems and technology correctly. | ▪ Does not forecast projected new students | ▪ Consistently overstates projected new students | ▪ Usually accurately forecasts projected new students | ▪ Almost always accurately forecasts projected new students | ▪ Always accurately forecasts projected new students |
| | ▪ Does not understand the technical/procedural aspects of the job | ▪ Requires help in understanding the technical/procedural aspects of the job | ▪ Understands technical/procedural aspects of the job | ▪ Makes self available to others to help solve professional/technical or procedural problems or issues | ▪ Continuously builds knowledge, keeping up-to-date on the professional/technical or procedural aspects of the job |
| | ▪ Does not use technology effectively | ▪ Needs assistance on using the technology and/or does not input and/or update data accurately and/or on a timely basis | ▪ Effectively uses technology and inputs and updates data accurately and/or on a timely basis | ▪ Virtually always uses technology appropriately and inputs and updates data accurately and/or on a timely basis | ▪ Consistently uses technology to analyze and predict performance ▪ Always inputs and updates data accurately, on a timely basis |
| | ▪ Does not understand organizational policies and procedures | ▪ Needs to be reminded of organizational policies and procedures or may not apply them in a timely manner | ▪ Applies organizational policy and procedure correctly and in a timely manner | ▪ Uses a wide range and depth of professional/technical or specialized knowledge and skills ▪ Applies professional/technical/ procedural knowledge to correctly address a situation, taking into consideration the full range of available facts | ▪ Recognizes trends in theory and practice of one's own professional/technical area and effectively prepares for anticipated changes |


**EDMC**
Education Management Corporation

*Education that Builds Careers*

# Quality Factors


**Ai The Art Institutes™**
*America's Leader in Creative Education*

| | ❶ Unsatisfactory | ❷ Needs Improvement | ❸ Meets Expectations | ❹ Highly Effective | ❺ Outstanding Performance |
|---|---|---|---|---|---|
| **Business Practices and Ethics**<br><br><br>Demonstrates sound business ethics and business principles in serving prospective students and applicants, achievement on the Compliance/FAQ test. | **Does not act in an ethical manner – IMMEDIATE CORRECTIVE ACTION REQUIRED** | **Behaves ethically most of the time** | **Behaves ethically** | **Recognizes situations that may be in conflict with professional ethics** | **Consistently emphasizes integrity** |
| | ■ Does not conduct activities in accordance with the highest ethical standards | ■ Conducts most activities in accordance with the highest ethical standards | ■ Conducts all activities in accordance with the highest ethical standards | ■ Conducts all activities in accordance with the highest ethical standards | ■ Conducts all activities in accordance with the highest ethical standards |
| | ■ Has or has been alleged to not accurately and/or not completely portray the school's educational programs, expected outcomes, student services, and/or financial considerations to students, parents and/or educators | ■ Does their best to accurately and completely portray the school's educational programs, expected outcomes, student services and financial considerations to students, parents and educators, but does not always succeed | ■ Does their best to accurately and completely portray the school's educational programs, expected outcomes, student services and financial considerations to students, parents and educators | ■ Almost always accurately and completely portrays the school's educational programs, expected outcomes, student services and financial considera ions to students, parents and educators<br><br>■ Encourages others to comply | ■ Always accurately and completely portrays the school's educational programs, expected outcomes, student services and financial considerations to students, parents and educators<br><br>■ Reports to management others who do not comply |
| | ■ While meeting minimum legal requirements for entry, rarely determines the appropriateness of candidates for admission | ■ Needs assistance in determining the appropriateness of candidates for admission | ■ Usually determines  he appropriateness of candidates for admission | ■ Almost always determines the appropriates of candidates for admission | ■ Always determines the appropriateness of candidates for admission |
| | ■ Does not always adhere to all state, federal, accreditation and institute rules and regulations regarding student recruitment in significant ways | ■ Strives to adheres to all state, federal, accreditation and institute rules and regulations regarding student recruitment, but does not always succeed | ■ Adheres to all state, federal accreditation and institute rules and regulations regarding student recruitment | ■ Always adheres to all state, federal, accreditation and institute rules and regulations regarding student recruitment<br><br>■ Encourages others to comply | ■ Always adheres to all state, federal, accreditation and institute rules and regulations regarding student recruitment.<br><br>■ Reports to management others who do not comply |
| | ■ Does not treat people wi h respect | ■ Needs to be reminded to treat people with respect | ■ Usually treats people equitably and with respect | ■ Almost always treats people equitably and with respect | ■ Always treats people equitably and with respect |
| | ■ Does not follow through on commitments | ■ Occasionally does not follow through on commitments | ■ Builds trust through fulfilling commitments made to students, prospective students, co-workers and supervisors | ■ Almost always builds trust through fulfilling commitments made to students, prospective students, co-workers and supervisors | ■ Always builds trust through fulfilling commitments made to students, prospective students, co-workers and supervisors |
| | ■ Does not maintain confidentiality of information | ■ Occasionally does not maintain confidentiality of informa ion | ■ Maintains confidentiality of sensitive information | ■ Always maintains confidentiality of sensitive information | ■ Always maintains confiden iality of sensitive information |
| | ■ Does not recognize when situations or directives are directly or indirectly in conflict wi h professional ethics or with the organization's stated values | ■ Recognizes when situations or directives are directly or indirectly in conflict with professional ethics or with the organization's stated values, but does not always take the appropriate action | ■ Recognizes when situations or directives are directly or indirectly in conflict with professional ethics or with the organization's stated values, and takes the appropriate action | ■ Recognizes when situa ions or directives are directly or indirectly in conflict with professional ethics or with the organization's stated values, and takes the appropriate action; encourages discussion of ethical considerations before decisions are made<br><br>■ Seeks to understand individuals, avoids stereotyping | ■ Always emphasizes integrity, concern for people, and orientation to the organization's values and policies<br><br>■ Avoids conflicts of interest which can occur when one's own goals and biases exist or might exert inappropriate influence on a judgment or decision; avoids the appearance of conflict of interest |



**EDMC**
Education Management Corporation
*Education that Builds Careers*

# Quality Factors



| | ❶ Unsatisfactory | ❷ Needs Improvement | ❸ Meets Expectations | ❹ Highly Effective | ❺ Outstanding Performance |
|---|---|---|---|---|---|
| **Professionalism**<br><br>Assists prospective students and applicants in a cooperative manner. Willing to assist students assigned to others. Displays a positive attitude in the work environment. | **Does not display professionalism**<br><br>■ Frequently does not maintain composure under stress and pressure of the job<br><br>■ Does not accept responsbility for actions; blames others<br><br>■ Does not respond constructively or tactfully to feedback; speaks negatively of customers or co-workers<br><br>■ Rebels against new procedures or methods and incites co-workers to do the same | **Needs to accept responsibility and maintain a positive attitude**<br><br>■ Occasionally exhibits stress from the pressures of the job<br><br>■ Occasionally blames others and does not take responsibility for own actions<br><br>■ Occasionally speaks negatively about customers or co-workers<br><br>■ Ignores new procedures or methods that change | **Accepts responsibility for one's own actions**<br><br>■ Usually maintains composure under stress and pressure of the job<br><br>■ Usually accepts responsibility and deals constructively with own mistakes, feedback and failure<br><br>■ Usually responds tactfully to criticism and opposing ideas, remaining objective and receptive to the views of others<br><br>■ Accepts new procedures or methods that change | **Acts with a positive attitude toward work and change**<br><br>■ Almost always maintains composure under stress and pressure of the job<br><br>■ Almost always accepts responsibility and deals constructively with own mistakes, feedback and failure<br><br>■ Almost always responds tactfully to criticism and opposing ideas, remaining objective and receptive to the views of others<br><br>■ Seeks full understanding of new procedures or methods resulting from a change<br><br>■ Adapts to change quickly<br><br>■ Talks positively about changes with co-workers | **Shows willingness to learn new procedures and suggests changes to enhance results**<br><br>■ Always maintains composure under stress and pressure of the job<br><br>■ Always accepts responsbility and deals constructively with own mistakes, feedback and failure<br><br>■ Always responds tactfully to criticism and opposing ideas, remaining objective and receptive to the views of others<br><br>■ Looks for ways to make changes work rather than only identifying why change won't work<br><br>■ Makes suggestions for increasing the effectiveness of changes<br><br>■ Shows willingness to learn new methods, procedures, techniques, or systems resulting from departmental or organization-wide change |



EDMC
Education Management Corporation
*Education that Builds Careers*

# Quality Factors



The Art Institutes™
*America's Leader in Creative Education*

| | ❶ Unsatisfactory | ❷ Needs Improvement | ❸ Meets Expectations | ❹ Highly Effective | ❺ Outstanding Performance |
|---|---|---|---|---|---|
| **Customer Service**<br><br>Serves prospective students, applicants and fellow employees in a timely and accurate manner. Works to resolve issues and acts in a consultative sales role in achieving positive customer satisfaction. | **Responds inappropriately**<br><br>▪ No sense of urgency on contacting inquiries | **Occasionally responds inappropriately**<br><br>▪ Occasionally does not contact customers on a timely basis | **Responds appropriately**<br><br>▪ Manages customers on a timely basis | **Anticipates and follows-up on needs**<br><br>▪ Usually exceeds expectations in contacting customers on a timely basis | **Anticipates future needs**<br><br>▪ Shows an outstanding sense of urgency in managing customers<br><br>▪ Actively works to resolve potential issues in bringing customers to their proper conclusion |
| | ▪ Does not respond to customers in a timely or accurate manner | ▪ Occasionally does not respond to customers in a timely or accurate manner | ▪ Asks clarifying questions to identify customer's needs or expectations<br><br>▪ Talks easily with customers about their needs | ▪ Clearly states what one can and can't do to meet the customer's desires, with the emphasis strongly on creatively applying what one can do to meet the customer's needs<br><br>▪ Checks for understanding to ensure accurate interpretation of customer's needs and expectations | ▪ Looks for creative approaches to providing or improving service<br><br>▪ Works to remove barriers that get in the way of giving customers top-notch service |
| | ▪ Does not follow-up with enrollments | ▪ Occasionally follows-up with enrollments to assure successful matriculation | ▪ Usually follows-up with enrollments to assure successful matriculation | ▪ Almost always follows-up with enrollments to assure successful matriculation<br><br>▪ Actively prepares prospective students for success after matriculation | ▪ Consistently follows-up with enrollments to assure successful matriculation<br><br>▪ Actively prepares prospective students for success after matriculation |
| | ▪ Always requires assistance in referring the customer to the appropriate department or employee to solve specific problems<br><br>▪ Always passes issues on to others | ▪ Requires assistance in referring the customer to the appropriate department or employee to solve specific problems<br><br>▪ Usually passes issues on to others | ▪ Refers customer to appropriate department or employee to solve specific problems<br><br>▪ Responds to customer with an appropriate level of urgency | ▪ Discusses options with customer for alternative ways to meet customer's expectations cost-effectively and efficiently | ▪ Continually updates own knowledge about customers<br><br>▪ Seeks ways to continuously improve external and internal customer satisfaction with product or service quality and on-time delivery |



**EDMC**
Education Management Corporation

*Education that Builds Careers*

# Quality Factors



The Art Institutes™
*America's Leader in Creative Education*

| | ❶ Unsatisfactory | ❷ Needs Improvement | ❸ Meets Expectations | ❹ Highly Effective | ❺ Outstanding Performance |
|---|---|---|---|---|---|
| **Initiative**<br><br>Evaluates, selects and appropriately acts on various methods and strategies for effectively and appropriately solving problems and meeting objectives before being asked or required to do so. Self-starting rather than passively complying with instructions or assignments. | **Does not demonstrate initiative**<br><br>▪ Does not participate in recruitment and enrollment training<br><br>▪ Needs to be monitored and frequently reminded of the job's responsibilities | **Occasionally demonstrates signs of initiative**<br><br>▪ Occasionally participates in recruitment and enrollment training<br><br>▪ Requires significant support from a supervisor or co-workers | **Requires minimum supervision and actively participates in programs**<br><br>▪ Participates in appropriate recruitment and enrollment training.<br><br>▪ Requires minimum supervision and is self-directed<br><br>▪ Responds with an appropriate level of urgency | **Anticipates needs related to regular assignments**<br><br>▪ Participates in the development of recruitment and enrollment training<br><br>▪ Acts on own to improve and increase professional/technical or procedural knowledge<br><br>▪ Anticipates situational needs and takes appropriate action<br><br>▪ Willing and eager to seek out and/or accept increased responsibilities<br><br>▪ Eager to learn and assume responsibility | **Recognizes and seizes opportunities; self-starter**<br><br>▪ Develops appropriate recruitment and enrollment training for others<br><br>▪ Thinks of ways to apply new developments to improve organizational performance or customer service<br><br>▪ Digs beneath the obvious to get at the facts, even when not asked to do so |