# EXHIBIT O



**U.S. Department of Justice**

*United States Attorney*
*Western District of Pennsylvania*

*U.S. Post Office & Courthouse*
*700 Grant Street*
*Suite 4000*
*Pittsburgh, Pennsylvania 15219*                    *412/644-3500*

March 10, 2014

<u>VIA E-MAIL & HAND DELIVERY</u>
The Hon. Richard A. Levie (Ret.)
Special Master                                    **Contains Material**
JAMS, Inc.                                        **Designated Confidential**
555 13th Street NW, Suite 400 West
Washington, D.C. 20004

      RE:   *United States of America, et al. v. Education Management Corporation, et al.*,
<u>Civil Action No. 07-461</u>
<u>Plaintiffs' Reply in Support of their Motion to Enforce Report & Recommendation No. 4, Which Was Adopted in Full by the Court.</u>

Dear Special Master Levie:

      Defendants' Opposition to Plaintiffs' Motion to Enforce establishes that the parties are in agreement regarding the nature and implications of Defendants' production to date—that Defendants have not produced the materials Your Honor and the Court held are "central" to the allegations and should have been produced by December 31, 2013 in order to ensure efficient discovery; Defendants contend that the discovery obligations in R&R No. 4 only applied to Plaintiffs and thus Defendants need only produce certain of the materials they were ordered to prioritize in R&R No. 4 at the end of the document production period, upending the orderly progression of discovery; and Defendants will only ever produce the full extent of these priority documents if they are yet again ordered to do so by the Court, as Defendants have *ipse dixit* asserted that much of this central material is inaccessible. Three of Defendants' concessions should speed resolution of both this motion and Plaintiffs' Motion to Compel the Production of

Documents from Defendants' Backup Tapes ("Plaintiffs' MTC Backup Tapes"), which was filed concurrently with this motion on February 24, 2014, and thus are worth underscoring.

**First**, Defendants concede that—although R&R No. 4, as adopted by the Court, ordered Defendants to produce by December 31, 2013 all materials "currently available" from four discrete categories—Plaintiffs accurately portrayed the true extent of Defendants' production from these categories to date, namely:

- It is now mid-March 2014, and Defendants have only produced email from *eighteen* ADAs, and documents from *thirty-two* Admissions Employees. Defs.' Feb. 27, 2014 Opp. MTE R&R No. 4, at 4-5. This is the case even though Defendants represented that if they were ordered to produce all Admissions Employees' emails, as they were, this would include "'untold millions of documents'" from more than "11,000 recruiters." R&R No. 2, at 40-43. Moreover, according to their own statistics, Defendants have likely employed at least 5,300 different recruiters since Defendants first learned of the prospect of this litigation in 2007.

- Defendants have only produced documents from *five* PPA signatories, or *eight percent* of all of the PPA signatories for PPAs Defendants entered into with the United States. This is the case even though Defendants admit that even under their narrow and improper definition of what is "available," they likely have materials from more than thirty of the PPA signatories. Defs.' Feb. 27, 2014 Opp. MTE R&R No. 4, at 6 (stating that a "majority" of the sixty signatories are no longer employed by Defendants and "ESI was not maintained for many of those individuals").[1]

- Defendants have only produced documents from "*five* of the [Compensation Review] Task Force's 13 members." *Id.* at 7 (emphasis added). This is the case even though Defendants admit that even they consider the materials of four other members "available." *Id*.

- By December 31, Defendants had only produced documents related to their communications with investors concerning the ICB from a *single* custodian. This is the case even though Defendants now acknowledge that "numerous" other custodians possess responsive material. *Id.* at 6.

---

[1] As explained in Plaintiffs' MTC Backup Tapes, while Defendants state that certain ESI does not "exist" or was not "maintained"—and some may truly have been destroyed—Defendants elsewhere have explained that by this they mean much of the material exists on backup tapes, which Defendants created throughout the relevant period for this case, and which remain in Defendants' custody and control. *See also* Dec. 19, 2014 Miko Depo. Transcript Excerpts (Ex. F) 94:23-95:2; 120:17-23; 125:1-17

As expected, Defendants attempt to whitewash the reality of their production by pointing to the number of pages they produced, regardless of those pages' content. *See, e.g.*, *id.* at 1, 4. Yet, a cursory analysis of Defendants' documents demonstrates the true paucity of their production. Of Defendants' records with sufficient metadata, 423,548, or 33%, are duplicates. Moreover, nearly half, 565,205, or 44% of *all* documents come from only **five** custodians. Over 74% of *all* of Defendants' pages come from only **ten** custodians. Defendants have merely attempted to paper over the fact that they have withheld the very discovery that Your Honor and the Court recognized is central to Plaintiffs' allegations and thus the early production of which was necessary to "enhance[] the direction and efficiency of discovery." R&R No. 4, at 9.

**Second**, Defendants concede that the only justification for their insufficient existing production is their inequitable and illogical interpretation of R&R No. 4: that it purportedly permitted Defendants to wait until the close of document discovery to produce the central discovery that Plaintiffs asked Defendants to prioritize, while it required Plaintiffs to expedite the production of the materials Defendants claimed were necessary for their alleged defenses. Although Defendants acknowledge that the forensic collection of the documents they requested, including the investigatory and regulatory materials that R&R No. 4 recommended Plaintiffs prioritize, is a "laborious and time intensive process," they nonetheless insist that R&R No. 4 only imposed such a burden on Plaintiffs. Defs.' Feb. 27, 2014 Opp. MTE R&R No. 4, at 2, 4. Defendants claim R&R No. 4 only required them to take materials they had *already* collected and move "to the front of the [production] queue" documents that happened to fall within Plaintiffs' priority requests. *Id.* at 1. Defendants' reading of R&R No. 4 is improper and wholly inequitable.

Of course, it was not until well after R&R No. 4's December 31, 2013 production

deadline that Defendants belatedly articulated this alternative understanding of their obligations, despite the scope of the prioritized productions being the subject of discussion at the November 18, 2013 conference with Your Honor, and Plaintiffs explaining in their pre-conference submission that it was essential Defendants "reciprocate" any efforts Plaintiffs undertook to prioritize discovery, so that Defendants do not wait until the close of discovery to complete their production of Plaintiffs' priority items.  Pls.' Nov. 15 Submission to Special Master 15.  Now Defendants explain that in light of their reading of R&R No. 4 such delay is precisely what they intend.  Defendants state that they will not produce *any* more Admission Employee emails until March 31, 2014.  Defs.' Feb. 27, 2014 Opp. MTE R&R No. 4, at 5.  Defendants will not even say when they will produce the documents of the PPA signatories and Compensation Review Force Task members that they agree are available.  *Id.* at 6-7.  Put simply, Defendants are asking Your Honor to ratify their post-hoc rationalization for a discovery process that is inconsistent with R&R No. 4 and the parties' understandings at the November 18 conference and has threatened the orderly and equitable progression of the case.

**Third**, Defendants concede much of the central material for this case exists only on backup tapes.  In R&R No. 2, at 40-41, Your Honor explained that Defendants' communications with and among their recruiters "is central to [Plaintiffs'] argument that the quality factors were little more than 'window dressing.'"  Likewise, in its opinion denying Defendants' motion to dismiss [Dkt. No. 183] ("MTD Order"), 30-31, the Court explained that the "inference[s]" that could be drawn from the daily correspondence and experience of Defendants' recruiters could, in and of itself, establish falsity and scienter.  Now—despite Defendants' prior representation that "EDMC ha[d] preserved email," Defs.' Sep. 14, 2012 Letter (Ex. L) 1—Defendants claim that "much of this ESI no longer exists" because it is on backup tapes.  Defs.' Feb. 27, 2014 Opp.

4

MTE R&R No. 4, at 5.  Similarly, Defendants explain that "ESI was not maintained" in an active state for "many" of the PPA signatories whose documents R&R No. 2, at 18, stated are "directly relevant to [a] theory of scienter." Defs.' Feb. 27, 2014 Opp. MTE R&R No. 4, at 6.  Likewise "the ESI for four of the members [of the Compensation Task Force] is unavailable" even though, according to the Court, the conduct of this committee, on its own, could establish "the involvement and knowledge of senior EDMC executives" in the fraud.  MTD Order 30.

Defendants continue to offer no explanation for why the fact that these materials exist on backup tapes affects whether they should be produced.  As explained in Plaintiffs' MTC Backup Tapes, 7-12, the burden rests on Defendants to establish that a source is inaccessible.  Even if Defendants had come forward with such evidence, and they have not, there would be good cause to compel Defendants' production from backup tapes because, among other reasons, the Court has already recognized the centrality of the information contained on those tapes.  Pls.' MTC Backup Tapes 13-18.  Requiring Defendants to produce from their backup tapes would also be warranted because, if the information on the backup tapes is deemed inaccessible, it is only inaccessible because Defendants have spoliated the documents.  *Id.* at 18-22.  Indeed, in their Opposition Defendants acknowledge for the first time that they are *not* truly claiming they were unaware of the prospect of this litigation during its investigation, merely that after receiving earlier notices regarding the prospect of the litigation, in 2010 they became aware of "the *specific* nature and scope of the lawsuit." Defs.' Feb. 27, 2014 Opp. MTE R&R No. 4, at 5 (emphasis added).

The briefing on Plaintiffs' Motion to Enforce presents two starkly different paths for discovery.  Plaintiffs seek enforcement of the plain language and intent of R&R No. 4 and request that Your Honor recommend Defendants immediately produce all of the priority

materials, which Plaintiffs, Your Honor, and the Court identified as central to Plaintiffs' allegations, so that Plaintiffs can analyze that evidence and determine how to efficiently proceed. Defendants claim, having already been provided the materials that they alleged were essential to their purported defenses, they may wait until just days before the close of document discovery to produce the material they have unilaterally declared is accessible.  For those central documents that Defendants possess on backup tapes, Defendants make clear that absent some further intervention by the Court, they have no intention of ever producing those materials.  Defendants' request is not only inequitable, but will undermine the fact-finding that is at the core of this case. Accordingly, Plaintiffs request that Your Honor recommend R&R No. 4 be enforced and Defendants be ordered to immediately produce all of their: (1) Admissions Employees' emails; (2) investor communications related to the ICB; (3) materials relied upon to ensure Defendants' compliance with their PPAs; and (4) materials related to Defendants' Compensation Review Task Force.

    Very truly yours,

    DAVID J. HICKTON
    United States Attorney

    /s/ Christy C. Wiegand
    CHRISTY CRISWELL WIEGAND
    Assistant U.S. Attorney
    (412) 894-7452