# EXHIBIT P



**U.S. Department of Justice**
*United States Attorney*
*Western District of Pennsylvania*

---

U.S. Post Office & Courthouse
700 Grant Street
Suite 4000
Pittsburgh, Pennsylvania  15219                                    412/644-3500

February 24, 2014

<u>**VIA E-MAIL & HAND DELIVERY**</u>
The Hon. Richard A. Levie (Ret.)
Special Master                                                     **Contains Material**
JAMS, Inc.                                                         **Designated Confidential**
555 13th Street NW, Suite 400 West
Washington, D.C. 20004

      RE:    *United States of America, et al. v. Education Management Corporation, et al.*,
                  Civil Action No. 07-461
                  <u>Plaintiffs' Motion to Enforce Report & Recommendation No. 4, Which Was Adopted in Full by the Court.</u>

Dear Special Master Levie:

      Defendants stand in violation of Report and Recommendation No. 4 [Dkt. No. 314] ("R&R No. 4"), which was adopted in full by the Court [Dkt. No. 319] ("R&R No. 4 Order"). That decision required Defendants to produce by December 31, 2013 all documents "currently available to them" that are responsive to four discrete categories of Plaintiffs' requests; those seeking: "(1) admissions employee emails; (2) investor communications related to the ICB; (3) materials relied upon with regard to the Program Participation Agreements and Defendants' compliance therewith; and (4) materials related to Defendants' Compensation Review Task Force[.]" R&R No. 4 at 21. To date, Defendants have produced a minuscule fraction of each set of documents.

      When notified of these deficiencies, Pls.' Jan. 22, 2014 Letter (<u>Ex. A</u>), Defendants fell back onto their tired tropes of reciting the number of pages they have produced—regardless of

the content of those pages—and rewriting Plaintiffs' requests and the Court's orders. Defs.' Jan. 28, 2014 Letter (Ex. B) (referencing Defendants' production to date, but written in response to concerns raised by the testimony of Defendants' Rule 30(b)(6) designee); Defs.' Jan. 31, 2014 Letter (Ex. C) (written in response to Plaintiffs' January 22, 2014 letter). In fact, Defendants' letters made clear that they had not produced the documents the Court ordered them to produce and that they believe Plaintiffs must wait for these documents until Defendants choose to make them available. Indeed, Defendants' most recent production, made on February 20, 2014, underscores their recalcitrance, as it contained documents from only *four* new custodians. *See* Defs.' Feb. 20, 2014 Letter (Ex. D) 2 (listing the custodians contained in Defendants' production). Defendants' conduct actively interferes with the orderly progression of discovery and jeopardizes the discovery schedule in Case Management Order No. 2 [Dkt. No. 298]. As a result, Plaintiffs respectfully request that Your Honor enforce R&R No. 4 by recommending Defendants be ordered to immediately produce all of the materials in their custody and control responsive to the four categories of documents, as they were required to do by December 31.

**I.     R&R No. 4 Required Defendants to Search for and Produce their Admissions Employees' Emails, Investor Communications Related to the ICB, PPA Compliance Documents, and Materials Related to Their Compensation Review Task Force.**

The import of R&R No. 4 is clear on its face, and is reinforced by the facts and circumstances surrounding its adoption. Defendants were required to search for and produce all of their responsive non-privileged documents relating to their: (1) Admissions Employees' emails; (2) investor communications regarding the ICB; (3) efforts to determine their compliance with their commitments in their PPAs; and (4) Compensation Review Task Force.

At the November 18, 2013 conference with Your Honor, Defendants explained that they believed the most important documents in Plaintiffs' productions would be the material Plaintiffs

collected as part of their pre-intervention investigations. While Plaintiffs reiterated that the case law does not support the relevance of this material and that its immediate forensic collection would involve substantial undertakings, Plaintiffs ultimately prioritized the collection and production or logging of such materials.

However, Plaintiffs also argued that this should not be a unilateral undertaking, and that Defendants should be ordered to "reciprocate" Plaintiffs' efforts through the production of certain key materials of most interest to Plaintiffs—Defendants' Admissions Employees' emails, investor communications related to the ICB, PPA compliance documents, and materials related to Defendants' Compensation Review Task Force. Pls.' Nov. 15 Submission to Special Master 15. Without an order requiring Defendants to produce the entirety of these categories of documents, Plaintiffs continued, Defendants would continue to string out their production, "treat[ing] any document tangentially related to Plaintiffs' requests as satisfying the need to prioritize" this material, and not "complet[ing]" the production of the material until the close of discovery; undermining the efficiencies that would be created from its earlier production. *Id.*

R&R No. 4 reflected Plaintiffs' proposed compromise. It explained that Plaintiffs would be required to undertake "a laborious, time-intensive" forensic collection of the materials "in their possession," *i.e.*, those that had already been collected by attorneys "such as material from the investigation the United States and States undertook before deciding to intervene in this case or material provided by Plaintiff-Relators to the United States during that investigative stage." R&R No. 4, at 9-10. It also provided that Defendants would be required to affirmatively collect from their various institutions and review and produce "all material currently available to them regarding the four categories of documents." R&R No. 4, at 11.

The distinction that Defendants were seeking a forensic collection of the investigatory

materials in Plaintiffs' attorneys' possession and that Plaintiffs were seeking the collection of discrete subject matters, regardless of whether those materials had yet been collected from the Defendant-institutions, was reflected in R&R No. 4's recommendation, which was adopted in full by the Court. That recommendation stated Plaintiffs should be ordered to produce all non-privileged "responsive material that was *in their possession* as of November 18, 2013," and that Defendants should be required to produce "all material *currently available to them*" from each of the four categories. R&R No. 4, at 21 (emphasis added); *see also* R&R No. 4 Order 1 (using the same language). R&R No. 4 explained that this recommendation would require "the parties [to] use the remainder of November and the whole of December to focus on generating extensive document productions that include the categories of documents identified by each party," but that this was essential to ensure all involved had the "substantive" information necessary to efficiently move forward with discovery. R&R No. 4, at 12.

As a result, months before the close of document discovery, Plaintiffs produced or logged the entirety of their investigative files, in addition to producing documents related to the relevant ICB rulemakings, the United States Department of Education's communications with the GAO regarding the ICB, damages, and the Hansen memorandum and related whitepapers—*i.e.*, *all* of Defendants' priority requests discussed at the November 18 conference. As explained in more detail below, even now, eight weeks after the production deadline set by R&R No. 4, Defendants have made no comparable effort to produce all of the documents from the categories Plaintiffs identified.

Defendants' excuses for their failure to produce the required documents are just that. In contradiction to the rules of the English language, Defendants claim that the phrase "currently available to them"—the requirement for what Defendants were ordered to produce—should be

4

construed *more narrowly* than the phrase "in their possession"—the requirement for what Plaintiffs were ordered to produce. Defs.' Jan. 31, 2014 Letter (Ex. C) 1-2. Swapping the plain meaning of the phrases, Defendants' insist "[t]he only reasonable interpretation" of "currently available to them" "is that it refers to materials from within the four prioritized categories that EDMC had [already] collected," not the material they could get. *Id.* at 1. Of course, this reading disregards Plaintiffs' purpose in requesting that Defendants be ordered to collect and produce the entirety of these materials, namely, to prevent Defendants from dragging their feet on producing the full scope of responsive documents. In other words, exactly what Defendants have done.

Moreover, in contradiction to the text of R&R No. 4—which emphasized the substantial collection and production efforts that it was requiring of all parties—Defendants insist that their interpretation is the only acceptable one, as otherwise the order would have been burdensome. *Id.* at 1-2. Yet, Defendants had the same six weeks that Plaintiffs were provided to undertake their collection, review and production, and even Defendants' most recent production, made nearly two months later, fails to produce the material at issue in R&R No. 4. Further, as Defendants have noted, the document requests were served in January 2013, Defendants were ordered to produce responsive documents in July 2013, and productions began in October 2013.

As detailed below, the topic areas Plaintiffs asked be prioritized, and that R&R No. 4 ordered Defendants to include in their December 31, 2013 production, were not extraneous material, but rather documents that Your Honor and the Court have repeatedly recognized could establish the two core areas of dispute: falsity and scienter. *See* Sections II-V *infra*. Defendants' strategic decision to delay their productions of these materials not only prevents Plaintiffs from confirming that they will be fruitful vehicles to establish Defendants' fraud, but undermines the value of the material Defendants have produced to date. As Your Honor and the

5

Court have repeatedly recognized, because Plaintiffs are entitled to prove their case through circumstantial evidence, the documents are not only relevant for what they contain, but how they compare to one another.  *See*, *e.g.*, Order Overruling Objs. R&R No. 2 & R&R No. 3 [Dkt. No. 291] ("MTC Order I") 5; Report and Recommendation No. 2 [Dkt. No. 258] ("R&R No. 2") 18. It is for this reason, among others, that Plaintiffs requested Defendants make complete productions of each category.

## II.   Defendants Have Failed To Produce the Admissions Employees' Emails Currently Available to Them As Required by R&R No. 4.

Your Honor and the Court have consistently rejected Defendants' efforts to reduce this case to the window-dressing Defendants used to disguise their fraud.  Instead, the Court has explained that the issue in dispute is not whether Defendants documented their use of "Quality Points" in their Admissions Employees compensation plans, but "whether the Quality Points accurately reflected ADA performance" or "were not actually of significance."  MTC Order I, at 6 (quotation marks omitted).  As a result, R&R No. 2 required Defendants to produce materials about the actual experiences of Defendants' recruiters, such as would be reflected in their emails. R&R No. 2 explained that such discovery "is central to [Plaintiffs'] argument that the quality factors were little more than 'window dressing,'" as it can show: "communications to pressure ADAs to obtain as many enrollments as possible"; tracking materials used to "identify ADAs who were not recruiting sufficient numbers of student and then pressure[] those ADAs to increase their enrollments"; the improper representations made to students, which would suggest that "Defendants encouraged ADAs to increase enrollment 'at all costs'"; and "the amount of time that Admissions Employees spent on recruiting," which if "disproportionate . . . would [t]end to show that the employees had incentive to focus on enrollments."  R&R No. 2, at 40-41.

In Defendants' productions thus far (including their February 20, 2014 production), they

6

have produced the "hard drives" of only *eighteen* ADAs. Defs.' Dec. 31 Letter (Ex. E) Ex. B, at 1 (Defendants' letter accompanying their December 31, 2013 production detailing the documents produced in response to R&R No. 4); Defs.' Feb. 20, 2014 Letter (Ex. D) 2 (Defendants' letter accompanying their next production, on February 20, 2014, detailing the custodians contained in that production).[1] This low number is particularly jarring in light of Defendants' representations in arguing against Plaintiffs' requests for production that requiring Defendants to produce Admissions Employees' emails would "require the production of 'untold millions' of documents" because Defendants "have employed over *11,000* recruiters since 2003." R&R No. 2, at 42 (emphasis added).

Without any attempt to square their current position with past representations, Defendants now state that "much of this ESI" for the 11,000 recruiters "no longer exists." Defs.' Jan. 31, 2014 Letter (Ex. C) 3. However, as explained in Plaintiffs' Motion to Compel the Production of Documents from Defendants' Backup Tapes, filed simultaneously with this Motion, this statement is not accurate. Defendants admit they possess email for most or all 11,000 recruiters, just some of these emails exist on backup tapes. Dec. 19, 2014 Miko Depo. Transcript Excerpts (Ex. F) 94:23-95:2; 120:17-23; 125:1-17. However, under the governing case law, the fact that these emails exist on tapes does not excuse Defendants from producing this material. Given the facts of this case, such tapes are accessible and thus like any other source of documents, Defendants must search for responsive materials on the tapes, and, per R&R No. 4, should have produced the Admissions Employees' emails contained on the tapes by December 31, 2013.

Further, regardless of whether Defendants have email for each and every recruiter, their

---

[1] Defendants' Rule 30(b)(6) witness on Defendants' information technology systems explained that hard drives are but one place that an employee might store email. Thus, it is far from clear that Defendants have even produced all of the email for these eighteen individuals.

7

existing production barely touches upon the email they surely do have. Even generously assuming that the recruiters were spread evenly over the entire relevant period for this case—and thus Defendants achieved no growth for over a decade—this would mean that Defendants employed over 1,000 different recruiters every year. The evidence is clear that Defendants were on notice of the prospect of this litigation since at least September 2007, it was 2008 when Defendants actively engaged with the United States regarding its investigation in this case, and it was 2011 when the government-Plaintiffs intervened.[2] Yet, Defendants have only produced the "hard drives" of eighteen carefully selected ADAs.

Defendants have made much of the fact that they produced "ESI" (not necessarily email) from *twelve* additional Admissions Employees by December 31, 2013. Defs.' Dec. 31 Letter (Ex. E) Ex. B, at 1. However, the production of some materials from 30 out of the over 11,000 Admissions Employees did not satisfy Defendants' obligations under R&R No. 4. And, Defendants' February 20, 2014 production provides material only from two additional custodians who appear to be Admissions Employees, and four additional custodians in total.[3] *See* Defs.' Feb. 20, 2014 Letter (Ex. D) 2.

In its Memorandum Opinion denying Defendants' motion to dismiss [Dkt. No. 183], at 30-31, the Court explained that the "inferences" that could be drawn from the daily communications and experiences of Defendants' recruiters could establish that Defendants were knowingly engaged in fraudulent conduct. As a result, Your Honor recognized that email communications between recruiters and among recruiters and their supervisors is "central" evidence in this case. R&R No. 2, at 40-41. Nonetheless, in contravention to R&R No. 4,

---

[2] These communications are discussed in Plaintiffs' Motion to Compel the Production of Documents from Defendants' Backup Tapes at pages 19-21. That discussion is incorporated here by reference.

[3] Of these four additional custodians, one of the apparent Admissions Employees was an ADA for one year in 2004. Yet, from this custodian, Defendants have not produced documents from the year 2004.

Defendants have not produced this material and now will only state that they are "in the process of collecting and producing" *some* of it.  *See* Defs.' Jan. 28, 2014 Letter (Ex. B) 1-2.  Defendants should produce all of these materials now.

### III. Defendants Have Failed To Produce the Investor Communications Regarding the ICB Currently Available to Them As Required by R&R No. 4.

Defendants' communications with "actual or potential investors" are likely to discuss the "income they received under the HEA as well as any risks the company faced, such as the risk of losing funds due to noncompliance with the ICB."  R&R No. 2, at 19-20.  This is particularly the case here, where Defendants' primary investors—Goldman Sachs, Providence Equity and Leeds Equity—control over 75% of Defendants' shares[4] and have run the company since 2006.[5]  Since 2006, numerous representatives of these investors have been members of Defendants' Board of Directors, and one of these board members was even hired by Defendants to be an Officer in the parent company, EDMC.[6]  Accordingly, Defendants' communications with their investors will not only detail Defendants' past practices and exposures, but examine the policies under consideration and the risks they pose.  Indeed, Relator Michael Mahoney has already testified that the 2006 investment by Goldman Sachs, Providence Equity and Leeds Equity, which took EDMC private, facilitated a company-wide shift in recruitment practices towards a yet greater

---

[4] *See* http://www.sec.gov/Archives/edgar/data/880059/000119312513393111/d596356ddef14a.htm.

[5] *See* http://www.edmc.edu/about/History.aspx.

[6] According to publically available information, Adrian M. Jones has served on Defendants' Board of Director since 2006 while he has been employed by Goldman Sachs; Leo F. Mullin has served on Defendants' Board of Directors since 2006 while he has been employed by Goldman Sachs; Mick Beekhuizen served on Defendants' Board of Directors from 2009 to 2013 while he was employed by Goldman Sachs, and resigned and was hired full-time as EDMC's Executive Vice-President and Chief Financial Officer; Paul J. Salem has served on Defendants' Board of Directors since 2006 while he has been employed by Providence Equity; Peter O. Wilde has served on Defendants' Board of Directors since 2006 while he has been employed by Providence Equity; Michael K. Powell served on Defendants' Board of Directors from 2009 to 2011 while he was employed by Providence Equity; Joseph R. Wright served on Defendants' Board of Directors from 2011 to 2012 while he also served on the Board of Directors of Providence Equity; Brian A. Napack has served on Defendants' Board of Directors since 2012 while he has been employed by Providence Equity; and Jeffrey T. Leeds has served on Defendants' Board of Directors since 2007 while he has been employed by Leeds Equity.

9

focus on securing enrollments. Jan. 17, 2014 Mahoney Depo. Transcript Excerpts (Ex. G) 72: 12-18; 240: 6-18. As R&R No. 2, at 26, explained, the development of such business plans could, in and of itself, establish "a top-down plan designed to maximize enrollments."

By December 31, however, Defendants had only produced documents related to investor communications regarding the ICB from a *single* custodian, John Iannone, Assistant Vice-President and Director of Investor Relations. Defs.' Dec. 31 Letter (Ex. E) Ex. B, at 1-2.[7] From this *one* custodian Defendants produced only 365 documents and his communications appear largely to be sanitized emails containing industry analysis. For example, Defendants produced a summary of a conference about investing in the education industry, which explains that it contains ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ but establishes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ EDMC-WASH-09529719 (Ex. H).

Defendants' February 20, 2014 production indicates that other custodians had communications with investors, including custodians at the highest level of Defendants' operations, such as Defendants' Chairmen and CEOs Todd Nelson and John McKernan. *See* Defs.' Feb. 20, 2014 Letter (Ex. D), Ex. A, at 5 (listing Bates ranges of documents that may contain investor communications). However, Defendants have only produced a smattering of these documents, including but a single page from Mr. Nelson, which is merely a chart that appears prepared to assist with a discussion with investors, but contains no explanation. EDMC-WASH-09847945 (Ex. I). Defendants now refuse to even say when the communications containing the true give and take between Defendants and their investors will be forthcoming. Defs.' Jan. 28, 2014 Letter (Ex. B); Defs.' Jan. 31, 2014 Letter (Ex. C).

---

[7] There is a dispute among the parties regarding whether Defendants must produce other communications with their investors. *See*, *e.g.*, Pls.' Jan. 15, 2015 MTC 2d RFPs. However, that dispute does not extend to Defendants' communications with their investors related to the ICB. R&R No. 2, at 20, as adopted by the Court, ordered Defendants to produce such material "in full."

10

**IV.     Defendants Have Failed To Produce the PPA Compliance Documents Currently Available to Them As Required by R&R No. 4.**

R&R No. 2, at 17, explained that "the process that the PPA signatory undertook to ensure that Defendants' institutions complied with the ICB before signing the PPA . . . is directly relevant to scienter." So too, R&R No. 2 continued, is evidence of what steps were taken to confirm the accuracy of the other statements in the PPAs, as "[e]vidence that Defendants were substantially more careful in their treatment of other regulations than they were with their treatment of the ICB is directly relevant to [a] theory of scienter." *Id.* at 18. Indeed, Officers, including John McKernan, signed numerous PPAs. Likewise, "information regarding internal and external audits completed by or on behalf of Defendants" related to both Defendants' ICB compliance and compliance with other regulatory requirements is relevant because it could demonstrate Defendants' false conduct and "whether Defendants knew that their compliance efforts were lacking with regard to the ICB." *Id.* at 19.

Yet, here too Defendants have denied Plaintiffs their discovery, rendering Plaintiffs unable to make the sorts of comparisons Your Honor explained make this evidence particularly potent. For example, documents reviewed by the PPA signatories to determine whether the statements in the PPAs were accurate are clearly responsive compliance documents. However, again including Defendants February 20, 2014 production, Defendants have only produced documents from 5 of the 60 signatories of the PPAs Defendants entered into with the United States since 2003.[8] (Although Plaintiffs have served an interrogatory on this issue, Defendants have failed to identify the signatories of the agreements Defendants entered into with the named

---

[8] Plaintiffs are relying on the list of PPA signatories in Exhibit A attached to Defendants' Amended Answers and Objections to Certain Interrogatories Propounded in Plaintiffs' First Set of Interrogatories, served on October 23, 2013. (Ex. J). Although this list states that it is only of "certain" PPAs, Defendants have since represented that it includes all "responsive PPA[s]"of which Defendants are aware. Defs.' Jan. 10, 2014 Opp. Pls.' MTC ROGs 3 n.2 (quotation marks omitted).

Plaintiff-States.  *See* Pls.' Jan. 15, 2014 Reply MTC ROGs at 6.)



Further, Defendants' letter accompanying their December 31 production indicates that in response to this request they only sought out documents related to one PPA signatory and three custodians in total.  Defs.' Dec. 31, 2013 Letter (Ex. E) Ex. B, at 2.  Although Defendants attempt to rely on their prior productions, even they acknowledge that these prior productions only consist of a "non-exhaustive collection of *sample* documents relating to internal controls, training and processes" to assure regulatory compliance.  Defs.' Dec. 31, 2013 Letter (Ex. E) Ex. B, at 2 (emphasis in original).  Because such productions are plainly insufficient, Defendants do not defend the material they have produced.  But, they also offer no timeline or plan for completing their productions.  Defs.' Jan. 28, 2014 Letter (Ex. B); Defs.' Jan. 31, 2014 Letter (Ex. C).

V. **Defendants Have Failed To Produce the Materials Related to Their Compensation Review Task Force Currently Available to Them As Required by R&R No. 4.**

The import of materials related to Defendants' Compensation Review Task Force, which developed and assisted with the implementation of Defendants' Admissions Employees compensation scheme, is self-evident.  Indeed, in its Memorandum Opinion denying Defendants'

motion to dismiss, at 30, the Court cited the conduct of the "EDMC-wide task force" as one of the bases for concluding Plaintiffs properly "pled the involvement and knowledge of senior EDMC executives" in the fraud.  *See also* US000111164 (Ex. K) (Defendants' PowerPoint explaining that Defendants "[c]hanged to Incentive Based Compensation," "[b]ecause we can").

Yet, even with this evidence, which Defendants have known would be relevant since the pleadings stage, if not earlier, Defendants failed to comply with R&R No. 4.  Defendants have not provided a complete list of the employees who worked on activities related to their Compensation Review Task Force.  But, of the twelve individuals associated with the task force that Defendants have identified, to date, they have produced documents from only *five* of them.[9]

Indeed, Defendants' December 31, 2013 production letter explains that they produced only a little over 1,000 pages of documents associated with the Compensation Review Task Force.  Defs.' Dec. 31, 2013 Letter (Ex. E) Ex. B, at 3.  The February 20, 2014 production contains around 5,500 additional pages that Defendants describe as "on the general topic of the development of admissions compensation plans, including [but not exclusively] documents pertaining to the Compensation Task Force."  Defs.' Feb. 20, 2014 Letter (Ex. D) Ex. A, at 2.  Defendants again point to earlier productions—which exclude the majority of identified custodians—as somehow satisfying their obligations.  But the weakness of that argument is apparent from their acknowledgment that, at best, these documents only "*may* pertain to the Compensation Review Task Force."  Defs.' Dec. 31, 2013 Letter (Ex. E) Ex. B, at 3 (emphasis added).  Once again, Defendants make no efforts to explain why they have denied Plaintiffs this important information and offer no plan for providing Plaintiffs the materials to which they are

---

[9] Plaintiffs are relying on the list of individuals Defendants identified as "participating in meetings related to the development of the Admissions Performance Plan" in Defendants' Amended Answers and Objections to Certain Interrogatories Propounded in Plaintiffs' First Set of Interrogatories (Ex. J) 14.

13

entitled.  Defs.' Jan. 28, 2014 Letter (Ex. B); Jan. 31, 2014 Letter (Ex. C).

## VI. R&R No. 4 Must Be Enforced to Ensure Efficient Discovery.

R&R No. 4 recognized that requiring all parties to prioritize the production of certain materials would "enhance[] the direction and efficiency of discovery."  R&R No. 4, at 9.  These materials would help the parties determine fruitful areas on which to focus their review of documents and how to order and proceed with depositions.  As a result, Plaintiffs provided Defendants all of the non-privileged investigatory materials on which Defendants (inexplicably and in contravention to the case law) have staked their defense.  To date, Plaintiffs have received almost none of the materials they requested.  Defendants are delaying Plaintiffs' ability to have a comprehensive overview of Defendants' activities.  Accordingly, Defendants' conduct is inequitable, and threatens to delay the orderly development and ultimate resolution of the case.

## VII. Conclusion.

For the foregoing reasons, Plaintiffs respectfully request that Your Honor enforce R&R No. 4 and recommend Defendants be ordered to immediately produce the entirety of the documents in their custody and control responsive to the four categories of documents identified in R&R No. 4: (1) Admissions Employees' emails; (2) investor communications related to the ICB; (3) materials relied upon to ensure Defendants' compliance with their PPAs; and (4) materials related to Defendants' Compensation Review Task Force.

    Very truly yours,

    DAVID J. HICKTON
    United States Attorney


    /s/ Christy C. Wiegand
    CHRISTY CRISWELL WIEGAND
    Assistant U.S. Attorney
    (412) 894-7452