# EXHIBIT R



**U.S. Department of Justice**

*United States Attorney*
*Western District of Pennsylvania*

*U.S. Post Office & Courthouse*
*700 Grant Street*
*Suite 4000*
*Pittsburgh, Pennsylvania  15219    412/644-3500*

February 24, 2014

**_VIA E-MAIL & HAND DELIVERY_**
The Hon. Richard A. Levie (Ret.)
Special Master                                    **Contains Material**
JAMS, Inc.                                          **Designated Confidential**
555 13th Street NW, Suite 400 West
Washington, D.C. 20004

> RE:    ***United States of America, et al. v. Education Management Corporation, et al.,***
> **Civil Action No. 07-461**
> **Plaintiffs' Motion to Compel The Production of Documents From**
> **Defendants' Backup Tapes**

Dear Special Master Levie:

Despite repeated assurances that they had preserved all relevant discovery, Defendants did an about face and now contend that the vast majority of core discovery, particularly Admissions Employees' email, is inaccessible and they will not search for or produce it.[1]

Defendants have gone so far as to say that "much" of this core discovery "no longer exists."[2]

---

[1] The term Admissions Employees shall have the definition ascribed in Plaintiffs' discovery requests and includes, among others, ADAs and their supervisors.

[2] There is no dispute that the emails of Admissions Employees employed by Defendants during the relevant time period are core discovery in this case.  Both Your Honor and the Court have repeatedly acknowledged their significance.  *See, e.g.,* Report and Recommendation No. 2 [Dkt. No. 258] ("R&R No. 2") at 40-41 ("…communications between Defendants' institutions and admissions employees regarding their salary goals and associated New Student Point and Quality Factor goals … are directly relevant to Plaintiffs' claims that Defendants relied on email and other communications to pressure ADAs to obtain as many enrollments as possible"); July 23, 2013 Order Overruling Objections to Report and Recommendation Nos. 2 and 3 [Dkt. No. 291] ("MTC Order 1").  Defendants themselves have

Defs.' Jan. 31, 2014 Letter (Ex. A) 3.  To the contrary, while Defendants may have destroyed some Admissions Employees' emails prior to 2009, it is clear that the majority of this core discovery does indeed exist, on backup tapes.  However, Defendants claim these tapes containing Admissions Employees' email are *per se* inaccessible, and that *ipse dixit* Defendants have no obligation to restore the tapes and comply with their obligations to produce such essential discovery.  That is not so.

Federal Rule of Civil Procedure 26(b)(2)(B) is clear that material is inaccessible only when the responding party can show "undue burden or cost."  Absent a showing of undue burden or cost, which Defendants cannot establish here, backup tapes are to be deemed accessible. Moreover, even if Defendants could establish the inaccessibility of the backup tapes, there is good cause in this case to nonetheless order production, which Rule 26(b)(2) permits.

In response to Plaintiffs' inquiries, Defendants attempt to justify their failure to preserve such ESI in an active state by arguing that it is the result of Plaintiffs' failure to notify Defendants of this lawsuit earlier during the seal period.  Ex. A at 3; Defs.' Jan. 30, 2014 Letter (Ex. B) 2.  But, as discussed more fully below, the evidence shows that Defendants not only were on notice of the prospect of this litigation in September 2007, but also were seeking to influence the United States Department of Justice's ("DOJ") actual investigation of this case since at least March 2008.  Moreover, Defendants' counsel was again communicating with the United States' Department of Education ("ED") and DOJ regarding this lawsuit in June 2010. Despite these facts, Defendants continue to misrepresent to this day that they did not reasonably anticipate litigation until December 2010.  Miko Transcript Excerpts (Ex. C) 8:3-5; Ex. A at 3 (arguing that relevant ESI was not maintained in an active state due to the "Government's four-

---

acknowledged that the emails of Admissions Employees "will likely constitute a substantial portion of EDMC's overall document productions in this case."  Ex. A at 2.

year delay in notifying EDMC about this lawsuit."); <u>Ex. C</u> at 13:9-12 (asserting that Defendants did not issue a litigation hold until June 2011); *see also* Defs.' Sep. 14, 2012 Letter (<u>Ex. D</u>) 1 (stating that Defendants "reasonably anticipated litigation in 2010").  Defendants' destruction of and/or failure to preserve core discovery in an active state—despite their awareness of the potential for this litigation—amounts to spoliation.  As a result, even if Your Honor finds that Defendants' backup tapes represent inaccessible ESI, Defendants should be ordered to search and restore them.

The stakes in this case are indisputably high.  And the importance of Admissions Employees' emails to the case cannot be contested.  Indeed, even Defendants have acknowledged that such emails are central to Plaintiffs' claims.  Although unsupportable in any context, Defendants' conclusory assertion that their backup tapes are not accessible, without any showing of undue burden or cost under the Federal Rules, cannot possibly stand under the facts of this case.  Indeed, and as discussed herein, good cause supports the production of these materials even were Your Honor to determine that Defendants backup tapes are inaccessible (and they are not).  For all of these reasons, Plaintiffs respectfully request that Your Honor recommend Defendants be ordered to restore the backup tapes that contain current and former Admissions Employees' emails for the period of January 1, 2002 to the present, and produce all such emails to Plaintiffs, consistent with Your Honor's and the Court's prior orders.

## I.    <u>Background.</u>

On January 14, 2013, Plaintiffs served their First Request for Production of Documents on Defendants ("Requests").  Among other things, the Requests sought all communications among Admissions Employees and between Admissions Employees and other employees of Defendants regarding a variety of topics, including emails to and from Admissions Employees

and other employees from January 1, 2002 to the present.  Defendants objected to these Requests on various grounds, and argued that the Requests would "require the production of 'untold millions' of documents" from more than 11,000 Admissions Employees.  R&R No. 2 at 42. Defendants' objections were properly overruled in July 2013.  *See id.*; MTC Order 1.  Then, on December 10, 2013, recognizing the import of these communications, Your Honor and the Court expedited production of this ESI and ordered Defendants to produce, "by December 31, 2013, all material currently available to them regarding: (1) admissions employee emails…" Order Adopting Special Master Report and Recommendation No. 4 [Dkt No. 319] at 1.

Notwithstanding the Court's Orders, and despite Defendants' acknowledgement that Admissions Employees' emails "will likely constitute a substantial portion of EDMC's overall document productions in this case," Defendants continue to refuse to produce this core discovery by raising new and ever changing arguments about what it is they were ordered to produce and what is and is not reasonably accessible, going so far as to now argue that "*much of this ESI no longer exists.*"  Ex. A at 2, 3 (emphasis added).  In actuality, Defendants have merely decided (or have always known) that they will not produce this discovery even though the vast majority of it is in their possession and is undisputedly core, relevant information.

Specifically, on December 19, 2013, Defendants' designated Rule 30(b)(6) witness revealed for the first time that Defendants do not intend to produce the "untold millions" of Admissions Employees' emails they told the Court they would produce in this action.  Instead, after first testifying that such emails were ***not*** inaccessible, following verbal coaching from his counsel, Defendants' Rule 30(b)(6) witness stated that virtually all of the email that Defendants had previously represented to the Court would be produced was actually not "reasonably

accessible" because the email did not exist in an active state, but instead on backup tapes.  *See, e.g.*, Ex. C at 199:9-200:23; 214:1-10; 315:15-316:5.

According to Defendants' 30(b)(6) designee, Defendants first issued a litigation hold in connection with this case in June 2011 (*id.* at 13:9-12) but, since January 1, 2002, Admissions Employees' email accounts have been limited in size, generally to 250 megabytes (*id.* at 93:17-94:2).  Moreover, when Admissions Employees leave the employ of Defendants, unless they are *at that time* subject to a litigation hold, the employee's computer and email account are deleted. *Id.* at 123:3-124:25; 221:13-24.

Nonetheless, Defendants' designee also testified that most emails since at least January 1, 2002 have been saved on tapes.[3]  *Id.* at 94:23-95:2.  Thus, the only source of any email of an employee not under a litigation hold who left EDMC between January 1, 2002 and December 31, 2012 is these tapes.  *Id.* at 125:1-17.  The same would be true for emails of employees under a litigation hold, but where the message preceded the issuance of the hold.  *Id.*  Similarly, any emails that a current employee deleted in order to comply with the mailbox size limitations may not exist anywhere other than in the backup tapes.  *Id.* at 120:17-23.

---

[3] Defendants' 30(b)(6) designee testified that since sometime in 2009, backups of Defendants' email systems have been conducted on a daily basis.  Ex. C at 95:13-25.  Prior to that time, backups were done once a month.  *Id.* at 96:3-8.  Thus, there is a category of emails that have been destroyed and no longer exists:  pre-2009 emails that users deleted from their mailboxes during the month preceding each backup. *See id.* at 133:3-7.  The appropriate remedy for Defendants' spoliation cannot be fashioned at this time without first obtaining and reviewing all of the Admissions Employees' emails contained both in an active state and in the backup tapes.  *See generally Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1326 (Fed. Cir. 2011) ("District courts have the inherent power to control litigation by imposing sanctions appropriate to rectify improper conduct by litigants . . . The particular sanction imposed is within the sound discretion of the district court in exercising its inherent authority and in assuring the fairness of the proceedings before it.") (quotation marks omitted);  *Bozic v. City of Wash.*, 912 F. Supp. 2d 257, 266-73 (W.D. Pa. Dec. 5, 2012) ("[A] spoliation sanction is not one size fits all, but must be tailored to fit the facts of the case.") (quotation marks omitted).  Once those emails are reviewed, Plaintiffs, and the Court, will be in a better position to determine how many emails have been destroyed and their importance to the case;  information necessary to determine the appropriate remedy for Defendants' spoliation of the emails that no longer exist in either an active state or on backup tapes.

Defendants' 30(b)(6) designee also testified that current employees could store emails on their computers by creating PST files, but there is no policy requiring them to do so and the employee could have instead chosen to delete the emails, making the tapes the only source for the emails. *See id*. at 118:19-119:10; 128:18-129:25.  Moreover, because Defendants erase the computers of all former employees who are not currently under a litigation hold, even had such former employees created PST files before leaving the employ of Defendants, the tapes would be the only likely source for that email.

In stark contrast to Defendants' repeated past assurances to both Plaintiffs and Your Honor that they had not lost or destroyed any discovery relevant to this case, Defendants' counsel recently sent two letters, dated January 30 and 31, 2014, claiming that a large portion of core ESI no longer exists.  Specifically, at various meet and confers and during telephone conferences with Your Honor, Defendants have represented to Plaintiffs and to Your Honor that no relevant discovery has been lost and that Defendants have retained all emails since 2002. *See, e.g*., Ex. D at 1 ("With respect to your discussion of our position on ESI, so that there is no question in your mind, EDMC has preserved email").  After the testimony of their 30(b)(6) designee raised questions about the accuracy of such repeated representations, however, Defendants abruptly changed course and baldly asserted that Admissions Employees' emails are either inaccessible or have been destroyed.  Specifically, on January 30, Defendants explained that it was EDMC's practice to wipe the hard drive of any departing employee not subject to a litigation hold, and further stated that EDMC no longer had most of the relevant ESI for either of the Relators in this case.  Ex. B at 2.  Then, on January 31, Defendants' counsel stated that much of the ESI for the over 11,000 Admissions Employees at issue in this case "*no longer exists*." Ex. A at 3 (emphasis added).

In light of Defendants' unexpected assertion that core discovery in this case has either been destroyed or is inaccessible, Plaintiffs have repeatedly asked Defendants to explain their claims of undue burden or cost, both informally and through the Rule 30(b)(6) deposition. *See, e.g.,* Pls.' Jan, 15, 2014 Letter (Ex. E) 3. Defendants have unjustifiably failed to do so, and instead simply repeat their mantra that backup tapes are *per se* inaccessible. *See, e.g.,* Defs.' Jan. 28, 2014 Letter (Ex. F) 1-2. As a result, on January 31, 2014, Plaintiffs served written discovery requests requesting this information. Defendants' time to respond to the written requests is March 3, 2014. However, given the importance of this issue, and Defendants' anticipated objections in line with their repeated and ongoing refusal to provide this information, Plaintiffs had no choice but to file this motion to ensure that this issue could be resolved well in advance of the close of document discovery.

## II.     Admissions Employees' Emails In Backup Tapes Are Reasonably Accessible Because Defendants Have Not—And Cannot—Show Undue Burden Or Cost.

Federal Rule of Civil Procedure 26(b) provides for broad discovery. This right to broad discovery unquestionably extends to ESI, the presumption being that "electronically stored information is indeed discoverable unless the party from whom discovery is sought makes a sufficient showing of undue burden or cost." *Commerce Benefits Grp., Inc. v. McKesson Corp.*, No. 1:07-2036, 2008 U.S. Dist. LEXIS 15181, at *11-12 (N.D. Ohio Feb. 13, 2008); *see also* Fed. R. Civ. P. 26(b)(2)(B) ("On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost."). Pertinent parts of Federal Rule of Civil Procedure 26(b)(2)(B) provide:

> *Specific Limitations on Electronically Stored Information.* A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible

because of undue burden or cost. **On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost.** If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C).

*Id.* (emphasis added).

Thus, the question of accessibility turns not on how ESI is maintained, but rather on the burden and cost of accessing such material. For this reason, courts have rejected the argument that backup tapes are *per se* inaccessible. *See, e.g., Commerce Benefits Grp.,* 2008 U.S. Dist. LEXIS 15181, at *11-12 ("[T]he Defendant's assertion that the back-up tapes recently discovered by Per-Se are presumptively not searchable is without merit."); *Omnicare, Inc. v. Mariner Health Care Mgmt. Co.*, No. 3087, 2009 Del. Ch. LEXIS 95, at *22-23 (Del. Ch. Dec. 4, 2008) ("Defendants have not adequately demonstrated that the ESI in question is not reasonably accessible. Simply because the ESI is now contained on Backup Tapes instead of in active stores does not necessarily render it not reasonably accessible."); *Semsroth v. City of Wichita*, 239 F.R.D. 630, 638, 640 (D. Kan. 2006) (finding that a backup tape was not inaccessible because, among other things, "the costs of restoring and searching the e-mail back-up tape does not seem excessive when compared to the possible amount in controversy"); *Calixto v. Watson Bowman Acme Corp.*, No. 07-60077, 2009 U.S. Dist. LEXIS 111659, at *35-36 (S.D. Fla. Nov. 16, 2009) (finding that "the cost of reconfiguring and reviewing" the requested backup tapes does not render the backup tapes inaccessible); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. Oct. 22, 2003) ("Zubulake IV") ("Backup tapes, however, should not be considered per se inaccessible."); *see also Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 n.68, 321-22 (S.D.N.Y. May 13, 2003) ("Zubulake I") ("[T]he purposes for which the responding party maintains the requested data is typically unimportant.

Whether the data is kept for a business purpose or for disaster recovery does not affect its accessibility, which is the practical basis for calculating the cost of production.").[4]  Moreover, the party claiming that discovery is inaccessible must establish undue burden or cost with particularity; general unsupported statements are not enough.  *O'Bar v. Lowe's Home Ctrs., Inc.,* 5:04-00019, 2007 U.S. Dist. LEXIS 32497, at *16, 16 n.6 (W.D.N.C. May 2, 2007) ("No party should object to the discovery of ESI pursuant to Fed. R. Civ. P. 26(b)(2)(B) on the basis that it is not reasonably accessible because of undue burden or cost unless the objection has been stated with particularity, and not in conclusory or boilerplate language.  Wherever the term 'reasonably accessible' is used herein, the party asserting that ESI is not reasonably accessible should be prepared to specify facts that support its contention.");  *Lindell v. Synthes USA,* 1:11-02053, 2013 U.S. Dist. LEXIS 85636, at *20 (E.D. Cal. June 18, 2013) (explaining that conclusory recitations of expense and burdensomeness are not sufficiently specific to demonstrate why requested discovery is objectionable (citing *Panola Land Buyers Ass'n v. Shuman,* 762 F.2d 1550, 1559 (11th Cir. 1985))*;  Osborne v. C.H. Robinson Co.,* 08-50165, 2011 U.S. Dist. LEXIS 123168, at *9 (N.D. Ill. Oct. 25, 2011) ("The responding party has a similar obligation to make specific objections or to indicate the extent to which the requested production will be limited by undue burden or cost of production." (citing Comment 4.b of *The Sedona Principles, Second*

---

[4] Defendants will no doubt cite to cases that have found backup tapes to be inaccessible, but the Rule and the case law are clear:  whether ESI is to be deemed inaccessible is a factual question that turns on the specific burdens and cost in each case.  *See* Rule 26(b)(2)(B);  *Omnicare,* 2009 Del. Ch. LEXIS 95, at *22-23;  *see also* Craig D. Ball, "E-Discovery: Right…From the Start" (LSC TIG Conference 2010) at 96-97,                                    *available*                                    *at* http://tig.lsc.gov/sites/default/files/TIG/Ball_Right_from_the_Start_LSC_TIG_2010.pdf   ("The  burden and cost of recreating a restoration platform for backup data was a major reason why backup media came to be emblematic of ESI deemed 'not reasonably accessible.'  But while the inaccessibility presumption endures, newer technology has largely eliminated the need to recreate a native computing environment in order to restore backup tapes.  Today, when a lawyer or judge opines that 'backups are not reasonably accessible, per se,' you can be sure they haven't looked at the options in several years.").  Under the facts of this case, Defendants have not, and cannot, show undue burden or cost.

*Edition: Best Practices, Recommendations and Principles for Addressing Electronic Document Production* (The Sedona Conference Working Group Series, 2007)).

Defendants want to draw a line as to what is and is not accessible based on the form in which the ESI is kept, rather than by demonstrating the burdens and calculating the cost of production.   Based on this faulty premise, Defendants assert that ESI on the backup tapes is inaccessible without even attempting to show the required elements of undue burden or cost. Plaintiffs have repeatedly asked Defendants to substantiate their claims of undue burden and cost, but Defendants have refused to provide this information—both during the 30(b)(6) deposition, which expressly included accessibility as a topic, and in subsequent correspondence.[5] Specifically, while Defendants' 30(b)(6) designee made general reference to the burdens of accessing this critical information, he admitted that he had never attempted to obtain information from backup tapes and did not offer any cost estimates associated with doing so.  *See* Ex. C at 209:6-19.   Exhibit 1 to the deposition is likewise insufficient to establish the necessary undue burdens or costs that would render the backup tapes inaccessible.  *See* Miko Deposition Exhibit 1 (Ex. G) ("Defendants' Memory Aid").[6]   In the exhibit, which was prepared by counsel, Defendants again summarily conclude that emails residing on backup tapes are not reasonably accessible because they "have been preserved on tapes that have been sent off-site for permanent storage."  *Id.* at 57(c)(i).   But this bald assertion does not come close to meeting Defendants' obligation to establish undue burden or cost.   The exhibit makes vague references to alleged burdens associated with obtaining data from the backup tapes.   But it does not provide any

---

[5] As previously noted, Plaintiffs have recently served written discovery requests requesting information on the burden and costs of restoring Defendants' backup tapes.  However, given Defendants' repeated refusals to provide this information, Plaintiffs had no choice but to file this motion.

[6] Plaintiffs do not have a marked version of Exhibit 1 to the Miko Deposition.  Exhibit 1 was produced by Defendants as a memory aid to the R. 30(b)(6) deponent.

detailed information concerning the nature or scope of the asserted burden—presumably because Defendants incorrectly view all backup tapes as *per se* inaccessible.  More importantly, it does not provide any estimate of the costs associated with restoring and searching this core ESI.

Following the deposition, Plaintiffs sent a letter to Defendants outlining several deficiencies in the testimony of their 30(b)(6) designee, and noted that "Defendants have also not made any effort to ascertain the burdens and costs associated with accessing the critical information on these tapes." Ex. E at 3.  In response, Defendants simply restated their position that backup tapes are per se inaccessible, but again failed to provide any details regarding undue burden or cost. Ex. F at 1-2 ("Backup tapes are the quintessential inaccessible source. . . . It is not reasonable to require that EDMC produce ESI from these inaccessible sources.").  These vague and conclusory assertions do not conform to Rule 26(b)(2)(B), which requires that the party show undue burden or cost.

That Defendants have refused to provide this information and have not attempted to show undue burden or cost is perhaps because they know they cannot do so.  When determining whether the cost of accessing ESI amounts to undue burden, courts consider the amount in controversy in the litigation. *See, e.g., Semsroth v. City of Wichita*, 239 F.R.D. 630, 640 (D. Kansas 2006) (finding that a backup tape was not inaccessible because, among other things, "the costs of restoring and searching the e-mail back-up tape does not seem excessive when compared to the possible amount in controversy").  In determining the reasonableness of the cost of production as compared to the amount in controversy, one court found that an estimated $10 million cost for the production was dwarfed by the $7 billion of federal funds at issue in the case.[7] *John B. v. Goetz*, 879 F. Supp. 2d 787, 887, 889 n.42 (M.D. Tenn. 2010);  *see also*

---

[7] Given Defendants' contention that their backup tapes are inaccessible, Defendants were obligated to provide Plaintiffs with details regarding undue burden or cost, both during the 30(b)(6) deposition on that

*Quinby v. WestLB AG*, 245 F.R.D. 94, 109-10 (S.D.N.Y. 2006) ($226,266.60 cost of restoring and searching allegedly inaccessible emails of former employees was justified when, among other things, plaintiff had potential of receiving a multi-million recovery);   *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 288 (S.D.N.Y. July 24, 2003) ("Zubulake III") (a cost of $165,954.67 to restore backup tapes not significantly disproportionate in a multi-million case); *PSEG Power N.Y., Inc. v. Alberici Constructors, Inc.*, No. 1:05-657, 2007 U.S. Dist. LEXIS 66767, at *32-33 (N.D.N.Y. Sep. 7, 2007) (ordering discovery because its potential outweighed the estimated cost for re-production of important e-mails).

While Defendants have not offered any estimates of the cost to restore the relevant backup tapes, it is unlikely that such costs will be in the millions of dollars.  The potential recovery of tax-payers' money, meanwhile, is tens of billions of dollars.  Even assuming greater costs than are likely, restoration is therefore justified.  Ultimately, however, this analysis cannot be properly completed, and is beside the point, because it is Defendants' burden to establish undue burden or cost, and they have failed to do so.  Indeed, they have refused even to try.  Your Honor should therefore recommend that Defendants be ordered to restore the tapes and to comply with previous orders to produce the emails of all Admissions Employees.

---

topic and in response to Plaintiffs' subsequent inquiries.  They have failed to do so presumably because their position is unsupportable.  Nonetheless, if, and after Defendants belatedly provide details regarding their claim of undue burden or cost, Plaintiffs will be in a position to respond to their evidence and present any appropriate challenges.  In light of Defendants' failure to provide such details, Plaintiffs reserve all rights in this respect, including the right to submit evidence challenging any estimated costs of restoring and searching the backup tapes.

**III.     Even If The Backup Tapes Are Deemed Inaccessible Within The Meaning Of Rule 26, There Is Good Cause To Require Production Of Emails That Reside In The Backup Tapes.**

Documents found to be not reasonably accessible are not immune from discovery. Rather, upon a finding of inaccessibility, the burden simply shifts to the requesting party to establish good cause.  If good cause is shown, the inaccessible documents must be produced. *Commerce Benefits Grp.*, 2008 U.S. Dist. LEXIS 15181, at *11-12 ("Even if that party shows that the electronic discovery would be unduly expensive and burdensome, the Court may still order discovery of such information upon a showing of good cause.");  *In re Veeco Instruments, Inc. Sec. Litig.*, No. 05-MD-1695, 2007 U.S. Dist. LEXIS 23926, at *5 (S.D.N.Y. Apr. 2, 2007) (finding good cause for production of data from backup tapes where discovery requests were specific, emails sought were important, and defendants were not able to demonstrate that the emails requested were available from another, easily accessed source);  *Disability Rights Council of Greater Wash. v. Wash. Metro. Transit Auth.*, 242 F.R.D. 139, 147 (D.D.C. 2007) ("[A] court may nevertheless order discovery from sources that are not reasonably accessible upon a showing of good cause and after considering the limitations of Rule 26(b)(2)(C).").

The decision whether to require a responding party to search for and produce information that is not reasonably accessible depends on whether those burdens and costs can be justified under the circumstances of the case.  The Federal Rules of Civil Procedure advisory committee's notes list seven factors to inform the "good cause" inquiry:

> (1) the specificity of the discovery request; (2) the quantity of information available from other and more easily accessed sources; (3) the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources; (4) the likelihood of finding relevant responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of the further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources.

Fed. R. Civ. P. 26(b)(2) advisory committee's notes (2006 Amendment);  *Major Tours, Inc. v. Colorel*, No. 05-3091, 2009 U.S. Dist. LEXIS 97554, at *14 (D.N.J. Oct. 20, 2009) (applying the seven factor test);  *GE v. Wilkins*, No. 1:10-674, 2012 U.S. Dist. LEXIS 22331, at *23-24 (E.D. Cal. Feb. 21, 2012) (same); *Helmert v. Butterball, LLC*, No. 4:08-342, 2010 U.S. Dist. LEXIS 60777, at *30-31 (E.D. Ark. May 27, 2010) (same).

Here, even assuming, *arguendo*, that Defendants' backup tapes are deemed to be not reasonably accessible, all seven factors weigh in favor of production.  In fact, some of these factors have already been considered by Your Honor and the Court and those existing rulings favor a finding of good cause.  MTC Order 1 at 6 ("Discovery in this case will undoubtedly present a Herculean task.  But in evaluating the burden and expense of discovery, the Court must consider it in the context of an amount in controversy of billions of dollars; that the government and EDMC both possess significant resources;  and that the issues are of surpassing importance, particularly to EDMC.")

As to the first factor, Plaintiffs have requested, and Defendants have been ordered to produce, all of the Admissions Employees' emails.  These requests are sufficiently specific. There is no vagueness or confusion as to what Defendants need to search for in the backup tapes.

The second factor, *i.e.,* the quantity of information available from other and more easily accessed sources, also clearly weighs in favor of production.  By Defendants' own admission, there is no other source for the information contained in these emails that is more easily accessible.  *See In re Veeco Instruments,* 2007 U.S. Dist. LEXIS 23926, at *5 (finding that plaintiff established "good cause" to require defendant to restore the requested backup tapes because, among other things, "[i]t has not been demonstrated that said information is reasonably available from any other easily accessed source"); *Disability Rights Council of Greater Wash.,*

14

242 F.R.D. at 148 (finding that good cause was met, in part, because "there is absolutely no other source from which the electronically stored information can be secured, thanks to WMATA's failure to impose a litigation hold").  As Your Honor and the Court have repeatedly made clear, discovery of Defendants' "real" compensation practices is at the heart of this litigation, and the communications between Defendants, Admissions Employees, and other employees of Defendants, including their emails, are the best source for discovery of such practices.  R&R No. 2 at 40-41 (explaining that materials about the actual experiences of Defendants' recruiters, which are likely best encapsulated in their emails, are "central" to Plaintiffs' argument that the quality factors were little more than "window dressing").  Admissions Employees' emails are therefore an absolutely essential part of discovery.

No other discovery vehicle will more readily provide, or in fact provide at all, the information that is contained within the emails of Admissions Employees.  In this "massive and complex case, in which Plaintiffs are seeking to prove a multi-billion dollar, top-down, corporate-wide fraud[,] Plaintiffs must 'prove a negative' – *i.e.*, that EDMC did not implement the ADA compensation plan as written[,]" (MTC Order 1 at 5), answers to interrogatories, especially where, as here, Defendants mostly rely on Rule 33(d) in responding, will not yield the type of direct and circumstantial evidence to prove the fraud allegations.  Likewise, given that Defendants employed over 11,000 Admissions Employees during the relevant time, it would be unduly burdensome and cost prohibitive to require Plaintiffs to depose all such Admissions Employees to inquire about the same information that is contained in the documents.  And, given the length of the fraud that Defendants have engaged in, the information in the documents will be more reliable than the memory of the many witnesses.  Requests for Admissions also will not

yield the needed information.  Defendants are vigorously contesting the allegations of fraud so

that they are not likely to admit that in practice their compensation practices violated the ICB.

In addition, the fact that Defendants will produce some portion of emails from some

small fraction of Admissions Employees is wholly insufficient to comply with the prior Court

orders.    The evidence of fraud in this case will likely come from a large number of

communications among Defendants and their Admissions Employees.  The frequency of such

communications and the strong emphasis on the number of students enrolled, as well as the

breadth of dissemination of information, is highly relevant.[8]  Moreover, communications from

key periods—such as 2002 when the Safe Harbor was enacted and 2006 when the company was

acquired by a consortium of investors[9]—are unlikely to exist in an active state either because

most of the Admissions Employees employed at that time are no longer with Defendants or

because these emails have been removed from an active state due to Defendants' mailbox size

limitations.  For these reasons, the emails of the Admissions Employees, whether stored on

backup tapes or not, are the best and most readily available source of the requested information.

Similarly, as to factor three, *i.e.,* the failure to produce relevant information that seems

likely to have existed but is no longer available on more easily accessed sources, Defendants

have already admitted that the majority of these emails, which Defendants have also

acknowledged is core discovery in the case, "no longer exist" in an active state.  Ex. A at 3;  Ex.

C at 125:1-17, 119:19-120:4.  Until 2011 when the litigation hold was put in place, Defendants

---

[8] Plaintiffs' Motion to Enforce Report & Recommendation No. 4, filed simultaneously herewith, discusses in detail how Your Honor's Report and Recommendation No. 2 and the Court's Order overruling objections to same recognized the importance of Admissions Employees' emails.    That discussion, found in page 6 of Plaintiffs' Motion to Enforce, is incorporated here by reference.

[9] Relator Michael Mahoney testified that the 2006 investment by Goldman Sachs, Providence Equity and Leeds Equity, which took EDMC private, facilitated a company-wide shift in recruitment practices towards an even greater focus on securing enrollments.  Mahoney Transcript Excerpts (Ex. H) 72:12-18; 240:12-18.

routinely wiped the hard drives of departing Admissions Employees.  Thus, for the majority of the period relevant to this litigation, the emails of former employees—whose numbers are in the thousands—only exist on backup tapes.  Indeed, as previously explained, because for the entire relevant time period their mailboxes have been limited to 250 megabytes, even the emails of current employees are likely to exist only on backup tapes.

Factors four and five, *i.e.,* the likelihood of finding relevant responsive information that cannot be obtained from other, more easily accessed sources and predictions as to the importance and usefulness of the further information, respectively, also favor Plaintiffs.  The central role of Admissions Employees' emails has been acknowledged by Your Honor, the Court, and Defendants.  *See* R&R No. 2 at 40-41;  Ex. A at. 2 (acknowledging that Admissions Employees' emails "will likely constitute a substantial portion of EDMC's overall document productions in this case").  And, as explained with respect to the third factor, Defendants have conceded that the vast majority of this information exists only in the backup tapes.  Ex. A at 3;  Ex. C at 125:1-17, 119:19-25.

The importance of the issues at stake in the litigation, which is the sixth factor, cannot be disputed, and clearly weighs in favor of production.  Your Honor and the Court have already recognized as much.  *See* MTC Order 1 at 6 (finding that "the issues [in this litigation] are of surpassing importance").

Finally, as to the parties' resources, which is the seventh factor, as the Court has also already acknowledged, Defendants are a multi-billion dollar company and have substantial resources available to conduct a search of the backup tapes.  *See* MTC Order 1 at 6 (finding that EDMC "possess[es] significant resources").  Defendants cannot contest this fact.

Therefore, even if Defendants could show undue burden and cost to render the backup tapes inaccessible—and they cannot—Your Honor should nonetheless order Defendants to restore them because there is good cause for production of all Admissions Employees' emails, including those in backup tapes.

## IV.   Defendants' Failure to Preserve Admissions Employees' Emails in An Active State Amounts to Spoliation.

It is well established that "the obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake IV*, 220 F.R.D. at 216, 218; *Bozic v. City of Wash.*, 912 F. Supp. 2d 257, 266-73 (W.D. Pa. Dec. 5, 2012) (citing *Bull v. UPS*, 665 F.3d 68, 73 (3d Cir. 2012)); *Rogers v. Allstate Ins. Co.*, No. 11-7776, 2012 U.S. Dist. LEXIS 151818, at *14-15 (E.D. Pa. Oct. 22, 2012); *Major Tours, Inc. v. Colorel*, No. 05-3091, 2009 U.S. Dist. LEXIS 68128, at *11-12 (D.N.J. Aug. 4, 2009). "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Id.* The destruction or significant alteration of evidence, or the failure to preserve [or produce] property for another's use as evidence in pending or reasonably foreseeable litigation" amounts to spoliation. *Bozic*, 912 F. Supp. 2d at 266-73 (citing *Bull*, 665 F.3d at 73); *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. July 20, 2004) ("*Zubulake V*"). The Third Circuit applies a four-factor test to determine what actions constitute spoliation: "[1] the evidence was in the party's control; [2] the evidence is relevant to the claims or defenses in the case; [3] there has been actual suppression or withholding of evidence; and [4], the duty to preserve the evidence was reasonably foreseeable to the party." *Major Tours, Inc. v. Colorel*, 2009 U.S. Dist. LEXIS 97554, at *9; see also *Bozic*, 912 F. Supp. 2d at 266-73 (citing *Bull*, 665 F.3d at 73).

The first three elements have clearly been established: (1) Defendants cannot dispute that the emails of its Admissions Employees—emails they now claim exist only in their backup tapes—were, and continue to be, in their control;  (2) Your Honor and the Court have twice found the emails of Admissions Employees not just relevant, but central to the claims in the case; and (3) Defendants' January 30 and 31, 2014 letters and the testimony of their 30(b)(6) designee acknowledge that Defendants have failed to preserve this core ESI in an active state.   The question of spoliation thus turns on whether Defendants had a reasonably foreseeable duty to preserve this evidence, and the answer is also yes.

Defendants would like Your Honor to believe that they were unaware of the governments' investigations into potential violations of the ICB or the potential of this litigation until December 2010.  But the evidence shows otherwise.

Plaintiff Relator Michael Mahoney informed Defendants about the potential of this lawsuit in 2007.  Specifically, on September 5, 2007, Mr. Timothy A. Fedele, a lawyer acting on behalf of Mr. Mahoney, sent a letter to Mr. John Oliverio, EDMC's Vice President of Human Resources, informing EDMC that Relator Mahoney was considering litigation against EDMC on various grounds.   Mahoney's Sept. 5, 2007 Letter (Ex. I).   Among other things, the letter informed EDMC that Mr. Mahoney was "considering the possibility of pursuing related whistleblower reports to the appropriate education funding agencies."  *Id*. at 3.  Mr. Mahoney further mentioned concerns about "federal (U.S. Department of Education/Title IV) compliance issues" and asserted that employees were "directed to lie to the IRS" for "purposes of making a financial aid determination as part of the enrollment process."  *Id.* at 2.  On October 8, 2007, following communications between Mr. Mahoney's lawyer and Defendants, Mr. Mahoney emailed Mr. Oliverio and again made his intentions to pursue litigation, including regarding

compliance issues, very clear.  For example, the subject of the email was "On my way to the eeoc," and in the email Mr. Mahoney reiterated that he would be "reaching out to those that would have some interest in some of the compliance issues" at the Defendant-institutions. Mahoney's Oct. 8, 2007 Email (Ex. J).  The documents also show that this matter, including Mr. Mahoney's allegations with regards to compliance issues, was escalated to Ms. Karen Baillie, Vice President, Assistant General Counsel and Assistant Secretary at EDMC.  Baillie's Oct. 10, 2007 Letter (Ex. K).

The correspondence and referenced communications among Mr. Mahoney, Mr. Fedele (Mr. Mahoney's lawyer), Mr. Oliverio (EDMC's VP of Human Resources) and Ms. Baillie (EDMC's VP, Assistant General Counsel and Assistant Secretary) unequivocally put Defendants on notice of the potential for this litigation.  In fact, Defendants have argued that Mr. Mahoney anticipated litigation as of September 2007, seemingly relying on this very same correspondence. Defs.' Jan. 17, 2014 Email (Ex. L).  But despite this correspondence, which among other things informed Defendants that Mr. Mahoney was "intent on proceeding to litigation" (Ex. I at 3) and that he would be "reaching out to those that would have some interest in some of the compliance issues" (Ex. J), and despite Mr. Mahoney having filed an EEOC claim in February 2008, Defendants did not even preserve any of Mr. Mahoney's ESI at that time.  *See* Ex. B at 2 (EDMC "does not have any ESI for custodian Michael Mahoney in its possession").

At a minimum, Defendants were aware that the government was investigating them for potential ICB violations as early as March 2008.  As Defendants are aware, on March 19, 2008, EDMC's counsel, Tom Hylden, contacted the United States Department of Education in order to obtain the name of the Assistant United States Attorney handling the *United States ex rel. Washington* investigation into EDMC.  This communication clearly shows that Defendants

reasonably anticipated the potential of this litigation and thus had a duty to preserve evidence since that time. *See The Sedona Conference Commentary on Legal Holds: The Trigger and the Process* (The Sedona Conference Working Group Series, September 2010 Version), *available at* www.thesedonaconference.org ("*Sedona Conference On Legal Holds: The Trigger and the Process (Sept. 2010 version)*") (duty to preserve is triggered when "an organization concludes (or should have concluded), based on credible facts and circumstances, that litigation or *a government inquiry* is probable") (emphasis added).[10]

That Defendants should reasonably have been on notice of potential litigation concerning their recruiting practices no later than March 2008 is particularly true here, given Defendants' 2007 hiring of numerous former University of Phoenix ("UoP") employees who were involved in, and had inside knowledge of, the ED investigation that found that the UoP's compensation system was an illegal attempt to circumvent Title IV of the HEA's prohibition on incentive compensation.[11] These individuals had knowledge of the strong similarities between the UoP and Defendants' compensation plan, and should therefore have been particularly aware of the

---

[10] In addition, in June 2010, EDMC's counsel, Timothy Hatch from Gibson Dunn, who is an attorney of record in this case, had communications with Paul Skirtich, Assistant U.S. Attorney for the Western District of Pennsylvania, and Jay Majors, Attorney for the Department of Justice's Commercial Litigation Branch, regarding this very case. *See, e.g.,* US000150562 (Ex. M) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and US000150542 (Ex. N) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Thus, it is inconceivable—and utterly inaccurate—to say that Defendants did not anticipate this litigation until December 2010. This evidence also disproves Defendants' mantra that the United States did not inform them of the pendency of this lawsuit for four years. *See, e.g.,* Ex. A at 3 (arguing that relevant ESI no longer exists "in part because of the Government's four-year delay in notifying EDMC about this lawsuit.").

[11] For example, one of the former UoP employees hired by Defendants was Todd Nelson, who was the signator to the settlement agreement between ED and UoP and became EDMC's Chief Executive Officer.

Metadata in Defendants' document production shows that Defendants were not only aware of the University of Phoenix case but were actively monitoring its progress. For example, Mr. Nelson had an email folder titled "apollo case"—UoP is one of the school groups that make up the Apollo Education Group.

potential for a government investigation of EDMC and this litigation.  *See Sedona Conference On Legal Holds: The Trigger and the Process (Sept. 2010 version).*

Despite being aware of the potential of this litigation for years before the partial unsealing of the complaint, up until June 2011 when a litigation hold was finally issued, Defendants failed to preserve the majority of relevant emails in their active state and instead preserved them only in backup tapes which they now claim are inaccessible.  As they have admitted, between January 2002 and June 2011, Defendants routinely wiped the hard drives of departing Admissions Employees and limited the mailboxes of current Admissions Employees to 250 megabytes, making the backup tapes the only source for this core and essential discovery.  Ex. B at 2 (explaining that EDMC's "typical practice . . . upon departure of an employee, was to wipe the hard drive and (typically) repurpose the employee's machine or dispose of it");  Ex. C at 120:17-23 (confirming that " ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████ ")  And, some pre-2009 emails no longer exist, not even in the backup tapes, when the backup of Defendants' email systems were conducted on a monthly basis.  Ex. C at 133:3-7.  Defendants should not be allowed to benefit from their spoliation of evidence and should therefore be ordered to restore and produce Admissions Employees' emails that reside in the backup tapes. Once the emails on the backup tapes are restored and reviewed, Plaintiffs will be able to determine whether further motion practice is required to remedy the spoliation of pre-2009 emails.

**V.**     <u>**Conclusion.**</u>

Based on the foregoing, Plaintiffs respectfully request that Your Honor recommend that Defendants be ordered to restore the backup tapes that contain current and former Admissions Employees' emails for the period of January 1, 2002 to the present, and to produce all such emails to Plaintiffs.

Very truly yours,

DAVID J. HICKTON
United States Attorney


/s/ Christy C. Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney
(412) 894-7452