# EXHIBIT S



**U.S. Department of Justice**
*United States Attorney*
*Western District of Pennsylvania*

*U.S. Post Office & Courthouse*
*700 Grant Street*
*Suite 4000*
*Pittsburgh, Pennsylvania  15219    412/644-3500*

March 27, 2014

**VIA E-MAIL & HAND DELIVERY**
The Hon. Richard A. Levie (Ret.)
Special Master                                                **Contains Material**
JAMS, Inc.                                                    **Designated Confidential**
555 13th Street NW, Suite 400 West
Washington, D.C. 20004

>   RE:   ***United States of America, et al. v. Education Management Corporation, et al.*,**
>         **Civil Action No. 07-461**
>         **Plaintiffs' Reply in Support of Motion to Compel The Production of Documents From Defendants' Backup Tapes.**

Dear Special Master Levie:

Defendants' Opposition to Plaintiffs' Motion to Compel the Production of Documents from Defendants' Backup Tapes ("Opposition") confirms the timeliness and necessity of Plaintiffs' Motion and, more importantly, the need to have Defendants restore their backup tapes and produce the emails of all Admissions Employees[1] for the time period of January 1, 2002 to December 31, 2012 that have not otherwise been produced.

Defendants assert that Plaintiffs' Motion is somehow premature because, contrary to Court Order, Defendants have not yet produced all of the Admissions Employees' ESI that exists in an active state.  Yet, by Defendants' own admission, the Admissions Employees' ESI they intend to produce will be limited to ESI from only a tiny fraction – at most 1.2% –of the 11,000

---

[1] The term Admissions Employees shall have the definition ascribed in Plaintiffs' discovery requests.

Admissions Employees employed by Defendants during the time period relevant to this case. Defendants' promised future production of responsive ESI for just 1% of Admissions Employees in no way satisfies Defendants' discovery obligations under the Federal Rules and the Court's discovery Orders in this case. That is particularly true where, as here, responsive ESI for the remaining 99% of custodians that Defendants have definitively refused to produce "represents some of the most probative evidence sought by Plaintiffs[.]" R&R No. 2 [Dkt. No. 258]. Plaintiffs' Motion is therefore not only ripe, but must be promptly resolved in order for discovery more broadly, including the looming start of depositions, to move forward meaningfully.

Defendants' substantive arguments against the production of this core discovery, whether styled as arguments against accessibility or otherwise, are similarly infirm. The backup tapes are accessible. Many of Defendants' assertions of burden are nothing more than an attempt to re-litigate Your Honor's and the Court's Orders on the parties' April 2013 motions to compel, which required that Defendants produce ESI for all 11,000 Admissions Employees. The grossly inflated cost estimates Defendants offer for restoring the ESI at issue, meanwhile, utterly fail to take into account more cost-effective restoration technologies. Indeed, as set forth in the Declaration of Todd M. Haley, cataloging and restoring relevant PSTs *for the entire January 1, 2002 to December 31, 2012 time period* will cost, at most, $823,741.80. In the context of this lawsuit, where the stakes are high and the potential recovery is billions of dollars of taxpayers' money, this amount is well within reason. Because the backup tapes are accessible, Defendants' faulty analysis of whether the Plaintiffs have shown good cause for restoration is irrelevant. Nonetheless, should Your Honor determine that the good cause analysis be conducted, that analysis decisively favors restoration of Defendants' backup tapes.

For these reasons, Your Honor should recommend that Defendants be ordered to restore the backup tapes that contain current and former Admissions Employees' emails that do not exist in an active state, and produce all Admissions Employees' emails to Plaintiffs, consistent with Your Honor's and the Court's prior orders.

**I. Plaintiffs' Motion Is Timely And Necessary Because Of The Wholesale Inadequacy Of Defendants' Production Of Admissions Employees' Email.**

Defendants' argument that Plaintiffs' Motion is premature is a red-herring aimed at masking the inadequacy of Defendants' production – both to date and through the completion of discovery. Defendants' representations that they have not yet completed their production of Admissions Employees' emails and other relevant ESI, and that they will allow Plaintiffs to inspect the backup tapes in response to pending discovery requests, do not address the concerns raised in Plaintiffs' Motion. To the contrary, Defendants' concession that their completed productions will be woefully inadequate—consisting of ESI from only 132 of more than 11,000 Admissions Employees—*confirms* that Plaintiffs' Motion is both necessary and ripe for adjudication. Moreover, although Defendants now claim that they may have destroyed some of the relevant emails, they also are forced to acknowledge that their backup tapes were designed to capture all of the missing documents and indeed are the *only* source for those emails that do not exist in an active state. Given the wholesale inadequacy of Defendants' planned productions, the impending close of document discovery, and the critical importance of the evidence contained on Defendants' backup tapes, it would be inappropriate to delay adjudication of this Motion.

Nor can there be any dispute that Defendants' stated intention, to produce ESI from a total of approximately 132 Admissions Employees,[2] is fundamentally inadequate.[3] As Your

---

[2] Defendants have not even guaranteed that the ESI for the additional 100 Admissions Employees they plan to produce will include emails. However, for purposes of this Motion, Plaintiffs assume that Defendants will in fact produce the emails for this limited number of Admissions Employees.

3

Honor noted in R&R No. 2, communications between Defendants and their Admissions Employees "represents some of the most probative evidence sought by Plaintiffs and in many cases is directly relevant and responsive to allegations made in the Joint Complaint." R&R No. 2 [Dkt. No. 258]. Nevertheless, Defendants' production of this "most probative evidence" will be limited to just **1.2%** of relevant custodians. *See id.; see also* Ex. A at 2 (acknowledging Admissions Employees' emails "will likely constitute a substantial portion of EDMC's overall document productions in this case"). Waiting for Defendants to complete their document productions will not change the fact that most ESI for the remaining 98.8% of the approximately 11,000 relevant Admissions Employees exists only in backup tapes. Ex. C at 125:1-17; 120:17-23. Rather, such delay will only further hinder Plaintiffs' preparation for depositions next month. As there is no dispute that Defendants intend to produce – at most – ESI for 132 out of 11,000 Admissions Employees, Plaintiffs' Motion is ripe for adjudication.[4]

## II. The Vast Majority Of Admissions Employees' Emails Exist Only on Backup Tapes.

Defendants' designated Rule 30(b)(6) representative ("Rule 30(b)(6) Representative") acknowledged that the majority of Admissions Employees' emails exist only on backup tapes.[5] Indeed, in response to questions regarding accessibility and Defendants' backup practices,

---

[3] As set forth in Plaintiffs' Motion to Enforce Report and Recommendation No. 4, Defendants were ordered to produce, among other things, all Admissions Employees' emails by December 31, 2013; yet, to date, Defendants have produced ESI from thirty-two Admissions Employees, including emails from eighteen Admissions Employees. *See* Defs.' Dec. 31, 2013 letter, Ex. A at 4. Document production is to be completed in approximately one month and Defendants have acknowledged that they will not be producing the vast majority of this key discovery because it is available only in backup tapes. Defs.' Mar. 12, 2014 Opp. MTC Backup Tapes 8.

[4] For these same reasons, Defendants' suggestion that Plaintiffs must first inspect Defendants' backup tapes would only unnecessarily delay Plaintiffs' receipt of this probative discovery. The backup tapes are the only source for a large number of Admissions Employees' emails. *See* Ex. C at 124:3-125:17. That "some" of the emails may not be present on the tapes is no reason to allow Defendants to avoid their production obligations.

[5] Defendants' argument that much of what exists in backup tapes also exists in an active state is incorrect. Plaintiffs are not seeking to have Defendants produce ESI from the backup tapes that also exists in an active state, as Plaintiffs understand that Defendants will be producing such emails. Rather, Plaintiffs are seeking—and are entitled to—production from the backup tapes of responsive ESI *that does not exist elsewhere.*

Defendants' Rule 30(b)(6) Representative unequivocally testified that nearly all of Defendants' emails have been retained in backup tapes for the period of January 1, 2002 to August 2009, and that *all* emails that passed through Defendants' servers since September 2009 have been retained in backup tapes. Ex. C at 94:23-95:2.

Specifically, between January 1, 2002 and August 2009, Defendants performed monthly backups of their email systems, *id.* at 96:3-8; thereafter, Defendants performed daily incremental backups, as well as weekly backups, and monthly full back ups of their email systems. *Id.* at 94:25-95:25. The only emails that do not exist in backup tapes are pre-September 2009 emails that users may have purged from their "deleted" items folder during the month preceding the backup and which had not been captured during the prior month's backup. *See id.* at 133:3-7. Thus, the backup processes described by Defendants' Rule 30(b)(6) Representative should have captured the vast majority of relevant ESI and such backup tapes have been maintained indefinitely.

Apparently unhappy with the testimony their Rule 30(b)(6) Representative provided, Defendants improperly seek to modify it in their Opposition. *Resolution Trust Corp. v. Farmer*, No. 92-3310, 1994 U.S. Dist. LEXIS 8755, at *1 (E.D. Pa. June 24, 1994) (noting purpose of Rule 30(b)(6) is to create testimony that binds the corporation); *see also Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ. v. Varian Med. Sys.*, No. 08-01307, 2011 U.S. Dist. LEXIS 149685, at *41 (W.D. Pa. Dec. 30, 2011) (citing approvingly *Resolution Trust Corp*, 1994 U.S. Dist. LEXIS 8755). For example, Defendants' Rule 30(b)(6) Representative testified that Defendants performed monthly backups during the January 2002 to August 2009 time period, and that there were no backup tapes missing for that time period. Ex. C at 94:23-95:1. But Defendants now claim that for some months during that time period Defendants either

backed up email systems files rather than individual user files or entirely failed to perform the backup of the email systems, Defs.' Mar. 12, 2014 Opp. MTC Backup Tapes 3, and argue that Admissions Employees' emails "may or may not exist on the backup tapes … and may exist from other accessible sources." *Id.* at 7.  Ultimately, however, Defendants' speculation about what may or may not exist is beside the point.  Defendants' Rule 30(b)(6) Representative established that the vast majority of Admissions Employees emails exist on the backup tapes and nowhere else, and his testimony is corroborated by Defendants' admission that they will produce ESI for only 1% of Admissions Employees.  Even if Defendants are right that their Rule 30(b)(6) Representative provided incorrect testimony, and that, as shown in the inventory of Defendants' backup tapes,[6] a number of tapes for the relevant time period are unaccounted for, Defendants clearly should still be required produce Admissions Employees' emails from the numerous backup tapes Defendants acknowledge they possess.

     Defendants also argue that the backup tapes include only the "*server-based* emails in the user's mailbox at the time of the backup" and that "[b]ecause of size restrictions . . . ., most employees saved emails to individual computer hard drives, *which were never part of the email backup.*"  Defs.' Mar. 12, 2014 Opp. MTC Backup Tapes 3.  But Defendants' monthly snapshot backups performed from January 2002 to August 2009 included emails in the deleted folder.  Ex. C at 111:4-5.  The only emails that would not have been captured during this time period are those that were not merely "deleted" by the user but also "purged" from the deleted folder.  Since September 2009, Defendants have performed daily backups and have employed a "double delete" system that ensures that all emails – even those deleted and purged by users – are backed

---

[6] *See* Exhibit A to the Declaration of Matthew Siconolfi submitted in support of Defendants' Opposition.

up and maintained indefinitely in the tapes. *See id.* 111:19-25, 12:20-24 (███████████████████████████████████████████████████████████████████████████████████████████). Thus, while there may be some pre-September 2009 emails not captured in the backups, the majority of Admissions Employees' emails that no longer exist in an active state do exist in the backup tapes. In sum, Defendants' backup processes were designed to capture the vast majority of emails that no longer exist in an active state. Even if some emails have been destroyed, Plaintiffs are entitled to receive those emails that still exist.

### III. Restoration of the Backup Tapes Does Not Impose An Undue Burden.

Defendants' representation that restoring even a fraction of the ESI maintained in their backup tapes will cost approximately $13 million and will require seven to nine months of work is wildly inaccurate. Defendants' numbers are the result of strategically choosing a restoration process that would greatly exaggerate the cost of restoring ESI in order to provide a false sense of inaccessibility.[7] In fact, as detailed in the supporting Declaration of Todd M. Haley (Ex. O), and as set forth below, the requested data can be located and obtained efficiently at a fraction of Defendants' purported cost.[8]

---

[7] Defendants have represented that they issued proper litigation holds in December 2010 and that they have preserved all relevant discovery since that time. Thus, ESI for 2011 and 2012 should exist in an active state, eliminating the need to catalog or restore backup tapes for those years. Nonetheless, Defendants' estimates on the cost of restoration focus on the September 2009 to December 2012 time period. That Defendants base their estimates on restoration of tapes that contain ESI that is available in an active state shows that they are being disingenuous with their estimated number of tapes that need restoration and extraction and with the amount it would cost to restore them.

[8] Defendants estimate that there are 2,331 backup tapes for the entire relevant time period (*i.e.*, January 1, 2002 to December 31, 2012). Defs.' Mar. 12, 2014 Opp. MTC Backup Tapes 4. They further estimate that there are 648 tapes containing emails for the September 2009 to December 2012 time period, and that those tapes contain a total of 1,368,000 .pst files. *Id.* at Ex. A to Ex. 3 at ¶¶12 (72 sets times 9 tapes per set), 26. For purposes of this Motion, Plaintiffs assume that those numbers are correct.

The first step in restoring backup tapes is to obtain a catalog of each tape – a process that costs a mere $35 per tape. Ex. O ¶ 6.b.  This process will identify which tapes contain emails, known as Exchange Database Files ("EDBs"), preventing the need for restoring tapes that do not contain emails, which will correspondingly reduce the cost and increase the efficiency of the restoration process. *Id.* at ¶¶ 6. Using Defendants' estimated number of a total of 2,331 tapes, cataloging all tapes for the entire relevant time period would cost $83,216.70, including a technical services fee of $1,631.70.  *Id.* at ¶ 6. This first step can be accomplished in 40 to 50 days.  *Id.* at ¶ 6.a.

The second step is to restore and extract .pst files from those tapes that contain EDBs.  *Id.* at ¶ 7. The cost to restore the .pst files from the 648 tapes which Defendants believe contain such files for the September 2009 to December 2012 time period, is $160 per tape, for a total of $103,680. *Id.* at ¶ 8.a. Assuming 1,368,000 .pst files for this time period, the total cost of extraction is $478,800. *Id.* at ¶ 8.b. Thus, the total cost associated with restoration and extraction of the estimated .pst files for the September 2009 to December 2012 time period, including a technical service cost of $11,649.60, is **$549,129.60** — not over $13 million as Defendants allege.[9]  *Id.* at ¶ 8.d. In a case of this size and complexity, this cost is reasonable, particularly because the costs would be incurred to restore critical ESI that the Court and Your Honor have ordered Defendants to produce.  *Cf. John B. v. Goetz*, 879 F. Supp. 2d 787, 882-83, 889 n.42 (M.D. Tenn. 2010) (estimated $10 million cost for production was dwarfed by $7 billion of

---

[9] As an alternative, to restore and extract the proposed 360,000 .pst files discussed in the Opposition would cost a total of $491,313.60 and require 30 to 40 days to complete. Ex. O at ¶ 9.  Specifically, it would cost $103,680 to restore 648 tapes (a cost of $160 per tape), plus $1.05 per each of the 360,000 .pst files, and a technical services cost of $9,633.60.  *Id.*

8

federal funds at issue in the case). Moreover, this entire process, including the cataloging, can be done in 90 to 110 days.[10]  *Id.* at ¶ 8.

Defendants do not provide an estimate of the number of .pst files for the January 2002 to August 2009 time period.  *Id.* at ¶ 10.  Defendants assume that there are 67 backup sets during the January 2002 to August 2009 time period, and in other calculations they assume 9 tapes and 19,000 extractable .pst files per backup set.  *Id.*  Based on those assumptions, Plaintiffs estimate that there are a total of 1,273,000 .pst files on 603 backup tapes for the February 2002 to August 2009 time period.  *Id.*  Combining this number with the estimated 1,368,000 .pst files for the September 2009 to December 2012, there are an estimated 2,641,000 .psts for the entire relevant time period.  *Id.*  Restoring and extracting 2,641,000 .pst files from 1,251 tapes will require approximately 100 to 130 days, and cost a total of $823,741.80.[11]  *Id.* at ¶ 11.

The burdens and costs of restoring the backup tapes in the context of this case are reasonable and, as a result, pursuant to Rule 26, Defendants' backup tapes are to be deemed accessible.  Fed. R. Civ. P 26(b)(2)(B).

## IV. Even If The Backup Tapes Are Deemed Inaccessible, Plaintiffs Have Shown Good Cause To Order Their Restoration.

Even assuming that Defendants' back up tapes are inaccessible, restoration is appropriate because Plaintiffs have shown good cause. On pages 13-18 of the Motion, Plaintiffs demonstrate how each of the seven factors used to inform the good cause analysis weigh in favor of ordering restoration. Defendants' summary arguments to the contrary – which were provided as short bullets with little to no analysis – lack colorable merit.

---

[10] The restoration and extraction can begin in parallel with the cataloging process so that the total turnaround time is less than the sum of both the cataloging and restoration steps. Ex. O at ¶ 8.

[11] Even this number is inflated as it includes backup tapes for years when Admissions Employees' email should exist in an active state.

As to the first factor, that Defendants have been ordered to produce materials that require a search of a decade's worth of backup tapes is irrelevant to the question of specificity. Plaintiffs are asking Defendants to search their backup tapes for core documents responsive to requests that the Court and Your Honor already considered and found to be proper. Thus, among other things, the Court, in overruling Defendants' objections to Your Honor's R&R No. 2, found Plaintiffs' requests to be appropriately tailored to the facts of this case. Memorandum Opinion and Order of the Court [Dkt No. 291]. There simply can be no argument that Plaintiffs' requests are not sufficiently specific. The fact that Plaintiffs have not provided a list of names of Admissions Employees whose emails are not available in an active state – which is something only Defendants can do – does not make the request insufficiently specific.

Second, it is not true that relevant information is available from more easily accessed resources. Defendants have admitted that when their productions are complete they will have produced ESI from a total of approximately 132 Admissions Employees. This represents less than 1.2% of relevant custodians – which is a fraction of the discovery Plaintiffs are entitled to receive. The Court has repeatedly acknowledged that Defendants' communications with Admissions Employees are "central" to Plaintiffs' case, and has, based on that finding, also rejected Defendants' various attempts at sampling.[12] As Plaintiffs explained in the Motion, Defendants' production of some portion of emails from some small fraction of Admissions

---

[12] Despite Defendants' repeated efforts to limit discovery in various ways, including sampling, the Court authorized "conventional, unlimited discovery." Memorandum Order Denying Motion for Case Management Order [Dkt. No. 224] 3. In their Opposition, Defendants once again argue in favor of a sampling methodology. Your Honor should not entertain these arguments. As Plaintiffs have explained numerous times – and as the Court and Your Honor have previously agreed – evidence of fraud is likely to be found among Defendants' communications with their Admissions Employees, including the frequency of and breadth of dissemination of certain communications focusing on enrollments of students above all else. The discovery at issue – Admissions Employees' email showing their day-to day employment experiences -- is central to Plaintiffs claims. Your Honor and the Court have repeatedly ordered Defendants to produce this discovery in full. The fact that this discovery resides in backup tapes should not allow Defendants to curtail their discovery obligations especially where, as here, the cost to restore the tapes is quite reasonable.

Employees is wholly insufficient to comply with prior Court orders. Pls.' Feb. 24, 2014 MTC Backup Tapes 16. Evidence of fraud will require a large number of communications between Defendants and their Admissions Employees. All of the communications are needed to establish the systemic and constant pressure placed on Admissions Employees to "enroll at all costs." Producing ESI from, at most, 1.2% of Admissions Employees will not, for example, paint a full picture of the frequency and manner in which Defendants tracked and evaluated Admissions Employees' enrollment-related activities and promoted enrollment goals to the exclusion of everything else. Moreover, there is no dispute that the vast majority of the emails for approximately 98.8% of Admissions Employees employed during the relevant time period exist only on the backup tapes.

Defendants' arguments with regards to the third factor -- *i.e.,* the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources – are also unconvincing. Defendants have represented that by the close of document discovery they will produce ESI from just 132 Admissions Employees. This is unacceptable.

It is also not true that the likelihood of finding relevant information and the predicted usefulness of additional information are low (factors four and five). The importance of Admissions Employees' emails has been acknowledged by all, and Defendants' Rule 30(b)(6) Representative testified that most of these emails reside only in backup tapes. Restoration of such tapes will therefore yield this crucial discovery that does not exist elsewhere. Ex. C at 125:1-17, 119:19-25.

Finally, Defendants have conceded that the sixth and seventh factors are met, as the issues in this case are of great importance, Defs.' Mar. 12, 2014 Opp. MTC Backup Tapes 9, and

Defendants indisputably have substantial resources, *id*; *see also* MTC Order 1 at 6 (finding that "the issues [in this litigation] are of surpassing importance").

**V. The Need To Restore A Significant Portion Of The Backup Tapes Is The Direct Result Of Defendants' Failure To Take Appropriate Action After Learning of The Potential for Litigation In September 2007.**

Defendants do not deny that in September 2007 Plaintiff-Relator Michael Mahoney put them on notice that he may pursue litigation, including on "whistleblower reports." Ex. I at 3. Nor do Defendants deny that their outside counsel reached out to the United States in March 2008 regarding the *Washington* investigation. Likewise, they do not deny that their lawyers had communications with the United States regarding this *qui tam* case in June 2010. *See* Pls.' Feb. 24, 2014 MTC Backup Tapes 21, n. 10. Nevertheless, Defendants continue to argue that they did not anticipate litigation until December 2010. In light of the above-mentioned evidence, Defendants' position is simply not credible. For the reasons set forth in Plaintiffs' Motion, Defendants should be ordered to restore the backup tapes so that Plaintiffs can assess the amount of ESI that has been spoliated. To be clear, Plaintiffs' position is not that the backup tapes must be restored due to spoliation. Rather, as Plaintiffs have shown, Defendants' backup tapes are accessible and, as a result, Defendants must search and produce relevant ESI from such tapes. But, even if Your Honor finds that the tapes are inaccessible, Plaintiffs have shown good cause for their restoration. Indeed, Defendants have admitted that they have destroyed some evidence— *see, e.g.,* Ex. A at 3 (claiming that "much" of Admissions Employees' ESI "no longer exists"), Defs.' Mar. 12, 2014 Opp. MTC Backup Tapes 3 ("And it is possible that no email exists for some months…")—and such actions give rise to spoliation. Yet, even if

spoliation had not occurred, Defendants should search their backup tapes for discovery they have already been ordered to produce.[13]

## VI. Conclusion.

Based on the foregoing, Plaintiffs respectfully request that Your Honor recommend that Defendants be ordered to restore their backup tapes and produce the emails of all Admissions Employees[14] for the time period of January 1, 2002 to December 31, 2012 that have not otherwise been produced.

Very truly yours,

DAVID J. HICKTON
United States Attorney

/s/ Christy C. Wiegand
CHRISTY CRISWELL WIEGAND
Assistant U.S. Attorney
(412) 894-7452

---

[13] Contrary to the testimony of their Rule 30(b)(6) Representative, Defendants admit that there are gaps in the list of backup tapes that they currently have available. For example, Defendants have backup tapes for just two months of 2006. Ex. A to Siconolfi Declaration (Ex B to Defs.' Mar. 12, 2014 Opp. MTC Backup Tapes). The discrepancies between the testimony of Defendants' Rule 30(b)(6) Representative and Siconolfi's Declaration in Support of the Opposition raise questions as to whether the missing tapes existed but were spoliated.

[14] The term Admissions Employees shall have the definition ascribed in Plaintiffs' discovery requests.