# EXHIBIT U

# JONES DAY

500 GRANT STREET, SUITE 4500 • PITTSBURGH, PENNSYLVANIA 15219.2514

TELEPHONE: +1.412.391.3939 • FACSIMILE: +1.412.394.7959

DIRECT NUMBER: (412) 394-7929
LEELLSWORTH@JONESDAY.COM

JP013742:ccs/1281661v1
149637-635001

March 12, 2014

## VIA EMAIL and OVERNIGHT DELIVERY

The Honorable Richard A. Levie (Ret.)



rlevie@jamsadr.com

     Re:   United States *ex rel*. Washington v. Educ. Mgmt. Corp. *et al.*,
              Civil Action No. 2:07-cv-00461-TFM (W.D. Pa.)
              **EDMC's Opposition to Plaintiffs' Motion to Compel Backup Tapes**

Dear Judge Levie:

     In its continued effort to impose undue discovery burdens on EDMC, the government claims it has "no choice" but to move to compel EDMC to restore electronic data on some twelve years' worth of disaster-recovery backup tapes at a cost that will run in the millions of dollars. Mot. to Compel at 7. Yet the government filed its motion before EDMC even had the opportunity to serve its Rule 34 response to the government's request for the inspection of those tapes and before discovery from other sources is complete. The crush of the burden, its utter lack of warrant, and the rush to impose it, all are emblematic of discovery deployed not to develop facts but to exact punishment. The government's motion should be recognized for what it is and summarily denied.

     The government asks the Special Master to order EDMC to restore all backup tapes "that contain current and former Admissions Employees' emails from January 1, 2002 to present, and to produce all such emails to Plaintiffs." Mot. to Compel at 23. The undertaking would involve restoring an estimated 2,000 tapes at a cost potentially exceeding $13,000,000. It would take many months to complete. And, as explained below, the effort ultimately may recover very little.

     The data on EDMC's disaster-recovery backup tapes is inaccessible. The government cannot show good cause to force EDMC to absorb the cost of restoring inaccessible data. And the "good cause" inquiry is, in material measure, premature. The government itself asked to inspect EDMC's backup tapes, presumably to make its own determination on accessibility and the extent to which relevant ESI exists, yet the government did not wait for EDMC's answer before it filed this motion. As EDMC's response to the government's third set of requests for production, which was served Monday, states, EDMC will permit the government to inspect and see for itself that the tapes are inaccessible. Moreover, as the government ignores, EDMC has

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 2

already committed to producing in the very near term a substantial volume of additional accessible data from current and former Admissions Employee custodians.[1]  "Plaintiffs should obtain and evaluate the information from [reasonably accessible sources] before insisting that the responding party search and produce information contained on sources that are not reasonably accessible."  *Kleen Prods. LLC v. Packaging Corp. of Am.*, No. 10-5711, 2012 WL 4498465, at *18 (N.D. Ill. Sept. 28, 2012) (citation and marks omitted) (request to produce backup tapes premature where plaintiffs had not completed review of defendants' documents).  All of this must be complete before any "good cause" inquiry is ripe.

In an effort to advance a motion for restoration that should have been deferred, the government also asserts that EDMC's litigation-hold and backup-tape practices resulted in spoliated evidence.  The government makes this groundless charge as a final argument for restoration, but, in reality, the allegation is a fairly transparent effort to impose implicitly costly discovery sanctions—the financial burden of restoration—without any evidence that could meet the required standard.  The premise of the argument—that EDMC knew of the substance and scope of the government's allegations in this case before December 2010—fails at the outset. None of the communications the government cites suggest in any way that EDMC should have been retaining every email of every Admissions Employee for four years while the government's claims in this case remained under seal and were entirely hidden from EDMC.  "Must a corporation, upon recognizing the threat of litigation, preserve every shred of paper, every email or electronic document, and every backup tape?  The answer is clearly, 'no.'"  *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y 2003) ("*Zubulake IV*").  The loss of ESI in the normal course of business without knowledge of its relevance is not spoliation.  *Hixson v. City of Las Vegas*, No. 12-871, 2013 WL 3677203, at *5 (D. Nev. July 11, 2013) ("[A] party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of its business.").[2]

The government's motion is unripe and groundless.  It should be denied.

I.   **EDMC's Backup Tapes**

Every EDMC employee is given an email account.  EDMC has over 25,000 user inboxes on its email servers at any one time.  *See* Ex. 1, M. Miko Dep. Tran., 319:16-19.[3]  Absent a litigation hold, and as is common business practice, users routinely deleted emails, and EDMC

---

[1] *See* Defendants' Opposition to Motion to Enforce Report & Recommendation No. 4 at 5.

[2] The government also asserts, without citations, that "[d]espite repeated assurances that they had preserved all relevant discovery, Defendants did an about face and now contend that the vast majority of core discovery, particularly Admissions Employees' email, is inaccessible and they will not search for or produce it."  Mot. to Compel at 1.  The government's claim is groundless.  EDMC took steps to preserve relevant ESI when litigation was foreseeable.  The government's claim that EDMC gave "assurances" that it had saved and could produce every Admissions Employee email from 2002 forward is as false as it is citation-free.

[3] Mr. Miko, EDMC's Chief Information Officer, was deposed as EDMC's Rule 30(b)(6) designee regarding EDMC's document collection and its retention practices.

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 3

routinely deleted email accounts as employees left EDMC's employ.  *See id.* at 111:14-16, 115:20-25.

EDMC's backup tapes exist for disaster-recovery purposes only.  *Id.* at 100:2-5.  To the extent that emails were captured at all in the backup process, the backups would include all *server-based* emails in the user's mailbox at the time of the backup. *See* Ex. 2, Miko Dep. Ex. 1, Memory Aid at 6.  The term "server-based" is key:  Because of size restrictions for email accounts, most employees saved emails to individual computer hard drives, *which were never part of the email backup.  Id.*  Those emails would remain on those individual hard drives until they were deleted.  In other words, the email that may have been captured on a backup is not a complete picture but, instead, only a subset of what existed at the time of the backup.

The backup tapes at issue here can be broken into two groups by time periods.  The first group consists of backup tapes for emails that were on EDMC's servers from January 1, 2002 through September 2009.  During this period, EDMC's practice was to back up its email servers once per month (though it missed some months).  *See* Ex. 1, M. Miko Dep. Tran., 96:14-17, 97:19-23.  EDMC did not dedicate separate tapes for email, and, thus, until and including September 2009, the email backup is intermixed with other electronic data systems.  Ex. 3, Declaration of Matthew Siconolfi ("Siconolfi Decl.") at ¶5.  And it is possible that no email exists for some months because for part of that period, EDMC was only backing up the email system files (the files that tell the system how to operate) as opposed to the individual user files (where the actual email resides).  *Id.* at ¶6.  There is no way to find the email (or determine if it exists) without incurring the cost to restore all of the tapes in a given month.  Every tape in each monthly cycle must be restored in order to find whether email even exists.

During this period, EDMC maintained an inventory of its backups by month, but it did not maintain a list of the number of tapes included in each backup.  *Id*. at  ¶¶3, 7.[4]  EDMC engaged bit-x-bit, a Pittsburgh company that specializes in forensic analyses of electronic data systems, to restore four sets of tapes within this period—February 2002, May 2008, June 2008, and September 2009.  The average number of backup tapes within each of these four months is 27.  Ex. 4, Declaration of Susan Ardisson ("Ardisson Decl.") at ¶10.  There are 63 monthly sets of backup tapes that have not been restored for the period January 2002 through September 2009 (EDMC has restored four sets).  Ex. 3, Siconolfi Decl. at ¶7.  Using the average of 27 tapes per month, EDMC would have to restore an additional 1,701 backup tapes for this period alone simply to see *if* there is *any* email on them or not.  Ex. 4, Ardisson Decl. at ¶11.

---

[4]For its ordinary business purposes, EDMC has no need to know the precise number of tapes; it only needs to know the location of those tapes at the Iron Mountain facility.  In order to obtain a precise number, someone would have to go to the Iron Mountain facility in Boyers, Pennsylvania, locate each of more than 130 containers of tapes, and count the thousands of tapes.  Should the government wish to do so rather than rely on estimates provided here, EDMC will make the tapes available at the Iron Mountain facility as part of the government's requested inspection.

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 4

The second group consists of backup tapes from October 2009 to December 31, 2012.[5] For this period of time, EDMC's email backup is segregated to its own, identifiable set of tapes. Ex. 3, Siconolfi Decl. at ¶8. Also, during this time period, EDMC, in general, was backing up its email servers at least twice per month. *Id.* There are 70 sets of segregable and identifiable email backups that have not been restored for this period of time (EDMC has restored two sets for October 2009), and each backup consists of between 8 and 11 tapes. *Id.* at ¶9. Using an average of 9 tapes per set, there are an estimated 630 tapes for this time period. Thus, for the two periods, there is a combined estimated total of approximately 2,331 backup tapes that would have to be restored. Ex. 4, Ardisson Decl. at ¶13.

To find out whether it was even possible to successfully restore backup tapes dating back some twelve years, EDMC asked bit-x-bit to restore four sets of backup tapes for the first period set forth above and one set from the second period.[6] For the February 2002, May 2008, and June 2008 backup tape sets—a total of 87 tapes—bit-x-bit was *unable to locate any* individual email accounts. *Id.* at ¶¶17, 21.[7] Thus, no email could be extracted from these tapes. Bit-x-bit was able to find extractable email for September 2009 and October 2009, a combined total of 48 tapes. *Id.* at ¶18. EDMC's vendor identified 165 email Exchange databases on 13 of the 48 tapes consisting of more than 49,000 .pst files. *Id.* Each .pst file is the equivalent of an individual mailbox. To confirm that email could be extracted, EDMC's vendor extracted the native email files for five custodians. *Id.* at ¶19.

Based on its restoration of five sets of tapes—only two of which contained extractable email—bit-x-bit estimated the cost of restoring all of EDMC's backup tapes from February 2002 to December 2012 and extracting email from those tapes. There are two different costs at issue: (1) the cost to restore the tapes to determine whether email exists; and (2) the cost to extract any email from those tapes, if email is found at all.

As explained above, there are an estimated 2,331 tapes that would require restoration. It costs $150 to restore a single tape. *Id.* at ¶24. To restore the estimated 2,331 tapes would cost approximately $350,000. *Id.* It would take EDMC's vendor seven to nine months to restore these tapes. *Id.*

---

[5] EDMC uses December 31, 2012, as an end date, which is the date the Court and the Special Master previously determined was a reasonable cutoff. *See* Order Adopting Special Master Report and Recommendation #4, at 1 [Doc 319] ("Further Ordered that Defendants shall extend the date parameters for their document searches to January 1, 2002 through December 31, 2012"). Of course, if EDMC were required to restore additional tapes after December 31, 2012, the effort and associated costs would increase.

[6] February 2002 was chosen because it is the first back-up in 2002. May and June 2008 were chosen because those tapes were created around the time Phil Clark, an Admissions Employee specifically identified in Paragraph 105 of the Second Amended Complaint, left EDMC. September and October 2009 were chosen to determine whether extractable email would exist around the time EDMC switched its email backups to dedicated tapes, which occurred in October 2009.

[7] As part of its inspection of EDMC's backup tapes, EDMC can make these 87 tapes available to the government so it can attempt to locate email.

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 5

      The government's demand that EDMC locate every Admissions Employee email that might exist on EDMC's backup tapes would require EDMC to then extract every email mailbox from the restored tapes. To extract all 49,000 mailboxes found for September and October 2009, the cost would be more than $500,000 for those two months alone. *Id.* at ¶25. Assuming that extractable email exists for each of the sets of backup tapes from September 2009 forward (but not before) and estimating 19,000 mailboxes per set, there would be more than 1,300,000 mailboxes. At $10 per mailbox, *the cost would exceed $13,000,000. Id.* at ¶26.[8] There, of course, would be additional costs to review that material and then process it for production.

## II.    EDMC's Back-Up Tapes Are Not Reasonably Accessible

      EDMC's backup tapes are inaccessible. "Accessible" and "inaccessible" are terms of art, developed through case law and ultimately incorporated into the Rules of Civil Procedure. *See, e.g.,* Adv. Comm. Notes to Fed. R. Civ. P. 26(b)(2)(B). "Inaccessible" sources are those "that are accessible only by incurring substantial burdens or costs," and discovery from such sources may only be obtained if "good cause" exists. *Id.* Backup tapes are "typically classified as inaccessible," *Major Tours, Inc. v. Colorel*, No. 05-3091, 2009 WL 3446761, at *3 (D.N.J. Oct. 20, 2009), particularly where the data is maintained for disaster recovery:

> [T]he data on a backup tape are not organized for retrieval of individual documents or files because the organization of the data mirrors the computer's structure, not the human records management structure. Backup tapes also typically employ some sort of data compression, permitting more data to be stored on each tape, but also making restoration more time-consuming and expensive, especially given the lack of uniform standard governing data compression.

*Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 319 (S.D.N.Y. 2003) (citation and marks omitted) (*Zubulake I*).[9] Numerous cases—including cases cited by the government—have confirmed that disaster-recovery backup tapes are inaccessible. *See., e.g., Calixto v. Watson Bowman Acme Corp.*, No. 07-60077, 2009 WL 3823390, at *11 (S.D. Fla. Nov. 16, 2009) (backup tapes kept for disaster-recovery purposes that stored "information in a compressed form that is not accessible unless it is reformatted" were not reasonably accessible due to estimated $40,000 burden).[10]

---

[8] As explained in the Ardisson Declaration, even if the parties were to agree to extract substantially few mailboxes, costs would remain extreme. The cost to restore and extract as few as 5,000 mailboxes per set of backup tapes from September 2009 to December 2012 could still exceed $2 million. Ex. 4, Ardisson Decl. at ¶¶27-28.

[9] In *Zubulake I,* the court found the backup tapes inaccessible despite the method of storage that created an index for each backup tape, allowing a "search through the tapes from the relevant time period" to determine which tapes contained relevant documents. *Zubulake I*, 217 F.R.D. at 314; *see also GE v. Wilkins*, No. 10-674, 2012 WL 570048, at *3 (E.D. Cal. Feb. 21, 2012).

[10] *See also Zubulake I*, 217 F.R.D. at 314, 320 (backup tapes sought "are not currently accessible" because the method of storage required each tape to be restored separately onto a hard drive, individual emails extracted and opened through Microsoft Outlook, and searched manually for relevance); *Helmert v. Butterball, LLC*, No. 08-342,

JONES DAY

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 6

      Given the costs and time involved, and as Mr. Miko confirmed without overstatement, restoring the more than 2,000 disaster recovery backup tapes at issue here would be a "monumental task." *See* Ex. 1, M. Miko Dep. Tran., 200:14-15.[11]   As explained above, restoring backup tapes to find email for *thousands* of employees would require the use of outside vendors, cost millions of dollars, and take many months to complete.  The data on EDMC's backup tapes is inaccessible.  *See, e.g., GE*, 2012 WL 570048, at *5 (data on backup tapes not reasonably accessible where cost to process and host data approached $2 million, plus $100,000 to catalogue, index, and search each tape); *Aguilar v. Immigration & Customs Enforcement Div.*, 255 F.R.D. 350, 360 (S.D.N.Y. 2008) (rejecting discovery of backup tapes where process of restoring and reviewing data would be extremely burdensome); *Helmert*, 2010 WL 2179180, at *8 (backup tapes inaccessible); *Johnson v. Neiman*, No. 09-689, 2010 WL 4065368, at *1 (E.D. Mo. Oct. 18, 2010) (backup tapes not reasonably accessible where thousands of tapes were at issue, each tape took several hours to restore, and estimated cost of each hour of work was $76.03).

      The scope of the government's requests—for the emails of thousands of employees—also compels the conclusion that the tapes are inaccessible.  As the government's own cases recognize, the scope of the requested information *must be limited* in some manner to render the burden of retrieval reasonable.  *See, e.g., Semsroth v. City of Wichita*, 239 F.R.D. 630, 638, 641 (D. Kan. 2006) (though party sought restoration of a single backup tape and identified email boxes of 117 custodians to be searched using 17 search terms, court considered cost of $3,374.95 troublesome and limited restoration to 50 email boxes and eliminated several generic search terms).[12]  The government's requests here are anything but limited.  The government demands that EDMC restore thousands of backup tapes to reconstruct data belonging to unnamed custodians identified only as "Admissions Employees"—who number in the thousands—which

---

(continued…)

2010 WL 2179180, at *8 (E.D. Ark. May 27, 2010) (tapes inaccessible where recovery involved a "server [that] must be built, [software] installed, and then the entire post office restored, a process which takes several days" at a cost of approximately $10,000).  The government cites *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003) (*Zubulake IV*) for the proposition that "[B]ackup tapes, however, should not be considered per se inaccessible."  Mot. to Compel at 8.  EDMC, however, can find neither this quotation nor the argument it purportedly supports in *Zubulake IV*.

[11]   The government claims that Mr. Miko testified that the backup tapes were "accessible."  Mot. to Compel at 4.  Even a cursory review of the transcript reveals that Mr. Miko was using the term "accessible," as any layperson would, to mean that he could physically locate them, not as the term is used in the Rules of Civil Procedure.  Mot. to Compel Ex. C, 200:17-19 ("Like, I can go get you the tape.  If you tell me to get the monthly back-up tape . . ., that's accessible.").

[12]   *See also Calixto*, 2009 WL 3823390, at *12-13(refusing to impose a "generalized search of all [defendant's] back-up tapes" but ordering defendants to retrieve a single backup tape, reasoning that production of single tape, rather than all "thirty-plus" tapes, was not an undue burden); *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 285 (S.D.N.Y. 2003) ("*Zubulake III*") (party requested information on backup tapes of only five employees); *Disability Rights Council of Greater Washington v. Washington Metro. Transit Auth.*, 242 F.R.D. 139, 147 (D.D.C. 2007) (party sought order that backup tapes be searched for information of "several persons they have identified by name"); *Major Tours, Inc.*, 2009 WL 3446761, at *3 (requests for search of backup tapes were specific where they sought relevant keyword searches for 37 identified custodians).

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 7

data may or may not exist on the backup tapes in the first place (and may exist from other accessible sources).  Additionally, the government's data demand extends from January 1, 2002 to present—more than twelve years.  Nowhere does the government explain any basis for seeking EDMC's backup tapes for such a lengthy period (when the Special Master and the Court have already concluded that December 31, 2012, is an appropriate cutoff and where litigation holds have been in place dating to 2010).  Nor does the government propose any sort of sampling that would limit the burden.  The government's broad requests increase the burden and further confirm that the tapes are not reasonably accessible.

At some level recognizing that its request, if granted, would impose enormous burden, the government preemptively argues that when "determining whether the cost of accessing ESI amounts to undue burden, courts consider the amount in controversy in the litigation."  Mot. to Compel at 11.  Yet *none* of the cases the government cites forces a party to restore backup tapes at a cost of millions of dollars—the order of magnitude of the costs the government would impose here.[13]  The government's position—that millions of dollars in restoration costs should be thrust upon EDMC—is utterly unjustifiable.  The request is more punitive than probative.  That data on the tapes is inaccessible.  The government's request should be denied.

## III.  Plaintiffs Cannot Establish the Good Cause Required to Restore the Data on the Inaccessible Backup Tapes

Because data on the tapes is not reasonably accessible, the government must prove that good cause warrants restoration and production of the data.  Rule 26(b)(2)(C) requires a balancing of the costs and potential benefits of discovery, taking into account seven factors:

> (1) the specificity of the discovery request; (2) the quantity of information available from other and more easily accessed sources; (3) the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources; (4) the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of the further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources.

---

[13] *See Zubulake III*, 216 F.R.D. at 287 (extrapolating that remaining tapes would cost $165,000 to restore); *Quinby v. WestLB AG*, 245 F.R.D. 94, 109-10 n.21 (S.D.N.Y. 2006) (discussing restoration and search costs of less than $250,000); *PSEG Power N.Y., Inc. v. Alberici Constructors, Inc.*, No. 05-657, 2007 WL 2687670, at *11-12 (N.D.N.Y Sept. 7, 2007) (dealing with method of production of emails rather than retrieval of information from backup tapes); *John B. v. Goetz*, 879 F. Supp. 2d 787, 882 (M.D. Tenn. 2010) (claimed multi-million dollar "burden" related primarily to the privilege review, not backup tapes; burden was not "undue" where there were already repeated judicial findings that defendant had violated children's rights); *Semsroth*, 239 F.R.D. at 640 (cost of $3,374.95 to retrieve single backup tape was not unreasonable, but "[h]ad the direct cost and expense of restoring and searching the back-up tape been larger in this case, as may often be the case with back-up tapes," the cost would have "easily supported a shifting of some of the costs to the" requesting party.").

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 8

Adv. Comm. Notes to Fed. R. Civ. P. 26(b)(2)(B); *see also Major Tours, Inc.*, 2009 WL 3446761, at \*2-3.

The government cannot establish good cause to require the production of EDMC's backup tapes because the government's request is entirely premature. Within the next month, millions of pages of emails from Admissions Employees will have been produced from accessible sources. "Plaintiffs should obtain and evaluate information from [reasonably accessible sources] before insisting that the responding party search and produce information contained on sources that are not reasonably accessible." *Kleen Prods. LLC*, 2012 WL 4498465, at \*18 (request to produce backup tapes premature where plaintiffs had not completed review of defendants' documents) (citation omitted). Thus, until this production is completed, it is not possible to conduct the Rule-required balancing test. The information needed to assess factors (2), (3), (4), and (5) is incomplete. Indeed, the very information the government seeks may, in material measure, be within the forthcoming productions from accessible sources.

Even on the incomplete record to date, each of the seven factors favors EDMC:

- First, the government's request that EDMC search more than a decade's worth of backup tapes—approximately 2,331 tapes—for any emails to or from thousands of Admissions Employees is anything but specific.

- Second, "a substantial amount of relevant information is available to plaintiffs from a number of more easily accessed sources." *Major Tours, Inc.*, 2009 WL 3446761, at \*3. For example, emails of current and former employees that have already been produced or will be produced likely contain email correspondence also found on the backup tapes.

- Third, with productions incomplete, the government cannot show that the information it seeks "is no longer available on more easily accessed sources." The data for key custodians has been produced, and additional email from more than 100 Admissions Employees will be in the governments' hands within the next 30 days. And, the government's demand includes periods after the litigation hold was issued (and even to present day), when email is likely to exist on accessible sources.

- Fourth, the likelihood of finding relevant, responsive information is low. As explained above, EDMC's vendor was unable to locate any email in the February 2002 restoration or the May and June 2008 restorations. This suggests that there may be little or no email available for the period in between. The government can use its inspection to see if it can locate any email during this period. EDMC only found extractable emails in September and October 2009, and these emails would be much more likely to still be available on accessible sources given the time frame. But because the government rushed to the Special Master rather than wait for an answer to its request to inspect EDMC's backup tapes, the government has no idea what exists. And, given the discovery end-date of December 31, 2012, nowhere does the

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 9

government explain how tapes for periods after that date are likely to have responsive information at all.

- Fifth, the predicted usefulness of this additional information is low.  If, as appears to be the case, extractable email files only exist for the later periods, this is more likely to be duplicative of what is already on accessible sources.  *See Major Tours, Inc.*, 2009 WL 3446761, at *4.  And, as explained above, the bulk of employee email was stored on local hard drives, not on the email servers.  That local email is not backed up at all.  Thus, restoration of backups would produce a limited subset of employee email (what exists at the end of a month and is saved on the email servers only) at very high cost.

- Sixth, although this case may involve issues of some import, EDMC has already provided extensive discovery and will provide much more from accessible sources—certainly discovery sufficient to assess the merit (or lack thereof) of the government's allegations of fraud.  To the extent that the public has an interest in this case, it can be vindicated without the need to impose additional, excessive costs on EDMC.

- Seventh, EDMC's resources are not unlimited.  It has already expended vast sums on retrieving, reviewing, and producing large quantities of electronic data.  No company can afford to pay, or should be ordered to pay millions of dollars more for document production efforts that are of marginal benefit.  The United States certainly has more resources than EDMC.

EDMC's backup tapes are inaccessible.  The government cannot show good cause to require EDMC to restore them.

## IV.  The Government Has Not Shown Spoliation.

The government ends its motion with the charge of spoliation.  The charge is as unwarranted as it is unfortunate—unfortunate, that is, that such an allegation should be raised as a final effort to bolster a premature and otherwise groundless motion.  The government argues that EDMC somehow should have anticipated that the government would allege "a widespread and complex fraud that will require massive discovery (of a direct and circumstantial nature) into Defendants' real compensation practices" [14] some *four years before* the United States itself—with full knowledge of the allegations of the sealed initial complaint—claims that it anticipated litigation. [15]  The government makes its spoliation argument for the sole purpose of seeking the implicit sanction of forcing EDMC to absorb the cost of restoring thousands of backup tapes.

---

[14] *See* United States' Supplemental Responses and Objections to Interrogatories at 2, attached as Ex. B to EDMC's Motion to Compel Supplementary Interrogatory Responses (March 4, 2014).

[15] Hummel Dep. Ex. 1 at 1 ("On April 29, 2011, the United States Attorney's Office and the Department of Justice decided to intervene in the case on behalf of the United States Department of Education.  The United States did not reasonably anticipate litigation in connection with this case before that date." (emphasis added)).

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 10

Spoliation requires four elements:  (1) the evidence was in the party's control; (2) the evidence is relevant to claims or defenses; (3) there has been actual suppression or withholding of evidence (meaning that a party acted in bad faith); and (4) the duty to preserve was reasonably foreseeable.  *See Duffy v. CEVA Logistics, US, Inc.*, No. 12-236, 2013 U.S. Dist. LEXIS 183999, *5 (W.D. Pa. Dec. 31, 2013), *adopted by* 2014 WL 241745 (Jan. 22, 2014).   The party alleging spoliation has the burden to prove each element.  *In re Delta Airlines*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011).  The government cannot meet its burden.

The premise of the government's argument—that EDMC was required to preserve every shred of ESI from its Admissions Employees and other electronic data and paper documents yet undescribed before this litigation was unsealed in May 2011—fails out of the gates.  The duty to preserve attaches when a party reasonably foresees litigation and, only then, to the evidence the party reasonably believes is relevant.  *Hixson*, 2013 WL 3677203, at *5 ("[A] party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of its business."); *Zubulake IV*, 220 F.R.D. at 217 ("Must a corporation, upon recognizing the threat of litigation, preserve every shred of paper, every email or electronic document, and every backup tape?  The answer is clearly, 'no.'").

The government does not dispute that EDMC issued a litigation hold for this case after the partial unsealing of the complaint in 2011.  *See* Mot. to Compel at 22.  The government ignores altogether that EDMC had already issued multiple litigation holds beginning in May 2010 for litigation and investigations in other matters that involved admissions policies.  *See* Ex. 2, Miko Dep. Ex. 1, Memory Aid at 1.  The government nowhere argues that these litigation holds were insufficient given EDMC's knowledge at the time.

Nothing the government does argue suggests that EDMC should have preserved every Admissions Employee email since 2007 (or at any other time before EDMC's preservation efforts began in 2010).  The government's argument that EDMC had to preserve evidence starting in 2007 is based on two communications from Relator Mahoney and his counsel to EDMC.  *See* Mot. to Compel at 19-20 and Exs. I-J.  Mr. Mahoney and his lawyer, while threatening unfortunately all-too-routine (for any employer) employment discrimination claims, also indicated that he "was considering the possibility of pursuing related whistleblower reports." *Id.,* Ex. I at 3.  Mr. Mahoney demanded that EDMC pay him the sum of $140,000 to resolve his "claims."  These employment and otherwise undifferentiated threats of suit in no way put EDMC on notice of the *qui tam* lawsuit putatively implicating billions of dollars that the government would unseal some four years later.  *See United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (concluding that allegations of fraud, which were determined to be unsupported, did not put defendant "on notice of potential litigation, much less a specific, future qui tam lawsuit"); *see also EEOC v. New Breed Logistics*, No. 10-2696, 2012 WL 4361449, at *6 (W.D. Tenn. Sept. 25, 2012) (no duty to preserve where the defendant was not advised of the

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 11

broader allegations prior to receiving the complaint).[16]  And, in fact, Mr. Mahoney did not even join this litigation as a relator until April 2011.[17]

Next, the government cites a conversation between Tom Hylden, a lawyer for EDMC, and an attorney for the United States in March 2008.  Mot. to Compel at 20.  The government recounts *no* details regarding that conversation except that Mr. Hylden sought the name of the lawyer handling the *Washington* investigation.  Nowhere does the government explain what, if anything, Mr. Hylden may have known or learned at this time about the referenced investigation.  This conversation, if it ever occurred, cannot satisfy the government's burden to prove that EDMC could reasonably foresee in March 2008 that every Admissions Employee email should be preserved.[18]

The government then suggests that the mere fact that EDMC hired former University of Phoenix employees in 2008 should have put EDMC on notice of what would later be unsealed as this *qui tam* action against EDMC.  The ground for this suggestion—a non sequitur—is simply this:  The University of Phoenix faced investigations and litigation related to the ICB; EDMC should have known the government would sue EDMC if and when it hired anyone who used to work there.  *Id*. at 21.  The government then speculates about what these new employees must have known about the allegations concerning their former employer and that they should have "reasonably foreseen" litigation against EDMC for this reason.  Speculation is not evidence.  And the government's spoliation charges are worse than groundless.[19]

The government has not come close to meeting its burden to show that EDMC had some obligation four years before the complaint was unsealed to save every shred of ESI relevant to

---

[16] The government argues that the September 2007 letter must have put EDMC on notice because EDMC alleges that is the date on which Mr. Mahoney anticipated litigation.  This is absurd.  A party initiating litigation and a party defending litigation will anticipate litigation at different times.  *Spanish Peaks Lodge, LLC v. Keybank Nat. Ass'n*, No. 10-453, 2012 WL 895465, at *1 (W.D. Pa Mar. 15, 2012).  Accordingly, evidence supporting a defendant's notice will be different than evidence supporting a plaintiff's notice.  *Id*. at 1-3 (explaining service of a complaint will typically trigger the duty to preserve for a defendant, whereas communications evidencing serious contemplation of litigation will trigger the duty to preserve for a plaintiff); *see also Anderson v. Sullivan*, No. 07-111, 2013 WL 4455602, at *10-11 (W.D. Pa. Aug. 16, 2013) (concluding that a letter from plaintiff's attorney that plaintiff believed she was being treated unfairly did not put defendant on notice of the potential litigation).

[17] *See* Relators' Opposition to EDMC's Motion to Dismiss at 42 [Doc 159] ("On April 1, 2011, this Court granted relator Lynntoya Washington's motion to amend her complaint in order to add Michael T. Mahoney as a co-relator . . . .").

[18] The government argues in a footnote, and EDMC responds in kind, that two communications in which lawyers for EDMC asked to discuss *qui tam* cases with the government gave rise to a duty to preserve in 2010.  *Id*. at 21 n.10.  But nothing about these communications seeking to talk with the government suggests that EDMC should have known to preserve every Admissions Employee email.  And, as the government knows, EDMC had multiple litigation hold notices in place in 2010.

[19] Under the same logic, given that the United States sued the University of Phoenix, it should have anticipated litigation against other for-profit schools years before the government's claimed April 2011 date for anticipating litigation here.

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 12

that unseen complaint.  If the government wanted EDMC to know about the broad sweep of the allegations in this case, the government should have told EDMC.[20]

Besides failing to show a duty to preserve all Admission Employee email as early as 2007, the Government makes no showing at all of the "pivotal" element of bad faith.  *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 79 (3d Cir. 2012) ("[A] finding of bad faith is pivotal to a spoliation determination.").  Indeed, the government's motion *admits* that any loss of evidence was the result of routine business practices.  Mot. to Compel at 22.  The routine destruction of documents, standing alone, does not support a finding of an intent to destroy evidence.  *Chirdo v. Minerals Techs., Inc.*, 2009 WL 2195135, at *2 (E.D. Pa. July 23, 2009) ("no evidence that defendants intentionally destroyed" certain documents because they "were destroyed pursuant to the company's document retention policy, which properly accounts for the failure to produce those e-mails.").  Without bad faith, there is no spoliation.

And before imposing the sanction the government seeks—the costs of restoring thousands of backup tapes—the government would have to establish that it is somehow prejudiced by the alleged loss of evidence.  *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).  Given that millions of pages of ESI from Admissions Employees remain to be produced and that this data source may only serve to refute the claims the government pursues, the government cannot show such prejudice.

The government has not met its burden to prove the elements of spoliation, nor has it established any basis for (effectively) sanctioning EDMC by forcing it to restore backup tapes at the cost of millions of dollars.[21]

## V.    Conclusion

For all of the reasons set forth here, the government's motion to compel the restoration of backup tapes should be denied.

Sincerely,

/s/  Laura E. Ellsworth

Laura E. Ellsworth

Enclosures

---

[20] EDMC, if so notified, could have taken steps to preserve information, including exculpatory evidence. That opportunity was lost through no fault of EDMC.  EDMC reserves the right to seek appropriate relief in the form of sanctions or otherwise for having been deprived of the referenced opportunity.

[21] The government alleges that EDMC spoliated evidence between 2007 or 2008 and 2011.  No where does the government explain why forcing EDMC to restore back-up tapes that both pre-date (all the way back to January 2002) and post-date ("to present") this alleged spoliation is the logical consequence.

JONES DAY

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 13

cc:     Christy Wiegand, Esq.
        (*via e-mail and Overnight Delivery*)
        Christy.Wiegand@usdoj.gov

        Christina Calce, Esq.
        (*via e-mail and Overnight Delivery*)
        christina.calce@gmail.com

JONES DAY

The Honorable Richard A. Levie (Ret.)
March 12, 2014
Page 14


bcc:    Gina Vadala