## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2:07-cv-00461-NBF |
| | ) | |
| v. | ) | Hon. Nora Barry Fischer |
| | ) | |
| EDUCATION MANAGEMENT LLC, *et al.*, | ) | Electronically Filed Document |
| | ) | |
| Defendants. | ) | |

## REPLY IN SUPPORT OF PROJECT ON PREDATORY STUDENT LENDING'S MOTION TO INTERVENE

### INTRODUCTION

The law has long been clear that where a protective order impedes a party's access to information under state or federal law, that party may intervene to challenge the protective order. Here, the Project on Predatory Student Lending sought information from the Government—documents originally produced in this litigation—pursuant to the Freedom of Information Act ("FOIA"). The Government relied on the protective order entered in this case—an order that explicitly states that it may not be used for that purpose—and Education Management Corporation ("EDMC")'s confidentiality designations under that order—designations that have never been supported by a showing of good cause—to deny the Project's request. The Project, therefore, should be permitted to intervene to challenge that reliance.

### ARGUMENT

### I.    The Project on Predatory Student Lending Has Standing.

The requirements for standing are well-known. To have standing, a party must (1) have suffered an injury that is "both concrete"—that is, "actually exist[s]"—and "particularized"—that is, "affect[s]" the plaintiff "personal[ly]." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1545,

1548 (2016). [1]  This injury must be (2) "fairly traceable" to the challenged "conduct" and (3)

"likely to be redressed by a favorable judicial decision." *Id.* at 1547.  The Project easily meets

this standard.[2]

There is no dispute that the inability to obtain information under FOIA is a concrete

injury sufficient to support standing.  *See, e.g.*, *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S.

440, 449 (1989) (collecting cases); *see also Spokeo*, 136 S. Ct. at 1549 (when Congress

"decide[s] to make" information "public," the inability to obtain that information is a concrete

---

[1]      Internal quotation marks and citations omitted throughout.

[2]      In the context of intervening to challenge a protective order, the Third Circuit has
summarized these requirements as requiring that a prospective intervenor show that the
protective order is an "obstacle" to the intervenor's "attempt to obtain access" to documents.
*Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 777 (3d Cir.1994); *accord United States v.
Wecht*, 484 F.3d 194, 203 (3d Cir. 2007).  Contrary to the Government's contention, this is not a
lower standard than that established by the Supreme Court—it is merely an application of that
standard to the context of challenging a protective order: The injury in this context is the inability
to access documents.  If the protective order is an "obstacle" to accessing those documents, the
injury is thus traceable to the order.  And modification of the protective order would redress the
injury.

EDMC argues that "much has changed . . . since *Pansy* was decided," though it doesn't
specify precisely what.  EDMC Br. 10.  And the Government goes further and contends that
*Pansy* is no longer good law, though it doesn't cite any case law saying so.  Gov't Br. 12.
Neither EDMC nor the Government mentions that *Pansy* does not stand alone.  Since it was
issued, the Third Circuit—and district courts within it—have reaffirmed—and continued to rely
on—its formulation.  *See, e.g.*, *Wecht*, 484 F.3d at 203; *United States v. Territory of the Virgin
Islands*, No. CV 1986-0265, 2015 WL 6459938, at *2 (D.V.I. Oct. 26, 2015); *In re Motions for
Access of Garlock Sealing Techs. LLC*, 488 B.R. 281, 295 (D. Del. 2013); *see also Ford v. City
of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001) (adopting "obstacle" formulation established in
*Pansy*).

*Pansy* relied on the same three-pronged test for standing (injury, traceability, and
redressability) that still applies today.  *See Pansy*, 23 F.3d at 777.  And contrary to the
Government's contention, the injury-in-fact requirement has not been "re-formulated" since
*Pansy* was decided, Gov't Br. 12.  *See, e.g.*, *Finkelman v. Nat'l Football League*, 810 F.3d 187,
193 (3d Cir. 2016) (describing the injury requirement in precisely the same terms as *Pansy*
("distinct and palpable")).  To the contrary, in its most recent case on the injury-in-fact
requirement, the Supreme Court relied on the cases *Pansy* relied on, and reaffirmed the
"principles" they established.  *See Spokeo*, 136 S. Ct. at 1547-49.

In any case, the Project's standing does not depend on *Pansy*'s formulation.  The Project
has standing regardless of whether the question is framed as whether the protective order is an
"obstacle" to the Project's ability to obtain documents under FOIA or as whether the
Government's reliance on the protective order to deny the Project's FOIA request—despite no
good cause ever having been shown for keeping any of the information secret—is fairly traceable
to the protective order and redressed by an order requiring that good cause be shown.

injury).

And although EDMC contends otherwise, the Government has admitted that it relied on the protective order—and EDMC's confidentiality designations pursuant to that order—in denying the Project's FOIA request.  *See* Gov't Br. 5, 14-15.  Thus, the denial of the Project's request is, at least in part, traceable to the protective order and EDMC's confidentiality designations.

This reliance on a protective order—which explicitly states that it does not constitute good cause for keeping any information secret—and confidentiality designations—which have never been supported by a showing of good cause—to withhold information under FOIA is certainly redressable by an order from this Court clarifying that the Government may not rely on the protective order, in and of itself, to withhold information, and requiring that EDMC demonstrate good cause for the continued secrecy of information responsive to the Project's FOIA request.

Thus, the Project meets all three standing requirements: Its injury—the withholding of documents based on an umbrella protective order that explicitly doesn't justify such withholding and confidentiality designations unsupported by a good cause showing—is traceable to the protective order (and the confidentiality designations pursuant to it) and redressable by an order from this Court preventing the Government from withholding documents based on the protective order unless good cause is shown.

Nevertheless, EDMC and the Government raise a host of objections to the Project's standing.  They are all meritless.

**2.** Their primary objection is that the protective order is not the sole reason the Government denied the Project's FOIA request—the Government also cited four FOIA exemptions it asserted applied to the requested information.  EDMC Br. 6; Gov't Br. 14-15.  This objection is framed in multiple ways, but essentially, the argument is that the Project lacks standing to challenge the Government's reliance on the protective order until it has succeeded in

challenging the FOIA exemptions—and therefore proven that the protective order is not just *an* obstacle, but the *sole* obstacle to its FOIA request.  *See* EDMC Br. 12-14; Gov't Br. 14-15.  In their view, standing requires not merely that an injury be "fairly traceable" to the conduct a party (or in this case, an intervenor) seeks to challenge, but that the party "prove" that "but for" the challenged conduct, the injury would certainly not occur—i.e., that the challenged conduct is the *only* cause of the injury.  *See* EDMC Br. 9-14; Gov't Br. 14-15.  This is not the law.

Indeed, if it were, the Project would *never* have standing to challenge the denial of its FOIA request.  If, as EDMC and the United States suggest, the Project brought a lawsuit to challenge the FOIA exemptions before it challenged the protective order, the same standing objection would apply: The FOIA exemptions were not the sole basis for the Government's denial of the Project's request.  Therefore, the Government could argue that even if the Project succeeds in its FOIA lawsuit, it might still be able to withhold documents based on the protective order.  And thus, the argument would go, without a ruling on the protective order and EDMC's confidentiality designations thereunder, it is purely speculative whether the Project would ultimately be able to gain the relief it seeks—the information it has requested—and so the Project lacks standing.  On EDMC and the Government's view, the Project would not be able to challenge the Government's reliance on FOIA exemptions because the Government also relied on the protective order.  And it would not be able to challenge the reliance on the protective order because the Government also relied on the FOIA exemptions.

Fortunately, the law does not actually impose this catch-22.  In fact, the Third Circuit and the Supreme Court have both expressly rejected the argument that to have standing, the challenged conduct must be the sole possible cause of a party's injury.  *See, e.g.*, *Larson v. Valente*, 456 U.S. 228, 242-43 & n.15 (1982); *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 194 (3d Cir. 2004).

In *Larson*, for example, the Unification Church challenged the constitutionality of an amendment to Minnesota law, which provided that religious organizations could only be exempt from the reporting and registration requirements otherwise applicable to charitable organizations,

if more than 50 percent of the religious organization's funds came from its members.  *Larson*, 456 U.S. at 230.  (Before the amendment, all religious organizations were exempt, regardless of funding.  *Id.* at 239.)  The dissent argued that the Church lacked standing to challenge the amendment, because even if the Church succeeded in demonstrating that the amendment was unconstitutional, the state could still subject the Church to the reporting and registration requirements by demonstrating that it was not, in fact, a religious organization at all.  *Id.* at 239. The Court rejected this argument.  *Id.* at 243.

The Court held that the Church need not "show that [it is] certain, ultimately, to receive a religious-organization exemption from the registration and reporting requirements of the Act." *Larson*, 456 U.S. at 243 n.15 (1982) (emphasis omitted).  "[T]he relevant inquiry," the Court explained, "is whether the plaintiff has shown *an* injury . . . that is likely to be redressed by a favorable decision," not "that a favorable decision will relieve [its] *every* injury."  *Id.* (alteration omitted).  Thus, while the Court recognized that the "Church may indeed be compelled, ultimately, to register under the Act on some ground other than the fifty per cent rule," the Court held that this fact did "not deprive [it] of jurisdiction."  *Id.* at 242.  The injury before the Court, it explained, was not *any* attempt to compel the Church to register, but solely the state's attempt to compel the Church to register based on the 50 percent rule.  *Id.*  That injury could be remedied by a declaration that the rule was unconstitutional.  *Id.*  That, the Court held, was enough.

Furthermore, the Court continued, it was not certain that the state would be able to demonstrate that the Church is not a religious organization.  *Larson*, 456 U.S. at 243.  "At the very least," therefore, a declaration that the 50 percent rule was unconstitutional "would put the State to the task of" attempting to do so.  *Id.* at 243.  Requiring the state to overcome this obstacle before it could compel the Church to register was, in and of itself, the Court held, "substantial and meaningful relief."  *Id.*

So too here.  It is by no means certain that the Government will be able to withhold all of the information the Project seeks based on the FOIA exemptions it cited.  To the contrary, as explained in the Project's opening memorandum in support of clarifying or modifying the

protective order, while these exemptions will almost certainly justify *redacting* some of the information the Project seeks, it is exceedingly unlikely that *all* of the information the Project has requested may be withheld on this basis.  *See* Doc. 459, at 11-12.  The FOIA exemptions the government cited are, essentially, for private personal information and confidential business information.  It is extremely doubtful that the information the Project seeks—including complaints EDMC received about its recruiting process and information regarding alleged misrepresentations or misconduct by recruiters—is entirely composed of private personal information and confidential business information.  At the very least, eliminating the Government's ability to rely on vague assertions about the protective order—which, again, does not actually purport to protect anything—and confidentiality designations, unsupported by good cause, will "put" the Government "to the task" of demonstrating that the exemptions it relied upon do somehow permit it to withhold, in its entirety, the information the Project seeks.  That is, as *Larson* puts it, "substantial and meaningful relief."

The Third Circuit's decision in *Khodara* is even more on point.  There, a developer brought a lawsuit challenging a federal statute that prevented it from developing a landfill it wished to build.  *Khodara*, 376 F.3d at 192-93.  But in addition to the federal statute, there was a second, independent obstacle to the landfill: a state agency had—in the developer's view, erroneously—revoked the developer's permits to build it, a decision that could not be challenged in the same lawsuit as the challenge to the federal statute.  *Id.* at 191, 194.  Much like EDMC and the Government here, the Government in *Khodara* argued that the landfill developer therefore lacked standing to challenge the federal law, because that law was not the sole—or "but-for"— cause of its inability to build the landfill.  *See id.* at 194-95.  "[I]t is purely speculative," the Government argued, that the developer's "injury would be redressed by" a ruling that the federal statute was inapplicable or unconstitutional, for "even if the declaration were granted, the lack of state permits" could still "block the development of the landfill."  *Id.* at 194.

The Third Circuit, in an opinion written by then-Judge Alito, forcefully rejected this argument.  First, the court explained, because the developer "faces two, independent regulatory

obstacles that can only be attacked in separate proceedings, it makes sense to conceptualize [its] injury, not as the prohibition of its proposed landfill" in the general sense, but as the prohibition of its landfill by the challenged application of the" federal statute. *Khodara*, 376 F.3d at 194. "[U]nderstood in this way," the court observed, "both the causation and redressability prongs are plainly satisfied." *Id.*

Furthermore, the court continued, even if the developer's injury were defined more generally as "its inability to operate the landfill"—rather than its inability to do so because of the federal statute—the standing requirements would still be satisfied. *Khodara*, 376 F.3d at 194-95. As here, the Government's argument in *Khodara* "hinge[d] on the proposition that . . . the test for constitutional standing demands that the challenged conduct be a but-for cause of the plaintiff's injury." *Id.* at 195. The court refused to accept this contention. *Id.* Neither the Third Circuit nor the Supreme Court, the court explained, "has ever held that but-for causation is always needed." *Id.* "Moreover," the court continued, "it is well recognized that but-for causation is problematic in precisely the situation present here, i.e., where an effect is causally over-determined, i.e., where there are multiple sufficient causes." *Id.*

The court analogized the Government's standing argument to the "classic example in tort law . . . in which a person is simultaneously hit with two lethal gun shots fired at the same time by two hunters." *Khodara*, 376 F.3d at 195. Requiring "[b]ut-for causation" would "lead[] to the absurd conclusion that neither shot was the cause of the victim's demise," and neither shooter could be held liable. *Id.* Similarly, the court explained, the Government's standing argument would "lead[] logically to the conclusion that any litigation commenced by [the developer] to remove either of the two obstacles that prevent[ed] it from developing" the landfill "would fail Article III standards," because whichever obstacle the developer targeted, the other obstacle would still remain. *Id.* "Article III," the court concluded, "does not dictate such an absurd result." *Id.*

To the contrary, the court held that where a party "faces two, independent obstacles that are potentially removable but that cannot be challenged in a single litigation, . . . Article III

allows [it] to challenge each obstacle separately." *Khodara*, 376 F.3d at 195.

This conclusion squarely governs this case. Like the developer in *Khodara*, the Project "faces two, independent obstacles that are potentially removable but that cannot be challenged in a single" lawsuit: the protective order (and EDMC's confidentiality designations pursuant to that order), which must be challenged by intervening in this lawsuit, and the applicability of the four FOIA exemptions the Government cited, which must be challenged in a separate FOIA lawsuit. Under *Khodara*, the Project plainly has standing "to challenge each obstacle separately."

EDMC contends that the Third Circuit requires prospective intervenors to prove with certainty, at the time of intervention, that absent a protective order, they would have access to the information they seek. But none of the cases EDMC cites for that proposition actually says that. To the contrary, the cases EDMC cites stand, at most, for the proposition that where an intervenor seeks information from a private party, there must be some "reason to believe" that the private party "is willing" to provide that information. *FOCUS v. Allegheny Cty. Court of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996); *accord Pichler v. UNITE*, 585 F.3d 741, 749 (3d Cir. 2009).[3]

These cases don't even apply here. The Project doesn't seek information from a private party. It seeks information under FOIA. And, as the Third Circuit has explained, cases in which an intervenor seeks documents by statute are different than those in which an intervenor seeks information—and particularly speech—from a private party. *See Wecht*, 484 F.3d at 203.

---

[3]      *Pichler* does not hold otherwise. *Pichler* stands for the uncontroversial proposition that if it is *certain* that the intervenor *cannot* access the information it seeks, regardless of the protective order, the intervenor does not have standing because there is no possibility that it will ever receive the information it seeks. *See Pichler*, 585 F.3d at 753. In arguing to the contrary, EDMC pulls language from *Pichler* out of context. Contrary to EDMC's assertion, *Pichler* did *not* hold that an intervenor *must* demonstrate that a protective order is the but-for cause of its inability to obtain information. It simply stated that the intervenor in that case *had* argued that the protective order was a but-for cause of its inability to gain documents from the plaintiffs' counsel, and that this argument was incorrect. *See Pichler*, 585 F.3d at 746, 751.

Because there is no right to force a private party to speak, it makes sense that an intervenor

seeking access to private speech must demonstrate that there is some "reason to believe" the

party is actually "willing" to speak.  *See id.*  That concern is inapplicable where an intervenor

seeks access to documents that are made public by statute.  If the law requires documents to be

made available, it doesn't matter whether the Government is "willing" or not—it must release

them.

Even assuming the willing speaker standard was relevant here, the Project meets it.

There is certainly "reason to believe" that at least some of the information the Project seeks will

be available under FOIA.  As explained above, it is extremely unlikely that the FOIA exemptions

the Government cites will cover all of the information the Project seeks.  There is, therefore,

"reason to believe" that at least some information would be available.[4]

EDMC cites, and we have found, no case in which the Third Circuit has held that an

---

[4]      EDMC contends that in addition to the FOIA exemptions cited by the Government in
denying the Project's request, to succeed in its FOIA lawsuit, the Project will necessarily have to
overcome several other "hurdles."  EDMC Br. 13.  That's false.  It is the Government's burden
to identify and prove any justification for withholding information.  *See* 5 U.S.C. § 552(a)(4)(B).
And, as of yet, the Government has only identified the four FOIA exemptions in its letter, and it
has proven none of them.  It is pure speculation that the Government might choose to rely on one
of the other arguments EDMC hypothesizes might apply—and even further speculation that it
could succeed in withholding all of the information the Project seeks on that basis.  Indeed, in its
brief, the Government did not specifically identify *any* new arguments it plans to make with
respect to the Project's appeal of its FOIA denial.  And none of the arguments EDMC suggests
are likely to support withholding all of the documents the Project seeks.  *Cf. U.S. Dep't of Justice
v. Tax Analysts*, 492 U.S. 136, 145 (1989) (explaining that all records "create[d] or obtain[ed]"
by an agency that came "into the agency's possession in the legitimate conduct of its official
duties" are agency records subject to FOIA); 5 U.S.C. § 552(a)(8)(A)(i) ("An agency shall . . .
take reasonable steps necessary to segregate and release nonexempt information").
        In any event, at this point, EDMC's contention that there could possibly be some other
basis for withholding the records that the Government has not yet asserted is pure speculation.
And the Supreme Court has clearly and repeatedly held that a party does not lack standing,
simply because, hypothetically, it's possible that the injury it suffered could be inflicted in some
other way.  *See, e.g., Larson*, 456 U.S. at 242-43; *Duke Power Co. v. Carolina Envtl. Study Grp.,
Inc.*, 438 U.S. 59, 77-78 (1978) (explaining that "[n]othing in" the Supreme Court's case law
"requires a party seeking to invoke federal jurisdiction to negate . . . speculative and hypothetical
possibilities" that it could be injured by some other means).

intervenor lacks standing unless it can prove that a protective order is the sole but-for cause of its inability to obtain documents—let alone a case in which it has so held in a situation like the one here, where an intervenor faces two independent obstacles to obtaining documents, each of which must be challenged separately.  Such a holding would directly conflict with the Third Circuit's decision in *Khodara* and the Supreme Court's decision in *Larson*.  This Court should decline to adopt such a rule here.

 **3.** The Government raises two additional challenges to the Project's standing that EDMC does not join.  Both are meritless.  First, perplexingly, the United States contends that the denial of the Project's FOIA request does not "affect" the Project "in a personal and individual way"— that is, it contends the Project's injury is not particularized.  Gov't Br. 13.  The Government does not explain this contention, and it is obviously incorrect.  The Project does not seek to intervene out of an abstract concern for the lawfulness of EDMC's confidentiality designations or the Government's response to FOIA requests in general.  It seeks to intervene because the protective order in this case—and EDMC's designations pursuant to that order—are blocking the Project's access to information the Project itself seeks under FOIA.  This clearly specifically harms the Project—in other words, it is a particularized injury.  *Cf. Pub. Citizen*, 491 U.S. at 449–50 (explaining that "the fact that numerous citizens might request the same information under the Freedom of Information Act" does not mean that "those who have been denied access do not possess a sufficient basis to sue").

 Second, the Government asserts that it is not the protective order in and of itself, but "rather [EDMC's] designation of documents [as confidential] under the terms of" that order, that rendered "documents unavailable" to the Project.  Gov't Br. 13.  In the Government's view, this assertion somehow demonstrates that the Project lacks standing.  *See id.*  The Government's argument on this point is unclear.  Regardless of whether the Government erroneously withheld information based on the protective order itself—which explicitly states that it cannot do so—or the confidentiality designations—for which no good cause has been shown—the documents are being kept secret without a showing of "good cause."  That is the injury the Project seeks to

remedy here.  And, as explained above, it is redressable by this Court.

## II.    The Project Meets the Requirements for Permissive Intervention.

There is no dispute that "permissive intervention is appropriately used to enable a litigant who was not an original party to an action to challenge protective or confidentiality orders entered in that action." *Pansy*, 23 F.3d at 778.  That is precisely what the Project seeks to do here.  There is no reason it should not be permitted to do so.

### A.    The Motion to Intervene Need Not Be Accompanied by a Complaint.

The Government contends that this Court is required to deny the Project's motion to intervene, simply because it was accompanied by a motion to clarify or modify the protective order—rather than a complaint or an answer.  Gov't Br. 6.  This contention is meritless.

In arguing otherwise, the Government relies on an overly restrictive reading of Federal Rule of Civil Procedure 24—the rule governing intervention.  Rule 24 states that a motion to intervene must "be accompanied by a pleading that sets out the claim or defense for which intervention is sought."  Fed. R. Civ. P. 24(c).  Although Rule 24 does not define pleading, the Government nevertheless argues that the rule mandates that any party seeking intervention for any reason must file one of the specific pleadings listed in Federal Rule of Civil Procedure 7(a)—essentially, a complaint or an answer.  Gov't Br. 6.  And furthermore, it argues, where a party does not strictly adhere to this rule, courts are *required* to deny intervention.  *See id.* Neither is true.

Indeed, courts have repeatedly rejected the contention that a motion to intervene must be denied simply because the intervenor did not file one of the pleadings listed in Rule 7(a).  *See, e.g.*, *Amalgamated Transit Union, Local 1729 v. First Grp. Am. Inc.*, No. 2:15-CV-806, 2016 WL 520989, at *1 (W.D. Pa. Feb. 10, 2016); *New Century Bank v. Open Sols., Inc.*, No. CIV.A. 10-6537, 2011 WL 1666926, at *3 (E.D. Pa. May 2, 2011).

11

As one court in this district has explained, "[t]he purpose of requiring an intervenor to file a pleading is to place the other parties on notice of the position, claim, and relief sought by the intervenor." *Amalgamated Transit Union*, 2016 WL 520989, at *1.  Therefore, "courts . . . liberally construe[] the 'pleading' requirement of Rule 24(c) to embrace other filings as long as the documents filed clearly notify the original parties of the position the applicant intervenor will assert." *New Century Bank*, 2011 WL 1666926, at *3.  The Government does not dispute that it is aware of the relief the Project seeks—modification or clarification of the protective order.  That is sufficient.[5]

The Government's argument to the contrary relies almost entirely on the 2007 amendments to the Federal Rules, which replaced the word "shall"—as in, motions to intervene "shall be accompanied by a pleading"—with the word "must."  Gov't Br. 7.  But the Government fails to mention that the Committee notes to the amendments expressly state that the changes to Rule 24 were "intended to be stylistic only"—that is, they did not change the substantive meaning of the rule.  Fed. R. Civ. P. 24 advisory committee's note to 2007 amendment.  The Government also fails to cite even a single case that holds that Rule 24's shift from one synonym to another somehow requires that courts apply a narrow—and harshly unforgiving—reading to the Rule. And, indeed, as explained above, multiple decisions that post-date these amendments have rejected such a narrow reading.

Furthermore, whatever the general rule regarding intervention for purposes of becoming a party to the litigation, the Third Circuit—like courts around the country—has made clear that

---

[5] The Government's contention that the Project cannot intervene solely to challenge the confidentiality order, but instead must assert a claim or defense against *a party*, is plainly foreclosed by Third Circuit precedent.  As the Third Circuit explained in *Pansy*, simply by virtue of challenging the confidentiality order entered in a lawsuit, an intervenor automatically satisfies the requirement that it bring a claim that shares "a question of law or fact in common with the main action."  *Pansy*, 23 F.3d at 778.

intervention for the sole purpose of challenging a confidentiality order is different.  *See, e.g.*, *Pansy*, 23 F.3d at 792 n.7 ("The standards articulated in" cases governing traditional motions to intervene are "not helpful" and "do not control in cases" where the proposed intervenor "seek[s] to litigate an ancillary issue, such as a protective or confidentiality order."); *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045-46 (D.C. Cir. 1998) (motions to intervene for the sole purpose of challenging confidentiality need not abide by the "literal terms" of Rule 24, but instead require a "flexible reading" of the rule).

The Government has not cited—and we have not found—a single case holding that a motion to intervene for the sole purpose of challenging confidentiality must be accompanied by a complaint, rather than by the motion challenging confidentiality itself.  To the contrary, the Third Circuit has expressly *rejected* the contention that a party seeking to intervene solely to challenge a confidentiality order must do so via complaint.  *See Pansy*, 23 F.3d at 778 n.4; *see also Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 474 (9th Cir. 1992) (same).  This Court should do the same.

### B.   The False Claims Act Does Not Prohibit Intervention for the Limited Purpose of Challenging a Confidentiality Order.

The Government contends that the False Claims Act expressly prohibits intervention, even where an intervenor seeks solely to challenge a confidentiality order.  But that's simply not true.

The False Claims Act provides that "no person other than the Government may intervene or bring a related action based on the facts underlying [a] pending action" in a False Claims Act suit.  31 U.S.C. §§ 3730(b)(5).  As an initial matter, this prohibition is explicitly limited to "*pending*" actions.  All claims in this case have been dismissed.  *See* Docket No. 447.  The bar to intervention, therefore, cannot apply here.  *See Kellogg Brown & Root Servs., Inc. v. U.S., ex rel.*

*Carter*, 135 S. Ct. 1970, 1979 (2015) (holding that a claim "under the [False Claims Act] ceases to be 'pending' once it is dismissed").

Moreover, intervention for the sole purpose of challenging a confidentiality order is *not* "based on the facts underlying" a claim in a lawsuit—it is based on the confidentiality order entered in that lawsuit.  By the express terms of the statute, therefore, it is not prohibited—even if the lawsuit were still pending.  *Cf. U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 232 (3d Cir. 1998) (interpreting the statute as barring "later allegation[s]" if they "state[] *all the essential facts* of a previously-filed claim" (emphasis added)).

This interpretation accords with the purpose of the prohibition.  To aid the Government in discovering and combatting fraud, the False Claims Act permits private plaintiffs to sue for fraud on the Government's behalf—and, if successful, take a portion of the funds recovered.  *See LaCorte*, 149 F.3d at 230.  The Act's prohibition on bringing claims based on the facts underlying a previously-filed lawsuit seeks to prevent "parasitic suits"—lawsuits brought by parties who do not themselves discover fraud, but instead simply copy the allegations of a pre-existing complaint, hoping to share in the bounty.  *Id.* at 233.  As the Third Circuit has explained, these opportunistic lawsuits, if permitted, would diminish the incentive for those who actually discover fraud to bring a False Claims Act case, because they could be required to share their recovery with "dozens" of others who did nothing but copy their allegations.  *Id.* at 234.  Intervention for the sole purpose of challenging confidentiality does not raise these concerns.

On the other hand, prohibiting intervention in False Claims Act cases for the purpose of challenging confidentiality would raise serious constitutional concerns.  Not only would it prevent intervention to challenge protective orders governing discovery documents, it would also prevent the public from intervening in a case to challenge the sealing of court records— potentially infringing the common law *and First Amendment* rights of access to court records.  *See In re Cendant Corp.*, 260 F.3d 183, 198 n.13 (3d Cir. 2001) (explaining that there is both a common law and First Amendment right to civil court records).

The Government does not cite a single case in which a court has prohibited intervention

14

in a False Claims Act case solely to challenge confidentiality.  There are, however, several cases in which courts have permitted such intervention.  *See, e.g.*, *US ex rel. Mahmood v. Elizabethtown Hematology Oncology*, 2015 WL 6870140, at *1 (W.D. Ky. 2015); *US ex rel. Martin v. Life Care Centers of America, Inc.*, 912 F. Supp. 2d 618, 621 (E.D. Tenn. 2012); *US ex rel. Erickson v. University of Washington Physicians*, 339 F.Supp.2d 1124, 1125 (W.D. Wash. 2004).  This court should do the same.

### C.    Intervention Would Not Unduly Delay or Prejudice the Adjudication of the Original Parties' Rights.

Although the Government and EDMC protest the burdens they contend would result from requiring EDMC to justify its confidentiality designations with the good cause the law requires, neither party identifies any burden that will result from the Project's intervention, in and of itself. Nor could they.  This case is closed.  And the Project does not seek to reopen the merits.  Merely allowing the Project intervene for the limited purpose of challenging confidentiality does not, standing alone, affect any party's rights.  *See Pansy*, 23 F.3d at 780.  No party argues otherwise.

The Government and EDMC's arguments are, in fact, arguments on the merits of the Project's motion to clarify or modify the protective order—not on its motion to intervene.  But, however construed, they do not justify permitting the Government to withhold documents because of a protective order that explicitly does not provide good cause to withhold documents and confidentiality designations for which good cause has not been shown.

**1.** First, the Government argues that intervention "would upset the settled reliance interests" of the parties, explaining that the parties carefully negotiated and litigated the protective order entered at the beginning of discovery in this case.  Gov't Br. 16-17.  But the Project does not seek to change the terms of the protective order the parties so carefully negotiated.  It seeks to *enforce* those terms.  For the entire life of the case—and for months thereafter—the protective order provided that once the Government notified EDMC of a FOIA request, EDMC would, within ten days, seek a further protective order for any information it wished to keep confidential.  That is precisely what the Project seeks.  The Project does not

challenge the longstanding terms of the protective order upon which the parties relied to produce discovery, but rather the eleventh-hour change to that order—a change that was seemingly designed specifically to enable the Government and EDMC to keep documents secret, without having to show good cause for doing so.  The Government's argument that the parties should adhere to the protective order that was carefully considered and negotiated, rather than be subject to hasty after-the-fact changes, weighs in favor of granting the Project's motion.

**2.** Second, the Government contends that it would be burdensome for it to review the "propriety" of EDMC's "good cause justifications," and therefore all of the documents should just remain confidential.  Gov't Br. 17-18.  This argument makes no sense.  If the Government is truly worried about whether EDMC's confidentiality designations are properly supported by good cause, such that, ideally, it would prefer to review each designation itself, it is better for the Government if the Project's motions are granted.  At least then, *someone*—in fact, multiple people (the Project's counsel and this Court)—will be reviewing the designations, even if the Government cannot.  The Government's concern about improper confidentiality designations, in fact, supports the Project's motions.

**3.** The Government contends that the Project has moved to intervene too late in the litigation.  But as the Third Circuit has made clear, and as we explained in our opening brief, motions to intervene for the sole purpose of challenging confidentiality may be brought long after a case is closed, for they do not threaten to disrupt the adjudication of the merits of a case. *See Pansy*, 23 F.3d at 780; Project Br. Supp. Mot. Intervene 13-15.

The Government impugns the Project's motives for filing a FOIA request in the first place, arguing that because the Project did not file its request immediately once the case settled, "one can only question the degree of actual interest" it has in receiving the information it seeks. Gov't Br. 20.   Of course, the Project's motives are entirely irrelevant to the merits of its FOIA request.  *See U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749 (1989).  In any case, the Project has made clear why it seeks these documents: It advocates for students harmed by for-profit schools, and these documents will likely aid those students.  *See*

16

Minnesota Resp., Doc. 474, at 3 (explaining that these students—and "the public interest"—is "best served by the Project receiving access to at least a representative portion of the information produced by EDMC in this matter").  And, more generally, it seeks to inform the public about the predatory practices of for-profit schools, and it advocates for strong federal enforcement of rules intended to protect students from those practices.  These documents will help it better understand the practices of one of the largest for-profit education corporations and the basis on which the Government chose to settle its claims with that corporation.

Presumably, the Government does not actually believe that the Project would go to the trouble of not only filing a FOIA request but also litigating the denial of that request and attempting to intervene in this case to litigate the propriety of EDMC's confidentiality designations if it did not have a strong "actual interest" in receiving the information it seeks.

Aside from casting aspersions on the Project's motives, the Government has little explanation for its assertion that the Project's timing matters.  It states that some documents have already been destroyed.  But, if anything, this would seem to prejudice the Project, not the Government.  The Project is simply not entitled to documents that no longer exist.

The Government also states that its document review platforms have been taken down, but that too, should not prejudice the Government.  As an initial matter, the documents were apparently taken down from the document review platform before the parties even reached a settlement—so it would not have mattered if the Project intervened then, when the Government contends it should have.  Doc. 480-1, ¶ 18.

Moreover, it's not clear why the existence of a document review platform will alter the impact on the Government of the Project's motions.  Pursuant to FOIA, the Government was *already* required to identify the documents responsive to the Project's FOIA request; review them; determine what information could be withheld and why; and release the rest.  *See* 5 U.S.C. § 552(a)(6)(A)(i), § 552(a)(8)(A)(i) ("An agency shall . . .  take reasonable steps necessary to segregate and release nonexempt information").  The Government, therefore, should have *already* borne any burden caused by a lack of a document review platform—not as a result of the

17

Project's motion to intervene, but as a result of the federal statute (and the Project's request pursuant to that statute).  If the Project's motion to clarify or modify the protective order is granted, the only thing the Government will be required to do is provide information that it has already collected to EDMC, the Court, and the Project.  This is not a heavy burden.

To the extent the Government's complaint is that, despite its letter purporting to have properly responded to the Project's FOIA request, it did not actually comply with the statute—and therefore, if the Project's motion to clarify the protective order is granted, it would have to identify the documents responsive to the Project's request for the first time—this violation of the law cannot be a justification for denying the Project's motions.  The Government should not be permitted to thwart the Project's efforts to enforce FOIA by violating FOIA.  Moreover, the Government will presumably be required to comply with FOIA and identify the responsive documents in response to the Project's FOIA lawsuit.  So, even if the Government has so far failed to identify the documents responsive to the Project's request as the law requires, it will almost certainly be required to do so soon.  Doing so in response to an order from this Court will cause no extra burden.

**4.** While the Government argues that the Project's motion is too late, EDMC contends it is too early.  EDMC argues that it should not be required to move for a protective order, when the Government has not even informed it of which documents are responsive to the Project's request, and when it is not yet clear whether the Project will win its FOIA lawsuit.

EDMC is half right.  The Project agrees that EDMC should not be forced to simply guess which of the documents it produced in discovery the Government believes are responsive to the Project's request.  The Project's FOIA request covers only a small percentage of the discovery requests in this case.  *Compare* Doc. 459-3 (requesting documents responsive to 22 written discovery requests), *with* EDMC Br. 4 (noting that the plaintiffs in this case served "165 written discovery requests").  Therefore, as explained in the Project's reply in support of its motion to clarify or modify the protective order, the Project requests that the Court order the Government to inform EDMC of which documents are both responsive to the Project's request and marked

confidential.  As explained above, because the Government has already responded to the Project's FOIA request, it should have this information readily available.

There is, however, no reason to delay evaluating EDMC's confidentiality designations pending the Project's FOIA lawsuit.  EDMC's argument to the contrary is, essentially, a ripeness argument.  And, as explained below, it is meritless.

## III.   The Project's Motion to Intervene is Ripe.

EDMC's contention that the Project's motion to intervene is not ripe rests on the same flawed rationale as its argument that the Project lacks standing—the idea that the Project cannot challenge the Government's reliance on EDMC's confidentiality designations because the Government also relied on FOIA exemptions that have not yet been litigated.  This rationale is no more convincing in the guise of ripeness as it is in the guise of standing.

As an initial matter, this argument does not apply at all to any information the Government has withheld solely based on the protective order or EDMC's confidentiality designations thereunder—and not on any FOIA exemption.  The Project's success or failure in challenging the Government's claimed FOIA exemptions will have no impact on this information.  And therefore, at the very least, the Project's motion is ripe with respect to that information.

But the Project's motion is also ripe with respect to information that is both marked confidential and purportedly subject to a FOIA exemption.  EDMC's argument to the contrary leads to precisely the same catch-22 that the Third Circuit rejected in the standing context: The Project's challenge to the Government's reliance on the protective order would not be ripe until it had successfully challenged the Government's reliance on the FOIA exemptions.  But its challenge to the Government's reliance on FOIA exemptions would not be ripe until it had successfully challenged EDMC's confidentiality designations.

It simply cannot be that because the Project faces two obstacles to obtaining the information it seeks, neither challenge is ripe.  And, indeed, in *Khodara*, the Third Circuit rejected this catch-22 in the ripeness context, just as it did in the standing context.  See *Khodara*,

19

376 F.3d at 196.

EDMC offers no basis for believing that deciding the FOIA litigation first will be more efficient.  Doing so would simply shift the burden from EDMC to the Government.  If the FOIA litigation proceeds before EDMC is required to demonstrate good cause for its confidentiality designations, the Government will be required to justify the application of FOIA exemptions to information that may turn out to be legitimately marked confidential.  EDMC does not explain why this better than EDMC having to justify confidentiality designations for information that turns out to be exempt.  Indeed, because the protective order required EDMC to have a good faith basis for marking documents confidential in the first place—and because the law requires good cause to keep documents secret—it arguably makes more sense to decide the confidentiality issue first.

Moreover, contrary to EDMC's contention, if EDMC is permitted to wait until the Project's FOIA litigation concludes to decide whether to move for a further protective order—and to litigate that motion, if it chooses to make it—the Project's rights under FOIA will be further delayed.  And the students who have been victimized by the fraudulent practices the Government alleged were committed by EDMC in this lawsuit, will have to wait even longer to gain evidence that is likely to aid them in seeking relief.

## CONCLUSION

For the reasons stated above, the Project respectfully requests that this Court grant its motion to intervene.

Respectfully submitted,

PROJECT ON PREDATORY STUDENT LENDING

*/s/ Amanda Savage*
Amanda Savage (admitted *pro hac vice*)
MA 690938
Eileen Connor (admitted *pro hac vice*)
MA 569184
Legal Services Center of Harvard Law School
122 Boylston Street
Jamaica Plain, MA 02140

Tel.: (617) 390-2710
Fax: (617) 522-0715
asavage@law.harvard.edu

Jennifer Bennett (admitted *pro hac vice*)
CA 296726
Public Justice
555 12th Street, Suite 1230
Oakland, CA 94607
Tel.: (510) 622-8213
Fax: (510) 622-8155
jbennett@publicjustice.net

Dated: February 15, 2017                *Counsel for Proposed Intervenor*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 15, 2017, I electronically filed the foregoing Reply in

Support of Project on Predatory Student Lending's Motion to Intervene using the CM/ECF

system, which will send notification of such to all counsel of record.


*/s/ Jennifer Bennett*
Jennifer Bennett
Counsel for Proposed Intervenor
